## Jeffries v. Centre Life Insurance Company, et al.

## United States District Court, Southern District of Ohio,

## Western Division

## Case No.C-1-02-351

My name is Mary E. Fuller.   I am the sole owner of Disability Claims Consulting Services in Yarmouth, Maine.

My area of specialty is disability insurance, specifically: contract analysis, claims practices and procedures, and underwriting.  I have worked in the field of disability insurance for approximately 17 years.  I was employed by a company formerly known as Unum, now UnumProvident.  I was a Supervisor in Individual Disability Claims from 1982-1984; from 1984-1988, I was Assistant Vice President of Individual Disability Underwriting.  During the years 1991-1995, I was Director of Individual Disability Benefits and managed the individual disability claims within the Western region of the United States.  I was Assistant Vice President of Claims from 1995-1997 and managed the Psychiatric and Complex Claims Units.  I was Vice President of the Individual Disability Benefits Department from 1997-1999, where, among other things, I was responsible for the oversight of all pending claims as well as initial liability decisions for all impairment groups.  I was Vice President of the Psychiatric and Cardiac Claim Units from 1999-2001 and had full responsibility for the management of that block of business. In my current private practice, I specialize in insurance matters and serve as a consultant on disability insurance claims handling issues.  My Résumé is attached as EXHIBIT II.

In April of 1996, Mr. Jeffries was issued a policy by Massachusetts Casualty Insurance Company in the amount of the amount of $5,000 as a part of a Guarantee Issue underwriting program. The policy contained a 90-day elimination period and a benefit period for accident and sickness of 60 months. Mr. Jeffries' policy contained riders for non-disabling injury, residual disability, and double dismemberment or loss of sight. In 1997 and again in 1998, the policy was increased, with benefits to age 65. Mr. Jeffries occupation in 1998 was Vice President of Banking for Provident Bank.

## Contract Provisions

Mr. Jeffries' policy states, "Total Disability and totally disabled means that due to injury or sickness the insured:

> 1. Is substantially unable to perform the material duties of his/her occupation; and
>
> 2. Is receiving care by a physician that is appropriate for the condition causing the disability. We will waive this requirement when continued care would be of no benefit to the insured."

The Insured's Occupation means the occupation (or occupations, if more than one) in which the insured is regularly engaged at the start of the period of disability. In the event (a) the insured shall retire prior to the Period of Disability, and (b) the insured is also not engaged in another occupation, the Insured's Occupation shall mean the normal activities of a retired person of like age, sex, and good health."

Mr. Jeffries' policy has an undated amendment to his policy that states:

"Mental Disorder or Substance Use Disorder Limitation: "If a Total Disability or other covered loss is due to a Mental Disorder and/or Substance Use Disorder, the number of months for which any benefits for Total Disability shall be payable under the Policy during the lifetime of the insured shall not exceed in the aggregate a total of 24 months."

**Residual Disability** prior to the commencement date means: "Due to injury or sickness

2

     a.  You are unable to perform one or more of the substantial and material duties of your work; or you are not able to perform such usual daily duties for as much time as it would normally take you to perform such; and

     b.  You have a loss of net income; and

     c.  You are receiving medical care by a physician, which is appropriate for the condition causing you the disability. We will waive this requirement if it can be shown that continued care would be of no benefit to you."

This term "on or after the Benefit Commencement date" means you are no longer required to have a loss of duties or time. Residual Disability then means that, due to the same injury or sickness:

     a.  "You have a loss of net income; and

     b.  You are receiving medical care by a physician that is appropriate for the condition causing your Loss of Net income…." (Claim 540)

### Materials Reviewed

Documents that I reviewed in preparation of this report included the entire DMS and Prudential claim files as produced in discovery, the underwriting file an Affidavit dated July 10, 2003 signed by Dr. Gerier and Defendants first and second responses to interrogatories.

I have attached as **EXHIBIT I** my Chronology used for the purpose of developing my opinion on this case.

## Summary and Opinion

Based on my review of the material and the attached chronology (Exhibit I), it is my opinion that DMS failed to comply with Industry Fair Claims Practice Standards and acted in Bad Faith in the administration of Mr. Jeffries claim for all of the reasons identified below:

### I. To investigate fully the relevant and applicable facts;

1.      At the onset of the claim, DMS asked Mr. Jeffries' employer to complete a detailed questionnaire regarding his occupational duties. The employer complied with that request in a timely fashion, including the submission of a detailed job description and salary information. They indicated at that time that they were not able to hold his position open because of business necessity. There was no vocational analysis done by staff at DMS at that time, or at any other time, nor were there any indications that DMS had any issues with the information that Mr. Jeffries and his employer had provided.

2.      DMS proceeded to conduct an extensive investigation into the financial and occupational aspects of the claim. In fact, one month after accepting liability on the file, although the information requested was extensive and provided a wealth of information regarding Mr. Jeffries' business and personal life, the majority of what Mr. Jeffries was required to produce was irrelevant and could, in my opinion, easily be construed as an invasion of privacy. DMS attempted to gain access to Mr. Jeffries' travel information through a special investigation data base check, and did not have proper authorization to obtain the records; they required that Mr. Jeffries produce a copy of his passport for the last five years, and a list of the names and phone numbers of every hotel he stayed in. This request was irrelevant to the Disability determination and represented pure harassment, as was evidenced by the threat to terminate benefits for his failure to produce those records. Mr. Jeffries' employer had already reported that extensive travel was a part of his job and that Mr. Jeffries traveled more heavily than others in the company.

3.      It is not unusual for an insurance company to do an earnings check or request tax returns on a residual claim, but earnings are not relevant in determination of total disability. The requirement that Mr. Jeffries not only provide tax returns but that he provide authorization to DMS to obtain his return directly through the IRS was completely unwarranted.

4

4.      Insurance companies may sometimes do bankruptcy checks to see if there may be financial factors contributing to the claim in some way. DMS not only did extensive data base searches of Mr. Jeffries' real estate holdings, automobile holdings, and court records, they completed an urgent request for a data base search to determine whether Mr. Jeffries or any of his family members, including his wife and children, were recipients of trust funds, a fact that had absolutely nothing to do with his claim

5.      Mr. Spencer McNeil had accepted liability on Mr. Jeffries' claim in April of 1999, based on medical records contained in the file from Dr. Dunn, and Dr. Luggen; he requested further records from Drs. Young, Fessler and McCellan. DMS' in-house physician, Dr. Hall, reviewed the file and supported impairment; following Dr Hall's review, additional records were received from Drs. Dunn, Fritz, Wallace, Kovacs, Jonas, Waisbren, Mannions, Reed, Young, and Luggen.

6.      Despite obtaining all of these records, and requiring Mr. Jeffries to submit monthly continuance of disability forms from his Attending Physician, it does not appear that DMS had a physician review any of these records. Ms. Palmer, a nurse case manager for Psychiatric Disability Consultants, conducted calls with Dr. McCellan and Dr. Luggen to obtain additional information; however, other than that, there was no medical review. Given the significant credentials of Mr. Jeffries' multiple treating physicians, it is not clear why DMS choose to have a nurse-level resource conduct the AP calls instead of Dr. Hall or other more highly trained medical resource, particularly in light of the extremely complex constellations of symptoms Mr. Jeffries was presenting.

7.      In October of 1999 Ms. Palmer inquired as to whether Dr. McCellan had considered a neuropsychological evaluation or whether consideration had been given to the possibility that Mr. Jeffries was suffering from somatization. Although Ms. Palmer raised the possibility of somatization in her call to Dr. McCellan, she did not challenge Mr. Jeffries' disability during her call, or raise any concerns about the legitimacy of the claim. Furthermore, although Ms. Palmer raised somatization briefly with Dr. McCellan, DMS did not do anything to pursue this as a possible cause of his impairment, through phone calls, narratives, or Independent Medical Exams.

5

8.      DMS' file did not include a file plan. It is clear from the aggressive way in which they investigated this file that they had concerns as to the legitimacy of the disability from the onset, although it is not clear why. Given the poor documentation in the file it was not possible to discern what specific issues DMS had, who had the concerns, or, why they had them. It is clear from the Prudential phone log documentation between Prudential and DMS, that DMS believed that Mr. Jeffries' claim was not legitimate however they did not elaborate as to what objective evidence they had to support their position. It is clear that surveillance activity was conducted for the sole purpose of attempting to prove fraud. The extent to which DMS conducted surveillance on this case was far beyond what one would normally see in a file, particularly given the massive amount of medical documentation. In addition to extensive medical records, the surveillance that was conducted showed minimal activity, and yet despite the fact that Mr. Jeffries' activity on surveillance was consistent with what he reported to DMS, they continued to order more. The techniques used by the surveillance vendor for pretext were highly questionable, DMS delayed response to Mr. Jeffries' inquires about the surveillance was unprofessional, the suggestion that it was not an invasion of privacy to have a delivery man come to the door and pretend to be looking for a signature is clearly beyond the normal pre-text investigation.

9.      On April 20, 1999 Dr. Hall from DMS reviewed the file and stated, "We have no choice but to follow the case on a monthly basis in the hopes that a diagnosis will be established and treatment undertaken that will hopefully prove effective." DMS did not do anything from the perspective of a medical investigation beyond the collecting of medical records for all of 1999 until June of 2000, when the file was referred to Dr. Garb for an independent review.  Dr. Garb's handwritten notes stated that Mr. Jeffries had received excellent medical care. All MDs did a complete workup; there are three diagnoses, cannot make one causality review.  He provided an extensive review of the records and noted, among other things, "The greatest diagnostic difficulty in this case centers around the suggestion of some poorly-defined type of autoimmune process. Some objective diagnostic tests suggest that such a process may be present. At this point, I think one can only say Mr. Jeffries may have a poorly characterized non-inflammatory autoimmune syndrome of uncertain etiology." He concluded, "The totality of these records does not indicate to me that Mr. Jeffries currently is unable to perform the duties of his occupation." Dr. Garb did not dispute Mr. Jeffries' symptoms; he acknowledged the presence of objective tests to support an autoimmune disorder, and yet DMS continued to view this claim as

6

though it was fraudulent. Dr. Garb failed to indicate the basis upon which he determined that Mr. Jeffries was not impaired. DMS did not appear to have this information reviewed by Dr. Hall, nor did they share this with any of Mr. Jeffries' Attending Physicians. Dr. Garb stated, "… unless disability is supported by rigorous neuropsychological testing, I feel he could resume work at this time." There was no request for an independent psychiatric medical exam made following Dr. Garb's review.

10.     DMS had access to a medical review from Prudential Insurance Company's consulting expert, Dr. Curran.  His review provided a history of the onset of symptoms, and as to the issue whether Mr. Jeffries' condition was related to his Hepatitis B vaccine he concluded, "…I would prefer the diagnosis of acquired autoimmunity..." Dr. Curran was asked to identify any discrepancies in the medical records and he stated, "I find no discrepancies."  There is no evidence that DMS's medical staff reviewed this medical record or that the claims were considered, or that there were two independent physicians supporting that it was likely Mr. Jeffries suffered from an autoimmune system problem, the cause of which was unclear. Given the medical conclusions of their own company experts, in combination with the opinions of Mr. Jeffries' doctors, it is not clear why DMS continued to challenge the legitimacy of Mr. Jeffries' symptoms.

11.     Ms. Palmer received a copy of Dr. McCellan's July 2000 phone conversation with her. He noted, "As stated in the past, there are no objective diagnostic markers which can be measured and followed in the disease."  DMS's medical investigation was focused on establishing an accurate diagnosis for Mr. Jeffries, despite being told on numerous occasions by multiple experts, including their own, that his case was complex and that any number of conditions could be the cause of his complaints. DMS never consulted with the Legal staff to determine the relevancy of diagnosis under these extremely unusual circumstances. World-renowned specialists could not agree on a diagnosis; however, none of them challenged Mr. Jeffries' symptoms, and the majority of them opined that the symptoms were consistent with an autoimmune disorder, regardless of the etiology.  DMS repeatedly refused to acknowledge that evidence.

7

12.    In November of 2000, Ms. Palmer recommended that they obtain an expert consultation on the thyroid problem, the infectious disease problem, and get a neuropsychologist.

13.    In June of 2001, Mr. Champagne, Vice President at DMS, indicated they were conducting a forensic review of the claim. The plan was to have a neuropsychological evaluation done. PDC was asked to arrange an IME. Mr. Jeffries had undergone a neuropsychological evaluation, which he submitted for DMS to review. The review was completed in October of 2001. Notes in the file indicated Dr. Clionsky did not agree with the interpretation of the neuropsych testing but, in the end their conclusions were similar... more current testing was needed." There were significant negotiations related to Dr. Clinosky and Dr. Bastien's interpretation of test results in the interim, one additional psych reviews were provided by Mr. Roberts from Dr. Sandman. Dr. Clionsky disputed the results of all three physicians. Benefits were denied without providing Mr. Jeffries physicians the opportunity to comment on the findings.


**II.  To fairly consider all information obtained including that which tends to favor claim payment or continuation as well as that which tends to favor declination or termination;**

1.    DMS considered evidence from Mr. Jeffries' physicians when accepting liability on the claim and continued to pay him benefits in accordance with the contract, based on the proof provided by his physicians. For the first eighteen months, only one physician-level medical review was completed by DMS. Following Dr. Garb's review in June of 2000, Ms. Palmer asserted; "We do not believe that any of Mr. Jeffries' treating physicians' records reflect persistent findings which would reflect occupational impairment. For that reason, we have not felt it necessary to arrange for an IME." Ms. Palmer's statements are completely improper. DMS had never challenged Mr. Jeffries' impairment. Immediately following her referral to Mr. Gelardi, the recommendation was made to have an IME.  Dr. Garb's review acknowledged that Mr. Jeffries 21 treatment providers were highly credentialed and provided excellent treatment, given Dr. Garb's opinion it is not clear why an IME was warranted. The aggressive pursuit of an IME, following Dr. Garb's review, was clearly inconsistent with the concept of considering

8

information that tends to favor claim payment. DMS efforts following Dr. Garb's review focused on finding information to terminate benefits.

