UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


- - -


| | | |
|---|---|---|
| ERIC L. JEFFRIES, | . | CIVIL ACTION NO. C-1-02-351 |
| | . | |
| Plaintiff, | . | Cincinnati, Ohio |
| | . | |
| - v - | . | Friday, July 11, 2003 |
| | . | |
| CENTRE LIFE INSURANCE CO., | . | **Volume II of the Motion Hearing** |
| et al., | . | |
| | . | |
| Defendants. | . | |

. . . . . . . . . . . . . . . . . . . . . . . . . . .

CONTINUED TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE TIMOTHY S. HOGAN, MAGISTRATE JUDGE
TRANSCRIPT ORDERED BY:  Counsel for the Parties

APPEARANCES:

For the Plaintiff:      GRAYDON, HEAD & RITCHEY, LLP
                        BY:  Michael A. Roberts, Esq.
                        511 Walnut Street, Suite 1900
                        Cincinnati, Ohio   45202

For the Defendants:     WOOD & LAMPING, LLP
                        BY:  William R. Ellis, Esq.
                        and  Peter M. Burrell, Esq.
                        600 Vine Street, Suite 2500
                        Cincinnati, Ohio   45202

Law Clerk:              Linda Smith, Esq.

Courtroom Clerk:        Barbara Crum

Court Reporter:         Mary Ann Ranz


- - -

EXHIBIT
2
ALL-STATE LEGAL®

1                    FRIDAY, JULY 11, 2003

2                  PROCEEDINGS IN PROGRESS

3          THE COURT:  Yes, sir.

4          MR. ELLIS:  I'd like, Judge, to deal I guess with

5   the Hartings issue first.  I will tell you that we did file a

6   response on behalf of Dr. Hartings because we didn't feel

7   that he should have to hire a lawyer, since he was hired

8   simply to do an independent medical examination.

9      The simple fact was, there was an issue concerning

10  whether or not the raw data of a test could be given to

11  anyone outside of another psychologist.  I've run into this a

12  number of times, and it came from some ethical considerations

13  in the psychiatric community.  I couldn't get them.

14         THE COURT:  No, I'm familiar with that.  There is

15  something to that effect that --

16         MR. ELLIS:  But in any event --

17         THE COURT:  -- Psychological Association's ethical

18  rules.

19         MR. ELLIS:  Well, we discussed this back and forth

20  with Dr. Hartings and he said, "Look.  If he gives me the

21  name of a psychologist, I'll give it to him," you know.  And

22  I said, "Mike, he's demanding.  I don't know what to do."  We

23  went back and forth and talked about the ethical

24  consideration, and ultimately it was determined that because

25  of the nature of this particular one, he could give them to

1    benefits right up until the point when he was advised not to

2    attend an independent medical examination, even though it was

3    the first and only independent medical examination request by

4    this company and was contained in the policy as an obligation

5    of the insured's.  That's what started this thing.  All

6    right?

7        How can you be in bad faith in handling a claim while

8    you're paying the benefit every month?  How can you in bad

9    faith make the payment of the full amount of the benefit

10   every month?

11       Now, since the suit has started, the claim is that we

12   stopped paying him in bad faith, when as this Court knows,

13   and as Judge Beckwith ruled, we stopped because he refused to

14   comply.  As soon as he complied, we made another payment in

15   good faith until there was a decision made.  Now, that

16   decision is in controversy whether this is mental illness or

17   physical ailment.  But, I hardly think that the e-mails or the

18   documents between these companies or any of the requests that

19   we'll go through here in a minute, in 1999 and 2000 and 2001

20   and 2002, have absolutely anything to do with the fact that a

21   decision has now been made that Mr. Jeffries is disabled by a

22   mental illness as opposed to a physical ailment.

23       How can you be in bad faith when you're paying a claim?

24   And the Court knows why we weren't, because we were in front

25   of the Court when we stopped paying.  We are jumping through

1    hoops.

2        He complains about the expense to his client.  This has

3    been an onslaught of wasted time and wasted paper and wasted

4    discovery dictated by the plaintiff, trying to find something

5    to talk about other when there's only one issue in this case:

6    Is this disability mental or physical?  It's the only issue.

7    Frankly, he wouldn't have missed a payment up until this

8    claims decision was made had he gone to the independent

9    medical examination when it was first proposed.

10       We're being asked to produce data from 1999.  He wants

11   depositions.  He's already taken probably ten of them in this

12   case.  But he wants depositions of the president of Centre

13   Life.  Centre Life is the insurer who turns over their claims

14   to a third-party administrator and says, Administer these.

15   What he's going to know about Eric Jeffries or Eric Jeffries'

16   claim?  For that matter, the vice president of DMS, what's he

17   going to know about Eric Jeffries' claims?  They don't deal

18   with claims day-to-day.  They deal in the business.

19       Here's the bigger question:  What relevance, possible

20   relevance can the business plan in the development of DMS

21   have as to whether or not Mr. Jeffries is disabled by a

22   mental or a physical condition?  And surely we couldn't have

23   had a business plan to act in bad faith if we were paying the

24   claim.

25       We are chasing our tail on this discovery stuff, which is

1   a complete distraction from the one and only issue in this

2   case:  Is he disabled by a physical ailment or is he disabled

3   by a mental condition?  We think it's clear one way.  He

4   thinks it's clear the other way.  It just depends on whose

5   experts you talk to and how you view the medical records.

6      We view all of his treating physicians here, and several

7   of the experts he's consulted from the University of

8   Pennsylvania, the Mayo Clinic and the Cleveland Clinic, and

9   somewhere out in California, Johns Hopkins, all as saying,

10  "We believe that this guy is suffering from pain.  We believe

11  that he's suffering from all these symptoms, his fatigue.

12  Whatever he's telling us, we're buying, we believe it,

13  because he appears honest.  He appears like he means this."

14  And that is not inconsistent with the diagnosis Dr. Hartings

15  made, because you would actually feel these things.  But

16  they're psychogenic.  And each of them gives him

17  examinations, tests.  He's had neuro tests.  He's had x-rays,

18  MRIs.  You name it, he's gone through it.

19     He's had liver biopsies.  He's had every test known to

20  man and they're all normal, except of course Petin (phonetic)

21  and Spice (phonetic) scans which we'll end up dealing with in

22  the future on this anyways, that can say if in fact that it

23  exists that he has Chronic Fatigue Syndrome.

24     Now, CDC says Chronic Fatigue Syndrome, which is what

25  he's claiming, is a disease in which the patient keeps

1   psych -- actually psychiatrists who I know. I can tell you

2   that there are doctors who think that everything is mental,

3   and they are psychologists who think that everything is

4   physical. So, the truth probably is somewhere in between.

5   You can find somebody who will express a view if you look far

6   enough and hard enough, and I should say we're pretty

7   familiar with these two diagnostic, I guess, disorders that

8   the doctor came up with because we see them all the time in

9   Social Security cases. So, I'm pretty familiar with the

10  elements, at least according to Social Security law.

11      So, anyway, we'll resolve this as quick as we can and

12  going to try to make it soon. We're involved in several

13  other things at the moment that have to get done first. So,

14  soon.

15          MR. ELLIS:  Thank you, Your Honor.

16          MR. ROBERTS:  Thank you, Your Honor.

17          THE COURT:  Thanks.

18          THE CLERK:  Court is adjourned.

19                  -  -  -

20              PROCEEDINGS CONCLUDED

21                  -  -  -

22

23

24

25

# C E R T I F I C A T E

I, Mary Ann Ranz, the undersigned, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


Mary Ann Ranz

Official Court Reporter