UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| ERIC L. JEFFRIES, | : | |
| | : | Case No. C-1-02-351 |
| Plaintiff, | : | |
| | : | (Judge Beckwith) |
| vs. | : | (Magistrate Judge Hogan) |
| | : | |
| CENTRE LIFE INSURANCE COMPANY, | : | **DEFENDANTS' MEMORANDUM** |
| et al., | : | **REGARDING THE COURT'S** |
| | : | **OCTOBER 17, 2003 ORDER** |
| Defendants. | : | |

**INTRODUCTION**

Defendants are in receipt of the Court's October 17, 2003 Order which was issued following correspondence from Plaintiff's counsel, of the same date, to the Court. It appears that that the letter from Plaintiff's counsel was the impetus for the Order. At the time counsel for Defendants received the Order, they had just received Plaintiff's counsel's October 17, 2003 letter but had not an opportunity to respond.

In apparent acceptance of Mr. Robert's continued claims that Defendants have not been genuine with the Court, the Court has now ordered production of copies of backup tapes, which cannot be copied. Defendants were surprised that the Court issued such a strong Order before they had an opportunity to respond to Mr. Roberts' latest complaint.

**ARGUMENT**

**A.    The Back-Up Tapes Must be Restored in Order to be Produced in a Useful Form.**

Mr. Roberts' pattern of misrepresenting facts to the Court can no longer be overlooked by Defendants. In the October 17, 2003 Order, the Court accuses Defendants of **intentionally misunderstanding** its October 6, 2003 Order. This **intentional misunderstanding** is a creation

of the comments of Plaintiff's counsel which the Court has accepted without input by Defendants. In the October 6 Order, which followed the October 1 conference regarding outstanding discovery issues, the Court ordered:

> Defendants shall produce to Plaintiff back-up computer tapes containing electronic messages and information. Plaintiffs search of those tapes shall be limited as described in the proposed protocol.

In anticipation of the Court's Order on this issue, Defendants had filed the affidavit of Peter Cinq Mars on October 6, 2003. Mr. Cinq Mars explained the efforts that would have to be undertaken in order to provide Mr. Roberts with the opportunity to search the information on the backup tapes. Rather than consider the reasoned and factual explanation of the procedure involved as set forth by an expert in the field of network management, the Court has accepted the unsubstantiated assumptions of Plaintiff's counsel that these tapes could be simply duplicated. In fact, the Court's most recent order holds that the procedure outlined by Mr. Cinq Mars is not necessary.

As counsel for Defendants has tried to explain to Plaintiff's counsel on numerous occasions, there are offsite back-up tapes and onsite back-up tapes. In the July 11, 2003 hearing on the Motions, counsel for Plaintiff appeared to express his understanding of the offsite storage of back-up tapes. He cited to the testimony of Kevin Hulse regarding the offsite storage of back-up tapes and the fact that review of those tapes had not been done pending Defendants' objections to production of the tapes. In his October 17, 2003 letter to the Court, Mr. Roberts misstates DMS' position and claims that DMS represented that it had in fact searched the back-up tapes. **This is not true**. There has never been a search of the back-up tapes **nor had there ever been a representation that such a search been done**. What was done was a search of the existing computer network. In anticipation of the Court's Order on this issue, however, DMS put together

a detailed explanation of what would be required just to retrieve, let alone search the back-up tapes.

An affidavit of Eugene M. Vinyard is attached. *See* Exhibit A, Vinyard Affidavit. Mr. Vinyard is the Senior Network Administrator for DMS. He is an expert in the field of computer data management. The back-up tapes in question are stored in an offsite facility and anticipated to be used only in the event of a catastrophe. For this reason, it costs $100 per tape to retrieve these tapes. There are approximately 60 back-up tapes. *See* Exhibit A Vinyard Affidavit 2 at ¶ 2. Thus, it costs $6,000 just to pull the tapes from storage. *See* Exhibit B, Cinq Mars Affidavit at ¶ 4.

Once the tapes are retrieved from the offsite storage, they are not in a searchable format. Mr. Roberts has argued that he simply requires copies of the back-up tapes. Consultation with three IT experts has revealed that to their knowledge there is no hardware and software in existence which Defendants could buy in order to duplicate compressed backup tapes and get a searchable product. If copies of the tapes are produced to Mr. Roberts in their current format, they would be impossible to search without restoration to a server. Restoration to a server would mean that the person restoring the information after conversion would, of necessity have access to all of the material on the tapes. This would include information on hundreds of thousands of insureds and tens of thousands of claims, not to mention employee records, confidential business documents and attorney-client communications wholly unrelated to this lawsuit.

