**ORIGINAL**

UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

Civil Action No.  C-1-02-351

ERIC L. JEFFRIES,

        Plaintiff,

  vs.

CENTRE LIFE INSURANCE COMPANY,

        Defendant.

        DEPOSITION of MARY E. FULLER, taken pursuant to agreement, at the offices of Downing & Peters Reporting Associates, 79 Atlantic Place, South Portland, Maine, on October 16, 2003, commencing at 10:05 A.M., before Lisa S. Bishop, Registered Professional Reporter, a Notary Public in and for the State of Maine.

Downing & Peters Reporting Associates
79 Atlantic Place, South Portland, Maine  04106

1   Q.   And they were within two years of the claim
2   disability, were they not?
3   A.   Yes, but at the point of underwriting, they would have
4   requested financial information.
5   Q.   My question to you is very simple.  If they had
6   Mr. Jeffries telling them he was making $350,000 a year and
7   the application saying he's making $225,000 a year and the
8   bank telling us he was making a different number, then that
9   would be something you may want to verify with income tax,
10  correct?
11  A.   Yes.
12  Q.   When you are reviewing a claims file, do you look for
13  other potential issues that may be generating the claim for
14  disability other than actual physical impairment?
15  A.   Yes, you do.
16  Q.   One of the things you would want to know is is there a
17  financial gain to being disabled as opposed to working?
18  A.   Yes.
19  Q.   In this case, if you combine the two policies,
20  Prudential and DMS, Mr. Jeffries would be making about
21  $300,000 a year tax-free, correct?
22  A.   Yes.
23  Q.   And his highest earned income ever was in 1999, the
24  year after he became disabled, at 558 taxable, correct?
25              MR. ROBERTS:   Objection.  Go ahead.

1  A.   My understanding was that much of the earnings that he
2  reported in 1999 as he indicated to the company were bonus
3  earnings from previous employment and the exercise of stock
4  options.
5  Q.   Putting that aside, that's his highest earned income
6  ever, correct?
7  A.   To my knowledge, yes.
8  Q.   Some $50,000 less -- I'm sorry, roughly equal to
9  $300,000 tax-free?
10 A.   Correct.
11 Q.   Only with the 300,000 tax-free, he wouldn't have to
12 work at all, he could do whatever he wanted, correct?
13 A.   Well, within his restrictions and limitations of his
14 disability, yes.
15 Q.   That's not what we are asking.  We are talking about
16 whether or not that is one of the things that you would
17 look at as a claims handler that may raise some suspicions.
18 A.   Claims handlers are going to look at whether there is
19 secondary gain contributing to the disability, yes.
20 Q.   Okay.  Again, that's information that tax returns are
21 helpful in determining, correct?
22 A.   I don't know that tax returns help you understand
23 secondary gain, it simply provides you information about
24 earnings.
25 Q.   When you compare benefits with earnings, that tells

1  what they are doing with no other evidence as to what the
2  impact is on their functionality from an employment
3  standpoint.
4  Q.   Well, certainly a surveillance of a person who claims
5  he can't walk and you see him in a wheelchair would kind of
6  confirm that, would it not?
7  A.   Yes, it certainly would.
8  Q.   But if you see him walking down the street with no
9  apparent limp, easy stride, that would be a different
10 story, would it not?
11 A.   I would want to see a lot more surveillance, but yes.
12 Q.   I'm sure that you would and there was a lot of
13 surveillance done on this, but it was done by two different
14 companies simultaneously, correct?
15         MR. ROBERTS:   Objection.   Go ahead.
16 A.   My understanding is some of the surveillance was done
17 by two different companies at the same time.  I was not
18 clear how much of it was done by Prudential and how much of
19 it was done by DMS separately versus together.
20 Q.   But you fault DMS for doing so much?
21 A.   Yes, I do.
22 Q.   Even though you don't know how much was done by them
23 at all?
24 A.   For this particular condition, I don't feel
25 surveillance was warranted particularly given the lack of

