IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **ERIC L. JEFFRIES,** | ) | CASE NO. C-1-02-351 |
| Plaintiff, | ) | JUDGE BECKWITH |
| v. | ) | |
| **CENTRE LIFE INSURANCE CO.,** | ) | |
| Defendant. | ) | |

**PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE PURPORTED
EXPERT TESTIMONY OF DRS. BULLARD, HARTINGS, AND CLIONSKY**

Pursuant to Fed. R. Evid. 702 and ***Daubert v. Merrell Dow Pharmaceuticals***, 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993), the plaintiff requests that the Court exclude from the trial of this case the opinion testimony of Drs. Bullard, Clionsky, and Hartings. A memorandum and exhibits in support of this motion are attached.

Respectfully submitted,

| | |
|---|---|
| OF COUNSEL | /s Michael A. Roberts |
| | Michael A. Roberts, Esq. (0047129) |
| GRAYDON HEAD & RITCHEY LLP | GRAYDON HEAD & RITCHEY LLP |
| 1900 Fifth Third Center | 511 Walnut Street, Suite 1900 |
| 511 Walnut Street | Cincinnati, Ohio 45202 |
| Cincinnati, Ohio 45202 | (513) 629-2799 |
| (513) 621-6464 | (513) 651-3836 (fax) |
| | email:mroberts@graydon.com |
| | *Attorneys For Plaintiff* |

1

**MEMORANDUM IN SUPPORT**

I.   **Issue For Trial.**

In the mid-1990s, the plaintiff, Eric L. Jeffries, purchased a long term disability insurance policy from Massachusetts Casualty Insurance Company (n/k/a Centre Life Insurance Company). In 1998, Mr. Jeffries' chronic illness prevented him from continuing in his occupation of merchant banker for Provident Bank. Mr. Jeffries brought this action in April 2002 because the defendant refused to pay him benefits and had, since February 1999, acted in bad faith.

In its Answer to the Complaint, the defendant denied that Mr. Jeffries was disabled. (*Doc. 9*). The defendant has since amended its position. The defendant now concedes that Mr. Jeffries is disabled and is in fact to this day unable to perform his occupation. Defendant also now concedes that Mr. Jeffries was entitled to long-term disability benefits under the policy at issue from March 1999 to March 2001 (*See, Counterclaim, Doc. 89*). But defendant now contends that, even though Mr. Jeffries continues to be disabled, no benefits are payable beyond March, 2001. Defendant claims that benefits are limited based on its argument that Mr. Jeffries' undisputed disability is caused by a psychological disorder, not a physical illness.

After taking this position, the defendant identified 4 purported "expert" witnesses: Drs. Hartings, Clionsky, Bullard, and Frey. (Defendant has not permitted plaintiff to take Dr. Frey's deposition to date, and for that reason, in a contemporaneous motion, plaintiff requests an extension of time to move to exclude his testimony, as appropriate).

For the reasons discussed below, the defendant should be precluded from calling Drs. Bullard, Clionsky, or Hartings as experts.

2

II.     **Framework Of Legal Analysis.**

Federal Rule of Evidence 702, is the primary source for determining the admissibility of expert testimony in federal court. It states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, expertise, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts of data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case." *FRE 702*.

The district court is charged, under Rule 702, with the gate-keeping function of determining whether the expert testimony proffered by the defendant is both reliable and relevant. *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993), (trial court judges are to serve a gatekeeper function with respect to expert testimony).

In *Daubert*, the Supreme Court set forth a non-exclusive list of factors for trial courts to consider in assessing the reliability of scientific expert testimony. Those factors include:

(1)     whether the expert's technique or theory can be or has been tested;

(2)     whether the technique or theory has been subject to peer review and publication;

(3)     the known or potential rate of error of the technique or theory when applied;

(4)     the existence and maintenance of standards and controls; and

      (5)    whether the technique or theory has been generally accepted in the scientific community. *Id*.

The list is not exclusive. And in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 143 L. Ed. 2d 238, 119 S. Ct. 1167 (1999), the Supreme Court extended the *Daubert* analysis to non-scientific expert testimony. In *Kumho* the Court explained that whether the factors set forth in *Daubert* are reasonable measures of reliability in a particular case "is a matter that the law grants the trial judge broad latitude to determine." *Id. at 153*. The *Kumho* Court held that, "*Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho*, 526 U.S. at 141.

