---

### Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ERIC L. JEFFRIES,
    Plaintiff,
        vs.           CASE NO.
                              C-1-02-351
CENTRE LIFE INSURANCE CO.,
et al.,
    Defendants.

Deposition of:    NEWTON H. BULLARD, M.D.
Pursuant to:     Subpoena and Notice
Date and Time:   Friday, April 18, 2003
                  2:40 p.m.
Place:          Graydon, Head & Ritchey
                  511 Walnut Street
                  1900 Fifth Third Center
                  Cincinnati, Ohio 45202
Reporter:       Patti Stachler, RMR, CRR
                  Notary Public - State of Ohio

---

### Page 2

APPEARANCES OF COUNSEL:

For the plaintiff:

    Michael A. Roberts, Esq.
        of
    Graydon, Head & Ritchey, LLP
    1900 Fifth Third Center
    511 Walnut Street
    Cincinnati, Ohio 45202
    513.621.6464

        and

    Clifford J. Shoemaker, Esq.
        of
    Shoemaker & Associates    (via telephone)
    9711 Meadowlark Road
    Vienna, Virginia 22182
    703.281.6395

For the defendants:

    William R. Ellis, Esq.
        of
    Wood & Lamping, LLP
    600 Vine Street
    Suite 2500
    Cincinnati, Ohio 45202
    513.852.6000

- - -

COPY

---

### Page 3

I N D E X

NEWTON H. BULLARD, M.D.                PAGE
    EXAMINATION BY MR. ROBERTS         4
    EXAMINATION BY MR. SHOEMAKER      51
    FURTHER EXAMINATION BY MR. ROBERTS 57

| EXHIBITS | MARKED | REFERENCED |
|---|---|---|
| PLAINTIFF'S EXHIBIT 70 | 21 | 22 |
| PLAINTIFF'S EXHIBIT 71 | 34 | 34 |
| PLAINTIFF'S EXHIBIT 72 | 35 | 35 |
| PLAINTIFF'S EXHIBIT 73 | 61 | 61 |
| PLAINTIFF'S EXHIBIT 74 | 63 | 63 |

- - -

---

### Page 4

NEWTON H. BULLARD, M.D.
a witness herein, having been duly sworn, was examined and deposed as follows:
                EXAMINATION
BY MR. ROBERTS:

    Q.   Good afternoon, Dr. Bullard. I can refer to you as Dr. Bullard, Newton, Skip. How would you like for me to refer to you this afternoon?

    A.   Whichever way is easier for you.

    Q.   Okay. My name is Mike Roberts. I'm a lawyer at the law firm of Graydon, Head & Ritchey. I represent the plaintiff, Eric Jeffries, in this lawsuit. And you've been asked to perform an examination of Mr. Jeffries and I'd like to go through that with you today.

    MR. ROBERTS: First, let's go off the record for a second.

    (Off the record.)

BY MR. ROBERTS:

    Q.   Dr. Bullard, could you kindly share with me your business address?

    A.   47 East Hollister Street, Cincinnati, Ohio, 45219.

    Q.   And what is your profession?

    A.   I am a physician practicing internal

Page 5:

```
 1  medicine.
 2     Q.  Could you kindly share with me your
 3  educational background just starting with where you
 4  went to college, the degree you received, and bring me
 5  forward?
 6     A.  I graduated from Princeton University in 1970
 7  in engineering physics.  Attended Northwestern for two
 8  years, completing course work for a Ph.D. in physics.
 9  And then entered the University of Cincinnati College
10  of Medicine in 1972 and graduated in 1976.
11     Q.  I missed the university.  I'm sorry.
12     A.  Cincinnati.
13     Q.  Cincinnati.
14     A.  Entered a medicine residency at The Christ
15  Hospital in 1976, completed the residency in internal
16  medicine in 1979.  Served as the chief resident from
17  1979 to 1980, and then entered the general practice of
18  medicine in roughly 1980.
19     Q.  Here in Cincinnati?
20     A.  Correct.
21     Q.  And has your practice been in Cincinnati for
22  the 23 or so years?
23     A.  That's correct.
24     Q.  Okay.  Have you been a solo practitioner
25  during that period of time or have you been affiliated
```

