Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ERIC JEFFRIES,            )
            Plaintiff    )
v.                        ) Case No. C-1-02-351
                          )
CENTRE LIFE INSURANCE CO. )
et als.,                  )
            Defendants   )

DEPOSITION OF: MITCHELL I. CLIONSKY

taken before Jessica R. Stasio, Notary Public-Stenographer, pursuant to Rule 30 of the Rules of Civil Procedure, at the offices of ACCURATE COURT REPORTING, 1500 Main Street, Springfield, Massachusetts on September 23, 2003.

Appearances: (see page 2)

Jessica R. Stasio
Registered Professional Reporter

Page 2

APPEARANCES

FOR THE PLAINTIFF:
GRAYDON HEAD & RITCHEY LLP
1900 Fifth Third Center
511 Walnut Street
Cincinnati, Ohio 45202-3157
513-621-6464
BY: MICHAEL A. ROBERTS, ESQ.

FOR THE DEFENDANTS:
WOOD & LAMPING LLP
600 Vine Street, Suite 2500
Cincinnati, Ohio 45202-2491
513-852-6000
BY: WILLIAM R. ELLIS, ESQ.

IN ATTENDANCE: Carrie Barnes, Esq.

Page 3

I N D E X

WITNESS              DIRECT  CROSS  REDIRECT  RECROSS
MITCHELL I. CLIONSKY   4

EXHIBITS
Exhibit 66, Dr. Hawkins' report
Exhibit 67, Dr. Shear's report
Exhibit 68, Dr. Clionsky's file

Page 4

        MITCHELL I. CLIONSKY, Deponent, having first been duly sworn, deposes and states as follows:

DIRECT EXAMINATION BY MR. ROBERTS:
   Q. Good morning, Dr. Clionsky. My name is Mike Roberts. I represent Eric Jeffries. Could you kindly state and spell your name for the record as well as your residential address?
   A. Sure. It's Mitchell Clionsky. C-L-I-O-N-S-K-Y, and my office address is 155 Maple Street, suite 203, Springfield, Massachusetts. 01105.
   Q. What is your residence address?
   A. Is that necessary?
   Q. Yes.
   A. I prefer to not have something that's publicly --
        MR. ELLIS: That's your choice.
        MR. ROBERTS: We will seal this.
   A. I'm a resident of Hampden County.
   Q. I need your residence address in the event I need to subpoena you in the future. You've been identified as an expert in a lawsuit by Mr. Ellis.

Page 5

1  The need may arise for me to have you served with a
2  subpoena in the future, and for that purpose I need
3  your residence address.
4      MR. ELLIS: I will accept service for
5  Dr. Clionsky of any subpoena, or it can be
6  issued at his office.
7      Q. (by Mr. Roberts) I will need your
8  residence address, sir.
9      A. I get served all of my subpoenas at the
10 office. It's a standard part of business practice,
11 and I don't intend to give you my home address. My
12 home address is unlisted. My telephone number is
13 unlisted. I do not wish to be -- have them listed
14 in this day and age unless you want to put this
15 under seal.
16     Q. I will do that.
17     A. Okay. Then you can have it.
18     Q. Okay. What is it?
19     A. (Answer was stricken)
20         MR. ROBERTS: Let's just strike that
21 from the record. I mean I could just write
22 it down off the record, so let's strike that
23 last response from the record, and if you could
24 just repeat it for me to make sure I have it

Page 6

1  written down correctly in my notes. We'll go
2  off the record.
3      (Discussion off the record)
4      Q. (by Mr. Roberts) Sir, you've been engaged
5  from time to time to review materials relating to
6  Eric Jeffries; is that right?
7      A. Yes.
8      Q. And have you had the opportunity to review
9  reports prepared by a Paula Shear and a Jim Hawkins?
10     A. To the best of my knowledge, no.
11         MR. ROBERTS: Okay. Why don't we go
12 back off the record.
13     (Discussion off the record)
14         MR. ROBERTS: Let's go back on the
15 record.
16     The report, the expert report deadline in
17 the case for the Plaintiff was August 15th. On
18 August 15th I provided the reports of Dr. Shear
19 and Dr. Hawkins to Mr. Ellis. The expert
20 report deadline for Mr. Ellis was August 30th.
21 On August 30th of 2003 he identified Dr.
22 Clionsky as an expert in the case. The fact
23 discovery witness deadline was August 31st.
24 The expert discovery deadline is October 15th.

Page 7

1  I'm here today for the purpose of examining Dr.
2  Clionsky, the identified expert, as to his
3  opinions in the case. I have presented him --
4  he should have been presented with copies
5  of my expert reports before he was identified
6  as an expert. If he wasn't, he wasn't. And if
7  he wasn't given them before today, he wasn't.
8  But I intend to proceed in this deposition by
9  taking a break, suspending the deposition now,
10 having Dr. Clionsky review these materials and
11 ask him questions. If when I ask him
12 questions, because he wasn't given the reports
13 before today and feels inclined not to answer
14 the questions because he hasn't had
15 satisfactory time to review the material, then
16 he can say that at that time. But the way
17 we're going to proceed is that Dr. Clionsky
18 takes as much time as he desires to review
19 these reports, we'll go back on the record when
20 he instructs me that he's done that, and we're
21 going to ask him questions. That's what we are
22 going to do. This is my opportunity. I spent
23 a lot of money to come to Massachusetts to take
24 the deposition of an expert, and that is what

