## Page 1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ERIC L. JEFFRIES,
    Plaintiff,
    vs.        CASE NO. C-1-02-351
CENTRE LIFE INSURANCE CO., et al.,
    Defendants.

Deposition of:   MICHAEL F. HARTINGS, Ph.D.
Pursuant to:     Notice
Date and Time:   Monday, October 27, 2003
               9:55 a.m.
Place:          Graydon, Head & Ritchey, LLP
               1900 Fifth Third Center
               511 Walnut Street
               Cincinnati, Ohio 45202
Reporter:      Patti Stachler, RMR, CRR
               Notary Public - State of Ohio

## Page 2

APPEARANCES OF COUNSEL:

For the plaintiff:

    Michael A. Roberts, Esq.
      of
    Graydon, Head & Ritchey, LLP
    1900 Fifth Third Center
    511 Walnut Street
    Cincinnati, Ohio 45202
    513.629.2722

For the defendants:

    William R. Ellis, Esq.
      of
    Wood & Lamping, LLP
    600 Vine Street
    Suite 2500
    Cincinnati, Ohio 45202
    513.852.6067

COPY

## Page 3

I N D E X

MICHAEL F. HARTINGS, Ph.D.          PAGE
EXAMINATION BY MR. ROBERTS          5

| EXHIBITS | MARKED | REFERENCED |
|---|---|---|
| EXHIBIT 17 | - | 64 |
| EXHIBIT 66 | - | 172 |
| EXHIBIT 67 | - | 180 |
| EXHIBIT 69 | - | 30 |
| EXHIBIT 77 | - | 6 |
| EXHIBIT 79 | - | 135 |
| EXHIBIT 80 | 136 | 136 |
| EXHIBIT 81 | 39 | 39 |
| EXHIBIT 82 | 62 | 62 |
| EXHIBIT 83 | 138 | 139 |
| EXHIBIT 69-A | 43 | 43 |
| EXHIBIT 69-B | 45 | 45 |
| EXHIBIT 69-C | 48 | 48 |
| EXHIBIT 69-D | 51 | 51 |
| EXHIBIT 69-E | 71 | 71 |
| EXHIBIT 69-F | 74 | 74 |
| EXHIBIT 69-G | 83 | 83 |
| EXHIBIT 69-H | 84 | 84 |
| EXHIBIT 69-I | 84 | 84 |
| EXHIBIT 69-J | 86 | 86 |
| EXHIBIT 69-K | 90 | 90 |
| EXHIBIT 69-L | 91 | 91 |
| EXHIBIT 69-M | 91 | 91 |
| EXHIBIT 69-N | 92 | 92 |
| EXHIBIT 69-O | 92 | 92 |
| EXHIBIT 69-P | 93 | 93 |
| EXHIBIT 69-Q | 94 | 94 |
| EXHIBIT 69-R | 95 | 95 |
| EXHIBIT 69-S | 95 | 95 |
| EXHIBIT 69-T | 96 | 96 |
| EXHIBIT 69-U | 97 | 97 |

## Page 4

| EXHIBITS | MARKED | REFERENCED |
|---|---|---|
| EXHIBIT 69-V | 97 | 97 |
| EXHIBIT 69-W | 98 | 98 |
| EXHIBIT 69-X | 99 | 99 |
| EXHIBIT 69-Y | 100 | 100 |
| EXHIBIT 69-Z | 100 | 100 |
| EXHIBIT 69-AA | 101 | 101 |
| EXHIBIT 69-BB | 102 | 102 |
| EXHIBIT 69-CC | - | - |
| EXHIBIT 69-DD | 112 | 112 |
| EXHIBIT 69-EE | 114 | 114 |
| EXHIBIT 69-FF | 114 | 114 |
| EXHIBIT 69-GG | 115 | 115 |
| EXHIBIT 69-HH | 122 | 122 |
| EXHIBIT 69-II | 125 | 125 |

