## Jeffries v. Centre Life Insurance Company, et al.

## United States District Court, Southern District of Ohio,

## Western Division

## Case No.C-1-02-351

My name is Mary E. Fuller.  I am the sole owner of Disability Claims Consulting Services in Yarmouth, Maine.

My area of specialty is disability insurance, specifically: contract analysis, claims practices and procedures, and underwriting.  I have worked in the field of disability insurance for approximately 17 years.  I was employed by a company formerly known as Unum, now UnumProvident.  I was a Supervisor in Individual Disability Claims from 1982-1984; from 1984-1988, I was Assistant Vice President of Individual Disability Underwriting.  During the years 1991-1995, I was Director of Individual Disability Benefits and managed the individual disability claims within the Western region of the United States.  I was Assistant Vice President of Claims from 1995-1997 and managed the Psychiatric and Complex Claims Units.  I was Vice President of the Individual Disability Benefits Department from 1997-1999, where, among other things, I was responsible for the oversight of all pending claims as well as initial liability decisions for all impairment groups.  I was Vice President of the Psychiatric and Cardiac Claim Units from 1999-2001 and had full responsibility for the management of that block of business. In my current private practice, I specialize in insurance matters and serve as a consultant on disability insurance claims handling issues.  My Résumé is attached as EXHIBIT II.

In April of 1996, Mr. Jeffries was issued a policy by Massachusetts Casualty Insurance Company in the amount of the amount of $5,000 as a part of a Guarantee Issue underwriting program. The policy contained a 90-day elimination period and a benefit period for accident and sickness of 60 months. Mr. Jeffries' policy contained riders for non-disabling injury, residual disability, and double dismemberment or loss of sight. In 1997 and again in 1998, the policy was increased, with benefits to age 65. Mr. Jeffries occupation in 1998 was Vice President of Banking for Provident Bank.

## Contract Provisions

Mr. Jeffries' policy states, "Total Disability and totally disabled means that due to injury or sickness the insured:

1. Is substantially unable to perform the material duties of his/her occupation; and

2. Is receiving care by a physician that is appropriate for the condition causing the disability. We will waive this requirement when continued care would be of no benefit to the insured."

The Insured's Occupation means the occupation (or occupations, if more than one) in which the insured is regularly engaged at the start of the period of disability. In the event (a) the insured shall retire prior to the Period of Disability, and (b) the insured is also not engaged in another occupation, the Insured's Occupation shall mean the normal activities of a retired person of like age, sex, and good health."

Mr. Jeffries' policy has an undated amendment to his policy that states:

"Mental Disorder or Substance Use Disorder Limitation: "If a Total Disability or other covered loss is due to a Mental Disorder and/or Substance Use Disorder, the number of months for which any benefits for Total Disability shall be payable under the Policy during the lifetime of the insured shall not exceed in the aggregate a total of 24 months."

**Residual Disability** prior to the commencement date means: "Due to injury or sickness

a.  You are unable to perform one or more of the substantial and material duties of your work; or you are not able to perform such usual daily duties for as much time as it would normally take you to perform such; and

b.  You have a loss of net income; and

c.  You are receiving medical care by a physician, which is appropriate for the condition causing you the disability. We will waive this requirement if it can be shown that continued care would be of no benefit to you."

This term "on or after the Benefit Commencement date" means you are no longer required to have a loss of duties or time. Residual Disability then means that, due to the same injury or sickness:

a.  "You have a loss of net income; and

b.  You are receiving medical care by a physician that is appropriate for the condition causing your Loss of Net income…." (Claim 540)

### Materials Reviewed

Documents that I reviewed in preparation of this report included the entire DMS and Prudential claim files as produced in discovery, the underwriting file an Affidavit dated July 10, 2003 signed by Dr. Gerier and Defendants first and second responses to interrogatories.

I have attached as **EXHIBIT I** my Chronology used for the purpose of developing my opinion on this case.

3

## Summary and Opinion

Based on my review of the material and the attached chronology (Exhibit I), it is my opinion that DMS failed to comply with Industry Fair Claims Practice Standards and acted in Bad Faith in the administration of Mr. Jeffries claim for all of the reasons identified below:

### I. To investigate fully the relevant and applicable facts;

1.      At the onset of the claim, DMS asked Mr. Jeffries' employer to complete a detailed questionnaire regarding his occupational duties. The employer complied with that request in a timely fashion, including the submission of a detailed job description and salary information. They indicated at that time that they were not able to hold his position open because of business necessity. There was no vocational analysis done by staff at DMS at that time, or at any other time, nor were there any indications that DMS had any issues with the information that Mr. Jeffries and his employer had provided.

