**EXHIBIT I.**            **CHRONOLOGY**

**February 4, 1999**  Mr. Jeffries notified Massachusetts Casualty (now know as Centre Life) of his intention to file a claim for disability related a disabling illness disease as of September of 1998.

**February 11, 1999** Disability Management Services ("DMS") acknowledged receipt of the claim notification and explained that they were the Third Party Administrator for Massachusetts Casualty. DMS provided a description of the claims process and forwarded the necessary claim forms for Mr. Jeffries to complete.

**February 23, 1999**  The Claims Examiner, Spencer McNeil, spoke with Mr. Jeffries and learned that he began having symptoms following a vaccination and had not worked since September. (CL 03130)

**March 8, 1999** DMS received the completed claim form, which indicated a return to work date as soon as physically possible. Restrictions were an inability to maintain the demands of the job due to physical problems, as well as an inability to concentrate and make critical decisions.

**March 18, 1999** A detailed questionnaire was sent to Mr. Jeffries' employer, with the request that they respond within 30 days. That same day, Mr. Jeffries sent a fax to Mr. McNeil with a list of all of his treating doctors.

**March 26, 1999**  Mr. Jeffries' employer provided the occupational questionnaire as requested, and included a detailed job description. The form indicated that the company was not interested in a rehabilitation effort and that the return-to-work date was unknown and might possibly be never. The position was not being held open due to business necessity. (03108)

**March 19, 1999**  Medical records were received from Dr. Dunn that included treatment dates from 1997 through March of 1999. Treatment for this period was for symptoms related to his post-hepatitis B vaccine, including overall stiffness, headaches, night sweats, abdominal pain, and generalized lethargy. Mr. Jeffries was to bring in records from the Cleveland Clinic and Dr. Luggen in an attempt to gain further knowledge of testing that had been done to date. Possible diagnoses listed over time included: Chron's disease, irritable bowel syndrome, non-

20

inflammatory rheumatism, and undiagnosed systemic illness with rheumatologic features. Dr. Luggen submitted an Attending Physician's statement at that same time noting, "Undifferentiated connective tissue disease with muscle and joint pain, fatigue, mouth sores, ocular inflammation, and abdominal pain." (03083)

**March 27, 1999** Medical records were requested from Drs. Young, Dunn, Luggen, Fessler, and McCellan. Medical records from Dr. Young included references to headache, joint pain and muscle stiffness dating back to June of 1997, with symptoms waxing and waning in severity until approximately August, when they continued to progress, resulting in a request for a referral to Mayo Clinic in October of 1998. (03068)

**April 5, 1999**  Liability was accepted and payment was issued.

**April 5, 1999**  Mr. Jeffries called and informed Mr. McNeil that he had been to UCLA and that the doctors there thought he might have Whipple's Disease, which is treatable with antibiotics and has an anticipated recovery period of three to four months.

**April 7, 1999** Records from Dr. Luggen were received for the period of October 1998 through March of 1999. Treatment records from February of 1999 reflected a recommendation that Mr. Jeffries follow the treatment regimen that was outlined by Dr. McChalski, an expert in Bechets that Mr. Jeffries had consulted in Alabama. Dr. Luggen also recommended that Mr. Jeffries consult with an expert in the field of Hepatitis B vaccine, if one existed, as Dr. Luggen was not convinced that Mr. Jeffries' problem was related to the vaccine. However, he stated he was not as familiar with the issue as others might be. (02992) Mr. Jeffries' medications over the six-month treatment period included prednisone, vicodin, Zoloft, amitryptyline, effexor and ketoprofen.

**April 20, 1999** Dr. Hall from DMS reviewed the file and noted, "In spite of all of these symptoms and their duration, extensive workup at multiple centers (university hospitals, Mayo Clinic, Cleveland Clinic, England, etc.), have been normal; no diagnosis has been established. Tx has been symptomatic and apparently ineffective…at this time we have no choice but to follow the case on a monthly basis in the hopes that a dx will be established and treatment undertaken and will hopefully prove effective." (02989)

21

**May 25, 1999**   Mr. McNeill called to speak with Mr. Jeffries and learned he had been to UCLA for testing. Whipples testing was negative, but he was still placed on antibiotics. Mr. Jeffries indicated Dr. Luggen was going to continue to be the physician coordinating his care.

