**October 31, 2000**  Mr. Roberts and Mr. Gelardi spoke regarding the past due benefits, and the altered authorization and outstanding information from Mr. Jeffries. Mr. Gelardi agreed that they would allow an amended authorization that would be sent to Mr. Roberts and that benefits would continue under ROR. The conversation was followed up that same day with a letter confirming the discussion; the letter indicated, however, that benefits would be issued following receipt of the outstanding information.

**November 1, 2000**  Mr. Roberts submitted medical information from Dr. Hyde from the Nightengale Research Foundation. Dr. Hyde concludes, "As a result of a Hepatitis A and B immunization, Eric Jeffries suffers from an autoimmune disease which has rendered him totally and completely disabled from being able to work at his former occupation and will continue to be disabled for the foreseeable future." Mr. Roberts asked that DMS confirm that based on everything that they have in their possession DMS has terminated the processing and review of Mr. Jeffries' claim. (0 1762)

**November 7, 2000**  Mr. Roberts called Mr. Gelardi and informed him that Mr. Jeffries was getting radiation and chemo treatment for his cancer, and that he was clearly disabled. Mr. Gelardi consulted with Mr. Midghall and said that they would consider payment under ROR based on the new medical information.(01768)

**November 9, 2000**  Mr. Roberts called regarding the withholding of benefits, among other things, and was informed that, based on the current circumstances, a check would be released. A rush request for medical records was sent that same day. A letter was sent to Mr. Jeffries with one months' check for the period of August to September.

**November 12, 2000**  Mr. Roberts provided all of the information that had been requested from DMS, including a preliminary report from Dr. Hyde, the passport and travel information that had been requested previously, as well as the completed daily activity logs. Mr. Roberts noted that DMS had three hundred pages of records that had been submitted in June of 2000 and indicated that the most recent request for data was irrelevant to the claims process. In addition, Mr. Roberts provided detailed responses to each of the requests for information made by DMS. (01727) Book three.

**November 16, 2000**   Ms. Palmer prepared a "note to File," summarizing the medical history of the file, and recommended that Mr. Gelardi obtain addition records from any providers that Mr. Jeffries had seen, as well as Drs. Hyde, Bastein, Fidler, and the Christ Hospital, as well as all other hospitals he may have attended. In addition, she recommended that they obtain infectious disease specialist or other expert consultations on the thyroid problem, the hepatitis vaccine, with a record review by Dr. Garb and an evaluation by a neuropsychologist.(01708)

**November 21, 2000** Mr. Gelardi wrote a five-page response to Mr. Roberts' previous correspondence. first stating, "We are in receipt of your delayed response to our letter…" and then asked him to refrain from sending multiple letters, and sending letters before they have had a chance to respond. Mr. Gelardi addressed each of Mr. Roberts' concerns regarding the handling of the file. Regarding Mr. Jeffries' diagnosis and impairment, Mr. Gelardi stated, "None of the evidence or tests that you referred to as objective evidence supporting Mr. Jeffries' illness were submitted with your letter." He also stated that it would appear that the diagnosis of thyroid cancer remains in part due to Dr. Hyde's inability to provide a final opinion or conclusion. … Please be advised Dr. Hyde's conclusions and opinions will be considered upon completion of his investigations and upon review of his final report."(01699) Mr. Gelardi identified several areas in which he felt Mr. Roberts had misconceptions or misunderstandings regarding the handling of Mr. Jeffries' claim, with a particular emphasis on the relevancy of the information that DMS had requested during the claims process.  Mr. Gelardi closed his letter stating, "Upon completion of their reviews and receipt of requested information, we will be in contact with you regarding the status of Mr. Jeffries' claim."

**December 1, 2000** Ms. Palmer spoke with Dr. McCellan and verified that Mr. Jeffries had surgery for his cancerous thyroid. Ms. Palmer also stated that Dr. McCellan did not feel the cancer treatment would hinder any further investigation of the autoimmune condition, which is the basis for his disability.

**December 5, 2000** Mr. Gelardi wrote to Mr. Roberts and enclosed two months' of benefit checks; he also asked that Mr. Roberts respond to the letter of November 21 and provide the information that had been requested, as well as a progress report and updated authorization.

