UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| ERIC L. JEFFRIES, : | |
| : | Case No. C-1-02-351 |
| Plaintiff, : | |
| : | (Judge Beckwith) |
| vs. : | (Magistrate Judge Hogan) |
| : | |
| CENTRE LIFE INSURANCE COMPANY, : | **DEFENDANTS' MEMORANDUM** |
| et al., : | **IN OPPOSITION TO PLAINTIFF'S** |
| : | **MOTION IN LIMINE TO** |
| Defendants. : | **EXCLUDE TESTIMONY OF DRS.** |
| : | **BULLARD, HARTINGS AND** |
| : | **CLIONSKY** |

## I. *INTRODUCTION*

Plaintiff misunderstands the mandate of *Daubert* in his latest Motion. Plaintiff has moved to exclude the opinions rendered by Drs. Bullard, Hartings and Clionsky. In essence he argues that their conclusions are incorrect and the opinions they render are more prejudicial than probative. These are not *Daubert* issues. Plaintiff's objections relate to the qualifications of the experts, and the weight the jury is to assign to their opinions are not appropriately addressed under *Daubert*. The jury is entitled to hear these opinions, and Plaintiff is entitled to challenge them. At trial Plaintiff will have an opportunity on cross-examination to challenge both the experts' qualifications and their opinions.

Under *Daubert* the question is whether the expert's testimony is both reasonable and reliable; in other words, has the expert applied sound methodology grounded in established science capable of producing a reliable basis for his or her opinion. In this case, there is no question that Drs. Bullard, Hartings and Clionsky have testified within the scope of their relevant fields, that their methodology is appropriate and accepted in the medical community, and are

appropriately applied to draw scientifically supported conclusions. Plaintiff's *Daubert* Motion must therefore be denied.

## II.     ARGUMENT

### A.     Dr. Bullard Has Offered an Opinion as an Internist.

#### 1.     Dr. Bullard applied sound diagnostic methodology to his examination of Mr. Jeffries and review of his records.

Dr. Newton Bullard is a board-certified internist. *See* Exhibit A, Verification of Bullard Certification. As an internist, he is qualified to analyze differing diagnoses and render an opinion as to physical findings. Defendants asked Dr. Bullard to first, review the tremendous volume of information regarding Plaintiff's many and varied physical examinations, and second, to examine Mr. Jeffries and make a determination regarding any physical ailments he may be able to confirm.

Plaintiff objects that Dr. Bullard is biased because he is a personal physician for one of the attorneys in this case. He infers that this relationship creates a bias on the part of Dr. Bullard. Dr. Bullard testified that he has never served as an independent medical examiner for that attorney or Wood & Lamping in any other matter. *See* Exhibit B, Bullard depo. at p. 10. Nonetheless, Plaintiff is of course free to attempt to establish some sort of inference of bias for the jury. The jury can then draw its own conclusions. Whether or not Dr. Bullard has a personal relationship with an attorney in this case does not impact the reliability of his opinion of the methodology he employed. As such, any potential bias is not a *Daubert* issue.

Plaintiff also argues that Dr. Bullard is not qualified to render an expert opinion in this case. In support of his argument, he quotes Dr. Bullard's deposition testimony out of context. Dr. Bullard readily admits that he is not an expert with regard to infectious disease, rheumatology or vaccine-related difficulty. *See,* Exhibit B, Bullard deposition at p. 19. Dr.

Bullard is not being offered as an expert in this capacity. Dr. Bullard was asked to first review the myriad of medical records created by Mr. Jeffries and aid Defendants' counsel in the assimilation of that information. He was also asked to perform a physical examination of Mr. Jeffries. Dr. Bullard has offered his opinion regarding the findings from that physical examination. He is qualified to do this.

