1

```
 1              UNITED STATES DISTRICT COURT
 2                SOUTHERN DISTRICT OF OHIO
 3                    WESTERN DIVISION
 4
 5      _____
                                        )
 6      ERIC L. JEFFRIES,               )
                                        )
 7              Plaintiff,              )
                                        )   CASE NO.
 8              vs.                     )   C-1-02-351
                                        )
 9      CENTRE LIFE INSURANCE CO.,      )
        et al.,                         )
10                                      )
                Defendants.             )
11                                      )
        _____)
12
13
14      Deposition of:      NEWTON H. BULLARD, M.D.
15      Pursuant to:        Subpoena and Notice
16      Date and Time:      Friday, April 18, 2003
                            2:40 p.m.
17
        Place:              Graydon, Head & Ritchey
18                          511 Walnut Street
                            1900 Fifth Third Center
19                          Cincinnati, Ohio  45202
20      Reporter:           Patti Stachler, RMR, CRR
                            Notary Public - State of Ohio
21
22
23
24
25
```

Elite Reporting Agency
513-632-5344

10

1  service of an independent medical examiner for a party
2  in litigation?
3      A.  Occasionally.
4      Q.  Have you previously served any lawyer at the
5  Wood & Lamping law firm in that capacity?
6      A.  No.
7      Q.  Have you previously performed that function
8  on behalf of any insurance company?
9      A.  No.
10     Q.  Have you been asked to perform that function
11 in the context of workers' compensation claims or other
12 types of claims?
13     A.  With respect to your question --
14     Q.  Yes, sir?
15     A.  -- concerning workman's compensation, the
16 answer is no.
17     Q.  Okay.
18     A.  With respect to other claims, the answer is
19 yes.
20     Q.  Okay.  But not previously for any insurance
21 company and not previously for any lawyer at the Wood &
22 Lamping law firm?
23     A.  That's correct.
24     Q.  Okay.  So Mr. Burrell has not ever asked for
25 your assistance -- your professional assistance on any

1        Q.    Have you testified as an expert in those
2    matters?
3        A.    Yes.
4        Q.    Can you give me a general range as to how
5    many depositions there may have been previously?
6        A.    Probably less than 20.
7        Q.    Okay. So you've had some experience with
8    lawyers in depositions, and there's something about the
9    Jeffries case that Mr. Burrell communicated to you
10   during that first call that was not appealing. What
11   was it about his characterization of the assignment
12   that did not appeal to you?
13       A.    It wasn't clear that if he was asking me for
14   an expert opinion based on a background in infectious
15   disease or a background in rheumatology or a background
16   in vaccine-related difficulty, that my ability to
17   testify would be a benefit to him.
18       Q.    Am I sensing that what you're saying is there
19   might be some subspecialty or other type of specialized
20   physician that would have been more appropriate based
21   on the description you were given?
22       A.    No.
23       Q.    Okay.
24       A.    The question was, if he --
25       Q.    Mr. Burrell's question?

```
 1   Mr. Burrell's part that the way -- the way he described
 2   the assignment to you was not appealing to you.  And so
 3   he asked you to reconsider, based on the slightly
 4   different description of what he was looking for.  Is
 5   that close to what happened?
 6       A.   Or the second call improved my understanding
 7   of what he had said the first time that I had
 8   misunderstood.  The end result was that by the end of
 9   the second call, I felt that there was an issue that
10   they would like to have me review that I felt
11   comfortable in reviewing and providing an opinion.
12       Q.   What did you understand that issue to be?
13       A.   My understanding of that, I was to review the
14   information that had -- was supplied to me concerning
15   Mr. Jeffries, that I was to examine the patient and to,
16   on the basis of my clinical experience as a practicing
17   physician, provide an overview assessment of the
18   situation.
19       Q.   To review the information that was provided
20   to me.  As of that moment in time, you had not been
21   provided any documents regarding Mr. Jeffries?
22       A.   My recollection is that that is the case.
23       Q.   Okay.
24            (Plaintiff's Exhibit 70 was marked for
25            identification.)
```

1  you told Mr. Burrell you could do.
2      A.   Let me rephrase that.
3      Q.   Okay.
4      A.   I indicated that I thought that I could
5  perform an examination which might be helpful in terms
6  of clarifying their understanding of the patient's
7  situation.
8      Q.   What do you mean by helpful to them?
9      A.   At the time that I reviewed the records,
10 there were large numbers of contrasting opinions that
11 had been accumulated over the course of this patient's
12 medical condition.  There seemed to be distractions
13 involved at every level which might have been missing
14 the illness of the patient.
15     Q.   So before -- were you done?
16     A.   (Nodding head.)
17     Q.   So before actually visiting with
18 Mr. Jeffries, you had concluded, based on your review
19 of the documents that were given to you, that there
20 were a large number of contrasting opinions?
21     A.   Yes.
22     Q.   Okay.  Was it your belief on reviewing the
23 records that there are opinions that Mr. Jeffries is
24 not disabled?  How do you mean contrasting, I guess is
25 my question?

1   you will repeat it.
2       Q.   Okay.  The repeat part would be that I asked
3   you whether, after reviewing the records, you concluded
4   that you had the capacity to assimilate all the records
5   and then in conjunction with an actual examination of
6   Mr. Jeffries clarify the situation for the
7   defendants?
8       A.   It wasn't clear to me that they had,
9   Mr. Burrell and his associates, had any need for
10  clarification of their understanding, necessarily.  I
11  think they were looking for a better insight into the
12  situation.  And that by reviewing the patient's
13  situation, the data and his examination, that I might
14  be able to provide a different perspective.
15      Q.   Let me back up a little.  Twice now you've
16  said that there were, quote, contrasting opinions.
17  What opinions in the file are contrasting?
18      A.   My recollection is that there were a number
19  of documents that had been produced by physicians that
20  indicated one -- that a particular symptom was related
21  to something.  A different physician indicating that
22  that symptom could not have been due to whatever the
23  first physician said.  Differences in diagnoses.  There
24  were -- there was a litany of different diagnoses and
25  different explanations of the patient's conditions.

```
 1        A.   Would you --
 2             (The record was read.)
 3   BY MR. ROBERTS:
 4        Q.   And what was your understanding of their
 5   interest in you seeing the patient?
 6        A.   My understanding was that they were looking
 7   for a global assessment from a general practitioner
 8   experienced in seeing patients on a day-to-day basis to
 9   assess my objective feeling as to this individual's
10   illness and current condition.
11        Q.   Okay.  I know you had those two initial calls
12   with Mr. Burrell and then you had this meeting with
13   Mr. Burrell.  Are there any other conversations you had
14   with Mr. Burrell before seeing Mr. Jeffries?
15        A.   I honestly don't recall any.
16        Q.   Okay.  Any time prior to seeing Mr. Jeffries
17   did you speak to Mr. Ellis, other than this
18   face-to-face conference that you've shared with me?
19        A.   No.
20        Q.   On the phone or in person?
21        A.   Not that I recall.
22        Q.   Okay.  Can you recall any other detail of
23   this less-than-an-hour meeting with Mr. Burrell and
24   Mr. Ellis face to face in your office?
25        A.   No.
```