```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF OHIO
 2                       WESTERN DIVISION

 3

 4

 5    ERIC JEFFRIES,              )
                Plaintiff         )
 6    v.                          ) Case No. C-1-02-351
                                  )
 7    CENTRE LIFE INSURANCE CO.   )
      et als.,                    )
 8              Defendants        )

 9

10

11

12              DEPOSITION OF:  MITCHELL I. CLIONSKY

13    taken before Jessica R. Stasio, Notary

14    Public-Stenographer, pursuant to Rule 30 of the

15    Rules of Civil Procedure, at the offices of ACCURATE

16    COURT REPORTING, 1500 Main Street, Springfield,

17    Massachusetts on September 23, 2003.

18

19

20    Appearances: (see page 2)

21

22

23                      Jessica R. Stasio
                  Registered Professional Reporter
24
```

ACCURATE COURT REPORTING
1500 Main Street, Suite 1412
Springfield, MA 01115
413-747-1806

1    Q.    What's incorrect about that?
2    A.    The DSM is a consensus document.  Take a
3  group of fifteen people who are on the committee to
4  establish the criteria for a certain diagnosis,
5  let's say it's Attention Deficit Hyperactivity
6  Disorder just for the sake of argument.  They will
7  then have the input based on what they're reading as
8  knowledgeable parties or experts in the field about
9  what are the conditions, what are the symptoms, what
10 are the standards that they use to try to determine
11 how to best design this diagnostic category.  The
12 fact that there are at least four, because we've
13 gone up through the various versions of the DSM,
14 this TR is, of course, the newest one, but there has
15 been DSM IV, DSM III, DSM III-R, all revisions, all
16 attempts at better understanding psychopathology.
17 With each revision there are things that are added,
18 things that are taken away largely based on what the
19 consensus is at that point as to how things work.
20 The practicing clinician rarely sees pure form cases
21 of any disorder.  Usually they are set up in a
22 cookbook fashion.  You know, column A, you need two
23 out of these.  Column B, you need three out of
24 these.  Column C, you need one out of these.

1   Sometimes you are fortunate enough as a clinician to
2   get a case that meets all of those criteria in each
3   case, and you can say with at least a greater sense
4   of certainty if -- and confidence, if not truth,
5   because I am not sure it actually is truth, but a
6   greater sense of certainty that what you have is a
7   true diagnosis here.  I can tell you that different
8   people looking at the same patient can legitimately
9   come up with different diagnoses based on their
10  reading of those symptoms and what falls into which
11  category.  In the case of ADHD, you have a symptom
12  where -- you have two classes of symptoms.  One's an
13  inattention cluster where there is nine symptoms;
14  the other is a hyperactivity/impulsive cluster where
15  there is also nine symptoms.  In order to make a
16  diagnosis of a child, you need six out of the nine
17  in one or the other or both categories.  Now, you
18  also get people like Russel Barkley, who's one of
19  the preeminent experts in this area who says that in
20  adults often times the disorder ameliorates a bit,
21  it becomes less severe, and then you only need four
22  or five.  So the issues of prevalence, the issues of
23  date of onset, the course, all of these various
24  factors that go in, as well as the specifics of how

ACCURATE COURT REPORTING
1500 Main Street, Suite 1412
Springfield, MA 01115
413-747-1806

1    many you need in each category are meant as a source
2    of guidance.  They are not made in a way that allows
3    you to say, well, this can't be the diagnosis
4    because there are only four out of the five here.
5    This can't be the diagnosis because there is only
6    two out of the three here.  Because what happens is
7    you have this huge wastebasket of leftovers where it
8    doesn't meet any diagnosis.  That doesn't mean the
9    person is psychologically healthy, it just means you
10   didn't come up with enough specific symptoms.  And
11   some of these symptoms, for example, sexual
12   dysfunction, the person does not complain about
13   symptoms of sexual dysfunction.  Okay, well, does
14   that mean that they don't have this disorder or they
15   simply don't want to talk about that?  I don't
16   know.  But what your job is as a clinician is to try
17   to best understand, hopefully, for the job of
18   helping somebody and treating them as to what's
19   going on so that you can use that diagnosis to
20   understand the disorder.  That's the whole purpose
21   of diagnosis is to understand.
22          So, when we get back to do I agree with
23   that statement, to sort of draw this full circle,
24   no, I don't believe that people have to meet

```
 1      DMS about your report --
 2           A.   Correct.
 3           Q.   -- orally?  So I understand, you agree
 4      with Dr. Hartings' diagnosis about the personality
 5      disorders of Mr. Jeffries; is that right?
 6           A.   I agree that Mr. Jeffries has a -- is
 7      likely has a somatoform disorder.
 8           Q.   Likely has?
 9           A.   Yeah.  I mean we are all talking about
10      more likely than not, okay, these are not things
11      that exist in real life.  Disorders are conceptual
12      constraints.
13           Q.   So it's your opinion it's more likely than
14      not that he suffers somatization personality
15      disorder?
16           A.   Yes.
17           Q.   Okay.  And there are obsessional
18      tendencies involved in this?
19           A.   I don't believe that he has a diagnosis of
20      obsessive-compulsive disorder.
21           Q.   It's not your opinion that it's more
22      likely than not that he suffers from the DSM IV
23      defined obsessive-compulsive personality disorder?
24           A.   Correct.
```

```
 1        Q.   And what do you base your judgment with
 2   regard to that diagnosis on?
 3        A.   Which one?
 4        Q.   The obsessive-compulsive?
 5        A.   The very focused and specific kind of way
 6   in which he responds to some of the test materials,
 7   and the symptom presentation has that flavor to it,
 8   that -- this is, I mean, again, this is not a
 9   diagnosis, this is based on, you know, we all have
10   personality traits and personality approaches to
11   things.  And I think that there is an obsessional
12   way in which he has approached the work-up of this
13   medical condition.
14        Q.   No, but my question was it's not your
15   opinion that he has OCPD, and why do you conclude
16   that he doesn't have OCPD?
17        A.   Oh, I don't see the range of obsessive
18   kinds of behaviors or compulsive thoughts and
19   impairment based on that in terms of his
20   relationships.  I mean I think Dr. Shear was correct
21   in that portion of her analysis.
22        Q.   Are most people that enjoy success,
23   lawyers, doctors, psychologists, to a certain degree
24   obsessive or compulsive?  I mean those words, are
```