1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - - - - - - - - - - - - - -

ERIC L. JEFFRIES,                  :
                                   :
            Plaintiff,             :
                                   :
     vs.                           : Case No. C-1-02-351
                                   : (Judge Beckwith)
CENTRE LIFE INSURANCE              :
COMPANY, et al.,                   :
                                   :
            Defendants             :
- - - - - - - - - - - - - - -

        Deposition of PAULA K. SHEAR, M.D., a witness herein, called by the defendants for cross-examination, pursuant to the Federal Rules of Civil Procedure, taken before me, Angie Portune, a Registered Merit Reporter and Notary Public in and for the State of Ohio, at the offices of Graydon, Head & Ritchey, 1900 Fifth Third Center, 511 Walnut Street, Cincinnati, Ohio, on Wednesday, November 12, 2003, at 10:00 AM.

ORIGINAL

1   comprehensive critique of everything that was in
2   the file.
3       Q.   Okay.  You weren't asked to critique the
4   findings of Dr. Sandman or Dr. Bastian; correct?
5       A.   I was asked to review all of the
6   evaluations and to provide a critique particularly
7   of Dr. Hardings' evaluation.
8       Q.   But you weren't provided the raw test
9   data nor the interview notes from either of those
10  neuropsychologists.
11      A.   We discussed getting that, I believe.
12  Part of the difference between their reports and
13  Dr. Hardings' reports is that they incorporated a
14  lot of the raw data in the report itself, so it
15  gives actual test scores and compares them to the
16  norms.  So there was less of a need to do that.
17  And I believe that Dr. Sandman said explicitly that
18  he did not conduct a clinical interview as part of
19  the evaluation.
20      Q.   Is that unusual, not to do a clinical
21  interview?
22           MR. ROBERTS:  Objection.
23      A.   That would depend a lot on what the
24  person was asked to do.  My impression was that

44

```
 1              MR. ROBERTS:  Objection.
 2        A.    I just want to say again that I did not
 3   examine him.
 4        Q.    I understand.
 5        A.    And so I can't make a diagnosis.  I think
 6   that really you're asking a medical question.  And
 7   the question is whether he has a medical disorder
 8   that explains his symptoms or not.  And that's a
 9   question for the physicians.
10        Q.    Were you able, based upon the information
11   that you were provided, to conclude one way or the
12   other whether or not he has a physical ailment or a
13   psychological ailment?
14              MR. ROBERTS:  Objection.
15        A.    I would not diagnose a psychological
16   ailment without seeing the patient, so I can't
17   answer that part.  I can say that there are, you
18   know, in these documents, a number of different
19   reports from people who are experts in the field
20   who do seem to feel that he has a medical condition
21   and a medical condition that's often associated
22   with many of the symptoms that he's complaining
23   about.
24        Q.    Okay.  Let's explore that.  Can you --
```

73

1  condition.
2  A.  Correct.
3  Q.  In your critique of Dr. Hardings, you
4  draw upon the literature and the proforma
5  evaluation and evaluation rules for at least a
6  couple of the tests out of the 21 that he gave; is
7  that right?
8  A.  I need you to help me understand what you
9  mean by proforma.
10  Q.  The general research on interpreting
11  these tests.
12  A.  Okay.
13  Q.  Am I correct?
14  A.  You're referring to manuals and things
15  like that?
16  Q.  Manuals, things like that.  Right?
17  A.  Guidelines?  Yes.
18  Q.  Would you agree with me that these
19  guidelines or manuals, while important to review
20  and to know, are not to be used by a clinical
21  psychologist, or for that matter a forensic
22  psychologist, as cookbook interpretations of the
23  testing results.?
24      MR. ROBERTS:  Objection.

1      A.    I agree.

2      Q.    Because if they were, then I could do the
3 tests. I wouldn't even need psychological
4 training, right?

5      A.    I'm not sure if that's true.

6      MR. ROBERTS: Objection.

7      Q.    Well, if I gave the tests according to
8 the manuals as it's set out and got their response,
9 that would not be what you would consider a true
10 neuropsychological examination; correct?

11     A.    That's correct.

12     Q.    Because in order to interpret the results
13 of the tests, you have to look at the validity
14 scales of the tests and how that might affect the
15 answers, and couple that with the clinical
16 interview and the observations of the person doing
17 the test; right?

18     A.    Correct.

19     Q.    Something you did not have the ability to
20 do in this case.

21     A.    I did not have the ability to interview
22 him or observe him. Correct.

23     Q.    Okay. Some of your conclusions, such as
24 on page 4, where you speak about Mr. Jeffries'

1   highest score being the somatoform disorder, you
2   follow that by saying, "Because the scale is the
3   highest of those for all the clinical syndrome,
4   scores at the level he achieved might be suggestive
5   of mild somatoform symptoms if corroborated by
6   other clinical information."  That was your
7   conclusion or is that the way the manual reads?
8        A.   That's my conclusion and it's the way the
9   manual reads.
10       Q.   Okay.  So if Dr. Hardings' clinical
11  observations and the review of 3000 pages of
12  medical records supports his conclusion that
13  there's a somatoform disorder, it would not be
14  inconsistent with these testing results; is that
15  right?
16       A.   It would not be inconsistent.  These are
17  very subtle elevations.
18       Q.   Well, they're subtle elevations, but he
19  had a very significant score on the scale that
20  suggests he's trying to present himself better off
21  than he is from an emotional and psychological
22  standpoint; correct?
23       A.   Yes, he did.
24       Q.   Pardon?

