1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF OHIO

3              WESTERN DIVISION

4

5

6  ERIC L. JEFFRIES,                    )

7          Plaintiff,                   )
                                        )   CASE NO.
8          vs.                          )   C-1-02-351
                                        )
9  CENTRE LIFE INSURANCE CO.,           )
   et al.,                              )
10                                      )
           Defendants.                  )
11                                      )

12

13

14  Deposition of:    NEWTON H. BULLARD, M.D.

15  Pursuant to:      Subpoena and Notice

16  Date and Time:    Friday, April 18, 2003
                      2:40 p.m.
17
    Place:            Graydon, Head & Ritchey
18                    511 Walnut Street
                      1900 Fifth Third Center
19                    Cincinnati, Ohio  45202

20  Reporter:         Patti Stachler, RMR, CRR
                      Notary Public - State of Ohio
21

22

23

24

25

                                                              1

---

1  APPEARANCES OF COUNSEL:

2

3      For the plaintiff:

4          Michael A. Roberts, Esq.
              of
5          Graydon, Head & Ritchey, LLP
           1900 Fifth Third Center
           511 Walnut Street
6          Cincinnati, Ohio  45202
           513.621.6464
7
              and
8
           Clifford J. Shoemaker, Esq.
9              of
           Shoemaker & Associates   (via telephone)
10         9711 Meadowlark Road
           Vienna, Virginia  22182
11         703.281.6395

12

13     For the defendants:

14         William R. Ellis, Esq.
              of
15         Wood & Lamping, LLP
           600 Vine Street
16         Suite 2500
           Cincinnati, Ohio  45202
17         513.852.6000

18                   - - -

19

20

21

22

23

24

25

COPY

                                                              2

---

1                  I N D E X

2

3  NEWTON H. BULLARD, M.D.                       PAGE

4      EXAMINATION BY MR. ROBERTS                  4
       EXAMINATION BY MR. SHOEMAKER               51
5      FURTHER EXAMINATION BY MR. ROBERTS         57

6

7  EXHIBITS                          MARKED    REFERENCED

8      PLAINTIFF'S EXHIBIT 70          21         22
       PLAINTIFF'S EXHIBIT 71          34         34
9      PLAINTIFF'S EXHIBIT 72          35         35
       PLAINTIFF'S EXHIBIT 73          61         61
10     PLAINTIFF'S EXHIBIT 74          63         63

11

12                   - - -

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                              3

---

1                NEWTON H. BULLARD, M.D.

2  a witness herein, having been duly sworn, was examined

3  and deposed as follows:

4                     EXAMINATION

5  BY MR. ROBERTS:

6      Q.   Good afternoon, Dr. Bullard.  I can refer to

7  you as Dr. Bullard, Newton, Skip.  How would you like

8  for me to refer to you this afternoon?

9      A.   Whichever way is easier for you.

10     Q.   Okay.  My name is Mike Roberts.  I'm a lawyer

11  at the law firm of Graydon, Head & Ritchey.  I

12  represent the plaintiff, Eric Jeffries, in this

13  lawsuit.  And you've been asked to perform an

14  examination of Mr. Jeffries and I'd like to go through

15  that with you today.

16          MR. ROBERTS:  First, let's go off the record

17  for a second.

18          (Off the record.)

19  BY MR. ROBERTS:

20     Q.   Dr. Bullard, could you kindly share with me

21  your business address?

22     A.   47 East Hollister Street, Cincinnati, Ohio,

23  45219.

24     Q.   And what is your profession?

25     A.   I am a physician practicing internal

                                                              4

1    was?

2         (The record was read.)

3    A.   I do not believe he has a physical impairment

4    which would prevent him from performing his former

5    occupation.

