March 15, 2003


Attorney Peter Burrell
Wood & Lamping, L. L. P.
600 Vine Street, Suite 2500
Cincinnati, OH 45202

**Re:  IME (Neuropsychological) of Eric Jeffries**
DoB:  05-15-1961

Dear Attorney Burrell:

It was my opportunity to conduct a neuropsychological IME on Eric Jeffries in response to your request.  This examination commenced on 07-08-2002, with a subsequent appointment on 07-12-2002.  Because medical records were not received in their entirety prior to those dates, Mr. Jeffries returned for further tests on 02-06-2003.  Prior to the interview, testing, or review of records of Mr. Jeffries, the non-confidential nature of this evaluation was reviewed with him.  It was pointed out that I would not be offering him direct treatment.   It was pointed out that confidentiality is modified in this circumstance in order to permit me to render a report of my findings to your office.  Mr. Jeffries indicated an understanding of these circumstances and agreed to proceed.   This IME is requested in order to clarify his psychological and neuropsychological status, following a claim for disability ensuing from what the claimant believes was an autoimmune reaction to receiving hepatitis vaccinations in the summer of 1997.  Since that time, he claims to have suffered a repetitive cycle of mental and physical symptoms which has progressively disabled him from working as an investment banker.

RE:  Eric Jeffries
DATE:  03-15-2003
PAGE:  2

This evaluation consisted of an extended interviews with Mr. Jeffries on three occasions, and administration scoring and interpretation of the following neuropsychological instruments:  The Wechsler Abbreviated Scale of Intelligence, the National Adult Reading Test – Revised, the Controlled Word Association, Animal Fluency Test, the Denman Neuropsychological Memory Test, the Warrington Recognition Memory Test, the Memory Assessment Scales, Facial Recognition Test from the Wechsler Memory Scale – III, the Seashore Rhythm Test, Serial Digit Learning Test, Trail Making Test, the Attention Diagnostic Method, the Booklet Category Test, the Stroop Color-Word Test, the Finger Tapping Test, the Lafayette Grooved Pegboard, the Millon Clinical Multiaxial Inventory – III, the MMPI - 2, Rorschach's Test.  WAIS-III, Mental Processing Speed, Arithmetic Subtest. There were also voluminous medical records reviewed.

**Behavioral Observations:**  Mr. Jeffries appears as a large, robust, articulate man of his stated age with no noticeable physical abnormalities.  He is alert, oriented, attentive, and cooperative.  Hs speech is fluent and his thinking is goal directed, particularly focused upon communicating the history and details of his symptoms. His thought processes are highly nuanced in discussing this. During the administration of tests, his demeanor and approach to items was frequently tentative and over-wrought.  He displayed repeated over-thinking of simple items and over-analysis of simple instructions.  He often placed his own meaning or interpretation on such instructions, which lead him to anguish over simple responses.  Some examples of this are as follows:

- On the WRMT, the patient is asked to look at a series of photographs of men's faces, and to report whether the pictured individual looks "pleasant or unpleasant."  He rejected this: "It is unfair of you to ask me to judge these people just by looking at them."  In was explained that he was not being asked to make moral judgments, only report impressions.  He fretted about how he might make this decision, and finally said "I will decide on the basis of whether they're smiling."  Soon after, he was shown a photograph where he said, "He's smiling on one side and not on the other."  This threw him again into a quandary.  Later, when asked to pick out the faces he had previously seen, he said, "I have no idea.  I was looking at the mouths, not the faces."
- A similar thinking style appear on the MMPI-2, after instructions were explained to him in the usual manner.  To the first item  *I like mechanics magazines*, he queried "What is a mechanics magazine?"  He noted, "I don't subscribe to any."  After more discussion, he noted, "I don't *dislike* them."  He then worried, "It will take me forever to do this."  He predicted that "I know what'll happen -- they will look at one answer and then at another question back here and then they will see if I answered it differently."  It was only after extended reassurances and encouragement that "this is not a philosophical debate," and "the test is not designed to be nit-picking," that Mr. Jeffries began to engage the test items. He expressed concern that this and other tests were there to "trick him."
- He often used dramatic, concrete language to describe his symptoms:  "They beat me up at night.  I have crispy skin, electric shocks like Morse code on my tongue.  I am eaten up from the inside like a meat grinder."

