UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| ERIC L. JEFFRIES, | : | |
| | : | Case No. C-1-02-351 |
| Plaintiff, | : | |
| | : | (Judge Beckwith) |
| vs. | : | (Magistrate Judge Hogan) |
| | : | |
| CENTRE LIFE INSURANCE COMPANY, | : | **DEFENDANT'S MOTION FOR** |
| et al., | : | **SUMMARY JUDGMENT** |
| | : | |
| Defendants. | : | **ORAL ARGUMENT REQUESTED** |

Now comes Defendant Centre Life Insurance Company ("Centre Life"), by and through

counsel, and pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, moves this Court for

an order granting summary judgment in its favor and against Plaintiff Eric L. Jeffries on all

counts of Plaintiff's Complaint.  Centre Life further moves for judgment in its favor on its

Counterclaim and seeks reimbursement of overpaid benefits.  As will be established herein,

Centre Life correctly and with reasonable justification suspended payment of Mr. Jeffries' total

disability benefits when he refused to attend a medical examination as required by his policy.

Benefits were reinstated after Mr. Jeffries completed his examination, the results of which

established that Mr. Jeffries suffers a mental but not a physical malady.  Under the terms of his

policy, Mr. Jeffries is entitled to 24 months of benefits because of this disability.  The entirety of

the benefits due Mr. Jeffries have been paid to him.

There is no dispute that for 24 months Mr. Jeffries had a disability of a psychiatric nature

for which benefits were payable.  Benefits have been paid in full.  Plaintiff now contends he is

entitled to benefits beyond the 24 months and asserts that he has a physical condition that

prevents him from engaging in the normal duties of his occupation.  The existence of a claimed

physical condition is the only justiciable issue with regard to his benefits.  The medical evidence

submitted by Mr. Jeffries does not establish a physical disability as a matter of law.  Thus, Centre

Life is entitled to judgment on all counts of Plaintiff's Complaint which claims allege breach of

contract, bad faith, invasion of privacy, interference with contract and conspiracy.  Mr. Jeffries

also seeks a declaration of permanent disability.  Centre Life respectfully requests oral argument

on this matter.

Respectfully submitted,

s/William R. Ellis
William R. Ellis (0012279)
Peter M. Burrell (0044139)
Amy Gasser Callow (0063470)
Wood & Lamping LLP
600 Vine Street, Suite 2500
Cincinnati, OH  45202-2491
(Telephone) (513) 852-6000
(Facsimile) (513) 852-6087

Attorneys for Defendants
Massachusetts Casualty Insurance Company
and Disability Management Services, Inc.

TABLE OF CONTENTS

I.      Summary Of The Argument………………………………………………………5
II.     Undisputed Material Facts………………………………………………...…………6
III.    Argument…………………………………………………………………………12
        A.      Centre Life Is Entitled To Summary Judgment Pursuant To Supreme Court
                Standards………………………………………………………..…………12
                FED. R. CIV. P. 56(c)…………………………………….…………………12
                *Celotex Corp. v. Catrett*, 477 U.S. 316, 106 S.Ct. 1548 (1986)……………12, 13
                *Anderson v. Liberty Lobby, Inc.*, 477 US. 242, 106 S.Ct. 1505 (1986)………12, 13
                *Matsushita Electric and Industrial Co., Ltd. v. Zenith Radio Corp.*,
                   475 U.S. 574, 106 S.Ct. 1348 (1986)……………………………….………12
                *Street v. J.C. Bradford and Co.*, 866 F.2d 1472 (6th Cir. 1989)……………...12
                *Cloverdale Equipment Co. v. Simon Aerials, Inc.*, 869 F.2d 934, 937 (1989)..…13
                *Sixty Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)…..……13

        B.      As A Matter of Law, DMS And Centre Life Have Not Acted In Bad Faith
                With Regard To Mr. Jeffries' Suspension Of Benefits…………………..13

        1.      Centre Life had reasonable justification for its actions…………………13
                *Hoskins v. Aetna Ins. Co.*, 6 Ohio St. 3d 272, 452 N.E.2d 1315 (1983)……..14, 15
                *Staffbuilders, Inc. v. Armstrong*, 37 Ohio St. 3d 298, 515 N.E.2d 783
                   (1988)………………………………………………………………14, 15
                *Zoppo v. Homestead Ins. Co.*, 71 Ohio St. 3d 552, 644 N.E.2d 397 (1994)….…14
                *Ketchum v. Miller*, 104 Ohio St. 372, 136 N.E.2d 145 (1992)…………………14
                *Hart v. Republic Mut. Ins. Co.*, 152 Ohio St. 183, 87 Ohio N.E.2d 347 (1949)....14

        2.      The suspension of Mr. Jeffries' benefits was reasonable and
                done in good faith……………………………………………………..15

        3       Centre Life's subsequent determination that Mr. Jeffries was
                disabled by a mental disorder was reasonable…………………...………16
                *Sculimbrene v. Paul Revere Life Ins. Co.*, 925 F. Supp. 505 (E.D. Ky. 1996)…18
                *Sudman v. Minnesota Life Ins. Co.*, 40 F. Supp. 2d 590 (E.D. Pa. 1997)……..…18
                *Guarino v. Metropolitan Life Ins. Co.*, 915 F. Supp. 435 (D. Mass. 1995)….…..18
                *Green v. Metropolitan Life Ins. Co.*, 924 F. Supp. 351 (D. RI 1996)……..……18

        C.      Centre Life Has Not Breached Its Contract With Mr. Jeffries……………..……18

        1       Centre Life may require an examination under the terms of Mr. Jeffries'
                policy……………………………………………………………..………18
        2       Mr. Jeffries' treating physicians cannot agree as to the cause
                of his symptoms……………………………………………………………19
                a       Many of Mr. Jeffries' symptoms pre-date his inoculation……..…22
                b       Mr. Jeffries does not accurately describe his symptoms…………23

3      Mr. Jeffries' has pursued a link between his complaints and his Hepatitis B vaccination and is focused on his illness……………………..…………25

4      Dr. McClellan's findings support a mental disorder diagnosis……..……29

D.     Mr. Jeffries Must Submit Sufficient Proof Of Loss To Establish A Physical Disability………………………………………….……………31

*Chicago Title Insurance Company v. Huntington National Bank*, 87 Ohio St. 3d 270, 273, 719 N.E.2d 955 (1999) *citing Inland River Service Corp. v. Hartford Fire Insurance Company*, 66 Ohio St. 2d 32, 418 N.E.2d 1381 (1981)………………………………32
*Mayhew v. Bell S.S. Company*, 917 F.2d 961, 963 (6th Cir. 1990)………..……33

E     Mr. Jeffries Is Not Entitled To A Declaration Of Continued Benefits…………35
*Inland Refuse Transfer Co. v. Browning-Ferris Industries of Ohio, Inc.*, 15 Ohio St. 3d 32, 322, 474 N.E.2d 271, 272 (1984)……………………..………35
*Miller v. Marrocco*, 28 Ohio St. 3d 438, 439, 504 N.E.2d 67, 69 (1986)………...36
*Karabin v. State Auto. Mut. Ins. Co.*, 10 Ohio St. 3d 163, 166-167 462 N.E.2d 403, 406 (1984)………………………..……………………………..36

F     The Remaining Counts Of Mr. Jeffries' Complaint Are Without Basis In Fact Or Law…………………………………………………….……………………36
1      Invasion of privacy………………………………………..…………36
2      Interference with contract……………………………………………..…37
3      Conspiracy…………………………………………………………37
*Celotex Corp. v. Catrett*, 477 U.S. at 323, 324…………………………..…38
*Mitchell v. Toledo Hospital*, 964 F.2d 577, 581 (6th Cir. 1992)………...38

G     Centre Life Is Entitled To Reimbursement Of Overpaid Benefits………………38
*Hambleton v. R.G. Barry Corp.* 12 Ohio St. 3d 179, 183 465 N.E.2d 1298 (1984)………………………………………………………38

IV     Conclusion…………………………………………………………………..…39

Certificate of Service……………………………………………………………………41

## MEMORANDUM IN SUPPORT

I.    **Summary Of The Argument**

Mr. Jeffries originally filed his Complaint in the Hamilton County Court of Common Pleas.  Centre Life removed the case to this Court on May 16, 2002.  At the time Mr. Jeffries filed his lawsuit, his benefits had been suspended due to his refusal to attend a medical examination as required under the terms of his policy.  In correspondence dated March 21, 2002, Centre Life advised Mr. Jeffries that no further benefits were payable because of his refusal to attend a medical examination.  Mr. Jeffries proceeded to file this lawsuit and sought a temporary restraining order.  Mr. Jeffries' Motion for a TRO was denied and the Court determined that Centre Life's request for a medical examination was reasonable.  *See* Order dated May 23, 2002, Document No. 12.

