# NEUROPSYCHOLOGICAL EVALUATION AND ASSESSMENT REPORT

**NAME:** Eric Jeffries
**DATE OF BIRTH:** 5-16-1961
**DATE OF EVALUATION:** 9-20-2001
**EXAMINER:** Curt Sandman, PhD, James O'Halloran, PhD, Sarah Marion

**REASON FOR REFERRAL:** Mr. Eric Jeffries, a 40-4 year-old man, was self-referred for evaluation of neuropsychological functioning. Mr. Jeffries was diagnosed with vaccine-induced autoimmune disorder following Hepatitis A and B vaccinations in June, 1997. He experienced serious symptoms within days of the vaccinations and reports that over time his cognitive function has deteriorated significantly. Mr. Jeffries was evaluated with a comprehensive neuropsychological assessment by Sheila Bastien, PhD in July, 2000. She concluded that Mr. Jeffries exhibits neurocognitive abnormalities including "impairment in attention, auditory verbal memory, verbal fluency and ability to screen out background interference." Mr. Jeffries requested this evaluation to determine his current status and to be evaluated with several specific tests of memory. This evaluation was confined to testing and not a comprehensive diagnostic interview or a review of records.

**PRESENT EVALUATIONS:**

*Evaluation Instruments*

Mini-Mental Status Examination (MMSE)
Benton Mental status
Blessed MSQ (Kahn-Goldfarb)
"15 item" Malingering Evaluation
Carrol Depression Rating Scale
Barona Premorbid Index
Wechsler Adult Intelligence Scale-III (WAIS-III)
Wechsler Memory Scale-III (WMS-III)
Wisconsin Card Sort Test (WCST)
Trail-Making Test-A & B (TMT)
Boston Naming Test (BNT)

CLAIM 01140

# Graydon
# Head &
# Ritchey
# LLP

*Attorneys at Law*

**Michael A. Roberts**
Direct Dial: (513) 629-2799
E-Mail: mroberts@graydon.com



February 6, 2002

***Via Fax (617) 338-4419; Hard Copy To Follow***
Mr. Jeff Champagne
Disability Management Services, Inc.
155 Federal Street, 7th Floor
Boston, Mass. 02110

    ***Re:*** ***Eric Jeffries***

Dear Mr. Champagne:

I am writing to respond to your letter of January 10, 2002, and your request that Mr. Jeffries undergo still more medical tests. For the reasons discussed below, your request is not reasonable and is, therefore, unacceptable. Furthermore, the timing of your request is incredibly curious, if not suspicious.

It has been conclusively documented that DMS and Prudential have colluded to improperly deny Mr. Jeffries' respective claims for benefits. The collusion is obvious from (I) the phone logs produced; (ii) the evidence that you jointly hired a single surveillance company to conduct secret surveillance of Mr. Jeffries in January 2000; and (iii) the timing of your respective letters of January 4, 2002, and January 10, 2002. Your collusion resulted from your respective desire to deny Mr. Jeffries' claims because of their size and his youth.

"Plan A" of the strategy hatched by DMS and Prudential was to have Prudential take the lead in harassing Mr. Jeffries, withhold disability benefit payments from Mr. Jeffries, and improperly deny Mr. Jeffries' Claim. Plan A also called for DMS to slither to the sidelines and harass Mr. Jeffries but to also do the minimum necessary to avoid a lawsuit and the potential for punitive damages on a bad faith claim.

No doubt, DMS and Prudential assumed that Plan A would succeed (or at least strategically determined that it was the advisable first option) in accomplishing the goal of improperly denying Mr. Jeffries' respective claims since Plan A required Mr. Jeffries to jump through the hoops of an expensive, exhaustive, and labored 3-step internal appeal process with Prudential. You each no doubt believed that, <u>if</u> Mr. Jeffries had the stomach to survive that lengthy and expensive internal appeal procedure with Prudential, <u>then</u> once in Court,

---

www.graydon.com

*Mailing Address*
P.O. Box 6464
Cincinnati, Ohio 45201-6464

*Cincinnati Office*
1900 Fifth Third Center
511 Walnut Street
Cincinnati, Ohio 45202-3157
telephone (513) 621-6464
fax (513) 651-3836

*Kentucky Office*
8100 Burlington Pike
Suite 480
Florence, Kentucky 41042-1212
telephone (859) 282-8800
fax (859) 525-0214

CLAIM 01174

# Disability Management Services, Inc.

*A Third Party Administrator for*
**Massachusetts Casualty Insurance Company**
*7th Floor 155 Federal Street*
*Boston, MA 02110*
*Tel: (800) 462-9897*

January 10, 2002

Graydon, Head & Ritchey, LLP
Attn: Michael Roberts
P.O. Box 6464
Cincinnati, OH 45201-6464

Re:    Eric Jeffries
     Claim #: 402696
     Policy #: 641734

Sent by fax to (513) 651-3836 and overnight to Mr. Jeffries residence

Dear Mr. Roberts:

We are writing to provide you with an update.

After review at your request of Dr. Sheila Bastein's May 1, 2001 neuropsychological report of Mr. Jeffries, our in-house consultant has noted various inconsistencies with the validity of the tests administered by Dr. Bastein and her scoring of each evaluation. Since the inconsistencies of this evaluation raise numerous questions as to whether or not your client is suffering from a disabling condition and qualifies for disability benefits, we have chosen to exercise our right under the policy to have Mr. Jeffries examined. As written in your client's policy and in our August 30, 2001 letter (copy enclosed), we have a right to have Mr. Jeffries examined by an examiner of our choice as often as is reasonable while a claim is pending.

Once again, we have scheduled the first of two IME's for Mr. Jeffries to attend. The first IME is scheduled for Thursday February 14, 2001 at 9:00 AM at the following address:

Sycamore House
Kathleen Hart, Ph. D (Neuropsychologist)
Xavier University
Cincinnati, OH 45207-6411
Phone: (513) 745-3278

For directions, the test facility may be reached at the above phone number. Mr. Jeffries is expected to arrive to the scheduled appointment promptly. No cancellations will be accepted for this examination not to take place, per us agreeing to review, at your request, Dr. Bastein's report. Please be advised that failure to attend this appointment may impact Mr. Jeffries eligibility for further benefits.

*d/b/a New England Claims Administration Services, Inc. in FL, MD, ME*
*Licensed as New England Claims Administration Services, Inc. in CA*
*d/b/a Centre Claims Administration Services in NH*

Jeffries                                  2                    January 10, 2002

To be of service and as a convenience, we are supplying you with an additional copy of Dr. Hart's curriculum vitae.

Lastly, as written in our November 2, 2001 letter (copy enclosed), we are still in the process of arranging an exam with an Infectious Disease Specialist for Mr. Jeffries to attend. We will contact you and your client immediately once this examination is scheduled, to avoid any confrontations with the date and time of the appointment.

If you should have any questions, please contact me at 800-462-9897 ext. 1855.

Sincerely,

John B. Graff
Disability Claim Consultant
Disability Management Services

Enc.: CV, copies of 8-30-01 & 11-2-01 ltrs.
CC: Eric Jeffries
JBG

CLAIM 01191

# Disability Management Services, Inc.

*A Third Party Administrator for*
**Massachusetts Casualty Insurance Company**
*7th Floor 155 Federal Street*
*Boston, MA 02110*
*Tel: (800) 462-9897*

August 30, 2001

Graydon, Head & Ritchey, LLP
Attn: Michael Roberts
P.O. Box 6464
Cincinnati, OH 45201-6464

Re:     Eric Jeffries
        Claim #: 402696
        Policy #: 641734

Dear Mr. Roberts:

We are writing to confirm the receipt of both your August 28, 2001 letters, as well as our discussion on the phone yesterday.