2.      Mr. Jeffries treated with over 20 physicians throughout the US, Canada, and England. Each of the doctors identified a number of consistent complaints in each of the visits; Mr. Jeffries was given a variety of possible diagnoses, none of which could be confirmed completely by objective measures. Each examining doctor had a variety of potential diagnoses and treatment options which were offered to Mr. Jeffries, most if not all of which he tried; yet DMS repeatedly refused to accept Mr. Jeffries' claim as valid, simply because the experts were not able to identify with medical certainty exactly what was causing his complex symptomology.

3.      None of the medical reviews provided by either Mr. Jeffries' doctors, Prudential, or DMS suggested that Mr. Jeffries' complaints were not real or that they were inconsistent. None of the records from providers suggested  Mr. Jeffries was fraudulent or that he was a malingerer; however, despite the absence of any such observations by his treating doctors and the consulting doctors at DMS, they continued to disregard the opinions of experts.

4.      The consensus amongst providers was that Mr. Jeffries was suffering from some type of autoimmune disorder, the cause of which could not be determined with absolute certainty. DMS and their consulting physician, Dr Garb, suggested that there might be a neuropsych component involved in Mr. Jeffries' condition. Mr. Jeffries participated in two neuropsych evaluations which both suggested cognitive impairment, most likely neurologic in origin. Notes from the file indicate that Dr. Clionsky's conclusions were similar to those of Dr. Bastein, but that he had a different interpretation of the test results. Following an interchange between Dr. Bastein and Clionsky, it appears that DMS completely disregarded the validity of her report.

5.      A second report was submitted from Dr. Poser from Harvard Medical School, which was consistent with that of Dr. Bastein, but Dr. Clionsky, disregarded this. DMS insisted on obtaining Independent Medical Exams and were awarded that privilege through the court. Scheduling and completion of the exams occurred over several months with the results being reported in May of 2003.

6.      The Independent Medical Exam from Dr. Hastings stated that Mr. Jeffries was suffering
from a Cognitive Disorder, with <u>undetermined</u> etiology and Somatization Disorder, Severe. He
also stated, Rule Out Auto-Immune Disorder. The neuropsych exam acknowledged that Mr.
Jeffries was suffering impairment in function and that the etiology was not clear. It is apparent
that one of the explanations for Mr. Jeffries' symptoms was Somatization. However, numerous
physicians, including DMS' in house staff, acknowledged that he was suffering from some type
of autoimmune disorder, the cause of which may or may not have been the immunization. DMS
flagrantly ignored the evidence in support of an autoimmune disorder of unknown etiology.
DMS did not address the obvious co-morbid nature of Mr. Jeffries medical problems. There was
no evidence that DMS asked either the treating providers or Independent Medical Examiners to
comment on the likelihood that Mr. Jeffries' symptoms from autoimmune disorder were
exacerbated by his somatization and obsessive-compulsive personality. The likelihood that Mr.
Jeffries' psychological state was contributing to his existing symptoms and not the cause of his
symptoms was completely ignored.

7.      Generally, the mental and nervous limitations in disability policies do not pertain to
impairments that are physiological in nature. There was no evidence that DMS explored the
appropriateness of applying the limitation, knowing that the majority of the physicians in the file
acknowledged the presence of some form of autoimmune disorder contributing to his disabling
symptoms, therefore potentially precluding the use of the limitation in Mr. Jeffries case.

8.      The results of the IMEs were not shared with any of Mr. Jeffries' physicians for input,
despite their vast credentials. The claim was denied immediately following receipt of the IME
results.

9.      DMS was unfair and clearly biased. The focus of the investigation was their own self-
interest. Evidence of their bias is particularly clear in their complete disregard for the opinions of
the multiple treating providers. DMS had minimal contact with Mr. Jeffries' physicians, and
when they did, they utilized a nurse-level resource as opposed to someone of equal training and
experience. DMS never provided a written or oral presentation of Dr. Garb's opinion, nor did
they attempt to address the disparity of opinions between Dr. Garb and Mr. Jeffries' APs
regarding his work capacity.   DMS not only failed to share Dr. Garb's assessment of Mr. Jeffries

10

with any of his treating physicians, but DMS repeatedly challenged Mr. Jeffries for not providing objective evidence despite his having done so on numerous occasions. DMS accepted their own consultants' opinion with absolutely no objective medical evidence to substantiate it. DMS clearly was holding Mr. Jeffries to a much higher standard of proof than they required of themselves. In addition, they completely ignored a standard principle within the claims industry, that being, "When there is reasonable doubt, rule in favor of the insured." The medical evidence would suggest that there was more than enough evidence to support payment in the face of uncertainty as to the condition; Mr. Jeffries was clearly not given equal or fair consideration in the matter.

10.    Mr. Roberts retained a vocational expert to review Mr. Jeffries' claim. Ms. Baris conducted an extensive review of Mr. Jeffries' medical and occupational history and concluded that he would not be able to perform in his occupation due to his cognitive and physical limitations. This information was presented to DMS; however, there was no evidence in the records that any of DMS's medical or vocational staff reviewed the documents. In addition to completely ignoring Ms. Baris' review, DMS failed to conduct any type of vocational analysis or employability assessment during the claim, including at the point of denial, despite the fact that Mr. Jeffries had been out of the workplace for nearly six years.


### III. To promptly and timely pay benefits owed under the policy;

1.    The initial acceptance of liability was done in a timely manner; however, throughout, the claim benefits were threatened to be withheld or were withheld from Mr. Jeffries with no legitimate basis.

2.    In December of 1999, after paying benefits on the basis that Mr. Jeffries had been disabled since September of 1998, Mr. Gelardi wrote to Mr. Jeffries and told him that if he did not complete the progress statement he would be unable to proceed with the processing of his claim. At that time, DMS had numerous medial records from Mr. Jeffries' treating providers supporting impairment, and in fact, Ms. Palmer had just recently spoken with Dr. McCellan and

learned he was starting Mr. Jeffries on Gamma Globulin injections Ms Palmer did not challenge disability at that time.

3.    In addition, on November 8, DMS had received treatment records indicating that Mr. Jeffries had elevated CMV and EBV titers as well as herpes. It appears that benefits were stopped in December as February 24, 2000 phone documentation between prudential and DMS reflect that DMS had not paid Mr. Jeffries since December and that they were wondering where his money was coming from. It is not clear if the claim was closed on the system in December as no systems records were produced.

4.    In March of 2000, Mr. Gelardi issued a check to Mr. Jeffries for a three-month period with a Reservation of Rights. Mr. Gelardi said that they were waiting for additional claim related documents but did not specify what he was waiting for and also said if Mr. Jeffries had no objective documentation to submit that he would proceed with processing based on what he had. Payment continued to be made but with a Reservation of Rights, despite continued certification of disability from his physicians.

5.    In October and November of 2000, Mr. Jeffries' attorney, Mr. Roberts, had to intervene to obtain past due benefits which were withheld pending receipt of Mr. Jeffries' passport, travel schedule and daily activity log. Benefits were issued in December.

6.    In April of 2001, Mr. Gelardi wrote to Mr. Jeffries and told him that his claim had come up for periodic review and that no further benefits would be issued until they received the information that they had requested including an unaltered authorization. Benefits were not issued again until July 23.

7.    On February 21, 2002, Mr. Graff removed Mr. Jeffries' policy from waiver and, on February 28, 2002, Mr. Graff closed Mr. Jeffries 'claim while Mr. Champagne, Assistant Vice President of Claims was discussing the possibility of settlement with Mr. Roberts. Mr. Graff closed the claim without any notice to Mr. Roberts or Mr. Jeffries, one month before Dr. Clionsky's review of records from Dr. Sandman and Dr. Poser.

8.      On April 2, 2002 one month after the claim had been closed on the system, Mr. Jeffries was notified through his agent that the policy premium was due on March first and that failure to pay by March 30th would result in the lapse of his policy.

9.      On April 25, 2002 Mr. Champagne verified that no further benefits were forthcoming.

10.     In November 2002, following a mediation with the court, Mr. Roberts wrote to Mr. Ellis, attorney for DMS, and asked that he pay the benefits owed Mr. Jeffries for the period of February to date. Mr. Ellis agreed to pay a portion of the benefits under Reservation of Rights but not the entire time.

11.     On May 15, 2003, benefits were withheld again on the premise that they had not received a Continuance of Disability form until June and at that, benefits were dependent upon receipt of a Continuance of Disability forms. Mr. Ellis said the forms had to be appropriately evaluated and therefore benefits would continue to be paid under ROR.

12.     On May 16, 2003, Mr. Graff wrote to Mr. Roberts ad informed him that DMS had received the two IME reports and they had determined that Mr. Jeffries was disabled due to a psychiatric condition. They informed Mr. Roberts that benefits for mental and nervous were limited to 24 months and therefore he was overpaid and would need to refund the money.

### IV. To establish and maintain procedures for the purpose of guaranteeing compliance of these obligations;

1.      It is not possible to ascertain what procedures existed within DMS for assuring compliance with fair claims practice standards as no claims manual was produced in discovery for review.

2.      Based on the review of the claim there are several observations that in my opinion indicated that DMS's procedures are not consistent with the industry standards for Fair Claims Practices in a number of ways.

3.      My specific observations relative to the administration of the claim are as follows:

13

4.    There was no internal documentation to reflect that a file plan had been created for the management of Mr. Jeffries' claim.

5.    There were activities that kept occurring on the claim with no documentation as to how they were being determined. For example, the file was referred to SIU, but it is not clear who made that decision, why it was made, or what issues SIU was supposed to be investigating.

6.    The file was referred to Ms. Palmer; there is nothing in the file to reflect who recommended that Ms. Palmer look at the file and what it was she was expected to address.

7.    The field investigator asked that DMS contact Prudential, and documents from the Prudential file indicate that there were numerous phone calls between the two companies, but the documentation of those phone calls and the content of the calls were not in the DMS file.

8.    The field representative recommended that DMS go to Prudential and review the claim file; records from Prudential indicate that there was discussion about doing that, however there is no documentation as to whether that occurred.  Generally, the absence of documentation would be evidence that no meeting occurred; however, DMS clearly did not document many activities that took place, as was evidenced by the Prudential Phone Log.

9.    A director-level staff person, Mr. Wentworth, reviewed the file. There were no referrals to him asking that he review the claim, nor was there any documentation as to his observations of the file, other than his recommendation that surveillance be ordered and Prudential be contacted. It is not clear what he observed in the file that precipitated that activity and what he hoped to resolve by conducting the activities he had recommended.

10.    It is entirely unclear why Ms. Palmer was asked to contact the physicians as opposed to a physician-level resource. It is also unclear what the protocol is relative to IME exams. Generally, within the industry, an IME exam that results in a disparity of opinion between the company and the IME is sent to the AP for review and comment.  DMS' failure to share any internal or external expert opinions with treating providers is not consistent with industry standards of Fair Claims Practice.

11.    The participation of a director and an Assistant Vice President in the administration of a claim is evidence of high visibility and financial exposure. It is entirely inconsistent to have that high a level resource involved with a file and to see absolutely no documentation as to discussions regarding issues and concerns as well as action plans established.

12.    The extensive utilization of surveillance was also highly unusual. Surveillance is a costly tool and is generally reserved for suspected fraud. There is nothing documented in the file to identify what Mr. Jeffries had done to cause DMS to consider him a fraud. Clearly, based on Prudential's documentation of phone contact with DMS, they did consider Mr. Jeffries a fraud and were pursuing that avenue of investigation very aggressively

13.    Mr. Champagne, Assistant Vice President for DMS, discussed the issue of settlement with Mr. Roberts on three separate occasions. There was no documentation in the file as to what aspects of Mr. Jeffries' claim Mr. Champagne was disputing as the basis for considering settlement, other than the altered authorization, which was clearly not significant to the claims process.

14.    It is clear that Prudential and DMS were interacting throughout the claim process, which is not an uncommon occurrence in the claims process. What was unusual is that it appears form the documentation that authorizations to exchange information did not actually occur until a month after the interactions first occurred. It is also difficult to determine what information was shared between the companies and when that was shared. One would normally see clear documentation of what was requested and received and when as well as who reviewed that information and was decided as a result of that review. There was information in Prudential's file that supported impairment that was clearly available to DMS, yet it appears that they chose to ignore that despite Mr. Roberts' request that they review the data.

15.    There were systems claim payment records produced in discovery, so it was not possible to track what actually occurred relative to the reserves. It is not clear for example, when payments were stopped in December of 1999, whether the claim was actually closed on the system to remove the financial liability that occurred. Nor is it possible to tell whether the claim was reopened when benefits were reinstated in March. It is also clear from the file documentation that Mr. Gelardi closed the claim in February of 2002, one month prior to

15

completing the medical review further evidence that DMS intended to close the claim and was simply going through steps to appear as though they were being fair and thorough.

16.     A March 9, 2000 phone call said they did not think insured was legitimate, but did not explain why and never shared that with the insured or the doctors.

17.     In the event that DMS had procedures in place, it would be helpful to review them specifically as it related to Utilization of Surveillance, establishing occupational duties, and the clarification of disparate medical opinions.