As Mr. Vinyard's Affidavit points out, the back-up tapes need to be converted in order to be searched. The tapes are kept in a compressed format that cannot by any known current industry standard be simply duplicated, copied and searched. It is not just a matter of making a duplicate tape like a VCR tape. There is no known hardware or software in the industry that

would allow anyone to simply copy the tapes in the format in which they currently exist and have a searchable result. Therefore, the tapes will need to be restored to a separate network and then, if duplicate tapes were desired, backed up again, in order for them to be delivered to an outside firm. *See* Vinyard and Cinq Mars Affidavits.

Imagine if the data stored on the back-up tapes were Legos and you wanted to see a specific car built out of the legos on a specific day. But, when the Legos were put away, the car was disassembled and packed together tightly with all the other Legos in order to take up the least amount of space in the box as possible. It is not simply a matter of opening up the box and dumping the Legos out to find the car. The block of Legos would have to be pulled apart and put back together in the form of the car you want. To simply hand over the square mass of Legos all hooked together, or even an exact copy of the mass of Legos, accomplishes nothing.

DMS had proposed restoring these back-up tapes sought by Plaintiff to a dedicated server and removing extraneous material so that Plaintiff's unnamed expert could search for the claim number or the name Jeffries. At the very least, the material must be restored to a searchable format. Mr. Vinyard has explained:

> In order to put this data in a searchable format it must first be decompressed from its current backed-up state on the Digital Linear Tape (DLT) tape. This accomplished using Computer Associates' ArcServe software. This software is designed to restore to a server the exact files that were present on the server when it was backed up. This means files in the format that is usable by the applications that use the files. The data once restored to a server, is still not yet in a searchable format.
>
> The data restored would then need to go onto a server that runs the Microsoft Exchange mail software involved and then the data must be searched using Microsoft Outlook client software. This process can search only one email box at a time.
>
> Even if the backup tapes could be simply copied in their current format, the data on those tapes must be restored onto a server using ArcServe software and into an Exchange environment to perform the review.

*See* Vinyard Affidavit 2 at ¶¶ 6-8.  After the restoration is complete, the search itself is time-consuming.  The privacy and encryption safeguards designed by Microsoft to protect e-mail security must be dealt with as the individual mailboxes are searched.  See Vinyard Affidavit at ¶ 9.

Plaintiff's counsel had previously agreed, and the Court had earlier confirmed, that these costs were to be borne by the Plaintiff.  In the most recent Order, the Court appears to have concluded that the restoration process is unnecessary and, apparently as a sanction, the cost of producing the information is to be born by defendant.

Unfortunately, if the tapes could be produced without restoration, they will be useless. Neither the hardware nor the software exists to duplicate a condensed back-up tape into a searchable format without first restoring it as set forth in Mr. Vinyard's Affidavit.  DMS is certainly willing to comply with the Court's Order and is in fact to anxious to establish that the evidence of bad faith Mr. Jeffries seeks is not on back-up tapes which pre-date the determination of his claim.   However, it cannot do the impossible.  It would be a wonderful system if all discovery demands made by Mr. Roberts were at least possible to provide.  DMS could then avoid the Court's ire.  But apparently, our inability to do what no one else on earth can do is insufficient in a case where Mr. Roberts is allowed to set the parameters.  Mr. Roberts either intentionally or through ignorance misstates, as he has so often done before, what would be required.

This issue has come up no less than three times.  In the past and now, DMS has answered the same way:  production of the tapes is overly burdensome and will likely not lead to the discovery of admissible evidence.  Nonetheless, in anticipation of the Court's Order that the information on the tapes be copied and produced, DMS has submitted the cost of producing that

information.  **Restoration, despite Mr. Roberts' disbelief, is required.**  If the tapes could be produced in their current, compressed form, Mr. Roberts will no doubt complain to the Court that they cannot be searched.  DMS will have gone to the expense of retrieving and recreating these tapes only to be sanctioned once again.  Moreover, the back-up tapes Mr. Roberts seeks are from a time period during which Mr. Jeffries' claim was being paid.  It is important to remember that until Mr. Jeffries refused to attend a medical examination as required by his policy, DMS had paid his benefits in full.  Mr. Roberts futile search for evidence of bad faith will not bear fruit upon production of this information.