1   speech --
2              MR. ROBERTS:  Objection.  Counsel --
3   Q.   You consider it bad faith --
4              MR. ROBERTS:  Counsel, please refrain your
5   commentary, just ask questions, stop harassing the witness.
6   Q.   You consider it bad faith if the claim file doesn't
7   have the referral that you suggest even though the results
8   of the referral are evident in the claims file; is that
9   right?
10  A.   I consider it bad faith that it's repeatedly omitted
11  from the file, what their action plans are, what their
12  intentions are, and what they hope to glean from each of
13  the activities that occur, yes.
14  Q.   So this is bad faith even while they are paying the
15  claim?
16             MR. ROBERTS:  Objection.  Misstates facts.
17  A.   The way in which they are approaching the claim to me
18  is unreasonable.  The jury can decide if that's bad faith
19  or not, but the way in which this claim was approached and
20  the failure to follow normal industry practice to me was
21  totally unreasonable in the handling of this claim.
22  Q.   You raise a good issue.  The jury can decide whether
23  what was done is unreasonable or not, correct?
24  A.   It can decide whether it's bad faith, yes.
25  Q.   Well, by definition, bad faith is acting without a

1  reasonable basis, that's something the jury can and does
2  decide?
3  A.    Yes.
4  Q.    They don't need you to tell them what's reasonable and
5  what isn't, do they?
6           MR. ROBERTS:  Objection.
7  A.    Well, they need someone who is expert in understanding
8  adjudication of claims, which I think my qualifications
9  stand out.
10 Q.    Why would -- why would your evaluation of how you
11 think the claim should be handled change whether or not the
12 jury thinks the claim was handled reasonably or not?
13 A.    Because I wouldn't expect a jury to know all of the
14 requirements of the industry in terms of how a claim is
15 handled.  I don't expect them to have been trained in each
16 of those areas.  And I think the ability for them to hear
17 what's expected by statute, by the ICA, by the National
18 Association of Insurance Commissioners is information that
19 will assist them in their decision-making process.
20 Q.    Cite me to the specific document from the
21 International Insurance -- International Claims Association
22 that suggests that you must have your referrals in your
23 claims file or you're in bad faith.
24 A.    What the International Claims Association speaks about
25 as a matter of practice is claim files will be documented,

1   A.   Yes, I would.
2   Q.   Would you agree that the -- I'm not going to say the
3   majority -- that all of the potential diseases known to man
4   have been excluded by objective testing?
5            MR. ROBERTS:  Objection.  Misstates facts.
6   A.   Excuse me, I need you to repeat that.
7   Q.   Yes.  For example, there were potential diagnoses of
8   Bruchette's Syndrome, do you recall that?
9   A.   Yes, I do.
10  Q.   Do you believe that was ruled out eventually?
11  A.   Eventually, yes, after they treated him for awhile.
12  Q.   And let's see, then there were diagnoses of any number
13  of things, Crohn's Disease, you name it, he was diagnosed
14  as possibly having it, but basically, they have all been
15  ruled out?
16  A.   All -- as I understand it, the majority of what was
17  looked at was ruled out with the exception of the
18  autoimmune deficiency disorder which was consistent in
19  about eight or 10 of the medical reviews.
20  Q.   And what was the evidence of the autoimmune disorder?
21  A.   My understanding from, again, the review of the
22  records was that part of it comes from having ruled out all
23  of the other conditions, that absent those other diagnoses,
24  one of the ways that you come to the diagnosis of
25  autoimmune disorder is because it's not one of those other

1 a number of claims.

2 Q. My understanding is one of the other things you find
3 that was wrong was that these IMEs that were performed
4 finally were not shared with Mr. Jeffries' physicians; is
5 that right?

6 A. Yes.

7 Q. That's another piece of evidence of bad faith?

8 A. Yes.

9 Q. You're aware that they were provided to Mr. Roberts
10 the next day?

11 A. No, I don't recall that.

12 Q. Does that have any impact on your opinion of that
13 particular element of bad faith?

14         MR. ROBERTS: It's only after I hacked into your
15 computer, Bill. Do you remember that?

16 Q. Go ahead.

17 A. My expectation would be that if an insurance company
18 is going to take action against a claimant based on an
19 independent medical exam, that it would be the insurance
20 company physicians and claims examiners who would present
21 that information to the doctors that had certified to
22 disability going forward and ask them for review and
23 comment and to ask those physicians to respond.