Rule 702 explicitly states that the court must review whether or not the methods are reliably applied to the facts of the case. The trial judge has "considerable leeway in deciding . . . how to go about determining whether particular expert testimony is reliable." *Kumho* 526 U.S. at 152.

III.    <u>Defendant's Opinion Testimony.</u>

    A.    *Dr. Newton Bullard.*

Dr. Bullard is a general practitioner. (*See, Bullard Depo., Exhibit 1, pp. 4-5*). Defendant secured Dr. Bullard to serve as an expert in this case because he is defendant's counsel's personal physician and the physician for Attorney Burrell's wife, mother, and sister. (*Id. at 9*).

    1.    <u>Dr. Bullard Concedes That He Offers No "Scientific" Or "Other Specialized Knowledge" That Will Assist The Jury In This Case</u>.

The first problem with allowing Dr. Bullard to testify as an expert is that he is not (as he <u>himself</u> readily concedes) an expert on the issues which the jury will need to determine. Dr. Bullard even declined defendant's initial invitation to serve as an expert: when first approached

4

about this case, Dr. Bullard told defendant's counsel that given the "description of the case material [Dr. Bullard] was not certain whether this was something that [his] involvement might be productive or not for [the defendant]." (*Id. at 11*). Dr. Bullard explained that "it was not clear that if [Attorney Burrell] was asking [Dr. Bullard] for an expert opinion based on a background in infectious disease or a background in rheumatology or a background in vaccine-related difficulty, that [Dr. Bullard's] ability to testify would be a benefit to [Attorney Burrell]." (*Id. at 19*). Given the nature of Mr. Jeffries' illness, an auto-immune adverse reaction to the hepatitis B vaccine, Dr. Bullard correctly concluded that the appropriate expertise defendant needed was in the field of infectious disease, rheumatology or vaccines. Dr. Bullard has no relevant expertise.

Dr. Bullard speculated that "if [Attorney Bullard] was looking for a specific response or opinion concerning some of the issues that appeared to be active, that [Attorney Burrell] would be more appropriate in seeking . . . opinion from someone who was a 'recognized expert' in that particular narrow area." (*Id. at 20*). Dr. Bullard concedes that he could not "assimilate the data [concerning Mr. Jeffries] and clarify it [because as he] had already indicated . . . [he] was not an expert in any of the subspecialties that they had numerous contrasting opinions on." (*Id. at 26*).

    2.    <u>**Dr. Bullard Agrees To See Mr. Jeffries.**</u>

Attorney Burrell called Dr. Bullard days after Dr. Bullard declined the invitation to serve as an expert and "requested that [Dr. Bullard] reconsider [his] position in order to provide [Attorney Burrell] with the opinion of someone who was <u>not so much an expert</u> . . . ." (*Id. at 15*)(*emphasis supplied*).

Dr. Bullard then arranged to meet with both Attorney Ellis and Attorney Burrell for about an hour. (*Id. at 29*). And after that meeting, Dr. Bullard "agreed to perform the

5

examination (of Mr. Jeffries) based on [Dr. Bullard's] understanding of what their interest was in [him] seeing [Mr. Jeffries]." (*Id. at 31*). Dr. Bullard then set out to "provide an overview assessment of the situation" from a general practitioner's perspective. (*Id. at 21, 32*).

Before examining Mr. Jeffries, Dr. Bullard reviewed his medical records and concluded that there were large numbers of <u>contrasting</u> opinions. (*Id. at 25*). Dr. Bullard then visited with Mr. Jeffries for less than 45 minutes. (*Id. at 34*). Dr. Bullard's Report is Exhibit 2, attached.

3.  **Dr. Bullard's "Opinion."**

A review of the written Bullard Report reveals no opinions whatsoever. During the course of Dr. Bullard's deposition, his opinion was learned. The essence of Dr. Bullard's opinion is that:

- During his 45 minute examination of Mr. Jeffries, other than observing Mr. Jeffries' peculiar gait, Dr. Bullard did not uncover any "objective" evidence of a physical illness ("in Mr. Jeffries' situation…there was [no] evidence of a physical disability at the time of [Dr. Bullard's] examination"). (*Id. at 35*).