Page 6:

```
 1  with groups?
 2     A.  I have been both.
 3     Q.  Okay.  Could you walk me through what that
 4  has been?
 5     A.  I originally entered practice in 1980 with
 6  Dr. Karl Vilter, who retired.  Became a solo
 7  practitioner after his retirement.
 8     Q.  Do you recall when that was?
 9     A.  His retirement was somewhat extended.
10     Q.  Over time?
11     A.  Probably from 1986 through 1994 I was a solo
12  practitioner.  In 1994, I joined the Alliance Primary
13  Care.  Left Alliance Primary Care in 1999 or 2000, and
14  currently have a working relationship with Tri-State
15  Physicians through the Deaconess Hospital.
16     Q.  Has anyone at this law firm ever done work
17  for you through your capacity with Alliance Primary
18  Care?  That's a client that I have worked on, other
19  lawyers in this law firm have worked on previously.
20     A.  Personally -- I'm not aware of any
21  relationship with a specific individual at your law
22  firm.
23     Q.  Okay.  So now you maintain -- did you say
24  just '99 and 2000 or '99 through the present that
25  you've maintained some relationship with Tri-State and
```

Page 7:

```
 1  Deaconess Hospital?
 2     A.  2000 through the present.
 3     Q.  2000 through the present.  What's the nature
 4  of that relationship?
 5     A.  That's somewhat complex.  I own my
 6  practice.
 7     Q.  Okay.
 8     A.  They manage certain portions of it and I
 9  receive a reimbursement based on productivity.  But it
10  is not an owned practice as the Alliance Primary Care
11  operational model was.
12     Q.  From '94 to '99 when you were affiliated with
13  APC, did you have your own office or did you share
14  office space with other physicians?
15     A.  I had my own office.
16     Q.  And the same has been the case since you've
17  been affiliated with Deaconess and Tri-State?
18     A.  That is correct.
19     Q.  Okay.  What does an internal medicine doctor
20  do?  What kind of patients do you see?
21     A.  I see adult medical illnesses.  I see all
22  illnesses from minor to more complex.  I see numerous
23  patients daily with problems as trivial as a rash to
24  heart failure, diabetes, hypertension.  I am trained in
25  the diagnosis and treatment of a vast majority of adult
```

Page 8:

```
 1  medical illnesses.
 2     Q.  Okay.  At some point in time you received a
 3  request or an invitation to perform an independent
 4  medical exam of Eric Jeffries?
 5     A.  That is correct.
 6     Q.  Okay.  Do you recall that occasion, how that
 7  occurred and when that occurred?
 8     A.  Not specifically.
 9     Q.  Can you describe for me what you can recall
10  about the first contact or occasion it was that you
11  were asked to examine Eric Jeffries?
12     A.  I was contacted by his lawyer and asked if I
13  would be willing to perform an examination on
14  Mr. Jeffries.
15     Q.  You were contacted by me?
16     A.  No, by --
17     Q.  By the defendants?
18     A.  By the defendants' lawyer, correct.
19     Q.  Was that Mr. Burrell or Mr. Ellis that
20  contacted you?
21     A.  Mr. Burrell.
22     Q.  Did he contact you by phone initially or was
23  it by letter?
24     A.  My recollection, it was by phone.
25     Q.  Okay.  Do you know how you came onto
```

1  Mr. Burrell's radar screen, so to speak?
2      A.  I am his personal physician.
3      Q.  How long have you served as Mr. Burrell's
4  personal physician?
5      A.  I would have to estimate ten years.
6      Q.  Okay.  Do you also serve in that capacity for
7  his spouse?
8      A.  Yes.
9      Q.  Are there any other Burrell family members
10 that you provide medical care for?
11     A.  Yes.
12     Q.  Can you name them for me?
13     A.  I believe his mother and his sister.
14     Q.  Tell me about the substance of that first
15 contact with Mr. Burrell as it related to Mr. Jeffries.
16         You've had -- I sense that you had some
17 difficulty in pinpointing when it was that Mr. Burrell
18 contacted you and I suspect that's because you've had a
19 relationship with him for ten years.  So it might be
20 hard to nail down.  But what do you recall about the
21 conversation you had with Mr. Burrell when he first
22 sought you to consider performing this exercise?
23     A.  I really don't recall the substance of that
24 conversation.
25     Q.  Okay.  Have you previously performed the