Page 8

1  we are going to do.
2      MR. ELLIS: In response, if the
3  Doctor wishes to do that, I'm not going to tell
4  him that he shouldn't. I will point out that
5  these reports were not sent to Dr. Clionsky for
6  his comment and therefore will not be part of
7  his comments at the trial of this case to my
8  knowledge. And he's not the only expert
9  who's been named. One of our experts has
10 reviewed these reports, it just doesn't happen
11 to be Dr. Clionsky. Dr. Clionsky is prepared
12 to testify about those things he has done in
13 this claim file on behalf of DMS, and I don't
14 believe it's proper for counsel for the
15 Plaintiff to ask his opinions on matters
16 outside the scope of his review.
17     MR. ROBERTS: Let's go. We're going
18 to go off the record, Dr. Clionsky's going to
19 be asked to review these. If he refuses to
20 review them, then the deposition will be
21 suspended as several others were in this case
22 because of Mr. Ellis' interference, and I will
23 require that the court order that the
24 Defendants make Dr. Clionsky available

Page 49

example, or in the supraspinal fluid over multiple times in different places in the brain so that you can image the brain, for example, one day and there is a plaque in one area or two areas, and then six months later there may be nothing going on from a neurologically radioneurological approach. Six months after that, consistent with changes and certain symptoms, you might find that there is plaque in the visual cortex that didn't appear before. One thing about people with MS is that they do experience changes in their cognitive and emotional functioning reflective of the changes that are going on neurologically. And what is interesting, I guess, is that you can image these and be able to see where they are taking place at various times and correlate them with what is going on clinically.

Q. Could I direct your attention to page seven, paragraph number four under the word Diagnosis?

A. Yes.

Q. She, Dr. Shear, suggests there that Dr. Hartings has concluded that Mr. Jeffries suffers from Cognitive Disorder. Is that your understanding

Page 50

of what Dr. Hartings concluded?

A. Yes.

Q. The next paragraph starts General Comments. Dr. Shear talks generally about the use of the DSM IV materials. You agree with what she is saying there?

A. About what?

Q. The somatization disorder and obsessive-compulsive personality disorder are both specialized terms, it's as she describes it there?

A. That they are both specialized terms that are part of the -- listed in the DSM, certainly.

Q. The current version of the diagnostic handbook is DSM-IV-TR; right?

A. I am not familiar with the TR. I am still using the IV. I must be behind the times. Hopefully they haven't changed too many diagnoses in the last couple months.

Q. The last three lines of that paragraph she says for each mental disorder in the DSM, the clinician is provided with explicit criteria that the patient must meet before diagnosis is assigned. Is that correct?

A. No.

Page 51

Q. What's incorrect about that?

A. The DSM is a consensus document. Take a group of fifteen people who are on the committee to establish the criteria for a certain diagnosis, let's say it's Attention Deficit Hyperactivity Disorder just for the sake of argument. They will then have the input based on what they're reading as knowledgeable parties or experts in the field about what are the conditions, what are the symptoms, what are the standards that they use to try to determine how to best design this diagnostic category. The fact that there are at least four, because we've gone up through the various versions of the DSM, this TR is, of course, the newest one, but there has been DSM IV, DSM III, DSM III-R, all revisions, all attempts at better understanding psychopathology. With each revision there are things that are added, things that are taken away largely based on what the consensus is at that point as to how things work. The practicing clinician rarely sees pure form cases of any disorder. Usually they are set up in a cookbook fashion. You know, column A, you need two out of these. Column B, you need three out of these. Column C, you need one out of these.

Page 52

Sometimes you are fortunate enough as a clinician to get a case that meets all of those criteria in each case, and you can say with at least a greater sense of certainty if -- and confidence, if not truth, because I am not sure it actually is truth, but a greater sense of certainty that what you have is a true diagnosis here. I can tell you that different people looking at the same patient can legitimately come up with different diagnoses based on their reading of those symptoms and what falls into which category. In the case of ADHD, you have a symptom where -- you have two classes of symptoms. One's an inattention cluster where there is nine symptoms; the other is a hyperactivity/impulsive cluster where there is also nine symptoms. In order to make a diagnosis of a child, you need six out of the nine in one or the other or both categories. Now, you also get people like Russel Barkley, who's one of the preeminent experts in this area who says that in adults often times the disorder ameliorates a bit, it becomes less severe, and then you only need four or five. So the issues of prevalence, the issues of date of onset, the course, all of these various factors that go in, as well as the specifics of how

Page 53

many you need in each category are meant as a source of guidance. They are not made in a way that allows you to say, well, this can't be the diagnosis because there are only four out of the five here. This can't be the diagnosis because there is only two out of the three here. Because what happens is you have this huge wastebasket of leftovers where it doesn't meet any diagnosis. That doesn't mean the person is psychologically healthy, it just means you didn't come up with enough specific symptoms. And some of these symptoms, for example, sexual dysfunction, the person does not complain about symptoms of sexual dysfunction. Okay, well, does that mean that they don't have this disorder or they simply don't want to talk about that? I don't know. But what your job is as a clinician is to try to best understand, hopefully, for the job of helping somebody and treating them as to what's going on so that you can use that diagnosis to understand the disorder. That's the whole purpose of diagnosis is to understand.

So, when we get back to do I agree with that statement, to sort of draw this full circle, no, I don't believe that people have to meet

Page 54

specific numbers of criteria in order for the diagnosis to best fit.

Q. The DSM IV, though, does talk in mandatory terms you must have the following. When I say mandatory terms, I mean must, you must have, you know, one, two, and three. Not and/or. You understand that the DSM talks in mandatory terms?

A. To tell you the truth, I have not read the specific language of the DSM in this category in terms of the musts and shoulds.

Q. Okay.

A. It very well might. I'm telling you that as a clinician that does not mean that those things are always present for someone to have a specific disorder.

Q. Okay. At the bottom of page eight, she begins, second to last paragraph, discussion of the Somatization Disorder, Severe diagnosis made by Dr. Hartings, --

A. Yes.

Q. -- and she suggests that according to the DSM this is a rare condition occurring in only 0.2% of men, and tends to persist across many years of life. Do you agree with her assessment?