**Page 5**

MICHAEL F. HARTINGS, Ph.D.
a witness herein, having been duly sworn, was examined
and deposed as follows:
                    EXAMINATION
BY MR. ROBERTS:
 Q. Dr. Hartings, my name is Mike Roberts. I represent Eric Jeffries. Mr. Jeffries is a plaintiff in a lawsuit pending in the United States District Court, Southern District of Ohio, Case Number C-1-02-351.
   Could you please state and spell your name and your residence address, please, sir?
 A. My name is Michael F. Hartings, H-a-r-t-i-n-g-s. My residence is 135 Francis Ridge Drive, Cincinnati, 45238.
 Q. And how are you presently employed?
 A. As a psychologist at Riverhills Healthcare in Cincinnati.
 Q. Do you have any ownership in that entity?
 A. Yes.
 Q. What is your percent ownership in that entity?
 A. 1/15, probably, or thereabouts. I'd have to count up how many doctors we have.
 Q. You were kind enough, sir, to fax to me a

**Page 6**

resume last week. It's marked as Exhibit 77. Could you take a look at that for me and confirm that this is a curriculum vitae of yours?
 A. It is, yes.
 Q. Where did you receive your neuropsychology -- is that the way you say it -- neuropsychology training?
 A. Yes.
 Q. Where did you receive that?
 A. Well, I received my initial training in neuropsychology and my internship at Rush-Presbyterian-St. Luke's Medical Center in Chicago in 1966, '67.
 Q. Is that reflected on your resume?
 A. The internship should be. Yes, it's the first thing on page 3.
 Q. The Collateral Training and Experience section?
 A. Right.
 Q. Or the staff appointments, page 2 of your curriculum vitae, right? Page 3 of the exhibit, page 2 of your vitae?
 A. Well, this is page 1, page 2. It says page 2 on the top of this, yes.
 Q. Where it says Collateral Training and

**Page 7**

Experience?
 A. Right, the very first entry there.
 Q. This is where you received neuropsychology training?
 A. I received training in neuropsychology as part of my internship.
 Q. Tell me about the scope of that.
 A. Well, at that time, in 1965, neuropsychology was not yet a subdiscipline of the field of psychology, so there was no formal training available. The training that was available was on an incidental basis, case by case.
   So we were fortunate to have a neuropsychologist there, one of the early ones, and I trained with him in the examination of brain-injured individuals.
 Q. For that entire internship period?
 A. No. As I recall, there may have been four or five cases that I saw during that year.
 Q. Okay.
 A. Which at the time would have been a lot for anyone in the field of neuropsychology.
 Q. What's a neuropsych IME?
 A. Well, an IME is an independent medical examination, and that is a evaluation of a condition of

**Page 8**

a patient from any number of perspectives, whatever is the focus of inquiry. I put neuropsychological behind it in order to specify that it is an IME which focuses on the neuropsychological aspects of the patient's condition.
 Q. Have you shared with me all of your formal training in neuropsychology?
 A. No.
 Q. Okay. What else has been your formal training in neuropsychology?
 A. Well, in 1973, when I was on staff at Rush-Presbyterian-St. Luke's Medical Center, I became involved in the evaluation and treatment of persons with multiple sclerosis, and for that purpose took the training that was then available in neuropsychology by virtue of continuing medical education from a variety of neuropsychologists around the country.
 Q. Are there certificates or any documents that reflect that anywhere that you received?
 A. From 1973?
 Q. Yes, sir.
 A. I don't have them anymore.
 Q. Okay.
 A. I would have received CEU credit documentation, but I haven't kept that.

1  Q. I interrupted you, I'm sorry. Go ahead.
2  A. And that prepared me to assume the position
3  of associate director of the multiple sclerosis center
4  at Rush Medical College, which was the first in the
5  nation.
6  Q. Is that reflected here or not?
7  A. I don't know. Probably -- it would have been
8  during the time that -- of employment at
9  Rush-Presbyterian-St. Luke's Medical Center, which
10  begins on page 2, the second item from the bottom,
11  during those years of '71 to '78. I just didn't add
12  that to the list of my responsibilities.
13  Q. Okay. What else?
14  A. And then from 19 -- oh, boy -- from 1973
15  until 19 -- well, actually till the present -- well,
16  let's go back. To 1973. Usually from '73 until like
17  1985, I took all of my CEU in the area of
18  neuropsychology.
19     And the reason for that was I decided in 1978
20  to accept a position here with a group of physicians
21  specializing in neurology, which was then known as
22  Cincinnati Neurological Associates. And so I needed to
23  know all I could about neuropsychology. And at the
24  time that was really the only way you could get
25  training, because there were no -- late '70s, early