2.      DMS proceeded to conduct an extensive investigation into the financial and occupational aspects of the claim. In fact, one month after accepting liability on the file, although the information requested was extensive and provided a wealth of information regarding Mr. Jeffries' business and personal life, the majority of what Mr. Jeffries was required to produce was irrelevant and could, in my opinion, easily be construed as an invasion of privacy. DMS attempted to gain access to Mr. Jeffries' travel information through a special investigation data base check, and did not have proper authorization to obtain the records; they required that Mr. Jeffries produce a copy of his passport for the last five years, and a list of the names and phone numbers of every hotel he stayed in. This request was irrelevant to the Disability determination and represented pure harassment, as was evidenced by the threat to terminate benefits for his failure to produce those records. Mr. Jeffries' employer had already reported that extensive travel was a part of his job and that Mr. Jeffries traveled more heavily than others in the company.

3.      It is not unusual for an insurance company to do an earnings check or request tax returns on a residual claim, but earnings are not relevant in determination of total disability. The requirement that Mr. Jeffries not only provide tax returns but that he provide authorization to DMS to obtain his return directly through the IRS was completely unwarranted.

4

4.       Insurance companies may sometimes do bankruptcy checks to see if there may be financial factors contributing to the claim in some way. DMS not only did extensive data base searches of Mr. Jeffries' real estate holdings, automobile holdings, and court records, they completed an urgent request for a data base search to determine whether Mr. Jeffries or any of his family members, including his wife and children, were recipients of trust funds, a fact that had absolutely nothing to do with his claim

5.       Mr. Spencer McNeil had accepted liability on Mr. Jeffries' claim in April of 1999, based on medical records contained in the file from Dr. Dunn, and Dr. Luggen; he requested further records from Drs. Young, Fessler and McCellan. DMS' in-house physician, Dr. Hall, reviewed the file and supported impairment; following Dr Hall's review, additional records were received from Drs. Dunn, Fritz, Wallace, Kovacs, Jonas, Waisbren, Mannions, Reed, Young, and Luggen.

6.       Despite obtaining all of these records, and requiring Mr. Jeffries to submit monthly continuance of disability forms from his Attending Physician, it does not appear that DMS had a physician review any of these records. Ms. Palmer, a nurse case manager for Psychiatric Disability Consultants, conducted calls with Dr. McCellan and Dr. Luggen to obtain additional information; however, other than that, there was no medical review. Given the significant credentials of Mr. Jeffries' multiple treating physicians, it is not clear why DMS choose to have a nurse-level resource conduct the AP calls instead of Dr. Hall or other more highly trained medical resource, particularly in light of the extremely complex constellations of symptoms Mr. Jeffries was presenting.

7.       In October of 1999 Ms. Palmer inquired as to whether Dr. McCellan had considered a neuropsychological evaluation or whether consideration had been given to the possibility that Mr. Jeffries was suffering from somatization. Although Ms. Palmer raised the possibility of somatization in her call to Dr. McCellan, she did not challenge Mr. Jeffries' disability during her call, or raise any concerns about the legitimacy of the claim. Furthermore, although Ms. Palmer raised somatization briefly with Dr. McCellan, DMS did not do anything to pursue this as a possible cause of his impairment, through phone calls, narratives, or Independent Medical Exams.

5

8.      DMS' file did not include a file plan. It is clear from the aggressive way in which they investigated this file that they had concerns as to the legitimacy of the disability from the onset, although it is not clear why. Given the poor documentation in the file it was not possible to discern what specific issues DMS had, who had the concerns, or, why they had them. It is clear from the Prudential phone log documentation between Prudential and DMS, that DMS believed that Mr. Jeffries' claim was not legitimate however they did not elaborate as to what objective evidence they had to support their position. It is clear that surveillance activity was conducted for the sole purpose of attempting to prove fraud. The extent to which DMS conducted surveillance on this case was far beyond what one would normally see in a file, particularly given the massive amount of medical documentation. In addition to extensive medical records, the surveillance that was conducted showed minimal activity, and yet despite the fact that Mr. Jeffries' activity on surveillance was consistent with what he reported to DMS, they continued to order more. The techniques used by the surveillance vendor for pretext were highly questionable, DMS delayed response to Mr. Jeffries' inquires about the surveillance was unprofessional, the suggestion that it was not an invasion of privacy to have a delivery man come to the door and pretend to be looking for a signature is clearly beyond the normal pre-text investigation.