**May 27, 1999** In-photo submitted a surveillance report for activity on May 20, 21, and 22. The total number of hours of observation on the 20th and 21st were not noted in the report; however, the 22nd represented four hours' of observation. There was no activity reported during the three days.

**June 4, 1999**   Lance Daniel from DMS received a report from CS Claims Group outlining the completed activity to date, including the completion of several database inquiries done, as well as Internet search results on Mr. Jeffries and Provident Bank.

**June 7, 1999**   In-photo submitted a report on surveillance that had been conducted on June 1st, 2nd and 3rd. The report does not identify who requested the surveillance or for whom the report was being prepared. Prudential BATES stamps are on the report, as is the case with all other reports. A total of seven hours of observation occurred, with no activity reported other than the insured driving to an Oriental medicine clinic.

**June 15, 1999**   Mr. McNeil spoke with Mr. Jeffries again and learned that he continued to have problems with pain and fatigue, as well as cognitive problems and periodic blinding headaches. Mr. McNeil asked that Mr. Jeffries keep a log of his symptoms over a two-week period in order for them to have a better understanding of his problems. (2917)

**July 1999**   Records from Dr. Dunn were received, showing treatment since 1997 for symptoms including muscle aches and malaise. Dr. Fritz had diagnosed Mr. Jeffries with Fibromyalgia. Dr. Dunn conducted additional testing for possible gastritis and hemochromatosis, well as a whole body nuclear screening for inflammatory arthritis.

**July 12, 1999**   Records were received from Dr. Wallace indicating a diagnosis of reactive arthritis requiring minocycline, and a restart of Azulfidine. In addition, it was determined Mr. Jeffries had abnormal liver function studies that needed to be rechecked. (02841) Dr. Wallace noted, "Rule out: Palindromic rheumatism with episodic fevers, headache, joint aches, and migratory arthralgias, seronegative spondyloarthropathy, Whipple's disease, Bechets, and occult infection. Current medications included Elavil and Hydrocodone."

**July 14, 1999** A surveillance report was prepared for the dates of June 22 & 26, July 1 & 5, representing 20 hours' of observation and no activity. The surveillance team conducted a pretext call and learned that Mr. Jeffries was away.

**July 23, 1999** Records from Dr. Kovacs indicated, "He has certainly had an extensive workup, with no apparent real strong objective findings. Nevertheless, he does appear to have some autoimmune process…" (02826)

**July 31, 1999** Mr. Jeffries wrote to Mr.McNeil and explained that he had tested positive for Acute Intermittent Porphyria as well as Cold Agglutinin disease. He stated he had been to the Emergency Room on three occasions, and that he was having a liver biopsy done. The file also contained an article written by Insight magazine, which talked about Hepatitis B immunization damage to a number of people, including Mr. Jeffries. In addition to the article, there were documents from business and a personal check that had been conducted on Mr. Jeffries (2762-2803). It is not clear who order these activities, when they were ordered, or why.

**August 5, 1999** Mr. Jeffries informed Mr. McNeil that he had been diagnosed with a liver problem and he had been referred for a biopsy.

**August 10, 1999** DMS was sent surveillance that was done by CS group for the dates May 27, June 21, July 23, July 24; surveillance represented approximately 23 hours of observation, with the only observed activity being minimal errands in the general area.

**August 11, 1999** Records were ordered from Dr. McCellan and Dr. Mark Jonas for the period of March 1999 to the present. A copy of a surveillance report was in the file. Surveillance was conducted over three days. The closing remarks on the report indicated that surveillance would continue as instructed. There were no documents reflecting who ordered the surveillance, or why the surveillance was ordered.

**August 31, 1999** Mr. Jeffries informed Mr. McNeil that he was scheduled to see Dr. Waisbren on September 16th regarding the adverse reaction to the vaccine, as Dr. McCellan had ruled out Genotomoclosis. He was still having headaches and pain, including trouble walking and tachycardia. (02675)

**September 7, 1999** DMS received a copy of a surveillance report prepared by CS Claims Group for August 7, 9, and 10, representing approximately 36 hours of observation, with no noted activity.