**January 2, 2001** Mr. Gelardi sent a follow-up request to Mr. Roberts, who responded that same day. Mr. Roberts' letter outlined his areas of disagreement with DMS's position relative to Mr. Jeffries claim, including; the assertion that since he is able to fly in an airplane he is able to perform his occupation, which involves exhaustive financial analysis of risk in multi-million dollar investment opportunities, that he provide evidence that he could not work since September of 1998, and the suggestion that his illness predates the vaccination. Mr. Roberts submitted information regarding the Provident benefits package, and agreed to submit authorization for Christ Hospital and United Health Care of Ohio and Dr. Hyde. Mr. Roberts closed by asking for a reassignment of the claim to a senior officer of DMS stating, "The tone and content of his (Mr. Gelardi's) letters appears obvious that you are taking this claim personally and, as a result, are staking out an indefensible position." (01662)

**January 16, 2001** Dr. Hyde submitted a letter to DMS stating that he had treated Mr. Jeffries for Hashimoto's Thyroiditis, and follicular carcinoma of the thyroid, and autoimmune disease that is affecting at least his CNS, and possibly his red blood cells. Dr. Hyde stated, "Mr. Jeffries was partially disabled from within one week of receiving the Hepatitis A and B immunization, and has been totally disabled since he ceased work. …This patient remains gravely ill and is totally incapable of sustaining any form of work in the present time." (01641)

**January 19, 2001** Mr. Gelardi requested special investigative reports labeled Urgent, including an Auto track profile report, a Discovery report, and research as to whether Mr. Jeffries or his family members have any trusts. (01636)

**January 19, 2001** Mr. Gelardi spoke with Mr. Roberts regarding a file review that was being completed by Mr. Champagne, and arranged for a conference call to take place on January 22nd.

**January 31, 2001** Mr. Champagne wrote to Mr. Roberts summing up the recent conversation between himself, Mr. Jeffries, and Mr. Roberts. Mr. Champagne stated they were not clear about his occupational duties at the time of claim and were not sure why his travel to various car shows, doctors' visits and vacations contain at least some of the same skills as when he was with Provident. He asked that Mr. Roberts provide the authorization he had promised in his January 8, 2001 letter, the name of Mr. Jeffries' dentist, acupuncturist, and all the pharmacies where he got his prescriptions, as well as the names, addresses, and phone numbers of the places

38

Mr. Jeffries stayed while traveling. He also asked, "Does Mr. Jeffries drink or not? Does his sister have lupus or not? Has Mr. Jeffries presented a urine sample documenting burgundy-colored urine, and verification of three phone numbers as those of the nanny, Mr. Jeffries' home, and Mr. Jeffries' cell? He stated, among other things, that the front portion of the monthly supplemental forms would be needed until such time as Dr. Hyde had completed his evaluation of Mr. Jeffries and submitted a report. Mr. Champagne asked that all future correspondence be directed to him, but that Mr. Gelardi would not be removed from the administration of the claim. (1593-94)

**January 31, 2001** DMS received extensive 33-page documentation on litigation pertaining to chronic fatigue, as well as information regarding Dr. Byron Hyde and his work related to the Nightengale Research Foundation. (01538)  In addition, information regarding Dr. Luggen, Dr. Hyde, Dr. McCellan, Dr. Fidler, Dr. Dunn, and Graydon Head and Ritchley LLP and  Michaels Roberts was included.

**February 9, 2001** DMS received the summary of Dr. McCellan's July 2000 conversation with Ms. Palmer, which had been resent to him in December. Corrections made to the summary by Dr. McCellan were, "As stated in the past, there are no objective diagnostic markers which can be measured and followed in the disease as, for example, a broken bone." In response to the question regarding cognitive aspects of impairment to which Dr. McCellan had stated no, he corrected that to be, "Difficulty focusing, concentrating, or performing complex tasks particularly, at time of exacerbation." (01516)

Article I.    **March 10,2001**   DMS wrote To Mr. Jeffries and informed him; "their medical consultant had completed a review of the documentation contained within your claim file. Based on the review, we note a history of periodic subjective complaints however there is no objective evidence to support these complaints or a diagnosis of a medical condition. Further, although your history and subjective complaints appear at times, to be consistent with some kind of disorder, this documentation does not appear to support a total Disability As defined by your policy." Mr. Gelardi informed Mr. Jeffries he was still awaiting objective medical in formation and tax returns. He stated that if there was no objective information he wished to submit he would proceed with the processing of the claim with the information contained in the file. A

check was issued with a reservation of rights for benefits from December 1999 to March of 2000.

**March 31, 2001** PMSI notified DMS that they were unable to get records from Dr. Hyde for six months, as he would be out of the country until May.

**April 6, 2001** Mr. Champagne spoke with Mr. Roberts regarding his failure to submit the information requested in January; Mr. Roberts said he would get the information to him.