Plaintiff takes Dr. Bullard's deposition testimony out of context in order to argue that Dr. Bullard concedes he is not an expert witness. To the contrary, Dr. Bullard confirms that he is qualified to render the opinion Defendants sought. Plaintiff quotes page 19 of Dr. Bullard's deposition. On page 21, however, Dr. Bullard establishes that he is qualified to render an opinion on the issue reviewed in this case. He stated:

> A: *Or the second call improved my understanding of what he had said the first time that I had misunderstood. The end result was that by the end of the second call, I felt that there was an issue that they would like to have me review that I felt comfortable in reviewing and providing an opinion.*
>
> Q: *What did you understand that issue to be?*
>
> A: *My understanding of that, I was to review the information that had -- was supplied to me concerning Mr. Jeffries, that I was to examine the patient and to on the basis of my clinical experience as a practicing physician, provide an overview assessment of the situation.*

*See* Exhibit B, Bullard deposition at p. 21. Dr. Bullard went on to characterize his role in assessing a patient as:

> A: *My understanding was that they were looking for a global assessment from a general practitioner experienced in seeing patients on a day-to-day basis to assess my objective feeling as to this individual's illness and current condition.*

*See id.* at p. 32. As an internist, Dr. Bullard is experienced in the diagnosis of medical conditions and the assimilation of medical records.

Dr. Bullard testified that there was a great deal of contrasting opinions with regard to Mr. Jeffries' medical condition. *See id.* at p. 25. His role was to review Mr. Jeffries' information and provide some insight with regard to his condition. *See id.* at p. 27. Dr. Bullard was competent and qualified to undertake this task. It is correct that he is not an expert with regard to infectious disease, rheumatology or a vaccine-related difficulty. This does not impact his diagnostic expertise as an internist.

Plaintiff's argument that Dr. Bullard is not qualified as an expert witness is unconvincing. Dr. Bullard was asked to perform a physical examination of Mr. Jeffries, and he has offered an opinion regarding that examination. Dr. Bullard's report reveals that the physical examination was essentially normal. He is qualified to offer this opinion. In reaching this opinion, he does not employ unsound or untested methodology or unsupported conclusions. He performed a standard physical exam and reported his findings.

### 2. *Dr. Bullard's opinion is probative.*

Plaintiff also makes the conflicting argument that Dr. Bullard's testimony is first irrelevant and then potentially prejudicial. Setting aside this incongruous argument, however, it is clear that Dr. Bullard is qualified to testify as an expert in this case and that the jury can assign whatever weight to this testimony it chooses. The issue in this case is whether Mr. Jeffries' alleged disability is caused by a mental disorder or a physical ailment. The depositions of Mr. Jeffries' treating physicians have confirmed that there is no objective medical evidence of any physical ailment suffered by Mr. Jeffries. Dr. Bullard's examination also confirms that Mr. Jeffries' examination is normal from a physical standpoint. This is relevant to the issue of the cause of Mr. Jeffries' alleged disability. Although Dr. Bullard is not addressing the ultimate

issue of what actually did cause Mr. Jeffries' disability, he is certainly qualified to offer an opinion with regard to his specific findings.

Plaintiff argues that Dr. Bullard's opinion that he did not find any physical abnormalities is more prejudicial than probative. It is true that this finding does not conform with the theory of the case Plaintiff would like to put forward, but this does not make the opinion unfairly prejudicial. He has also failed to establish that Dr. Bullard's testimony would be more confusing than helpful. Again, the testimony is not in conformity with Plaintiff's theory of the case but that does not make it confusing. It is anticipated that there will be a great deal of medical testimony in this case with regard to the findings of various physicians. Dr. Bullard's findings are relevant with regard to his physical examination of Mr. Jeffries. He is qualified to testify as an internist and his opinion as such must be allowed.

Finally, Plaintiff's argument that Dr. Bullard's testimony could be potentially confusing because the jury may be misled into believing that he is an expert in areas in which he admits he has no expertise, is unfounded. Dr. Bullard admits that he is not an expert with regard to rheumeutology, infectious diseases or vaccine reactions. He is not trying in any way to mislead the jury. He admits that his expertise is limited to that of an internist. The jury may assign whatever weight it chooses to this fact.