1  someone with multiple sclerosis or another clear
2  neurologic disorder, you are seeing personality
3  problems on top of their medical condition or just
4  the medical condition. That's the debate.
5      Q.  Okay. That's an issue we haven't been
6  able to discern yet. Whether we've got test
7  results because there's an overlying personality
8  problem or because it's simply the effects of the
9  disease on the person.
10     A.  And on this particular instrument. Yes.
11     Q.  Okay. When it comes to a series of
12  complaints that cannot be identified or objectified
13  by physical means, and the person has for example a
14  somatoform disorder, you would see the same kind of
15  results?
16         MR. ROBERTS: Objection.
17     Q.  Because again, there's a focus on
18  physical symptoms.
19     A.  You could see the same results. Yes.
20     Q.  Okay. Which is to say, that these
21  results are consistent with a person who has
22  somatoform disorder.?
23         MR. ROBERTS: Objection.
24     A.  Yes. They're consistent with a lot of

1  things.
2      Q.    Okay.  To be diagnostic, however, you
3  would have to have a clinical correlation.
4      A.    That's correct.
5      Q.    You spend some time discussing or
6  critiquing Dr. Hardings' use of the Rorschach test,
7  right?
8      A.    Correct.
9      Q.    That's R O R S C H A C H.  And that is
10 basically the old ink blot test.
11     A.    That's what it is.
12     Q.    Right?  And you questioned the way it was
13 scored by Dr. Hardings; is that right?
14     A.    Yes.
15     Q.    Did you see any scoring by Dr. Hardings
16 of the Rorschach test?
17     A.    I did not.  That was part of the problem.
18     Q.    Can the Rorschach test be used even
19 without scoring for purposes other than achieving a
20 score through the normal protocols?
21     MR. ROBERTS:  Objection.
22     A.    That would be very unusual.  And it would
23 be up to the person doing it to demonstrate that
24 there's validity to that method.

1    Q.   Do you know how many patients he's
2  observed taking it?
3    A.   No.
4    Q.   Do you know whether or not Rorschach was
5  commonly used in evaluating post-traumatic stress
6  disorder in veterans?
7    A.   I haven't read those studies.
8    Q.   You go down the line of the DSM-IV-TR in
9  ticking off the symptoms that you believed were or
10 were not exhibited by Mr. Jeffries; is that right?
11   A.   I believe I went through the different
12 criteria and talked about whether or not
13 Dr. Hardings showed evidence that those symptoms
14 were present.
15   Q.   You suggest that he can't have -- at
16 least according to the DSM-IV, he can't have a
17 somatoform disorder because there was no sexual
18 symptom; is that right?
19   A.   Somatization disorder.
20   Q.   Somatization disorder.  The two things he
21 was lacking was a sexual component and beginning
22 prior to age 30.?
23        MR. ROBERTS:  Objection.
24   A.   Those were two of the things that were

1  concluded that he may have obsessive traits that
2  actually assisted him in the success of his
3  business life because of the nature of his
4  business?
5          MR. ROBERTS:  Objection.  Misstates
6  facts.
7      A.   I wouldn't be surprised.  Many successful
8  people have obsessive traits.
9      Q.   Those obsessive traits only become a
10 problem or a disorder if they become focused on
11 something unhealthy.?
12         MR. ROBERTS:  Objection.
13     Q.   To the point of intrusion --
14         MR. ROBERTS:  Objection.
15     Q.   -- in daily activity; is that right?
16         MR. ROBERTS:  Objection.
17     A.   Obsessive traits, per se, are not a
18 disorder.  In order to talk about a disorder you
19 have to talk about constellations of symptoms that
20 go together in certain ways.
21     Q.   Do people --
22     A.   But I agree with you that traits are not
23 a disorder.
24     Q.   Right.  And people with obsessive traits

95

1  seeks diagnoses and opinions from doctors all over
2  the world, is that focus evidence to you of a
3  potential underlying psychological disorder?
4           MR. ROBERTS:  Objection.  Misstates
5  facts.
6       A.   I'm very uncomfortable talking about
7  potential disorders without evaluating the patient.
8       Q.   I understand.  My question is generic.
9  If someone exhibits these behaviors, and if these
10 behaviors stem from a focus, and that focus and
11 these behaviors interfere with his normal, daily
12 existence, normal daily living, his occupation, his
13 social life, whatever, is that evidence that a
14 clinician would look to in evaluating whether or
15 not there's an underlying psychological problem?
16          MR. ROBERTS:  Objection.
17      A.   I think if there's that degree of
18 preoccupation and it indeed keeps people from doing
19 other things, that that is definitely noteworthy
20 and unusual.
21      Q.   The actual evidence of whether or not
22 that occurred in Mr. Jeffries' case has not been
23 presented to you; correct?
24          MR. ROBERTS:  Objection.