6    BY MR. ROBERTS:

7    Q.   Have you discussed the nature of

8    Mr. Jeffries' insurance policy with Mr. Ellis or

9    Mr. Burrell?

10    A.   Only in a general term.

11    Q.   What general term?

12    A.   That he had a disability policy that -- this

13    occurred during the second -- or the meeting that we

14    had, the only meeting that we had, at which time they

15    expressed a desire for me to examine the patient and

16    give them an honest assessment of what the individual's

17    problem was, whether or not he had physical illness or

18    not.  And they indicated that there was a disability

19    policy that they were apparently the defenders of or

20    they were representing the insurance company that had

21    the disability policy, but there were -- they weren't

22    particularly specific, and I'm not even sure that

23    that's, in fact, the -- what they are -- what their

24    position is.

25         My understanding is that your position is in

37

1    defense of -- or for Mr. Jeffries and their position is

2    in contrast to that.

3    Q.   Did they share with you any specific

4    provisions of the insurance policy or discuss any

5    provisions of the insurance policy with you?

6    A.   No, they did not.

7    Q.   I don't mean by section number.  I mean

8    generally.

9    A.   And I understand that.  As they indicated,

10    they wanted, you know, an honest global assessment of

11    the individual's situation.

12    Q.   Okay.  Did you have an opinion prior to

13    actually seeing Mr. Jeffries?

14    A.   With respect to his physical condition,

15    yes.

16    Q.   What was your opinion prior to seeing

17    Mr. Jeffries?

18    A.   My opinion prior to seeing him was based on

19    the observations of the 15 or 20 physicians and their

20    records as they detailed their physical exam of the

21    patient.  Throughout those records, there appeared to

22    be a number of comments that there were no objective

23    findings in terms of a physical abnormality.

24         As such, it was my opinion that when I saw

25    the patient it would be unlikely that I would discover

38

1    something new.

2    Q.   So what was your opinion before actually

3    seeing Mr. Jeffries?

4    A.   What opinion are you requesting?

5    Q.   Did you have an opinion about Mr. Jeffries'

6    health prior to actually seeing him based on your

7    review of the records and your meeting with Mr. Ellis

8    and Mr. Burrell?

9    A.   My opinion was that I would be unlikely to

10    find a physical abnormality on examining the exam.

11    Q.   Did you have an opinion that he did not

12    suffer from some physical abnormality that made him

13    disabled?

14    A.   No.  My opinion was that he had been seen by

15    repeated competent and otherwise physicians and that

16    multiple physical examinations had been performed.  My

17    opinion was that my physical examination would be

18    unlikely to find some new finding.

19    Q.   Some objective finding?

20    A.   Correct.

21    Q.   Okay.  So is it your testimony that you did

22    not have the opinion prior to seeing Mr. Jeffries that

23    he was not physically disabled from performing his

24    job?

25    A.   No.  I reserved the right to make that

39

1    comment until I had actually seen the patient.

2    Q.   Was it your judgment that that might be your

3    finding before actually seeing Mr. Jeffries?

4    A.   I would phrase that as my expert opinion

5    based on looking at the other exams.

6    Q.   Okay.  What you suspected your findings may

7    be from seeing Mr. Jeffries turned out to be what they

8    were after seeing Mr. Jeffries?  Let me ask you a

9    different question.

10         You reviewed the records and it's your

11    conclusion that -- at least you didn't ascertain from

12    those records any objective evidence of some physical

13    abnormality.  Is that accurate?

14    A.   I witnessed a very unusual gait on the part

15    of the patient, which --

16    Q.   I'm not talking about your observations of

17    Mr. Jeffries yet.  I want to understand what your

18    opinions were, your judgments were prior to actually

19    seeing him, okay?

20         Based on simply review of the medical

21    records, do I understand correctly that it was your

22    conclusion that there wasn't any objective evidence of

23    a physical abnormality in the records; is that right?