**Background:**  Mr. Jeffries provides the following information.  He was born and raised as the younger of two full siblings and his parents divorced when he was three years of age.  He was subsequently raised by his father who "tried to keep the family as normal as possible."  He attended high school and graduated from the University of Mississippi with a degree of accounting

RE:  Eric Jeffries
DATE:  03-15-2003
PAGE:  3

and finance.  He later went on to complete a master's degree in philosophy at the University of Cambridge, England.  His father remarried when the patient was 6 years of age.  Mr. Jeffries denied any prior history of serious illness, hospitalization or surgery.  He denied a history of alcohol abuse, drug abuse, or tobaccoism.  He denied any childhood history of abuse, abandonment or other such trouble.  He denied any legal history.  He denied any prior history of psychological or psychiatric illness or treatment.  He stated that one year ago, he saw a psychiatrist "to be sure I wasn't crazy -- he said I was completely fine."  As a child, he suffered from Rocky Mountain Spotted Fever from which he completely recovered.  In a motor vehicle accident at age 16, he suffered several fractures from which he completely recovered.  He had a thyroidectomy for thyroid cancer, which he believes was a sequela of the autoimmune disease resulting from his inoculations.  He currently is medicated with Neurontin and Levoxyl and a thyroid supplement.  He reports his current weight at 270 pounds and height at 6 feet 4 inches tall.  He has been married for 16 years to his wife, Sue and they have two children ages 8 and 6.  They are reported to be in good health.

His father, Kenneth, worked as an engineer and was employed at the regional transit authority at Atlanta, Georgia.  He retired in his 40's on medical disability subsequent to Ascher's Syndrome II, resulting in hearing and vision loss.  Mr. Jeffries states that his sister has an autoimmune disease, systemic lupus erythematosus and that a half brother has the same condition as his father resulting in blindness.

Mr. Jeffries reports that he was employed in the banking industry in supervision, management, and capital investment.  He worked for the Provident Bank Corporation.  He was an investment banker at the time of the immunizations in 1997.  He left the Provident Bank in 1998 due to that illness.  He describes his former style as "very driven, very entrepreneurial, with a passion for growing businesses.  I worked a lot, I was amazed how much I was paid, I was fortunate to have a stable and steady marriage."  He describes that his home life is "great.  I am very fortunate man.  My relationship to my wife has been unchanged.  She is amazing and supportive.  This has not affected our sex or affectionate life.  You just adapt.  She is great."

Mr. Jeffries describes the onset of his illness as follows.  In summer of 1997, he received two vaccinations within one week.  He believes he then developed "an autoimmune disorder."  Within one week, he witnessed rashes and sweats, and was told that he was experiencing a serum sickness reaction.  This eventually improved.  However, it returned in cycles, which became more progressive.  "Each cycle, I was worse."  These cycles included symptoms of feeling heavy and fatigued, eye pain, torso rashes, testicular pain, right-sided weakness, loss of swinging gait on the right side.  He has painful joints and feels "a little slow mentally;" has had trouble remembering things, did not follow conversations, and said his skin "felt crispy."  Mr. Jeffries continued to work through the first year but felt "I wasn't very clear.  I worried that if I made a mistake, it would be a $20 million mistake.  I was very good at what I did but now I noticed things weren't working.  I made small mistakes that I shouldn't have made, a lot of subtleties.  I had to interpret financial statements, evaluate management."  Mr. Jeffries believes that he made an investment error on behalf of the bank when he lent $8 million to a company in San Diego without "doing the due diligence I should have."  After the deal closed, he realized he had made a mistake and was able to get the Provident Bank out of the deal by being "bailed out by other another investment bank.  Had I been well, I never would have made the loan.  But nobody else blamed me." Due to these

RE: Eric Jeffries
DATE: 03-15-2003
PAGE: 4

symptoms, he left his work in September 1998 and six months later applied for disability. He states, "I knew I couldn't do the job because I wasn't fixed yet." He also has noticed feet cramps, twitching muscles, electric shocks in this tongue, nocturnal pain, an intense tickle that turns to awful pain. He states that after a day of activity "I get beat up at night." He feels physical exertion "wears on my body, I have to allow my body to catch up." He gives examples of traveling with his family either on vacation or to participate in children's activities and having to take frequent rest and spend a lot of time in the hotel recuperating. He says his "threshold for aggravation is not predictable." He believes stress makes it worse but he does not know what causes him to have stress. Alcohol aggravates his symptoms so he avoids its use.