This action can be broken into two segments.  The first is the suspension of Mr. Jeffries' benefits.  It has already been determined by this Court that Centre Life was reasonable in its request for a medical examination and its subsequent suspension of benefits when Mr. Jeffries did not comply.  The plain and unambiguous terms of Mr. Jeffries' policy allows for an examination as often as is reasonable by a physician of the insurer's choosing.  At the time Mr. Jeffries filed his lawsuit, he had refused to attend <u>any</u> medical examination.  The suspension of benefits was in accordance with the terms of Mr. Jeffries' policy, and his refusal to cooperate. The suspension of Mr. Jeffries' benefits in light of his refusal to attend a reasonable examination was not bad faith.  The Court has already agreed that Mr. Jeffries' refusal to attend a medical examination justified Centre Life's decision to suspend his benefits.  *See* Document No. 30. Thus, there can be no bad faith with regard to the first portion of the case.

The second segment of this case is that period after Mr. Jeffries was ordered to attend and complete a neuropsychological examination with a physician of Centre Life's choice. Mr. Jeffries also completed a physical examination with an internist, Newton Bullard, M.D. The findings of Michael F. Hartings, Ph.D. were reviewed by Centre Life's medical consultant, Mitchell Clinosky, Ph.D. After review of this report, Centre Life concluded that Mr. Jeffries was disabled by a mental disorder. Mr. Jeffries' policy provides that benefits payable for a mental disorder shall not exceed an aggregate total of 24 months. Mr. Jeffries has already been paid well in excess of 24 months and no further benefits are payable. Centre Life's determination that Mr. Jeffries has a mental disorder is based on the objective medical evidence obtained during Mr. Jeffries' neuropyschological examination and the lack of evidence of physical disability in his physical exam. It is also supported by the findings, or in this case, lack thereof, of his treating physicians. This determination was reasonable and therefore made in good faith.

Mr. Jeffries has also made claims of invasion of privacy, interference with contract and conspiracy. These allegations are not supported by fact or law and Centre Life is entitled to judgment in its favor on these counts as well.

## II.    Undisputed Material Facts

Plaintiff Eric Jeffries owns a policy of individual disability insurance that was issued by Centre Life Insurance Company (when the company was known as Massachusetts Casualty Insurance Company) on April 1, 1996. The policy was initially issued in the amount of $5,000.00 per month and contained a limitation on benefits payable to 60 months. *See* Claim 529. On March 13, 1997, Mr. Jeffries increased his coverage to $8,840.00 and his benefit period to age 65. On March 26, 1998, Mr. Jeffries again applied for an increase in coverage. *See*

Exhibit A, Policy No. 0641734.  As currently written, Mr. Jeffries' policy can provide him

benefits in the amount of $12,133.00 per month.  The policy contains the following amendment:

> <u>Mental Disorder and/or Substance Abuse Disorder Limitation</u>:  If a Total
> Disability or other covered loss is due to a Mental Disorder and/or Substance Use
> Disorder, the number of months for which any benefits for Total Disability shall
> be payable under the Policy during the lifetime of the insured shall not exceed in
> the aggregate a total of 24 months.

*See* Exhibit A, Policy No. 0641734 at Amendment.  This amendment has been a part of the

policy since Mr. Jeffries' initial purchase.  *See* Claim 528-543.  Mr. Jeffries has received 39

months of payments for the claim that gave rise to the instant case.

Disability Management Services, Inc. ("DMS") is a third-party administrator charged

with the responsibility of administering claims made under Mr. Jeffries' Centre Life policy.

Mr. Jeffries had initially included DMS as a Defendant in this case, but DMS was dismissed by

the Court on September 18, 2003.  *See* Document No. 90.

On February 28, 1999 Mr. Jeffries submitted a claim under his policy and alleged that he

was totally disabled.  This notice of claim was received by DMS on March 8, 1999.  *See* Exhibit

B, relevant pages of Centre Life Claims file at Claim 3124-3127.  At the time of the February

1999 claim, Mr. Jeffries' exact disability and cause of disability were ill defined.  When asked to

describe the nature of his illness, he reported on his initial notice of claim form:  "Adverse

reaction to Hep. B vaccination - severe joint and muscle pain - abdominal problems - headache

and eye problems."  *Id.*  Dr. Michael Luggen completed Mr. Jeffries' March 1999 Attending

Physician Statement and listed the diagnosis as "undifferentiated connective tissue disease."  *Id.*

at Claim 3083-84.  Dr. Luggen reported that he expected Mr. Jeffries to return to work in 3-6

months.  *Id.*  Although not identified by Dr. Luggen at the time, Mr. Jeffries alleged that he

suffered from an adverse reaction to a Hepatitis A and Hepatitis B vaccination he had received in

July 1997.  During an initial phone conference with DMS, Mr. Jeffries referenced a 20/20 episode he saw about adverse Hepatitis B vaccination reactions.  *See* Claim 3130, 3131.  He also encouraged DMS to contact the National Vaccine Information Center for information about Hepatitis B autoimmune reactions.  *See id.* at Claim 3113-3114.  It is notable that Mr. Jeffries' advocacy of a physical malady preceded any actual diagnosis.  Mr. Jeffries claims that as of September 1998, he was unable to continue in his occupation as a corporate banker and senior officer of Provident Bank.  *Id.* at Claim 3124-27.

Mr. Jeffries received a Hepatitis B vaccination on June 18, 1997.  *See* Exhibit C, deposition of Dr. Nunlist-Young at p. 68.  At the time, Dr. Nunlist-Young was his primary physician.  On the day of the injection, Mr. Jeffries had no fever but stated he had been exposed to someone with scarlet fever so Dr. Nunlist-Young did a rapid strep screen which was negative. *See id.* at p. 66.  Strep is the germ responsible for scarlet fever and Dr. Nunlist-Young wanted to be assured Mr. Jeffries did not have it.  *See id.*  He also prescribed an antibiotic to cover any bacteria.  *See id.* at 67.  Two days later, Mr. Jeffries returned for his Hepatitis B shot and no symptoms were documented.  *Id.*

Approximately five to nine days after receiving the injection, Mr. Jeffries reported to Dr. Nunlist-Young that he had suffered an adverse reaction.  *Id.* at p. 68.  Mr. Jeffries described his symptoms as night sweats, headaches, joint aches, fever, abdominal pain and arthralgias.  *Id.* at pp. 68-69.  Between June 24, 1997 and July 7, 1997, Mr. Jeffries complained to Dr. Nunlist-Young on several occasions that he was not feeling any better and that he was having strange pains.  *Id.*  On July 2, 1997 Mr. Jeffries reported to Dr. Moulton that his weird pains were getting worse and that his three year old was also complaining of joint pain.  *Id.* at 77.

Dr. Nunlist-Young saw him again on July 7, 1997 and he continued to complain of joint pain, headache and abdominal pain.  *Id.* at 77-78.  On July 8, 1997 Mr. Jeffries saw a new doctor, Dr. Corwin Dunn and complained of a sore throat, pains in his abdomen, sore muscles and joint pain.  *See* Exhibit D, Dunn depo. at p. 5.

One day after his visit with Dr. Dunn, Mr. Jeffries called Dr. Nunlist-Young, on July 9, 1997, and reported that he was feeling fine.  *See* Exhibit C at pp. 83-84.  Mr. Jeffries explained to Dr. Nunlist-Young that he was changing insurance companies and would like his recent episodes explained as an allergic reaction.  *Id.*  Mr. Jeffries continued to report problems to Dr. Dunn for an additional two weeks, however.[1]

Mr. Jeffries continued to work until September of 1998.  In June of 1998, almost a year after receiving the injection, Mr. Jeffries returned to Dr. Dunn and once again complained of muscle pain and aches, malaise and headache with pain behind his eyes.  Between the time of his Hepatitis B inoculation in June of 1997 and his cessation of work in September 1998, Mr. Jeffries increased his disability insurance coverage.  *See* Exhibit A.  He had also extended the term of his coverage from five years to until age 65 before his inoculation.  *Id.*

Mr. Jeffries claims that as of September 1998, he was unable to continue in his occupation as a corporate banker and senior officer of Provident Bank.  After expiration of the elimination period designated in his policy, DMS, on behalf of Centre Life, began issuing payments to Mr. Jeffries for the period beginning on December 25, 1998.  *See* Exhibit B, Claims file at 3032-35.  Although payment was made, Centre Life continued to evaluate Mr. Jeffries' claim and attempted to define both the cause and the effects of Mr. Jeffries' alleged disability.

---

[1] In his most recent filing opposing Defendants' Hep B *Daubert* Motion, Plaintiff alleges on p. 1 of his Brief that he had developed a lump at the site of his shot which was surgically removed.  Plaintiff does not cite any medical evidence which documents this surgery and no evidence is referenced in the depositions of Drs. Dunn and

During the investigation period, Mr. Jeffries, on his own initiative, consulted with and was evaluated by numerous doctors across the United States and abroad. Mr. Jeffries submitted some but not all of the results of his many consultations and evaluations to Centre Life.[2] In these post-vaccination consultations, Mr. Jeffries ascribed the onset of his symptoms to his Hepatitis B vaccination. As the medical evidence in this case, and in particular the records of Dr. Nunlist-Young, establishes, many of Mr. Jeffries' symptoms pre-date his vaccination.

Centre Life continued to pay Mr. Jeffries benefits until February 2002 when his payments were suspended. The Centre Life policy issued to Mr. Jeffries contains a clause entitled "Physical Examinations" which states that:

> We, at our own expense, have the right to have you examined by an examiner of our choice as often as is reasonable while a claim is pending.