Following up to our conversation, we have postponed the Independent Medical Examination (IME) scheduled for Friday August 31, 2001 with Kathleen Hart, Ph.D (neuro-psychologist). The reason for this postponement, as stated by you, is prior to us sending Mr. Jeffries for further neuropsychological examinations; we should have his most recent examination reviewed by our appropriate in-house psychological specialist. Be advised that under the above policy we have a right to have Mr. Jeffries examined by an examiner of our choice as often as is reasonable while a claim is pending. To date, we have not conducted an IME at our expense on your client and in no way are harassing your client to adhere to his policy provisions. In addition, we have continued to provide total disability benefits while we continue our ongoing investigation of Mr. Jeffries claim.

However, we have forwarded Mr. Jeffries May 1, 2001 neuropsychological report to our in-house psychological specialist, Mitchell Clionsky, Ph. D, for a review. So that we can determine that the results of this examination are valid to the testing that was performed during the examination, we are requesting that you contact Sheila Bastien, Ph.D and convey that the raw data be forwarded to Dr. Clionsky at the following address:

Mitchell Clionsky, Ph.D
Licensed Clinical Psychologist
Neuro-psychology Associates of Western Mass
155 Maple Street
Springfield, MA 01105
#413-734-3331

*d/b/a New England Claims Administration Services, Inc. in FL, MD, ME*
*Licensed as New England Claims Administration Services, Inc. in CA*
*d/b/a Centre Claims Administration Services in NH*

CLAIM 01192

Jeffries – Page 2
August 30, 2001

Upon receipt of this data, Dr. Clionsky will be able to complete his review and we will address the concerns raised in both of your August 28, 2001 letters.  Please be advised that we are reserving our rights to conduct an IME on Mr. Jeffries.

If you should have any questions or concerns, please contact me at 1-800-462-9897 ext. 1855.

Very truly yours,


John B. Graff
Disability Claim Specialist
Disability Management Services

CC: Eric Jeffries
JBG

CLAIM 01193

NEURO-PSYCHOLOGY ASSOCIATES of western massachusetts

# MITCHELL I. CLIONSKY, Ph.D.
### Licensed Clinical Psychologist
### Diplomate, ABPP (CN)



January 3, 2002

Jeffrey Champagne
Disability Management Services
7th Floor
155 Federal Street
Boston, MA 02110

Re:    Eric Jeffries
Claim: 402696
Policy: 641734

Dear Mr. Champagne:

As you know, your company engaged me in late August 2001 to review the disability file on
the above named claimant and to comment on the neuropsychological evaluation performed by
Sheila Bastien, Ph.D.  I then telephoned your office in late October and we discussed my desire
to have Dr. Bastien respond to a series of questions regarding her evaluation and its
conclusions. For the sake of completeness, I am attaching that letter below:

*October 31, 2001*

*Sheila Bastien, Ph.D.*
*2126 Los Angeles Avenue*
*Berkeley, CA 94707-2618*

*Re:     Eric Jeffries*
*DOB:    5-15-61*

*Dear Dr. Bastien,*

*As you know from prior correspondence, I am the neuropsychologist who is reviewing the raw data and your
report on Mr. Jeffries for his disability carrier. I appreciate the extensive report and the raw data that you have
sent. There remain a few unanswered questions to which I would ask you to respond in order that I can expedite
my opinion regarding Mr. Jeffries's disability from employment:*

*1.    You reference the TOMM and Rey test in the section on malingering. I do not see either of these tests in
the raw data that you provided. I would appreciate the chance to review them.*

*2.    You discuss his Draw a Bicycle picture as being in the organic range. Would you kindly provide me with
your scoring criteria on this measure and Mr. Jeffries's particular score?  Similarly, you indicate that
his person drawing "resembles the drawings of individuals who have organic/neurologic problems" and
I am wondering what, aside from the drawing being in the 25% of the page to the left of center, suggests
this to you and what about it being placed at that point on the page causes you to consider it to be a sign
of organicity? By the way, did you instruct Mr. Jeffries to draw the picture in the middle of the page?*

---

CLAIM 01214

Jeffries, Eric
January 3, 2002
Page 2

JAN 2002
RECEIVED

3. You indicate that there are "serious signs of organicity (including a collision) on the Bender Gestalt test. Your raw data page appears to indicate a "near collision" of two figures. Is this the collision to which you refer and is this or some other indication the basis for your conclusion of serious signs of organicity?

4. I notice that your summary sheet indicates a memory score of 7 for TPT blocks but the raw data sheet appears to indicate a score of 8. Could you please clarify this apparent discrepancy?

5. I notice a T-score of 54 on the Category Test with 16.4 errors. I was surprised to see this very average T-score for such an impressively low number of Category errors. Could you comment on the comparison group that you used for this?

6. Was there a particular reason for choosing the 20-item Buschke-Fuld learning test as opposed to the Rey AVLT, the California Verbal Learning Test or the Hopkins Verbal Learning Test?

7 What do you make of his normatively better performance on the more difficult Trailmaking B with less robust performance on the less complex Trailmaking A?

8. I notice that you have administered three tests of story memory – the Story Memory Test, the WMS-III stories, and the WMS stories but have only reported the results of, and commented on, the first two. Was this an oversight?

9. Could you provide me with one or more references in regard to the use of the Differential Aptitude Test being used with persons who have neurological problems. This is a test I do not routinely use and would appreciate your referencing any validity studies.

10. You have administered the MMPI-2 and then caution against its use in patients with these types of complaints. How do you interpret this profile if not in reference to the traditional normative groups? I see that you compare it to patients with CFS and fibromyalgia, although my reading of the records suggests that these conditions were ruled out by treating physicians.

11. Is it your underlying assumption that Mr. Jeffries should function at a superior level in all areas of cognitive functioning because of his superior verbal IQ and occupation? Or is there some expected variability for persons at that level of verbal IQ or occupational class?

12. I understand that you see Mr. Jeffries as having had a very high level of preexisting functioning. Is there any data that you possess to indicate the amount of ability that an average investment banker must possess in order to perform his or her job adequately?

Thank you in advance for your assistance in this matter.

Yours truly,

Mitchell Clionsky, Ph.D.

In early December I received the following letter from Dr. Bastien, date November 26, 2001:

Dear Dr. Clionsky:

Your letter of October 31, 2001 asks for opinions, sample size, and research information, among other things. I was only asked to supply raw data; I therefore cannot give opinions, discuss my reasoning with you and so forth.

*You have asked for the raw data on the Rey and TOMM. These are being sent.*

*Item 4 of your letter points out a discrepancy on TPT Memory. I scored it correctly as an 8; a clerical error was made and it was recorded as a 7. I noted that when I went over the data and it has been corrected.*

*Sorry for the late response, I've been out of my office for weeks.*

*Sincerely,*

*Sheila Bastien, Ph.D.
Board Certified Neuropsychologist (ABPS)*

Frankly, I find Dr. Bastien's response to be unresponsive and unprofessional. Her unwillingness to comment on the basis for her opinions renders her opinion unscientific and very probably legally inadmissible under the *Daubert* criterion. She should realize this because, as it turns out, Dr. Bastien and I coincidentally sat next to each other for about 8 hours of a 20-hour forensic psychology conference in Seattle, Washington in early October and the subject of admissibility of scientific information was one of the topics presented at that conference. (By the way, I did not realize who she was at that time and we did not discuss this case).

Let me review my reasoning for asking the questions to Dr. Bastien so that the potential problems in her reasoning may be clearer:

1. This item asked for TOMM and Rey raw data and Dr. Bastien supplied it as requested. Both of these tests appear validly administered and scored. In both cases, the raw data support her contention that Mr. Jeffries gave effortful responses.