18.     DMS medical staff reviews from Drs. Hall and Curran clearly acknowledge some type of autoimmune disorder, the cause of which was unknown. Mr. Jeffries also had the opinion of approximately 20 different doctors, all of which were overruled by the opinion of one neuropsych evaluation obtained by DMS.

19.     DMS asked Dr. Bullard to conduct an independent medical examination of Mr. Jeffries which, based on deposition testimony lasted approximately forty-five minutes to one hour. (page 34 lines 4-7). Dr. Bullard was not a specialist in the field of infectious disease, or rheumatology, or vaccine-related difficulties. The usual customary procedure for obtaining an IME is to identify an expert resource that us able to address the pertinent medical issues in a file.  Dr. Bullard testified in deposition that he was initially uncomfortable with conducting the examination because, "If Mr. Burrell was looking for specific responses or opinion concerning some of the issues that appear to be active that he would be more appropriate in seeking counsel, not counsel but opinion from someone who was a quote recognized expert in that particular narrow area." (Page 19 lines 3-8).

20.     Dr. Bullard testified that after reading the medical records "it was his opinion that he would be unlikely to find a physical abnormality upon examining the patient." (Page 39 Lines 9-12) Dr. Bullard also testified that there are illnesses that are recognized for which there are no objective findings. (Page 43 Lines 10-12)  Dr. Bullard testified that he did not find objective medical evidence to confirm a disabling condition. (Page 49 Line 11-13).  When asked whether Mr. Jeffries' complaints of arthralgias were physical or mental, he responded that arthralgias are, by definition, a symptom originating from the joint causing joint discomfort. Depending on the

16

definition they may or may not be associated with physical findings. (page 51 Lines 20-25) When asked whether Mr. Jeffries' arthralgia was related to some mental problem, he responded he "did not make an opinion as to the source of his subjective complaints." (Page 52 line 16-17) He responded the same was true for myalgia and that he could not document a physical abnormality that coincided with his subjective complaints. Although Dr. Bullard testified that he did not make an opinion as to the source of Mr. Jeffries' complaints, DMS determined that the complaints were psychological in nature as a basis for eliminating liability.

### V.  To know and understand the applicable laws of controlling jurisdiction and to administer their insured's claims accordingly;

1.      Mr. Jeffries involved the insurance department in his claim as a result of a complaint to them. Mr. Champagnes' response to the insurance department was intentionally misleading and inaccurate. Specifically, Mr. Champagne stated that although Mr. Jeffries had provided significant medical information, the reports lacked objective medical evidence and were based on subjective reporting. In truth, there were a number of objective factors in medical records that had been acknowledged by DMS' medical staff including blood tests, liver function studies, spect scans, and neuropsych testing results.

2.      Mr. Champagne also stated that DMS hadn't asked for access to Mr. Jeffries personal finances; however they had; asked for tax returns which were not relevant to his case, checked bankruptcy records, conducted a credit check asked for a complete description of his automobile collection, and did a search to see if he or his family were recipients of trust funds a fact totally irrelevant to the claim.

3.      Mr. Champagne also said Mr. Jeffries refused to participate in an IME, when in fact Mr. Jeffries objected to the IME provider's qualifications. Mr. Champagne had also agreed to postpone the IME pending Dr. Clionsky's review of the additional neuropsychological records that had been provided and was waiting for that review to be completed.  Mr. Champagne's responses to the Insurance department were untruthful and misleading.

## Summary

The initial review of Mr. Jeffries' claim by Mr.McNeill appeared to have been done in a manner consistent with the industry standards of Fair Claims Practice. He requested appropriate medical and financial information and upon receipt of that information, he accepted liability for the claim and was prompt in providing benefits. Following the acceptance of liability, the entire focus of the claims process by DMS was biased, and intended to find a way to eliminate the significant financial liability they had incurred.   It is my opinion that Disability Management Services breached their obligation of good faith and fair dealing in the administration of Mr. Jeffries claim following acceptance of liability and that they failed to administer the claim in accordance with Industry Fair Claims Practice standards. I state my opinion based on all of the above observations and, in summary, for the following reasons:

The unwarranted decision to conduct surveillance immediately after accepting liability and to continue to do for approximately 23 days, despite no evidence of fraud, was clearly an attempt to find some basis for denial;

The complete disregard for Mr. Jeffries' providers' opinions in support of impairment despite their extremely impressive recognized credentials in their respective areas of expertise in favor of two examining doctors neither of whom had expertise pertaining to Mr. Jeffries impairment;

The unwarranted harassment requiring Mr. Jeffries to obtain extensive information as to his travel during a five-year period, and his automobile collection under the pretense that it was relevant to the claims process. Mr. Jeffries' employer had already stated that travel was a requirement of the job and that Mr. Jeffries traveled extensively.  Mr. Jeffries' automobile collection had nothing to do with his occupational duties. Not only was this irrelevant to the process, it was an unwarranted invasion into his life. DMS withheld benefits from Mr. Jeffries until he provided that information;

Mr. Jeffries had provided well over 600 pages of medical documentation from more than 20 physicians. DMS insisted that he provide the names, addresses and phone numbers of all of his care providers, as well as all dates of treatment with each one. All of that information was

18

available in the file at the time of the request. Benefits were wrongfully withheld pending production of this information.

Not one of the 21 physicians treating Mr. Jeffries indicted that they felt his condition was psychiatric, including two mental health providers who had treated him. Ms. Palmer was the only medical resource to suggest that Mr. Jeffries might be suffering from somatization until the final IME was performed in May of 2003. DMS immediately accepted the diagnosis that Ms. Palmer had attempted to establish in 1999, without offering any of the treating providers an opportunity to comment on the findings, ultimately disregarding some of the top specialists in the world for the opinion of two physicians retained by DMS, neither of whom were specialists in the field of medicine pertaining to Mr. Jeffries' medical condition.

Dr. Geier submitted a signed statement regarding a conversation that took place during his deposition with Attorney Ellis on July 10, 2003. Dr. Geier reported that Attorney Ellis claimed he felt Mr. Jeffries' claim was not a medical issue, but fraud. It is not clear what evidence Attorney Ellis had in his possession to support the accusation of fraud. The statement made by Mr. Ellis was consistent with the statements made by DMS in their conversation with Prudential Insurance Company as early as March of 2000, reflecting a continued biased view that Mr. Jeffries was a fraud, despite objective evidence in support of impaired functioning from treating physicians as well as Independent Medical Examiners.

I declare under penalty of perjury that the foregoing is true and correct. I reserve the right to modify my opinion in the event additional information is provided to me for consideration.

*Mary E. Fuller*

Mary E. Fuller, M.Ed.                                    August 13, 2003

**EXHIBIT I.**                    **CHRONOLOGY**

**February 4, 1999**   Mr. Jeffries notified Massachusetts Casualty (now know as Centre Life) of his
       intention to file a claim for disability related a disabling illness disease as of September of 1998.

**February 11, 1999** Disability Management Services ("DMS") acknowledged receipt of the claim
       notification and explained that they were the Third Party Administrator for Massachusetts
       Casualty.  DMS provided a description of the claims process and forwarded the necessary claim
       forms for Mr. Jeffries to complete.

**February 23, 1999**   The Claims Examiner, Spencer McNeil, spoke with Mr. Jeffries and learned that he
       began having symptoms following a vaccination and had not worked since September. (CL
       03130)

**March 8, 1999** DMS received the completed claim form, which indicated a return to work date as soon
       as physically possible.  Restrictions were an inability to maintain the demands of the job due to
       physical problems, as well as an inability to concentrate and make critical decisions.

**March 18, 1999** A detailed questionnaire was sent to Mr. Jeffries' employer, with the request that they
       respond within 30 days. That same day, Mr. Jeffries sent a fax to Mr. McNeil with a list of all of
       his treating doctors.

**March 26, 1999**   Mr. Jeffries' employer provided the occupational questionnaire as requested, and
       included a detailed job description.  The form indicated that the company was not interested in a
       rehabilitation effort and that the return-to-work date was unknown and might possibly be never.
       The position was not being held open due to business necessity. (03108)

**March 19, 1999**   Medical records were received from Dr. Dunn that included treatment dates from
       1997 through March of 1999. Treatment for this period was for symptoms related to his post-
       hepatitis B vaccine, including overall stiffness, headaches, night sweats, abdominal pain, and
       generalized lethargy.  Mr. Jeffries was to bring in records from the Cleveland Clinic and Dr.
       Luggen in an attempt to gain further knowledge of testing that had been done to date. Possible
       diagnoses listed over time included: Chron's disease, irritable bowel syndrome, non-

20

inflammatory rheumatism, and undiagnosed systemic illness with rheumatologic features. Dr. Luggen submitted an Attending Physician's statement at that same time noting, "Undifferentiated connective tissue disease with muscle and joint pain, fatigue, mouth sores, ocular inflammation, and abdominal pain." (03083)

**March 27, 1999** Medical records were requested from Drs. Young, Dunn, Luggen, Fessler, and McCellan. Medical records from Dr. Young included references to headache, joint pain and muscle stiffness dating back to June of 1997, with symptoms waxing and waning in severity until approximately August, when they continued to progress, resulting in a request for a referral to Mayo Clinic in October of 1998. (03068)

**April 5, 1999** Liability was accepted and payment was issued.

**April 5, 1999** Mr. Jeffries called and informed Mr. McNeil that he had been to UCLA and that the doctors there thought he might have Whipple's Disease, which is treatable with antibiotics and has an anticipated recovery period of three to four months.

**April 7, 1999** Records from Dr. Luggen were received for the period of October 1998 through March of 1999. Treatment records from February of 1999 reflected a recommendation that Mr. Jeffries follow the treatment regimen that was outlined by Dr. McChalski, an expert in Bechets that Mr. Jeffries had consulted in Alabama. Dr. Luggen also recommended that Mr. Jeffries consult with an expert in the field of Hepatitis B vaccine, if one existed, as Dr. Luggen was not convinced that Mr. Jeffries' problem was related to the vaccine. However, he stated he was not as familiar with the issue as others might be. (02992) Mr. Jeffries' medications over the six-month treatment period included prednisone, vicodin, Zoloft, amitryptyline, effexor and ketoprofen.

**April 20, 1999** Dr. Hall from DMS reviewed the file and noted, "In spite of all of these symptoms and their duration, extensive workup at multiple centers (university hospitals, Mayo Clinic, Cleveland Clinic, England, etc.), have been normal; no diagnosis has been established. Tx has been symptomatic and apparently ineffective…at this time we have no choice but to follow the case on a monthly basis in the hopes that a dx will be established and treatment undertaken and will hopefully prove effective." (02989)

**May 25, 1999**  Mr.McNeill called to speak with Mr. Jeffries and learned he had been to UCLA for testing. Whipples testing was negative, but he was still placed on antibiotics. Mr. Jeffries indicated Dr. Luggen was going to continue to be the physician coordinating his care.

**May 27, 1999** In-photo submitted a surveillance report for activity on May 20, 21, and 22. The total number of hours of observation on the 20th and 21st were not noted in the report; however, the 22nd represented four hours' of observation. There was no activity reported during the three days.

**June 4, 1999**  Lance Daniel from DMS received a report from CS Claims Group outlining the completed activity to date, including the completion of several database inquiries done, as well as Internet search results on Mr. Jeffries and Provident Bank.

**June 7, 1999**  In-photo submitted a report on surveillance that had been conducted on June 1st, 2nd and 3rd. The report does not identify who requested the surveillance or for whom the report was being prepared.  Prudential BATES stamps are on the report, as is the case with all other reports. A total of seven hours of observation occurred, with no activity reported other than the insured driving to an Oriental medicine clinic.

**June 15, 1999**  Mr. McNeil spoke with Mr. Jeffries again and learned that he continued to have problems with pain and fatigue, as well as cognitive problems and periodic blinding headaches. Mr. McNeil asked that Mr. Jeffries keep a log of his symptoms over a two-week period in order for them to have a better understanding of his problems. (2917)

**July 1999**  Records from Dr. Dunn were received, showing treatment since 1997 for symptoms including muscle aches and malaise.  Dr. Fritz had diagnosed Mr. Jeffries with Fibromyalgia. Dr. Dunn conducted additional testing for possible gastritis and hemochromatosis, well as a whole body nuclear screening for inflammatory arthritis.

**July 12, 1999**  Records were received from Dr. Wallace indicating a diagnosis of reactive arthritis requiring minocycline, and a restart of Azulfidine.  In addition, it was determined Mr. Jeffries had abnormal liver function studies that needed to be rechecked. (02841) Dr. Wallace noted, "Rule out: Palindromic rheumatism with episodic fevers, headache, joint aches, and migratory arthralgias, seronegative spondyloarthropathy, Whipple's disease, Bechets, and occult infection. Current medications included Elavil and Hydrocodone."

**July 14, 1999** A surveillance report was prepared for the dates of June 22 & 26, July 1 & 5, representing 20 hours' of observation and no activity. The surveillance team conducted a pretext call and learned that Mr. Jeffries was away.

**July 23, 1999** Records from Dr. Kovacs indicated, "He has certainly had an extensive workup, with no apparent real strong objective findings. Nevertheless, he does appear to have some autoimmune process…" (02826)

**July 31, 1999** Mr. Jeffries wrote to Mr.McNeil and explained that he had tested positive for Acute Intermittent Porphyria as well as Cold Agglutinin disease. He stated he had been to the Emergency Room on three occasions, and that he was having a liver biopsy done. The file also contained an article written by Insight magazine, which talked about Hepatitis B immunization damage to a number of people, including Mr. Jeffries. In addition to the article, there were documents from business and a personal check that had been conducted on Mr. Jeffries (2762-2803). It is not clear who order these activities, when they were ordered, or why.