      **B.**      **The Cost of Production.**

The cost of production in this case is estimated to be in the area of $50,000.  Several courts have dealt with this problem in the past specifically dealing with backup tapes.  Eight factors to be considered by the court have been identified; 1) The specificity of the discovery request; 2) the likelihood of discovering critical information; 3) the availability of such information from other sources; 4) the purpose for which the responding party maintains the information; 5) the relative benefit to the parties of obtaining the information; 6) the total cost of the production; 7) the relative ability of each party to control the costs and its incentive to do so; 8) the resources available to each party.  *Medtronic v. Michelson*, 2003 WL 21468573 (W.D. Tenn. 2003); *Murphy Oil, Inc. v. Fluor Daniel, Inc.*, 2002 WL 246439 (E.D. La. 2002); *Rowe Entertainment v. The Williams Morris Agency*, 205 F.R.D. 421 (S.D.N.Y. 2002).

      **1) Specificity:**  In this case, the plaintiff specifies that he desires to review all of the backup tapes of the DMS network ever created so that he can search for his name and claim number. This appears to be a very specific request. However, since Mr. Jeffries claim was being paid through early 2002 and was suspended only after his refusal to attend an IME it seems

unlikely that the tapes from 1998-2001 would be needed. **2) Critical Information:** Given the facts of this case -- that the Defendants would not be using any information from these tapes in its defense; that even the Plaintiff's alleged "bad faith" expert found no need to resort to this information to render her opinions; that the Plaintiff's counsel was directly involved in the claim for over one year before benefits were suspended; and that DMS' practice is to place all relevant information in hard copy format in the claim file that has already been produced, there is little possibility of any new or critical information being discovered;  **3) Availability:**  All of the information used in determining Mr. Jeffries claim is contained in the claims file or counsel's litigation file and is thus readily available to both parties.  In fact in his August 5 ruling, Magistrate Judge Hogan specifically held that the Defendants could not use any information from these tapes. **4) Purpose of Maintaining the Data:**  There is no dispute that this data, kept offsite and in the condensed format is designed for disaster recovery only and would never be retrieved nor used by the Defendants for any other purpose. **5) Benefit:**  There is no appreciable benefit to either party in the retrieval of this information. Since all information used to make the claims decision in this case is in the claims file or the litigation files of counsel there appears to be no benefit to relative to this case to either party. **6)  Total Cost:**  Although the estimated costs of doing the search is $50,000, this cost does not include the need for a person from DMS to monitor the restoration and search nor the travel expenses of the Plaintiff's expert to Springfield, nor the potential postage for notification as required by some states, nor the time and effort to review documents discovered for privilege. The total cost cannot be accurately estimated at this time. **7) Ability to Control Costs:**  The costs of this production are entirely within the control of the Plaintiff's counsel who has unfettered ability to control costs by limiting his desired discovery. **8)**

**Available Resources:** The Defendants cannot determine the relative resources due to its inability to discover the financial information of the Plaintiff.

    C.    **Proprietary and Privacy Issues Must Still Be Addressed.**

DMS also has significant concerns for its proprietary information despite the acknowledgement of a protective order as set forth by the Court. The original tapes are required to make the restoration useful but DMS cannot simply turn over these tapes to an outside firm. These tapes are for disaster recovery purposes. They represent a full cache of company wide emails, documents, privileged information, private information on other policyholders, proprietary IT information and business information. This information involves hundreds of thousands of policyholders and thousands of claims. DMS owes a duty not just to Mr. Jefferies but all of its clients, policyholders and claimants. DMS is bound by the privacy statutes of all fifty states and HIPAA. It has not yet been determined how many of these states will require advance notice to the claimants and insureds that their information may be disclosed to a third party.

DMS is required by law to protect the privacy rights of its clients' insureds. Removal of the proprietary and private information contained on the back-up tapes is in keeping with the duty. The purpose of HIPAA is to provide safeguards to the disclosure of personal health information and narrowly limit those who need to have access to that information. *See* Public Law 104-191, §§ 1173, 1177. Before DMS can release "personal health information" (PHI) to anyone not involved in the treatment, payment or health care operations of an individual, a written authorization from the individual is required. PHI can be anything personally identifying or anything that can lead to the identity of a person such as a name, address, telephone number, date of birth, social security number, policy number or claim number. Although there is an exception to the HIPAA safeguards with regard to PHI disclosed pursuant to a civil or criminal subpoena,

this is limited to issues "with respect to a payment." Although Mr. Jeffries issue is with respect to a payment, the private information of other insureds, who are unrelated to Mr. Jeffries' payment claim is not a valid exception. In the initial affidavit of Mr. Cinq Mars, therefore, DMS proposed removal of this protected information rather than undertaking the impossible task of obtaining the written authorization of all the insureds identified on the back-up tapes.