24         I would not expect that Mr. Roberts would do that
25 because I -- I would find it highly unlikely that an

1  property, that you are treacherously stepping along the
2  line of bad faith in regard to surveillance activity.
3  Q.   Why would you have ordered someone to be surveilled in
4  their home?
5  A.   Didn't order it.  The investigator overstepped their
6  bounds in terms of the type of cameras they utilized which
7  gave them access to homes that they didn't have the right
8  to have access to.
9  Q.   Was there surveillance of Mr. Jeffries in his home in
10 this case that you're concerned about?
11 A.   I was concerned about the pretext that was presented.
12 It's not clear whose pretext that was, but typically, a
13 pretext will involve calling a home to see if someone is
14 there, going up to someone's house and pretending to be a
15 delivery person to me is a violation of a pretext
16 investigation.
17 Q.   Was that surveillance ordered by Prudential or DMS or
18 do you know?
19 A.   I couldn't tell by the file, as I stated.
20 Q.   That's what I thought.  But nonetheless, it's an
21 important element of bad faith of DMS that it happened?
22 A.   The element of bad faith that I felt was most
23 important was the extent to which surveillance took place.
24 Q.   If you do surveillance and you don't see the person,
25 isn't it customary to redo it at a later date?

1  years, roughly, to $12,500 until age 65 in 1998, months
2  before they go disabled, and almost a year after the event
3  which they claim disabled them occurred, would that raise
4  suspicion in your mind?
5  A.   I think being a claims person, I would always be
6  suspicious of somebody increasing coverage prior to
7  disability.
8  Q.   How about increasing coverage --
9  A.   Whether it would warrant me going to the extent that
10 my first claim action would be to conduct surveillance,
11 probably not.  Would I be suspicious, yes.
12 Q.   I mean that is one of the red flags, is it not, when
13 someone dramatically increases their coverage after an
14 event they claim disabled them, but before they actually
15 stop working?
16 A.   Well, my understanding is the event that occurred
17 didn't cause disability following the initial occurrence,
18 it took some time before those symptoms reached a point
19 that they were disabling, so I was less concerned about
20 that, but I would certainly -- as you point out, it would
21 be a red flag.  Would I initiate surveillance right away,
22 probably not.
23 Q.   Let's add a factor.  Now you have got the red flag in
24 front of you with a new claim.  The medical evidence that
25 comes in says I can't objectively identify the cause of the

1  symptoms and Mr. Jeffries' history in those very medical
2  records is that I got sick right after it happened and then
3  it would periodically flare up during '98 to the point
4  where I could no longer function in September with a
5  significant increase in insurance being just a few months
6  before September.
7  A.   Yes, that would cause me concern.
8  Q.   It would raise the specter of potential fraud, would
9  it not?
10 A.   And I would confront him about that.
11 Q.   You would?
12 A.   I would expect that that would have been there, what's
13 going on, why is it happening now, what caused the increase
14 in coverage to occur, did you disclose that information on
15 the application, was it required of you to disclose that
16 information.  There's no secret if you think someone -- if
17 there are issues that you have with a claim, there should
18 be no secret about the fact that you have questions.  I
19 don't challenge a company's right to question a claim and I
20 don't challenge the fact that there are red flags.
21 Q.   So any time you dealt with a case in which -- and of
22 course this would be through your actual person handling
23 the file -- any time they came to you and sought your
24 advice when they suspected a fraud, your first response was
25 let's call the claimant and ask him if he is a fraud, is

1  A.  Well, it would be consistent with the perception that
2  the company thought it was fraud. Whether it's truly
3  psychiatric or not I think is still a question.
4  Q.  That's not for me nor you to decide?
5  A.  Correct.
6  Q.  But there was indicia or red flags of a potential
7  fraudulent claim from the get-go, correct?
8  A.  Yes.
9  Q.  Something that would have raised your suspicion and
10 mine although it doesn't mean we have to stay with that
11 thought process throughout, correct?
12 A.  Correct.
13 Q.  And the focus of the case in this claims file varied
14 from time to time as it progressed, did it not?
15 A.  Pardon me, would you repeat that?
16 Q.  Yes, the focus of information and information sought
17 and what was going on with an evaluation of the claims file
18 moved along from time to time as the claim developed and
19 more medical evidence and more physical evidence came in,
20 did it not?
21 A.  In a very delayed fashion, the medical evidence began
22 to be looked at. Again, as I said, the surveillance was
23 consistent throughout. The medical, the in-depth medical
24 analysis did not begin until about 15 months into the claim
25 or later, and then again, the AP was left out of the