Dr. Bullard arrived at this opinion during his meeting with Attorney Ellis and Attorney Burrell which preceded his visit with Mr. Jeffries.

4.  **Dr. Bullard's Testimony Is Irrelevant And Potentially Confusing**

Dr. Bullard's initial reaction was a correct one. He is not a proper expert in this case because he has no specialized knowledge of any sort which will assist the jury is discerning whether Mr. Jeffries' undisputed disabling illness is caused by a mental disorder or a physical ailment (the defendant offers the testimony of psychologists Clionsky and Hartings for their argument on that issue). Dr. Bullard's testimony will neither "assist the jury either to

6

understand the evidence or to determine a fact in issue." Dr. Bullard's "opinion" simply is not relevant or helpful to the jurors in this case.

In addition to not being an expert, Dr. Bullard's opinion is inadmissible because his testimony would confuse rather than educate or assist the jury in determining whether Mr. Jeffries' undisputed disability is one caused by a mental disorder or a physical ailment.

If the jury listens to Dr. Bullard opine that, during his 45 minute visit with Mr. Jeffries, Dr. Bullard saw no objective signs of an illness, the jury may conclude that it is Dr. Bullard's "expert" opinion that Mr. Jeffries cannot possibly have a physical illness. This is erroneous and prejudicial since many illnesses known to the medical community have either no objective findings or no findings detectable by the cursory examination such as the one performed by Dr. Bullard. These illnesses <u>include</u> the diagnosis Mr. Jeffries' physicians and experts have given, chronic fatigue syndrome.

Although Dr. Bullard has a medical degree, he simply offers no assistance to the jury and may prejudice and/or confuse the jury. For this reason, defendant should be precluded from offering his testimony. (<u>See</u>, ***Snyder v. Consol. Coal Mines***, 973 F.2d 555, 557 (7th Cir. 1992) (expert testimony excluded *because its probative value was outweighed by its prejudicial effect*).

Dr. Bullard's opinion has too little connection with the facts of this case to be useful to the jury, or to overcome the potential prejudicial effect of having a "qualified expert" giving his opinion on these matters. Based on a full consideration of the value of Dr. Bullard's evidence, the Court can not allow him to testify at all. The risk from Dr. Bullard's testimony in the present case is that the jury could easily be misled into believing that he is an expert in areas

7

that he admits he has no expertise. His opinions would waste the Court's time and confuse the jury.

Accordingly, this Court should sustain this Motion *In Limine* and preclude defendant from offering Dr. Bullard's opinions as evidence in the trial of this case.

B.   *Dr. Mitchell Clionsky.*

In March, 2003, Dr. Michael Hartings issued a report claiming that Mr. Jeffries suffers from DSM-IV "300.81, Somatization Disorder" and DSM-IV "301.4, Obsessive Compulsive Personality Disorder" ("OCPD"). (*See, Exhibit 3, p. 8*). On May 5, 2003, Dr. Mitchell Clionsky, defendant's in-house psychologist, sent a letter to defendant setting forth his "analysis" of Dr. Hartings' report. (*See, Exhibit 4*). For the reasons discussed below, this Court should preclude Dr. Clionsky from asserting the opinions set forth in his analysis.

1.   **Dr. Clionsky Concedes That Any OCPD Diagnosis Is Unfounded.**

Despite his May 5, 2003 analysis supporting Dr. Hartings' claim that Mr. Jeffries has OCPD, in deposition, after he was presented with plaintiff's expert's reports (which state that Mr. Jeffries does not have any mental disorder), Dr. Clionsky conceded that the OCPD diagnosis rendered by Dr. Hartings and confirmed by Dr. Clionsky was incorrect and unfounded. (*See, Exhibit 5, Clionsky Depo., pp. 80-81:* "I don't believe that [Mr. Jeffries] has a diagnosis of obsessive compulsive disorder . . . I don't see the range of obsessive kinds of behaviors or compulsive thoughts and impairment based on that in terms of his relationships. I mean I think Dr. Sheer was correct in that portion of her analysis"). Dr. Clionsky unequivocally declared that in his professional opinion Mr. Jeffries does not suffer from OCPD. (*See, Exhibit 10 for diagnostic criteria*).