9

1  service of an independent medical examiner for a party
2  in litigation?
3      A.  Occasionally.
4      Q.  Have you previously served any lawyer at the
5  Wood & Lamping law firm in that capacity?
6      A.  No.
7      Q.  Have you previously performed that function
8  on behalf of any insurance company?
9      A.  No.
10     Q.  Have you been asked to perform that function
11 in the context of workers' compensation claims or other
12 types of claims?
13     A.  With respect to your question --
14     Q.  Yes, sir?
15     A.  -- concerning workman's compensation, the
16 answer is no.
17     Q.  Okay.
18     A.  With respect to other claims, the answer is
19 yes.
20     Q.  Okay.  But not previously for any insurance
21 company and not previously for any lawyer at the Wood &
22 Lamping law firm?
23     A.  That's correct.
24     Q.  Okay.  So Mr. Burrell has not ever asked for
25 your assistance -- your professional assistance on any

10

1  case that he's worked on previously?
2      A.  That's correct.
3      Q.  Okay.  Did you during that one call agree to
4  perform the exercise?
5      A.  No.
6      Q.  Okay.  What did you do?
7      A.  My recollection, once again, as it's somewhat
8  vague how this event occurred, is that based on his
9  description of the case material, that I was not
10 certain whether this was something that my involvement
11 might be productive or not for him.
12     Q.  You said his description of the case
13 material.  How did he describe the case material?
14     A.  Once again, my recollection of that is very
15 vague, other than a general description of the
16 patient.
17     Q.  He characterized the nature of the purported
18 illness?
19     A.  Not at all.  He said that they had --
20     Q.  They who?
21     A.  Their law firm.
22     Q.  He said that the Wood & Lamping law firm --
23 and then I interrupted you.
24         MR. ELLIS:  Stop doing that.
25     A.  No.

11

1      Q.  I'm trying to understand.  That's all.  I
2  mean, if you gave me the whole thing and there was a
3  pronoun I didn't understand, I'd have to ask you again.
4  So I won't interrupt, but kindly tell me what you can
5  recall about his description of the case material.
6      A.  My recollection is that he indicated that his
7  firm was involved in a litigation or trial, or
8  whatever, involving a rather complicated case, and that
9  he had asked me if I would be willing or interested in
10 reviewing the material.
11     Q.  Okay.  What gave you either misgivings or
12 uncertainty about whether you'd perform this exercise
13 during that call?
14     A.  My only reluctance was the length of time
15 that the claim had been ongoing and the number of
16 opinions that apparently had already been expressed
17 concerning the matter.
18     Q.  During that first call did Mr. Burrell share
19 with you that there were some opinions about
20 Mr. Jeffries that had already been rendered by
21 physicians?
22     A.  My recollection is not that specific.  My
23 recollection is that he indicated that the case had
24 been long standing and there had been -- whether they
25 were opinions -- but other physicians involved in