Page 55

A. Without the DSM in front of me I don't know what the percentage is, but it's, you know, --

Q. It's rare?

A. It's relatively rare, yeah.

Q. Okay. She suggests that the DSM criteria on this diagnosis or disorder is that the complaints span several years and begin before the age of 30. Is that consistent with your understanding?

A. It's probably what it says in there, yeah.

Q. She says most commonly, this disorder is evident by adolescence.

Do you agree with that assessment?

A. Yeah, I don't have it in front of me to understand it well enough to remember the exact onset of somatization disorder.

Q. Based on your twenty-plus year history in the field, would you agree that these type -- this type of disorder is generally evident by adolescence?

A. I really don't know.

Q. Okay. She then says, bottom of page eight carrying over to nine, quote, I see no evidence in the medical records or in data from Dr. Hartings'

Page 56

clinical interview with Mr. Jeffries to suggest that Mr. Jeffries has a history of physical complaints prior to age 30 or prior to the time he received the immunizations that he claims led to his current illness.

Do you know if Dr. Hartings explored Mr. Jeffries' medical history prior to age 30 and what he uncovered, if anything?

A. I didn't see any suggestion that he had read his medical records prior to age 30, and frankly nor have I seen those in any of the data that I've looked through.

Q. Did Dr. Hartings inquire during his interview with Mr. Jeffries what his medical history was prior to age 30?

A. I believe he did. I'd have to refresh my memory by specifically looking at it. Would you like me to look at it?

Q. If you desire. But then let me ask you a second question while you are undertaking that effort it requires you to do that.

Based on the history that Dr. Hartings gleaned about Mr. Jeffries' health prior to the age of 30, is it consistent with that someone evidence

Page 57

1 by adolescence somatization disorder?
2   A. I've not seen anything anywhere in the
3 report to suggest that Mr. Jeffries had a history of
4 excessive doctor involvement --
5   Q. Okay.
6   A. -- prior to the time that the records I
7 saw began.
8   Q. Okay. There's not even the suggestion
9 that Dr. Hartings even made that inquiry; correct?
10   A. Actually, he did, because he says on page
11 three of his report that Mr. Jeffries denied any
12 prior history of serious illness, hospitalization,
13 or surgery. So he apparently did make the inquiry
14 at least on a basic, you know, have you ever been
15 ill seriously before.
16   Q. Okay. So the information generated from
17 that inquiry would be inconsistent with the
18 requirement that someone evidence somatization
19 disorder during their adolescence?
20   A. Yes.
21   Q. Okay. She then, Dr. Shear on page nine,
22 first paragraph, full paragraph, starts with the
23 word all of the following material must be met.
24     And I understand you disagree with her

Page 58

1 about the mandatory nature of criteria, and you
2 highlighted earlier based on review of her report
3 that there is no evidence of any sexual symptom in
4 the records; is that correct?
5   A. Yes.
6   Q. In fact, did Dr. Hartings even inquire
7 about the sexual -- Mr. Jeffries' sexual
8 capabilities?
9   A. I believe he did.
10   Q. And what was the evidence that he
11 generated?
12   A. I believe it was in his report that he
13 asked something about the effect this had on the
14 relationship, and Mr. Jeffries commented that he and
15 his wife -- his wife had really been a great support
16 to him and stuck through this and that they
17 continued to have a sexual life and that that was
18 unaffected.
19   Q. And the next paragraph in the continuing
20 discussion of the diagnoses of somatization
21 disorder, Dr. Shear says either each of the symptoms
22 above can't be explained fully by a known medical
23 condition or else there is an established medical
24 condition but the physical complaints are in excess

Page 59

1 of what is expected. Do you see that?
2   A. Yes.
3   Q. Do you agree with her assessment that that
4 is one of the alternative requirements?
5   A. Yes.
6   Q. Do you agree with her last -- the last
7 sentence she has in that paragraph, therefore, it is
8 at least plausible to consider as a possibility that
9 his symptoms are fully explained by known medical
10 condition?
11   A. No. That's the part I do quarrel with.
12   Q. Okay. Why do you quarrel with that?
13   A. I should say this with a caveat that I'm
14 not a physician. My understanding from the reading
15 of the medical file is that there has been no
16 definitive medical diagnosis reached in this case.
17   Q. So because it's your understanding that
18 there is no medical doctor that has diagnosed
19 Mr. Jeffries with chronic fatigue syndrome or any
20 other medical condition, autoimmune disorder, your
21 data is that that doesn't exist so it must be a
22 psychological disorder?
23       MR. ELLIS: Objection. Form.
24   A. No, that's mischaracterizing my

Page 60

1 testimony. What I'm saying is if you read the
2 beginning of the paragraph it says either each of
3 the symptoms above cannot be explained fully by a
4 known medical condition or else there is an
5 established medical condition but the physical
6 complaints are in excess of what you would expect.
7     So, the fact that there is no known
8 medical condition here, obviously those symptoms
9 cannot be explained fully by it because there's no,
10 you know, true diagnosis reached. I mean if
11 someone's limping and you say, ha-ha, this person's
12 exaggerating, and it turns out they have a fractured
13 leg, that is an example of where the fracture would
14 explain the known limping. Or if you think, and
15 again this is somewhat suggestive, that they are
16 limping more than you would limp if they had a
17 fractured leg, then that would also meet the
18 criteria that is excessive response to that
19 condition. That leaves open the possibility that
20 there is an unknown malignancy in the leg that no
21 one's yet seen that causes it to be much worse than
22 the pain that most other people would have if they
23 fractured their leg. On the other hand, we are
24 talking about known medical conditions here, and