9

1  '80s, maybe there were one -- Oscar Parsons had a
2  program out at Oklahoma, but there were -- it was just
3  a time when the specialty was beginning and there were
4  very few formal training programs. So most of us,
5  people my age, trained by doing their homework and
6  attending workshops.
7  Q. Okay. Are you a Chicago native?
8  A. No.
9  Q. Did you spend a good portion of your early
10  career in Chicago, then moved to Cincinnati; is that
11  right?
12  A. Yes.
13  Q. What prompted that move?
14  A. I'm a native of Cincinnati. My wife is a
15  native of Cincinnati. In 1976, when we started to
16  consider coming back here, we had three sons. And I
17  didn't want to have to travel an hour to go to a
18  baseball game, I didn't want to have to inherit tickets
19  to the Chicago symphony, and I didn't want my kids
20  spending all summer every summer in camps, so we came
21  back to a much more family-friendly choice.
22  Q. Good choice. Are you still married?
23  A. Yes.
24  Q. I have one job, and I don't have a whole
25  bunch of appointments, but it appears that you

10

1  simultaneously hold different positions at different
2  locations. Since coming to Cincinnati, you've worked
3  at HealthSouth Rehab Hospital?
4  A. Yes.
5  Q. But your resume also shows that you've been
6  working at Riverhills for an overlapping period of
7  time?
8  A. Right. During my -- my practice group is
9  Riverhills Healthcare. They do not assign us duties.
10  I was asked to consult at HealthSouth in 1986 and --
11  '89, excuse me. And in 1993 I was asked to head up the
12  brain injury rehab program, which I did for three
13  years. And that's not on the resume.
14  Q. There's two references to HealthSouth Rehab
15  Hospital on your resume, one under employment, one
16  under staff appointments.
17  A. Right.
18  Q. You both -- you held those positions from '89
19  to '96?
20  A. Right.
21  Q. Are they different?
22  A. No. You can be on the staff without being in
23  the employ of the hospital.
24  Q. Okay.
25  A. And you can be in the employ of the hospital

11

1  and not be on the medical staff.
2  Q. Okay. So you were employed for seven years
3  at HealthSouth during the same period of time you were
4  employed at Riverhills?
5  A. Okay. Technically I was an independent
6  contractor at HealthSouth.
7  Q. Okay.
8  A. And all of the -- all of the fees that I
9  generated through my work at Riverhills -- at
10  HealthSouth were paid to my employer, Riverhills
11  Healthcare.
12  Q. Okay. So you've actively worked for
13  Riverhills for the 24 years since 1978 without any
14  interruption then, I guess?
15  A. Correct.
16  Q. Is that correct?
17  A. That's correct.
18  Q. And the active work for that 25-year period,
19  has that been as a psychologist the whole time?
20  A. Yes.
21  Q. I mean, is that the right title to you,
22  psychologist?
23  A. Yes.
24  Q. You never left Riverhills to go to either
25  HealthSouth or these positions and staff appointments

12

1  on page 3?
2     A.  No, I never left Riverhills to go anywhere
3  else.
4     Q.  Okay.  So we're clear, for the last 25 years,
5  you've been working there as a psychologist at
6  Riverhills, right?
7     A.  Right.
8     Q.  Okay.  Have you ever been convicted of a
9  crime?
10    A.  No.
11    Q.  How did you become involved with Boys' Hope
12 of Cincinnati?
13    A.  That's a program that's conducted by -- how
14 did I become involved?  I was asked --
15    Q.  I am also involved, that's why I'm curious.
16    A.  I was asked in, I don't know what time frame
17 it was, the '80s sometime, to help out with the
18 evaluation of candidates for the program.  Earl
19 Kronenberger was the psychologist involved and he was
20 cutting back and he asked me to pick up some of it,
21 which I did.
22    Q.  Okay.  In the Cincinnati Neuropsychology Peer
23 Review Group, you're a founding member of that
24 organization?
25    A.  Uh-huh.
                                                    13