9.      On April 20, 1999 Dr. Hall from DMS reviewed the file and stated, "We have no choice but to follow the case on a monthly basis in the hopes that a diagnosis will be established and treatment undertaken that will hopefully prove effective." DMS did not do anything from the perspective of a medical investigation beyond the collecting of medical records for all of 1999 until June of 2000, when the file was referred to Dr. Garb for an independent review.  Dr. Garb's handwritten notes stated that Mr. Jeffries had received excellent medical care. All MDs did a complete workup; there are three diagnoses, cannot make one causality review. He provided an extensive review of the records and noted, among other things, "The greatest diagnostic difficulty in this case centers around the suggestion of some poorly-defined type of autoimmune process. Some objective diagnostic tests suggest that such a process may be present. At this point, I think one can only say Mr. Jeffries may have a poorly characterized non-inflammatory autoimmune syndrome of uncertain etiology." He concluded, "The totality of these records does not indicate to me that Mr. Jeffries currently is unable to perform the duties of his occupation." Dr. Garb did not dispute Mr. Jeffries' symptoms; he acknowledged the presence of objective tests to support an autoimmune disorder, and yet DMS continued to view this claim as

6

though it was fraudulent. Dr. Garb failed to indicate the basis upon which he determined that Mr. Jeffries was not impaired. DMS did not appear to have this information reviewed by Dr. Hall, nor did they share this with any of Mr. Jeffries' Attending Physicians. Dr. Garb stated, "... unless disability is supported by rigorous neuropsychological testing, I feel he could resume work at this time." There was no request for an independent psychiatric medical exam made following Dr. Garb's review.

10.     DMS had access to a medical review from Prudential Insurance Company's consulting expert, Dr. Curran. His review provided a history of the onset of symptoms, and as to the issue whether Mr. Jeffries' condition was related to his Hepatitis B vaccine he concluded, "...I would prefer the diagnosis of acquired autoimmunity..." Dr. Curran was asked to identify any discrepancies in the medical records and he stated, "I find no discrepancies." There is no evidence that DMS's medical staff reviewed this medical record or that the claims were considered, or that there were two independent physicians supporting that it was likely Mr. Jeffries suffered from an autoimmune system problem, the cause of which was unclear. Given the medical conclusions of their own company experts, in combination with the opinions of Mr. Jeffries' doctors, it is not clear why DMS continued to challenge the legitimacy of Mr. Jeffries' symptoms.

11.     Ms. Palmer received a copy of Dr. McCellan's July 2000 phone conversation with her. He noted, "As stated in the past, there are no objective diagnostic markers which can be measured and followed in the disease."   DMS's medical investigation was focused on establishing an accurate diagnosis for Mr. Jeffries, despite being told on numerous occasions by multiple experts, including their own, that his case was complex and that any number of conditions could be the cause of his complaints. DMS never consulted with the Legal staff to determine the relevancy of diagnosis under these extremely unusual circumstances. World-renowned specialists could not agree on a diagnosis; however, none of them challenged Mr. Jeffries' symptoms, and the majority of them opined that the symptoms were consistent with an autoimmune disorder, regardless of the etiology.  DMS repeatedly refused to acknowledge that evidence.

7

12.    In November of 2000, Ms. Palmer recommended that they obtain an expert consultation on the thyroid problem, the infectious disease problem, and get a neuropsychologist.

13.    In June of 2001, Mr. Champagne, Vice President at DMS, indicated they were conducting a forensic review of the claim. The plan was to have a neuropsychological evaluation done. PDC was asked to arrange an IME. Mr. Jeffries had undergone a neuropsychological evaluation, which he submitted for DMS to review. The review was completed in October of 2001. Notes in the file indicated Dr. Clionsky did not agree with the interpretation of the neuropsych testing but, in the end their conclusions were similar... more current testing was needed." There were significant negotiations related to Dr. Clinosky and Dr. Bastien's interpretation of test results in the interim, one additional psych reviews were provided by Mr. Roberts from Dr. Sandman. Dr. Clionsky disputed the results of all three physicians. Benefits were denied without providing Mr. Jeffries physicians the opportunity to comment on the findings.