**September 1999** Medical records from the Mr. Jeffries' Emergency Room visits were received. No diagnosis was noted; however, Mr. Jeffries was given Tylenol Three and was instructed to call his physician. In addition to the Emergency Room records, Dr. McCellan completed an Attending Physician statement, and Dr. Waisbren of Waisbren Clinic provided a detailed analysis of Mr. Jeffries' previous medical history. Dr. Waisbren concluded, "By exclusion of other diseases by reports of similar situations in the literature, by experience with autoimmune diseases that have followed other viral vaccinations (Swine flu), and by my personal experience with having seen similar cases, I conclude that Mr. Jeffries is suffering from Chronic Debilitating post-vaccinal encephalomyelitis and acquired autoimmunity." (02706). Dr. Waisbren also provided a hypothetical explanation of the pathogenesis of Mr. Jeffries' clinical condition, and provided background information as the basis for that hypothesis. He concluded, "It would be reasonable under the circumstances to help this patient with an antiviral which will hopefully suppress the offending virus, and with gamma globulin which theoretically may help suppress the virus or may give natural blocking antibodies which will prevent attack of receptor sites in other body tissues..." Dr. Waisbren did not certify to total disability as a part of his assessment process. (02710)

**September 17, 1999** DMS received Dr. Mannions' records, which indicated he would be conducting additional testing regarding the cold agglutinins. Dr. Mannions also recommended a trial of Colchicine to see if that had any benefit. His notes reflected that he had seen a report of three patients with post-hepatitis B vaccination recurrent vasculitis who did not respond to prednisone; two of whom did have significant benefit from the Colchicine. (02638).

**September 30, 1999** On behalf of DMS, Ms. Palmer spoke with Mr. Jeffries at length regarding the treatment prescribed by Dr. Waisbren, the status of the lawsuit against the drug company that produced the vaccine, his future plans for return to work, and whether he would participate in counseling. Mr. Jeffries explained he was doing all that he could to understand what was wrong with him; that most of the doctors that he was seeing he was paying for out-of-pocket. When

asked about his willingness to participate in counseling, he stated, "he was not adverse to that, however he did not think it was really needed and that this hadn't gotten to that point." (02351)

**October 1, 1999** Ms. Palmer spoke with Dr. McCellan regarding Mr. Jeffries' claim. She learned that Dr. McCellan continues to consult with Dr. Luggen and that it was Dr. McCellan's belief that "the set of conditions presented by Mr. Jeffries defies diagnosis." (02362) He stated he believes that Mr. Jeffries' events are all temporally related to the actual vaccination of the Hepatitis B, which he referred to as an Autoimmune Complex. Dr. McCellan noted that at times Mr. Jeffries seemed significantly impaired, and that there were no laboratory values to "hang your hat on." He indicated that the onset of Mr. Jeffries' symptoms occurred when he was on vacation, not working, and that it would be atypical for someone feigning an illness or disease to do so during a vacation. Mr. Jeffries' limitations were described as limited strength and endurance, and considerably decreased capabilities. Dr. McCellan also explained that, although he was aware of Mr. Jeffries' ability to work on the computer, travel, and focus on his disease, he felt Mr. Jeffries' experiences made it very difficult for him to focus on the more cerebral requirements of work. When asked about whether a psychiatric evaluation had been considered for somatization given that a clear medical diagnosis had not been reached, he stated no, but that he felt Mr. Jeffries would participate in an exam if asked. He stated, "Mr. Jeffries sincerely wants to find some sort of diagnosis and treatment and closure to this situation, and be able to move on with his life." (02364)

**October 11, 1999** DMS received records from Dr. Reed dated September 9, 1999, and a gasterenterology study from Dr. Jonas. Dr. Reed's records reflected an aborted effort at a spinal fluid study. Dr. Jonas noted, "Differential diagnoses include idiopathic hemochromatosis, alcoholic liver disease, and prophyria crutanea tarda. Clinical correlation is warranted." (02617)

**October 15, 1999** Ms. Cynthia Palmer wrote to Dr. Luggen and explained that DMS had attempted to arrange for her to call and speak with him about Mr. Jeffries. She noted that she was attempting to call because she wanted to clarify the diagnosis, treatment plan, and the objective basis for his evaluation for Mr. Jeffries' impairment. "I have also spoken with other physicians with whom he has sought evaluations." (02376)

25

**October 27, 1999**  Dr. McCellan signed Ms. Palmer's summary of their phone conversation, adding the addendum that since that time he had received a report from Dr. Waisbren and that he had recommended he try the Gamma Globulin injections prescribed by Dr. Waisbren.