**April 14, 2001** A physician retained by the department of Health and Human Services in regard to another claim from Mr. Jeffries, Dr. Zweiman, wrote a report pertaining to his review of records from Drs. Waisbren and Hyde. Dr. Zweiman stated, "As noted by the many specialists that have examined him, the clinical presentation in Mr. Jeffries' case is both complex and puzzling…Dr. Zweiman presented other medical possibilities worth exploring, including Bechets syndrome. He noted that the SPECT scans that were described in the records sounded atypical. Other diseases mentioned were Chrons disease, congenital complement deficiency, serum sickness reaction, and cold agglutinin disease. He placed caveats on the possibilities for each of these conditions, but did raise them for consideration. In addition, he stated, "Dr. Waisbren refers to a diagnosis of chronic post-vaccinal encephalomyelitis …the nature of Mr. Jeffries' symptom complex and lack of supporting laboratory findings rule strongly against this diagnosis." In closing he concluded, "I do not believe that it is more than likely that the Hepatitis B immunization caused the symptoms described above in the case of Mr. Jeffries."

**April 25, 2001** Mr. Roberts contacted Baker and Baris, Inc. to perform a vocational analysis of Mr. Jeffries' capability to perform the material and substantial duties of his occupation. Ms. Baris completed a comprehensive assessment of Mr. Jeffries' vocational abilities after having reviewed extensive documentation provided by Attorney Roberts, from treatment providers, claims file records, Mr. Jeffries' employer, and multiple research articles, all of which was identified in her report. Ms. Baris reviewed the medical issues presented by Mr. Jeffries, as well as the neuropsychological status from Dr. Bastein. Ms. Baris provided a functional capacity assessment and stated, "The claimant suffers from symptoms that are corroborated through the research studies consistent with individuals with similar diagnosis. His cognitive symptoms have been validated in Dr. Bastien's report and these are identified in her summary…In addition to his

40

check was issued with a reservation of rights for benefits from December 1999 to March of 2000.

**March 31, 2001** PMSI notified DMS that they were unable to get records from Dr. Hyde for six months, as he would be out of the country until May.

**April 6, 2001** Mr. Champagne spoke with Mr. Roberts regarding his failure to submit the information requested in January; Mr. Roberts said he would get the information to him.

**April 14, 2001** A physician retained by the department of Health and Human Services in regard to another claim from Mr. Jeffries, Dr. Zweiman, wrote a report pertaining to his review of records from Drs. Waisbren and Hyde. Dr. Zweiman stated, "As noted by the many specialists that have examined him, the clinical presentation in Mr. Jeffries' case is both complex and puzzling...Dr. Zweiman presented other medical possibilities worth exploring, including Bechets syndrome. He noted that the SPECT scans that were described in the records sounded atypical. Other diseases mentioned were Chrons disease, congenital complement deficiency, serum sickness reaction, and cold agglutinin disease. He placed caveats on the possibilities for each of these conditions, but did raise them for consideration. In addition, he stated, "Dr. Waisbren refers to a diagnosis of chronic post-vaccinal encephalomyelitis ...the nature of Mr. Jeffries' symptom complex and lack of supporting laboratory findings rule strongly against this diagnosis." In closing he concluded, "I do not believe that it is more than likely that the Hepatitis B immunization caused the symptoms described above in the case of Mr. Jeffries."

**April 25, 2001** Mr. Roberts contacted Baker and Baris, Inc. to perform a vocational analysis of Mr. Jeffries' capability to perform the material and substantial duties of his occupation. Ms. Baris completed a comprehensive assessment of Mr. Jeffries' vocational abilities after having reviewed extensive documentation provided by Attorney Roberts, from treatment providers, claims file records, Mr. Jeffries' employer, and multiple research articles, all of which was identified in her report. Ms. Baris reviewed the medical issues presented by Mr. Jeffries, as well as the neuropsychological status from Dr. Bastein. Ms. Baris provided a functional capacity assessment and stated, "The claimant suffers from symptoms that are corroborated through the research studies consistent with individuals with similar diagnosis. His cognitive symptoms have been validated in Dr. Bastien's report and these are identified in her summary...In addition to his

40

cognitive problems, Mr. Jeffries also might be suffering from a mild depression secondary to his illness, as described by Dr. Bastein." (CLM00618)

The occupational analysis provided a detailed description of Mr. Jeffries' work history and accountabilities. Ms. Baris noted that Mr. Jeffries' employer prepared an affidavit stating "it is simply not feasible to have a banker and managing director of our structured finance division out for extended periods of time, on an ongoing and intermittent basis." (00619) She also noted that research findings pertaining to occupational requirements of Mr. Jeffries' occupation reflected the need for physical tolerance of someone in fairly good health to carry out the various duties of his occupation. This would include a physical capacity to sustain a rigorous work schedule of greater than 10 – 12 hour days. Additionally, Mr. Jeffries would have to have high average to superior skills in the area of cognition associated with the job described." (00622) Ms. Baris also conducted a telephone interview with Mr. Jeffries and his attorney. Her impressions were provided in summary to be, "The ability for Mr. Jeffries to return to work in an occupation such as what he was performing at the time of disability would require significant recovery from his current multiple symptom complex. It would be difficult to assess what point he could begin to resume some or any of his duties. In reviewing this information, consideration was given as to whether Mr. Jeffries could possibly consult in this field. However, the nature of his condition would render him unable at the present time to make any commitment to project work which would involve deadlines...." (00625)

**April 27, 2001** Mr. Gelardi wrote to Mr. Roberts stating that the claim had come up for periodic review, that no further benefits would be issued until the information they had requested was received, and that they would close the claim if he had not responded within 21 days.