### B.    Dr. Clionsky's Opinion is Admissible.

Plaintiff has also moved to exclude any opinion that Mr. Jeffries has obsessive compulsive personality disorder. He argues that Dr. Clionsky agrees with this assessment. In making this argument, he offers an incomplete and out-of-context exchange between counsel and Dr. Clionsky. In fact, Dr. Clionsky agrees that Mr. Jeffries has obsessive personality traits. *See*, Exhibit C, Clionsky deposition at p. 84. Dr. Hartings has testified that Mr. Jeffries is obsessive.

At trial and at the Daubert hearing Dr. Hartings will explain the basis for his opinion and the method he used to reach this conclusion. The fact that Dr. Clionsky may or may not agree with the ultimate conclusion does not invalidate the opinion under *Daubert*.

### 1. *Dr. Clionsky agrees that Mr. Jeffries has obsessional traits.*

Plaintiff cites deposition testimony from pages 83-84 of Dr. Clionsky's deposition and argues that Dr. Clionsky agrees with Dr. Shear that Mr. Jeffries does not suffer from "the DSM-IV defined obsessive-compulsive personality disorder." *See* Plaintiff's Motion at p. 8.[1] His quotation, however, includes an ellipse in which he eliminates Dr. Clionsky's agreement with Dr. Hartings that Mr. Jeffries has obsessional personality traits. Taken in context, Dr. Clionsky testified that:

> A. *The very focused and specific kind of way in which he responds to some of the test materials, and the symptom presentation has that flavor to it, that--this is I mean, again, this is not a diagnosis, this is based on, you know, we all have personality traits and personality approaches to things. And I think there is an obsessional way in which he has approached the workup of this medical condition.*

*See*, Exhibit C, Clionsky deposition at p. 84.

Whether Mr. Jeffries fits a neat checklist of criteria with regard to his obsessive-compulsive focus on his medical issues is immaterial. The issue is whether Mr. Jeffries has a DSM-IV diagnosis that explains his impairment. He does, and Plaintiff's attempts to quote his doctors out of context does not change this fact.

### 2. *Mr. Jeffries has somatization/somatoform disorder.*

Plaintiff also seeks to exclude Dr. Clionsky's agreement with Dr. Hartings' conclusion that Mr. Jeffries has somatization/somatoform disorder. Dr. Hartings explained in deposition, and will explain at the Daubert hearing, that the version of the DSM-IV he used defines Somatization Disorder, 300.81, the same way the version used by plaintiff's counsel and Dr.

Shear defines Undifferentiated Somatoform Disorder, 300.82.[2]  Whatever title is used, the checklist of symptoms between 300.81 in the version Dr. Hartings used and 300.82 in the version plaintiff used are the same.  *See*, Exhibit F.  No matter the title, Dr. Clionsky and Dr. Hartings agree that Mr. Jeffries has the disorder.

Moreover, Dr. Clionsky disagreed with Plaintiff's proposition that the DSM-IV is a strict diagnostic checklist from which deviation is not allowed.  Mr. Jeffries argues that he does not meet the DSM-IV criteria for somatozation disorder as defined in the DSM-IV-TR at 300.81 without addressing the fact that he falls squarely within the diagnosis of 300.82.  In his motion, Mr. Jeffries fails to cite any expert evidence that strict adherence to the DSM-IV or DSM-IV-TR is required.  Dr. Clionsky was questioned:

> Q.   *The last three lines of that paragraph she says for each mental disorder in the DSM, the clinician is provided with explicit criteria that the patient must meet before the diagnosis is assigned.  Is that correct?*
>
> A.   *No.*
>
> Q.   *What is incorrect about that?*
>
> A.   *The DSM is a consensus document.  Take a group of 15 people who are on the committee to establish the criteria for a certain diagnosis. . . They will then have the input based on what they're reading as knowledgeable parties or experts in the field about what are the conditions, what are the symptoms, what are the standards that they use to try to determine how best to design this diagnostic category.  The fact that there are at least four, because we've gone up through the various versions of the DSM, this TR is, of course, the newest one, but there has been DSM IV, DSM III, DSMIII-R, all revisions, all attempts at better understanding psychopathology.  With each revision, there are things that are added, things that are taken away largely based on what the consensus is at that point as to how things work.  The practicing clinician rarely sees pure form cases of any disorder.  Usually they are set up in a cookbook fashion.  You know, column A, you need two out of these, column B, you need three out of these, column C, you need one out of these.  Sometimes you are fortunate enough as a clinician to get a case that meets all of those criteria in each case, and you can say with at least a great sense of certainty, if – in confidence, if not truth, because*

---

[1] Plaintiff cites pages 80-81 but it should be 83-84.
[2] This issue is addressed in detail in subsection C, herein.