24    A.   My response to that would be that I hadn't

25    entered the framework of making any conclusion.  That

40

1 that would be at cross purposes to my role in the case,
2 which was to be a relatively unbiased general
3 examination of the patient. I had formed an opinion
4 but certainly no conclusion.
5    Q.   Okay. That's what I'm getting to. What
6 opinion did you form prior to actually seeing
7 Mr. Jeffries?
8    A.   As I had earlier stated, I formed the opinion
9 that I would be unlikely to find something new
10 physically on my examination of the patient.
11    Q.   Okay. But that's different than what your
12 opinion might be of this patient's abnormality or
13 health. You're expressing opinion about what success
14 you might have in finding something that other doctors
15 didn't. What I want to know is different.
16       I want to know what opinions you took away
17 from the records you reviewed as a medical doctor.
18 What opinions did you take away from those records, if
19 any? Not whether you had the opinion of whether you'd
20 be successful in uncovering something that others
21 didn't. Do you understand?
22    A.   Uh-huh. I honestly had not formed an opinion
23 as to the issue that you're asking.
24    Q.   Okay.
25    A.   Which was --

41

1    Q.   So based on your review of the medical
2 records prior to seeing Mr. Jeffries, you did not have
3 an opinion about whether he had a physical disability
4 or not? That was something that you didn't arrive at
5 until actually performing a physical exam?
6    A.   That's correct.
7    Q.   Okay. Did you learn something in the
8 physical exam that leads you to have the opinion that
9 he has no physical disability?
10    A.   Absolutely.
11    Q.   Okay. Could you share that with me?
12    A.   The general examination of a patient is a
13 global integration for a practicing physician of the
14 physical examination, the way the patient speaks,
15 talks, walks, their demeanor. And as such, there are
16 specific physical features; for example, that the
17 patient has an amputation. But the entire individual
18 and how they present and manifest themselves really is
19 what I took away from that examination.
20    Q.   What did you observe, what findings did you
21 make during the actual examination that led you to
22 render an opinion that he has no physical disability
23 that you couldn't glean from your records?
24    A.   I was not able to detect any objective
25 physical impairment on my examination of the patient.

42

1    Q.   Okay. Is it because you concluded that
2 there's no objective impairment or no evidence of an
3 objective impairment that you conclude that he has no
4 physical disability?
5    A.   I concluded that I could not define a
6 physical disability based on my exam.
7    Q.   Okay.
8    A.   And it was my opinion that he did not then
9 have one.
10    Q.   Okay. Are there any illnesses that are
11 recognized for which there are no objective medical
12 findings a physician such as you can actually make?
13    A.   Yes.
14    Q.   So do I understand that you conclude that
15 Mr. Jeffries doesn't have a physical disability because
16 you couldn't find any objective medical evidence of
17 one, but you would concede that there are some physical
18 disabilities that exist for which there is no objective
19 medical evidence?
20    A.   Given the information that was supplied to me
21 prior to the physical examination, which reviewed
22 countless diagnostic studies, scans and other
23 information, coupled with my physical exam, I felt
24 reasonably comfortable in saying that I felt that if
25 Mr. Jeffries had a problem, that it was not a physical

43

1 one.
2    Q.   Okay. What are some illnesses for which
3 there are no objective medical findings that a
4 physician such as you can detect?
5    A.   Virtually every mental illness has no
6 objective physical finding. So the entire gamut of
7 mental illness is without physical abnormality.
8    Q.   Okay. Anything else?
9    A.   There are hundreds of transient illnesses
10 that manifest themselves for which there is no
11 residual, so that an examination will not find or
12 discover that issue.
13    Q.   What do you mean by transient?
14    A.   A syncopal episode, heart stoppage. The
15 patient presents for an evaluation of that. During
16 your exam you can find no evidence of any abnormality,
17 but clearly something happened at some other time.
18    Q.   Are there any chronic ill -- non-mental
19 illnesses for which there is no objective medical
20 evidence?
21    A.   There are a number of illnesses -- not a
22 number -- a fairly small number of illnesses about
23 which there is some contention in the medical
24 literature as to whether or not they exist and, if that
25 is the case, if they do exist, how do we quantify them.