Mr. Jeffries denies any personality change or depression secondary to this condition. "I work hard not to be depressed. I try to keep a positive outlook. I have a supportive family and loving children." He is stressed by the "conduct of the insurance company," which is described as "atrocious." He believes that his symptoms are unpredictable, "really strange and bizarre." He believes his condition is chronic and "with me all the time." He states, "If I think about the symptoms too much I'd be a wreck."

Concerning his daily activities, he is capable of all self-care skills. He has no "set formula" to his daily routine. He modifies his schedule depending upon "how I feel." He feels he spends a lot of time in bed endeavoring to get up and endeavoring to do something positive and be more focused. He feels he is limited by his body in terms of how much activity he can endure. "If I overdo it, I will shut down for a day or two." He does have hobbies of antique cars, which are maintained by a company. He denies any active physical exertions. The most he does is ride his lawn mower to cut his grass. He has received some relief from Neurontin. He is able to spend time navigating the Internet. He is able to provide some management to his investments. He keeps his activity "pretty throttled back." His muscle cramps in his tongue and lips are described as "like a Morse code of electricity poking through my lips." "When I start to walk, I have to take baby steps. It takes me a while to engage my whole body." He was also prescribed Vicodin, which he takes p.r.n. for pain.

When asked how he understood his condition, Mr. Jeffries states, "It is post-vaccines -- that is, an immune mediated reaction in the microvascular system that affects different parts of the body." He understands that it fluctuates and changes over time. After his last visit, he made a followup trip to the office to provide me with a copy of an article from a British medical journal called "The Glass Cage" by author Clare Fleming, describing myalgic encephalomyelitis.

**TEST RESULTS:** This is not a normal neuropsychological profile. Mr. Jeffries tests as a man of superior overall intellectual ability with a full scale IQ of 125, which places him at the 95th percentile in terms of age peers. The verbal IQ of 120 is at the 91st percentile, and the performance IQ of 123 is at the 94th percentile. Mr. Jeffries has well-preserved intellectual ability. However, his cognitive profile across several other domains reflects a much lower level of functioning. Most notably, his mental processing speed and efficiency is weak. The processing speed index of 84 is at the 32nd percentile, one standard deviation below average. This reflects a significant slowing in the accuracy and efficiency of his mental processing. This slow-down is also apparent on other tasks, which require accurate and efficient processing of new information. On the Stoop Color-Word Test, his performance falls two standard deviations below average on this test requiring sustained attention and processing in the presence of distracters. His verbal fluency measured by Word

RE:  Eric Jeffries
DATE:  03-15-2003
PAGE:  5

Association Test is also at the 25th percentile, much lower than expected in an individual of his overall ability.

Attentional measures cluster around the average range with attention concentration index of 104 at about the 60th percentile, and the Serial Digit Learning Test where he performs at the 64th percentile.  The Seashore Rhythm Test, a measure of his auditory acuity in distinguishing rhythmic patterns, falls into the impaired range.  On certain types of stimulus material, his attentional focusing declines.  Yet on others, such as performing mental arithmetic, his mind is quite acute, focused, accurate, and his performance is well above average.  This strongly suggests that emotional/psychological fluctuations result in erratic attention, rather than neurogenic dysfunction..