See Exhibit A, Policy No. 0641734 at p. 9. Mr. Jeffries refused to attend a neuropsychological examination scheduled by DMS. It was this refusal which resulted in the suspension of his benefits and ultimately, the filing of this lawsuit.

On May 23, 2003 the Court entered an Order denying Plaintiff's Motion for a Temporary Restraining Order. Doc. No. 12. In denying Plaintiff's Motion, the Court acknowledged that the policy contains a provision which allows Centre Life to have Mr. Jeffries examined by an examiner of its choice as often as is reasonable while the claim is pending. See Exhibit A at p. 9, Section 6. The Court stated:

> It appears to be undisputed that Plaintiff has never submitted to an examination by a physician of Centre Life's choice. While Plaintiff argues that it is not reasonable for Centre Life to require an IME, as Centre Life's counsel stated at

---

Nunlist-Young, the physicians Plaintiff initially consulted. Plaintiff does not identify in his brief who performed the surgery.

[2] Although there was indeed a plethora of medical information submitted by Mr. Jeffries, it appears that not all of Mr. Jeffries' medical records and consultations were in fact submitted to DMS.

> oral argument, the policy clearly gives the insurer the right to conduct at least <u>one</u> IME of the claimant.  Moreover, the Court does not think that the policy requires the insurance company to accept Plaintiff's medical evidence at face value.  Therefore, it does not appear unreasonable that Centre Life should require Plaintiff to undergo an IME.

*See* Document No. 12 at pp. 3-4 (emphasis in original).  Although Mr. Jeffries' contention had long been that he had so much medical information that no further evaluation was reasonable, the Court rejected this argument.  Centre Life does not have to accept the medical records Plaintiff submits "at face value."  *Id.*

Shortly after the Court's Order denying Plaintiff's Motion for Temporary Restraining Order, Plaintiff agreed to submit to an examination with Dr. Michael Hartings, a neuropsychologist.  An examination with Dr. Newton Bullard, a physician board certified in internal medicine, was also scheduled.  On February 7, 2003 Dr. Bullard completed his examination of Mr. Jeffries.  Dr. Bullard rendered a diagnosis of malaise/fatigue but stated that "Unfortunately, there are no objective findings to support his complaints."  *See* Exhibit E, report of Newton Bullard at p. 1.

Michael F. Hartings, Ph.D., also performed neuropsychological testing on and evaluation of Mr. Jeffries.  Dr. Hartings' testing and examination continued over three sessions.  After completion of the first two sessions, Mr. Jeffries refused to attend the third session until ordered by the Court.  Upon completion of the examination, Dr. Hartings issued a report which concluded that Mr. Jeffries suffered from somatization disorder, a psychiatric, not a physical malady.[3]  *See* Exhibit F, Hartings report.  The report of Dr. Hartings was reviewed by Dr. Mitchell Clinosky for DMS.  Dr. Clinosky concurred with Dr. Hartings and agreed that it

---

[3] As addressed further herein and in Centre Life's Memorandum In Opposition to Plaintiff's Daubert Motion to exclude Dr, Hartings, in a subsequent version of the DSM-IV, the criteria of 300.81 somatization disorder as used by Dr. Hartings has been renumbered to 300.82, somatoform disorder.

was "extremely unlikely that Mr. Jeffries suffers from a neurological condition and that his complaints and test results are better explained by a psychological disorder." *Id. See* Exhibit G, May 5, 2003 correspondence from Clinosky to Graff.

Under the terms of Mr. Jeffries' policy he is entitled to payment of benefits for up to 24 months if he is totally disabled due to a mental disorder or substance abuse disorder. *See* Exhibit A, Policy at Amendment. There is no dispute on this point. Mr. Jeffries has been paid the entirety of the benefits to which he is entitled for a disability caused by a mental disorder. Moreover, Mr. Jeffries has not established that he is entitled to benefits beyond 24 months. Mr. Jeffries must provide sufficient proof of loss that he is totally disabled under his policy. The medical evidence before the Court establishes that Mr. Jeffries' disability is a mental disorder. To receive additional benefits, Mr. Jeffries must establish that he has a physical disability. The evidence before the Court does not meet his burden.

## III.    Argument

### A.    Centre Life Is Entitled To Summary Judgment Pursuant To Supreme Court Standards.

As established throughout this Memorandum, Centre Life is entitled to summary judgment under the standards set forth by the Supreme Court, followed by the Sixth Circuit and applicable to this Court. *See* FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 316, 106 S.Ct. 1548 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 US. 242, 106 S.Ct. 1505 (1986); *Matsushita Electric and Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348 (1986); *Street v. J.C. Bradford and Co.*, 866 F.2d 1472 (6th Cir. 1989). These cases establish that summary judgment is "properly regarded not as a disfavored procedural shortcut but, rather, an integral part of the Federal Rules as a whole." *See Celotex*, 477 U.S. at 327; *Street*, 866 F.2d at 1478.

In *Celotex*, the Supreme Court recognized that summary judgment is designed to "isolate and dispose of factually unsupported claims" and held that:

> *Rule 56(c) mandates the entry of summary judgment . . . against the party who fails to make a showing sufficient to establish the existence of an element essential to the party's claim and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issues as to any material fact since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.*

*See Celotex,* 477 U.S. at 322-24.

Consistent with the concern for judicial economy, "the mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient" to defeat a motion for summary judgment. *See Anderson*, 477 U.S. at 252. Mere allegations do not suffice. *See Cloverdale Equipment Co. v. Simon Aerials, Inc.*, 869 F.2d 934, 937 (1989). "The party with the burden of proof at trial is obligated to provide concrete evidence supporting the claims and establishing the existence of a genuine issue of fact." *Id.* In other words, the opposing party "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *See Anderson*, 477 U.S. at 256 (1986). Mr. Jeffries, as the non-moving party, "is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial." *See Sixty Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987).

As proven herein by Centre Life, the undisputed material facts establish Mr. Jeffries' claims for breach of contract and bad faith fail as a matter of law. It is also undisputed that there is no factual and legal support for the remainder of Plaintiff's claims.

**B.    As A Matter of Law, DMS And Centre Life Have Not Acted In Bad Faith With Regard To Mr. Jeffries' Suspension Of Benefits.**

**1.    Centre Life Had Reasonable Justification For Its Actions.**

Under Ohio law, an insurer has a duty to act in good faith in the processing and payment of claims of its insurers.  A breach of that duty will give rise to a cause of action in tort against the insurer. *See Hoskins v. Aetna Ins. Co.*, 6 Ohio St. 3d 272, 452 N.E.2d 1315 (1983); *Staffbuilders, Inc. v. Armstrong*, 37 Ohio St. 3d 298, 515 N.E.2d 783 (1988).  The test annunciated in *Hoskins* and *Staffbuilders* and restated in *Zoppo v. Homestead Ins. Co.*, 71 Ohio St. 3d 552, 644 N.E.2d 397 (1994), requires that an insured prove the insurer lacked "reasonable justification" for the denial of benefits.  Under this "reasonable justification" standard, an insurer fails to exercise good faith in the processing of a claim of its insured where its refusal to pay the claim is not predicated upon circumstances that furnish reasonable justification therefore." *See Staffbuilders*, 525 N.E.2d at 788. In other words, the plaintiff must show the insurer had no reasonable justification whatsoever for denying the claim.  *See Hoskins, supra*.

Moreover, under Ohio law, the breach of contract is not a tort, regardless of motive.  *See Ketchum v. Miller,* 104 Ohio St. 372, 136 N.E.2d 145 (1992); *Hoskins*, 6 Ohio St. 3d at 276.  The liability of an insurer also does not arise from the mere omission to perform a contractual obligation but rather from a breach of a positive legal duty imposed by the law due to the relationship of the parties. *See Hoskins, Staffbuilders¸ supra*.

In defining the standard to apply in analyzing claims of bad faith by an insurer, the Ohio Supreme Court has stated that the denial of a claim of an insured does not automatically expose the insurer to an action in tort. *See Hoskins*, 6 Ohio St. 3d at 276-277.  An insurer has a right to legitimately question a claim without exposing itself to a bad faith action.  *Id.*  Moreover, negligence is not sufficient for a finding of bad faith. *See Hart v. Republic Mut. Ins. Co.*, 152 Ohio St. 183, 87 Ohio N.E.2d 347 (1949); *Hoskins*, 6 Ohio St. 3d at 276-277.  An insurer cannot

be held liable in tort for negligence on its part in failing or refusing to settle or compromise a claim, even if such failure later proves to be erroneous. *Id.*

As a threshold matter, Mr. Jeffries has no claim for bad faith prior to February 2002. Until that time, Centre Life had paid Mr. Jeffries the entirety of the monthly benefits he claimed were due to him. Although there is now an issue of overpayment, the fact that payments were made demonstrates good faith. Although Plaintiff argues that Centre Life's inability to make a final disability determination was bad faith at the time of Mr. Jeffries' benefit suspension, his claim was being evaluated and paid in full on a month-to-month basis and in accord with the terms of his policy. [4] Moreover, any delay in a final determination was caused by Plaintiff's refusal to attend a medical examination. This was not bad faith on the part of Centre Life.