2. I believe that the issue of Mr. Jeffries's bicycle drawing on the Draw a Bicycle test is over-interpreted and over-pathologized by Dr. Bastien and cannot be used as evidence of any type of impairment. My reasoning is based upon the discussion and scoring system for bicycle drawings given by Muriel Lezak, Ph.D. in her book, Neuropsychological Assessment, Third Edition, 1995. This is possibly the most authoritative and comprehensive text on the general area of neuropsychological assessment in the field.

    Dr. Lezak provides a 20-point scoring system for bicycle drawings and a data table from the drawings of 141 blue collar workers in five age groups. According to my scoring of the drawing provided by Dr. Bastien, Mr. Jeffries receives 19 of 20 points (missing only a point for the absence of a fender on his bike). In his age group of 35-44 year olds, the mean or average score is 14.22 and the standard deviation is 3.63. Mr. Jeffries score is, therefore, 1.32 SD's above the mean, equivalent to a scaled score of 14 on a WAIS-R subtest and clearly within the above average range of functioning. This score cannot be called deficient or reflective of a neurological problem in any manner of speaking. I would also note that this score is significantly better than his scaled score of 8 on the Picture Completion subtest of the WAIS-III, ostensibly also a

CLAIM 01216

JAN 2002

measure of attention to relevant detail that Dr. Bastien cites as evidence of spatial detail problems. I would also note that Dr. Lezak does not discuss the locational placement of the bicycle on the page as an indicator of any type of pathology, even though Dr. Bastien makes a point of interpreting his slightly-to-the-left placement as reflecting organic damage.

3. I do not see the "collision" cited by Dr. Bastien in her discussion of the Bender-Gestalt and, in fact, she doesn't either. Her handwriting on the scoring form says that it is a "near coll". She also says that there are "serious signs of organicity" without specifying what those are. From what I can deduce, the only concerns she has involve the slight separation of a circle and diamond (which should be touching) and a slightly more vertical placement of an angled set of circles. I fail to see any way that she can arrive at her conclusion from these very insignificant deviations from perfection. I also fail to see the problems that she indicates on the Background Interference Procedure suggesting "disproportion; distortion; superfluous lines; variability; separation; collision; column misalignment; and a problem crossing in one of the figures." From my perspective, the figures that she photocopied and mailed to me look quite good. It is unfortunate that Dr. Bastien doesn't consider it to be her job to support her contention because I simply can't see her point.

4. Dr. Bastien has already commented that the wrong score was entered for the memory component of the Tactual Performance Test. This test of learning, memory, and spatial orientation and organization is therefore entirely within normal limits.

5. I still do not understand her scoring of the Category Test as being anything other than above average for Mr. Jeffries. According to the normative data published by Jerome Pauker, Ph.D. (1980) this score would fall in the above average range for people of this age group, equivalent to an IQ score of 124. Even for people with IQ's above 120 in Mr. Jeffries's age range, his score on this test represents fewer than half the usual number of errors. The importance of my question addressed to Dr. Bastien on this test is that the Category Test is a good measure of abstraction, attention to task over a lengthy period of time, and visuospatial functioning, according to Dr. Lezak's book. The Category Test is commonly viewed as being the single best measure of overall neuropsychological integrity, or as Dr. Lezak states, "the most sensitive to the presence of brain damage regardless of its nature or location" (citing Cullum and Bigler, 1986; G. Goldstein and Ruthven, 1983; M.C. King and Snow, 1981). She also indicates that it is has wide usage in neuropsychological evaluation because it is very sensitive to frontal lobe lesions, right sided tumors, head trauma sequelae, stroke-induced impairments, and the effects of alcoholism. From my perspective, the robustness of Mr. Jeffries's score on the Category Test goes counter to Dr. Bastien's conclusion that he suffers from impairment in executive functioning, has "serious nonverbal abstract reasoning problems", "easy distractibility", and "visual perceptual and visual-motor abnormalities."

CLAIM 01217

JAN 2002

6.  This question regarding the choice of the Buschke-Fuld 20-item learning task rather
    than several other auditory verbal learning tests was purely a request to better
    understand the characteristics of learning and retention that Dr. Bastien was trying to
    measure. I am not familiar with the norms for this test, cannot find it listed in Lezak's
    compendium of tests, and do not see a date or journal reference in either Dr. Bastien's
    raw data or her report. According to Dr. Lezak, under the heading "Selective
    Reminding (SR) (Buschke and Fuld, 1974), "... this is a procedure, not a developed
    test format, it has been given in many different ways" and I am not clear on the
    characteristics of this version used by Dr. Bastien. It is therefore very difficult to
    review her conclusions on the findings of this procedure. On the other hand, I am
    much more familiar with Rey's Auditory Verbal Learning Test, the California Verbal
    Learning Test, and the Hopkins Verbal Learning Test which Dr. Bastien did not use.

7.  I raised the question about the relative strength of performance on Trailmaking B vs.
    Trailmaking A because the results from Mr. Jeffries's performance on these measures
    of visual sustained attention and divided attention appeared contradictory to me.
    According to Dr. Bastien, his Trailmaking A score (involving a simple, connect-the-
    dots type of task) was "Below Average" due to slowness of processing, while his
    performance on the more complex task of alphanumerical alternation on Trailmaking
    B was without problem. Because Trailmaking B is much more difficult and
    demanding, we would expect someone with true processing impairment to have
    relatively greater difficulty on the more challenging task and less difficulty on the
    easier task. But this was not the pattern of scores from Mr. Jeffries.

    I actually have an additional problem with Dr. Bastien's characterization of
    Trailmaking A as being impaired. When reviewing her raw data I note that
    Trailmaking A was completed without error in 26 seconds and Trailmaking B was
    completed without error in 50 seconds. According to age norms for Trailmaking tests,
    both scores are above the average range. When scores are converted to an IQ-type
    standard score, Trailmaking A becomes a 108 and Trailmaking B becomes a 113.
    While I understand that some norms can be more sensitive to specific populations than
    others, I cannot imagine any norms finding Mr. Jeffries to be at a level that was
    sufficiently impaired on the Trailmaking Tests to indicate that he could not sequence
    numbers adequately for an investment banker.

8.  The reason I raised the question regarding the absence of Dr. Bastien's discussion of
    the WMS stories while she did discuss the results of the Story Memory Test and the
    WMS-III stories is that the WMS story scores were normal and the other two were
    apparently not. I wondered if this were a simple oversight or if Dr. Bastien preferred
    not to consider Mr. Jeffries's intact findings in favor of those suggesting memory
    impairment. Selective reporting of these results without discussion of why some
    results are more valid than others raises concerns about report bias.

9.  I asked for references regarding neuropsychological use of the Differential Aptitude
    Test because I was not aware of any validity data showing its applicability for

CLAIM 01218

JAN 2002

neurologically impaired populations. The only reference that I could find in the literature was a brief statement in Lezak that some items for tests of spatial organization have been taken from pencil and paper intelligence and aptitude tests such as the DAT. When I consulted the catalog of the Psychological Corporation, the company that publishes the DAT, I found it listed under Guidance and Counseling and touted as a measure of aptitudes and career interest levels for adolescents and adults. While such a test might have application in a rehabilitation setting when determining what future careers a person might wish to consider, I do not find any objective information that would allow me to use this test as a measure of cognitive impairment or to validly determine if a person is unable to work at his usual occupation. In my opinion, the use of the DAT in this application was inappropriate.

10. I raised the question about the interpretation of the MMPI-2 profile because Dr. Bastien had first given this test, only to then decide that it reflected a number of physical complaints and therefore could not be validly used when examining a patient of this type. Despite her lengthy review of the records, in which diagnoses of Chronic Fatigue Syndrome and fibromyalgia were both ruled out, she chose to compare Mr. Jeffries's profile to those of patients with these disorders. She does not consider diagnoses of Conversion Disorder, Somatoform Disorder, Hypochondriasis, or Factitious Disorder, despite the fact that all three would be reasonable given a 3-1-8 primary profile type and a history of multiple physical complaints of unknown origin without specific medical findings and despite intensive medical workups.