**August 5, 1999** Mr. Jeffries informed Mr. McNeil that he had been diagnosed with a liver problem and he had been referred for a biopsy.

**August 10, 1999** DMS was sent surveillance that was done by CS group for the dates May 27, June 21, July 23, July 24; surveillance represented approximately 23 hours of observation, with the only observed activity being minimal errands in the general area.

**August 11, 1999** Records were ordered from Dr. McCellan and Dr. Mark Jonas for the period of March 1999 to the present. A copy of a surveillance report was in the file. Surveillance was conducted over three days. The closing remarks on the report indicated that surveillance would continue as instructed. There were no documents reflecting who ordered the surveillance, or why the surveillance was ordered.

**August 31, 1999** Mr. Jeffries informed Mr. McNeil that he was scheduled to see Dr. Waisbren on September 16th regarding the adverse reaction to the vaccine, as Dr. McCellan had ruled out Genotomoclosis. He was still having headaches and pain, including trouble walking and tachycardia. (02675)

**September 7, 1999** DMS received a copy of a surveillance report prepared by CS Claims Group for
August 7, 9, and 10, representing approximately 36 hours of observation, with no noted activity.

**September 1999**   Medical records from the Mr. Jeffries' Emergency Room visits were received. No
diagnosis was noted; however, Mr. Jeffries was given Tylenol Three and was instructed to call
his physician.  In addition to the Emergency Room records, Dr. McCellan completed an
Attending Physician statement, and Dr. Waisbren of Waisbren Clinic provided a detailed
analysis of Mr. Jeffries' previous medical history.  Dr. Waisbren concluded, "By exclusion of
other diseases by reports of similar situations in the literature, by experience with autoimmune
diseases that have followed other viral vaccinations (Swine flu), and by my personal experience
with having seen similar cases, I conclude that Mr. Jeffries is suffering from Chronic Debilitating
post-vaccinal encephalomyelitis and acquired autoimmunity." (02706). Dr. Waisbren also
provided a hypothetical explanation of the pathogenesis of Mr. Jeffries' clinical condition, and
provided background information as the basis for that hypothesis. He concluded, "It would be
reasonable under the circumstances to help this patient with an antiviral which will hopefully
suppress the offending virus, and with gamma globulin which theoretically may help suppress
the virus or may give natural blocking antibodies which will prevent attack of receptor sites in
other body tissues..." Dr. Waisbren did not certify to total disability as a part of his assessment
process. (02710)

**September 17, 1999** DMS received Dr. Mannions' records, which indicated he would be conducting
additional testing regarding the cold agglutinins. Dr. Mannions also recommended a trial of
Colchicine to see if that had any benefit. His notes reflected that he had seen a report of three
patients with post-hepatitis B vaccination recurrent vasculitis who did not respond to prednisone;
two of whom did have significant benefit from the Colchicine. (02638).

**September 30, 1999**   On behalf of DMS, Ms. Palmer spoke with Mr. Jeffries at length regarding the
treatment prescribed by Dr. Waisbren, the status of the lawsuit against the drug company that
produced the vaccine, his future plans for return to work, and whether he would participate in
counseling. Mr. Jeffries explained he was doing all that he could to understand what was wrong
with him; that most of the doctors that he was seeing he was paying for out-of-pocket. When

asked about his willingness to participate in counseling, he stated, "he was not adverse to that, however he did not think it was really needed and that this hadn't gotten to that point." (02351)

**October 1, 1999**  Ms. Palmer spoke with Dr. McCellan regarding Mr. Jeffries' claim. She learned that Dr. McCellan continues to consult with Dr. Luggen and that it was Dr. McCellan's belief that "the set of conditions presented by Mr. Jeffries defies diagnosis." (02362) He stated he believes that Mr. Jeffries' events are all temporally related to the actual vaccination of the Hepatitis B, which he referred to as an Autoimmune Complex. Dr. McCellan noted that at times Mr. Jeffries seemed significantly impaired, and that there were no laboratory values to "hang your hat on." He indicated that the onset of Mr. Jeffries' symptoms occurred when he was on vacation, not working, and that it would be atypical for someone feigning an illness or disease to do so during a vacation. Mr. Jeffries' limitations were described as limited strength and endurance, and considerably decreased capabilities. Dr. McCellan also explained that, although he was aware of Mr. Jeffries' ability to work on the computer, travel, and focus on his disease, he felt Mr. Jeffries' experiences made it very difficult for him to focus on the more cerebral requirements of work. When asked about whether a psychiatric evaluation had been considered for somatization given that a clear medical diagnosis had not been reached, he stated no, but that he felt Mr. Jeffries would participate in an exam if asked. He stated, "Mr. Jeffries sincerely wants to find some sort of diagnosis and treatment and closure to this situation, and be able to move on with his life." (02364)

**October 11, 1999**  DMS received records from Dr. Reed dated September 9, 1999, and a gasterenterology study from Dr. Jonas. Dr. Reed's records reflected an aborted effort at a spinal fluid study. Dr. Jonas noted, "Differential diagnoses include idiopathic hemochromatosis, alcoholic liver disease, and prophyria crutanea tarda. Clinical correlation is warranted." (02617)

**October 15, 1999** Ms. Cynthia Palmer wrote to Dr. Luggen and explained that DMS had attempted to arrange for her to call and speak with him about Mr. Jeffries. She noted that she was attempting to call because she wanted to clarify the diagnosis, treatment plan, and the objective basis for his evaluation for Mr. Jeffries' impairment. "I have also spoken with other physicians with whom he has sought evaluations." (02376)

**October 27, 1999**  Dr. McCellan signed Ms. Palmer's summary of their phone conversation, adding the addendum that since that time he had received a report from Dr. Waisbren and that he had recommended he try the Gamma Globulin injections prescribed by Dr. Waisbren.

**November 8, 1999**  DMS received records from Dr. McCellan stating, among other things, "He has elevated antibody titers against CMV, EBV, and herpes. This to me simply indicates a chronic inflammatory state… We will proceed with the Gamma Globulin injections as recommended, but discontinue Valtrex…" (02595)

**December 9, 1999** Mr. Gelardi wrote to Mr. Jeffries and asked that he complete the progress statement, as he would be unable to proceed with the processing of the claim until an appropriate Proof of Loss form had been received and reviewed.

**December 13, 1999**  Brian Wentworth, Director of Claims for DMS, completed a referral form to Mr. Gelardi that stated the file was reviewed that day.  Refer to Dr. Hall for review of all medical records, order three days' of surveillance, as well as searches for fictitious names, court records and follow up with LTD carrier for the status of their handling. (00549 &02546)

**December 15, 1999** Prudential received a copy of a surveillance report done on December 10, 11; it is not clear from the record whether this was in DMS file at the time. (00900)

**December 27, 1999** Dr. McCellan submitted the monthly Attending Physician statement indicating he was administering a one-month trial of Gamma Globulin.

**January 22, 2000**  Dr. Spickett, Consultant and Senior Lecturer in Clinical Immunology from the United Kingdom, examined Mr. Jeffries for the second time. He concluded, "I remain puzzled by his illness, especially his low CH50, the cold agglutinins and dark urine. This did make me wonder about paroxysmal cold haemoglobinuria, which might explain the complement abnormalities. This can cause malaise, chills, fever, headaches, and muscle aches. The raised bilirubin might be due to low-grade haemolysis (a haptoglobin would be less), and this may explain the liver abnormalities with iron deposits. This condition can occur as a result of infections, bacterial or viral, or simply as an autoimmune disease." (0000583MR) "Finally, as a diagnosis of exclusion, Chronic Fatigue Syndrome should be considered (post vaccination); this would account for most physical symptoms, but does not account for low ch50 or the presence of

26

cold agglutinins (unless these were transient). I am not convinced that there is any truly specific beneficial therapy for this condition, although some cognitive behavioral therapy seems to have the best track record."

**January 26, 2000**  Dr. Curran, Medical Consultant to Prudential, completed a medical review of the records at Prudential. He observed, "The medical evidence to support Mr. Jeffries' impairment is entirely clinical. The diagnostic tests are not affirmative to support a diagnosis. I do not see any documentation to support a change in Mr. Jeffries' status on or about September 28, 1998, when he left work. However, from the history it seems likely that his pain and frustration, as well as mental confusion, became more embarrassing and upsetting. Finally, he had to quit work in the hope he would improve while on temporary disability. There is no medial documentation to support a casual relationship between his symptoms and his last diagnosis of post-vaccinal encephalomyelitis and acquired immune deficiency. This would require *ad hoc ergo propter hoc* reasoning which may not be considered scientifically reasonable. I would prefer the diagnosis of acquired auto immunity… I find no discrepancies, inconsistencies, or contradictions in this record, only the humbling confusion of our inadequacies of defining these problems." (00567)

**February 11, 2000** Corporate Investigative Services provided a surveillance report to Mr. Brian Wentworth from DMS. The report encompassed surveillance activity that took place January 4-8. Surveillance was conducted for approximately 55 hours; the activity observed consisted of Mr. Jeffries driving a variety of cars, eating at a restaurant, going to a flower shop, etc. A criminal and civil court check was also done, with no results found.

**February 17, 2000**  DMS received the surveillance report, which covered five days of activity; they also requested that a Frequent Flyer search be done, and were told that a copy of the credit report was needed in order to complete that request.

**February 18, 2000**  DMS requested updated medical records on a rush basis from Drs. Young, Dunn, Luggen, Fessler, Kaufman, and McCellan. Bankruptcy records were searched, as well as the recorder's office, the auditor's office, and the Secretary of State's office. (00928) This was not in Claim file as produced and was copied to Prudential.

**February 22, 2000** The file contained a phone log from Prudential (00592 book 4), representing
contacts with DMS.  In addition, on February 23, 2000 there are contacts noted between
Prudential and DMS, specifically Brian Wentworth and William Gelardi.  Mr. Gelardi stated
that, "DMS believes there is financial incentive for [Mr. Jeffries] to stay out of work; he would
get 24k between two policies."(00593) He also stated, "They have not paid since December and
question where he is getting money from..."

**March 1, 2000**  Mr. Turek, Field Investigator for DMS, prepared a report for Mr. Gelardi indicating
that he had inquired about the status of Mr. Jeffries' treatment as well as his LTD coverage with
Prudential.  Mr. Jeffries explained that Mr. Jeffries had had Gamma Globulin treatments that did
not work, and that there was no specific treatment in place. When asked about his failure to
disclose LTD coverage with Prudential, Mr. Jeffries stated he did not recall being asked about
that when he completed his application.  Mr. Turek reported Prudential had been paying his
claim from the inception. Mr. Turek recommended that Mr. Gelardi should consider a personal
visit with Prudential to review their file.  Dr. Hall should review the claim, and an IME or paper
file reviews, as well as further surveillance, may be in order. (02295)

**March 9, 2000** DMS received a Notarized statement prepared by Dr. Luggen regarding Mr. Jeffries'
medical condition which said, among other things, "I am reasonably certain that Mr. Jeffries'
symptoms are real and have a debilitating effect on Mr. Jeffries.  I believe that he suffers from
substantial pain, even though diagnostic tests to date have not focused on any one disease. It is
my opinion that, irrespective of my inability to precisely diagnose Mr. Jeffries' condition, the
effects of his illness make him unable to function in a consistent manner, and he is unable to
function professionally without interruption." (02346)

**March 9, 2000**  The Prudential file reflected that DMS called and stated, "They are closely reviewing
the claim.  They do not believe the EE is legitimate; they have a field report and want to come to
Prudential and review our file...will share information... They had a medical review.  They do
not find one piece of documentation to support his claim; they ruled out 92 things.  Will
exchange file with authorizations provided previously ..."

**March 10, 2000** Mr. Gelardi wrote to Mr. Jeffries and explained that they did not have objective
evidence in support of disability, and that they were awaiting the receipt of additional claim-

related documents, stating that, "If there is no objective documentation you wish to submit, we will proceed with the processing of your claim with the documents contained within your claim file." Tax returns for the period of 1996–2000 were also requested.  Mr. Gelardi issued a check with a Reservation of Rights for the period of December 1999 through March of 2000. (02274)

**March 14, 2000**   DMS received treatment notes from Dr. Luggen's office for the period of 1999 to date.  Included in the notes were two letters from Mr. Jeffries to Dr. Luggen expressing frustration with Dr. Luggen's apparent disbelief that Mr. Jeffries' symptoms were related to the vaccine, the second being an apology from Mr. Jeffries, and a request for Dr. Luggen's assistance in learning more about the vaccine related illness from Dr. Wallace. (02227)

**March 15, 2000** The file noted, "faxed authorization today and requesting claim information." The fax of the authorization appears to have been nearly a month after the initial contact. There was also no documentation in the file reflecting the request for the file from Prudential to DMS, or DMS to Prudential. (0595)

**March 17, 2000** Mr. Gelardi received a report from Ms. Ahles stating that she had tried a number of search engines and had not been able to find information on Mr. Eric Jeffries. (02180) The file contained an undated memorandum to Mr. Gelardi from Mr. Turek indicating that Mr. Jeffries called to inquire as to whether DMS had conducted surveillance on him, as he saw someone filming him. He also stated that Mr. Jeffries' doctor believes that he has found a diagnosis and that it is RNA synthesis. (02131)

**April 13, 2000** Mr. Jeffries called and spoke with Mr. Gelardi regarding surveillance activity that was taking place. He reported that a delivery man had been to his house on two separate occasions asking him to sign for a package, and that he and his children had been followed. He stated the surveillance as an invasion of privacy. Mr. Gelardi said he would call him regarding the surveillance next Wednesday or Thursday. (01919)

**April 24, 2000** Mr. Turek sent an e-mail to Mr. Gelardi stating that In-photo informed him it was not their practice to pose as delivery men.  In addition, the surveillance had stopped well before someone called his home and asked him all kinds of questions

**May 11, 2000** Mr. Jeffries asked that he be allowed to submit medical proof of disability on an annual basis, given that it has been firmly established that his illness was chronic and not likely to change. There was nothing in the file acknowledging this request.