Mr. Roberts argues that he only wants a copy of the tapes. Without input from Defendants and without apparent consideration of the affidavit of Defendants' expert, the Court has agreed to this request and sanctioned Defendants in the process. For this reason, it is suggested that perhaps an expert be hired by the Court to evaluate the back-up tapes situation and offer an expert opinion as to what steps must be taken to retrieve the data Mr. Jeffries seeks while protecting the proprietary nature of DMS' claims information and the privacy of its insureds. DMS will offer to bear the cost of an evaluation by a court appointed expert. It is anticipated that such expert will confirm the information contained in Mr. Cinq Mars affidavits.

    **D.**    **Other Discovery Issues Raised by the Court's Order.**

The Court's October 17, 2003 ruling is also of concern to DMS because it again reflects Mr. Roberts' ability to direct all discovery in his favor. At the same time the Court has ordered DMS to undergo the burdensome and extremely expensive cost of producing these back-up tapes, it has denied DMS' request to review Mr. Jeffries' financial information. DMS understands that the Court has conducted an <u>in camera</u> evaluation of Mr. Jeffries' financial records and has determined that they are not relevant. This ruling was made despite the fact that Dr. McClellan, one of Mr. Jeffries main treating physicians, has now testified in deposition that Mr. Jeffries discussed with him being involved in a business with a partner in which they would market patented cell phone equipment. Mr. Jeffries has also testified that he has not filed tax returns and

is not required to file tax returns due to a lack of income. He makes this statement despite the fact that it has been put into evidence that he is being paid under a Prudential Group Disability Policy which is governed by ERISA. If benefits paid under that policy are, as are most ERISA benefits, in fact taxable, a tax return would be required. Mr. Roberts has once again been permitted to present his distorted view of the facts, i.e. that the financial records are not relevant, despite clear evidence to the contrary.

Mr. Roberts has also distorted the discovery request of Defendants with regard to the facts concerning the auto-immune disorder of Mr. Jeffries' son. It is true that Defendants requested the deposition of the treating physician for Mr. Jeffries' son. This was only requested after Mr. Roberts hinted that additional information existed regarding the medical condition of Mr. Jeffries' son which would impact the claims decision, but then taunted that such information would not be made available to Defendants because discovery had closed. Defendants' interest is in a full and fair resolution of this claim. This is not a game and as such, Defendants requested the ability to evaluate all potentially relevant information. To this end, the medical records and a deposition of Mr. Jeffries' son's treating physician was requested and it was noted that an IME could possibly be required if questions arose following that. **At no time did DMS ever request a biopsy of a minor child.** Yet, in the Court's Order denying DMS' request to depose the treating physician, the Court notes the **unconscionable** request of DMS for a biopsy of a minor child. DMS can only surmise that this allegation of a required biopsy was made during some **ex-parte** communication to the Court by Mr. Roberts. Once again, Mr. Roberts has succeeded in controlling the information available to the Court and conditioning the outcome.

## CONCLUSION

The Court's order that DMS copy and produce the back-up tapes cannot be accomplished to the satisfaction of the Court or the Plaintiff's Attorney.  DMS is anxious to resolve this matter but is limited by existing technology and must consider both its obligations with regard to the privacy of its other insureds and its proprietary information.  DMS would welcome a court appointed expert and cooperate in any way possible to convince this court that it has been forthright and honest in its responses to this discovery issue.  Since the court found that Magistrate Judge Hogan abused his discretion when he refused to order production of backup tapes, Defendants wish to comply with any order of this Court which is able to be accomplished with known technology.  Defendants do ask the Court to be mindful of the proprietary and privacy rights of the Defendants and their insureds in rendering its order.  It would be impossible to simply release full backup tapes to an outside party and not deal with the privacy, proprietary and privilege issues.

Respectfully submitted,

s/William R. Ellis
William R. Ellis (0012279)
Peter M. Burrell (0044139)
Amy Gasser Callow (0063470)
Wood & Lamping LLP
600 Vine Street, Suite 2500
Cincinnati, OH  45202-2491
(Telephone) (513) 852-6000
(Facsimile) (513) 852-6087

Attorneys for Defendants
Massachusetts Casualty Insurance Company
and Disability Management Services, Inc.

- 12 -

**CERTIFICATE OF SERVICE**

    I hereby certify that a copy of the foregoing has been filed with the Court by electronic means on this 22nd day of October 2003 and by regular U.S. Mail. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system and by regular U.S. Mail. Parties may access this filing through the Court's system.

                                  s/William R. Ellis  
                                  William R. Ellis, Esq.

189595.1