For this reason, plaintiff seeks an evidentiary order precluding the defendant and all of its witnesses from stating, suggesting, or inferring that Mr. Jeffries has OCPD or that his undisputed cognitive impairment is caused by OCPD.

### 2.     Dr. Clionsky's Somatization Disorder Diagnosis Is Unreliable.

For the "mental disability" limitation of the Policy to apply as defendant desires, the defendant must prove that Mr. Jeffries' disability is due to "a disorder classified in the then current issue of the [DSM-IV]." Dr. Clionsky's opinion that Mr. Jeffries suffers from DSM-IV "300.81 Somatization Disorder" (*See, ¶6 of Clionsky report*), is unreliable and, pursuant to FRE 702 (1) and (3), he should not be permitted to make such opinions at trial.

For each disorder classified in the DSM, a clinician is provided with explicit criteria that the patient "<u>must</u>" meet before such diagnosis may be assigned. <u>Before</u> a clinician can diagnose an individual with "300.81 Somatization Disorder," he/she "must find," *inter alia*: (1) "a history of many complaints beginning before age 30;" and (ii) a "history of at least one sexual or reproductive symptom other than pain." (<u>*See*</u>, *Exhibit 6 DSM-IV criteria for 300-81, Somatization Disorder*). As Dr. Clionsky conceded in his deposition, there is no evidence in Mr. Jeffries' medical history supporting these 2 mandatory characteristics. (*Exh. 5 at 54-59*). Accordingly, there is no foundation or basis or data for a DSM-IV Somatization Disorder diagnosis.

FRE 702(1) requires that an expert's opinion testimony be based "upon sufficient facts or data." Here, Dr. Clionsky concedes that there is no "data" to support a finding of at least 2 separate criteria, which according to DSM-IV 300-81, "must" exist in a person diagnosed with 300.81 Somatization Disorder.

Since there is nor reliable basis for an OCPD or Somatization Disorder diagnosis, Dr. Clionsky should be excluded from offering any opinion evidence whatsoever at the trial of this case.

**C.**     *Dr. Hartings.*

   **1.**     <u>Dr. Hartings' Suspension and Lack Of Credibility.</u>

In the 1990's, Dr. Hartings' license to practice psychology was revoked and/or suspended for his exhibition of "low standards." (*See*, *Exhibit 7*). Notwithstanding Dr. Hartings' earlier professional discipline, under oath Dr. Hartings testified that he has "actively" worked as a psychologist "without interruption" from 1979-2003. A false statement. In deposition, Dr. Hartings testified:

> "Q.    Okay. So you've <u>actively</u> worked for Riverhills for the 24 years since 1978 <u>without any interruption</u> then, I guess?
>
> A:    Correct.
>
> Q:    Is that correct?
>
> A.    That's correct.
>
> Q:    And the <u>active</u> work for that 25 year period, has that been as a psychologist <u>the whole time</u>?
>
> A:    Yes.
>
> Q:    Okay. So we're clear, for the last 25 years, you've been working there as a psychologist at Riverhills, right?
>
> A:    Right. (*Exhibit 12-13*).

The principle factor underlying FRE 702 is "reliability." Dr. Hartings' truth transgression negatively impacts the reliability of his opinions.

10

      **2.**    **Dr. Hartings' Former Diagnosis of Somatization Disorder And Revised Opinion That Mr. Jeffries Has Undifferentiated <u>Somatoform Disorder Are Unfounded And Unreliable</u>.**

As analyzed above, because there is no "data" to support a finding of the existence of at least 2 of the mandatory criteria for a DSM-IV Somatization Disorder diagnosis, Dr. Hartings (like Dr. Clionsky) should be precluded from offering the opinion (expressed unequivocally in his only report submitted to plaintiff) that Mr. Jeffries has DSM-IV 300.81 Somatization Disorder.

The obvious shortcomings with defendant's 300.81 Somatization Disorder were plainly evident during the conduct of Dr. Clionsky's deposition. Therefore, one month later, during the course of Dr. Hartings' own deposition, he changed his opinion. (*See, Exhibit 8 Depo. pp. 140-143*). Dr. Hartings now asserts that although his only written report identifies a diagnosis of "300.81 – Somatization disorder, severe" he <u>never</u> diagnosed Mr. Jeffries with that disorder. *Id*. And despite Dr. Clionsky's opinion, according to Dr. Hartings, Mr. Jeffries does not suffer from "300.81 – Somatization disorder," he suffers from "300.82 – Undifferentiated Somatoform Disorder," a completely different diagnosis.