12

```
 1  reviewing the material.
 2      Q.  Did he suggest to you at that time that there
 3  were any physicians involved in reviewing the material
 4  that had concluded that Mr. Jeffries is not disabled?
 5      A.  He did not characterize any of the opinions
 6  as either disabled or not disabled.
 7      Q.  Did you understand, after terminating that
 8  first call, that it was Mr. Burrell's client's position
 9  that Mr. Jeffries is not disabled?
10      A.  I understood that Mr. Burrell's position was
11  from the standpoint that he was -- his position was
12  that Mr. Jeffries might or might not be disabled but
13  that there was considerable confusion from the amount
14  of information that at that point had been gathered.
15      Q.  You sensed from his representations that
16  there was confusion or conflicting information about
17  disability; is that correct?
18      A.  I sensed from his opinion that there had been
19  a number of individuals with different opinions.
20      Q.  Different opinions, meaning some opinions say
21  disabled, some opinions say not disabled, is that what
22  you mean?
23      A.  No.  I think the issue that was more
24  prominent in the discussion was that he was requesting
25  some clarification of the morass of data that had been
                                                      13
```

```
 1  accumulated.
 2      Q.  Okay.  So do I understand correctly that at
 3  least at the conclusion of that first call, you were
 4  willing to consider the assignment but hadn't committed
 5  yourself?
 6      A.  That is correct.
 7      Q.  Okay.  Is there anything else in that first
 8  contact that we haven't discussed that you discussed
 9  with Mr. Burrell?
10      A.  Since my recollection of it is somewhat
11  sketchy, no.
12      Q.  Okay.  Understandable.  Do you call -- was
13  that in January of this year that that took place?
14      A.  I do not recall that.
15      Q.  Was it -- do you recall what the weather was
16  like outside, whether it was warm time of the year or
17  cold time of the year?  I mean, can we pin it down to
18  the winter, or was it maybe as far back as last
19  summer?
20      A.  I honestly can't recall that.
21      Q.  I'm a lawyer.  These are questions lawyers
22  need to ask.  You can't recall?
23      A.  No.
24      Q.  Okay.  What was the next action that took
25  place?
                                                      14
```

```
 1      A.  He recontacted me.
 2      Q.  By telephone again or by letter?  Okay.
 3      A.  Telephone, I would assume.  I don't have a
 4  letter to indicate that that occurred, so I am assuming
 5  that it was by telephone.
 6      Q.  Okay.  Can you share with me what the
 7  substance of that phone call was?
 8      A.  His request was that I reconsider my position
 9  in order to provide him with the opinion of someone who
10  was not so much an expert, as someone who could look at
11  the entire situation, make more of a global opinion
12  based on their experience in dealing with patients.
13      Q.  I don't understand the distinction there.
14  Did you understand there to be a distinction?
15          Let me ask you a different question.  He
16  asked you to reconsider -- during the first call, did
17  you decline the invitation to perform some service for
18  Mr. Burrell?
19      A.  I'm not sure it was a true, no, I won't do
20  this.  It was more on the level of, that doesn't sound
21  particularly appealing.  I might think about it.
22      Q.  Okay.
23      A.  So the response that he had was clearly -- or
24  the next step was clearly in his ballpark to come
25  forward.
                                                      15
```

```
 1      Q.  Have you ever testified in a trial setting
 2  previously as an expert?
 3      A.  Yes.
 4      Q.  On how many occasions?
 5      A.  Once or twice.
 6      Q.  Do you recall what the nature of those claims
 7  or those disputes were?
 8      A.  The one case that I am certain of is a
 9  complicated case involving a patient that had a
10  multitude of problems that developed from a surgical
11  misadventure.
12      Q.  It was a medical malpractice suit where you
13  were actually a treating physician --
14      A.  No.
15      Q.  -- but not the physician who was the
16  defendant accused of negligence?
17      A.  Can you separate that?
18      Q.  Do I understand correctly that you had an
19  ongoing relationship with a person, patient/doctor
20  relationship, for a period of time; that person had
21  some service performed by another doctor that became an
22  issue in a lawsuit?
23      A.  With respect to the case that I was
24  mentioning, the answer to that is no.
25      Q.  Okay.
                                                      16
```

```
 1    A.   With respect to the other potential case that
 2  I've testified in, the answer is yes.
 3    Q.   You can't recall whether you testified
 4  twice?
 5    A.   Twice that I recall.
 6    Q.   Okay. And one of them was the scenario where
 7  you happened to be a treating physician over --
 8  historical treating physician and you were providing
 9  some evidence relating to the patient who was
10  challenging the conduct of a different physician?
11    A.   That's correct.
12    Q.   Okay. And in the first one, I don't think I
13  have a handle on what your -- the nature of that case
14  was or what your role was.
15    A.   I was asked to provide expert witness
16  testimony in a case where there were medical issues.
17    Q.   Okay. It wasn't relating to a historical or
18  existing patient of yours? It was some third party?
19    A.   That's correct.
20    Q.   What was the nature of your opinion?
21    A.   That medical malpractice had been performed
22  by the treating physicians.
23    Q.   So you were retained by the plaintiff's
24  lawyer in that case?
25    A.   That is correct.
                                                      17
```

```
 1    Q.   Do you recall the name of the lawyer that
 2  retained you?
 3    A.   Charles Atkins.
 4    Q.   Do you recall the parties in that lawsuit?
 5    A.   No, I do not.
 6    Q.   Do you recall the year that you gave that
 7  testimony?
 8    A.   Would you be satisfied with a range?
 9    Q.   Absolutely.
10    A.   Early 1980s.
11    Q.   Do you recall what the outcome of that case
12  was?
13    A.   Not for the plaintiff.
14    Q.   Do you recall who the defendants' lawyer
15  was?
16    A.   There were seven of them.
17    Q.   Did any one of them make an impression on you
18  that you can remember their names today?
19    A.   No.
20    Q.   Would the number of depositions that you've
21  given be more than two?
22    A.   Yes.
23    Q.   So you've testified previously in actions
24  that simply didn't make it to trial?
25    A.   That is correct.
                                                      18
```

```
 1    Q.   Have you testified as an expert in those
 2  matters?
 3    A.   Yes.
 4    Q.   Can you give me a general range as to how
 5  many depositions there may have been previously?
 6    A.   Probably less than 20.
 7    Q.   Okay. So you've had some experience with
 8  lawyers in depositions, and there's something about the
 9  Jeffries case that Mr. Burrell communicated to you
10  during that first call that was not appealing. What
11  was it about his characterization of the assignment
12  that did not appeal to you?
13    A.   It wasn't clear that if he was asking me for
14  an expert opinion based on a background in infectious
15  disease or a background in rheumatology or a background
16  in vaccine-related difficulty, that my ability to
17  testify would be a benefit to him.
18    Q.   Am I sensing that what you're saying is there
19  might be some subspecialty or other type of specialized
20  physician that would have been more appropriate based
21  on the description you were given?
22    A.   No.
23    Q.   Okay.
24    A.   The question was, if he --
25    Q.   Mr. Burrell's question?
                                                      19
```

```
 1    A.   The question in my mind.
 2    Q.   Okay.
 3    A.   The question in my mind was, if he was
 4  looking for a specific response or opinion concerning
 5  some of the issues that appeared to be active, that he
 6  would be more appropriate in seeking counsel -- not
 7  counsel -- but opinion from someone who was a, quote,
 8  recognized expert in that particular narrow area.
 9    Q.   Okay. That helps. So when -- so you didn't
10  jump at the opportunity and you suggested that -- to
11  Mr. Burrell that you weren't excited about it. And
12  then he calls you back some period of time later and
13  asks you to reconsider; is that right?
14    A.   Or rephrases the -- what it was, in fact,
15  that my understanding was they were, in fact, looking
16  for.
17    Q.   Did you articulate what your understanding
18  was during that first call?
19    A.   The elusive first call. No, because we were
20  not as -- this was a global description, a global
21  response.
22    Q.   Okay.
23    A.   A feeling that occurred.
24    Q.   Okay. So the second call, it must have
25  been -- must have been some sense of clarity on
                                                      20
```