Page 61

1  that is the point that I make here, that is not a
2  known medical condition.
3     Q. As far as you know?
4     A. As far as I have seen in the record, yeah.
5     Q. Have you reviewed Dr. Pretoris' --
6  P-R-E-T-O-R-I-S, report?
7     A. I would have to be shown it to see if I
8  remember it, frankly, there were so many medical
9  doctors involved here.
10    Q. Her last -- her next paragraph she
11 suggests that the clinicians who have seen
12 Mr. Jeffries are consistent in stating that they do
13 not believe he is consciously fabricating his
14 symptoms. Do you agree with that?
15    A. They have, in fact, been consistent in
16 that, yes.
17    Q. She starts a discussion of Dr. Hartings'
18 obsessive-compulsive personality disorder diagnosis
19 at the bottom of page nine. Do you see that?
20    A. Yes.
21    Q. And then on the top of page ten that
22 paragraph continues. In the fourth line at the end
23 of the line there is a sentence that starts with the
24 word by. Dr. Shear says by definition, personality

Page 62

1  disorders must have an onset by at least adolescence
2  or early adulthood and must affect multiple areas of
3  functioning. Do agree with that?
4     A. Yes.
5     Q. She says it's not possible to abruptly
6  develop a personality disorder at Mr. Jeffries' age
7  unless it's the direct result of a medical illness
8  in which case a different diagnosis is given or to
9  have it effect only his search for medical treatment
10 without impacting other aspects of his life. Do you
11 agree with that?
12    A. In a narrow context of this being a
13 personality disorder, yes, I do.
14    Q. Okay. In the next paragraph, second
15 sentence, third line, she says that she was unable
16 to find any evidence at all in Mr. Jeffries' record
17 that he has longstanding symptoms of a personality
18 disorder. Were you able to find that in the record?
19    A. I didn't see that.
20    Q. She says people with OCPD -- and that is
21 obsessive-compulsive personality disorder -- have
22 extreme difficulty with their interpersonal
23 relationships, including marital relationships,
24 interactions with their children, tending to be

Page 63

1  highly controlling, coworkers and supervisees,
2  highly perfectionistic and unable to delegate, and
3  supervisors, so concerned about doing each task
4  perfectly that it's hard to prioritize, hard to
5  complete things successfully, and deadlines are very
6  commonly missed. Is that accurate with your
7  understanding of the disorder?
8     A. Yes.
9     Q. She says from the material in the file, I
10 see no evidence that Mr. Jeffries had any of these
11 difficulties at work before this illness, nor that
12 he had impairment in other aspects of his life prior
13 to his illness.
14    And I think when she refers to illness she
15 is talking about the '97, '98 time frame. From your
16 review of the file were you able to glean any
17 evidence that Mr. Jeffries had any difficulties in
18 his work or marital life that could be the result of
19 obsessive-compulsive personality disorder prior to
20 1997?
21    A. No.
22    Q. The balance of page 10 she says that
23 according to the DSM IV a person must show four of
24 the following criteria.

Page 64

1     And I know you disagree with her about the
2  mandatory nature.
3     At the very bottom of page 10, the last
4  two lines she says that she sees no evidence in the
5  record that Dr. Hartings asked questions in his
6  interview about situations in which rigid
7  organization may have been evident. Do you know if
8  Dr. Hartings made those inquiries?
9     A. No, I don't know.
10    Q. Have you spoken to Dr. Hartings?
11    A. No.
12       (A break was taken)
13    Q. (by Mr. Roberts) On page 11, I think
14 that's where we were.
15    A. We were still at the bottom of page 10,
16 but we'll move along.
17    Q. Okay. Thank you. There's a number of
18 paragraphs there discussing different elements of an
19 obsessive-compulsive disorder diagnosis, and with
20 each discussion of the element Dr. Shear essentially
21 concludes that she doesn't see any evidence that Dr.
22 Hartings even asked about those types of issues.
23    Is your recollection of Dr. Hartings, the
24 scope of his examination different than what Dr.

### Page 73

1  Q. Is that a psychiatric diagnosis?
2  A. It's in the DSM IV.
3  Q. Okay. The 294.9?
4  A. Yes.
5  Q. Okay. But he concludes that it's likely
6  due to cerebritis as a result of vaccine induced
7  auto immune disorder; right?
8  A. That's what he says there, yes.
9  Q. Okay. Would the obsessive-compulsive or
10 somatization disorder be Axis I?
11 A. No, that would be on Axis II.
12 Q. Okay. And his Axis II diagnosis of page
13 nine is V71.09, no diagnosis. What does that mean?
14 A. I think the V codes are codes that are
15 used for things that don't have sort of -- they are
16 sort of like wastebasket categories. Marital
17 disfunction is a V code. Job problems, V code.
18 Social difficulty would be a V code. And my guess,
19 without looking it up, is that this V code is the
20 one that you reserve for no diagnosis, sort of a
21 place keeper. He could have just as easily put down
22 just as easily no diagnosis, which is what I do.
23 Q. He would have charged me less. Dr.
24 Hawkins says on page eight, the top paragraph,

### Page 74

1  middle of the top paragraph there it says on
2  examination Mr. Jeffries' mood was appropriate to
3  his medical condition, i.e. frustrated and unhappy.
4  There is no evidence for acute depression,
5  obsessions, or compulsions. He was concerned about
6  a serious illness that had been going on for several
7  years and was investigating every possibility. This
8  appears to be appropriate behavior for a bright
9  executive who's experiencing a debilitating medical
10 illness.
11      Have you ever had the opportunity to
12 personally sit with Mr. Jeffries and examine him and
13 make the assessment that Dr. Hawkins did on his
14 personal exam?
15 A. No.
16 Q. Dr. Hawkins then says on my second
17 examination two years later in June 2003,
18 Mr. Jeffries continues to be frustrated by his
19 illness which is characterized by waxing and waning
20 symptoms.
21      And according to Dr. Hawkins, Mr. Jeffries
22 appeared more disorganized with more deterioration
23 in his short-term memory.
24      You didn't have the occasion to examine