1     Q.  That's a group of seven or eight
2  psychologists in town that get together?
3     A.  It's fluctuated.  It started with three and
4  ended with three, if it's over.  It probably isn't.  We
5  still meet from time to time, but not with the
6  regularity that we did for the first 23 years.
7     Q.  The staff psychologist position that you held
8  at Bethesda, Christ and Jewish, those all ran from '78
9  to '95.  Why did you stop that?
10    A.  Well, health care went south, as you know,
11 especially mental health care.  And the hospitals
12 basically let go of their psychologists.  They didn't
13 want them, especially due to the turf battles with
14 psychiatry.  Psychiatry didn't want them in.
15        And basically I was on the staff in those
16 hospitals because psychiatry colleagues would ask me to
17 go there to see patients and evaluate them.  And I
18 would do that.  And that pretty much ended in the mid
19 '90s.  So I didn't want to pay my money to stay on the
20 staff.
21    Q.  Is that why your position at HealthSouth came
22 to a conclusion as well about the same time?
23    A.  No.  I ended that because, if you've been
24 reading about HealthSouth lately, I suspected -- and
25 the way they attempted to manage my service, I felt was
                                                    14

1  duplicitous at best, unethical at worst, and I simply
2  decided I did not want to deal with those folks
3  anymore.
4     Q.  Okay.
5         MR. ROBERTS:  We're off the record.
6         (Off the record.)
7  BY MR. ROBERTS:
8     Q.  Doctor, you were also kind enough to share
9  with me identification of testimony that you've
10 provided in cases in the last four years, both by way
11 of deposition and trial, I presume.  And Exhibit 78 is
12 the statement -- the identification; is that right?
13    A.  Yes.
14    Q.  Which of these cases referenced in Exhibit 78
15 are cases in which you testified at trial?
16    A.  I really have no idea.  Okay.  '99, none of
17 them.  2000, I don't remember.  2001, E. Johnson versus
18 E.W. Scripps was a trial testimony.
19    Q.  Do you know which court that might be in?
20    A.  I believe -- it was in Northern Kentucky.  I
21 believe it was the Federal Court for the District of
22 Northern Kentucky.
23    Q.  And do you know the first name of the Johnson
24 individual?
25    A.  Esther.
                                                    15