## II. To fairly consider all information obtained including that which tends to favor claim payment or continuation as well as that which tends to favor declination or termination;

1.    DMS considered evidence from Mr. Jeffries' physicians when accepting liability on the claim and continued to pay him benefits in accordance with the contract, based on the proof provided by his physicians. For the first eighteen months, only one physician-level medical review was completed by DMS. Following Dr. Garb's review in June of 2000, Ms. Palmer asserted; "We do not believe that any of Mr. Jeffries' treating physicians' records reflect persistent findings which would reflect occupational impairment. For that reason, we have not felt it necessary to arrange for an IME." Ms. Palmer's statements are completely improper. DMS had never challenged Mr. Jeffries' impairment. Immediately following her referral to Mr. Gelardi, the recommendation was made to have an IME.   Dr. Garb's review acknowledged that Mr. Jeffries 21 treatment providers were highly credentialed and provided excellent treatment, given Dr. Garb's opinion it is not clear why an IME was warranted. The aggressive pursuit of an IME, following Dr. Garb's review, was clearly inconsistent with the concept of considering

8

information that tends to favor claim payment. DMS efforts following Dr. Garb's review focused on finding information to terminate benefits.

2.      Mr. Jeffries treated with over 20 physicians throughout the US, Canada, and England. Each of the doctors identified a number of consistent complaints in each of the visits; Mr. Jeffries was given a variety of possible diagnoses, none of which could be confirmed completely by objective measures. Each examining doctor had a variety of potential diagnoses and treatment options which were offered to Mr. Jeffries, most if not all of which he tried; yet DMS repeatedly refused to accept Mr. Jeffries' claim as valid, simply because the experts were not able to identify with medical certainty exactly what was causing his complex symptomology.

3.      None of the medical reviews provided by either Mr. Jeffries' doctors, Prudential, or DMS suggested that Mr. Jeffries' complaints were not real or that they were inconsistent. None of the records from providers suggested   Mr. Jeffries was fraudulent or that he was a malingerer; however, despite the absence of any such observations by his treating doctors and the consulting doctors at DMS, they continued to disregard the opinions of experts.

4.      The consensus amongst providers was that Mr. Jeffries was suffering from some type of autoimmune disorder, the cause of which could not be determined with absolute certainty. DMS and their consulting physician, Dr Garb, suggested that there might be a neuropsych component involved in Mr. Jeffries' condition. Mr. Jeffries participated in two neuropsych evaluations which both suggested cognitive impairment, most likely neurologic in origin.  Notes from the file indicate that Dr. Clionsky's conclusions were similar to those of Dr. Bastein, but that he had a different interpretation of the test results. Following an interchange between Dr. Bastein and Clionsky, it appears that DMS completely disregarded the validity of her report.

5.      A second report was submitted from Dr. Poser from Harvard Medical School, which was consistent with that of Dr. Bastein, but Dr. Clionsky, disregarded this. DMS insisted on obtaining Independent Medical Exams and were awarded that privilege through the court. Scheduling and completion of the exams occurred over several months with the results being reported in May of 2003.

9

6.      The Independent Medical Exam from Dr. Hastings stated that Mr. Jeffries was suffering from a Cognitive Disorder, with underdetermined etiology and Somatization Disorder, Severe. He also stated, Rule Out Auto-Immune Disorder. The neuropsych exam acknowledged that Mr. Jeffries was suffering impairment in function and that the etiology was not clear. It is apparent that one of the explanations for Mr. Jeffries' symptoms was Somatization. However, numerous physicians, including DMS' in house staff, acknowledged that he was suffering from some type of autoimmune disorder, the cause of which may or may not have been the immunization. DMS flagrantly ignored the evidence in support of an autoimmune disorder of unknown etiology. DMS did not address the obvious co-morbid nature of Mr. Jeffries medical problems. There was no evidence that DMS asked either the treating providers or Independent Medical Examiners to comment on the likelihood that Mr. Jeffries' symptoms from autoimmune disorder were exacerbated by his somatization and obsessive-compulsive personality. The likelihood that Mr. Jeffries' psychological state was contributing to his existing symptoms and not the cause of his symptoms was completely ignored.