**November 8, 1999**  DMS received records from Dr. McCellan stating, among other things, "He has elevated antibody titers against CMV, EBV, and herpes. This to me simply indicates a chronic inflammatory state… We will proceed with the Gamma Globulin injections as recommended, but discontinue Valtrex…" (02595)

**December 9, 1999** Mr. Gelardi wrote to Mr. Jeffries and asked that he complete the progress statement, as he would be unable to proceed with the processing of the claim until an appropriate Proof of Loss form had been received and reviewed.

**December 13, 1999**   Brian Wentworth, Director of Claims for DMS, completed a referral form to Mr. Gelardi that stated the file was reviewed that day.  Refer to Dr. Hall for review of all medical records, order three days' of surveillance, as well as searches for fictitious names, court records and follow up with LTD carrier for the status of their handling. (00549 &02546)

**December 15, 1999** Prudential received a copy of a surveillance report done on December 10, 11; it is not clear from the record whether this was in DMS file at the time. (00900)

**December 27, 1999** Dr. McCellan submitted the monthly Attending Physician statement indicating he was administering a one-month trial of Gamma Globulin.

**January 22, 2000**   Dr. Spickett, Consultant and Senior Lecturer in Clinical Immunology from the United Kingdom, examined Mr. Jeffries for the second time. He concluded, "I remain puzzled by his illness, especially his low CH50, the cold agglutinins and dark urine. This did make me wonder about paroxysmal cold haemoglobinuria, which might explain the complement abnormalities. This can cause malaise, chills, fever, headaches, and muscle aches. The raised bilirubin might be due to low-grade haemolysis (a haptoglobin would be less), and this may explain the liver abnormalities with iron deposits. This condition can occur as a result of infections, bacterial or viral, or simply as an autoimmune disease." (0000583MR) "Finally, as a diagnosis of exclusion, Chronic Fatigue Syndrome should be considered (post vaccination); this would account for most physical symptoms, but does not account for low ch50 or the presence of

26

cold agglutinins (unless these were transient). I am not convinced that there is any truly specific beneficial therapy for this condition, although some cognitive behavioral therapy seems to have the best track record."

**January 26, 2000**  Dr. Curran, Medical Consultant to Prudential, completed a medical review of the records at Prudential. He observed, "The medical evidence to support Mr. Jeffries' impairment is entirely clinical. The diagnostic tests are not affirmative to support a diagnosis. I do not see any documentation to support a change in Mr. Jeffries' status on or about September 28, 1998, when he left work. However, from the history it seems likely that his pain and frustration, as well as mental confusion, became more embarrassing and upsetting. Finally, he had to quit work in the hope he would improve while on temporary disability. There is no medial documentation to support a casual relationship between his symptoms and his last diagnosis of post-vaccinal encephalomyelitis and acquired immune deficiency. This would require *ad hoc ergo propter hoc* reasoning which may not be considered scientifically reasonable. I would prefer the diagnosis of acquired auto immunity… I find no discrepancies, inconsistencies, or contradictions in this record, only the humbling confusion of our inadequacies of defining these problems." (00567)

**February 11, 2000**  Corporate Investigative Services provided a surveillance report to Mr. Brian Wentworth from DMS. The report encompassed surveillance activity that took place January 4-8. Surveillance was conducted for approximately 55 hours; the activity observed consisted of Mr. Jeffries driving a variety of cars, eating at a restaurant, going to a flower shop, etc. A criminal and civil court check was also done, with no results found.

**February 17, 2000**  DMS received the surveillance report, which covered five days of activity; they also requested that a Frequent Flyer search be done, and were told that a copy of the credit report was needed in order to complete that request.

**February 18, 2000**  DMS requested updated medical records on a rush basis from Drs. Young, Dunn, Luggen, Fessler, Kaufman, and McCellan. Bankruptcy records were searched, as well as the recorder's office, the auditor's office, and the Secretary of State's office. (00928) This was not in Claim file as produced and was copied to Prudential.