**May 2, 2000** Mr. Roberts provided the name of the acupuncturist and dentist, as requested. He agreed to have Dr. Hyde produce his report within one week from his return. He refused to provide the hotel information that had been requested. on the basis that it was irrelevant to the claim. The conversation was followed by a letter dated May 8, 2001 stating, among other things, that the authorization to allow DMS to conduct a third party review had been sent to him several months before with no response. He asked to be informed as to whether the company intended to pay

benefits or whether he would need to proceed with the alternative means of resolution discussed previously. (1457)

**May 10, 2001** Mr. Champagne spoke with Mr. Roberts and agreed to reassign the file to another examiner once the payments that had been issued were up-to-date.

**June 4, 2001** Mr. Champagne wrote to Mr. Roberts informing him that the file was transferred to Mr. John Graff. Mr. Champagne stated; contrary to Mr. Roberts' assertion that DMS was trying to beat Mr. Jeffries down, they were actually "attempting to understand this matter by obtaining all of the facts, which we are entitled to under the proof of loss provision of Mr. Jeffries' policy." Mr. Champagne reiterated that they were willing to accept an authorization that precluded them from speaking with Prudential for this claim only, "and with the understanding that, by entering into this agreement, we do not waive any rights to the request information, for example, by subpoena." (01439)

**June 7, 2001** Mr. Roberts responded to Mr. Champagne that he felt the issue of the authorization had been resolved, as he had submitted a proposed authorization earlier, with no response. He also questioned the suggestion by Mr. Champagne that they were planning to conduct a forensic review of Mr. Jeffries and his records on a claim that had been pending more than three years.

**June 15, 2001** The file was referred to Loretta Braga, RN, and case manager.

**June 20, 2001** A referral was completed for Psychiatric Disability Consultants to set up an IME to be completed by July 15th. The referral requested a specialist who may have written on the insured's diagnosis, (01424) as well as a neuropsychologist.

The extensive review resulted in a one-line recommendation to obtain an IME; there was nothing noted as to why, what specialist should be obtained, or what issues were to be addressed by the IME physician. (01412- 014125)

**June 20, 2001** DMS received a fax of Dr. Garb's and Dr. Hart's fee schedules, and their curriculum vitae.

**July 7, 2001** Dr. Hyde prepared an up-to-date medical report on Mr. Jeffries. He outlined all of the testing that had been performed, as well as Mr. Jeffries' past medical history. In conclusion, Dr.

Hyde stated, "The incredible number of historical, clinical and test results all are consistent with a major and overwhelming injury to the immune CNS. The tests conducted on Mr. Jeffries demonstrate that he has immunological and physiological injuries consistent with his complaints and consistent with the disability that he describes. The symptoms and patterns of his illness are also consistent with autoimmune and CNS vasculitis disease" (CLM00756)

**July 23, 2001** Mr. Champagne informed Mr. Roberts that additional payments were being issued and that they were still awaiting the documents he had promised to forward.

**July 30, 2001** DMS received an Insurance Department complaint requiring that they respond to the issues identified within 15 days.

**August 3, 2001** Mr. Graff wrote to Mr. Roberts to confirm a meeting with Mr. Champagne at Mr. Roberts' office on August 20. That same day, Mr. Roberts also sent a six-part submission of documents to Mr. Champagne in support of Mr. Jeffries' claim, including: Summary and Overview, an Occupational Assessment, Medical Evidence, Non-Medical Evidence of Bad Faith, and Appendix of supporting materials. The submission represented nearly six hundred pages of records, complete with a Table of Contents.

**August 17, 2001** Mr. Champagne responded to the Insurance Department complaint stating "they had received voluminous medical reports… and that, while there are indeed many reports, reviews by our medical consultants have indicated that they do not clearly support a claim for total disability. The majority of the reports lack objective medical evidence and are based on mostly subjective information provided by Mr. Jeffries. …Since the medical aspects of Mr. Jeffries' claim are still unclear, we have chosen to exercise our right under the policy to have Mr. Jeffries examined by physicians of the appropriate specialties to help us better understand the extent of his current restrictions and limitations." (01386). He also explained that DMS had not asked for information regarding his bank accounts, credit cards, and loan information, nor full access to his personal finances. We have, however, asked that he sign an authorization to allow us to fully evaluate his claim."