> *I am not sure it actually is truth, but a greater sense of certainty, that what you have is a true diagnosis here. I can tell you that different people looking at the same patient can legitimately come up with different diagnoses based on their reading of those symptoms and what falls into which category. . . So the issues of prevalence, the issues of date of onset, the course, all of these various factors that go in, as well as the specifics of how many you need in each category are meant as a source of guidance. They are not made in a way that allows you to say, well, this can't be the diagnosis because there are only four out of five here . . . Because what happens is you have this huge wastebasket of leftovers where it doesn't meet any diagnosis. That doesn't mean the person is psychologically healthy, it just means you didn't come up with enough specific symptoms and some of these symptoms, for example, sexual dysfunction, the person does not complain about symptoms of sexual dysfunction. Okay, well, does that mean that they don't have this disorder, or they simply don't want to talk about it?. . . So, when we get back to do I agree with that statement, to sort of draw this full circle, no, <u>I don't believe that people have to meet specific numbers of criteria in order for the diagnosis to best fit.</u>*

*See* Exhibit C, Deposition of Dr. Clionsky at pp. 51-53 (emphasis added).

This case is a perfect example. In the DSM-IV used by Dr. Hartings, the number 300.81 is used for *both* Somatization Disorder and Somatoform Disorder. In the DSM-IV-TR, used by Plaintiff, Somatization Disorder is 300.81 while Somatoform Disorder is now 300.82. The important consideration is not the label, but the existence of a significant psychological disorder which interferes with one's abilities.

Moreover, even if Plaintiff's argument is taken at face value, it fails. Plaintiff argues that there is no evidence that his symptoms began before age 30 or that he has a sexual dysfunction. There are multiple ways to account for this. One way is arguably that they do not exist. An equally plausible way, however, is that Mr. Jeffries refuses to acknowledge them. The Court will see that although Mr. Jeffries suffered a myriad of gastrointestinal and unexplained pain complaints prior to his Hepatitis B inoculation, about a year after the inoculation, when he claimed disability, he began to tie the onset of his problems to the vaccination. The medical evidence before the Court does not support this.

For example, when questioned regarding the lack of a specific determination as to whether Mr. Jeffries had any symptoms before age 30, Dr. Hartings explained that he was unable to obtain information regarding this specific response because it was blocked by Mr. Jeffries. *See* Exhibit D, Hartings deposition at p. 42. Dr. Hartings testified that Mr. Jeffries was in denial about his symptoms. *See id.* at p. 46. Dr. Hartings also testified that he attempted to elicit information from Mr. Jeffries regarding his pre-Hepatitis B vaccination symptomology, but that Mr. Jeffries denied any negative aspects of his life prior to the injection. *See id.* This is why Dr. Hartings asked to interview Mrs. Jeffries. *See id.* This is notably inconsistent with Mr. Jeffries' medical history which documented a variety of unresolved and largely unexplained objective complaints prior to the Hepatitis B vaccination.

Mr. Jeffries' denial and the impact this had on diagnosis was gleaned by Dr. Hartings during his examination of Mr. Jeffries. The examination of a patient in conjunction with neuropsychological testing is crucial to an accurate diagnosis. Dr. Paula Shear is an expert witness hired by plaintiff primarily to critique Dr. Hartings' evaluation. "I was asked to review all of the evaluations and to provide a critique particularly of Dr. Hartings' evaluation." *See*, Exhibit E, Paula Shear deposition at p. 25. Dr. Shear agreed that in conjunction with test results, a clinician must rely on his or her observations of the patient. She was questioned and testified:

> Q.  *Would you agree with me that these guidelines or manuals, while important to review and to know, are not to be used by a clinical psychologist, or for that matter, a forensic psychologist as cookbook interpretations of the test and results? . . .*
>
> A.  *I agree . . .*
>
> Q.  *Well, if I gave the test according to the manuals as set out and got the response, that would not be what you would consider a true neuropsychological examination; correct?*
>
> A.  *That's correct.*

> Q. *Because in order to interpret the results of the test, you have to look at the validity scales of the test and how that might affect the answers, and couple that with a clinical interview and the observations of the person doing the test, right?*
>
> A. *Correct.*
>
> Q. *Something you did not have the ability to do in this case.*
>
> A. *I did not have the ability to interview him or observe him, correct.*

*See* Exhibit E, Shear deposition at pp. 73-74.  Plaintiff's own expert agrees that the DSM is not to be used as a cookbook examination and that clinical observations will factor into the diagnosis.  Plaintiff's argument that his diagnosis does not fit into a neat package is not a basis for excluding it.

Moreover, Dr. Shear acknowledged that with regard to at least the objective testing, Mr. Jeffries did reveal scores that would be suggestive of somatoform disorder.  She was asked:

> Q. *Okay.  Some of your conclusions, such as on page 4, where you speak about Mr. Jeffries' highest score being the somatoform disorder, you follow that by saying, "Because the scale is the highest of those for all of the clinical syndrome, scores at the level he achieved might be suggestive of mild somatoform symptoms if collaborated by other clinical information."  That was your conclusion, or that was the way the manual reads?*
>
> A. *That is my conclusion and it is the way the manual reads.*
>
> Q. *Okay. So if Dr. Hardings' [sic] observations and the review of 3,000 pages of medical records supports his conclusion that there is a somatoform disorder, it would not be inconsistent with these testing results; is that right?*
>
> A. *It would not be inconsistent.  These are very subtle observations.*
>
> Q. *Well, they are subtle evaluations, but he had a very significant score on the scale that suggests he is trying to present himself he is better off than he is from an emotional or psychological standpoint, correct?*
>
> A. *Yes, he did.*

*See*, Exhibit E at pp. 74-75.  When pressed, Dr. Shear acknowledged that Dr. Hartings' clinical observations would need to be taken into consideration. When further questioned, she was asked,

> Q. *Okay, which is to say, that these results are consistent with a person who has somatoform disorder?*
>
> *Mr. Roberts: Objection.*
>
> A. *Yes, they are consistent with a lot of things.*

*See, id*. at pp. 80-81.

Finally, Dr. Shear also agreed that most successful people have obsessive traits. *See*, Exhibit E at p. 88. With regard to the obsessive traits of Mr. Jeffries, Dr. Shear was asked:

> Q. *. . . If someone exhibits these behaviors, and if these behaviors stem from a focus, and that focus and these behaviors interfere with his normal, daily existence, normal daily living, his occupation, his social life, whatever, is that evidence that a clinician would look to and evaluating whether or not there is an underlying psychological problem?*
>
> *Mr. Roberts: Objection.*
>
> A. *I think if there is that degree of preoccupation and it indeed keeps people from doing other things, that that is definitely noteworthy and unusual.*

*See id.* at p. 95.

Plaintiff argues that there is no evidence that his somatization/somatoform symptoms began before age 30 and that he is missing the criteria of a sexual component. *See* Exhibit E, Deposition of Shear at p. 83. As Dr. Hartings has explained, his efforts to explore Mr. Jeffries' pre -Hepatitis B morbidity were blocked because of Mr. Jeffries' denial. Mr. Jeffries seeks to find a physical component for his problems, when in fact, there is none. Dr. Clionsky also admitted that with regard to sexual dysfunction, the fact that a patient does not disclose it, does not necessarily mean they do not have it. *See,* Exhibit C at p. 53.

Dr. Hartings has determined based on both testing and his extensive neuropsychological examination, that Mr. Jeffries has somatization/somatoform disorder. Dr. Shear, the expert offered by Plaintiff, has testified that she cannot make a physical or mental diagnosis because she did not examine Mr. Jeffries. *See* Exhibit E, Shear deposition at p. 44. There is no basis, therefore, on which to exclude Dr. Hartings' and Dr. Clionsky's opinions with regard to somatization/somatoform disorder.