44

1  How do you -- do they have a name, are they different
2  manifestations of similar diseases or situations such
3  as that.
   Q.  What are some of those illnesses?
5  A.  Well, an example might be fibromyalgia.
6  Q.  Okay.
7  A.  However, that disorder has specific
8  subjective physical findings that are supposed to be a
9  manifestation of the diagnosis and of the disease, and
10 as a consequence, the diagnosis can then be
11 entertained.
12 Q.  Anything else?
13 A.  Nothing comes to mind.
14 Q.  What about chronic fatigue syndrome?
15 A.  That may be a similar disorder.  They're
16 frequently associated with one another.  There are any
17 number of Web sites or focus interest groups that
18 generally link both of those disorders together so that
19 people that have one may frequently have the other.
20 And so there seems to be an association between the
21 two.  Or overlap.
22 Q.  What about MS?
23 A.  MS is clearly a medical condition which,
24 although it may have transient findings, has objective
25 abnormalities that can be seen.
                                                    45

1  Q.  Did you discuss whether or not there was
2  objective medical evidence when you spoke to
3  Mr. Burrell and Mr. Ellis?  Did you discuss the topic
4  of objective medical evidence and whether it existed or
5  not when you had the discussion with Mr. Burrell and
6  Mr. Ellis?
7  A.  I -- they had provided me with information.
8  I had reviewed the information.  It was my opinion in
9  looking at it that the evidence was very tenuous at
10 best.
11 Q.  I don't understand.
12 A.  There are very few tests in medicine that are
13 entirely black or white.  The vast majority of studies
14 that are performed on patients have some range of
15 normal.  Almost by definition, a blood test will have a
16 normal range and an abnormal range.
17      I had looked at all of the studies on
18 Mr. Jeffries and really did not feel that there was a
19 consistent pattern of abnormality that suggested a
20 truly abnormal condition.
21 Q.  My question was, did you discuss with
22 Mr. Burrell and Mr. Ellis whether there existed or
23 whether there was an absence of objective medical
24 evidence?  Did the topic of objective medical evidence,
25 was it discussed at your meeting with Mr. Ellis and
                                                    46

1  Mr. Burrell?
2  A.  I discussed the medical evidence with them in
3  the same general way that I responded to your
4  question.
5  Q.  Okay.
6  A.  In other words, I said that I didn't find a
7  pattern throughout the information that I saw that
8  appeared to be consistent.  Individual items were never
9  reviewed, discussed or commented.
10 Q.  Did they ask you whether you believed there
11 was any objective medical evidence or whether you
12 believed there wasn't objective medical evidence?
13 A.  No.
14 Q.  Did you suggest to them that you didn't find
15 any objective medical evidence?
16 A.  I suggested to them exactly what I responded
17 to you with, which was that there didn't seem to be a
18 consistent pattern in the evidence that I had been
19 presented.
20 Q.  Okay.  So after examining Mr. Jeffries, you
21 rendered the conclusion that, in your judgment, there
22 is no objective medical evidence of a physical
23 disability.  You, therefore, conclude if he's disabled,
24 it's because of a mental disorder; is that correct?
25 A.  It was my opinion that in the absence of a
                                                    47

1  physical disability, if the individual was, in fact,
2  disabled, that it would be then from a mental
3  disorder.
4  Q.  But a physical disability, you told me
5  earlier, can exist even in the absence of objective
6  medical evidence; isn't that right?
7  A.  I believe the question was, are there
8  diseases associated with the absence of objective
9  medical evidence.
10 Q.  Okay.  Well, let me ask another question,
11 then, so we're clear.  Is it possible to have a
12 physical disability which is not manifest by objective
13 medical evidence?
14 A.  I would like to respond to that in two ways,
15 with two things.  One, a physical disability in and of
16 its definition implies, in my mind, something I can
17 measure, look at, you know, assess.  And so my response
18 to that would be no.
19      There are any number of disabling conditions
20 associated with all of the disease processes that we
21 previously mentioned that don't have physically
22 measurable disabilities.
23 Q.  Is that your answer?
24 A.  Yes.
25 Q.  So I understand where you are, it's your
                                                    48