Memory is a third area where there is a significant weakness in his cognitive function.  Two comparable measures of active working memory were performed at different times.  His scores are relatively stable.  A full-scale memory quotient on the Denman Test of 88 falls in the low average range, and a global memory index from the memory assessment scales falls at 85 or the 16th percentile.  Overall, Mr. Jeffries is showing weakness in processing speed, attention and short-term memory, which ranges from 1.5 to 2.5 standard deviations below his measured IQ.  Having noted that, it must also be pointed out that his memory capacity appears to fluctuate from time to time.  For example, on Warrington Recognition Memory Test for faces, his performance is two standard deviations below average.  On a similar memory test for faces from the Wechsler Memory Scale – III, his performance is solidly at the average rate at the 50th percentile.  This type of fluctuation does not fit any pattern of neurogenic illness, nor does Mr. Jeffries commit errors typical of persons with organic brain disease.  Other tests of his processing speed including a visual search test, the Attention Diagnostic Method, and the Trail Making Test part B, are also performed at 1.5 standard deviations below average.  Abstract reasoning in the absence of time or performance pressure appears to be within normal limits.  On a Booklet Category Test, which is a rigorous problem solving task requiring identification of search strategies and trial and error learning, he performs quite well within the expected range for a man of his ability. Motor function studies reveal on two occasions a decline in shear motor speed in the right upper extremity and the slowing of manipulation speed in the right upper extremity when compared to the nondominant left.  The etiology of this is not clear.

The Validity Indicator Profile was administered as a check on his level of effort and motivation.  On both the verbal and nonverbal aspects of this test, his results are valid suggesting that the patient made a adequate efforts to answer items correctly.  This result would tend to rule out malingering or purposeful production of erroneous responses.

Mr. Jeffries' psychological profile obtained from the MMPI – 2 and the Millon Inventory is also abnormal.  On both instruments, there is a significant psychological disorder characterized by rumination, hesitation, attention to detail, irritability, and concern for mild irrelevancies.  On both instruments, he was highly adverse to recognizing or acknowledging personal limitations or problems. There is also a slight tendency on this test to present himself in an overly positive light emphasizing his virtue, positive motivation and effortfullness.  On the MMPI – 2, his profile is strongly positive for somatization disorder, conversion type. In such individuals, obsessive and compulsive tendencies are focused on bodily preoccupations, sensory experiences, and symptoms of potential illness.  The clinical elevations suggest that this is an individual with a chronic pattern

RE:  Eric Jeffries
DATE:  03-15-2003
PAGE:  6

of psychological maladjustment, with intense anxiety, somatic distress and agitation.  It notes that the complaints emanating from such an individual may have a distinctly bizarre flavor and at times may contain elements of delusions.  Such individuals are also mistrustful and suspicious.  The diagnosis of *severe somatization disorder* would be consistent with his profile.

Rorschach's Test was administered in order to further clarify his cognitive/behavioral style.  Although there are no indicators of psychosis, Mr. Jeffries's thinking style is highly ruminative, obsessive, and hesitant.  Even the most mundane and ordinary circumstances evoke questioning, deliberation, uncertainty.   His thinking tends to be speculative and theoretical, rather than denotative and concrete.  He is fearful and indecisive.  The extremes to which he takes this style reflect a personality disorder with obsessive-compulsive features, which in itself would be an effective barrier against smooth and deficient cognitive processing. In summary, the personality test findings reveal an over-intellectualized and obsessively occupied individual, whose consistent style is one of over-thinking and ruminating.  This  is not caused by neurogenic etiology.

**REVIEW OF RECORDS:**  Voluminous medical records were presented for review in this matter. These records are remarkable in several aspects.  First, from a psychological aspect, they reveal an extraordinary picture of a patient in search of an illness. They reveal an energetic pursuit of medical opinions throughout North America and Europe.   Second, from a medical aspect they reveal an enormous number of self-initiated medical consultations with primary physicians and multiple specialists, without revealing a definitive diagnosis.   Finally, there is a significant disagreement in the records between highly specialized physicians (Dr. Hyde, Dr. Weisbren), who conclude that Mr. Jeffries suffers from a debilitating myalgic encephalomyelitis and acquired immunity, and Dr. Zweimann, immunologist at the University of Pennsylvania who finds that hepatitis B immunization did not cause the symptom complex in Mr. Jeffries, and is not the medical cause of his disorder.  It is not necessary for the purposes of this neuropsychological IME to trace the history of his presenting symptoms, the medical procedures, test results, and differential diagnoses ruled out.  Suffice it to say that his attending physicians and consultants who followed him closely in the initial years of his symptomatic development, were not able to establish any clear medical etiology.  The medical experts who believe they have identified an etiology will have to opine on its relationship to his physical condition and its causality.  What strike the psychologist examiner as salient, however, are the following features and findings in his medical records:

1.    Mr. Jeffries' own active and aggressive role in managing his own healthcare.  From the initial year of symptom onset, Mr. Jeffries took the lead in seeking a medical diagnosis to the point of initiating research, specialist consultations, repeated visits and extended travels throughout North America and Britain to secure a medical explanation for his subjective symptoms.  He was seen by a "myriad of physicians."  There were also a myriad of differential diagnoses considered and ruled out.

2.    In pressing his case before physicians, Mr. Jeffries has resorted to quite atypical behaviors such as photographing lesions on his genitals and photographing his stools.

3.    His own initiative is fully documented in the medical records, as the following samples will show:

   •   "He is still pursuing a possible connection between hepatitis B immunization and his symptoms.  He says that he had sent a DNA sample to a laboratory at Berkley,

RE:  Eric Jeffries
DATE:  03-15-2003
PAGE:  7

California to determine if he might be susceptible to vaccine-related complications" (Medical records of Dr. Michael Luggen, 12/23/1999).

- "He has complied an entire notebook full of articles and correspondence with different researches and government agencies responsible for tracking this situation and who
 are doing current research.  He is going to be going to the University of Oklahoma to talk to a chemist there, who was working on a test for HLA specific focus, which predisposes certain patients to adverse reactions" (Dr. McClellan notes 02/01/1999).

- "He continues to seek out new opinions regarding his illness.  He is having blood test for experimental genetic marker done in California" (Dr. McClellan notes 01-27-1999).

- Dr. McClellan has gone on record stating that in 10 years of practice, he has seen many patients with chronic pain but never anyone pursuing his problem so intently and aggressively as Mr. Jeffries.  Dr. McClellan asserts that he has put his talent and focus into trying to figure out what is the matter with him.  He has never known a patient who has worked so hard on his own case.

- "Eric is here to deliver more information about his peculiar ailment.  Eric also has a publication from the Internet RNA in the blood:  A new marker for chronic disease with references to Gulf War syndrome, endogenous retroviruses, AIDS without HIV" (Dr. Dunn's records 01-29-1999).

- On 03-03-1999, Mr. Jeffries provided Dr. Luggen a copy of an ABC news documentary 2020, which discussed the hepatitis B vaccine and reported adverse reactions.  When Dr. Luggen did not accept the referral for Mr. Jeffries for a friend with similar symptoms, Mr. Jeffries wrote him a letter of reprimand:  "What really surprises me is that even though I am trying to help you find the cause and effect relationship, you have absolutely no interest in exploring it.  I cannot understand why.  **These are people in our own community that may be helpful in proving a causal relationship that might in turn lead to a cure**" (emphasis in original).  Mr. Jeffries then goes on to question Dr. Luggen's motives, "Now I understand if you have a political/business issues that prohibit you from exploring this issue (i.e., you receive funding from either Smith Kline or Merck), but I would say that would be a cop out."

- Mr. Jeffries' activism is contained in the medical records of Dr. Stephen Fessler of 01/31/2000.  "I am enclosing a couple of items for your review.  Additionally, I am forwarding a copy of a recently discovered article that appeared in the **British Medical Journal** by a British doctor who has had an adverse reaction to hepatitis B vaccination.  Our illnesses are remarkably similar except I also have got an eye and gut  problems."

Responding to Mr. Jeffries' urgency for a diagnosis, some physicians have entertained numerous diagnostic possibilities and even proposing some conditions with no medical evidence for it:  "In reviewing your physician records, although they hypothesize you have a fibromyalgia syndrome, actually there is no objective evidence of that condition. Without examining you, your symptoms suggest the possibility of fibromyalgia.  However, I would want to forewarn you there is a strong possibility that we may not be able to get these symptoms to resolve" (C.J. Michet, Jr. M.D. Mayo Clinic 01/07/1999).