On January 13, 2003, this Court issued a Report and Recommendation from the Magistrate Judge denying Mr. Jeffries' Motion for Partial Summary Judgment. *See* Doc. No. 30. Mr. Jeffries had filed a Motion seeking payment of benefits from February 25, 2002 through the date of filing based upon his contention that his refusal to attend a medical examination was justified and that Centre Life's suspension of benefits constituted a breach of contract which entitled him to payment. The Court disagreed and denied his Motion.

> **2.    The Suspension Of Mr. Jeffries' Benefits Was Reasonable And Done In Good Faith.**

In denying Plaintiff's Motion, the Court held that Centre Life had the right to have Mr. Jeffries examined by an examiner of their choosing. *See* Doc. No. 30 at p. 4. Mr. Jeffries' objections that he had already undergone a neuropsychological examination on his own and by a

---

[4] Plaintiff had made a similar argument in the case he has against his group disability insurance carrier Prudential Insurance Company of America, case no C-1-01-680 also pending in the United States District Court for the Southern District of Ohio before the Honorable Judge Weber. Although that case is an ERISA action and therefore subject to a different standard of review, the Report and Recommendation of the Magistrate Judge rejected Mr. Jeffries' claim that delay in the processing of his case was bad faith.

doctor of his own choosing and that Dr. Hart, the IME doctor of Centre Life's choosing, was not qualified, were not well taken. *Id.* at pp. 2-3. The Court thus held that an examination of Plaintiff by Centre Life was reasonable and within the requirements of the policy. The Court then went on to state that it viewed Mr. Jeffries' "initial refusal to attend Dr. Hart's examination as justifying Centre Life's action in withholding policy payments until his cooperation is secured." Based on this finding, Plaintiff cannot prevail on his claim of bad faith. *See* Doc. No. 30 at p. 6.

Here, the Court has correctly determined that Mr. Jeffries' refusal to attend the medical examination justified Centre Life's decision to suspend payment of Mr. Jeffries' benefits. Prior to the suspension of benefits, Centre Lilfe took no other adverse action against Mr. Jeffries and there can be no finding of bad faith as a matter of law.

### 3. Centre Life's Subsequent Determination That Mr. Jeffries Was Disabled By A Mental Disorder Was Reasonable.

As set forth in subsection C of this Motion, there is considerable debate as to the cause of Mr. Jeffries' disability. Mr. Jeffries argues that he suffers from an unnamed autoimmune reaction caused by his Hepatitis B vaccination. The medical evidence submitted by Mr. Jeffries, however, fails to establish disability. The objective medical evidence before the Court does establish that Mr. Jeffries has a somatoform/somatization disorder as defined by the DMS-IV. This is a mental disorder for which 24 months of total disability benefits are payable and have in fact been paid.

Mr. Jeffries does not agree with this assessment. The burden is on Mr. Jeffries to submit the medical evidence of a physical disability if he seeks continued payment of benefits. Mr. Jeffries' policy provides for periodic payments and Mr. Jeffries has an obligation to submit "the claims forms and other information requested by [Centre Life], all of which is called

'written proof of loss' . . . within 90 days after the end of each period for which [Centre Life] is liable." *See* Exhibit A at p. 9.  As established in subsection C of this Motion, the medical information submitted by Plaintiff does not support payment of continued benefits.  Regardless, Centre Life's decision to terminate Mr. Jeffries' benefits is reasonably justified by the information received by Centre Life.  Under these circumstances, this decision could not have been made in bad faith.

Centre Life was unable to obtain its own examination of Mr. Jeffries until the Court ordered him to do so.  The neuropsychological testing of Mr. Jeffries by Dr. Hartings reveals objective proof of a somatoform/somatization disorder.  Dr. Clinosky reviewed this information and compared it to earlier information submitted by Mr. Jeffries from Dr. Sheila Bastien and agreed that Mr. Jeffries' disability was better explained by a psychological cause.  This determination was bolstered by the examination of Dr. Newton Bullard who could find no physical abnormality.  Like the examinations of Plaintiff's treating physicians, Dr. Bullard's examination recorded many subjective complaints but no objective physical findings.  This fact pattern is consistent with somatoform/somatization disorder and is a reasonable explanation for Mr. Jeffries' complaints.

Of Mr. Jeffries' treating physicians, Drs. Dunn, Nunlist-Young, Luggen and McClellan, only Dr. McClellan advocates a connection between Mr. Jeffries' Hepatitis B vaccination and his disability.  Although Mr. Jeffries has submitted reports from other advocates for a Hepatitis B connection, these doctors are not his treating physicians.  The fact that Dr. Clinosky disagrees with the findings of Mr. Jeffries' treating physician, Dr. McClellan, does not render Centre Life's decision bad faith.  It is not bad faith for an insurance company to rely upon an independent evaluation over the opinion of a treating physician.  *See Sculimbrene v. Paul Revere Life Ins.*

*Co.*, 925 F. Supp. 505 (E.D. Ky. 1996); *Sudman v. Minnesota Life Ins. Co.*, 40 F. Supp. 2d 590

(E.D. Pa. 1997); *Guarino v. Metropolitan Life Ins. Co.*, 915 F. Supp. 435 (D. Mass. 1995);

*Green v. Metropolitan Life Ins. Co.*, 924 F. Supp. 351 (D. RI 1996). Even if this determination is

eventually established to be erroneous, it is reasonably justified based upon the reports of

Dr. Hartings, Dr. Bullard and Dr. Clinosky. It is also supported by the deposition testimony of

Drs. McClellan, Dunn, Nunlist-Young and Luggen. Thus, there can be no determination of bad

faith.

      **E.**     **Centre Life Has Not Breached Its Contract With Mr. Jeffries.**

          **1.**     **Centre Life May Require An Examination Under The Terms Of Mr. Jeffries' Policy.**

The Complaint filed by Mr. Jeffries alleges that DMS, on behalf of Centre Life,

terminated his benefits in February 2002. In fact, Mr. Jeffries' benefits were suspended. At the

time his lawsuit was filed, no determination regarding a denial of Mr. Jeffries' claim for benefits

had been made. To the contrary, Centre Life was still gathering information necessary to

evaluate the claim. Crucial to their analysis was a medical examination by a physician of Centre

Life's choosing. Mr. Jeffries' policy explicitly states that: "We, at our own expense, have the

right to have you examined by an examiner of our choice as often as is reasonable while a claim

is pending." *See* Exhibit A at p. 9. Mr. Jeffries' initial objection to an examination by Centre

Life came in August 2001. Centre Life asked that Mr. Jeffries be examined by Dr. Kathleen

Hart. Mr. Jeffries objected and argued that he had already been examined by Sheila Bastien. *See*

Exhibit B at Claim 1349-50. Mr. Jeffries requested that Centre Life first review Dr. Bastien's

report and examination before requesting another neuropsychological examination. Mr. Jeffries

also argued that additional testing would have a "practice effect" that would "negatively impact

the accuracy of test results on repeat examinations." *See* Exhibit B at Claim 1349-50. Despite

his concern about a "practice effect" outlined in his August 28, 2001 letter, he self-referred for additional neuropsychological testing with Curt Sandman on September 20, 2001. *See* Exhibit B at Claim 1140.

In August 2001 Centre Life acquiesced to Mr. Jeffries' demand and postponed its requested neuropsychological examination. *See* Exhibit B at Claim 1192-93. Dr. Mitchell Clinosky reviewed the report of Sheila Bastien. Dr. Clionsky had several questions regarding both the tests performed and Dr. Bastien's interpretation of the result. *See* Exhibit B, Claims file at Claim 1214-1221. Dr. Clionsky tried to resolve his concerns and contacted Dr. Bastien to discuss his questions with her. *Id.* Dr. Bastien refused to engage in any analysis with Dr. Clionsky, however. *Id.* at Claim 1215-16. She responded that she had been asked to supply raw data and that is all she would do. *Id.* Dr. Clinosky was therefore unable to resolve his questions and advised Centre Life ". . . in the spirit of fairness to the claimant and the rather atypical nature of this case, I would recommend that an independent neuropsychological evaluation be conducted to better determine his current level of cognitive an emotional functioning and the degree, if any, to which he is impaired from his occupation." *Id.* at Claim 1221.

On January 10, 2002, Centre Life again requested that Mr. Jeffries attend a neuropsychological examination and scheduled an appointment with Dr. Kathleen Hart for February 14, 2002. *See* Exhibit B, Claims file at Claim 1190-91. Mr. Jeffries advised through his counsel that he would not attend the examination. *Id.* at Claim 1174. Mr. Jeffries' refusal to obtain a medical examination as required under his policy resulted in suspension of his benefits.

> **2.    Mr. Jeffries' Treating Physicians Cannot Agree As To The Cause Of His Symptoms.**

Under the terms of his policy, Mr. Jeffries has an obligation to submit proof of loss. Exhibit A at p. 9. This includes submission of periodic claims forms as well as periodic

attending physician statements. *Id.* The attending physician statements verify that the alleged disability continues and advise the insurance company of the nature of the disability. It is undisputed that Mr. Jeffries' problem has defied conventional diagnosis. As Mr. Jeffries himself has iterated to the Court on several occasions, there are thousands of pages of medical documentation in this case. The one fact upon which it can be agreed and which is borne out by the documentation is that Mr. Jeffries' doctors could not agree as to the cause of his problems. Mr. Jeffries' primary treating physicians were Corwin Dunn, Michael Luggen, Donald Nunlist-Young and Michael McClellan. In addition to these primary treating physicians, Mr. Jeffries, at his own expense and on his own determination, has also consulted with numerous other physicians in his quest for a diagnosis. As the medical documents before the Court demonstrate, these other physicians did not provide treatment to Mr. Jeffries but have offered opinions regarding his disability.