I understand that Dr. Bastien is concerned that the test may not be sufficiently sensitive to people with poorly understood medical conditions. However, I think that she makes an inappropriate conclusion that Mr. Jeffries does, indeed, suffer from a poorly understood medical condition based only on the background that he has received no definitive diagnosis despite a multitude of medical tests and has had persistent complaints of poor health and functioning. In this regard she engages in circular reasoning and probably should not be giving a test that she has already determined not to be appropriate for the patient taking it.

11. I raised the question about consistency and variability in functioning across domains because I believe that there is some truth to both sides of the argument. Clearly, people with above average abilities tend to be very good at a great number of things. Yet, there are many examples of exceptional people who cannot spell very well, have difficulty learning a foreign language, are good in science but not in literature, can write sonnets but need a calculator to do most math problems, etc. In this case, reading into Dr. Bastien's thought processes (since she does not wish to share them with us), I assume that she expects Mr. Jeffries to be excellent in everything and she interprets possibly normal variation to reflect a neurocognitive impairment stemming from a complex medical condition.

12. As in point 11, I raised this question to better understand the connection she sees between cognitive performance on the test battery and the level of everyday cognitive

CLAIM 01219

JAN 2002

functioning necessary for someone in Mr. Jeffries's occupational class to adequately perform his job duties. To my way of thinking, this is the cardinal question in disability evaluation – are there impairments on standardized tests and do these impairments reflect a neurological condition that would interfere with the claimant's ability to perform his or her usual job? Dr. Bastien reaches a conclusion that Mr. Jeffries could not perform his usual job or any job in the national economy for which he has reasonable training and experience. Based on my review of her testing and her analysis of this testing, I do not believe that she has made this case.

Because Dr. Bastien refuses to supply us with her reasoning for the tests that she has chosen, some of the underlying research for those measures that are not typically associated with neuropsychological evaluation, and her rationale for selectively interpreting the results that she has found, I believe that we must reject her evaluation as being definitive regarding Mr. Jeffries's level of disability. While a superficial reading of her 52-page report is most impressive, I must note that 35 pages represent a detailed review of records from various medical doctors whose specialty is outside that of neuropsychology and whose results Dr. Bastien is not in a position to either accept or dispute. While Dr. Bastien provides an adequate history of medical problems before the onset of disability claim, family medical problems, and both academic and occupational history, she apparently does not take a personal social history nor does she examine or note any situational or interpersonal issues that might have a bearing on Mr. Jeffries's functioning or his claim for disability. While this omission might be expected in a medical doctor whose focus is on the physical manifestations of this symptom complex, it cannot be the omission of a psychologist who, by training and licensure, should understand the interplay of interpersonal, intrapsychic, and physical factors in a patient's complaints and symptoms.

A last word must be said about Dr. Bastien's refusal to respond to my well-balanced and respectful questions of her methods and conclusions. While this is probably not an outright violation of ethical rules, she needs to remain watchful of these issues:

Principle 2.02 (a) of the Ethical Principles of Psychologists and Code of Conduct (effective 1992) states:

> Psychologists who develop, administer, score, interpret, or use psychological assessment techniques, interviews, tests, or instruments do so in a manner and for purposes that are appropriate in light of the research on or evidence of the usefulness and proper application of the techniques.

Principle 2.08 (a) states:

> Psychologists who offer assessment or scoring procedures to other professionals accurately describe the purpose, norms, validity, reliability, and applications of the procedures and any special qualifications applicable to their use.

Principle 7.02 (a) states:

> Psychologists' forensic assessments, recommendations, and reports are based on information and techniques (including personal interviews of the individual,

CLAIM 01220

when appropriate) sufficient to provide appropriate substantiation of their findings.

I believe that my questions were appropriate in light of these mandates and I believe that they deserve more of a reply than "I was only asked to supply raw data."

In light of the above, and in the spirit of fairness to the claimant and the rather atypical nature of this case, I would recommend that an independent neuropsychological evaluation be conducted to better determine his current level of cognitive and emotional functioning and the degree, if any, to which he is impaired from his occupation.

Yours truly,

Mitchell Clionsky, Ph.D.
Diplomate in Clinical Neuropsychology
American Board of Professional Psychology

Jeffries, Eric, analysis of Dr. Bastien's response

CLAIM 01221

08-28-01  01:53PM  FROM-GRAYDON HEAD & RITCHEY LLP                    T-433  P.002/003  F-472

# Graydon Head & Ritchey LLP

*Attorneys at Law*

Michael A. Roberts
Direct Dial: (513) 629-2799
E-Mail: mroberts@graydon.com

August 28, 2001

8-28-01
JBG

*Via Facsimile Transmission (617) 338-4419*
Mr. John Graff
DISABILITY MANAGEMENT SERVICES, INC.
155 Federal Street, 7th Floor
Boston, Mass. 02110

Re: *Eric Jeffries*

Dear Mr. Graff:

As I indicated on the phone yesterday and this morning, I have several questions with regard to DMS' latest request that Mr. Jeffries undergo yet another neuropsychological examination. Mr. Jeffries has already undergone such an examination, and the results of that recent, valid examination are in DMS' possession. Based on my conversation with Mr. Champagne, as of last Monday (i.e., 2 days prior to your Aug. 22 letter), no one at DMS had even made the effort to review the test results from Mr. Jeffries' first neuropsychological exam. It seems to me that DMS should, at a minimum, review Dr. Bastien's analysis before concluding that a second neuropsychological examination is necessary.

In addition to the fact that DMS made no effort to review the results of Mr. Jeffries' first neuropsychological examination, I further do not believe that a second exam is necessary or warranted because, as I understand, this particular field of psychological testing is not conducive to repeat evaluations because of the "practice effect" phenomenon which will negatively impact the accuracy of test results on repeat examinations.

Accordingly, before submitting Mr. Jeffries' to a second neuropsychological examination it is imperative that DMS advise why it believes a second and potentially flawed exam is necessary and why it should be performed without any analysis of the first examination. I will await your response.

Second, assuming DMS can provide some legitimate reason for a repeat test, I question why you have chosen a child psychologist to conduct the examination. It is my understanding that there are numerous psychologists who have hands on experience in evaluating the cognitive effects of autoimmune illnesses or chronic fatigue syndrome like illnesses, such as Mr. Jeffries' illness. It

www.graydon.com   **Mailing Address**        **Cincinnati Office**           **Kentucky Office**
                   P.O. Box 6464               1900 Fifth Third Center          8100 Burlington Pike
                   Cincinnati, Ohio 45201-6464  511 Walnut Street               Suite 480
                                                Cincinnati, Ohio 45202-3157     Florence, Kentucky 41042-1212
                                                telephone (513) 621-6464        telephone (859) 282-8800
                                                fax (513) 651-3836              fax (859) 525-0214

CLAIM 01349

Mr. John Graff
August 28, 2001
Page 2

would be appropriate, therefore, for DMS to identify a qualified professional possessing such experience. While I do not have any basis to assess Dr. Gray's abilities - it is clear from her Curriculum Vitae that she is not qualified for this assignment since she has no relevant experience, but rather is a child psychologist. Accordingly, I ask that you advise me why a child psychologist has been designated by DMS as opposed to a more appropriately qualified specialist. If DMS is having difficulty locating an appropriately qualified specialist, as Mr. Champagne indicated during our August 20 meeting, I'd be happy to perform the research and locate someone who is qualified.

I await your response.