**May 15, 2000** Mr. Turek met with Sharon Brummett at Provident Bank and was told that the bank would not allow him to speak with any of Mr. Jeffries' former business associates. She did however verify earnings that had been reported by Mr. Jeffries as being a combination of salary, bonus, and stock options.

**May 24, 2000** DMS received an Attending Physician statement from Dr. McCellan certifying to ongoing disability with no change anticipated; no specific treatment was being administered, other than a prescription for Vicodin.

**May of 2000** DMS received an extensive packet of information, which appeared to have been included in a report prepared by Dr. Waisbren as a part of his consultation with Mr. Jeffries. Documents included articles related to Myalgi Encephalomyelitis/Chronic Fatigue syndrome, Hepatitis B Vaccination report, and case reports on Post-Vaccinal Encephalomyelitis.

**May of 2000** DMS received an affidavit from Mr. K. Rodger Davis at Provident, which stated, among other things, "In his final year at Provident, I witnessed, and I was told by Eric Jeffries, that his health prevented him from doing his job on a consistent basis. It is simply not feasible to have a banker and managing director of our structured finance division out for an extended period of time on an ongoing and intermittent basis." (01984) DMS also received copies of Mr. Jeffries' tax returns for 1997–1999.

**May 1, 2000** Mr. Gelardi acknowledged receipt of Mr. Jeffries' letter, and indicated that he did not have the Attending Physician portion of the claim completed. He advised Mr. Jeffries that he would contact him upon completion of the review of his claim.

**May 2, 2000** DMS received a letter from Mr. Jeffries indicating that it was his understanding from the letter of March 10, 2000 that "DMS's medical consultant had conceded that I suffer a history of complaints consistent with a medical disorder, however, that the information in the file does not, in your opinion, support a finding of 'Total Disability.'" Mr. Jeffries noted that DMS's position that he had no medical diagnosis was incorrect; he had been diagnosed with Post-Vaccinal

Encephalomyelitis and Acquired Auto Immunity following a Hepatitis B vaccination, and that recent lab tests confirmed the diagnosis. This information was known to you through Dr. McCellan on his monthly continuance of Disability forms, and was reported to Mr. Turek in his personal interview.  Mr. Jeffries also provided an in-depth discussion of his medical condition, as well as his occupational duties. In closing, he indicated that the earnings reported on his tax returns were the result of an exercise of stock options and deferred income and bonus for the 1998 work year. (01937-40)

**May 3, 2000**   Prudential wrote to Mr. Roberts, Mr. Jeffries' attorney, and copied DMS.  The letter acknowledged Mr. Roberts' request for additional information from Prudential.  Prudential identified the documents that had been provided to Mr. Roberts, including a copy of the policy, all correspondence with surveillance teams, their reports and video, all notes concerning Dr. Curran's review, and all documents relating to Mr. Jeffries.  A copy of Dr. Curran's review was faxed previously.  Prudential informed Mr. Roberts they felt they had given him all that was required of them under ERISA. (00262)

**May 4, 2000**   Mr. Jeffries spoke with Mr. Gelardi and asked how long it would take him to complete a review of the file, as well as a number of other issues.  Mr. Gelardi said he would do his best to move things along.  There was no explanation as to what that meant.

**May 24, 2000**   Rick Turek spoke with Bill Gelardi and told him that he had explained to Mr. Jeffries that they had done surveillance on him and that they did not consider these activities intrusive and to consider the matter closed.

**June 5, 2000** Mr. Jeffries called Mr. Gelardi and informed him he had received transcripts from Prudential that characterized him as a liar; specifically, that Prudential's file noted DMS called him a liar.  Mr. Jeffries stated that he never told DMS that he was receiving money from Prudential.  Mr. Gelardi reminded Mr. Jeffries that he had continuously answered Question # 11, which asked whether he was receiving benefits, "Prudential 12k/month." Mr. Jeffries explained that he had sent a letter explaining his position, and that he had rescinded authorization for them to be in contact with Prudential. (01905)

**June 15, 2000**   Ms. Palmer sent Mr. Jeffries' file to Dr. Garb for a medical review.

**June 29, 2000** Notes in the file not signed, but apparently related to Dr. Garb, indicate, "Excellent medical care, all MDs did a complete workup. 3 dx can't make one causality. Work capacity, liver enzymes not major, skin rash not major, mouth lesions not major, mild lab results, some abnormalities, nothing to indicate a specific diagnosis, there are some abnormalities."

**July 7, 2000**  Dr. Garb submitted his review of Mr. Jeffries. Dr. Garb noted: Mr. Jeffries had seen 21 physicians across the United States and the United Kingdom. "…It is apparent to me that Mr. Jeffries has received unusually high quality medical care… I was impressed by the thoroughness of the evaluations he received from all of the physicians who saw him. Despite all of the evaluations that Mr. Jeffries has undergone, however, I believe that it is not possible at this time to make a single unifying diagnosis that would fully explain his condition." Dr. Garb then listed five different diagnoses that could be made with a varying the degree of certainty for each, ranging from high to moderate. He also noted, "The greatest diagnostic difficulty is that this case centers around the suggestion of some poorly-defined type of autoimmune process. There are some objective diagnostic tests that suggest that such a process may be present." At this point, I think that one can only say, "Mr. Jeffries may have a poorly characterized, non-inflammatory autoimmune syndrome of uncertain etiology, possibly related to Hepatitis B Vaccination." Dr. Garb also stated, "…Thus, it is difficult to establish with certainty that these rare events are related to the vaccine. People who are HLA-B27 positive, as is Mr. Jeffries, may be more susceptible to this type of reaction." (01894) Dr. Garb also spoke with Dr. Craven, an infectious disease specialist, and stated, "He believes there may be a relationship between the Hepatitis B vaccine and rare autoimmune illnesses; however, the risk is very low." He believes some people may have an underlying disease process that may be accelerated by the vaccine. (01895)

Dr. Garb concluded, "The totality of these records does not indicate to me that Mr. Jeffries currently is unable to perform the duties of his occupation. Unless disability is supported by rigorous neuropsychological testing, I feel he could resume work at any time." The bill for the review included a five-hour review of records, a four-hour literature review, a .25 hour phone consult with Dr. Craven, and a 1.5 hour case conference as well as 6.7 hours of report preparation. There was nothing in the file to reflect who the case conference call was with.

**July 18, 2000** Ms. Palmer spoke with Dr. McCellan for the second time after reviewing his diagnoses and treatment plan. Once again, Ms. Palmer asked Dr. McCellan whether the functional restrictions and limitations had been objectively measured, to which he responded that his measurement is observation of Mr. Jeffries when he is in his office. Dr. McCellan said Mr. Jeffries' symptoms are characterized by fluctuation, with periods of great difficulty followed by periods of stabilization. He indicated, "Exacerbation may occur every two or three months and in the interim he may not be so bad." (01880)

**July 20, 2000** Ms. Palmer called Mr. Jeffries to discuss his claim, followed by a letter on July 21, outlining each of the 16 areas she planned to discuss with him.

**July 21, 2000** Mr. Gelardi recommended an Independent Medical Exam be ordered which was not done until approximately fifteen months later.

**July 28, 2000** Ms. Palmer spoke with Dr. Dunn, who said that he was not providing regular care to Mr. Jeffries, "He had administered a follow-up blood test in March, specifically, the antimicrosomal antibody test of the thyroid; this was positive, which suggests an autoimmune thyroiditis, although he was not sure if this explained Mr. Jeffries' complaints." Ms. Palmer provided a summary of her conversation with Dr. Dunn, which ended with her own observation that "one must question to some extent if he is impaired from his former job." (01872)

**July 18, 2000** Mr. Roberts wrote to Mr. Gelardi stating that Mr. Jeffries had shared DMS's June 29th letter and the draft of a medical authorization form. Mr. Roberts noted his understanding that Prudential and DMS had shared information regarding Mr. Jeffries and that surveillance had been done of him as well. Mr. Roberts informed DMS that Prudential had denied Mr. Jeffries' claim and provided DMS with the copies of information that Mr. Jeffries had submitted to Prudential in his appeal of their denial. Mr. Roberts reported, "Several treating physicians have stated under oath that Mr. Jeffries is unable to perform the material and substantial duties of his occupation. Prudential's own independent physician supports this conclusion."(01849)

**August 4, 2000** Ms. Palmer wrote to Mr. Gelardi, "At the request of the claim consultants involved in the review of the file, I have had the opportunity to review the July 18, 2000 letter from Mr.

Roberts." Ms. Palmer outlined her involvement in the file and provided a response to Mr. Roberts' letter. Ms. Palmers' letter acknowledged that Dr. McCellan and Dr. Ludden agree with Mr. Jeffries that his subjective complaints periodically impair him for some of his occupational activities. We do not understand, from the numerous diagnostic or periodic clinical evaluations performed by Mr. Jeffries' physicians, any objective determination of functional limitations. We do not believe that any of Mr. Jeffries treating physicians' records show persistent findings which would reflect occupational impairment. For that reason we have not felt it necessary to arrange for Mr. Jeffries to undergo an independent medical evaluation to date..."

**August 15, 2000** Mr. Roberts responded to Mr. Gelardi's letter informing him that, "The authorization that Mr. Jeffries had provided was sufficient for DMS to obtain the employment and medical records that were needed to determine if a benefit was payable, and that Mr. Jeffries' monthly payment should not be withheld on the argument that he has failed to cooperate."(01838) He also informed Mr. Gelardi that Mr. Jeffries was undergoing surgery for thyroid cancer, and that he would be forwarding a complete copy of Mr. Jeffries' appeal submission to Prudential.

**August 17, 2000** DMS received medical records from Dr. McCellan that noted the planned treatment for his thyroid cancer, as well as problems with severe headache. In addition to medical records, the release for tax returns was also submitted.

**August 19, 2000** Mr. Gelardi acknowledged receipt of Mr. Roberts' July 18, letter. Mr. Gelardi stated that Mr. Roberts was aware DMS had been in communication with Prudential, but that the interaction had not been as extensive as outlined in Mr. Roberts' letter. Mr. Gelardi stated that "clear illustration of our independent assessment is evidenced by the issuing of benefits, with a reservation of rights while we continue to evaluate Mr. Jeffries' claim." Mr. Gelardi stated, "While our records indicate that numerous physicians have evaluated Mr. Jeffries, both nationally and internationally, our review of the medical documentation does not reveal one unifying diagnosis that would explain his complaints." Mr. Gelardi stated, "while we note that Dr. Luggen and Dr. McCellan apparently accept Mr. Jeffries' claim that his subjective complaints periodically impair his ability to perform some of the duties of his occupation, we do not see from the numerous diagnostic testing with subsequent normal findings, or the periodic clinical evaluations performed by Mr. Jeffries' physicians, any objective determination of

continuous functional limitations." Mr. Gelardi stated finally, "The authorization portion of the monthly progress report allows us to gather any and all pertinent information in order to fully and fairly administer a claim. Of note, your state insurance department has approved these forms. As such we anticipate that Mr. Jeffries will continue to provide this "Proof of Loss" as he has done in the past." Mr. Gelardi then presented Mr. Jeffries with a list of eight areas of inquiry to complete, including but not limited to; "travel activity from 1998 to the present, including but not limited to mode of travel, dates destinations reasons, a list of average daily activities since the inception of his claim, a copy of his passport for the last five years, any and all information pertaining to his automobile collection, and a 4506 form, as his returns were self prepared."

**August 23, 2000** Mr. Champagne spoke with Mr. Roberts regarding the letter he had sent disputing DMS' position. It was agreed that payment would continue under ROR and that the new medical information would be reviewed. Mr. Champagne also stated that the claim had never been denied but they needed additional information, which he would identify for Mr. Roberts, including Mr. Jeffries' passport, as he stated his occupation required that he travel extensively and the passport would enable them to verify that. (01817)

**August 28, 2000** Mr. Roberts wrote to Mr. Gelardi stating that he had attempted to reach him numerous times and had been advised by his assistant that she had informed Mr. Gelardi of his calls. Mr. Roberts asked that past due benefits be paid and that he have the opportunity to speak with Mr. Gelardi at his earliest convenience. (01821)

**September 14, 2000** Mr. Gelardi responded to Attorney Roberts' letter of August 28 and reiterated what was needed in order to process the claim. In addition to the information requested previously, he asked for a detailed job description, including title, number of direct reports, and names of those people, details of his compensation, as well as termination agreements. Mr. Gelardi noted that Mr. Jeffries' earnings were higher in 1999 while totally disabled than in 1997 when he was working, and asked for an explanation for that. (O1802)

**October 16, 2000** Mr. Roberts informed Mr. Gelardi that the authorization that Mr. Jeffries had signed was sufficient for DMS to obtain the information needed to manage their claim and that the only restriction was contact with Prudential. Mr. Roberts asked that past due benefits be sent to Mr. Jeffries.