Dr. Hartings' newest conclusions have no scientific basis. More importantly, he ignores opinions of medical doctors in coming to his diagnosis. Dr. Hartings' newest opinion should be excluded since it is: (i) not "based upon sufficient facts or data" as required by FRE 702(1); (ii) it is not the "product of reliable principles and methods" as required by FRE 702(2); and (iii) he has not "applied the principles and methods reliably to the facts of the case" as required by FRE 702(3).

11

A proper diagnosis of "300.82 Undifferentiated Somatoform Disorder" requires the clinician to establish that Mr. Jeffries' "symptoms cannot be fully explained by a known general medical condition;" or (as here) there is a medical condition present, but the "impairment is in excess of what would be expected." (*See, Exhibit 9*). Dr. Hartings has failed to meet this threshold. Specifically, Dr. Hartings completely overlooks the substantial evidence of experts and treating physicians establishing unequivocally that Mr. Jeffries has chronic fatigue syndrome and an auto-immune illness that is likely caused by a vaccination.

And in his report, Dr. Hartings, even concedes the very shortcoming with his analysis and the lack of a proper basis to make a diagnosis of Undifferentiated Somatoform Disorder. Specifically, Dr. Hartings states in the final paragraph of his report:

> "it is beyond the scope of this IME to determine whether Mr. Jeffries suffers from an occult auto-immune reaction, whether his condition is solely psychological, i.e., somatization disorder . . . or whether there is a combination of both."

Accordingly, Dr. Hartings unequivocally concedes that he is unable to satisfy the mandatory criteria that a medical condition is not the cause of Mr. Jeffries' disability. For this reason, Dr. Hartings should not be permitted to offer this new opinion either.

### 3    Dr. Hartings Concedes That Mr. Jeffries Does Not Have An "obsessive-compulsive" disorder "classified" in the DSM-IV.

As discussed in the analysis of Dr. Clinosky's opinion above, there is no reliable basis for diagnosing Mr. Jeffries with obsessive compulsive disorder. For that reason, Dr. Clionsky retracted his opinion on this point.

Dr. Hartings hasn't fully retracted his opinion, despite Dr. Clionsky's recognition that OCPD cannot be a proper diagnosis.

This court should nonetheless preclude Dr. Hartings from testifying that it is his opinion that Mr. Jeffries has some obsessive or compulsive disorder, because Dr. Hartings concedes that Mr. Jeffries has no such disorder as it is classified in the DSM-IV. (*See*, *Exhibit 8, p. 124*). This is an all-important concession since the Policy's mental disorder exclusion applies only if the defendant proves that Mr. Jeffries has a disorder "classified" in the DSM.

All of defendant's witnesses and its counsel should therefore be precluded from suggesting, stating, or inferring that Mr. Jeffries has any version of OCPD.

## Conclusion

For the above reasons, the Court should exercise its discretionary "leeway" and preclude defendant from offering the unreliable and unfounded opinions of Drs. Bullard, Hartings, and Clionsky at the trial of this case.

Respectfully submitted,

| | |
|---|---|
| OF COUNSEL | /s Michael A. Roberts_____<br>Michael A. Roberts (0047129) |
| GRAYDON HEAD & RITCHEY LLP<br>1900 Fifth Third Center<br>511 Walnut Street<br>Cincinnati, Ohio 45202<br>(513) 621-6464 | GRAYDON HEAD & RITCHEY LLP<br>1900 Fifth Third Center<br>511 Walnut Street<br>Cincinnati, Ohio 45202<br>(513) 629-2799<br>(513) 651-3836 fax<br>email: mroberts@graydon.com |

## CERTIFICATE OF SERVICE

The foregoing was delivered, via fax and regular U.S. Mail William R. Ellis, Esq., Wood & Lamping LLP, 600 Vine Street, Suite 2500, Cincinnati, Ohio 45202, this 12th day of December, 2003.

/s Michael A. Roberts