1  Mr. Burrell's part that the way -- the way he described
2  the assignment to you was not appealing to you. And so
3  he asked you to reconsider, based on the slightly
4  different description of what he was looking for. Is
5  that close to what happened?
6      A.  Or the second call improved my understanding
7  of what he had said the first time that I had
8  misunderstood. The end result was that by the end of
9  the second call, I felt that there was an issue that
10 they would like to have me review that I felt
11 comfortable in reviewing and providing an opinion.
12     Q.  What did you understand that issue to be?
13     A.  My understanding of that, I was to review the
14 information that had -- was supplied to me concerning
15 Mr. Jeffries, that I was to examine the patient and to,
16 on the basis of my clinical experience as a practicing
17 physician, provide an overview assessment of the
18 situation.
19     Q.  To review the information that was provided
20 to me. As of that moment in time, you had not been
21 provided any documents regarding Mr. Jeffries?
22     A.  My recollection is that that is the case.
23     Q.  Okay.
24         (Plaintiff's Exhibit 70 was marked for
25         identification.)
                                                    21

1      Q.  Dr. Bullard, I've handed you what I've marked
2  as Exhibit Number --
3          MR. ROBERTS: Let's go off the record.
4          (Off the record.)
5  BY MR. ROBERTS:
6      Q.  Dr. Bullard, I've handed you what I've now
7  marked as Exhibit 70, which appears to be a copy of
8  correspondence to you in November of 2002 from your
9  patient, Mr. Burrell, asking you to perform this
10 assignment for Mr. -- on his behalf relating to
11 Mr. Jeffries.
12         MR. ELLIS: I'm going to object to the use of
13 the term, as his patient. He was not contacting
14 him as a doctor/patient.
15     Q.  Okay. Is this a letter that you received
16 from Mr. Burrell's office?
17     A.  This letter is addressed to me. I don't
18 recall receiving it.
19     Q.  Okay. This was -- you understand this was in
20 the file that you produced to me pursuant to the
21 subpoena? Okay.
22         In here it's represented that you wanted to
23 first look at the medical records before you decided to
24 conduct the IME. Did you review medical records
25 between the first and second phone call or did those
                                                    22

1  not come until after the second phone call?
2      A.  As I responded earlier, I was not certain of
3  the time that the records had arrived. Based on that
4  correspondence, it would appear that I had, in fact,
5  looked at the records before, or at least skimmed them,
6  before I made a decision to perform the exam.
7      Q.  Which decision may have been made before the
8  second phone call or after the second phone call?
9      A.  Would you repeat that?
10     Q.  You can't be for certain sitting here today
11 whether you had reviewed records before the second
12 phone call or not?
13     A.  That's correct.
14     Q.  Okay. In this letter, Mr. Burrell
15 memorializes that during a November phone call you had
16 suggested that you could skim through the records and
17 get a sense of the situation and that he would like to
18 find out fairly quickly if you could assist with the
19 IME. Did you receive a volume of records from
20 Mr. Burrell's office?
21     A.  At some point I received a number of copies
22 of various items relating to the care of
23 Mr. Jeffries.
24     Q.  And did you, as was suggested in this letter,
25 in the phone call, skim through them to gain a sense of
                                                    23