### Page 75

1  Mr. Jeffries two years apart and come to a similar
2  conclusion or refute that, did you?
3  A. No.
4  Q. The next paragraph he says on neither
5  examination did I note evidence of depression such
6  as tearfulness, sad affect, social withdrawal, or
7  suicidal thoughts. On neither exam did I obtain any
8  clinical history that would be -- that would support
9  a diagnosis of a Personality Disorder. Mr. Jeffries
10 has never exhibited any pervasive patterns of
11 maladaptive behavior during his adult life, criteria
12 that are necessary for diagnosis of any Personality
13 Disorder.
14      You would agree based on what you know
15 about Mr. Jeffries' life prior to 1998 that
16 Dr. Hawkins' assessment there is correct?
17 A. That's not what Dr. Hawkins is saying
18 there.
19 Q. He says during neither of his exams --
20 A. Right. Which have both been subsequent to
21 1998.
22 Q. Right. But I thought we were in agreement
23 that the obsessive-compulsive personality disorder
24 is something that needs to exhibit itself in

### Page 76

1  adolescence, and some disorder needs to exhibit
2  itself before age 30?
3  A. Well, I wouldn't say we were in agreement
4  about that. I would agree that you said that is
5  what your expert said, and I said I don't
6  necessarily see it that way.
7  Q. Okay.
8  A. But despite that, that is not what he is
9  saying in this paragraph. What he is saying in this
10 paragraph is based on his observations he didn't see
11 anything maladaptive going on in either of the two
12 examinations that he had with him, both subsequent
13 to 1998.
14 Q. Okay. Fair enough.
15 A. He hadn't seen him before then either.
16 Q. Okay. He also says he didn't obtain any
17 clinical history that would support such a
18 diagnosis; right?
19 A. That's what he says there, yes.
20 Q. Okay. Are you aware of any clinical
21 history prior to 1998 that would support such
22 diagnoses?
23 A. No.
24 Q. I'm going to be forty in three weeks.

## Page 77

1   Assuming I don't have obsessive-compulsive disorder
2   sitting here today or somatization disorder, am I
3   someone that can develop those personality traits
4   now or in the future?
5       A. Yes.
6       Q. Okay.
7       A. Even though you wouldn't meet the criteria
8   diagnosis based on the onset being before age 40
9   unless you really hurried.
10      Q. Before age 40?
11      A. No, it's actually age 30 what is in
12  there.
13      Q. Now, you are making that suggestion just
14  on the basis of my assumption that you've not
15  gleaned me to have any of those presently?
16      A. Well, I've not examined you clinically, so
17  I don't know.
18          MR. ELLIS: I can suggest some.
19      Q. (by Mr. Roberts) The last paragraph of
20  page eight says that, according to Dr. Hawkins,
21  there's been a SPECT scan performed on Mr.
22  Jeffries. S-P-E-C-T. Do you know what a SPECT scan
23  is?
24      A. Generally, yes.

## Page 78

1       Q. And according to Dr. Hawkins, the SPECT
2   scan was consistent with nonspecific
3   neurodegeneration, likely immune mediated cerebritis
4   because of changes in the posterior fossa.
5   F-O-S-S-A. The SPECT scan demonstrated adequate
6   cerebral vascular flow and no evidence of an
7   affective disorder. You have no basis to comment
8   one way or the other about these conclusions there,
9   do you?
10      A. The only basis I have is as recently as
11  last week in another issue reading a review of where
12  the American Academy of Neurology views the value of
13  SPECT scanning, and according to this article which
14  was published just -- in fact, it was in the most
15  recent "Journal" of, I think, the "Archives of
16  Clinical Neuropsychology" they went through this,
17  five categories that the American College of
18  Neurology uses to determine whether something is an
19  established technique, a promising technique, an
20  investigational technique, a doubtful technique, or
21  an unproven technique. Those are the five strata
22  that they have. SPECT scanning in the area of at
23  least cognitive disorders and coming from a
24  background in terms of concussion-kinds of cognitive

## Page 79

1   disorders was found to be an investigational
2   technique as late as 1996 when apparently they
3   promulgated these levels. Investigational meaning
4   it wasn't proven and it wasn't established yet. It
5   wasn't at that level of scientific value but
6   nonetheless produced some information that could
7   potentially be of help in terms of understanding
8   what's going on with someone. I found that to be
9   interesting because I know that from a clinical
10  point of view people are often looking for SPECT
11  scans as ways of trying to raise hypotheses about
12  what is going on, but I don't know anyone that is
13  using that as a conclusive technique or anyone that
14  is ruling out something like an affective disorder
15  based on anything in the SPECT scan literature
16  that's currently accepted.
17      Q. Okay. What was that journal?
18      A. That was "Archives of Clinical
19  Neuropsychology", the article.
20      Q. September 2003?
21      A. I may even have it in my bag. I carry a
22  lot of junk here. Actually, it's Volume 18, No. 6,
23  August 2003. Page 591.
24      Q. Great.

## Page 80

1       A. And they also talk about the Society of
2   Nuclear Brain Imaging Council's position that there
3   was not yet adequate evidence to support the use of
4   SPECT or PET scanning in mild traumatic brain injury
5   to establish cause and effect relationships. So
6   certainly an interesting kind of thing it adds to
7   the total picture of what we understand about
8   someone.
9       Q. Was it the same for PET scan, is that what
10  you just said?
11      A. Yes.
12      Q. Okay. Do you know who Dr. Frye is?
13      A. No.
14      Q. That concludes paragraph eight. Paragraph
15  nine, the top we talked about a little bit Axis I,
16  and Axis II. What are Axes III, IV and V?
17          MR. ELLIS: I'm sorry, page nine, you
18      mean?
19          MR. ROBERTS: Page nine.
20          MR. ELLIS: Thank you.
21      A. Axis III is the place used for listing
22  medical conditions. So anything that is medically
23  related, history of cancer, history of hypertension,
24  goes in Axis III, especially if the evaluator