1     Q.  And on behalf of which party did you
2  testify?
3     A.  Scripps.
4     Q.  What was the nature of the lawsuit?
5     A.  Esther Johnson is a real estate developer in
6  Northern Kentucky who was investigated by Eye One or
7  Channel 9, Eye One News, whatever it is, particular
8  reporter whose name I can't remember.  And Esther
9  Johnson thought that the reporting on her business was
10 slanderous.  And she sued the Scripps news service and
11 this reporter in particular claiming emotional and
12 psychic damage.
13        I examined her on behalf of the defendant and
14 rendered an opinion as to her emotional and
15 psychological condition and the effects of any -- if
16 any, of the news report written about her.
17    Q.  Do you recall who the lawyers were involved
18 in that case?
19    A.  Uh-huh.
20    Q.  Could you share those with me?
21    A.  I mean yes.  The lawyer for Scripps Howard
22 was Phillip Taliaferro.
23    Q.  Do you recall who the other lawyer was?
24    A.  I do not.
25    Q.  How about the Paul Revere case in 2001?
                                                    16

```
 1   Q.  Okay.  What thought are you conveying when
 2  you use the word disingenuous?
 3   A.  Not genuine.
 4   Q.  What does that mean, not genuine?
 5   A.  Not a --
 6   Q.  Not true?
 7   A.  Not a genuine reflection of the capacity of
 8  his musculature in the upper right extremity to perform
 9  repetitive actions.
10   Q.  And you base that on -- so you're essentially
11  saying he was malingering during that test?
12   A.  If I thought he was malingering, I would say
13  he was malingering.
14   Q.  Okay.  What's the difference between this
15  person was malingering versus saying, my impression was
16  this person performed disingenuously?  What's the
17  difference?
18   A.  Disingenuous means not genuine.
19   Q.  Okay.
20   A.  Okay.  Now, a not genuine performance can
21  arise for a variety of reasons, not limited to
22  malingering or falsifying.
23   Q.  What was your impression of the cause on this
24  instance?
25   A.  I believe Mr. Jeffries believes that he is
                                                      121
```

```
 1  impaired and he acts in accord with that belief.
 2   Q.  69-HH, these are some more undated notes of
 3  somebody that are typewritten.
 4       MR. ROBERTS:  Mr. Ellis wants to say that he
 5       doesn't have a copy made available to him in this
 6       deposition, and he would be accurate were he to
 7       say that.
 8   Q.  Dr. Hartings?
 9   A.  Yes.
10   Q.  Who created these notes?
11   A.  Denise Midler.
12   Q.  Who is she?
13   A.  She is my office manager and psychometrist.
14   Q.  What's that?
15   A.  She's an office manager and she is a
16  psychometrist.
17   Q.  What does that mean?
18   A.  She is trained at the master's level to
19  administer, score psychological and neuropsychological
20  tests, and she is a licensed social worker with the
21  state of Ohio.  She's a master's degree person.
22   Q.  And were -- go ahead.
23   A.  That's all.
24   Q.  Are these notes from July 12 or from
25  February 6?
                                                      122
```

```
 1   A.  Neither.  No.  They're from July 12th.
 2   Q.  What does she mean when she says in the
 3  second paragraph, he whined?  That's fairly pejorative,
 4  don't you think?
 5   A.  That came up in Dr. Bastein's report.  I
 6  think if your kids whine and you tell them they're
 7  whining, is that pejorative?
 8   Q.  Is that professional?
 9   A.  It's professional to be accurate, especially
10  for a psychologist, and to describe behavior the way it
11  is.
12   Q.  So is it professional for you to say
13  Mr. Jeffries had some chronic thing that now you want
14  to take out of the report?
15   A.  Since I made that remark to you I've
16  reconsidered it, because chronic means more than six
17  months, and --
18   Q.  Since we took a break, you went to lunch with
19  Mr. Ellis, you now want to leave the word chronic in
20  your report that you were so insistent should be taken
21  out of your report this morning?
22       MR. ELLIS:  Objection to form.
23   A.  Mr. Roberts, I don't care if it's in or out,
24  frankly.
25   Q.  I just want the record to be clear.
                                                      123
```

```
 1       MR. ELLIS:  Let him finish.
 2   Q.  I just want the record to be clear.
 3   A.  Mr. Jeffries' illness is as it is or isn't,
 4  and whether I call it chronic or not doesn't change the
 5  onset, date or duration of time since it has occurred.
 6  So --
 7   Q.  Very well.  Now, you say in your report
 8  301. -- is it 8 for obsessive compulsive disorder?
 9  301.4, excuse me.  And you say, well, it's kind of like
10  that.  There's nothing in the DSM-IV that specifically
11  quantifies Mr. Jeffries' obsessive compulsive type
12  disorder, right?  Is that what you said this morning,
13  paraphrasing?
14   A.  The DSM combines obsessive and compulsive.
15   Q.  Does he have 301.4, as defined in the most
16  recent version of the DSM?
17   A.  He has the obsessive aspects of 301.4.
18   Q.  If he doesn't have 301.4, what does he
19  have?
20   A.  An obsession.
21   Q.  What number is that in the DSM-IV?
22   A.  All reality is not reflected in the DSM-IV.
23  I don't think that the authors of that tome isolated
24  obsessive neurosis as it used to be in DSM-II.
25   Q.  Okay.  So the present iteration of DSM, which
                                                      124
```