7.      Generally, the mental and nervous limitations in disability policies do not pertain to impairments that are physiological in nature. There was no evidence that DMS explored the appropriateness of applying the limitation, knowing that the majority of the physicians in the file acknowledged the presence of some form of autoimmune disorder contributing to his disabling symptoms, therefore potentially precluding the use of the limitation in Mr. Jeffries case.

8.      The results of the IMEs were not shared with any of Mr. Jeffries' physicians for input, despite their vast credentials. The claim was denied immediately following receipt of the IME results.

9.      DMS was unfair and clearly biased. The focus of the investigation was their own self-interest. Evidence of their bias is particularly clear in their complete disregard for the opinions of the multiple treating providers. DMS had minimal contact with Mr. Jeffries' physicians, and when they did, they utilized a nurse-level resource as opposed to someone of equal training and experience. DMS never provided a written or oral presentation of Dr. Garb's opinion, nor did they attempt to address the disparity of opinions between Dr. Garb and Mr. Jeffries' APs regarding his work capacity.   DMS not only failed to share Dr. Garb's assessment of Mr. Jeffries

10

with any of his treating physicians, but DMS repeatedly challenged Mr. Jeffries for not providing objective evidence despite his having done so on numerous occasions. DMS accepted their own consultants' opinion with absolutely no objective medical evidence to substantiate it. DMS clearly was holding Mr. Jeffries to a much higher standard of proof than they required of themselves. In addition, they completely ignored a standard principle within the claims industry, that being, "When there is reasonable doubt, rule in favor of the insured." The medical evidence would suggest that there was more than enough evidence to support payment in the face of uncertainty as to the condition; Mr. Jeffries was clearly not given equal or fair consideration in the matter.

10.     Mr. Roberts retained a vocational expert to review Mr. Jeffries' claim. Ms. Baris conducted an extensive review of Mr. Jeffries' medical and occupational history and concluded that he would not be able to perform in his occupation due to his cognitive and physical limitations. This information was presented to DMS; however, there was no evidence in the records that any of DMS's medical or vocational staff reviewed the documents. In addition to completely ignoring Ms. Baris' review, DMS failed to conduct any type of vocational analysis or employability assessment during the claim, including at the point of denial, despite the fact that Mr. Jeffries had been out of the workplace for nearly six years.

### III. To promptly and timely pay benefits owed under the policy;

1.     The initial acceptance of liability was done in a timely manner; however, throughout, the claim benefits were threatened to be withheld or were withheld from Mr. Jeffries with no legitimate basis.

2.     In December of 1999, after paying benefits on the basis that Mr. Jeffries had been disabled since September of 1998, Mr. Gelardi wrote to Mr. Jeffries and told him that if he did not complete the progress statement he would be unable to proceed with the processing of his claim. At that time, DMS had numerous medial records from Mr. Jeffries' treating providers supporting impairment, and in fact, Ms. Palmer had just recently spoken with Dr. McCellan and

11

learned he was starting Mr. Jeffries on Gamma Globulin injections Ms Palmer did not challenge disability at that time.

3.      In addition, on November 8, DMS had received treatment records indicating that Mr. Jeffries had elevated CMV and EBV titers as well as herpes. It appears that benefits were stopped in December as February 24, 2000 phone documentation between prudential and DMS reflect that DMS had not paid Mr. Jeffries since December and that they were wondering where his money was coming from. It is not clear if the claim was closed on the system in December as no systems records were produced.

4.      In March of 2000, Mr. Gelardi issued a check to Mr. Jeffries for a three-month period with a Reservation of Rights. Mr. Gelardi said that they were waiting for additional claim related documents but did not specify what he was waiting for and also said if Mr. Jeffries had no objective documentation to submit that he would proceed with processing based on what he had. Payment continued to be made but with a Reservation of Rights, despite continued certification of disability from his physicians.

5.      In October and November of 2000, Mr. Jeffries' attorney, Mr. Roberts, had to intervene to obtain past due benefits which were withheld pending receipt of Mr. Jeffries' passport, travel schedule and daily activity log. Benefits were issued in December.

6.      In April of 2001, Mr. Gelardi wrote to Mr. Jeffries and told him that his claim had come up for periodic review and that no further benefits would be issued until they received the information that they had requested including an unaltered authorization. Benefits were not issued again until July 23.