**February 22, 2000** The file contained a phone log from Prudential (00592 book 4), representing contacts with DMS. In addition, on February 23, 2000 there are contacts noted between Prudential and DMS, specifically Brian Wentworth and William Gelardi. Mr. Gelardi stated that, "DMS believes there is financial incentive for [Mr. Jeffries] to stay out of work; he would get 24k between two policies."(00593) He also stated, "They have not paid since December and question where he is getting money from…"

**March 1, 2000** Mr. Turek, Field Investigator for DMS, prepared a report for Mr. Gelardi indicating that he had inquired about the status of Mr. Jeffries' treatment as well as his LTD coverage with Prudential. Mr. Jeffries explained that Mr. Jeffries had had Gamma Globulin treatments that did not work, and that there was no specific treatment in place. When asked about his failure to disclose LTD coverage with Prudential, Mr. Jeffries stated he did not recall being asked about that when he completed his application. Mr. Turek reported Prudential had been paying his claim from the inception. Mr. Turek recommended that Mr. Gelardi should consider a personal visit with Prudential to review their file. Dr. Hall should review the claim, and an IME or paper file reviews, as well as further surveillance, may be in order. (02295)

**March 9, 2000** DMS received a Notarized statement prepared by Dr. Luggen regarding Mr. Jeffries' medical condition which said, among other things, "I am reasonably certain that Mr. Jeffries' symptoms are real and have a debilitating effect on Mr. Jeffries. I believe that he suffers from substantial pain, even though diagnostic tests to date have not focused on any one disease. It is my opinion that, irrespective of my inability to precisely diagnose Mr. Jeffries' condition, the effects of his illness make him unable to function in a consistent manner, and he is unable to function professionally without interruption." (02346)

**March 9, 2000** The Prudential file reflected that DMS called and stated, "They are closely reviewing the claim. They do not believe the EE is legitimate; they have a field report and want to come to Prudential and review our file…will share information… They had a medical review. They do not find one piece of documentation to support his claim; they ruled out 92 things. Will exchange file with authorizations provided previously …"

**March 10, 2000** Mr. Gelardi wrote to Mr. Jeffries and explained that they did not have objective evidence in support of disability, and that they were awaiting the receipt of additional claim-

28

related documents, stating that, "If there is no objective documentation you wish to submit, we will proceed with the processing of your claim with the documents contained within your claim file." Tax returns for the period of 1996–2000 were also requested. Mr. Gelardi issued a check with a Reservation of Rights for the period of December 1999 through March of 2000. (02274)

**March 14, 2000** DMS received treatment notes from Dr. Luggen's office for the period of 1999 to date. Included in the notes were two letters from Mr. Jeffries to Dr. Luggen expressing frustration with Dr. Luggen's apparent disbelief that Mr. Jeffries' symptoms were related to the vaccine, the second being an apology from Mr. Jeffries, and a request for Dr. Luggen's assistance in learning more about the vaccine related illness from Dr. Wallace. (02227)

**March 15, 2000** The file noted, "faxed authorization today and requesting claim information." The fax of the authorization appears to have been nearly a month after the initial contact. There was also no documentation in the file reflecting the request for the file from Prudential to DMS, or DMS to Prudential. (0595)

**March 17, 2000** Mr. Gelardi received a report from Ms. Ahles stating that she had tried a number of search engines and had not been able to find information on Mr. Eric Jeffries. (02180) The file contained an undated memorandum to Mr. Gelardi from Mr. Turek indicating that Mr. Jeffries called to inquire as to whether DMS had conducted surveillance on him, as he saw someone filming him. He also stated that Mr. Jeffries' doctor believes that he has found a diagnosis and that it is RNA synthesis. (02131)

**April 13, 2000** Mr. Jeffries called and spoke with Mr. Gelardi regarding surveillance activity that was taking place. He reported that a delivery man had been to his house on two separate occasions asking him to sign for a package, and that he and his children had been followed. He stated the surveillance as an invasion of privacy. Mr. Gelardi said he would call him regarding the surveillance next Wednesday or Thursday. (01919)

**April 24, 2000** Mr. Turek sent an e-mail to Mr. Gelardi stating that In-photo informed him it was not their practice to pose as delivery men. In addition, the surveillance had stopped well before someone called his home and asked him all kinds of questions

29

**May 11, 2000** Mr. Jeffries asked that he be allowed to submit medical proof of disability on an annual basis, given that it has been firmly established that his illness was chronic and not likely to change. There was nothing in the file acknowledging this request.

**May 15, 2000**  Mr. Turek met with Sharon Brummett at Provident Bank and was told that the bank would not allow him to speak with any of Mr. Jeffries' former business associates. She did however verify earnings that had been reported by Mr. Jeffries as being a combination of salary, bonus, and stock options.