**August 28, 2001** Mr. Roberts expressed concern about Dr. Hart's qualifications to conduct an exam, given that she is a child psychologist. He also noted that Mr. Jeffries had already undergone a

43

neuropsychological evaluation and that DMS could review those results; therefore, a second exam was not necessary.

**August 30, 2001** Mr. Graff submitted the IME report prepared by Dr. Bastein to Dr. Clionsky, the in-house psychological specialist, for review. He asked that Dr. Clionsky comment on the results of the exam as well as the objective testing performed. He indicated the raw data would be sent for review as well. (01282) The IME with Dr. Hart was postponed, pending receipt of Dr. Clionsky's review.

**September 26, 2001** Mr. Jeffries signed an authorization to allow DMS to submit their file to Prudential Insurance Company. Mr. Champagne notified Mr. Roberts that DMS would not comply with the request to copy the file for Prudential.

**October 5, 2001** Dr. Zweiman reviewed additional information from Drs. Hyde and Bastein. He stated he "did not have the expertise to comment as to Dr. Bastien's finding, and that from my review of the clinical descriptions submitted, it does appear that Mr. Jeffries has a chronic ill-defined systemic disorder. However, on the basis of my review of the additional information, my opinion has not changed. I do not feel that it is more likely than not that the hepatitis immunization received by Mr. Jeffries was the cause of his ill-defined disorder."

**October 10, 2001** Mr. Champagne spoke with Mr. Roberts about the neuropsych being delayed due to the need to prepay for the records, and that they were still looking for an infectious disease specialist. He asked if Mr. Roberts was seriously considering possible settlement, to which Mr. Roberts responded yes. Mr. Champagne agreed to get back to him. (01262)

**October 25, 2001** Mr. Roberts called, upset that DMS was still in the process of making a decision on the claim. He stated they had enough information and that it was time to remove the Reservation of Rights, and either pay or deny the claim within 30 days.

**October 29, 2001** Mr. Champagne received a phone call regarding the neuropsych review that was performed. Although Dr. Clionsky did not agree with the interpretation of some of the scores, "in the end, their conclusions were similar regarding Mr. Jeffries having cognitive difficulties." He stated testing is over a year old and new testing would be necessary. (1254 book three)

**November 2, 2001** Mr. Champagne wrote to Mr. Roberts, and among other things stated that he was waiting for the in-house physician to complete the review of Dr. Bastien's records. (01252) "Additionally, we are attempting to find an infectious disease specialist, but as a result of Mr. Jeffries' national and worldwide treatment, it has been difficult for us to find a physician that has no affiliation with prior treatment." Mr. Champagne noted that they would not be able to complete their investigation within thirty days due to the recent terrorist attacks, making it difficult to schedule an appointment with an infectious disease specialist. He acknowledged discussions regarding settlement of the claim and that he had offered to pay three years' of benefits. Mr. Champagne stated, "If you wish to pursue negotiation of settlement for the return of Mr. Jeffries' policy, we will await your response." (01253)

**November 8, 2001** Mr. Champagne spoke with the Department of Insurance regarding Mr. Jeffries' ongoing complaint. He informed them that no decision had been made because they had outstanding information, no authorization, and no attendance at the IME. (01248). Mr. Champagne noted that Ms. Smith informed him that they were not violating any statutes and that they had the right to decide.

**November 15, 2001** Ms. Smith, from the Department of Insurance, called and asked Mr. Champagne to provide a copy of the original authorization, the authorization on PR COD, and the attorneys' version of authorization with the changed language.

**January 3, 2002** Dr. Clionsky responded in writing to the review of the records from Dr. Bastein. Dr. Clionsky had sent Dr. Bastein a letter in October asking that she respond to a number of questions that he had relative to her testing process. Dr. Bastien responded that she was asked to provide the raw data, and that she was going to have that information sent to him. Dr. Bastein also noted that she had scored the TPT memory test as an 8 and that it was incorrectly reported as a 7. Dr. Clionsky indicated, "Dr Bastien's response to his inquiry was unresponsive and unprofessional... her unwillingness to comment on the basis of her opinions unscientific and probably legally inadmissible under the Daubert criterion." He then provided an explanation as to his reasoning for the questions he had posed, as well as a summary of Ethical Principles of Psychologists and Code of Conduct (effective 1992). In closing, Dr. Clionsky recommended that an independent neuropsychological evaluation be done. (01228)

**January 10, 2002** Mr. Champagne wrote to Mr. Roberts stating, "Their in-house consultant had noted various inconsistencies with the validity of the tests administered by Dr. Bastien and her scoring of each evaluation. Since these inconsistencies of this evaluation raise numerous questions as to whether or not your client is suffering from a disabling condition, we have chosen to exercise our right under the policy to have Mr. Jeffries examined." They arranged an IME with Dr. Hart for February 14, 2002.