        C.        ***Dr. Hartings' Opinion Is Both Relevant and Reliable.***

Plaintiff has also moved to exclude the opinion of Dr. Hartings. Dr. Hartings is a neuropsychologist who examined Mr. Jeffries on three occasions and conducted an extensive battery of tests. Plaintiff attacks Dr. Hartings' credibility. Again, the credibility of a witness and the weight to be assigned to his or her testimony are issues that can be argued to a jury; they are not the proper basis for a *Daubert* challenge.

> **1.**    ***Mr. Jeffries exhibits the symptoms of 300.82 Undifferentiated Somatoform Disorder or 300.81 Somatization Disorder depending on the version of the DSM-IV referenced.***

Dr. Hartings diagnosed Mr. Jeffries with Somatization disorder, severe (300.81). In the version of the DMS referred to by Dr. Hartings the criteria for 300.81 were:

A.    One or more physical complaints (e.g. fatigue, loss of appetite, gastrointestinal or urinary complaints).
B.    Either (1) or (2):
(1) After appropriate investigation, the symptoms cannot be fully explained by a known general medical condition or the direct effects of a substance (e.g. a drug or abuse, a medication)
(2) When there is a related general medical condition, the physical complaints or resulting social or occupational impairment is in excess of what would be expected from the history, physical examination, or laboratory findings
C.    The symptoms cause clinically significant distress or impairment in social, occupational or other important areas of functioning.
D.    The duration of the disturbance is at least 6 months.

> E. The disturbance is not better accounted for by another mental disorder (e.g. another Somatoform Disorder, Sexual Dysfunction, Mood Disorder, Anxiety Disorder, Sleep Disorder or Psychotic Disorder).
> F. The symptom is not intentionally Produced or feigned (as in Factitious Disorder or Malingering.

*See*, Exhibit F, DSM-IV 300.81. In the DSM-IV, the number 300.81 is assigned to both Somatiform Disorder and Somatization Disorder; being different manifestations of the same general disorder. As Dr. Clionsky testified, the DSM is a continually refined resource. In the version of the DMS-IV relied on by Plaintiff, DSM-IV-TR, diagnosis 300.81 is for Somatization Disorder but the diagnostic criteria differ. Instead, the diagnostic criteria of 300.82, Undifferentiated Somatoform Disorder, are the criteria that match the criteria of the diagnosis made by Dr. Hartings. *See,* Exhibit F. In deposition, Dr. Hartings explained:

> A. It's to highlight the basis upon which I made the diagnosis of 300.81.
>
> Q. Okay. Now, my Exhibit 80 is copies of pages 446, 447, 448, 449 and 450 of the DSM-IV?
>
> A. Right.
>
> Q. And we've marked as Exhibit 83 page 451 and 452 of the same book?
>
> A. Apparently not.
>
> Q. Well, mine goes 446 to 450. And it goes 300.81 to 300.82. Yours picks up at 451 and goes to 452. So it's not the same book?
>
> A. Apparently not. I think this might help clarify --
>
> Q. Okay.
>
> A. -- the discrepancy. If you look here, 300.82, undifferentiated somatoform disorder. Apparently in some edition of the DSM-III, the powers that be increased this digit by one, but it's the same diagnosis.
>
> Q. DSM-III?
>
> A. Or IV, excuse me.