1 judgment that if there's no objective medical evidence,
2 a person cannot be suffering from a physical
3 disability. If they're suffering at all, it's from a
4 mental disorder?
5     A.  I did not feel in Mr. Jeffries' situation
6 that there was evidence of a physical disability at the
7 time of my examination.
8     Q.  And you get to that conclusion because it's
9 your judgment that there's no objective medical
10 evidence of one?
11     A.  I did not find objective medical evidence in
12 Mr. Jeffries' situation to confirm a disabling physical
13 condition.
14     Q.  Okay.
15     MR. SHOEMAKER:  Mike, this is Cliff.  I'm
16     going to have to go to a meeting, but would any of
17     you object if I just asked a few questions before
18     I leave?  I'm going to be moving my mission pro
19     hoc vici in the case and while that's not
20     accomplished yet, I can either ask the question
21     and Mike can repeat it or I can just ask it
22     straight, if no one has any objection.
23     MR. ELLIS:  Are you saying you'd like to talk
24     to Mike and give him some questions to ask before
25     you leave?
                                                    49

1     MR. SHOEMAKER:  Well, it would simply be
2     quicker if I just asked the question of the
3     doctor.  I only have a few questions.  If you have
4     no objection.
5     MR. ELLIS:  Well, I generally do object to
6     double-teaming a witness.
7     MR. SHOEMAKER:  Well, then, let me -- I'll
8     just ask the question of Mike and he can repeat it
9     to the doctor.
10     Mike, can you ask the doctor whether he feels
11     there is a condition known as myalgic
12     encephalomyelitis or chronic fatigue syndrome?
13     MR. ROBERTS:  Just go ahead and repeat it.
14     Could you read that question back to the
15     witness?
16     (The record was read.)
17     A.  There are very large numbers of studies and
18 any number of patients who have been purported to have
19 chronic fatigue syndrome.  It is a recognized
20 diagnosis.
21     MR. SHOEMAKER:  Is that a physical diagnosis
22     or a mental diagnosis?
23     MR. ROBERTS:  Bill, do you want her to read
24     it back?
25     MR. ELLIS:  Just go ahead.  You're going to
                                                    50

1     double-team him anyway.  Just do it, get it over
2     with.
3     A.  That is a diagnosis based on specific
4 objective physical findings.
5                    EXAMINATION
6 BY MR. SHOEMAKER:
7     Q.  Are you familiar with the 1994 CVC
8 criteria?
9     A.  I do not have those criteria in front of
10 me.
11     Q.  Have you reviewed this case to see whether or
12 not Mr. Jeffries fits those criteria?
13     A.  I examined Mr. Jeffries in order to perform
14 an examination looking at his global functioning and
15 whether or not I felt that he had a physically
16 disabling condition.
17     Q.  With regard to his condition, the
18 arthralgias, are those caused by a physical, mental, or
19 does he just not have them?
20     A.  Arthralgias are, by definition, a symptom
21 originating from the joint causing joint discomfort.
22 Depending on your definition of the term, there may or
23 may not be associated physical findings.
24     Q.  I'm just talking about Mr. Jeffries' case.
25 Do you think his arthralgias -- he did complain of
                                                    51

1 arthralgia; is that correct?
2     A.  That is correct.
3     Q.  In your opinion, are his arthralgias mentally
4 caused, are they functional arthralgias?
5     A.  I could find no evidence of objective
6 arthritis on an examination of the patient.
7     Q.  That wasn't my question.  Are his
8 arthralgias, in your opinion, related to some mental
9 problem?
10     A.  The patient reported arthralgias.  I did not
11 find evidence of arthritis.
12     Q.  I understand.  I'm just asking you --
13     MR. ELLIS:  Excuse me.  Let him finish his
14     answer.
15     MR. SHOEMAKER:  Sure.
16     A.  I made no opinion as to the source of his
17 subjective complaint.
18     Q.  Okay.  So you have no opinion as to whether
19 or not the arthralgias are caused by a physical
20 problem, a mental problem or anything else, or they
21 just could be made up?  He's just saying it and he
22 doesn't really have them?
23     A.  The patient reported a subjective symptom for
24 which I could find no objective evidence.
25     Q.  Is the same true of the myalgias?
                                                    52

1    A.    Yes.

2    Q.    Is the same true of any of the pains that
3 he's experienced or the tingling or
4 anesthesia-like numbness?

5    A.    I was unable to document a physical
6 abnormality that coincided with his subjective
7 complaints.

8    Q.    And is the same thing true of the fatigue
9 that he experiences?

10    A.    As there is no objective measure of fatigue
11 that I am aware of, I was unable to measure that or
12 certainly verify its presence.