RE: Eric Jeffries
DATE: 03-15-2003
PAGE: 8

The records contain two reports of neuropsychological evaluations, done in California respectively by Dr. Curt Sandman on 09/20/2001 and by Dr. Sheila Bastien on 05/01/2001.  Mr. Jeffries self-referred to both of these neuropsychologists in California.  The results were abnormal, showing cognitive weaknesses in mental processing speed, memory, attention and concentration. Both reports show well-preserved intellectual and language facility.  Neither psychologist found evidence for malingering.   Dr. Sandman did not include a personality measure.  Dr. Bastien included the MMPI – 2, which she interprets as "consistent with patients with chronic fatigue like illnesses.  Many of those scales are loaded on physical symptoms.  The profile suggests physiological symptoms and psychological stress.  His profile is typical for patients with chronic fatigue syndrome and fibromyalgia."  Dr. Bastien's report either did not regard nor did not find significant the active and aggressive role played by Mr. Jeffries in his own health care.  She was also unaware of the findings of Dr. Burton Sweimann, University of Pennsylvania, who does not believe that his symptoms are accounted for on the basis of hepatitis vaccination.  Dr. Bastien makes a diagnosis of 394.9 cognitive disorder secondary to complex medical conditions and makes no psychological diagnosis whatsoever.  Dr. Sandman does not apparently list a formal diagnosis.

In summary of the present evaluation, the following diagnoses can be made:
- AXIS I: 296.9  Cognitive Disorder, with undetermined etiology.
- AXIS I: 300.81. Somatization disorder, severe.
- AXIS II: 301.4    Obsessive-Compulsive personality disorder.
- Axis III:          R/O  auto-immune disorder via medical IME.

**DISCUSSION:**  Mr. Jeffries presents to this examination as a disabled finance banker, who witnessed the onset of multiple sensory-motor, gastrointestinal, cognitive, and pain symptoms in 1997.  The patient related this to vaccination for hepatitis B, and from that point on commenced a medical mission to obtain diagnosis and treatment of his assumed condition. He has amassed an impressive volume of medical records in the ensuing years, with consultations with scores of physicians throughout North America and Europe.  He has been focused, relentless, and persistent in his pursuit of a definitive medical diagnosis.  Two specialists have suggested that he suffers from post-vaccinal autoimmune disorder.  Another equally credential specialist believes that his symptom complex has nothing to do with the vaccination. He has subjectively witnessed a decline in his functional capacity and has taken disability retirement from his high level professional job.

This evaluation suggests that he is showing some decline in cognitive functions secondary to severe obsessive-compulsive personality disorder, characterized by hesitation, rumination, over-thinking and somatic preoccupations.  This psychological disorder is a very significant aspect of his present functioning, and contributes significantly to the experienced level of disability.  One would have to say that in the pursuit of his medical diagnosis and treatment, Mr. Jeffries shows no cognitive or behavioral disability whatsoever.  It is remarkable that in five years of intensive medical investigations, no one has suggested to Mr. Jeffries that there is a psychological disorder or suggested that incorporating appropriate in-depth psychiatric treatment would enhance his functional capacity and may lead to significant improvement.  Mr. Jeffries' obsessive disorder is clear both in the medical records of his multiple and numerous physicians, and in his behavior and conduct during the present evaluation,

RE:  Eric Jeffries
DATE:  03-15-2003
PAGE:  9

and on objective test results. It is beyond the scope of this IME to determine whether Mr. Jeffries suffers from an occult auto-immune reaction, whether his condition is solely psychological, ie, somatization disorder in an obsessive-compulsive personality, or whether there is a combination of both. It would be important to his overall medical management and eventual prognosis that he submit to intensive psychiatric evaluation and treatment and for that purpose I will recommend one of the physicians at the Cincinnati Center for Psychoanalysis, specifically Dr. Bernard Foster, Dr. William Carney or Dr. Noel Free.

The opinions given here are to a reasonable degree of psychological certainty based upon my education and training in the field of psychology, my examination and testing of Mr. Jeffries, review of his records and board certification in clinical and forensic psychology.

Please let me know if any further information would be helpful.

Sincerely,


Michael F. Hartings, Ph. D.
**Board Certified in Clinical and Forensic Psychology**
**American Board of Professional Psychology**


MFH/src