Numerous diagnoses have been considered with regard to Mr. Jeffries. His doctors have conducted many objective tests which have not led to any conclusive or verifiable diagnoses. The results of the majority of these objective tests were normal or unremarkable. *See* Exhibits C, D, I. The only solid diagnosis carried by Mr. Jeffries during the course of his claim is that he had thyroid cancer which cancer has been removed. Mr. Jeffries continues to be treated with a replacement thyroid. Mr. Jeffries' thyroid cancer was not and is not disabling. *See* Exhibit H, Jeffries depo. at p. 86; D. Dunn depo. at p. 58.

Mr. Jeffries has attempted to tie his symptoms to an auto-immune disorder caused by his Hepatitis B vaccination. Mr. Jeffries has championed his Hepatitis B vaccination as the cause of his disability from the beginning. There are two factors to consider: (1) many of Mr. Jeffries' symptoms pre-date his Hepatitis B inoculation and continued after and (2) Mr. Jeffries'

complaints of cognitive difficulties, the factor which allegedly disables him, did not surface until several years after his initial disability claim.  Mr. Jeffries' quest to tie his symptoms to the Hepatitis B inoculation came with a 20/20 episode he saw.  *See* Exhibit B at Claim 3130-31; *see also* Exhibit H, Deposition of Eric Jeffries at pp. 80, 95.  He has since tried to convince his treating physicians that his problems were caused by the vaccination.  In March 1999, Mr. Jeffries sent a copy of the 20/20 episode to Dr. Luggen for review.  *See* Exhibit B at Claim 2230.  He has also associated himself with doctors whose primary focus of research, and therefore funding, is in exploration of a possible link between Hepatitis B vaccinations and the chronic fatigue type symptoms Mr. Jeffries claims to suffer.  Interestingly, when Dr. Luggen apparently discounted the relationship to the vaccination, and rejected a similar patient referral from Mr. Jeffries, Mr. Jeffries wrote back to Dr. Luggen:

> I was quite surprised by your response to him that you did not want to see him because you did not believe there is any correlation between his illness and the vaccine.
>
> What really surprises me is even though I am trying to help you find a cause and effect relationship, you have absolutely no interest in exploring it.  I cannot understand why.

*See* Exhibit B at Claim 2229.  As the letter illustrates, Mr. Jeffries was clearly irritated by Dr. Luggen's refusal to accept his Hepatitis B theory.

Mr. Jeffries' treating physicians have consistently offered the opinion that they believe there is something wrong with Mr. Jeffries and that the symptoms he suffers are real.  Mr. Jeffries claims to suffer a physical illness which has caused his disability.  Review of the medical information submitted establishes a different diagnosis.  Mr. Jeffries' treating physicians are not able to offer an opinion to a reasonable degree of medical certainty as to whether Mr. Jeffries' symptoms are caused by a physical or mental disorder.  Thus, the opinions of his

treating physicians are inconclusive with regard to the cause of Mr. Jeffries' disability.  More important for consideration of this Motion, they fail to establish to a reasonable degree of medical certainty that Mr. Jeffries' problems have a physical as opposed to mental origin.

      **a.**      **Many Of Mr. Jeffries' Symptoms Pre-Date His Inoculation**.

It is important first to consider Mr. Jeffries' medical condition prior to his Hepatitis B vaccination.  Dr. Nunlist-Young is the physician that administered Mr. Jeffries' Hepatitis B shot.  Dr. Nunlist-Young had treated Mr. Jeffries for various and sundry complaints in the several years prior to his inoculation.  A review of Dr. Nunlist-Young's records reveals a pattern of multiple subjective complaints without objective findings.

Dr. Nunlist-Young testified that he first saw Mr. Jeffries on January 25, 1993.  *See* Exhibit C, Nunlist-Young deposition at p. 5.  At the time Mr. Jeffries complained of prostrate problems.  *Id.*  Although Mr. Jeffries articulated symptoms of prostatitis, his exam was negative.  *Id.* at p. 7.  Between 1993 and 1997, Mr. Jeffries returned to Dr. Nunlist-Young on several occasions and often complained of bronchitis-like symptoms.  *See id.* at pp. 15-20.  In March of 1995 he complained of feeling funny, having hot flashes, feeling disoriented slightly and having pain in the back of his neck.  *See id.* at pp. 28-29.  Mr. Jeffries described a cold with a cough and a sore throat but no runny nose or earache.  *Id.* at p. 29.  Once again Dr. Nunlist-Young was unable to make any objective findings.  On March 21, 1995, Mr. Jeffries saw another doctor in Dr. Nunlist-Young's office, Dr. Regina Moulton.  He gave a history to Dr. Moulton of problems with either his gallbladder or liver, complained of pain in the right area under the rib cage.  *See id.* at p. 34.  Dr. Moulton made an assessment of right upper quadrant pain suspicious of gallbladder disease.  *See id.* at p. 36.  The objective tests to rule out gallbladder disease were unremarkable.  *See id.* at p. 37.  Dr. Nunlist-Young saw him again on March 27, 1995 and he

continued to complain of right upper quadrant pain. Again on March 25, 1996, approximately a year later, Mr. Jeffries complained of right upper quadrant discomfort. *See id.* at p. 55. As the deposition testimony of Dr. Nunlist-Young establishes, Mr. Jeffries' complaints of pain in the right upper quadrant pre-date his Hepatitis B vaccination. Mr. Jeffries also has a significant history of gastrointestinal problems.

### b.    Mr. Jeffries Does Not Accurately Describe His Symptoms.

Although the records of Dr. Nunlist-Young establish a prior medical history of right upper quadrant pain, since the time of his Hepatitis B vaccination, Mr. Jeffries has tied the onset of his symptom complex to that vaccination. There are other inaccuracies in Mr. Jeffries' history. When asked to describe the circumstances of his Hepatitis B vaccination, Mr. Jeffries inevitably relates to his physicians that he was ill at the time of inoculation. Dr. Hyde considers the fact that Mr. Jeffries had an illness at the time of inoculation as a factor in his conclusion that his problems are related to the inoculation. *See* Claims file at Claim 737. In fact, the records of Dr. Nunlist-Young, as well as Dr. Nunlist-Young's deposition testimony, establish that Mr. Jeffries was not ill at the time of inoculation.

Mr. Jeffries saw Dr. Nunlist-Young on June 16, 1997. At that time he reported that he had been exposed to somebody with scarlet fever. Exhibit C at p. 66. He also requested a Hepatitis A and B vaccination. Mr. Jeffries had no fever at the time of his June 16, 1997 examination. *Id.* To be sure that Mr. Jeffries did not have the strep virus, which causes scarlet fever, Dr. Nunlist-Young performed a rapid strep test. *Id.* This test was negative. *Id.* Dr. Nunlist-Young also prescribed antibiotics in case the complaints of Mr. Jeffries were caused by a bacterial problem. *Id.* Two days later Mr. Jeffries returned for his inoculation. At the time of his inoculation no symptoms are documented. *See id.* at 68.

After receiving his Hepatitis B vaccination, Mr. Jeffries reported to Dr. Nunlist-Young that he had an adverse reaction. *See* Exhibit C at p. 68. He continued to complain of an adverse reaction to Dr. Nunlist-Young for approximately two weeks. *Id.* at pp. 68-74; 77-80. Then, on July 8, 1997 he saw Dr. Dunn. He reported to Dr. Dunn the same type of symptoms he had been reporting to Dr. Nunlist-Young. *See* Exhibit D, Dunn depo. at pp. 5-6. The next day however on July 9, 1997, Mr. Jeffries reported to Dr. Nunlist-Young that he was feeling fine. Exhibit C at 83. He asked that his recent symptoms be explained as an allergic reaction because he was changing insurance companies. *Id.* at 83-84. Dr. Nunlist-Young did document the fact that his symptoms could have been caused by a possible allergic reaction. *Id.*

Despite his report to Dr. Nunlist-Young that he was feeling fine, Mr. Jeffries continued to report to Dr. Dunn that he was experiencing problems. Mr. Jeffries did not give Dr. Dunn a complete history. For example, Dr. Dunn testified in deposition that he thought Mr. Jeffries' right upper quadrant pain began with his Hepatitis B shot. *See* Dunn deposition at p. 7. Dr. Dunn admitted that Mr. Jeffries' multi-year history of right upper quadrant pain could have been of interest to him in making his diagnosis. *See* Dunn deposition at p. 8. Dr. Dunn was also unaware that Mr. Jeffries had reported to Dr. Nunlist-Young that he was feeling fine or that Mr. Jeffries had asked Dr. Nunlist-Young to record his problem as an allergic reaction. *See* Dunn deposition at p. 13.