Very truly yours,

GRAYDON HEAD & RITCHEY LLP

Michael A. Roberts

MAR/ndc
Copy: Mr. Eric Jeffries

CN_LIB:265145.1

CLAIM 01350



*204-446-363*

**ERIC L. JEFFRIES**
712 GLENSHIRE AVENUE
CINCINNATI, OHIO 45226
(513) 871-3545 PHONE
(513) 871-8599 FAX

16 March 1999

Michael E. Luggen, M.D.
University Medical Arts Building
Suite 600
222 Piedmont Avenue
Cincinnati, Ohio 45219

Dr. Luggen,

Since we spoke last night I've taken 60mg. of Prednisone with no measurable relief.

I really don't feel like writing a letter right now but my ire is up just a little because I received a phone call this morning from a gentleman named Tom Faul that had previously been in contact with me about his similar adverse reaction to the Hep B vaccine. He is one of the people I referred to you. I was quite surprised by your response to him that you did not want to see him because you do not believe there is any correlation between his illness and the vaccine.

What really surprises me is that even though I am trying to help you find a cause and effect relationship, you have absolutely no interest in exploring it. I can not understand why. **These are people in you own community that may be helpful in proving a causal relationship that might in turn lead to a cure**. An immunogeneticist I recently saw at the University of Oklahoma said something that I think is especially relevant to this situation; **"If you say the world is flat and you don't do research, maybe it will stay flat."** Now I can understand if you have political / business issues that prohibit you from exploring this issue (i.e. You receive funding from either SmithKline or Merck), but I would say that would be a copout.

I'm really sick and I want to get well. I need a doctor that is willing to put his heart into this. I know that this takes time and I am personally willing to pay you for your time.

Sincerely,

Eric Jeffries

CLAIM 02229

**ERIC L. JEFFRIES**
712 GLENSHIRE AVENUE
CINCINNATI, OHIO 45226
(513) 871-3545 PHONE
(513) 871-8599 FAX

3 March 1999

Dr. Luggen,

I have attached a copy of the ABC News Documentary 20/20 for your review which discusses the Hep B vaccine and reported adverse reactions. You might find it interesting. Please have Wanda return it to me as soon as possible because Dr. Fessler and Dr. McClellan would also like to review it. I have also attached another insurance form which needs to be completed. It has a pre-stamped and addressed envelope included.

As an update, I began feeling relatively better over the past couple of weeks, but I seem to have peaked on Monday and am now trending the other way. Same stuff, joints, muscles, gut, head and eyes. It's getting old.

I went to the University of Oklahoma last Friday and met with a group of scientists (immunogeneticists) that are working on developing a conclusive test to determine isolated genes responsible for adverse reactions to the Hep B vaccine. I think it looks promising. There are lots of other people out there with the same basket of problems that I have that are believed to be caused by the vaccine...

Eric Jeffries

*P.S. - DID YOU HAVE A CHANCE TO DO ANY FURTHER RESEARCH?*

CLAIM 02230

**Massachusetts Casualty Insurance Company**
**711 Atlantic Avenue Boston, MA 02205-9099  617-728-8000**
**EXPLANATION OF BENEFITS**

ERIC L. JEFFRIES
712 GLENSHIRE                                                    04/05/1999
CINCINNATI                    OH  45226

Dear  ERIC L. JEFFRIES

We are pleased to forward our check attached hereto in settlement of your claim for policy benefits shown thereon.  For your protection it is suggested that you cash or deposit the check promptly.

| INSURED'S NAME ERIC L. JEFFRIES | POLICY # 0641734 | CLAIM # 402696 | DATE OF DISABILITY 09/26/1998 |
|---|---|---|---|
| PAYOR SPENCER MCNEIL | PAYMENT TYPE MONTHLY | BENEFIT AMOUNT $12,133.00 | TOTAL PAID TO DATE $12,133.00 |
| BENEFITS FOR | FROM | TO | AMOUNT |
| DI | 12/25/1998 | 01/25/1999 | $12,133.00 |
| NET PAYMENT AMOUNT | | | $12,133.00 |

**Please see important information regarding your claim below:**
THE ENCLOSED PROGRESS REPORT SHOULD BE COMPLETED BY YOU AND YOUR DOCTOR BY 05/25/99

**Enclosures:**

COPY

Massachusetts Casualty Insurance Company
711 Atlantic Avenue Boston, MA 02205-9099 617-XXX-8000

## EXPLANATION OF BENEFITS

ERIC L. JEFFRIES
712 GLENSHIRE
CINCINNATI       OH  45226

04/05/1999

Dear  ERIC L. JEFFRIES

We are pleased to forward our check attached hereto in settlement of your claim for policy benefits shown thereon.  For your protection it is suggested that you cash or deposit the check promptly.

| INSURED'S NAME<br>ERIC L. JEFFRIES | POLICY #<br>0641734 | CLAIM #<br>402696 | DATE OF DISABILITY<br>09/26/1998 |
|---|---|---|---|
| PAYOR<br>SPENCER MCNEIL | PAYMENT TYPE<br>MONTHLY | BENEFIT AMOUNT<br>$12,133.00 | TOTAL PAID TO DATE<br>$24,266.00 |
| **BENEFITS FOR** | **FROM** | **TO** | **AMOUNT** |
| DI | 01/25/1999 | 02/25/1999 | $12,133.00 |
| NET PAYMENT AMOUNT | | | $12,133.00 |

**Please see important information regarding your claim below:**
PLEASE SEE OTHER CHECK

**Enclosures:**

CLAIM 03033

Massachusetts Casualty Insurance Company
711 Atlantic Avenue Boston, MA 02206-9099  617-XXX-8000

## EXPLANATION OF BENEFITS

ERIC L. JEFFRIES
712 GLENSHIRE
CINCINNATI                    OH  45226                    04/05/1999

Dear  ERIC L. JEFFRIES

We are pleased to forward our check attached hereto in settlement of your claim for policy benefits shown thereon.  For your protection it is suggested that you cash or deposit the check promptly.

| INSURED'S NAME | POLICY # | CLAIM # | DATE OF DISABILITY |
|---|---|---|---|
| ERIC L. JEFFRIES | 0641734 | 402696 | 09/26/1998 |
| **PAYOR** | **PAYMENT TYPE** | **BENEFIT AMOUNT** | **TOTAL PAID TO DATE** |
| SPENCER MCNEIL | MONTHLY | $12,133.00 | $36,399.00 |

| BENEFITS FOR | FROM | TO | AMOUNT |
|---|---|---|---|
| DI | 02/25/1999 | 03/25/1999 | $12,133.00 |
| NET PAYMENT AMOUNT | | | $12,133.00 |

**Please see important information regarding your claim below:**
PLEASE SEE OTHER CHECK

**Enclosures:**

**Massachusetts Casualty Insurance Company**
**711 Atlantic Avenue Boston, MA 02205-9099   617-457-8000**

## EXPLANATION OF BENEFITS

ERIC L. JEFFRIES
712 GLENSHIRE
CINCINNATI                    OH  45226                    04/05/1999

. . .