**October 31, 2000**  Mr. Roberts and Mr. Gelardi spoke regarding the past due benefits, and the altered authorization and outstanding information from Mr. Jeffries.  Mr. Gelardi agreed that they would allow an amended authorization that would be sent to Mr. Roberts and that benefits would continue under ROR. The conversation was followed up that same day with a letter confirming the discussion; the letter indicated, however, that benefits would be issued following receipt of the outstanding information.

**November 1, 2000** Mr. Roberts submitted medical information from Dr. Hyde from the Nightengale Research Foundation. Dr. Hyde concludes, "As a result of a Hepatitis A and B immunization, Eric Jeffries suffers from an autoimmune disease which has rendered him totally and completely disabled from being able to work at his former occupation and will continue to be disabled for the foreseeable future." Mr. Roberts asked that DMS confirm that based on everything that they have in their possession DMS has terminated the processing and review of Mr. Jeffries' claim. (0 1762)

**November 7, 2000** Mr. Roberts called Mr. Gelardi and informed him that Mr. Jeffries was getting radiation and chemo treatment for his cancer, and that he was clearly disabled. Mr. Gelardi consulted with Mr. Midghall and said that they would consider payment under ROR based on the new medical information.(01768)

**November 9, 2000** Mr. Roberts called regarding the withholding of benefits, among other things, and was informed that, based on the current circumstances, a check would be released. A rush request for medical records was sent that same day.  A letter was sent to Mr. Jeffries with one months' check for the period of August to September.

**November 12, 2000**  Mr. Roberts provided all of the information that had been requested from DMS, including a preliminary report from Dr. Hyde, the passport and travel information that had been requested previously, as well as the completed daily activity logs.  Mr. Roberts noted that DMS had three hundred pages of records that had been submitted in June of 2000 and indicated that the most recent request for data was irrelevant to the claims process. In addition, Mr. Roberts provided detailed responses to each of the requests for information made by DMS. (01727) Book three.

**November 16, 2000**  Ms. Palmer prepared a "note to File," summarizing the medical history of the file, and recommended that Mr. Gelardi obtain addition records from any providers that Mr. Jeffries had seen, as well as Drs. Hyde, Bastein, Fidler, and the Christ Hospital, as well as all other hospitals he may have attended. In addition, she recommended that they obtain infectious disease specialist or other expert consultations on the thyroid problem, the hepatitis vaccine, with a record review by Dr. Garb and an evaluation by a neuropsychologist.(01708)

**November 21, 2000** Mr. Gelardi wrote a five-page response to Mr. Roberts' previous correspondence. first stating, "We are in receipt of your delayed response to our letter…" and then asked him to refrain from sending multiple letters, and sending letters before they have had a chance to respond. Mr. Gelardi addressed each of Mr. Roberts' concerns regarding the handling of the file. Regarding Mr. Jeffries' diagnosis and impairment, Mr. Gelardi stated, "None of the evidence or tests that you referred to as objective evidence supporting Mr. Jeffries' illness were submitted with your letter." He also stated that it would appear that the diagnosis of thyroid cancer remains in part due to Dr. Hyde's inability to provide a final opinion or conclusion. … Please be advised Dr. Hyde's conclusions and opinions will be considered upon completion of his investigations and upon review of his final report."(01699) Mr. Gelardi identified several areas in which he felt Mr. Roberts had misconceptions or misunderstandings regarding the handling of Mr. Jeffries' claim, with a particular emphasis on the relevancy of the information that DMS had requested during the claims process.  Mr. Gelardi closed his letter stating, "Upon completion of their reviews and receipt of requested information, we will be in contact with you regarding the status of Mr. Jeffries' claim."

**December 1, 2000** Ms. Palmer spoke with Dr. McCellan and verified that Mr. Jeffries had surgery for his cancerous thyroid. Ms. Palmer also stated that Dr. McCellan did not feel the cancer treatment would hinder any further investigation of the autoimmune condition, which is the basis for his disability.

**December 5, 2000** Mr. Gelardi wrote to Mr. Roberts and enclosed two months' of benefit checks; he also asked that Mr. Roberts respond to the letter of November 21 and provide the information that had been requested, as well as a progress report and updated authorization.

**January 2, 2001** Mr. Gelardi sent a follow-up request to Mr. Roberts, who responded that same day. Mr. Roberts' letter outlined his areas of disagreement with DMS's position relative to Mr. Jeffries claim, including; the assertion that since he is able to fly in an airplane he is able to perform his occupation, which involves exhaustive financial analysis of risk in multi-million dollar investment opportunities, that he provide evidence that he could not work since September of 1998, and the suggestion that his illness predates the vaccination. Mr. Roberts submitted information regarding the Provident benefits package, and agreed to submit authorization for Christ Hospital and United Health Care of Ohio and Dr. Hyde. Mr. Roberts closed by asking for a reassignment of the claim to a senior officer of DMS stating, "The tone and content of his (Mr. Gelardi's) letters appears obvious that you are taking this claim personally and, as a result, are staking out an indefensible position." (01662)

**January 16, 2001** Dr. Hyde submitted a letter to DMS stating that he had treated Mr. Jeffries for Hashimoto's Thyroiditis, and follicular carcinoma of the thyroid, and autoimmune disease that is affecting at least his CNS, and possibly his red blood cells. Dr. Hyde stated, "Mr. Jeffries was partially disabled from within one week of receiving the Hepatitis A and B immunization, and has been totally disabled since he ceased work. ...This patient remains gravely ill and is totally incapable of sustaining any form of work in the present time." (01641)

**January 19, 2001**  Mr. Gelardi requested special investigative reports labeled Urgent, including an Auto track profile report, a Discovery report, and research as to whether Mr. Jeffries or his family members have any trusts. (01636)

**January 19, 2001** Mr. Gelardi spoke with Mr. Roberts regarding a file review that was being completed by Mr. Champagne, and arranged for a conference call to take place on January 22nd.

**January 31, 2001** Mr. Champagne wrote to Mr. Roberts summing up the recent conversation between himself, Mr. Jeffries, and Mr. Roberts. Mr. Champagne stated they were not clear about his occupational duties at the time of claim and were not sure why his travel to various car shows, doctors' visits and vacations contain at least some of the same skills as when he was with Provident. He asked that Mr. Roberts provide the authorization he had promised in his January 8, 2001 letter, the name of Mr. Jeffries' dentist, acupuncturist, and all the pharmacies where he got his prescriptions, as well as the names, addresses, and phone numbers of the places

Mr. Jeffries stayed while traveling. He also asked, "Does Mr. Jeffries drink or not? Does his sister have lupus or not? Has Mr. Jeffries presented a urine sample documenting burgundy-colored urine, and verification of three phone numbers as those of the nanny, Mr. Jeffries' home, and Mr. Jeffries' cell? He stated, among other things, that the front portion of the monthly supplemental forms would be needed until such time as Dr. Hyde had completed his evaluation of Mr. Jeffries and submitted a report. Mr. Champagne asked that all future correspondence be directed to him, but that Mr. Gelardi would not be removed from the administration of the claim. (1593-94)

**January 31, 2001** DMS received extensive 33-page documentation on litigation pertaining to chronic fatigue, as well as information regarding Dr. Byron Hyde and his work related to the Nightengale Research Foundation. (01538)  In addition, information regarding Dr. Luggen, Dr. Hyde, Dr. McCellan, Dr. Fidler, Dr. Dunn, and Graydon Head and Ritchley LLP and  Michaels Roberts was included.

**February 9, 2001** DMS received the summary of Dr. McCellan's July 2000 conversation with Ms. Palmer, which had been resent to him in December. Corrections made to the summary by Dr. McCellan were, "As stated in the past, there are no objective diagnostic markers which can be measured and followed in the disease as, for example, a broken bone." In response to the question regarding cognitive aspects of impairment to which Dr. McCellan had stated no, he corrected that to be, "Difficulty focusing, concentrating, or performing complex tasks particularly, at time of exacerbation." (01516)

Article I.        **March 10,2001**   DMS wrote To Mr. Jeffries and informed him; "their medical consultant had completed a review of the documentation contained within your claim file. Based on the review, we note a history of periodic subjective complaints however there is no objective evidence to support these complaints or a diagnosis of a medical condition. Further, although your history and subjective complaints appear at times, to be consistent with some kind of disorder, this documentation does not appear to support a total Disability As defined by your policy." Mr. Gelardi informed Mr. Jeffries he was still awaiting objective medical in formation and tax returns. He stated that if there was no objective information he wished to submit he would proceed with the processing of the claim with the information contained in the file. A

check was issued with a reservation of rights for benefits from December 1999 to March of 2000.

**March 31, 2001** PMSI notified DMS that they were unable to get records from Dr. Hyde for six months, as he would be out of the country until May.

**April 6, 2001** Mr. Champagne spoke with Mr. Roberts regarding his failure to submit the information requested in January; Mr. Roberts said he would get the information to him.

**April 14, 2001** A physician retained by the department of Health and Human Services in regard to another claim from Mr. Jeffries, Dr. Zweiman, wrote a report pertaining to his review of records from Drs. Waisbren and Hyde. Dr. Zweiman stated, "As noted by the many specialists that have examined him, the clinical presentation in Mr. Jeffries' case is both complex and puzzling…Dr. Zweiman presented other medical possibilities worth exploring, including Bechets syndrome. He noted that the SPECT scans that were described in the records sounded atypical. Other diseases mentioned were Chrons disease, congenital complement deficiency, serum sickness reaction, and cold agglutinin disease. He placed caveats on the possibilities for each of these conditions, but did raise them for consideration. In addition, he stated, "Dr. Waisbren refers to a diagnosis of chronic post-vaccinal encephalomyelitis …the nature of Mr. Jeffries' symptom complex and lack of supporting laboratory findings rule strongly against this diagnosis." In closing he concluded, "I do not believe that it is more than likely that the Hepatitis B immunization caused the symptoms described above in the case of Mr. Jeffries."

**April 25, 2001** Mr. Roberts contacted Baker and Baris, Inc. to perform a vocational analysis of Mr. Jeffries' capability to perform the material and substantial duties of his occupation.  Ms. Baris completed a comprehensive assessment of Mr. Jeffries' vocational abilities after having reviewed extensive documentation provided by Attorney Roberts, from treatment providers, claims file records, Mr. Jeffries' employer, and multiple research articles, all of which was identified in her report. Ms. Baris reviewed the medical issues presented by Mr. Jeffries, as well as the neuropsychological status from Dr. Bastein. Ms. Baris provided a functional capacity assessment and stated, "The claimant suffers from symptoms that are corroborated through the research studies consistent with individuals with similar diagnosis. His cognitive symptoms have been validated in Dr. Bastien's report and these are identified in her summary…In addition to his

check was issued with a reservation of rights for benefits from December 1999 to March of 2000.

**March 31, 2001** PMSI notified DMS that they were unable to get records from Dr. Hyde for six months, as he would be out of the country until May.

**April 6, 2001** Mr. Champagne spoke with Mr. Roberts regarding his failure to submit the information requested in January; Mr. Roberts said he would get the information to him.

**April 14, 2001** A physician retained by the department of Health and Human Services in regard to another claim from Mr. Jeffries, Dr. Zweiman, wrote a report pertaining to his review of records from Drs. Waisbren and Hyde. Dr. Zweiman stated, "As noted by the many specialists that have examined him, the clinical presentation in Mr. Jeffries' case is both complex and puzzling...Dr. Zweiman presented other medical possibilities worth exploring, including Bechets syndrome. He noted that the SPECT scans that were described in the records sounded atypical. Other diseases mentioned were Chrons disease, congenital complement deficiency, serum sickness reaction, and cold agglutinin disease. He placed caveats on the possibilities for each of these conditions, but did raise them for consideration. In addition, he stated, "Dr. Waisbren refers to a diagnosis of chronic post-vaccinal encephalomyelitis ...the nature of Mr. Jeffries' symptom complex and lack of supporting laboratory findings rule strongly against this diagnosis." In closing he concluded, "I do not believe that it is more than likely that the Hepatitis B immunization caused the symptoms described above in the case of Mr. Jeffries."

**April 25, 2001** Mr. Roberts contacted Baker and Baris, Inc. to perform a vocational analysis of Mr. Jeffries' capability to perform the material and substantial duties of his occupation. Ms. Baris completed a comprehensive assessment of Mr. Jeffries' vocational abilities after having reviewed extensive documentation provided by Attorney Roberts, from treatment providers, claims file records, Mr. Jeffries' employer, and multiple research articles, all of which was identified in her report. Ms. Baris reviewed the medical issues presented by Mr. Jeffries, as well as the neuropsychological status from Dr. Bastein. Ms. Baris provided a functional capacity assessment and stated, "The claimant suffers from symptoms that are corroborated through the research studies consistent with individuals with similar diagnosis. His cognitive symptoms have been validated in Dr. Bastien's report and these are identified in her summary...In addition to his

cognitive problems, Mr. Jeffries also might be suffering from a mild depression secondary to his illness, as described by Dr. Bastein." (CLM00618)

The occupational analysis provided a detailed description of Mr. Jeffries' work history and accountabilities. Ms. Baris noted that Mr. Jeffries' employer prepared an affidavit stating "it is simply not feasible to have a banker and managing director of our structured finance division out for extended periods of time, on an ongoing and intermittent basis." (00619) She also noted that research findings pertaining to occupational requirements of Mr. Jeffries' occupation reflected the need for physical tolerance of someone in fairly good health to carry out the various duties of his occupation. This would include a physical capacity to sustain a rigorous work schedule of greater than 10 – 12 hour days. Additionally, Mr. Jeffries would have to have high average to superior skills in the area of cognition associated with the job described." (00622) Ms. Baris also conducted a telephone interview with Mr. Jeffries and his attorney. Her impressions were provided in summary to be, "The ability for Mr. Jeffries to return to work in an occupation such as what he was performing at the time of disability would require significant recovery from his current multiple symptom complex. It would be difficult to assess what point he could begin to resume some or any of his duties. In reviewing this information, consideration was given as to whether Mr. Jeffries could possibly consult in this field. However, the nature of his condition would render him unable at the present time to make any commitment to project work which would involve deadlines...." (00625)

**April 27, 2001** Mr. Gelardi wrote to Mr. Roberts stating that the claim had come up for periodic review, that no further benefits would be issued until the information they had requested was received, and that they would close the claim if he had not responded within 21 days.