1  the situation?
2      A.  Yes.
3      Q.  And then did you provide Mr. Burrell with
4  feedback as to whether you could assist him with the
5  IME after reviewing those records?
6      A.  Yes.
7      Q.  What did you tell him after you reviewed or
8  skimmed the records?
9      A.  With response to your previous question
10 concerning my understanding of the situation in terms
11 of what it was they wanted, after reviewing the
12 records, I felt that I would be able to respond in some
13 positive way from the sense of clearing out some of the
14 debris in the data on the case.
15     Q.  I don't understand. You would respond in a
16 positive way to clear out --
17     A.  I would be able to perform an exam and
18 decide, after looking at the records, how they
19 correlated with the patient's symptoms or not.
20     Q.  So after skimming the records, you reported
21 to Mr. Burrell that you would be able to perform an IME
22 and provide him with feedback as to whether the
23 records -- whether your opinion, based on your physical
24 examination of Mr. Jeffries, correlated with his
25 symptoms? I'm not sure I fully understand exactly what
                                                    24

**Page 25**

1  you told Mr. Burrell you could do.
2     A.   Let me rephrase that.
3     Q.   Okay.
4     A.   I indicated that I thought that I could
5  perform an examination which might be helpful in terms
6  of clarifying their understanding of the patient's
7  situation.
8     Q.   What do you mean by helpful to them?
9     A.   At the time that I reviewed the records,
10 there were large numbers of contrasting opinions that
11 had been accumulated over the course of this patient's
12 medical condition. There seemed to be distractions
13 involved at every level which might have been missing
14 the illness of the patient.
15    Q.   So before -- were you done?
16    A.   (Nodding head.)
17    Q.   So before actually visiting with
18 Mr. Jeffries, you had concluded, based on your review
19 of the documents that were given to you, that there
20 were a large number of contrasting opinions?
21    A.   Yes.
22    Q.   Okay. Was it your belief on reviewing the
23 records that there are opinions that Mr. Jeffries is
24 not disabled? How do you mean contrasting, I guess is
25 my question?

**Page 26**

1     A.   The majority of the records that I was given
2  for review did not deal with the disability of the
3  patient. The records that I reviewed appeared to deal
4  with one symptom, a particular physician's opinion of
5  that symptom, a physician who didn't agree that that
6  symptom was due to a particular condition, and a series
7  of examination of medical minutia that, by the time
8  that I saw the records, were so far removed from the
9  actual patient as a person that it wasn't clear whether
10 they were treating, examining or diagnosing a
11 particular symptom or that anyone had looked at the
12 patient as a whole.
13    Q.   Do I understand correctly or can I conclude,
14 then, that you felt you could assimilate all the data
15 in conjunction with your own examination of
16 Mr. Jeffries and clarify the situation for the
17 defendants?
18    A.   There are really two questions there.
19    Q.   Okay.
20    A.   The first question was, can I assimilate the
21 data and clarify it. The answer to that is no. I had
22 already indicated that I was not an expert in any of
23 the subspecialties that they had numerous contrasting
24 opinions on.
25        The second part of your question was -- if

**Page 27**

1  you will repeat it.
2     Q.   Okay. The repeat part would be that I asked
3  you whether, after reviewing the records, you concluded
4  that you had the capacity to assimilate all the records
5  and then in conjunction with an actual examination of
6  Mr. Jeffries clarify the situation for the
7  defendants?
8     A.   It wasn't clear to me that they had,
9  Mr. Burrell and his associates, had any need for
10 clarification of their understanding, necessarily. I
11 think they were looking for a better insight into the
12 situation. And that by reviewing the patient's
13 situation, the data and his examination, that I might
14 be able to provide a different perspective.
15    Q.   Let me back up a little. Twice now you've
16 said that there were, quote, contrasting opinions.
17 What opinions in the file are contrasting?
18    A.   My recollection is that there were a number
19 of documents that had been produced by physicians that
20 indicated one -- that a particular symptom was related
21 to something. A different physician indicating that
22 that symptom could not have been due to whatever the
23 first physician said. Differences in diagnoses. There
24 were -- there was a litany of different diagnoses and
25 different explanations of the patient's conditions.