Page 81

1 thought it was relevant to the Axis I or Axis II
2 conditions.
3    Q. What was Axis II related to?
4    A. Personality disorders.
5    Q. Axis IV?
6    A. Axis IV is stressors, current levels of
7 stress on the person's life, what are the things you
8 see. Sometimes people will have a disorder where
9 it's exacerbated by financial distress or loss of
10 loved one or loss of job. Axis V is the global
11 assessment of functioning. It's a 100 point scale
12 with some anchors at different levels along the way
13 with lower scores reflecting greater, greater
14 impairment in functioning and higher scores
15 reflecting higher levels of functioning. And, you
16 know, if you want to do a full comprehensive
17 multiaxial diagnosis, you try to estimate what the
18 person's current level is and what their best level
19 of functioning has been in the past year.
20    Q. Are there different descriptions for
21 different bands?
22    A. Yes, there are.
23    Q. What would 60 be?
24    A. 60 is, it's, to the best of my

Page 82

1 recollection in the mild to moderate level of
2 impairment. The person's still functioning and in
3 routine everyday situations.
4    Q. When was the last time you spoke to Jeff
5 Champagne about Mr. Jeffries?
6    A. Not in the recent past. About
7 Mr. Jeffries? I can't remember. It's been a
8 while.
9    Q. Have you spoken to anyone at DMS about
10 Mr. Jeffries in the past six months?
11    A. When did I do my last review? May 5th,
12 yes. So I must have spoken with him or with
13 somebody down here just prior to that when they
14 asked me to take a look at the new data coming
15 through. John Graff sent me a letter on March 20th,
16 and I'm not sure if I spoke with him on the phone or
17 didn't about it.
18    Q. You don't know if you spoke to him on the
19 phone both prior to your examination or post-report?
20    A. I don't know if I spoke with him on the
21 phone at any point along. I may have just taken in
22 the letter and the report and written a response to
23 it.
24    Q. So you can't recall speaking to anyone at

Page 83

1 DMS about your report --
2    A. Correct.
3    Q. -- orally? So I understand, you agree
4 with Dr. Hartings' diagnosis about the personality
5 disorders of Mr. Jeffries; is that right?
6    A. I agree that Mr. Jeffries has a -- is
7 likely has a somatoform disorder.
8    Q. Likely has?
9    A. Yeah. I mean we are all talking about
10 more likely than not, okay, these are not things
11 that exist in real life. Disorders are conceptual
12 constraints.
13    Q. So it's your opinion it's more likely than
14 not that he suffers somatization personality
15 disorder?
16    A. Yes.
17    Q. Okay. And there are obsessional
18 tendencies involved in this?
19    A. I don't believe that he has a diagnosis of
20 obsessive-compulsive disorder.
21    Q. It's not your opinion that it's more
22 likely than not that he suffers from the DSM IV
23 defined obsessive-compulsive personality disorder?
24    A. Correct.

Page 84

1    Q. And what do you base your judgment with
2 regard to that diagnosis on?
3    A. Which one?
4    Q. The obsessive-compulsive?
5    A. The very focused and specific kind of way
6 in which he responds to some of the test materials,
7 and the symptom presentation has that flavor to it,
8 that -- this is, I mean, again, this is not a
9 diagnosis, this is based on, you know, we all have
10 personality traits and personality approaches to
11 things. And I think that there is an obsessional
12 way in which he has approached the work-up of this
13 medical condition.
14    Q. No, but my question was it's not your
15 opinion that he has OCPD, and why do you conclude
16 that he doesn't have OCPD?
17    A. Oh, I don't see the range of obsessive
18 kinds of behaviors or compulsive thoughts and
19 impairment based on that in terms of his
20 relationships. I mean I think Dr. Shear was correct
21 in that portion of her analysis.
22    Q. Are most people that enjoy success,
23 lawyers, doctors, psychologists, to a certain degree
24 obsessive or compulsive? I mean those words, are

### Page 85

1 they misused by the lay people?
2    A. It's like all aspects of normality that,
3 you know, in moderation it's probably a good thing
4 for success to be more obsessive and compulsive
5 about things, because you make sure you get it done
6 and you don't forget your socks and stuff like
7 that. But, you know, in excess, it gets in the way
8 of relationships that people spend so much time
9 counting their socks before they leave home that
10 they don't get to the plane on time because --
11    Q. Fair enough.
12    A. Because they are just straightening them
13 all out and color matching them and making sure they
14 have exactly the right sizes.
15    Q. Get the flags on the outside. Both
16 Dr. Shear and Dr. Hawkins say that in the five or
17 six years that Mr. Jeffries has been dealing with
18 his illness the manner in which he has approached
19 treatment is normal. Would you disagree with that?
20    A. I would.
21    Q. Okay. Why?
22    A. I can tell you that the sheer number of
23 medical evaluations and specialists sought to try to
24 understand or reach a diagnosis in this case is

### Page 86

1 clearly in the top one percent of all cases I've
2 seen over my career, and it is possibly the greatest
3 number of opinions that any one individual has ever
4 sought to try to establish a diagnosis.
5    Q. You know, there are people that I know
6 that live in Cincinnati that have never been to
7 Kentucky, and I bet there's people here that live in
8 Springfield that have never been to Connecticut. So
9 Mr. Jeffries you understand had a very successful
10 career, made a lot of money and traveled around the
11 world for his job. So are you comparing apples to
12 apples when you talk about how far someone will
13 travel to see a doctor?
14    MR. ELLIS: Objection to form. You
15    can go ahead.
16    Q. (by Mr. Roberts) Go ahead.
17    A. I am not concerned about the distances. I
18 realize he got his Master's degree at Cambridge, I
19 realize he is a world traveler, and as an investment
20 banker he was all over the place. Identifying who
21 are the top experts in a particular given area and
22 seeking out appropriate medical opinions from them I
23 don't quarrel with. I think that is a reasonable
24 thing to do. This is a couple notches above that in