**Page 125**

1 is DSM-IV, doesn't give a number for the type of
2 obsessive disorder that you think Mr. Jeffries has?
3    A.  Correct.
4    Q.  Perfect. I think that's a requirement of the
5 policy.
6        MR. ELLIS:  Is that a question or a
7    gratuitous comment?
8        THE WITNESS:  I didn't hear it.
9        MR. ELLIS:  Don't worry about it.
10       THE WITNESS:  I can't answer it.
11       MR. ELLIS:  It's not important.
12       MR. ROBERTS:  It's not important.
13 BY MR. ROBERTS:
14   Q.  Here's some more notes we've marked 69-II.
15 Whose notes are these, when were they taken, what do
16 they relate to?
17   A.  They were taken on or immediately after his
18 visit of February 6th, I guess it was. Yes, '03.
19       MR. ELLIS:  Let the record reflect again
20   there's no copies for me. I'll work with Mike
21   here.
22       MR. ROBERTS:  Not me Mike, that Mike.
23   A.  This was made -- this was a note put on the
24 word processor for me by me based upon my notes in
25 examining him with the Warrington. I tried as best I

**Page 126**

1 could to capture exactly what transpired.
2    Q.  Okay. Have we now gone through all of the
3 raw data that you created from your three visits with
4 Mr. Jeffries?
5    A.  It would seem so.
6    Q.  Are you mindful of anything that we've not
7 covered one way or the other today?
8    A.  No, I'm not.
9    Q.  We marked as Exhibit 82 your affidavit. And
10 you are mindful that this affidavit would be submitted
11 to Judge Beckwith or Judge Hogan for their
12 consideration whether you could see Mr. Jeffries a
13 third time; is that right?
14   A.  Yeah.
15   Q.  You say in paragraph 5, Mr. Jeffries will not
16 be asked to retake identical tests, right?
17   A.  Yeah.
18   Q.  Okay.
19   A.  I guess I changed my mind.
20   Q.  Let's focus on your report. You still have
21 it in front of you, 69?
22   A.  For the record, the test that I did repeat
23 was only the Trail Making test.
24   Q.  What about the peg test?
25   A.  And the -- you didn't let me finish.

**Page 127**

1    Q.  Oh, sorry.
2    A.  The motor function and the Trails for a
3 combined total time of approximately seven minutes.
4    Q.  So what were the discrepancies that you
5 attempted to reconcile? You told the court in the
6 affidavit you needed to --
7    A.  I think I mentioned them before, earlier in
8 my testimony.
9    Q.  Did you reconcile them?
10   A.  Yes.
11   Q.  How were they reconciled?
12   A.  I think I can answer that without checking on
13 the records. They were reconciled as follows: With
14 regard to Mr. Jeffries' attention and concentration
15 capacity, his scores fluctuate. They go down, they go
16 up, depending upon the modality and depending upon
17 other things which I was not able to ascertain.
18       And on other things which I believe have to
19 do with Mr. Jeffries' personality, which I was not --
20 which were not related to neurogenic conditions, first
21 thing.
22       With regard to his mental processing speed,
23 again, his mental processing speed also varied. It
24 varied from -- depending upon the modality of the test
25 and the task that he was required to do, his mental

**Page 128**

1 processing speed can be very fast and very accurate, or
2 it can be very slow and very inefficient. I believe
3 that that is a function of a neurogenic condition, not
4 a -- pardon me, I misspoke. I believe that is a
5 function of a psychogenic condition, not a neurogenic
6 condition.
7        And thirdly, I believe that Mr. Jeffries'
8 memory is poor and -- but not impaired. And that it is
9 poor on the basis of behavioral factors, not on the
10 basis of a neurological impairment of the central
11 nervous system. And that is how the discrepancies were
12 resolved.
13   Q.  Okay. Could you read that back to me,
14 please?
15       (The record was read.)
16       MR. ROBERTS:  Thank you.
17 BY MR. ROBERTS:
18   Q.  Dr. Hartings, do you recall the first time we
19 spoke on the phone?
20   A.  I suppose.
21   Q.  Peter Burrell arranged for the opportunity
22 for me to speak with you --
23   A.  Yes, conference, right.
24   Q.  -- when you wanted to take Mr. Jeffries' exam
25 for a third occasion. Do you recall that?