7.      On February 21, 2002, Mr. Graff removed Mr. Jeffries' policy from waiver and, on February 28, 2002, Mr. Graff closed Mr. Jeffries 'claim while Mr. Champagne, Assistant Vice President of Claims was discussing the possibility of settlement with Mr. Roberts. Mr. Graff closed the claim without any notice to Mr. Roberts or Mr. Jeffries, one month before Dr. Clionsky's review of records from Dr. Sandman and Dr. Poser.

12

8.      On April 2, 2002 one month after the claim had been closed on the system, Mr. Jeffries was notified through his agent that the policy premium was due on March first and that failure to pay by March 30th would result in the lapse of his policy.

9.      On April 25, 2002 Mr. Champagne verified that no further benefits were forthcoming.

10.     In November 2002, following a mediation with the court, Mr. Roberts wrote to Mr. Ellis, attorney for DMS, and asked that he pay the benefits owed Mr. Jeffries for the period of February to date. Mr. Ellis agreed to pay a portion of the benefits under Reservation of Rights but not the entire time.

11.     On May 15, 2003, benefits were withheld again on the premise that they had not received a Continuance of Disability form until June and at that, benefits were dependent upon receipt of a Continuance of Disability forms. Mr. Ellis said the forms had to be appropriately evaluated and therefore benefits would continue to be paid under ROR.

12.     On May 16, 2003, Mr. Graff wrote to Mr. Roberts ad informed him that DMS had received the two IME reports and they had determined that Mr. Jeffries was disabled due to a psychiatric condition. They informed Mr. Roberts that benefits for mental and nervous were limited to 24 months and therefore he was overpaid and would need to refund the money.


### IV. To establish and maintain procedures for the purpose of guaranteeing compliance of these obligations;

1.      It is not possible to ascertain what procedures existed within DMS for assuring compliance with fair claims practice standards as no claims manual was produced in discovery for review.

2.      Based on the review of the claim there are several observations that in my opinion indicated that DMS's procedures are not consistent with the industry standards for Fair Claims Practices in a number of ways.

3.      My specific observations relative to the administration of the claim are as follows:

13

4.      There was no internal documentation to reflect that a file plan had been created for the management of Mr. Jeffries' claim.

5.      There were activities that kept occurring on the claim with no documentation as to how they were being determined. For example, the file was referred to SIU, but it is not clear who made that decision, why it was made, or what issues SIU was supposed to be investigating.

6.      The file was referred to Ms. Palmer; there is nothing in the file to reflect who recommended that Ms. Palmer look at the file and what it was she was expected to address.

7.      The field investigator asked that DMS contact Prudential, and documents from the Prudential file indicate that there were numerous phone calls between the two companies, but the documentation of those phone calls and the content of the calls were not in the DMS file.

8.      The field representative recommended that DMS go to Prudential and review the claim file; records from Prudential indicate that there was discussion about doing that, however there is no documentation as to whether that occurred.  Generally, the absence of documentation would be evidence that no meeting occurred; however, DMS clearly did not document many activities that took place, as was evidenced by the Prudential Phone Log.

9.      A director-level staff person, Mr. Wentworth, reviewed the file. There were no referrals to him asking that he review the claim, nor was there any documentation as to his observations of the file, other than his recommendation that surveillance be ordered and Prudential be contacted. It is not clear what he observed in the file that precipitated that activity and what he hoped to resolve by conducting the activities he had recommended.

10.     It is entirely unclear why Ms. Palmer was asked to contact the physicians as opposed to a physician-level resource. It is also unclear what the protocol is relative to IME exams. Generally, within the industry, an IME exam that results in a disparity of opinion between the company and the IME is sent to the AP for review and comment.  DMS' failure to share any internal or external expert opinions with treating providers is not consistent with industry standards of Fair Claims Practice.

11.    The participation of a director and an Assistant Vice President in the administration of a claim is evidence of high visibility and financial exposure. It is entirely inconsistent to have that high a level resource involved with a file and to see absolutely no documentation as to discussions regarding issues and concerns as well as action plans established.