**May 24, 2000**  DMS received an Attending Physician statement from Dr. McCellan certifying to ongoing disability with no change anticipated; no specific treatment was being administered, other than a prescription for Vicodin.

**May of 2000**  DMS received an extensive packet of information, which appeared to have been included in a report prepared by Dr. Waisbren as a part of his consultation with Mr. Jeffries. Documents included articles related to Myalgi Encephalomyelitis/Chronic Fatigue syndrome, Hepatitis B Vaccination report, and case reports on Post-Vaccinal Encephalomyelitis.

**May of 2000** DMS received an affidavit from Mr. K. Rodger Davis at Provident, which stated, among other things, "In his final year at Provident, I witnessed, and I was told by Eric Jeffries, that his health prevented him from doing his job on a consistent basis. It is simply not feasible to have a banker and managing director of our structured finance division out for an extended period of time on an ongoing and intermittent basis." (01984) DMS also received copies of Mr. Jeffries' tax returns for 1997–1999.

**May 1, 2000** Mr. Gelardi acknowledged receipt of Mr. Jeffries' letter, and indicated that he did not have the Attending Physician portion of the claim completed.  He advised Mr. Jeffries that he would contact him upon completion of the review of his claim.

**May 2, 2000**  DMS received a letter from Mr. Jeffries indicating that it was his understanding from the letter of March 10, 2000 that "DMS's medical consultant had conceded that I suffer a history of complaints consistent with a medical disorder, however, that the information in the file does not, in your opinion, support a finding of 'Total Disability.' " Mr. Jeffries noted that DMS's position that he had no medical diagnosis was incorrect; he had been diagnosed with Post-Vaccinal

30

Encephalomyelitis and Acquired Auto Immunity following a Hepatitis B vaccination, and that recent lab tests confirmed the diagnosis. This information was known to you through Dr. McCellan on his monthly continuance of Disability forms, and was reported to Mr. Turek in his personal interview. Mr. Jeffries also provided an in-depth discussion of his medical condition, as well as his occupational duties. In closing, he indicated that the earnings reported on his tax returns were the result of an exercise of stock options and deferred income and bonus for the 1998 work year. (01937-40)

**May 3, 2000**  Prudential wrote to Mr. Roberts, Mr. Jeffries' attorney, and copied DMS. The letter acknowledged Mr. Roberts' request for additional information from Prudential. Prudential identified the documents that had been provided to Mr. Roberts, including a copy of the policy, all correspondence with surveillance teams, their reports and video, all notes concerning Dr. Curran's review, and all documents relating to Mr. Jeffries. A copy of Dr. Curran's review was faxed previously. Prudential informed Mr. Roberts they felt they had given him all that was required of them under ERISA. (00262)

**May 4, 2000**  Mr. Jeffries spoke with Mr. Gelardi and asked how long it would take him to complete a review of the file, as well as a number of other issues. Mr. Gelardi said he would do his best to move things along. There was no explanation as to what that meant.

**May 24, 2000**  Rick Turek spoke with Bill Gelardi and told him that he had explained to Mr. Jeffries that they had done surveillance on him and that they did not consider these activities intrusive and to consider the matter closed.

**June 5, 2000**  Mr. Jeffries called Mr. Gelardi and informed him he had received transcripts from Prudential that characterized him as a liar; specifically, that Prudential's file noted DMS called him a liar. Mr. Jeffries stated that he never told DMS that he was receiving money from Prudential. Mr. Gelardi reminded Mr. Jeffries that he had continuously answered Question # 11, which asked whether he was receiving benefits, "Prudential 12k/month." Mr. Jeffries explained that he had sent a letter explaining his position, and that he had rescinded authorization for them to be in contact with Prudential. (01905)

**June 15, 2000**  Ms. Palmer sent Mr. Jeffries' file to Dr. Garb for a medical review.

**June 29, 2000** Notes in the file not signed, but apparently related to Dr. Garb, indicate, "Excellent medical care, all MDs did a complete workup. 3 dx can't make one causality. Work capacity, liver enzymes not major, skin rash not major, mouth lesions not major, mild lab results, some abnormalities, nothing to indicate a specific diagnosis, there are some abnormalities."