**Feb 6, 2002** Attorney Roberts responded, among other things, "DMS has in its possession some of the unanimous opinions of Mr. Jeffries' treating physicians that he is disabled. The doctors who concur in this opinion are Dr. Hyde, Dr. Bastein, Dr. McCellan, Dr. Dunn and Dr. Luggen. In addition, Mr. Jeffries was examined and tested by Dr. Sandman, who concurs with Dr.Bastein's assessment that Mr. Jeffries is totally disabled. Dr. Charles Poser, who as you know is a professor at the Harvard Medical School, has personally examined Mr. Jeffries and recently provided a more detailed opinion that Mr. Jeffries is disabled ... As you know, Prudential had Mr. Jeffries' records reviewed by Dr. Curran. You have a copy of Dr.Curran's report. Dr.Curran judged that Mr. Jeffries indeed was disabled." ...The government's expert, a professor at the University of Pennsylvania, opined that Mr. Jeffries is disabled... Even though Prudential does not have knowledge of the reports from the University of Pennsylvania professor, the Harvard Medical school professor, or Dr. Sandman's report, Prudential just last month conceded that Mr. Jeffries is disabled. ... Quite clearly there is 'sufficient proof of loss,' as Mr. Jeffries has given DMS the information needed to determine if a benefit is payable. ... While the policy permits DMS to examine Mr. Jeffries, there is no doubt a point where enough is enough. We have reached that point. Accordingly, Mr. Jeffries does not intend to submit to further examination by DMS."(01182)

**February 21, 2002** Mr. Graff instructed Mr. Jeffries' policy be taken off Waiver of Premium effective as of February 25, 2002 that decision was never communicated to Mr. Jeffries. (00948)

**February 26 through 28, 2002** Mr. Champagne and Mr. Roberts had three phone calls regarding the refusal to participate in the IME. Mr. Champagne asked again whether settlement was an option and Mr. Roberts commented , "The amount being offered was ridiculous and no counter was going to be made.' Mr. Champagne noted the file stating, "I spoke with Mike about his letter and

advised him I felt it was ludicrous and BS. He accused the company of being secretive about information, and I told him we have no authorization to learn any new information." (01170)

**February 28, 2002** Mr. Roberts sent a follow-up letter to Mr. Champagne acknowledging their previous conversations. Mr. Roberts noted that DMS did not attempt to gather the medical information in Prudential's possession that supports impairment. He also noted that had Mr. Champagne read his letter he would have seen that Mr. Jeffries had already undergone a second Neuropsych exam following his exam with Dr. Bastein. He concluded by saying "… no further medial testing was warranted …and the settlement offer posed by DMS for less is rejected. … If Massachusetts Casualty desires to fairly evaluate their liability and make a settlement offer, Mr. Jeffries will consider it and respond. Your October offer is less than 5% of the exposure DMS has in this matter."  (01167)

**February 28, 2002**   The file was closed. (00943)

**March 6, 2002**   Mr. Roberts wrote to William Ellis, counsel for DMS, summarizing a number of his concerns with DMS' handling of Mr. Jeffries' file and the representations made about Mr. Jeffries' failure to cooperate with the claims process. He reiterated that he did not feel additional medical testing was warranted.

**March 8, 2002** DMS asked Dr. Clionsky to review additional neuropsychological records from Dr. Sandman and Dr. Poser. (book three BS 0113-01158) Dr. Sandman, PHD Professor and Vice Chair of Department of Psychiatry University of California Irvine, concluded, "It is clear that Mr. Jeffries has sever impairments in cognitive function. These impairments are not the result of malingering tendencies. He has focal losses in processing speed and working memory. He registers a fraction of information forming incomplete memories and has difficulties retrieving what he does consolidate. His impairment in judgment may result in poor decisions and frustration. … My results complement those of Dr. Bastein…"

**March 20, 2002** Dr. Clionsky spoke with Mr. Champagne and stated, "The testing done by Dr. Sandman was inadequate. There was no history taken, testing only; it appears to have been done in a vacuum. There were no updates since last testing. Cannot compare anything, cannot comment on whether data is valid and have many questions…" (00982)

**March 21, 2002** Mr. Champagne wrote to Mr. Roberts and informed him that, due to Mr. Jeffries' refusal to submit to an IME and his refusal to sign the standard authorization, " … he has failed to comply with the provisions as required under the policy and has continued to fail to cooperate with us in the investigation of his claim, we have been left with no option but to consider termination of further benefits absent compliance." (00980). The file was already closed a month before this.