*Q. You didn't clarify things for me. Your 301.4 here -- excuse me, your 300.81, your axis I diagnosis on March 15 of 2003, that's not a 300.81 that's Exhibit 80?*

*A. No.*

*Q. You're talking about something else?*

*A. I'm talking about 300.81 that is in this book, which apparently is listed in your book as 300.82.*

*Q. You have a -- you are basing your report on a version of the DSM that predates the one that I've been using?*

*A. That I have in my office, yes.*

*Q. A prior edition to the one that I shared with you?*

*A. It's a DSM-IV. I don't know.*

*MR. ELLIS: It may be subsequent, Mike. I don't know whether it's DSM-IVR or what. There are multiple versions of that book.*

*A. Yes.*

*Q. You say in your report that it's somatization disorder, which is what my Exhibit 80 calls 300.81?*

*A. Right.*

*Q. You're saying your report should really say 300.82, undifferentiated somatoform disorder?*

*A. Well, yes.*

*Q. It's a different diagnosis to a different number?*

*A. No, it's the same number. It's the same number in my book. It's a different kind of somatization disorder, and this is the one that Mr. Jeffries --*

\*\*\*

*Q. You use the exact same terminology that corresponds with 300.81 in my book?*

*A. Okay. That's true.*

*Q. Have you changed your diagnosis since March 2003?*

- 14 -

    *A. Not at all.*

    \*\*\*

    *A. I was diagnosing out of the manual I have in my office, 300.81 somatoform disorder, as described there and as fits Mr. Jeffries like a glove.*

*See*, Exhibit D, Hartings depo. at pp. 138-143. Dr. Hartings will explain at trial and at the Daubert hearing that although the numbering system may have changed, the diagnostic criteria are the same. Mr. Jeffries has a psychological disorder which has impacted his ability to function. Whatever the name or number, it is not a physical disorder. Despite diligent searching by Mr. Jeffries, Plaintiff's doctors have been unable to explain his physical symptoms: Dr. Hartings has. Plaintiff's treating physicians have agreed that they cannot opine as to a definitive diagnosis or unequivocally relate his problems to his Hepatitis B inoculation. *See* Exhibit G, Luggen Deposition at p. 19; Nunlist-Young deposition at p. 84; Dunn deposition at p. 36. Dr. Hartings has effectively ruled out any other medical cause by his review of over 3000 pages of medical records.

    **2.**    ***Dr. Hartings is a credible witness.***

Plaintiff has also attacked Dr. Hartings' credibility based on an incident that occurred over a decade ago. This information has no relationship to Dr. Hartings' abilities, is irrelevant, is highly prejudicial, and is improper. Even if there were evidence of a criminal conviction on the part of Dr. Hartings, which is not the case here, it would not be admissible in this instance because it occurred in excess of ten years ago. Plaintiff has attached a consent decree between Dr. Hartings and the Department of Professional Regulation for the State of Ohio. He argues that Dr. Hartings had a three-year suspension for "low standards." This is again taken out of context. In the early 90's, Dr. Hartings was accused of having a dual relationship with a patient, which relationship was alleged to have occurred in the mid- to late-1980's. In order to avoid hearings

on this issue, Dr. Hartings agreed to a consent agreement and settlement. As part of the agreement, Dr. Hartings accepted a three-month active suspension. Dr. Hartings was suspended from April 8, 1993 through July 7, 1993. Any testimony regarding this suspension must be excluded as highly prejudicial and irrelevant to the issue of Dr. Hartings' qualifications.

### III.    CONCLUSION

Plaintiff's motion does not address the methodology applied by Drs. Bullard, Clionsky and Hartings, nor does it establish that these doctors failed to apply sound scientific principles. His motion goes to the weight of their testimony which issue is within the purview of the jury. The opinions offered by the doctors are not junk science or unsupported speculation. Plaintiff's motion must be denied.

        Respectfully submitted,

        s/Peter M. Burrell
        William R. Ellis (0012279)
        Peter M. Burrell (0044139)
        Amy Gasser Callow (0063470)
        Wood & Lamping LLP
        600 Vine Street, Suite 2500
        Cincinnati, OH  45202-2491
        (Telephone) (513) 852-6000
        (Facsimile) (513) 852-6087

        Attorneys for Defendants
        Massachusetts Casualty Insurance Company
        and Disability Management Services, Inc.

- 17 -

**CERTIFICATE OF SERVICE**

      I hereby certify that a copy of the foregoing has been filed with the Court by electronic means on this _____ day of December 2003.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

                                                s/Peter M. Burrell
                                                Peter M. Burrell, Esq.

194955.1

12/24/2003 10:59 AM