13    Q.    Did you verify any abnormalities of blood
14 pressure as it's going from lying to standing, things
15 like that, or did you perform any such tests?

16    A.    I don't recall at this time.

17    Q.    Did you perform any test that looked at his
18 brain activity, CAT scan, spec scans, anything of that
19 sort?

20    A.    I was given information from previous studies
21 that had been performed on the patient.

22    Q.    Did you review those films?

23    A.    I reviewed reports on those films.

24    Q.    Did you perform any EMG or nerve conduction
25 velocities?

53

1    A.    I believe my response to you previously was
2 that I did not verify at the time of my personal
3 physical examination objective findings. I did not
4 order, perform or in any other way obtain additional
5 testing on this patient.

6    Q.    You mentioned in your report wide-based gait.
7 What was the significance of that? Why did you make
8 that notation?

9    A.    It appeared rather peculiar.

10    Q.    Do you have any opinion as to what causes
11 that?

12    A.    There are hundreds of different medical
13 conditions that may be associated with a wide-based
14 gait.

15    Q.    Did you perform an opinion in Mr. Jeffries'
16 case, having reviewed his medical records, as to the
17 cause of his wide-based gait?

18    A.    I could detect no neurologic impairment. I
19 could detect no reason based on my examination of the
20 patient for his peculiar gait.

21    Q.    Did you review the neuropsychological
22 testing?

23    A.    I looked briefly at several of the
24 neuropsychological tests.

25    Q.    Did you form any opinion on the basis of

54

1 that?

2    A.    I did not consider myself to be an expert,
3 nor did I consider that I was retained to independently
4 verify or review that information.

5    Q.    How many patients have you treated with
6 chronic fatigue syndrome?

7    A.    In the course of 25 years of medical practice
8 and 200,000 office visits, any number.

9    Q.    Do you have an estimation? Hundreds,
10 thousands, dozens?

11    A.    Dozens.

12    Q.    20 years, you've seen maybe one or two a
13 year?

14    A.    I would recall for you that the diagnosis was
15 only really entertained in the mid '90s and that the
16 first 12 to 15 years of my practice, patients did not
17 have this as an available resource or diagnosis.

18    Q.    So you're saying prior to the 1990s, there
19 was no such diagnosis?

20    A.    I believe that the diagnosis existed,
21 although there was no systematic or defined criteria
22 set for that. It may have been labeled as other
23 conditions.

24    Q.    Do you have an opinion as to whether or not
25 Mr. Jeffries experienced an adverse reaction to the

55

1 hepatitis B vaccination he received?

2    A.    No.

3    Q.    Have you reviewed the reports of various
4 experts -- have you reviewed the report of Dr. Charles
5 Poser?

6    A.    Was Dr. Poser the physician from Canada?

7    Q.    Dr. Hyde. You reviewed Dr. Hyde's
8 materials?

9    A.    I looked briefly at his materials.

10    Q.    Do you consider Dr. Hyde an expert in chronic
11 fatigue syndrome?

12    A.    Dr. Hyde purports to be an expert in chronic
13 fatigue syndrome.

14    Q.    Have you reviewed his textbook?

15    A.    No.

16    Q.    What other experts -- you mentioned other
17 people that had found negative findings or had found
18 that they thought this was due to some mental problem.
19 Who are you referring to there?

20    A.    I don't believe I made those comments. What
21 I said was, that in the examinations that were reported
22 in the data that I reviewed, that no objective findings
23 appeared to be present.