Another more recent development is an allegation contained in his Memorandum in Opposition to Centre Life's PET/SPECT Daubert motion. On page one of his brief Mr. Jeffries' again gives the inaccurate history of an acute illness at the time of his inoculation. For the first time in this Motion though he adds the additional fact of the development of a lump at the time of his shot that needed to be surgically removed. Doc. No. 31 at p. 1. Neither Dr. Dunn nor

Dr. Nunlist-Young, the two physicians who examined Mr. Jeffries' closest in time to his inoculation, gave this surgical history. In his brief Mr. Jeffries does not identify the physician that performed the surgery, the date of the surgery or the location.

> **3.    Mr. Jeffries' Has Pursued A Link Between His Complaints And His Hepatitis B Vaccination And Is Focused On His Illness.**

From the onset of his consultation with Dr. Dunn, Mr. Jeffries had expressed concern about a possible adverse reaction to his Hepatitis B vaccination. *See* Exhibit D, Dunn deposition at p. 16. Dr. Dunn was unable to find any verifiable Hepatitis B symptoms. *See id.* at p. 30. Dr. Dunn told Mr. Jeffries it was his impression that any problems from the Hepatitis B vaccination would go away. *Id.* at pp. 28-29. Although Dr. Dunn tried to allay Mr. Jeffries' fears regarding a Hepatitis B reaction, he was unable to do so. *See id.* at p. 36. He stated that his recollection was "that this was a recurring theme that came up other times than just this telephone conversation. It was also discussed at several visits. And he brought in his own research materials, which indicates that this has come up multiple times." *Id.* at pp. 36-37. Dr. Dunn testified that "[Mr. Jeffries] kept looking for reasons for the fatigue." *See id.* at p. 37. Dr. Dunn also testified he agreed that Mr. Jeffries was focused on finding some reason for feeling the way he felt. *See id.* at p. 37. Dr. Dunn was unable to find any objective problems however.

Through March of 1999, Dr. Dunn did not record any cognitive complaints from Mr. Jeffries. *See id.* at pp. 43-44. When he last saw Mr. Jeffries on February 23, 2001, Dr. Dunn saw no evidence of a physical disease. *See id.* at pp. 49, 57. At that last visit, Mr. Jeffries

reported to Dr. Dunn that he had long-term employment plans to travel and set up sports convention shows. *See* pp. 49-50.[5]

Dr. Dunn is one of the physicians who has testified on behalf of Mr. Jeffries that he believes something is wrong with him although he is unable to determine exactly what. Dr. Dunn has conferred with Dr. McClellan who agreed that they could not confirm what problem he specifically had. *See id.* at pp. 56-57. Dr. Dunn agrees however that Mr. Jeffries believes his symptoms are real. *See id.* at p. 75. But, Dr. Dunn is unable to offer an opinion as to the cause of Mr. Jeffries' symptoms. *See id.* at p. 76. To date, Dr. Dunn has been unable to perform any testing that would diagnose any type of autoimmune disorder. *See id.* at p. 79.

Mr. Jeffries also consulted with Dr. Michael Luggen a rheumatologist. *See* Exhibit I, Luggen deposition at p. 4. Dr. Luggen last saw Mr. Jeffries on April 4, 2000. *See id.* at p. 6. As of December 23, 1999, Dr. Luggen's diagnosis was a possible autoimmune disorder with an unclear cause and no objective abnormalities. *See id.* at p. 9. Dr. Luggen testified that he never saw any evidence of any disease he could diagnose. *See id.* at p. 31. Similarly, Dr. Luggen never saw a cognitive problem. *See id.* at p. 36.

In deposition, Dr. Luggen acknowledged that Mr. Jeffries was focused on his illness and the possible causes. *See* Luggen deposition at p. 10. Dr. Luggen also acknowledged that Mr. Jeffries was attempting to tie his problems to the Hepatitis B inoculation. *See id.* at p. 26. Based on the history given to him by Mr. Jeffries, for example, Dr. Luggen did not know that Mr. Jeffries had a history of abdominal problems. *See id.* at p. 20. Dr. Luggen also believed that prior to the Hepatitis B inoculation, Mr. Jeffries had not had a need for ongoing medical care. *Id.* at p. 23. Finally, Dr. Luggen testified that despite Mr. Jeffries' efforts to find a cause for his

---

[5] Later in October 2001 Mr. Jeffries reported to Dr. McClellan that he was working with a partner to market a patented idea for cell phones.

problems, his interpretation was that his lab results and examinations were normal. *Id.* at pp. 26-27.

Dr. Luggen acknowledged that Mr. Jeffries took it upon himself to explore possible medical theories. He would travel to various specialists and then share the findings with Dr. Luggen. *Id.* at pp. 30-31. It appears that Mr. Jeffries also shared his interpretation of the findings; or at least the interpretation he wanted Dr. Luggen to reach. For example, Dr. Luggen was questioned regarding some lab results that Mr. Jeffries presented to him. In his notes it is represented that the lab results were abnormal. This was not actually the case. Dr. Luggen was questioned:

Q:      And according to your note, all of these were abnormal; is that right?

A:      That's what my note says. And in reviewing it, that's actually not true.

*See id.* at p. 12. It is also interesting to note that in February of 2000, Mr. Jeffries asked Dr. Luggen for a referral for psychiatric or psychological counseling. *See id.* at p. 16. Dr. Luggen does not know that he gave such a referral.

The bottom line is that Dr. Luggen, like Dr. Nunlist-Young and Dr. Dunn, was unable to opine to a reasonable degree of medical certainty as to the cause of Mr. Jeffries' problems or even reach a consensus on what his problem is. As such, none of Mr. Jeffries' attending physicians can offer an opinion as to whether Mr. Jeffries' disability is of a mental nature or a physical one.

Moreover, Dr. Luggen reaches a conclusion consistent with the diagnosis of somatoform disorder in his admission that he never had a patient as persistent as Mr. Jeffries and that Mr. Jeffries was focused on his illness and possible causes. *See id.* at p. 10; pp. 32-33. Dr. Luggen was questioned:

Q:       Did you ever see any objective verification of a recognizable disease in the entire course of treatment with Mr. Jeffries other than the thyroid cancer that he did have and was rectified?

Mr. Roberts:  Objection.

A:       Nothing that I could diagnose.

Q:       Would the symptoms, coupled with the examinations and physical findings, and the activities of Mr. Jeffries in the way he approached the disease process, suggest potentially a somatic or psychosomatic source and then an obsession with finding that illness or source?

Mr. Roberts:  Objection.  Foundation.

A:       I'm not sure I can comment one way or the other on that.

Q:       Would you have any reason to suggest that there is not a psychosomatic component to Mr. Jeffries' course?

Mr. Roberts:  Objection.  Same.

A:       I think the fact that he was persistent and consistent in his symptomology, for the most part, suggested to me that there was something, something responsible for it.  What that was, was certainly beyond me.

*See id.* at pp. 31-32.

When later asked regarding Mr. Jeffries' involvement in his search for an illness,

Dr. Luggen commented that "but I don't think I have seen anyone who has been so persistent as

Mr. Jeffries."  *See id.* at pp. 32-33.

The long and the short of it is that the majority of Mr. Jeffries' treating physicians cannot

ascribe any physical cause to Mr. Jeffries' symptoms.  Dr. Nunlist-Young, Dr. Dunn and

Dr. Luggen agree that there are no objective physical findings that would substantiate

Mr. Jeffries' complaints.  The only diagnosis consistently offered is that of possible chronic

fatigue syndrome.  Chronic fatigue syndrome, however, is a diagnosis of exclusion.  In other

words, all other possible explanations for Mr. Jeffries' problems need to be excluded.  As his

own treating physicians have conceded, the possibility of some type of mental disorder is not one they can exclude.

### 4.    Dr. McClellan's Findings Support A Mental Disorder Diagnosis.

The only other treating physician whose decision needs to be considered is that of Dr. McClellan.  Dr. McClellan first saw Mr. Jeffries on October 14, 1998.  *See* Exhibit J, McClellan deposition at p. 5.  By history, Dr. McClellan was given no definitive diagnosis for Mr. Jeffries' problems.  *See id.*  Like Dr. Luggen, Dr. McClellan did not know that Mr. Jeffries' right upper quadrant pain pre-dated the Hepatitis B inoculation.  *See id.* at p. 9.  Dr. McClellan acknowledged that it would be important to him to know when that pain began.  *See id.* at p. 10. Like the other treating physicians, Dr. McClellan agrees that most of Mr. Jeffries' physical findings over the course of his treatment have been unremarkable.  *See id.* at p. 40.  He also agrees that Mr. Jeffries is the most active patient he has had.  *See id.* at p. 49.  Finally, he agrees with Dr. Luggen that Mr. Jeffries does not have fibromyalgia.  *See id.* at p. 55.

Dr. McClellan has accepted Mr. Jeffries' argument that he has an autoimmune disorder caused by his Hepatitis B inoculation.  Although Dr. McClellan rejects Mr. Jeffries' contention that the fact that his son has some sort of autoimmune disorder would lead him to expect that Mr. Jeffries would have one too, he does support Mr. Jeffries' argument.  *See id.* at p. 100. When questioned regarding the specifics of Mr. Jeffries' diagnosis however, Dr. McClellan has no choice but to admit that Mr. Jeffries does not fall into the typical category.  Dr. McClellan also acknowledges that he does not have any other patients like Mr. Jeffries.  He was questioned:

Q:    How many patients like Mr. Jeffries do you have, doctor?