Dear   ERIC L. JEFFRIES

We are pleased to forward our check attached hereto in settlement of your claim for policy benefits shown thereon.  For your protection it is suggested that you cash or deposit the check promptly.

| INSURED'S NAME | | POLICY # | CLAIM # | DATE OF DISABILITY |
|---|---|---|---|---|
| ERIC L. JEFFRIES | | 0641734 | 402696 | 09/26/1998 |
| **PAYOR** | | **PAYMENT TYPE** | **BENEFIT AMOUNT** | **TOTAL PAID TO DATE** |
| SPENCER MCNEIL | | MONTHLY | $12,133.00 | $48,532.00 |
| **BENEFITS FOR** | **FROM** | | **TO** | **AMOUNT** |
| DI | 03/25/1999 | | 04/25/1999 | $12,133.00 |
| NET PAYMENT AMOUNT | | | | $12,133.00 |

Please see important information regarding your claim below:
PLEASE SEE OTHER CHECK

**Enclosures:**

**Disability Management Services, Inc.**

711 Atlantic Avenue, P.O. Box 9099, Boston, MA, 02205-9099  Tel: (617) 728-8000
*A third-party administrator for:*
**Massachusetts Casualty Insurance Company**

### Attending Physician's Statement

#### TO BE COMPLETED BY THE INSURED

| 1) Insured's Name: ERIC JEFFRIES | 2) Policy Number(s): 0641734 | 3) Claim Number(s): |
|---|---|---|

| 4) Residence Address: 712 GLENSHIRE AVE. CINCINNATI OH 45226 | 5) Telephone Number: Home: 513-871-3545 Work: | 6) Date of Birth: 15 May 1961 |
|---|---|---|

| AUTHORIZATION FOR RELEASE OF INFORMATION: I HEREBY AUTHORIZE THE UNDERSIGNED PHYSICIAN TO RELEASE ANY INFORMATION ACQUIRED IN THE COURSE OF MY EXAMINATION OR TREATMENT. | SIGNATURE (Patient, or parent if minor): Relationship to insured: |
|---|---|

#### TO BE COMPLETED BY THE ATTENDING PHYSICIAN

**HISTORY**

1) When did symptoms first appear, accident occur, or pregnancy commence (LM)?
7/97 briefly; recurred 9/98

2) Has patient ever had same or similar condition? ✓ YES ___ NO
If "YES" state when and describe: see above

| 3) Date patient ceased work because of disability: 9/25/98 | 4) Date patient first consulted with you for this condition: 9/25/98 |
|---|---|

**PRESENT CONDITION**

5) Diagnosis: Undifferentiated connective tissue disease
710.9

6) Subjective Symptoms: Joint & muscle pain, fatigue, mouth sores, ocular inflammation, abdominal pain

7) Objective Findings:  (INCLUDE RESULTS OF CURRENT X-RAYS, E.K.G.'S OR ANY OTHER SPECIAL TESTS):
Increased bilirubin, depressed complement

8) Is patient still under your care for this condition: ✓ YES ___ NO

**TREATMENT**

9) Dates of treatment: 9/25/98, 10/13, 10/26, 11/10, 11/30, 1/29/99, 2/15/99

10) FREQUENCY OF VISITS:
WEEKLY    BIWEEKLY    MONTHLY    OTHER: please describe.. as above

11) Hospitalization:

| | | |
|---|---|---|
| Dates: __/__/__ - __/__/__ | Name of Hospital:_____ | Outpatient __ Inpatient __ ER __ |
| Dates: __/__/__ - __/__/__ | Name of Hospital:_____ | Outpatient __ Inpatient __ ER __ |
| Dates: __/__/__ - __/__/__ | Name of Hospital:_____ | Outpatient __ Inpatient __ ER __ |

Please continue to complete this form on the reverse side.

d/b/a: New England Claims Administration Services, Inc. in FL, MD, ME
Licensed as New England Claims Administration Services, Inc. in CA.
d/b/a Centre Claims Administration Services in NH

CLAIM 03083

**EXTENT OF DISABILITY**

| 12) Dates patient was continuously totally disabled (completely unable to work):     From: 9/23/99 to present |
|---|

| 13) Dates patient was partially disabled (able to perform any part of his or her job):     From: ___/___/___ to ___/___/___ |
|---|

| 14) When do you expect the patient to be able to return to work?     3-6 mon |
|---|

**Additional Comments or Progress:**

15)

**MEDICAL CONDITION**

16) Is this patient competent to manage his or her property unassisted, and to understand the nature and consequence of his or her action, including the ability to endorse checks and direct use of the proceeds?
____ YES ____ NO

| 17) Name of Attending Physician: MICHAEL LUGGEN | 18) Degree(s): MD | 19) Tax Identification Number: |
|---|---|---|
| 20) Business Address CINCINNATI OH 222 PIEDMONT AVE 45219 | 21) Telephone Number 573-475-5520 | |
| 22) Physician's Signature: M Luggen | 23) Date 3/19/99 | |

d/b/a New England Claims Administration Services, Inc. in FL, MD, ME
Licensed as New England Claims Administration Services, Inc. in CA.
d/b/a Centre Claims Administration Services in NH

PATIENT NAME  : JEFFRIES, ERIC 871-3.

**Alliance Laboratory Services**
Health Alliance

ENCOUNTER ID # :    A4182590    AGE : 37Y  SEX : MALE
CHART # / SSN  :    204446363    BIRTHDATE    : 05/05/1961

PERMANENT REPORT                    ACCOUNT : CHMEDA
DOCTOR / ADDRESS
CHRIST HOSPITAL MEDICAL ASSOC.
2123 AUBURN AVE. STE. 324
CINCINNATI, OH          45219
=== THIS REPORT CONTAINS DATA FROM JUN 22 1998 TO JUN 22 1998 ===  DUNN, C.

========================================= CHEMISTRY =========================================

|  | AST (SGOT) | ALT (SGPT) | ALK PHOS | BILI, DIRECT | BILI, TOTAL | ALBUMIN |
|---|---|---|---|---|---|---|
| LOW NORMAL  : | 11. | 7. | 46. | 0.0 | 0.2 | 3.5 |
| HIGH NORMAL : | 35. | 46. | 139. | 0.3 | 1.2 | 5.0 |
| UNITS    : | U/L | U/L | U/L | MG/DL | MG/DL | GM/DL |

SERUM    LAB
JUN 22 11:25  JHC    24.    40.    57.    0.3    2.0 H    4.9

========================================= IMMUNOLOGY =========================================

----------------------- HEPATITIS B [HBV] TEST GROUP -----------------------

|  | HBsAg | Anti-HBc |
|---|---|---|
| LOW NORMAL  : | NEGATIVE | NEGATIVE |
| HIGH NORMAL : |  |  |
| UNITS    : |  |  |

SERUM    LAB
JUN 22 11:25  JHIMMU  NEGATIVE    NEGATIVE

----------------------- HEPATITIS C [HCV] TEST GROUP -----------------------

|  | Anti-HCV |
|---|---|
| LOW NORMAL  : | NEGATIVE |
| HIGH NORMAL : |  |
| UNITS    : |  |

SERUM    LAB
JUN 22 11:25  JHIMMU  NEGATIVE

REPORT REVIEWED BY: _CRD_____MD
PHONE PATIENT?        YES_____ NO _✓___
PHONED TO: ___PT_____
COMMENTS:_____
_____ BY _LISA_____
DATE/TIME:_____6-24-98_____

PATIENT NAME  : JEFFRIES, ERIC 871-3545
ENCOUNTER ID # :    A4182590
MEDICAL REC. # :    204446363

CLAIM 03098

Steven Fessler, M.D.
Gatroenterologist
Gastroenterology Consultants of Cincinnati
3131 Harvey Avenue
Cincinnati, Ohio 45229

Phone: 513-281-8827
Fax:    513-281-1908
Note:  Dr. Fessler is looking after my abdominal problems.  I was first examined by Dr.
Fessler's partner, Dr. Deckter, about four years ago.

************************************************************************

Adam Kaufman, M.D.
Opthamologist
222 Piedmont Avenue
Suite 1700
Cincinnati, Ohio 45219

Phone: 513-475-7295
Fax:    513-475-7369
Note:  Dr. Kaufman diagnosed my eye problems.  He too is widely considered to be at the
top of his field.

************************************************************************

Other physicians that I have seen for my illness include:

Donald Nunlist-Young, M.D.
Family Practitioner
513-871-7848
Dr. Nunlist-Young is the doctor that administered the vaccine and did the early follow up
after the adverse reaction.  I stopped seeing him, I believe, in October 1998.