**May 2, 2000** Mr. Roberts provided the name of the acupuncturist and dentist, as requested. He agreed to have Dr. Hyde produce his report within one week from his return. He refused to provide the hotel information that had been requested. on the basis that it was irrelevant to the claim. The conversation was followed by a letter dated May 8, 2001 stating, among other things, that the authorization to allow DMS to conduct a third party review had been sent to him several months before with no response. He asked to be informed as to whether the company intended to pay

benefits or whether he would need to proceed with the alternative means of resolution discussed previously. (1457)

**May 10, 2001** Mr. Champagne spoke with Mr. Roberts and agreed to reassign the file to another examiner once the payments that had been issued were up-to-date.

**June 4, 2001** Mr. Champagne wrote to Mr. Roberts informing him that the file was transferred to Mr. John Graff. Mr. Champagne stated; contrary to Mr. Roberts' assertion that DMS was trying to beat Mr. Jeffries down, they were actually "attempting to understand this matter by obtaining all of the facts, which we are entitled to under the proof of loss provision of Mr. Jeffries' policy." Mr. Champagne reiterated that they were willing to accept an authorization that precluded them from speaking with Prudential for this claim only, "and with the understanding that, by entering into this agreement, we do not waive any rights to the request information, for example, by subpoena." (01439)

**June 7, 2001** Mr. Roberts responded to Mr. Champagne that he felt the issue of the authorization had been resolved, as he had submitted a proposed authorization earlier, with no response. He also questioned the suggestion by Mr. Champagne that they were planning to conduct a forensic review of Mr. Jeffries and his records on a claim that had been pending more than three years.

**June 15, 2001** The file was referred to Loretta Braga, RN, and case manager.

**June 20, 2001** A referral was completed for Psychiatric Disability Consultants to set up an IME to be completed by July 15th. The referral requested a specialist who may have written on the insured's diagnosis, (01424) as well as a neuropsychologist.

The extensive review resulted in a one-line recommendation to obtain an IME; there was nothing noted as to why, what specialist should be obtained, or what issues were to be addressed by the IME physician. (01412- 014125)

**June 20, 2001** DMS received a fax of Dr. Garb's and Dr. Hart's fee schedules, and their curriculum vitae.

**July 7, 2001** Dr. Hyde prepared an up-to-date medical report on Mr. Jeffries. He outlined all of the testing that had been performed, as well as Mr. Jeffries' past medical history. In conclusion, Dr.

Hyde stated, "The incredible number of historical, clinical and test results all are consistent with a major and overwhelming injury to the immune CNS. The tests conducted on Mr. Jeffries demonstrate that he has immunological and physiological injuries consistent with his complaints and consistent with the disability that he describes. The symptoms and patterns of his illness are also consistent with autoimmune and CNS vasculitis disease" (CLM00756)

**July 23, 2001** Mr. Champagne informed Mr. Roberts that additional payments were being issued and that they were still awaiting the documents he had promised to forward.

**July 30, 2001** DMS received an Insurance Department complaint requiring that they respond to the issues identified within 15 days.

**August 3, 2001** Mr. Graff wrote to Mr. Roberts to confirm a meeting with Mr. Champagne at Mr. Roberts' office on August 20. That same day, Mr. Roberts also sent a six-part submission of documents to Mr. Champagne in support of Mr. Jeffries' claim, including: Summary and Overview, an Occupational Assessment, Medical Evidence, Non-Medical Evidence of Bad Faith, and Appendix of supporting materials. The submission represented nearly six hundred pages of records, complete with a Table of Contents.

**August 17, 2001** Mr. Champagne responded to the Insurance Department complaint stating "they had received voluminous medical reports… and that, while there are indeed many reports, reviews by our medical consultants have indicated that they do not clearly support a claim for total disability. The majority of the reports lack objective medical evidence and are based on mostly subjective information provided by Mr. Jeffries. …Since the medical aspects of Mr. Jeffries' claim are still unclear, we have chosen to exercise our right under the policy to have Mr. Jeffries examined by physicians of the appropriate specialties to help us better understand the extent of his current restrictions and limitations." (01386). He also explained that DMS had not asked for information regarding his bank accounts, credit cards, and loan information, nor full access to his personal finances. We have, however, asked that he sign an authorization to allow us to fully evaluate his claim."

**August 28, 2001** Mr. Roberts expressed concern about Dr. Hart's qualifications to conduct an exam, given that she is a child psychologist. He also noted that Mr. Jeffries had already undergone a

neuropsychological evaluation and that DMS could review those results; therefore, a second exam was not necessary.

**August 30, 2001** Mr. Graff submitted the IME report prepared by Dr. Bastein to Dr. Clionsky, the in-house psychological specialist, for review. He asked that Dr. Clionsky comment on the results of the exam as well as the objective testing performed. He indicated the raw data would be sent for review as well. (01282) The IME with Dr. Hart was postponed, pending receipt of Dr. Clionsky's review.

**September 26, 2001** Mr. Jeffries signed an authorization to allow DMS to submit their file to Prudential Insurance Company. Mr. Champagne notified Mr. Roberts that DMS would not comply with the request to copy the file for Prudential.

**October 5, 2001** Dr. Zweiman reviewed additional information from Drs. Hyde and Bastein. He stated he "did not have the expertise to comment as to Dr. Bastien's finding, and that from my review of the clinical descriptions submitted, it does appear that Mr. Jeffries has a chronic ill-defined systemic disorder. However, on the basis of my review of the additional information, my opinion has not changed. I do not feel that it is more likely than not that the hepatitis immunization received by Mr. Jeffries was the cause of his ill-defined disorder."

**October 10, 2001** Mr. Champagne spoke with Mr. Roberts about the neuropsych being delayed due to the need to prepay for the records, and that they were still looking for an infectious disease specialist. He asked if Mr. Roberts was seriously considering possible settlement, to which Mr. Roberts responded yes. Mr. Champagne agreed to get back to him. (01262)

**October 25, 2001** Mr. Roberts called, upset that DMS was still in the process of making a decision on the claim. He stated they had enough information and that it was time to remove the Reservation of Rights, and either pay or deny the claim within 30 days.

**October 29, 2001** Mr. Champagne received a phone call regarding the neuropsych review that was performed. Although Dr. Clionsky did not agree with the interpretation of some of the scores, "in the end, their conclusions were similar regarding Mr. Jeffries having cognitive difficulties." He stated testing is over a year old and new testing would be necessary. (1254 book three)

**November 2, 2001** Mr. Champagne wrote to Mr. Roberts, and among other things stated that he was
waiting for the in-house physician to complete the review of Dr. Bastien's records. (01252)
"Additionally, we are attempting to find an infectious disease specialist, but as a result of Mr.
Jeffries' national and worldwide treatment, it has been difficult for us to find a physician that has
no affiliation with prior treatment." Mr. Champagne noted that they would not be able to
complete their investigation within thirty days due to the recent terrorist attacks, making it
difficult to schedule an appointment with an infectious disease specialist. He acknowledged
discussions regarding settlement of the claim and that he had offered to pay three years' of
benefits. Mr. Champagne stated, "If you wish to pursue negotiation of settlement for the return of
Mr. Jeffries' policy, we will await your response." (01253)

**November 8, 2001** Mr. Champagne spoke with the Department of Insurance regarding Mr. Jeffries'
ongoing complaint. He informed them that no decision had been made because they had
outstanding information, no authorization, and no attendance at the IME. (01248). Mr.
Champagne noted that Ms. Smith informed him that they were not violating any statutes and that
they had the right to decide.

**November 15, 2001** Ms. Smith, from the Department of Insurance, called and asked Mr. Champagne to
provide a copy of the original authorization, the authorization on PR COD, and the attorneys'
version of authorization with the changed language.

**January 3, 2002** Dr. Clionsky responded in writing to the review of the records from Dr. Bastein. Dr.
Clionsky had sent Dr. Bastein a letter in October asking that she respond to a number of
questions that he had relative to her testing process. Dr. Bastien responded that she was asked to
provide the raw data, and that she was going to have that information sent to him. Dr. Bastein
also noted that she had scored the TPT memory test as an 8 and that it was incorrectly reported
as a 7. Dr. Clionsky indicated, "Dr Bastien's response to his inquiry was unresponsive and
unprofessional... her unwillingness to comment on the basis of her opinions unscientific and
probably legally inadmissible under the Daubert criterion." He then provided an explanation as
to his reasoning for the questions he had posed, as well as a summary of Ethical Principles of
Psychologists and Code of Conduct (effective 1992). In closing, Dr. Clionsky recommended that
an independent neuropsychological evaluation be done. (01228)

**January 10, 2002** Mr. Champagne wrote to Mr. Roberts stating, "Their in-house consultant had noted various inconsistencies with the validity of the tests administered by Dr. Bastien and her scoring of each evaluation. Since these inconsistencies of this evaluation raise numerous questions as to whether or not your client is suffering from a disabling condition, we have chosen to exercise our right under the policy to have Mr. Jeffries examined." They arranged an IME with Dr. Hart for February 14, 2002.

**Feb 6, 2002** Attorney Roberts responded, among other things, "DMS has in its possession some of the unanimous opinions of Mr. Jeffries' treating physicians that he is disabled. The doctors who concur in this opinion are Dr. Hyde, Dr. Bastein, Dr. McCellan, Dr. Dunn and Dr. Luggen. In addition, Mr. Jeffries was examined and tested by Dr. Sandman, who concurs with Dr.Bastein's assessment that Mr. Jeffries is totally disabled. Dr. Charles Poser, who as you know is a professor at the Harvard Medical School, has personally examined Mr. Jeffries and recently provided a more detailed opinion that Mr. Jeffries is disabled ... As you know, Prudential had Mr. Jeffries' records reviewed by Dr. Curran. You have a copy of Dr.Curran's report. Dr.Curran judged that Mr. Jeffries indeed was disabled." ...The government's expert, a professor at the University of Pennsylvania, opined that Mr. Jeffries is disabled... Even though Prudential does not have knowledge of the reports from the University of Pennsylvania professor, the Harvard Medical school professor, or Dr. Sandman's report, Prudential just last month conceded that Mr. Jeffries is disabled. ... Quite clearly there is 'sufficient proof of loss,' as Mr. Jeffries has given DMS the information needed to determine if a benefit is payable. ... While the policy permits DMS to examine Mr. Jeffries, there is no doubt a point where enough is enough. We have reached that point. Accordingly, Mr. Jeffries does not intend to submit to further examination by DMS."(01182)

**February 21, 2002** Mr. Graff instructed Mr. Jeffries' policy be taken off Waiver of Premium effective as of February 25, 2002 that decision was never communicated to Mr. Jeffries. (00948)

**February 26 through 28, 2002** Mr. Champagne and Mr. Roberts had three phone calls regarding the refusal to participate in the IME. Mr. Champagne asked again whether settlement was an option and Mr. Roberts commented , "The amount being offered was ridiculous and no counter was going to be made.' Mr. Champagne noted the file stating, "I spoke with Mike about his letter and

advised him I felt it was ludicrous and BS. He accused the company of being secretive about information, and I told him we have no authorization to learn any new information." (01170)

**February 28, 2002** Mr. Roberts sent a follow-up letter to Mr. Champagne acknowledging their previous conversations. Mr. Roberts noted that DMS did not attempt to gather the medical information in Prudential's possession that supports impairment. He also noted that had Mr. Champagne read his letter he would have seen that Mr. Jeffries had already undergone a second Neuropsych exam following his exam with Dr. Bastein. He concluded by saying "… no further medial testing was warranted …and the settlement offer posed by DMS for less is rejected. … If Massachusetts Casualty desires to fairly evaluate their liability and make a settlement offer, Mr. Jeffries will consider it and respond. Your October offer is less than 5% of the exposure DMS has in this matter." (01167)

**February 28, 2002** The file was closed. (00943)

**March 6, 2002** Mr. Roberts wrote to William Ellis, counsel for DMS, summarizing a number of his concerns with DMS' handling of Mr. Jeffries' file and the representations made about Mr. Jeffries' failure to cooperate with the claims process. He reiterated that he did not feel additional medical testing was warranted.

**March 8, 2002** DMS asked Dr. Clionsky to review additional neuropsychological records from Dr. Sandman and Dr. Poser. (book three BS 0113-01158) Dr. Sandman, PHD Professor and Vice Chair of Department of Psychiatry University of California Irvine, concluded, "It is clear that Mr. Jeffries has sever impairments in cognitive function. These impairments are not the result of malingering tendencies. He has focal losses in processing speed and working memory. He registers a fraction of information forming incomplete memories and has difficulties retrieving what he does consolidate. His impairment in judgment may result in poor decisions and frustration. … My results complement those of Dr. Bastein…"

**March 20, 2002** Dr. Clionsky spoke with Mr. Champagne and stated, "The testing done by Dr. Sandman was inadequate. There was no history taken, testing only; it appears to have been done in a vacuum. There were no updates since last testing. Cannot compare anything, cannot comment on whether data is valid and have many questions…" (00982)

**March 21, 2002** Mr. Champagne wrote to Mr. Roberts and informed him that, due to Mr. Jeffries'
refusal to submit to an IME and his refusal to sign the standard authorization, " … he has failed
to comply with the provisions as required under the policy and has continued to fail to cooperate
with us in the investigation of his claim, we have been left with no option but to consider
termination of further benefits absent compliance." (00980). The file was already closed a month
before this.