**Page 28**

1     Q.   Is it your recollection that the file
2  contains the opinion of any doctor that Mr. Jeffries is
3  not disabled?
4     A.   I honestly don't recall noting whether any of
5  the physicians were commenting on his disability.
6     Q.   You told me that. You said the majority of
7  the records didn't deal with the disability of the
8  patient. Right?
9     A.   The records that I reviewed.
10    Q.   When you received the -- lawyers actually
11 came to your office and sat down with the stack of
12 records with you and reviewed them with you, right?
13    A.   That is not correct.
14    Q.   Okay. Has anyone from the law office of Wood
15 & Lamping been to your office to -- for any reason
16 relating to Mr. Jeffries in the past six months?
17    A.   I spoke with Mr. Burrell and Mr. Ellis one
18 afternoon concerning this.
19    Q.   At your office?
20    A.   Correct.
21    Q.   Was that before or after your examination of
22 Eric?
23    A.   That was before.
24    Q.   Did the three of you look at documents during
25 that discussion?

```
 1    A.   I do not believe that we reviewed documents
 2 at that time.
 3    Q.   It was suggested to me by someone that
 4 lawyers or paralegals from Mr. Ellis' firm came to your
 5 office and went through the documents with you.  Did
 6 that not happen?
 7    A.   That's absolutely not the case.
 8    Q.   Okay.  But Mr. Burrell and Mr. Ellis did come
 9 to your office and had a meeting with you in advance of
10 your meeting with Mr. Jeffries?
11    A.   That is correct.
12    Q.   What was the purpose for that meeting?
13    A.   I believe that meeting occurred after I had
14 skimmed or looked at the documents.
15    Q.   Okay.
16    A.   And their request was for me to summarize or
17 give my opinion of the information.
18    Q.   So before you actually examined Mr. Jeffries,
19 they requested and they met with you to receive your
20 opinion of what the records contained; is that right?
21    A.   That is not correct.  Let me rephrase what I
22 said.  That was during the period of time where I was
23 in the process of deciding whether I would perform the
24 independent exam.
25    Q.   Okay.
                                                       29
```

```
 1    A.   My recollection is that following the initial
 2 discussion, at some point I was provided with the
 3 documents, I reviewed the documents.  They arranged to
 4 meet me.  We discussed the situation in general without
 5 a review of the documents, per se.  In other words,
 6 discussed the situation in general as well as at that
 7 point discussed whether I would be able to perform the
 8 exam based on the issues that we had already talked
 9 about.  In other words, there was a -- a value to my
10 performing the exam.  Could I respond in a meaningful
11 way.
12    Q.   But I am correct that you received documents,
13 you reviewed documents, and then this face-to-face
14 meeting with Mr. Ellis and Mr. Burrell was arranged and
15 the three of you talked?
16    A.   That's correct.
17    Q.   Okay.  And after that discussion it was
18 agreed that the defendants would retain you to actually
19 see Mr. Jeffries?
20    A.   That's correct.
21    Q.   Okay.  How long did that meeting take?
22    A.   Probably less than an hour.
23    Q.   Did you bill Mr. Burrell's firm or his client
24 for that time?
25    A.   Yes, I did.
                                                       30
```

```
 1    Q.   Okay.  Would your bill reflect how long that
 2 meeting took?
 3    A.   Not necessarily.
 4    Q.   Did you take any handwritten notes of your
 5 review of the file?
 6    A.   No.
 7    Q.   You didn't take any notes of the meeting with
 8 Mr. Burrell and Mr. Ellis?
 9    A.   No.
10    Q.   What do you recall Mr. Burrell and Mr. Ellis
11 saying to you during that meeting?
12    A.   My recollection is that we discussed in
13 general terms what had transpired, Mr. Jeffries'
14 history, and they asked me what I thought about the
15 situation.  And my response was that I thought that
16 there had been an extraordinary number of opinions
17 previously rendered concerning every aspect of
18 Mr. Jeffries' clinical condition.
19    Q.   Anything else?
20    A.   It was at that time that I agreed to perform
21 the examination based on my understanding of what their
22 interest was in my seeing the patient.
23    Q.   Say that again.  I'm sorry.
24    A.   It was at that time --
25    Q.   My brain was somewhere else for a second.
                                                       31
```

```
 1    A.   Would you --
 2         (The record was read.)
 3 BY MR. ROBERTS:
 4    Q.   And what was your understanding of their
 5 interest in you seeing the patient?
 6    A.   My understanding was that they were looking
 7 for a global assessment from a general practitioner
 8 experienced in seeing patients on a day-to-day basis to
 9 assess my objective feeling as to this individual's
10 illness and current condition.
11    Q.   Okay.  I know you had those two initial calls
12 with Mr. Burrell and then you had this meeting with
13 Mr. Burrell.  Are there any other conversations you had
14 with Mr. Burrell before seeing Mr. Jeffries?
15    A.   I honestly don't recall any.
16    Q.   Okay.  Any time prior to seeing Mr. Jeffries
17 did you speak to Mr. Ellis, other than this
18 face-to-face conference that you've shared with me?
19    A.   No.
20    Q.   On the phone or in person?
21    A.   Not that I recall.
22    Q.   Okay.  Can you recall any other detail of
23 this less-than-an-hour meeting with Mr. Burrell and
24 Mr. Ellis face to face in your office?
25    A.   No.
                                                       32
```