### Page 87

1 my viewpoint.
2    Q. Because of the numerosity of doctors?
3    A. That, and also the other, the other
4 characteristic that's so unusual about this case is
5 the vividness and the quality and the number of
6 complaints that -- I mean you want to look back,
7 look at Dr. Bastien's evaluation, that is the one
8 that probably goes into the greatest degree of
9 specificity where there is a virtual shopping list
10 of complaints involving multiple areas of the body
11 and very striking kinds of complaints that I believe
12 are significantly greater than what is normal. When
13 I use that term, for medically ill people to have --
14 not that I think he could not have a medical
15 illness, but that even if he had a medical illness,
16 and he may, in fact, have one, over top of that
17 there is a level of focus and obsession, if you
18 will, and somatic preoccupation with this that is
19 far greater than what you see going through the
20 average hospitals in most places.
21    Q. Okay. What other physicians or
22 psychologists have you spoken to regarding
23 Mr. Jeffries?
24    A. None.

### Page 88

1    Q. Do you know that you've been identified as
2 an expert in the case formally on behalf of DMS?
3    A. I would assume so or else you probably
4 wouldn't be deposing me. Not that this hasn't been
5 fun.
6    Q. I love your eagerness. Okay. Doctor,
7 we're concluded to the extent that there's no
8 further opinions that you come to develop between
9 now and trial, in which case I'd like the
10 opportunity to explore those. But we are concluded
11 for now. Thank you.
12
13    (The deposition was concluded)

Page 89

1    SIGNATURE/ERRATA SHEET
2       I have read the foregoing, and it is a true
3    transcript of the testimony given by me at the
4    taking of the subject examination with the following
5    corrections/changes, if any:
6
7    _____        _____
8       date              MITCHELL I. CLIONSKY, Ph.D.
9
10
11   PAGE   LINE    CHANGE        REASON
12   ----------------------------------------------
13   ----------------------------------------------
14   ----------------------------------------------
15   ----------------------------------------------
16   ----------------------------------------------
17   ----------------------------------------------
18   ----------------------------------------------
19   ----------------------------------------------
20   ----------------------------------------------
21   ----------------------------------------------
22   Eric Jeffries v. Centre Life Insurance Co., et als.
23   Date Taken: September 23, 2003
24   jrs

Page 90

1  COMMONWEALTH OF MASSACHUSETTS
2  Hampden, ss.
3       I, JESSICA R. STASIO, a Notary Public in and
4  for the Commonwealth of Massachusetts, do certify
   that pursuant to notice there came before me on the
5  23rd day of September, 2003, at the offices of
   ACCURATE COURT REPORTING, 1500 Main Street,
6  Springfield, Massachusetts, the following named
   person, to wit: MITCHELL I. CLIONSKY, who was by me
7  duly sworn to testify to the truth and nothing but
   the truth as to his knowledge touching and
8  concerning the matters in controversy in this cause;
   that he was thereupon examined upon his oath and
9  said examination reduced to writing by me; and that
   the deposition is a true record of the testimony
10 given by the witness, to the best of my knowledge
   and ability.
11      I further certify that I am not a relative
   or employee of counsel or attorney for any of the
12 parties nor a relative or employee of such parties,
   nor am I financially interested in the outcome of
13 the action.
        WITNESS MY HAND, this 15th day of October,
14 2003.
15      --------------------
           Jessica R. Stasio
16
   My Commission expires:
17 March 15, 2007
18
19
20
21
22
23
24

$8 [1] 17:23
'97 [1] 63:15
'98 [1] 63:15
0.2% [1] 54:22
01105 [1] 4:13
1 [2] 44:22 45:21
10 [3] 63:22 64:3
64:15
100 [1] 81:11
11 [3] 64:13 66:2
66:3
15 [1] 90:17
1500 [2] 1:16 90:5
155 [1] 4:11
15th [4] 6:17 6:18
6:24 90:13
18 [1] 79:22
1900 [1] 2:3
1972 [1] 13:23
1974 [1] 14:1
1977 [1] 14:2
1996 [3] 45:1 45:10
79:2
1997 [1] 63:20
1998 [4] 75:15 75:21
76:13 76:21
1999 [1] 48:10
2 [1] 1:20
2000 [1] 22:22
2001 [6] 21:14 21:15
21:18 22:16 32:12
71:15
2003 [10] 1:17
6:21 71:16 72:21
74:17 79:20 79:23
89:23 90:5 90:14
2007 [1] 90:17
203 [1] 4:12
20th [1] 82:15
23 [2] 1:17 89:23
23rd [1] 90:5
2500 [1] 2:7
26 [1] 11:21
294.9 [2] 72:13
73:3
3 [2] 44:22 45:21
30 [9] 1:14 55:7
56:3 56:7 56:10
56:15 56:24 76:2
77:11
30th [2] 6:20 6:21
31st [1] 6:23
4 [1] 3:4
40 [2] 77:8 77:10
413 [1] 22:3
45202-2491 [1]
2:8
45202-3157 [1]
2:4
511 [1] 2:4
513-621-6464 [1]
2:5