    Q. Okay. Tell me where I'm wrong.
    A. There's another section that you don't have included here which is what I was basing it on.
    Q. Which is what?
    A. Somatization disorder undifferentiated.
    Q. Well, I have the copy of 300.81.
    A. If I can see the DSM, I'll show you what I mean.
    Q. Okay. Counsel must have known you intended to do that because he asked for the DSM-IV a minute ago.
        300.81 is what your report says, right?
    A. Right.
    Q. 300.81 is what I copied as Exhibit 80?
    A. It's not here. I have a copy of it, but it's not here.
    Q. Sir -- sir, pay attention.
    A. Yeah.
    Q. Your report says 300.81?
    A. Right.
    Q. I'm a lawyer, but we do have in our law firm this DSM-IV law book in our library.
    A. Right.
    Q. So I go to our library, I take the DSM-IV off the shelf. I say, Dr. Hartings says he has 300.81, so

                                                            137

I turn to page 46 of the DSM-IV and there I have 300.81.
    A. Right.
    Q. Did I do something wrong?
    A. Yes.
    Q. Okay. What did I do wrong?
    A. If I can have a minute, I'll show you. The 300.81 that I used for the diagnosis is right there.
    Q. You used -- you're handing me another page from your materials that I've not been provided earlier. I need to make a copy of that file, too, since we've pulled out a couple things that don't exist in the file that was given to me previously.
    A. And the reason for that is that, as I said before, I continue to work on the file and things get added.
    Q. Okay.
    A. If you want a copy, you're most welcome.
    Q. That would be wonderful.
        You pulled this out and you highlighted this. What's the highlighting for on -- let's mark this.
    A. It's to highlight the basis upon which I made the diagnosis of 300.81.
    Q. Okay. This is going to be Exhibit 83.
        MR. ROBERTS: Mr. Ellis, could I please have

                                                            138

my book back?
        MR. ELLIS: You bet.
        MR. ROBERTS: Great guy.
        MR. ELLIS: I know.
    Q. Okay. Now, my Exhibit 80 is copies of page 446, 447, 448, 449 and 450 of the DSM-IV?
    A. Right.
    Q. And we've marked as Exhibit 83 page 451 and 452 of the same book?
    A. Apparently not.
    Q. Well, mine goes 446 to 450. And it goes 300.81 to 300.82. Yours picks up at 451 and goes to 452. So it's not the same book?
    A. Apparently not. I think this might help clarify --
    Q. Okay.
    A. -- the discrepancy. If you look here, 300.82, undifferentiated somatoform disorder. Apparently in some edition of the DSM-III, the powers that be increased this digit by one, but it's the same diagnosis.
    Q. DSM-III?
    A. Or IV, excuse me.
    Q. You didn't clarify things for me. Your 301.4 here -- excuse me, your 300.81, your axis I diagnosis

                                                            139

on March 15 of 2003, that's not a 300.81 that's Exhibit 80?
    A. No.
    Q. You're talking about something else?
    A. I'm talking about 300.81 that is in this book, which apparently is listed in your book as 300.82.
    Q. You have a -- you are basing your report on a version of the DSM that predates the one that I've been using?
    A. That I have in my office, yes.
    Q. A prior edition to the one that I shared with you?
    A. It's a DSM-IV. I don't know.
        MR. ELLIS: It may be subsequent, Mike. I don't know whether it's DSM-IVR or what. There are multiple versions of that book.
    A. Yes.
    Q. You say in your report that it's somatization disorder, which is what my Exhibit 80 calls 300.81?
    A. Right.
    Q. You're saying your report should really say 300.82, undifferentiated somatoform disorder?
    A. Well, yes.
    Q. It's a different diagnosis to a different