12.    The extensive utilization of surveillance was also highly unusual. Surveillance is a costly tool and is generally reserved for suspected fraud. There is nothing documented in the file to identify what Mr. Jeffries had done to cause DMS to consider him a fraud. Clearly, based on Prudential's documentation of phone contact with DMS, they did consider Mr. Jeffries a fraud and were pursuing that avenue of investigation very aggressively

13.    Mr. Champagne, Assistant Vice President for DMS, discussed the issue of settlement with Mr. Roberts on three separate occasions. There was no documentation in the file as to what aspects of Mr. Jeffries' claim Mr. Champagne was disputing as the basis for considering settlement, other than the altered authorization, which was clearly not significant to the claims process.

14.    It is clear that Prudential and DMS were interacting throughout the claim process, which is not an uncommon occurrence in the claims process. What was unusual is that it appears form the documentation that authorizations to exchange information did not actually occur until a month after the interactions first occurred. It is also difficult to determine what information was shared between the companies and when that was shared. One would normally see clear documentation of what was requested and received and when as well as who reviewed that information and was decided as a result of that review. There was information in Prudential's file that supported impairment that was clearly available to DMS, yet it appears that they chose to ignore that despite Mr. Roberts' request that they review the data.

15.    There were systems claim payment records produced in discovery, so it was not possible to track what actually occurred relative to the reserves. It is not clear for example, when payments were stopped in December of 1999, whether the claim was actually closed on the system to remove the financial liability that occurred. Nor is it possible to tell whether the claim was reopened when benefits were reinstated in March. It is also clear from the file documentation that Mr. Gelardi closed the claim in February of 2002, one month prior to

15

completing the medical review further evidence that DMS intended to close the claim and was simply going through steps to appear as though they were being fair and thorough.

16.    A March 9, 2000 phone call said they did not think insured was legitimate, but did not explain why and never shared that with the insured or the doctors.

17.    In the event that DMS had procedures in place, it would be helpful to review them specifically as it related to Utilization of Surveillance, establishing occupational duties, and the clarification of disparate medical opinions.

18.    DMS medical staff reviews from Drs. Hall and Curran clearly acknowledge some type of autoimmune disorder, the cause of which was unknown. Mr. Jeffries also had the opinion of approximately 20 different doctors, all of which were overruled by the opinion of one neuropsych evaluation obtained by DMS.

19.    DMS asked Dr. Bullard to conduct an independent medical examination of Mr. Jeffries which, based on deposition testimony lasted approximately forty-five minutes to one hour. (page 34 lines 4-7). Dr. Bullard was not a specialist in the field of infectious disease, or rheumatology, or vaccine-related difficulties. The usual customary procedure for obtaining an IME is to identify an expert resource that us able to address the pertinent medical issues in a file. Dr. Bullard testified in deposition that he was initially uncomfortable with conducting the examination because, "If Mr. Burrell was looking for specific responses or opinion concerning some of the issues that appear to be active that he would be more appropriate in seeking counsel, not counsel but opinion from someone who was a quote recognized expert in that particular narrow area." (Page 19 lines 3-8).

20.    Dr. Bullard testified that after reading the medical records "it was his opinion that he would be unlikely to find a physical abnormality upon examining the patient." (Page 39 Lines 9-12) Dr. Bullard also testified that there are illnesses that are recognized for which there are no objective findings. (Page 43 Lines 10-12) Dr. Bullard testified that he did not find objective medical evidence to confirm a disabling condition. (Page 49 Line 11-13). When asked whether Mr. Jeffries' complaints of arthralgias were physical or mental, he responded that arthralgias are, by definition, a symptom originating from the joint causing joint discomfort. Depending on the

16

definition they may or may not be associated with physical findings. (page 51 Lines 20-25)
When asked whether Mr. Jeffries' arthralgia was related to some mental problem, he responded
he "did not make an opinion as to the source of his subjective complaints." (Page 52 line 16-17)
He responded the same was true for myalgia and that he could not document a physical
abnormality that coincided with his subjective complaints. Although Dr. Bullard testified that he
did not make an opinion as to the source of Mr. Jeffries' complaints, DMS determined that the
complaints were psychological in nature as a basis for eliminating liability.

### V. To know and understand the applicable laws of controlling jurisdiction and to administer their insured's claims accordingly;

1.      Mr. Jeffries involved the insurance department in his claim as a result of a complaint to
them. Mr. Champagnes' response to the insurance department was intentionally misleading and
inaccurate. Specifically, Mr. Champagne stated that although Mr. Jeffries had provided
significant medical information, the reports lacked objective medical evidence and were based
on subjective reporting. In truth, there were a number of objective factors in medical records that
had been acknowledged by DMS' medical staff including blood tests, liver function studies,
spect scans, and neuropsych testing results.