**July 7, 2000** Dr. Garb submitted his review of Mr. Jeffries. Dr. Garb noted: Mr. Jeffries had seen 21 physicians across the United States and the United Kingdom. "…It is apparent to me that Mr. Jeffries has received unusually high quality medical care… I was impressed by the thoroughness of the evaluations he received from all of the physicians who saw him. Despite all of the evaluations that Mr. Jeffries has undergone, however, I believe that it is not possible at this time to make a single unifying diagnosis that would fully explain his condition." Dr. Garb then listed five different diagnoses that could be made with a varying the degree of certainty for each, ranging from high to moderate. He also noted, "The greatest diagnostic difficulty is that this case centers around the suggestion of some poorly-defined type of autoimmune process. There are some objective diagnostic tests that suggest that such a process may be present." At this point, I think that one can only say, "Mr. Jeffries may have a poorly characterized, non-inflammatory autoimmune syndrome of uncertain etiology, possibly related to Hepatitis B Vaccination." Dr. Garb also stated, "…Thus, it is difficult to establish with certainty that these rare events are related to the vaccine. People who are HLA-B27 positive, as is Mr. Jeffries, may be more susceptible to this type of reaction." (01894) Dr. Garb also spoke with Dr. Craven, an infectious disease specialist, and stated, "He believes there may be a relationship between the Hepatitis B vaccine and rare autoimmune illnesses; however, the risk is very low." He believes some people may have an underlying disease process that may be accelerated by the vaccine. (01895)

Dr. Garb concluded, "The totality of these records does not indicate to me that Mr. Jeffries currently is unable to perform the duties of his occupation. Unless disability is supported by rigorous neuropsychological testing, I feel he could resume work at any time." The bill for the review included a five-hour review of records, a four-hour literature review, a .25 hour phone consult with Dr. Craven, and a 1.5 hour case conference as well as 6.7 hours of report preparation. There was nothing in the file to reflect who the case conference call was with.

**July 18, 2000** Ms. Palmer spoke with Dr. McCellan for the second time after reviewing his diagnoses and treatment plan. Once again, Ms. Palmer asked Dr. McCellan whether the functional restrictions and limitations had been objectively measured, to which he responded that his measurement is observation of Mr. Jeffries when he is in his office. Dr. McCellan said Mr. Jeffries' symptoms are characterized by fluctuation, with periods of great difficulty followed by periods of stabilization. He indicated, "Exacerbation may occur every two or three months and in the interim he may not be so bad." (01880)

**July 20, 2000** Ms. Palmer called Mr. Jeffries to discuss his claim, followed by a letter on July 21, outlining each of the 16 areas she planned to discuss with him.

**July 21, 2000** Mr. Gelardi recommended an Independent Medical Exam be ordered which was not done until approximately fifteen months later.

**July 28, 2000** Ms. Palmer spoke with Dr. Dunn, who said that he was not providing regular care to Mr. Jeffries, "He had administered a follow-up blood test in March, specifically, the antimicrosomal antibody test of the thyroid; this was positive, which suggests an autoimmune thyroiditis, although he was not sure if this explained Mr. Jeffries' complaints." Ms. Palmer provided a summary of her conversation with Dr. Dunn, which ended with her own observation that "one must question to some extent if he is impaired from his former job." (01872)

**July 18, 2000** Mr. Roberts wrote to Mr. Gelardi stating that Mr. Jeffries had shared DMS's June 29th letter and the draft of a medical authorization form. Mr. Roberts noted his understanding that Prudential and DMS had shared information regarding Mr. Jeffries and that surveillance had been done of him as well. Mr. Roberts informed DMS that Prudential had denied Mr. Jeffries' claim and provided DMS with the copies of information that Mr. Jeffries had submitted to Prudential in his appeal of their denial. Mr. Roberts reported, "Several treating physicians have stated under oath that Mr. Jeffries is unable to perform the material and substantial duties of his occupation. Prudential's own independent physician supports this conclusion."(01849)

**August 4, 2000** Ms. Palmer wrote to Mr. Gelardi, "At the request of the claim consultants involved in the review of the file, I have had the opportunity to review the July 18, 2000 letter from Mr.