**March 28, 2002** Mr. Jeffries agent was sent a premium notice informing him that Mr. Jeffries policy had been taken off Waiver effective February 25, 2002 and that premiums for March 01 to April 01 were now due. (00945) Waiver was processed Feb 21.

**April 2, 2002** Mr. Jeffries agent advised him that his policy had lapsed.

**April 3, 2002** DMS received Dr. Clionsky's report in which he stated, "Dr. Sandman's failure to perform a comprehensive diagnostic interview or review of records, his lack of comment as to Mr. Jeffries' presentation at exam, and his lack of knowledge regarding Mr. Jeffries' medication usage … were a fatal flaw in Dr. Sandman's report." Dr. Clionsky said, "In sum, I feel Dr. Sandman's testing is so flawed that we cannot draw useful statements of disability and prognosis from it. Dr. Sandman can not validly conclude that Mr. Jeffries' functioning will decline in the future or that it will persist and grow with advancing age, and he cannot validly conclude that Mr. Jeffries is currently disabled for his profession. Dr. Clionsky also disagreed with Dr. Poser's assessment of Mr. Jeffries on several bases, including but not limited to; "He did not provide the results of his own examination of Mr. Jeffries and he failed to provide a connection between his evaluation of Mr. Jeffries and his review of Mr. Jeffries' laboratory data and that diagnosis…Furthermore, very little in his report addresses the relationship between this diagnosis and the question of occupational disability. The closest that he comes to this is when he reports on the first page that Mr. Jeffries complains of problems, including cognitive dysfunction, and that this is quite significant in view of the fact that Mr. Jeffries is an investment banker." (00975) Book 4

**April 22, 2002** Mr. Graff wrote to Mr. Roberts to reconfirm DMS's position that no further benefits were forthcoming, due to Mr. Jeffries' failure to comply with the policy provisions as outlined previously. (00959)

**April 25, 2002** Mr. Graff agreed to extend the automatic reinstatement period on Mr. Jeffries' policy. (1008) Dr. Poser reviewed documents from Dr. Zweiman and Dr. Hyde, as well as numerous articles. Dr. Poser challenged a number of Dr. Zweiman's conclusions and stated in his own assessment, after having previously examined Mr. Jeffries and now reviewing additional data, "I am of the opinion that Mr. Jeffries suffers from chronic fatigue/myalgic encephalomyelitis and, to a reasonable degree of certainty, that it is the long-term result of his having been vaccinated against Hepatitis A and B in June of 1997."

**June 24, 2002**  Following a hearing with the Magistrate, Mr. Ellis, attorney for DMS, wrote to Mr. Roberts confirming the scheduling of an Independent Medical Exam with Dr. Grubb.

**July 3, 2002** Mr. Ellis confirmed the IME as scheduled for July 8, 2002.

**August 7, 2002**  Mr. Ellis requested that Mr. Jeffries return for additional evaluation, as Dr. Hartings had not reviewed the entire medical record prior to his initial exam and had additional questions. Mr. Ellis added that the IME with Grubb was cancelled.

**August 12, 2002**  Mr. Burrell, from Wood & Lamping, indicated that Dr. Hartings wanted to meet with Mr. Jeffries another four hours, and that he also wanted to interview Mr. Jeffries' wife.

**November 11, 2002**  Mr. Roberts wrote to Mr. Ellis and Wood & Lamping, informing them that the recent court order instructs DMS to retain Dr. Grubb for the IME. He also asked that past due benefits for the period of February 2002 to November 2002 be paid. Mr. Ellis agreed that he would attempt to retain Dr. Grubb for the IME and that DMS would pay benefits with a Reservation of Rights currently, but not for the period during which he was in breach of his insurance policy.

**January 13, 2003** Magistrate Judge Hogan opined that Mr. Jeffries would be obligated to participate in the IME, and that DMS maintain the policy in force.

**January 13, 2003**  Mr. Roberts wrote to Mr. Ellis and requested that DMS repay Mr. Jeffries the premium he had submitted, as well as back benefits owed. Mr. Roberts pointed out that Mr. Jeffries had complied with the DMS requests; he noted specifically that Mr. Jeffries had complied with all of the requests regarding participation in medical exams, and that the judge

49

had ruled that DMS's position relative to the authorization was unreasonable. Mr. Roberts stated in closing that "...Judge Hogan clearly spelled out that the event which caused Defendants to stop paying benefits to Mr. Jeffries was immaterial; Defendants should, therefore, stop relying on some fiction that an immaterial event gives them the right to deny benefits which are due and further the hardship they have bestowed." Mr. Jeffries asked that Mr. Ellis inform him whether they would pay benefits by February 3, 2003.

**February 5, 2003** Judge Hogan ruled that DMS respond to the request made by Plaintiff's Counsel to provide all memorialized communications about this case. He also stated Plaintiff has a right to the evidence the Defendant possesses that shows that the Plaintiff is not disabled.