24    Q.    Do you know Dr. McClellan?

25    A.    Very well.

56

1    Q.  Do you consider him a well-respected doctor
2 in your community?
3    A.  I assisted in his training.
     Q.  You would consider him a well-respected
5 doctor in this area, your area?
6    A.  Absolutely.
7        MR. SHOEMAKER: Mike, I'm going to have to
8    take off.  I appreciate being allowed to
9    participate, gentlemen.
10       MR. ROBERTS: Thanks, Cliff.  Have a nice
11   weekend.
12       MR. SHOEMAKER: You have a great day.
13       MR. ROBERTS: Bye-bye.
14             FURTHER EXAMINATION
15 BY MR. ROBERTS:
16   Q.  Have you read Dr. McClellan's reports
17 concerning Mr. Jeffries?
18   A.  No.
19   Q.  Have you spoken to him about Mr. Jeffries?
20   A.  No.  Not that -- I don't think so.  I mean, I
21 see him periodically in the hospital as part of just in
22 the normal activities that I -- you know, we both go to
23 the same hospital.
24   Q.  But you didn't review his affidavit or his
25 records relating to Mr. Jeffries?

                                                     57

1    A.  No, I have not looked at his affidavit.
2        MR. ELLIS: I don't know if I've looked at
3    his affidavit.  Does he have an affidavit?
4    Q.  Have you reviewed Dr. Poser's report?
5 Dr. Poser is the gentleman at Harvard Medical School.
6    A.  If that was supplied in the information given
7 to me, I have looked at it.
8    Q.  You don't have a memory sitting here today
9 of --
10   A.  I don't have a memory of the various
11 physicians and which report was associated with which
12 person's opinion.
13   Q.  Have you spoken to Dr. Hardings at all
14 relating to Mr. Jeffries?
15   A.  No.
16   Q.  Have you seen any documents or information
17 from him?
18   A.  I saw something today prior to coming here.
19   Q.  You saw his 10 or 15-page report?
20   A.  I just -- I looked at the summary on his
21 report.
22   Q.  But you haven't spoken to him directly
23 regarding Mr. Jeffries?
24   A.  That's correct.
25   Q.  Has Mr. Ellis or Mr. Burrell shared with you

                                                     58

1 Dr. Hardings' involvement in this case prior to
2 today?
3    A.  No.
4    Q.  Do you know Dr. Luggen?
5    A.  Yes.
6    Q.  What's his opinion -- what's his reputation
7 in the community?
8    A.  Michael is a rheumatologist.
9    Q.  Does he have a -- does he enjoy a good
10 reputation in the community or not?
11   A.  I'm unaware of any -- anything other than
12 glowing recommendations for Dr. Luggen.
13   Q.  How about Dr. Dunn, do you know who he is?
14   A.  I know him very well.
15   Q.  Does he enjoy a good reputation in the
16 community?
17   A.  Yes, he does.
18   Q.  Have you spoken to Dr. Luggen or Dr. Dunn
19 regarding Mr. Jeffries?
20   A.  Absolutely not.
21   Q.  Have you reviewed their records and
22 affidavits concerning Mr. Jeffries?
23   A.  I do not recall that.  Let me change that
24 response.  I have a recollection of seeing something
25 from Dr. Luggen in the materials supplied to me.  I

                                                     59

1 don't recall anything from Dr. Dunn.
2    Q.  Have you treated any patients that have
3 suffered adverse reactions to vaccines?
4    A.  Yes.
5    Q.  On how many occasions?
6    A.  I cannot respond to that.
7    Q.  What vaccine was it?
8    A.  Influenza.
9    Q.  And how many -- you can't give me an estimate
10 of how many occasions that's occurred in your
11 practice?
12   A.  From the course of the average influenza
13 immunization in my office where 500 injections are
14 given, probably 10 to 15 percent will complain that
15 they got the flu afterwards.
16   Q.  Do you administer hepatitis vaccines in your
17 office?
18   A.  Yes.
19   Q.  Have any of your patients suffered an adverse
20 reaction to hepatitis vaccine?
21   A.  Not to my knowledge.
22   Q.  Have you read any literature that hepatitis
23 does trigger adverse reactions -- the hepatitis
24 vaccine?
25   A.  I believe it is well recognized that that has

                                                     60

1  occurred.

2     Q.   Do you know what the symptoms are of someone

3  that experiences that condition?