A:    I don't have any others, thank the Lord for that.

*See id.* at p. 61.

When the checklist of "typical" Hepatitis B reactions is examined, Mr. Jeffries does not fit the mold. Dr. McClellan acknowledged that Mr. Jeffries does not have arthritis although the case reports that he has read talk about rheumatoid arthritis like syndrome. *See id.* at p. 25; *see also* Geier affidavit at ¶¶ 25-27, 30-33. He also denied knowing whether patient who complained of an immunization reaction should have tested positive for a Hepatitis B surface antibody. *See id.* at p. 25. Mr. Jeffries tested negative for a Hepatitis B surface antibody. *See,* Exhibit B at Claim 3098. This is contrary to the anecdotal records of other Hepatitis B reactions.

Dr. McClellan cannot render a physical diagnosis to an acceptable degree of medical certainty. Despite his efforts to advocate for his patient, his final diagnosis is a diagnosis of exclusion. This means he must rule out all other probable causes. It is important to note that McClellan eliminated a vast number of both common and obscure possible diagnoses. He was questioned:

Q:    Okay. Can you give me a list or did you know what the considered diagnoses were at the time [of his initial consultation on October 14, 1998]?

A:    The list of potential diagnoses was very broad and included everything from infections; those would be, for example, mononucleosis, Ebstein Barr virus infection, cytomegalovirus, herpes virus infections, as well as infections caused by, what we call, vectors, mosquito bite borne, anthropod borne infections, for example, lyme disease.

They include many rheumatologic diseases, autoimmune disorders, lupus, rheumatoid arthritis, Behcet's disease . . ., as well as fibromyalgia, a non-autoimmune rheumatologic disorder, endocrinologic disorders, thyroid disease.

And there are other potential causes that we eventually looked into that includes some very rare disorders, but I think at the time I originally saw him those were the initial primary considerations that had been looked at that point.

Q:    Over the course of time were you able to narrow the list?

A:    We were able to exclude many of the disorders that we considered.  We also went on to look into various gastrointestinal problems because he had abdominal pains as part of his symptom complex[6], so we considered inflammatory bowel disease, other infectious and non-infectious problems of the bowel, some very strange disorders, porphyrias, Whipple's disease, paroxysmal nocturnal hemoglobinuria, some diseases that I have only read about in textbooks and in 15 years in practice never seen a case of.

*See id.* at pp. 7-8.  Dr. McClellan eventually opined that he believes Mr. Jeffries' problems stem primarily from a central nervous system that somehow involves his gut and therefore his abdominal symptoms.  *See id.* at p. 28.  Even if this is accepted as true, as noted above, Mr. Jeffries' abdominal symptoms pre-date his Hepatitis B inoculation.  Had this full history been made known to Dr. McClellan, as he stated would have been of interest to him, perhaps his diagnosis would be different.

Although Dr. McClellan has accepted Mr. Jeffries' argument that his problems stem from his Hepatitis B inoculation and, therefore, are somehow related to a physical as opposed to a mental disorder, he cannot rule out the very real possibility of a mental disorder.  He admits that his diagnosis is one of exclusion.  *See*, Exhibit J at 112.  He than admits that although he disagrees with the diagnosis of somatoform disorder, Dr. Eric Dalvi's diagnosis of functional movement disorder, which is also a psychogenic problem, is "another potential explanation for his symptoms."  Exhibit J at pp. 111-113.  Dr. McClellan cannot exclude this potential mental diagnosis and so by his own admission, his diagnosis of exclusion fails.

D.    **Mr. Jeffries Must Submit Sufficient Proof Of Loss To Establish A Physical Disability.**

Mr. Jeffries' policy requires that he provide sufficient proof of loss to show that he is entitled to benefits under the terms of his policy.  Under Ohio law, the person "who seeks to recover on an insurance policy generally has the burden of demonstrating coverage under the

---

[6] Recall however that Mr. Jeffries' gastrointestinal problems pre-existed his Hepatitis B inoculation.

policy and then proving a loss." *See Chicago Title Insurance Company v. Huntington National Bank*, 87 Ohio St. 3d 270, 273, 719 N.E.2d 955 (1999) *citing Inland River Service Corp. v. Hartford Fire Insurance Company*, 66 Ohio St. 2d 32, 418 N.E.2d 1381 (1981). In this case Mr. Jeffries has put forth evidence which has established he has a disability caused by a mental disorder. Benefits have been paid under his policy for a mental disorder. The burden rests on him to prove that he has a physical disorder for which continued benefits under his policy are due. The medical evidence before the Court demonstrates that Mr. Jeffries has not met this burden.

The vast amount of medical information in this case can be summarized in the several affidavits prepared by Mr. Jeffries' treating physicians and submitted by Mr. Jeffries in support of his claim. None of the affidavits of Mr. Jeffries' treating physicians assign a cause to his disability. Dr. Dunn states in pertinent part:

- Since July 1997, I have treated Mr. Eric Jeffries on an intermittent basis for a malady which he continues to suffer. . . . After seeing Mr. Jeffries several times, I am certain that Mr. Jeffries' symptoms are real and have a significant debilitating effect on him.

- Since beginning my treatment of Mr. Jeffries, I have suspected that his condition presents some systemic illness with rheumatologic features.

- **It is my opinion that irrespective of my inability to precisely diagnose Mr. Jeffries' condition,** the effects of his illness make him unable to perform the material and substantial duties of his occupation of a merchant banker."

*See* Exhibit K, Affidavit of Corwin Dunn. Dr. Luggen has concurred:

- Specific diagnostic testing has failed to yield a precise diagnosis of Mr. Jeffries' illness.

- I am reasonably certain that many of Mr. Jeffries' symptoms are real and have a debilitating effect on Mr. Jeffries. I believe he suffers from substantial pain even though diagnostic test results to date have not focused on any one disease.

- It is my opinion that **irrespective of my inability to precisely diagnose Mr. Jeffries' condition, the effects of his illness make him unable to function in a consistent manner and he is unable to function professionally without interruption.**

*See* Exhibit L, Affidavit of Michael Luggen.  Finally, Dr. McClellan also admits that he is unable to precisely diagnose Mr. Jeffries although he continues to believe he is disabled.

- I believe he is disabled even though specific diagnostic tests have failed to yield a precise diagnosis or a common name for his illness.

- It is my opinion that irrespective of **the inability to precisely diagnose Mr. Jeffries' condition**, the effects of his illness make him unable to perform the material and substantial duties of his occupation of a merchant banker.

*See* Exhibit M, Affidavit of Michael McClellan.

What these affidavits have in common is their admitted inability to precisely diagnose Mr. Jeffries' condition.  Without a diagnosis there can be no valid opinion as to causation.  Ohio law requires that the opinion of a physician be rendered to a reasonable degree of medical certainty.  In this case, Plaintiff attempts to establish a cause between his Hepatitis B vaccination and his illness.  With regard to a causal relationship, the Sixth Circuit has held "[W]e believe that a medical expert must be able to articulate that there is more than a mere possibility that a causal relationship exists between the defendant's negligence and the injury for which the plaintiff seeks damages."  *Mayhew v. Bell S.S. Company*, 917 F.2d 961, 963 (6th Cir. 1990).  Although the liability issues were obviously different in that case, the causation question is analogous.  Mr. Jeffries' doctors cannot opine a medically sufficient connection between the Hepatitis B vaccination and a physical illness.  Speculation or guessing is not sufficient evidence to defeat a properly supported motion for summary judgment.

Dr. Hartings, on the other hand, has offered the opinion that Mr. Jeffries suffers from a mental disorder.  *See* Exhibit F.  Dr. Hartings' conclusion is based on his examination of

Mr. Jeffries, his neuropsychological analysis of Mr. Jeffries and extensive neuropsychological

testing performed on Mr. Jeffries. It is also consistent with the pattern displayed in Mr. Jeffries'

contacts with his treating physicians. Mr. Jeffries' history of numerous subjective complaints

without verifiable objective findings is in line with the diagnosis of somatoform disorder.

Mr. Jeffries has actual physical complaints. These complaints however cannot be fully explained

by any known general medical condition. These symptoms are not false and disturb his

functioning. As Dr. Hartings testified, Mr. Jeffries has undifferentiated somatoform disorder and

fits the criteria of that diagnosis. *See* Exhibit N, Hartings deposition at p. 143.

In Mr. Jeffries' case, his treating physicians all acknowledged that they are unable to

precisely diagnose his condition. Without a precise diagnosis, it is impossible to determine a

cause. Therefore, Mr. Jeffries' argument that his problems were caused not by his somatoform

disorder but by his Hepatitis B vaccination are not well-taken.

In addition to the opinions of his treating physicians, Mr. Jeffries also offered the

opinions of Burton Waisbren, Byron Hyde and David Geier.[7] Dr. Waisbren, Dr. Hyde and

Dr. Geier are the subject of *Daubert* motions submitted by Centre Life regarding their improper

methodology. It is also important to note that Dr. Hyde, Dr. Wasibren and Dr. Geier base their

research on their quest to tie adverse effects to the Hepatitis B vaccination. Their quest fits

nicely with Mr. Jeffries' quest. As the deposition of Dr. Hyde reveals, and the report of

Dr. Waisbren supports, Mr. Jeffries does not meet the typical criteria of the patients in their

anecdotal studies. Their opinions are therefore not well taken and insufficient to support an

opposition to this Motion.