Corwin Dunn, M.D.
Infectious Disease Specialist
513-721-0401
I saw Dr. Dunn starting in July 1997 until July 1998.  He did a lot of the early testing after
I had the adverse reaction.

I've also seen countless other doctors /researchers from universities and health centers in
Cleveland, Alabama, England, Oklahoma, Cincinnati, etc...

I would encourage you to contact the National Vaccine Information Center ("NVIC")for further-information about similar adverse autoimmune reactions to the Hepatitis B Vaccine:

National Vaccine Information Center
512 W. Maple Avenue, #206
Vienna, VA  22180

Phone: 703-938-0342
Fax:    703-938-5768

WEB ADDRESS:        www.909shot.com

Sincerely,

Eric Jeffries

CLAIM 03114

## Disability Management Services, Inc.
### A third-party administrator for:
## Massachusetts Casualty Insurance Company

### Occupational Duties Form

MAR 1999
RECEIVED

**THIS FROM SHOULD BE COMPLETED AS FULLY AS POSSIBLE WITH RESPECT TO YOUR NORMAL WORK:**

☒ IMMEDIATELY PRIOR TO DISABILITY    ☐ CURRENTLY

| NAME OF INSURED | POLICY NUMBER | DATE OF BIRTH |
|---|---|---|
| Eric Jeffries | 0641734 | 15 May 1961 |

| ADDRESS | TELEPHONE NUMBER | SOCIAL SECURITY NUMBER |
|---|---|---|
| 712 Glenshire Ave. Cincinnati, OH 45226 | 513-871-3545 | 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 |

| EMPLOYER NAME | EMPLOYER TELEPHONE NUMBER |
|---|---|
| Provident Bank | 513-579-2236 |

**EMPLOYER ADDRESS**
One East Fourth Street  Cincinnati, OH 45226

| WHAT IS YOUR PERCENTAGE OF OWNERSHIP INTEREST IN THIS BUSINESS? | DO YOU ACTIVELY WORK, OR HAVE ANY OWNERSHIP INTEREST IN ANY OTHER BUSINESS?  (IF YES, PLEASE GIVE DETAILS) |
|---|---|
| Very Nominal - Less than .001% | No |

| NUMBER OF HOURS YOU NORMALLY WORK EACH WEEK: | USUAL DAILY HOURS: Varied widely |
|---|---|
| 50+ | FROM               TO |

| NUMBER OF PEOPLE IN YOUR EMPLOY AND/OR UNDER YOUR SUPERVISION: | HOW MANY YEARS HAVE YOU WORKED FOR THIS EMPLOYER? | HOW MANY YEARS HAVE YOU WORKED IN THIS OCCUPATION? |
|---|---|---|
| 15+ | 7 | |

**OCCUPATIONAL DUTIES AND ACTIVITIES, LISTING MOST IMPORTANT FIRST AND PERCENTAGE OF TIME SPENT FOR EACH DUTY:**

a) I managed and ran Provident Capital Corp, A _____ %

b) Division of Provident Bank that specializes _____ %

c) in cash flow oriented lending/investing in _____ %

d) leveraged buy-outs, growth financing, recapitalizations, _____ %

e) etc., on national and sometimes global basis. _____ %

**DESCRIBE BRIEFLY WHICH OF THESE DUTIES YOU ARE CURRENTLY UNABLE TO PERFORM AS A RESULT OF YOUR DISABILITY, AND WHY:**
All. Because the cyclical and physically devastating nature of this illness completely impairs my ability to effectively manage my business and it interferes with my ability concentrate and make critical decisions, carry out negotiations, etc...

Please continue to complete this form on the reverse side.

Please return to:
711 Atlantic Ave.
P.O. Box 9099
Boston, MA 02205-9099  Tel:(617)728-8000
d/b/a:    New England Claims Administration Services, Inc. in (FL, MD, ME)
Centre Claims Administration Services in (NH)

CLAIM 03124

INSTRUMENTS, TOOLS, OR EQUIPMENT NORMALLY USED IN YOUR OCCUPATION:

a) _____

b) _____

c) _____

d) _____

e) _____

WHERE DO YOU WORK?

✓ MOSTLY INDOORS        ____ MOSTLY OUTDOORS        ____ EQUALLY IN AND OUT

IF YOUR OCCUPATION NORMALLY REQUIRES TRAVEL OTHER THAN BETWEEN RESIDENCE AND PRINCIPAL PLACE OF BUSINESS, DESCRIBE THE USUAL FREQUENCY, DISTANCE, AND MODE OF TRANSPORTATION:

## PHYSICAL AND MENTAL REQUIREMENTS OF YOUR OCCUPATION

(CHECK ONE OR MORE OF THE FOLLOWING WHICH BEST DESCRIBE THE PHYSICAL/MENTAL NEEDS REQUIRED BY YOUR OCCUPATION)

| ACTIVITY | HOW OFTEN PERFORMED | | |
|---|---|---|---|
| | OCCASIONALLY | FREQUENTLY | CONSTANTLY |
| BENDING | | | |
| REACHING | | | |
| LIFTING | | | |
| CARRYING | | | |
| SPEECH-EXPRESSING OR EXCHANGING IDEAS ORALLY | | | ✓ |
| HEARING-RECOGNIZING SOUNDS | | | ✓ |
| SIGHT-SHARPNESS OF NEAR VISION | | | ✓ |
| SIGHT-SHARPNESS OF FAR VISION | | | ✓ |
| EXACTING MANUAL DEXTERITY | | | |
| CAPACITY TO HANDLE STRESS | | | ✓ |
| PRODUCTION SALES QUOTAS | | | ✓ |
| TIME DEADLINES | | | ✓ |
| PERSONAL COMPETITION | | | ✓ |

IF YOU CHECKED LIFTING OR CARRYING, PLEASE ANSWER:

WHAT IS THE MAXIMUM WEIGHT YOU LIFT OR CARRY?        ___ 10 LBS ___ 25 LBS ___ 50 LBS ___ 100 LBS ___ OVER 100 LBS

WHAT IS THE MOST FREQUENT WEIGHT YOU LIFT OR CARRY?   ___ 10 LBS ___ 25 LBS ___ 50 LBS ___ 100 LBS ___ OVER 100 LBS

PLEASE ADD ANY ADDITIONAL INFORMATION ABOUT YOUR JOB WHICH YOU BELIEVE WILL HELP US UNDERSTAND YOUR OCCUPATION:

Any person who knowingly and with intent to injure, defraud or deceive any insurance company, files a statement of claim containing any false, incomplete or misleading information is or may be guilty of a criminal act punishable under law.

I have read the foregoing and above answers are true and complete to the best of my knowledge and belief.