**March 28, 2002** Mr. Jeffries agent was sent a premium notice informing him that Mr. Jeffries policy
had been taken off Waiver effective February 25, 2002 and that premiums for March 01 to April
01 were now due. (00945) Waiver was processed Feb 21.

**April 2, 2002** Mr. Jeffries agent advised him that his policy had lapsed.

**April 3, 2002**  DMS received Dr. Clionsky's report in which he stated, "Dr. Sandman's failure to
perform a comprehensive diagnostic interview or review of records, his lack of comment as to
Mr. Jeffries' presentation at exam, and his lack of knowledge regarding Mr. Jeffries' medication
usage … were a fatal flaw in Dr. Sandman's report." Dr. Clionsky said, "In sum, I feel Dr.
Sandman's testing is so flawed that we cannot draw useful statements of disability and prognosis
from it. Dr. Sandman can not validly conclude that Mr. Jeffries' functioning will decline in the
future or that it will persist and grow with advancing age, and he cannot validly conclude that
Mr. Jeffries is currently disabled for his profession.  Dr. Clionsky also disagreed with Dr. Poser's
assessment of Mr. Jeffries on several bases, including but not limited to; "He did not provide the
results of his own examination of Mr. Jeffries and he failed to provide a connection between his
evaluation of Mr. Jeffries and his review of Mr. Jeffries' laboratory data and that
diagnosis…Furthermore, very little in his report addresses the relationship between this
diagnosis and the question of occupational disability. The closest that he comes to this is when
he reports on the first page that Mr. Jeffries complains of problems, including cognitive
dysfunction, and that this is quite significant in view of the fact that Mr. Jeffries is an investment
banker." (00975) Book 4

**April 22, 2002** Mr. Graff wrote to Mr. Roberts to reconfirm DMS's position that no further benefits
were forthcoming, due to Mr. Jeffries' failure to comply with the policy provisions as outlined
previously. (00959)

**April 25, 2002** Mr. Graff agreed to extend the automatic reinstatement period on Mr. Jeffries' policy. (1008) Dr. Poser reviewed documents from Dr. Zweiman and Dr. Hyde, as well as numerous articles. Dr. Poser challenged a number of Dr. Zweiman's conclusions and stated in his own assessment, after having previously examined Mr. Jeffries and now reviewing additional data, "I am of the opinion that Mr. Jeffries suffers from chronic fatigue/myalgic encephalomyelitis and, to a reasonable degree of certainty, that it is the long-term result of his having been vaccinated against Hepatitis A and B in June of 1997."

**June 24, 2002** Following a hearing with the Magistrate, Mr. Ellis, attorney for DMS, wrote to Mr. Roberts confirming the scheduling of an Independent Medical Exam with Dr. Grubb.

**July 3, 2002** Mr. Ellis confirmed the IME as scheduled for July 8, 2002.

**August 7, 2002** Mr. Ellis requested that Mr. Jeffries return for additional evaluation, as Dr. Hartings had not reviewed the entire medical record prior to his initial exam and had additional questions. Mr. Ellis added that the IME with Grubb was cancelled.

**August 12, 2002** Mr. Burrell, from Wood & Lamping, indicated that Dr. Hartings wanted to meet with Mr. Jeffries another four hours, and that he also wanted to interview Mr. Jeffries' wife.

**November 11, 2002** Mr. Roberts wrote to Mr. Ellis and Wood & Lamping, informing them that the recent court order instructs DMS to retain Dr. Grubb for the IME. He also asked that past due benefits for the period of February 2002 to November 2002 be paid. Mr. Ellis agreed that he would attempt to retain Dr. Grubb for the IME and that DMS would pay benefits with a Reservation of Rights currently, but not for the period during which he was in breach of his insurance policy.

**January 13, 2003** Magistrate Judge Hogan opined that Mr. Jeffries would be obligated to participate in the IME, and that DMS maintain the policy in force.

**January 13, 2003** Mr. Roberts wrote to Mr. Ellis and requested that DMS repay Mr. Jeffries the premium he had submitted, as well as back benefits owed. Mr. Roberts pointed out that Mr. Jeffries had complied with the DMS requests; he noted specifically that Mr. Jeffries had complied with all of the requests regarding participation in medical exams, and that the judge

had ruled that DMS's position relative to the authorization was unreasonable. Mr. Roberts stated in closing that "…Judge Hogan clearly spelled out that the event which caused Defendants to stop paying benefits to Mr. Jeffries was immaterial; Defendants should, therefore, stop relying on some fiction that an immaterial event gives them the right to deny benefits which are due and further the hardship they have bestowed." Mr. Jeffries asked that Mr. Ellis inform him whether they would pay benefits by February 3, 2003.

**February 5, 2003** Judge Hogan ruled that DMS respond to the request made by Plaintiff's Counsel to provide all memorialized communications about this case. He also stated Plaintiff has a right to the evidence the Defendant possesses that shows that the Plaintiff is not disabled.

**February 7,2003** Dr. Bullard conducted an examination of Mr. Jeffries indicating a diagnosis of Malaise and Fatigue that was chronic active unstable and continuing. His assessment plan indicated; "Complicated medical patient with numerous problems. The primary difficulty in which he has a chronic myalgia and neuralgia. Unfortunately there are no objective findings to support his complaints. The unusual gait asymmetry is unusual. Additional neurological diagnostic testing is probably warranted based on the somewhat focal nature of the symptomology." The findings of his examination were primarily all normal results with the exception of the complaints of fatigue and malaise.

**March 15,2003,** Mr. Jeffries participated in a neuropsychological IME. Dr. Hartings reported that Mr. Jeffries test results did not reflect a normal neuropsychological profile. And that although Mr. Jeffries tests as a man with superior overall intellectual ability… his cognitive profile across several other domains reflects a much lower level of functioning. Most notably his mental processing speed and efficiency is weak." In summary Dr. Hartings concluded that the following diagnoses could be made: "Cognitive Disorder with an undetermined etiology, Somatization Disorder, Severe. Obsessive Compulsive Personality Disorder and Rule out Auto immune disorder via medical IME." Mr. Hartings stated: "It is beyond the scope of this IME to determine whether Mr. Jeffries suffers from an occult auto-immune reaction, whether his condition is solely psychological or whether there is a combination of both."

**April 3, 2003** Mr. Roberts filed a motion to compel to the court, because of DMS's misrepresentation of the information that was contained on the claim system, as well as the length of time that the

information was held. He also reported that Dr. Hartings examined Mr. Jeffries on March 3, 2003 and had spoken with Defense Counsel prior to the production of any written report. Defense Counsel had advised Plaintiff's Counsel that Dr. Harting's opinion was that Mr. Jeffries was disabled and that the written report would not be ready for two weeks.   Mr. Roberts stated he advised Defense Counsel that he was going to contact the physicians on March 18 regarding the status of the reports; Defense Counsel advised him that should he do so they would seek sanctions against him. Mr. Roberts then learned that the reports had been issued to Defense Counsel, and that they had asked Dr. Bullard to revise his report. Lastly, Mr. Roberts stated that DMS had refused to produce witnesses for deposition. Mr. Roberts asked that the court order sanctions.

**May 15, 2003** Mr. Burrell, from Woods & Lamping, wrote to Mr. Roberts regarding Mr. Jeffries' January benefit payment. Mr. Burrell responded that DMS had not received a continuance of disability form, did not receive one until April 7, and there was no Attending Physician statement. Mr. Burrell stated that the AP portion of the form was not received until May 2, 2003 and at that time; Mr. Jeffries' authorization had expired. Contingent upon policy provisions, payments are dependent upon completion of monthly progress reports. At least one of Mr. Jeffries' payments was delayed because of either his or his counsel's refusal to submit the forms. Moreover, because a final decision cannot be made until after the reports are appropriately evaluated, payments continued to be made under ROR.

**May 16, 2003** Mr. John Graf wrote to Mr. Roberts and informed him that payment had been made for the period of January 15 to February 15, and that waiver of premium was initiated. Mr. Graff stated, "A physical exam was scheduled for February 7, 2003. The results of this exam were completely negative. In addition, as a part of our evaluation of Mr. Jeffries' claim, a psychiatric exam was performed. This exam, completed in February, concluded that Mr. Jeffries was disabled due to a psychiatric disorder, particularly a somatization and or/obsessive compulsive disorder. Objective testing showed indications of a decline in cognitive functions, which were secondary to a severe obsessive-compulsive personality disorder; however, there was no evidence of cognitive or behavioral impairment. It was, therefore further concluded that it was unlikely that Mr. Jeffries suffers from a neurologic condition. This exam further concluded that with the right treatment plan, this condition is corrective.  Additionally, we forwarded a copy of

51

the exam to our consultant for a review; our consultant agreed with his examination and concluded that it is unlikely Mr. Jeffries suffers from a neurological condition and his complaints are better explained by a psychological disorder, particularly a somatization disorder, severe and obsessive compulsive personality disorder. ...The documents that we have reviewed to date indicate that Mr. Jeffries' condition is one that is classified as a 'mental Disorder.' According to the policy, such disorders include, but are not limited to, personality, psychotic, emotional or behavioral disorders. Our records indicate that Mr. Jeffries has been paid a total of 39 months for this claim. Because this is beyond the maximum benefit allowed in the policy, we are unable to pay additional benefits. We have calculated the amount of benefits paid in excess of the maximum benefit period and will contact you regarding that overpayment. Lastly, we have received information from Dr. Geier. We are in the process of considering this report as it regards our decision."

**Mary E Fuller**

*Disability Claim Consulting Services*
*32 Landing Woods Road*
*Yarmouth Maine, 04096*
*207-846-4225 e-mail: mfuller@maine.rr.com*

## Professional Experience

### UNUMProvident, Portland, ME

*1999-2001, Vice President of Psychiatric and Cardiac Claims*
Complete responsibility for the management of the block of business including financial results, strategic direction, staffing, training, quality and customer service. Managed a staff of 6 professionals; responsible for 60- 80 claims staff.

*1997-1999, Vice President, UNUM Individual Disability Benefits Department*
Responsible for the results of the department including oversight of over $600 million in claim reserves, return to work strategies and initial liability decisions for all impairment groups. Managed 5 professional staff with 130 employees including physicians, nurses, vocational consultant, CPA's and claims staff. Extensive experience as an expert witness in the capacity of "person most knowledgeable." Extensive experience in settlement negotiations for litigated and non-litigated disputes.

*1995-1997, Assistant Vice President*
 Managed the psychiatric and complex claims unit.

*1991-1995, Director of Individual Disability*
 Managed the individual disability claims units within the western region of the United States.


*1988-1991, Private practice counseling*

*1984-1988, Asst. Vice President, Individual Disability Underwriting, UNUM Life Insurance Company of America, Portland, ME*

*1982-1984 Supervisor of Individual Disability Claims,Unionmutual Insurance Company Portland,Maine*

*1979-1982, Drug Abuse Prevention Coordinator, State of Maine*

*1978-1979, Trainer, Eastern Maine Medical Center Inpatient Alcohol Treatment Program*

*1975-1978, Substance Abuse Counselor and Consultant*

**Education**

1979, M.Ed. University of Maine Orono
1975, BA in Social Welfare, University of Maine at Orono
1976, Rutgers School of Alcohol Studies

In addition to my academic education I have participated in numerous insurance industry seminars and courses over the past twenty years including HIAA , ICA and LOMA

Deposition and Trial Testimony of Mary E Fuller

During my tenure as Assistant Vice President and Vice President of Claims for Unum, Currently known as Unum provident, I participated in approximately twenty-five depositions and two trials as the designated expert for the company.

Trial testimony took place in Los Angeles California in Stephen Graheck Vs.Unum life insurance Company of America.
Atlanta Georgia in the matter of Harold Rosing Vs Unum Life Insurance Company of America.

The names and jurisdictions for the depositions that I have been involved in are not available to me at this time as Unum Provident holds that information.

Deposition Testimony that has occurred in my role as an expert witness occurred in October of 2002 in the matter of Chapman vs. Paul Revere Life Insurance Company.

Superior Court of California Marin County trial Chapman vs. Paul Revere Life Insurance Company Expert witness.

Conlin Vs Unum Provident State of Wisconsin Federal Court  Expert witness deposition testimony July 2003

Brown Vs Northwestern Mutual Life insurance Company  Expert witness deposition testimony  July 2003

Articles written By Mary E Fuller

During my seventeen years in the disability insurance industry I wrote four articles related to Disability Claims between the years 1993 and 1999.

The articles were presented at the National conferences for The Health Insurance Association of America and The International Claims Association. The publication of these articles was limited to the conference manuals.

The Articles included:

A Multi-disciplinary Approach To Claims Management.

Claims Management of The Drug Addicted Anesthesiologist

A Team Approach to Psychiatric Claims Management

Management of Residual Disability Claims

While operating in the capacity of Claims expert  I have written the following:

Management of Psychiatric Disability Presented March 2003 American Conference instate on Litigating Disability insurance Claims.