**Page 33**

Q. Did you consider it odd that Mr. Burrell and Mr. Ellis made this visit to your office to have this discussion?

A. My experience with the legal profession is not so vast as to consider a visit to my office abnormal.

Q. Have you ever suggested to anyone that it was unusual?

A. No.

Q. Did you have any further communications with Mr. Burrell and Mr. Ellis between the date of that visit and your actual examination?

A. Not that I recall. There may have been some brief communication indicating that they had arranged for Mr. --

Q. Scheduling?

A. -- Jeffries or that they were negotiating with you for the examination to occur, or I have some recollection of there being some maneuvering before the actual examination occurred.

Q. Maneuvering. What does that mean, maneuvering?

A. That they had talked to you and you had talked to them and -- I mean, that was my understanding.

**Page 34**

(Off the record.)

BY MR. ROBERTS:

Q. So you meet with Mr. Jeffries?

A. Correct.

Q. And how long did that take?

A. 45 minutes to an hour.

MR. ROBERTS: Okay. Why don't we take a short recess? It's 3:30. We've been going for an hour. We're not going to do another hour, I suspect, but let's take five minutes or so.

MR. ELLIS: Okay.

(Off the record.)

(Plaintiff's Exhibit 71 was marked for identification.)

BY MR. ROBERTS:

Q. Back on the record. Doctor, this is -- I've marked as Exhibit 71 a copy of the letter that I sent to you with a subpoena. I just want you to confirm that.

MR. ELLIS: Did you send us copies of these subpoenas you issued?

MR. ROBERTS: Did I send you copies of the subpoena? I'm sure I did. That's my practice.

MR. ELLIS: Okay.

A. Is there a response?

**Page 35**

Q. I just would like you to verify that that's the subpoena you received to appear today -- well, to appear on April 30th.

A. This appears to be similar.

(Plaintiff's Exhibit 72 was marked for identification.)

Q. I've marked as Exhibit 72 another letter from the law firm of Wood & Lamping to me with you as a blind carbon copy. It was in your file. Just confirm for me whether you received that from Wood & Lamping or not.

A. I think that -- I believe I did receive this.

Q. Okay. Thank you. Do you have an opinion about Mr. Jeffries, his health, his illness, his abilities, his disabilities?

MR. ELLIS: Which one do you want answered?

MR. ROBERTS: Any of the above.

A. I believe that he is basically healthy. I believe that if he has a disability, it is based more on his psychological make-up than a physical abnormality.

Q. Do you have an opinion whether he's disabled from his former occupation?

A. No.

**Page 36**

Q. You don't have an opinion whether he's disabled from his former occupation or not?

A. No.

Q. I asked you a question in the negative.

A. Right. And then I responded in reverse answer. Let's go back and then --

Q. Do you have an opinion as to whether Mr. Jeffries is disabled from his former occupation?

A. No, I do not.

Q. Okay. Is there additional information you require to render an opinion one way or the other?

MR. ELLIS: I'm going to object. I don't think he's ever been asked to render an opinion on that issue.

A. Based on the components of the individual's physical examination and my general assessment of the patient, I was not able to determine if he was -- let me rephrase that. I -- my belief was that he was not disabled from a physical condition.

Q. But you don't have an opinion whether he's disabled from performing his former occupation?

THE WITNESS: Would you read back what I had said in response to his previous question?

(The record was read.)

THE WITNESS: And then his question to me