513-852-6000 [1]
2:8
591 [1] 79:23
5th [1] 82:11
6 [1] 79:22
60 [2] 81:23 81:24
600 [1] 2:7
66 [4] 3:11 18:23
23:8 69:6
67 [5] 3:12 19:1
23:6 23:9 23:9
68 [6] 3:13 15:15
15:16 20:24 21:5
23:7
69 [1] 18:20
734-8490 [1] 22:3
75 [2] 39:24 40:8
8 [2] 44:22 45:21
8440 [2] 22:4 22:5
85 [2] 40:3 40:10
abilities [1] 25:1
ability [3] 12:21
29:4 90:10
able [5] 26:6 49:15
62:18 63:16 67:19
abnormal [1] 42:24
above [4] 39:24
58:22 60:3 86:24
above-average [1]
29:9
abruptly [1] 62:5
absence [1] 41:21
Academy [2] 14:20
78:12
accept [1] 5:4
accepted [1] 79:16
accident [1] 39:2
accidents [1] 12:12
according [9] 21:12
30:9 54:21 63:23
71:15 74:21 77:20
78:1 78:13
accurate [15] 1:15
22:12 22:17 32:1
33:17 35:9 38:5
41:3 42:8 43:15
43:20 44:4 44:6
63:6 90:5
accurately [2] 37:21
40:13
achieved [1] 43:12
action [1] 90:13
acute [4] 71:21 72:20
72:24 74:4
adaptive [1] 40:23
added [1] 51:17
additional [2] 16:11
19:4
address [8] 4:9
4:11 4:14 4:22
5:3 5:8 5:11
5:12
adds [1] 80:6
adequate [2] 78:5

80:3
ADHD [1] 52:11
adjectives [1] 68:20
administered [2]
26:15 26:19
administers [1] 36:11
administration [1]
41:11
administrative [1]
15:4
administrator [1]
11:5
adolescence [6] 55:12
55:20 57:1 57:19
62:1 76:1
adult [1] 75:11
adulthood [1] 62:2
adults [1] 52:20
Advisory [1] 14:21
affect [2] 62:2
75:6
affective [2] 78:7
79:14
again [7] 11:8
20:24 24:13 25:9
43:2 60:15 84:8
against [2] 25:10
26:8
age [14] 5:14 28:10
34:11 55:7 56:3
56:7 56:10 56:15
56:23 62:6 76:2
77:8 77:10 77:11
agree [31] 24:9
24:18 24:24 25:7
27:18 27:19 36:12
38:14 38:17 39:13
42:1 42:7 43:1
45:16 50:5 53:22
54:24 55:13 55:18
59:3 59:6 61:14
62:3 62:11 65:10
68:16 68:19 75:14
76:4 83:3 83:6
agree/disagree [1]
24:2
agreed [1] 45:11
agreement [2] 75:22
76:3
ahead [2] 86:15
86:16
al [1] 48:10
allowed [1] 70:23
allows [2] 35:19
53:2
almost [2] 33:1
47:4
along [3] 64:16
81:12 82:21
alphabet [2] 28:4
28:7
als [2] 1:7 89:22
alternative [1] 59:4
always [3] 32:18
33:6 54:14

Alzheimer's [7]
14:22 31:14 31:24
32:3 32:6 32:14
32:23
amazing [1] 32:20
ameliorates [1] 52:20
American [3] 14:16
78:12 78:17
analysis [3] 19:8
43:7 84:21
anchors [1] 81:12
answer [2] 5:19
7:13
anxiety [3] 39:4
72:2 72:7
anyway [1] 68:23
apart [1] 75:1
appear [2] 15:20
49:9
Appearances [2]
1:20 2:1
appeared [2] 29:3
74:22
apples [2] 86:11
86:12
appreciate [1] 10:1
approach [3] 24:1
24:16 49:6
approached [2] 84:12
85:18
approaches [1] 84:10
appropriate [3] 74:2
74:8 86:22
approximation [1]
12:1
April [1] 71:14
Archives [2] 78:15
79:18
area [4] 49:4 52:19
78:22 86:21
areas [4] 49:4 62:2
71:5 87:10
argument [1] 51:6
arise [1] 5:1
arrived [1] 29:21
article [4] 45:15
45:15 78:13 79:19
articles [1] 45:17
Arts [2] 13:19 14:1
aside [1] 66:7
aspects [5] 30:22
47:20 62:10 63:12
85:2
assess [1] 43:14
assessment [12] 41:2
42:8 43:20 44:5
45:6 48:19 54:24
55:13 59:3 74:13
75:16 81:11
assessments [1] 66:17
assigned [1] 50:22
associated [1] 41:18
Associates [3] 10:3
10:8 15:1

Association [3] 14:17
14:18 14:22
assume [5] 22:24
28:8 41:10 42:13
88:3
Assuming [2] 70:7
77:1
assumption [1] 77:14
attempts [1] 51:16
ATTENDANCE [1]
2:10
attention [12] 25:3
27:21 30:18 31:7
31:18 31:19 33:16
33:22 33:24 49:18
51:5 67:11
attentional [3] 31:10
31:15 31:19
attorney [1] 90:11
August [7] 6:17
6:18 6:20 6:21
6:23 21:18 79:23
authors [1] 39:23
auto [3] 12:12 72:18
73:7
autoimmune [1]
59:20
available [1] 8:24
average [1] 87:20
aware [3] 19:16
20:10 76:20
away [1] 51:18
Axes [1] 80:16
Axis [18] 71:21
72:1 72:12 72:20
72:21 73:10 73:11
73:12 80:15 80:16
80:21 80:24 81:1
81:1 81:3 81:5
81:6 81:10
B [1] 51:23
Bachelor [1] 13:19
background [2] 28:11
78:24
bad [2] 67:14 67:20
bag [1] 79:21
balance [1] 63:22
bands [1] 81:21
banker [1] 86:20
Barkley [1] 52:18
Barnes [2] 2:10
16:22
base [4] 39:24 40:2
40:18 84:1
based [22] 9:15
22:15 25:11 27:4
27:11 28:9 38:11
38:23 42:18 51:7
51:18 52:9 55:17
56:22 58:2 69:16
75:14 76:10 77:8
79:15 84:9 84:19
basic [1] 57:14
basis [7] 24:3 36:15
45:20 48:14 77:14
78:7 78:10