                                                            140

```
 1  number?
 2     A.  No, it's the same number.  It's the same
 3  number in my book.  It's a different kind of
 4  somatization disorder, and this is the one that
 5  Mr. Jeffries --
 6     Q.  But you don't say --
 7     A.  No, I didn't say it in there.
 8     Q.  You don't say undifferentiated somatoform
 9  disorder in your report?
10     A.  I don't, no.
11     Q.  You use the exact same terminology that
12  corresponds with 300.81 in my book?
13     A.  Okay.  That's true.
14     Q.  Have you changed your diagnosis since March
15  2003?
16     A.  Not at all.
17     Q.  So I just throw my Exhibit 80, 300.81, out?
18  It doesn't mean anything in Mr. Jeffries' case?
19     A.  300.82 is the one that means something in
20  Mr. Jeffries' case.
21            MR. ELLIS:  In your book.
22     A.  In your book.
23     Q.  Okay.  May I look at your --
24     A.  Sure.
25     Q.  Have you reviewed Dr. Shear's report prior to
                                                       141
```

```
 1  today?
 2     A.  Several times.
 3     Q.  Okay.  Have you spoken to Mr. Ellis about her
 4  report?
 5     A.  Once.
 6     Q.  Okay.  Did you ever give him your written
 7  impressions of her report?
 8     A.  Yes.
 9     Q.  You know that she commented that your
10  diagnosis of 300.81 is -- just can't be because
11  Mr. Jeffries doesn't have any sexual symptoms, right?
12  You're mindful of that criticism?
13     A.  I know that's what she says, based upon her
14  assumption of a DSM description that I didn't use.
15  That's the one that describes Mr. Jeffries.
16     Q.  Okay.  She assumed that when you say he
17  suffers from 300.81, as a psychologist you're up on the
18  new versions of DSM-IV, and so when you write a report
19  in March 2003 saying that a person has 300.81, another
20  psychologist should reasonably rely on that to mean
21  300.81, the most recent version, right?
22            MR. ELLIS:  Objection.
23     A.  I can't be accountable for what she relies on
24  or doesn't rely on.
25     Q.  Well, she was more up to speed than you were,
                                                       142
```

```
 1  sir?
 2     A.  That may be.  She may have the latest,
 3  hottest, off-the-press version of DSM-IV TRR
 4  whatever.
 5     Q.  So she was mistaken, then, to take your
 6  report and read it for what it says and that is that
 7  you were diagnosing 300.81 when really you were
 8  diagnosing 300.82?
 9            MR. ELLIS:  Objection to form.
10     Q.  Is that right?
11     A.  I was diagnosing out of the manual I have in
12  my office, 300.81 somatoform disorder, as described
13  there and as fits Mr. Jeffries like a glove.
14     Q.  Okay.  What's the age of onset for this
15  glove-fitting new diagnosis that you have?
16     A.  Can be any time.
17            MR. ELLIS:  Objection to form, new.  Not what
18     he testified.
19            MR. ROBERTS:  Well, it's new to me as of
20     about five minutes ago.
21     A.  It specifically does not have to occur before
22  the age of 30.
23     Q.  That's convenient.
24     A.  It's true, too.
25            MR. ELLIS:  Objection to counsel's comments
                                                       143
```

```
 1     and testimony.
 2     Q.  Sir, you would agree with me that the level
 3  of Mr. Jeffries' cognitive impairment would be shocking
 4  in someone that was suffering only from somato --
 5  somatoform disorder, right?
 6     A.  No.
 7     Q.  Okay.  Somatoform disorders are also -- don't
 8  exhibit themselves generally independent of some other
 9  disorder, true?
10     A.  I don't understand your question.
11     Q.  Is it normal for someone to have this type of
12  significant cognitive impairment with just somatoform
13  disorder without some other related disorder?
14     A.  Is it normal, did you say?
15     Q.  Is it common?
16     A.  Common.  It is not uncommon.  I have seen
17  many cases over the years where people suffering from
18  somatoform disorder of one kind or another and who
19  believe that they are very sick perform cognitively
20  much worse than Mr. Jeffries --
21     Q.  Somatoform --
22     A.  -- without any medical findings that
23  substantiate their medical illness.
24     Q.  Okay.  Somatoform disorder is something that
25  is fairly uncommon on a percentagewise basis in our
                                                       144
```