2.      Mr. Champagne also stated that DMS hadn't asked for access to Mr. Jeffries personal
finances; however they had; asked for tax returns which were not relevant to his case, checked
bankruptcy records, conducted a credit check asked for a complete description of his automobile
collection, and did a search to see if he or his family were recipients of trust funds a fact totally
irrelevant to the claim.

3.      Mr. Champagne also said Mr. Jeffries refused to participate in an IME, when in fact Mr.
Jeffries objected to the IME provider's qualifications. Mr. Champagne had also agreed to
postpone the IME pending Dr. Clionsky's review of the additional neuropsychological records
that had been provided and was waiting for that review to be completed.  Mr. Champagne's
responses to the Insurance department were untruthful and misleading.

## Summary

The initial review of Mr. Jeffries' claim by Mr.McNeill appeared to have been done in a manner consistent with the industry standards of Fair Claims Practice. He requested appropriate medical and financial information and upon receipt of that information, he accepted liability for the claim and was prompt in providing benefits. Following the acceptance of liability, the entire focus of the claims process by DMS was biased, and intended to find a way to eliminate the significant financial liability they had incurred.   It is my opinion that Disability Management Services breached their obligation of good faith and fair dealing in the administration of Mr. Jeffries claim following acceptance of liability and that they failed to administer the claim in accordance with Industry Fair Claims Practice standards. I state my opinion based on all of the above observations and, in summary, for the following reasons:

The unwarranted decision to conduct surveillance immediately after accepting liability and to continue to do for approximately 23 days, despite no evidence of fraud, was clearly an attempt to find some basis for denial;

The complete disregard for Mr. Jeffries' providers' opinions in support of impairment despite their extremely impressive recognized credentials in their respective areas of expertise in favor of two examining doctors neither of whom had expertise pertaining to Mr. Jeffries impairment;

The unwarranted harassment requiring Mr. Jeffries to obtain extensive information as to his travel during a five-year period, and his automobile collection under the pretense that it was relevant to the claims process. Mr. Jeffries' employer had already stated that travel was a requirement of the job and that Mr. Jeffries traveled extensively.  Mr. Jeffries' automobile collection had nothing to do with his occupational duties. Not only was this irrelevant to the process, it was an unwarranted invasion into his life. DMS withheld benefits from Mr. Jeffries until he provided that information;

Mr. Jeffries had provided well over 600 pages of medical documentation from more than 20 physicians. DMS insisted that he provide the names, addresses and phone numbers of all of his care providers, as well as all dates of treatment with each one. All of that information was

available in the file at the time of the request. Benefits were wrongfully withheld pending production of this information.

Not one of the 21 physicians treating Mr. Jeffries indicted that they felt his condition was psychiatric, including two mental health providers who had treated him. Ms. Palmer was the only medical resource to suggest that Mr. Jeffries might be suffering from somatization until the final IME was performed in May of 2003. DMS immediately accepted the diagnosis that Ms. Palmer had attempted to establish in 1999, without offering any of the treating providers an opportunity to comment on the findings, ultimately disregarding some of the top specialists in the world for the opinion of two physicians retained by DMS, neither of whom were specialists in the field of medicine pertaining to Mr. Jeffries' medical condition.

Dr. Geier submitted a signed statement regarding a conversation that took place during his deposition with Attorney Ellis on July 10, 2003. Dr. Geier reported that Attorney Ellis claimed he felt Mr. Jeffries' claim was not a medical issue, but fraud. It is not clear what evidence Attorney Ellis had in his possession to support the accusation of fraud. The statement made by Mr. Ellis was consistent with the statements made by DMS in their conversation with Prudential Insurance Company as early as March of 2000, reflecting a continued biased view that Mr. Jeffries was a fraud, despite objective evidence in support of impaired functioning from treating physicians as well as Independent Medical Examiners.

I declare under penalty of perjury that the foregoing is true and correct. I reserve the right to modify my opinion in the event additional information is provided to me for consideration.

Mary E Fuller

Mary E. Fuller, M.Ed.                                           August 13, 2003

19