33

Roberts." Ms. Palmer outlined her involvement in the file and provided a response to Mr. Roberts' letter. Ms. Palmers' letter acknowledged that Dr. McCellan and Dr. Ludden agree with Mr. Jeffries that his subjective complaints periodically impair him for some of his occupational activities. We do not understand, from the numerous diagnostic or periodic clinical evaluations performed by Mr. Jeffries' physicians, any objective determination of functional limitations. We do not believe that any of Mr. Jeffries treating physicians' records show persistent findings which would reflect occupational impairment. For that reason we have not felt it necessary to arrange for Mr. Jeffries to undergo an independent medical evaluation to date…"

**August 15, 2000** Mr. Roberts responded to Mr. Gelardi's letter informing him that, "The authorization that Mr. Jeffries had provided was sufficient for DMS to obtain the employment and medical records that were needed to determine if a benefit was payable, and that Mr. Jeffries' monthly payment should not be withheld on the argument that he has failed to cooperate."(01838) He also informed Mr. Gelardi that Mr. Jeffries was undergoing surgery for thyroid cancer, and that he would be forwarding a complete copy of Mr. Jeffries' appeal submission to Prudential.

**August 17, 2000** DMS received medical records from Dr. McCellan that noted the planned treatment for his thyroid cancer, as well as problems with severe headache. In addition to medical records, the release for tax returns was also submitted.

**August 19, 2000** Mr. Gelardi acknowledged receipt of Mr. Roberts' July 18, letter. Mr. Gelardi stated that Mr. Roberts was aware DMS had been in communication with Prudential, but that the interaction had not been as extensive as outlined in Mr. Roberts' letter. Mr. Gelardi stated that "clear illustration of our independent assessment is evidenced by the issuing of benefits, with a reservation of rights while we continue to evaluate Mr. Jeffries' claim." Mr. Gelardi stated, "While our records indicate that numerous physicians have evaluated Mr. Jeffries, both nationally and internationally, our review of the medical documentation does not reveal one unifying diagnosis that would explain his complaints." Mr. Gelardi stated, "while we note that Dr. Luggen and Dr. McCellan apparently accept Mr. Jeffries' claim that his subjective complaints periodically impair his ability to perform some of the duties of his occupation, we do not see from the numerous diagnostic testing with subsequent normal findings, or the periodic clinical evaluations performed by Mr. Jeffries' physicians, any objective determination of

continuous functional limitations." Mr. Gelardi stated finally, "The authorization portion of the monthly progress report allows us to gather any and all pertinent information in order to fully and fairly administer a claim. Of note, your state insurance department has approved these forms. As such we anticipate that Mr. Jeffries will continue to provide this "Proof of Loss" as he has done in the past." Mr. Gelardi then presented Mr. Jeffries with a list of eight areas of inquiry to complete, including but not limited to; "travel activity from 1998 to the present, including but not limited to mode of travel, dates destinations reasons, a list of average daily activities since the inception of his claim, a copy of his passport for the last five years, any and all information pertaining to his automobile collection, and a 4506 form, as his returns were self prepared."

**August 23, 2000** Mr. Champagne spoke with Mr. Roberts regarding the letter he had sent disputing DMS' position. It was agreed that payment would continue under ROR and that the new medical information would be reviewed. Mr. Champagne also stated that the claim had never been denied but they needed additional information, which he would identify for Mr. Roberts, including Mr. Jeffries' passport, as he stated his occupation required that he travel extensively and the passport would enable them to verify that. (01817)

**August 28, 2000** Mr. Roberts wrote to Mr. Gelardi stating that he had attempted to reach him numerous times and had been advised by his assistant that she had informed Mr. Gelardi of his calls. Mr. Roberts asked that past due benefits be paid and that he have the opportunity to speak with Mr. Gelardi at his earliest convenience. (01821)

**September 14, 2000** Mr. Gelardi responded to Attorney Roberts' letter of August 28 and reiterated what was needed in order to process the claim. In addition to the information requested previously, he asked for a detailed job description, including title, number of direct reports, and names of those people, details of his compensation, as well as termination agreements. Mr. Gelardi noted that Mr. Jeffries' earnings were higher in 1999 while totally disabled than in 1997 when he was working, and asked for an explanation for that. (O1802)

**October 16, 2000** Mr. Roberts informed Mr. Gelardi that the authorization that Mr. Jeffries had signed was sufficient for DMS to obtain the information needed to manage their claim and that the only restriction was contact with Prudential. Mr. Roberts asked that past due benefits be sent to Mr. Jeffries.

35