**February 7, 2003** Dr. Bullard conducted an examination of Mr. Jeffries indicating a diagnosis of Malaise and Fatigue that was chronic active unstable and continuing. His assessment plan indicated; "Complicated medical patient with numerous problems. The primary difficulty in which he has a chronic myalgia and neuralgia. Unfortunately there are no objective findings to support his complaints. The unusual gait asymmetry is unusual. Additional neurological diagnostic testing is probably warranted based on the somewhat focal nature of the symptomology." The findings of his examination were primarily all normal results with the exception of the complaints of fatigue and malaise.

**March 15, 2003,** Mr. Jeffries participated in a neuropsychological IME. Dr. Hartings reported that Mr. Jeffries test results did not reflect a normal neuropsychological profile. And that although Mr. Jeffries tests as a man with superior overall intellectual ability... his cognitive profile across several other domains reflects a much lower level of functioning. Most notably his mental processing speed and efficiency is weak." In summary Dr. Hartings concluded that the following diagnoses could be made: "Cognitive Disorder with an undetermined etiology, Somatization Disorder, Severe. Obsessive Compulsive Personality Disorder and Rule out Auto immune disorder via medical IME." Mr. Hartings stated: "It is beyond the scope of this IME to determine whether Mr. Jeffries suffers from an occult auto-immune reaction, whether his condition is solely psychological or whether there is a combination of both."

**April 3, 2003** Mr. Roberts filed a motion to compel to the court, because of DMS's misrepresentation of the information that was contained on the claim system, as well as the length of time that the

information was held. He also reported that Dr. Hartings examined Mr. Jeffries on March 3, 2003 and had spoken with Defense Counsel prior to the production of any written report. Defense Counsel had advised Plaintiff's Counsel that Dr. Harting's opinion was that Mr. Jeffries was disabled and that the written report would not be ready for two weeks. Mr. Roberts stated he advised Defense Counsel that he was going to contact the physicians on March 18 regarding the status of the reports; Defense Counsel advised him that should he do so they would seek sanctions against him. Mr. Roberts then learned that the reports had been issued to Defense Counsel, and that they had asked Dr. Bullard to revise his report. Lastly, Mr. Roberts stated that DMS had refused to produce witnesses for deposition. Mr. Roberts asked that the court order sanctions.

**May 15, 2003** Mr. Burrell, from Woods & Lamping, wrote to Mr. Roberts regarding Mr. Jeffries' January benefit payment. Mr. Burrell responded that DMS had not received a continuance of disability form, did not receive one until April 7, and there was no Attending Physician statement. Mr. Burrell stated that the AP portion of the form was not received until May 2, 2003 and at that time; Mr. Jeffries' authorization had expired. Contingent upon policy provisions, payments are dependent upon completion of monthly progress reports. At least one of Mr. Jeffries' payments was delayed because of either his or his counsel's refusal to submit the forms. Moreover, because a final decision cannot be made until after the reports are appropriately evaluated, payments continued to be made under ROR.

**May 16, 2003** Mr. John Graf wrote to Mr. Roberts and informed him that payment had been made for the period of January 15 to February 15, and that waiver of premium was initiated. Mr. Graff stated, "A physical exam was scheduled for February 7, 2003. The results of this exam were completely negative. In addition, as a part of our evaluation of Mr. Jeffries' claim, a psychiatric exam was performed. This exam, completed in February, concluded that Mr. Jeffries was disabled due to a psychiatric disorder, particularly a somatization and or/obsessive compulsive disorder. Objective testing showed indications of a decline in cognitive functions, which were secondary to a severe obsessive-compulsive personality disorder; however, there was no evidence of cognitive or behavioral impairment. It was, therefore further concluded that it was unlikely that Mr. Jeffries suffers from a neurologic condition. This exam further concluded that with the right treatment plan, this condition is corrective. Additionally, we forwarded a copy of

the exam to our consultant for a review; our consultant agreed with his examination and concluded that it is unlikely Mr. Jeffries suffers from a neurological condition and his complaints are better explained by a psychological disorder, particularly a somatization disorder, severe and obsessive compulsive personality disorder. ...The documents that we have reviewed to date indicate that Mr. Jeffries' condition is one that is classified as a 'mental Disorder.' According to the policy, such disorders include, but are not limited to, personality, psychotic, emotional or behavioral disorders. Our records indicate that Mr. Jeffries has been paid a total of 39 months for this claim. Because this is beyond the maximum benefit allowed in the policy, we are unable to pay additional benefits. We have calculated the amount of benefits paid in excess of the maximum benefit period and will contact you regarding that overpayment. Lastly, we have received information from Dr. Geier. We are in the process of considering this report as it regards our decision."