4     A.   I believe that the symptoms vary depending on

5  what the particular adverse condition is.

6     Q.   Do Mr. Jeffries' symptoms contrast the

7  symptoms that occur?

8     A.   The symptoms of an adverse reaction to a

9  vaccine are remarkably similar to any number of

10  ordinary illnesses.  The symptoms that I noted in the

11  information that I had been given might have been

12  secondary to the vaccine or an illness which was

13  concurrent.

14           (Plaintiff's Exhibit 73 was marked for

15             identification.)

16     Q.   Doctor, I'm handing you Exhibit 73.  Could

17  you tell me what that is?

18     A.   This is a -- or appears to be a print of the

19  patient's office record from my office.

20     Q.   When did you prepare this?

21     A.   Sometime after the 7th of February.

22     Q.   It wasn't produced to me until mid-March.  Is

23  there a reason why it took six weeks to prepare this

24  three-page report?

25     A.   The majority of that was delay on my part.

                                              61

1  As soon as I had completed this, I sent this to

2  Mr. Burrell.

3     Q.   Okay.  Do you have any handwritten notes that

4  you worked up this report from?

5     A.   No.  Not that I'm aware of.

6     Q.   So you prepared the report from memory

7  several weeks after seeing Mr. Jeffries?

8     A.   No.  I might have -- we use a documentation

9  system that uses voice recognition technology and so I

10  probably dictated some notes that then are overdictated

11  at the time the final opinion comes out.

12           So, in other words, in this document you

13  dictate something and then you go back and enhance it,

14  and as you enhance it, you dictate over what the

15  original was.

16     Q.   So did you dictate notes at or about February

17  7th?

18     A.   Oh, absolutely.

19     Q.   During the course of the exam were you

20  dictating your notes?

21     A.   No.

22     Q.   Was it after Mr. Jeffries left that day that

23  you dictated your notes?

24     A.   Within -- exams are generally dictated within

25  24 hours.

                                              62

1     Q.   And then it was six weeks later that you

2  edified those dictated notes?

3     A.   No.  The memo notes, the short note would be

4  dictated within 24 hours.  The finished report would be

5  dictated when I got around to it.

6     Q.   Okay.  Is that original dictated notes -- do

7  those exist somewhere?

8     A.   No.  Those would have been dictated over in

9  the process of doing this.

10           (Plaintiff's Exhibit 74 was marked for

11             identification.)

12     Q.   I've marked as Exhibit 74 another single-page

13  document you produced to me.  Could you share with me

14  what that is?

15     A.   That is a -- an additional part of the

16  computerized print of the patient.

17     Q.   What does that mean?

18     A.   The system that we use in the office will

19  print the patient's chief complaint, a diagnosis and

20  medications for inclusion in their records.

21     Q.   Do you have an opinion in this Exhibit 73 as

22  to whether or not Mr. Jeffries suffers from a physical

23  disability or not?  Is it in there somewhere?

24     A.   The encounter assessment and plan is really

25  the -- it's not a legal opinion to the extent of that.

                                              63

1  And what I indicated was that additional

2  neurodiagnostic testing is probably warranted based on

3  the peculiar nature of his symptoms.

4     Q.   You don't have the expertise to render an

5  opinion that Mr. Jeffries suffers from a mental

6  disorder, do you?

7     A.   I have never professed that I did.

8     Q.   Okay.  So you can't offer up that opinion

9  that he suffers from a medical -- or a mental

10  disorder?

11     A.   That is correct.

12     Q.   Okay.  So I understand correctly, the basis

13  for your opinion that Mr. Jeffries doesn't have a

14  physical disability is your conclusion that there's no

15  objective medical evidence of one?

16     A.   Based on my examination of the patient,

17  review of the information provided to me, it was my

18  opinion that I could not find an objective physical

19  disabling condition.

20     Q.   Okay.  You produced a pretty good volume of

21  records for me.

22     A.   Sorry.

23     Q.   That's okay.  By the way, do you have

24  documentation of your invoice to the Ellis-Burrell

25  firm?

                                              64