---

[7] It is anticipated that Mr. Jeffries will also make reference to the opinions of various and sundry other physicians with whom he has consulted in his quest for a disease. Defendant has filed Daubert motions to exclude any unreliable opinions, along with the opinions of Drs. Waisbren, Hyde and Geier. These motions are incorporated herein by reference.

Moreover, the opinions of Drs. Waisbren, Hyde, Geier and any other consulting physician, do not establish any continued right to benefits under the policy. To meet the definition of Total Disability Mr. Jeffries must be under the care of a physician. He is not under the continued care of these other consulting physicians and has therefore not submitted sufficient proof of loss. Even if their opinions were considered, they do not establish any right to benefits and Centre Life is entitled to a determination that it did not breach the contract as a matter of law.

### E.    Mr. Jeffries Is Not Entitled To A Declaration Of Continued Benefits.

Mr. Jeffries has also sought a declaration that he is permanently disabled and entitled to continued payment of benefits. The policy does not contain any provision for "permanent disability." The policy does contain provisions for presumptive total disability. *See* Exhibit A at pp. 3-4. Mr. Jeffries does not meet the terms of this portion of his policy, however. Specifically, total disability is presumed if an insured loses the entire use of both hands or the entire use of both feet or the entire use of one hand and one foot or the total loss of power of speech or the total loss of hearing in both ears. Where these factors are met an insured is entitled to presumptive total disability benefits regardless of continued medical care by a physician or his ability to engage in any work or occupation.

Mr. Jeffries does not meet the criteria of presumptive total disability. As such, he is not entitled to a declaration of presumptive total disability. It is this declaration he in fact seeks in Count Six of his Complaint. The Court must apply the plain and ordinary meaning of the policy. The Ohio Supreme Court has declared that "if a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined." *See Inland Refuse Transfer Co. v. Browning-Ferris Industries of Ohio, Inc.*, 15 Ohio St. 3d 32, 322, 474

N.E.2d 271, 272 (1984). Courts have "an obligation to give plain language its ordinary meaning and to refrain from rewriting the contractual agreement of the parties." *See Miller v. Marrocco*, 28 Ohio St. 3d 438, 439, 504 N.E.2d 67, 69 (1986). In other words, "when the language of an insurance policy has a plain and ordinary meaning, it is unnecessary and impermissible for this court to resort to construction of that language." *See Karabin v. State Auto. Mut. Ins. Co.*, 10 Ohio St. 3d 163, 166-167, 462 N.E.2d 403, 406 (1984). In this case, there is no allegation that the terms of the policy are unclear or ambiguous and the Court is required to give effect to the policy as written. Nothing in Mr. Jeffries' policy allows for a declaration of permanent total disability other than Section 3, Presumptive Total Disability. The criteria of this section have not been met and Mr. Jeffries' request for declaratory judgment must be denied.

**F.    The Remaining Counts Of Mr. Jeffries' Complaint Are Without Basis In Fact Or Law.**

Mr. Jeffries has also alleged invasion of privacy, interference with contract and conspiracy. Mr. Jeffries cannot meet his burden with regard to these claims.

**1.    Invasion Of Privacy.**

Mr. Jeffries' invasion of privacy claim appears to stem from the surveillance performed by Centre Life and DMS during the evaluation of his claim. Surveillance is a commonly accepted investigation tool used by insurance companies. Centre Life's own consultant, Mary Fuller, admits that surveillance is a tool that can be used in the course of an investigation. *See* Exhibit O, deposition of Mary Fuller at 31. She further admits that there were red flags of fraud raised in this case and that Centre Life's actions were reasonable. *Id.* at 109-110, 117. Finally, she admits that based on her review of the claim file, she cannot determine which periods of surveillance were conducted by Prudential and which were conducted by DMS. *Id.* at pp. 33, 107. As a matter of law, Mr. Jeffries' invasion of privacy claim must fail.

### 2.    Interference With Contract.

Mr. Jeffries' claim of interference with contract must also fail.  The authorization signed by Mr. Jeffries on his claims form allows Centre Life to obtain information from other insurance carriers.  The authorization, in pertinent part, allows any insurance company to give Centre Life "or its representative any and all such information required by them to determine my eligibility for policy claim benefits."  Exhibit B at Claim 3134.  Mr. Jeffries also signed an authorization with Prudential allowing the company to obtain information from other carriers including Centre Life.  Obtaining information from Prudential with the express permission of Mr. Jeffries cannot constitute interference with contract.

In any event, when Mr. Jeffries chose to revoke this authorization, it was honored.  This was done despite the fact that Mr. Jeffries expressly agreed that the "Authorization shall be valid for the duration of my current claim."  Mr. Jeffries instead chose to revoke the authorization and impede Centre Life's information-gathering process.

### 3.    Conspiracy.

For the same reasons, Mr. Jeffries' claim for conspiracy must also fail.  Mr. Jeffries has put forth no evidence that Prudential was engaged in any type of conspiracy with DMS and Centre Life to deny Mr. Jeffries' benefits under the Centre Life policy.  It has already been established that Mr. Jeffries' benefits were reasonably suspended when he refused to attend an independent medical examination.  The termination of his benefits came long after Mr. Jeffries had revoked his authorization to share information with Prudential.  That decision, therefore, had nothing to do with any interaction with Prudential.  Instead it was based upon the information contained in the claims file and the medical examinations and reports of Dr. Hartings, Dr. Bullard and Dr. Clinosky.

The burden on a non-moving party in response to a motion for summary judgment is to show, through the use of evidentiary materials that there exists a material fact which must be tried. *See Celotex Corp. v. Catrett*, 477 U.S. at 323, 324. The mere possibility of a factual dispute is not enough. *See Mitchell v. Toledo Hospital*, 964 F.2d 577, 581 (6th Cir. 1992). The court has the burden to make a threshold inquiry of whether there is a need for trial. In this case it is clear that with regard to the invasion of privacy, conspiracy and interference with contract claims of Mr. Jeffries' Complaint, there is no genuine issue for which a trial is required.

### G.     Centre Life Is Entitled To Reimbursement Of Overpaid Benefits.

As set forth above, Mr. Jeffries' policy limits payments for a disability caused by a mental disorder to 24 months. *See* Exhibit A at Amendment. Mr. Jeffries has been paid 39 months of total disability benefits. This results in an overpayment of in excess of $180,000.00. Centre Life seeks to recoup this overpayment.

Where a benefit has been conferred on a party and the party has knowledge that benefit was conferred, it is unjust for the party to retain the benefit. *See, Hambleton v. R.G. Barry Corp.* 12 Ohio St. 3d 179, 183, 465 N.E.2d 1298 (1984). Mr. Jeffries has been paid 15 months of benefits to which he was not entitled. Centre Life had filed a counterclaim for repayment of these benefits. Under the clear and unambiguous terms of Plaintiff's policy, he has a duty to submit continued proof of loss. As established herein, Mr. Jeffries cannot prove he has a physical disability for which additional benefits are due nor that he is under the care of a physician for a continuing physical disability. It would unjustly enrichment Plaintiff to allow him to retain the overpaid benefits and Centre Life asks for judgment in its favor on its counterclaim.

IV.   **Conclusion**

Mr. Jeffries has a mental disorder as defined under the terms of his policy.  He has been paid the entirety of the benefits to which he is owed under the terms of his policy.  To prevail on his claim of continued benefits, he must establish that he has any other type of physical disability which would entitle him to continued payment of benefits.  This he cannot do.  Accordingly, Mr. Jeffries' claim for breach of contract must fail.  With regard to Mr. Jeffries' bad faith claim, this Court has already determined that Centre Life acted reasonably and with justification in its suspension of Mr. Jeffries' benefits when he refused to attend a medical examination.  There can thus be no bad faith for non-payment of benefits between February 2002 when the benefits were suspended and the time Mr. Jeffries finally attended the medical examinations.  The subsequent termination of benefits in May, 2003 was also made in good faith.  Centre Life's determination was reasonably justified based upon the reports and examinations of Dr. Hartings and Dr. Bullard and the review of Dr. Clinosky.  Moreover, Plaintiff cannot establish that he in fact has a physical disorder which would entitle him to payment of continued benefits.  Even if he could however, this would still not justify a finding of bad faith.  Centre Life further moves for summary judgment on the remaining claims of Plaintiff's Complaint and seeks reimbursement of those benefits overpaid.  Centre Life respectfully requests the opportunity to present oral argument on this issue.

Respectfully submitted,

s/William R. Ellis
William R. Ellis (0012279)
Peter M. Burrell (0044139)
Amy Gasser Callow (0063470)
Wood & Lamping LLP
600 Vine Street, Suite 2500
Cincinnati, OH  45202-2491

(Telephone) (513) 852-6000
(Facsimile) (513) 852-6087

Attorneys for Defendants
Massachusetts Casualty Insurance Company
and Disability Management Services, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing has been filed with the Court by electronic means on this 22nd day of January 2004.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

s/William R. Ellis<br>
William R. Ellis, Esq.

196138.1