X ___~Ccarl~_____        02/28/99
        SIGNATURE                               DATE

Please return to:
711 Atlantic Ave.
P.O. Box 9099
Boston, MA 02205-9099  Tel:(617)728-8000
d/b/a:  New England Claims Administration Services, Inc. in (FL, MD, ME)
Centre Claims Administration Services in (NH)

CLAIM 03125



MAR 1999
RECEIVED

## Disability Management Services, Inc.
*A third-party administrator for:*
## Massachusetts Casualty Insurance Company

### Claimant's Statement

**COMPLETE THE FRONT AND THE BACK OF THIS FORM IN FULL AND RETURN IN THE ENVELOPE PROVIDED**

| 1) NAME OF INSURED: Eric Jeffries | 2) SOCIAL SECURITY NO.: 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 |
|---|---|

| 3) POLICY NUMBER(S): 0641734 | 4) DATE OF BIRTH: 15 May 1961 | 5) RESIDENCE TELEPHONE NO: 513-871-3545 |
|---|---|---|

6) RESIDENCE (Street, Town/City, State, Zip): ☐ CHECK IF NEW ADDRESS
712 Glenshire Ave., Cincinnati, OH 45226

7) NATURE OF ILLNESS OR INJURY:
Adverse Reaction to Hep B Vaccination
- Severe joint & muscle pain
- Abdominal problems    - Headaches & Eye problems

8) IF ILLNESS, WHEN DID SYMPTOMS FIRST APPEAR?
Late June / Early July 1997

9) IF ACCIDENT, WORK-RELATED? ___ YES ___ NO

10) DESCRIBE WHEN AND WHERE AND HOW ACCIDENT HAPPENED? HAS PATIENT EVER HAD SAME OR SIMILAR CONDITION?

| 11) EMPLOYER COMPANY NAME: Provident Bank | 12) EMPLOYER TELEPHONE: 513-579-2000 |
|---|---|

13) EMPLOYER ADDRESS:
One East Fourth Street
Cincinnati, OH 45226

14) MONTHLY EARNED INCOME:
PRIOR TO DISABILITY? $450,000/yr. + stock options & other benefits
CURRENT INCOME? ___

15) WHAT IS YOUR PERCENTAGE OF OWNERSHIP IN THIS BUSINESS?
Very Nominal

16) IS THE BUSINESS:
___ SUB CHAPTER "S" CORPORATION  ___ SOLE PROPRIETOR
___ PARTNERSHIP  X "C" CORPORATION

17) DOES YOUR EMPLOYER PAY ALL OR PART OF THE PREMIUMS FOR YOUR DISABILITY CONTRACT?
___ NO  X YES   IF YES, PERCENTAGE PAID BY THE EMPLOYER: ___ %
All but Taxable Portion

18) OCCUPATION:
Banker

19) BRIEFLY DESCRIBE YOUR OCCUPATIONAL DUTIES:
I manage & run Provident Capital Corp, a division of Provident Bank

20) DESCRIBE BRIEFLY HOW YOUR MEDICAL CONDITION HAS AFFECTED YOUR ABILITY TO WORK:
Pain & sickness can often leave me immobile and without the ability to perform professionally or concentrate.

HOURS WORKING PER WEEK: 50 +

21) DATES OF TOTAL DISABILITY (Completely unable to work):
FROM 9/25/98 TO N/A

22) DATES OF PARTIAL DISABILITY (Able to perform one or more duties):
FROM ___ TO ___

23) LAST DATE WORKED 9/25/98

24) DATE YOU EXPECT TO RETURN TO WORK:
As soon as physically possible

Please continue to complete this form on the reverse side.

Please return to:
711 Atlantic Ave.
P.O. Box 9098
Boston, MA 02205-9099  Tel:(617) 728-8000
d/b/a:  New England Claims Administration Services, Inc. in (FL, MD, ME)
Centre Claims Administration Services in (NH)

CLAIM 03126

25) DATE OF FIRST TREATMENT BY A PHYSICIAN FOR THIS CONDITION:
7/97

| 26) NAME OF TREATING PHYSICIANS | PHYSICIAN'S ADDRESS | TELEPHONE | DATES TREATED. |
|---|---|---|---|
| David Nuncist-York | Erie Ave, Cint, OH | 513. | FROM: 7/57 TO: 10/98 |
| Colwin Dunn | | 513. | FROM: 9/97 TO: |
| Michael Luggen | | 513-475-8520 | FROM: 9/98 TO: Present |
| Steven Fessler | | 513. | FROM: 12/98 TO: Present |
| Michael McClelland | | 513. | FROM: 10/98 TO: Present |

| 27) NAME OF ALL HOSPITALS | HOSPITAL'S ADDRESS | TELEPHONE | DATES CONFINED |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

| 28) LIST ALL OTHER COMPANIES WITH WHICH INSURED HAS DISABILITY OR MEDICAL COVERAGE | | (IF NONE, SO STATE) |
|---|---|---|
| COMPANY | POLICY NUMBER | BENEFIT AMOUNT |
| Prudential Ins. Co. | | $12,500 mo |
| | | |
| | | |

| 29) ARE YOU RECEIVING SOCIAL SECURITY BENEFITS? DISABILITY ___ YES _x_ NO RETIREMENT ___ YES _x_ NO IF YES, EFFECTIVE DATE _____ | 30) IS A WORKERS' COMPENSATION OR STATE DISABILITY CLAIM BEING MADE: ___ YES _x_ NO IF YES, PLEASE INDICATE CARRIER'S NAME AND ADDRESS |
|---|---|

31) OTHER BENEFITS YOU ARE RECEIVING, OR EXPECT TO RECEIVE INCLUDING SALARY CONTINUATION OR GROUP COVERAGE (Please Explain):
Group Coverage - Prudential Ins. - as noted above.

*Any person who knowingly, and with intent to defraud or deceive any insurance company, files a statement of claim containing any false, incomplete or misleading information is or may be guilty of a criminal act punishable by law.*

Notice: An investigative consumer report may be requested concerning factors affecting your eligibility for insurance benefits. The factors which may be investigated include your activities, personal characteristics, mode of living and health history. The report may be obtained through personal interviews with your friends, neighbors, and associates.

You have a right to submit a written request to us for a complete and accurate disclosure of the nature and scope of any such report which we may request.

I have read the foregoing and above answers are true and complete to the best of my knowledge and belief.

X _____                    02/20/99
        CLAIMANT SIGNATURE                              DATE

Please return to:
711 Atlantic Ave.
P.O. Box 9099
Boston, MA 02205-9099  Tel:(617) 728-8000
d/b/a:    New England Claims Administration Services, Inc. in (FL, MD, ME)
Centre Claims Administration Services in (NH)

CLAIM 03127

S E M     Con 39.

FEB 23 1999

# CLAIMS SERVICE REPORT

DATE: _____     TIME: _____     TO: _____

COMPLETED BY: _____     INSURED: _Jeffries_____

CALLER: _____     TELEPHONE #: _____

REMARKS: — 20/20 article — sms people have
recovered
- 11 out of 60 fire fighters got it
- 2 recovered — 3 in wheel chairs.
- 15000 people in France filed
lawsuit
- Researchers think it is a genetic
issue — predisposition
- he saw a Doctor in England.
- Talking to a biologist in U of OK
- sometimes produces permanent damage
- 7 years at bank.
- now senior VP - responsible for 2 departments
Provident Capital (?)
- Provident ~~xxxxxx~~ ~~xxxx~~ Bank.
- has not worked since September.
- two major attacks since Sept - late Sept.
- needs to stay in bed.
- @ will send forms
- job involves major travel
- changed GP's after shot.
- 20 employees.
- salary + bonus 1997 $350,000
- job open? — says HR letter says
job

CLAIM 03130

S E M
FEB 22 1999

# CLAIMS SERVICE REPORT

DATE: _____  TIME: _____  TO: _____

COMPLETED BY: _____  INSURED: _Tedtries_____

CALLER: _____  TELEPHONE #: _____

REMARKS: _____ call @ at work — not in_____

_____ — called @ at home — left message_____

S E M                — @ called
FEB 22 1999          — has several Doctors
                     — summer of '97 hepatitis vaccination
                     — bad reaction
                     — 9/98 — hit real hard
                     — auto immune disorder.
                     — has seen many many Doctors
                     — Behcet's Disease — very similar
                     — no genital ulcers
                     — joint & muscle problems — worse
                       than typical Behlets.
                     — eyes bad but not as bad as
                       Behcets
                     — 20/20 article about side effects
                       of same vaccination
                     — was going on a vacation & decided to
                       get vaccination — was going to island
                       of coast of S. Carolina
                     — Dr. intermittant for a long time
                     — hasn't worked its way out — got worse down.
                     — some days can't walk
                     — internal abdominal problems
                     — rashes, sores, headaches

CLAIM 03131