ORIGINAL

UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

Civil Action No.   C-1-02-351

ERIC L. JEFFRIES,

        Plaintiff,

  vs.

CENTRE LIFE INSURANCE COMPANY,

        Defendant.

        DEPOSITION of MARY E. FULLER, taken pursuant to agreement, at the offices of Downing & Peters Reporting Associates, 79 Atlantic Place, South Portland, Maine, on October 16, 2003, commencing at 10:05 A.M., before Lisa S. Bishop, Registered Professional Reporter, a Notary Public in and for the State of Maine.

Downing & Peters Reporting Associates
79 Atlantic Place, South Portland, Maine   04106

1  Q. Your chronology is not complete, is that correct,
2  those are just highlights that you picked out?
3  A. Yes, of the events that I thought were relevant to the
4  case.
5  Q. You didn't think it was relevant that on March 5,
6  2000, Dr. Hall presented an opinion, consulting opinion to
7  Brian Wentworth?
8  A. I would certainly have considered that important. If
9  I didn't note it, it would be because I apparently didn't
10 see it in the file for some reason.
11 Q. Okay. You say there was no purpose for surveillance?
12 A. Do you have that March 5th, the Bates stamp?
13          MR. ROBERTS: What was that reference, Bill?
14          MR. ELLIS: Bates stamp 2281.
15 A. Thank you.
16          MR. ROBERTS: What's the document?
17          MR. ELLIS: It is an opinion by Dr. Hall to Brian
18 Wentworth upon consult, March 5.
19          MR. ROBERTS: Okay.
20 Q. Now with regard to surveillance, can surveillance
21 sometimes in your experience confirm that a person's
22 activities or ability to get around is what was reported to
23 his physicians?
24 A. Yes, it's possible that you may see the restrictions
25 and limitations as reported by the -- to the physician.

1   what they are doing with no other evidence as to what the
2   impact is on their functionality from an employment
3   standpoint.
4   Q.   Well, certainly a surveillance of a person who claims
5   he can't walk and you see him in a wheelchair would kind of
6   confirm that, would it not?
7   A.   Yes, it certainly would.
8   Q.   But if you see him walking down the street with no
9   apparent limp, easy stride, that would be a different
10  story, would it not?
11  A.   I would want to see a lot more surveillance, but yes.
12  Q.   I'm sure that you would and there was a lot of
13  surveillance done on this, but it was done by two different
14  companies simultaneously, correct?
15           MR. ROBERTS:   Objection.   Go ahead.
16  A.   My understanding is some of the surveillance was done
17  by two different companies at the same time.   I was not
18  clear how much of it was done by Prudential and how much of
19  it was done by DMS separately versus together.
20  Q.   But you fault DMS for doing so much?
21  A.   Yes, I do.
22  Q.   Even though you don't know how much was done by them
23  at all?
24  A.   For this particular condition, I don't feel
25  surveillance was warranted particularly given the lack of

1  years, roughly, to $12,500 until age 65 in 1998, months
2  before they go disabled, and almost a year after the event
3  which they claim disabled them occurred, would that raise
4  suspicion in your mind?
5  A.  I think being a claims person, I would always be
6  suspicious of somebody increasing coverage prior to
7  disability.
8  Q.  How about increasing coverage --
9  A.  Whether it would warrant me going to the extent that
10 my first claim action would be to conduct surveillance,
11 probably not.  Would I be suspicious, yes.
12 Q.  I mean that is one of the red flags, is it not, when
13 someone dramatically increases their coverage after an
14 event they claim disabled them, but before they actually
15 stop working?
16 A.  Well, my understanding is the event that occurred
17 didn't cause disability following the initial occurrence,
18 it took some time before those symptoms reached a point
19 that they were disabling, so I was less concerned about
20 that, but I would certainly -- as you point out, it would
21 be a red flag.  Would I initiate surveillance right away,
22 probably not.
23 Q.  Let's add a factor.  Now you have got the red flag in
24 front of you with a new claim.  The medical evidence that
25 comes in says I can't objectively identify the cause of the

1  symptoms and Mr. Jeffries' history in those very medical
2  records is that I got sick right after it happened and then
3  it would periodically flare up during '98 to the point
4  where I could no longer function in September with a
5  significant increase in insurance being just a few months
6  before September.
7  A.    Yes, that would cause me concern.
8  Q.    It would raise the specter of potential fraud, would
9  it not?
10 A.    And I would confront him about that.
11 Q.    You would?
12 A.    I would expect that that would have been there, what's
13 going on, why is it happening now, what caused the increase
14 in coverage to occur, did you disclose that information on
15 the application, was it required of you to disclose that
16 information.  There's no secret if you think someone -- if
17 there are issues that you have with a claim, there should
18 be no secret about the fact that you have questions.  I
19 don't challenge a company's right to question a claim and I
20 don't challenge the fact that there are red flags.
21 Q.    So any time you dealt with a case in which -- and of
22 course this would be through your actual person handling
23 the file -- any time they came to you and sought your
24 advice when they suspected a fraud, your first response was
25 let's call the claimant and ask him if he is a fraud, is

1  A.   Well, it would be consistent with the perception that
2  the company thought it was fraud. Whether it's truly
3  psychiatric or not I think is still a question.
4  Q.   That's not for me nor you to decide?
5  A.   Correct.
6  Q.   But there was indicia or red flags of a potential
7  fraudulent claim from the get-go, correct?
8  A.   Yes.
9  Q.   Something that would have raised your suspicion and
10 mine although it doesn't mean we have to stay with that
11 thought process throughout, correct?
12 A.   Correct.
13 Q.   And the focus of the case in this claims file varied
14 from time to time as it progressed, did it not?
15 A.   Pardon me, would you repeat that?
16 Q.   Yes, the focus of information and information sought
17 and what was going on with an evaluation of the claims file
18 moved along from time to time as the claim developed and
19 more medical evidence and more physical evidence came in,
20 did it not?
21 A.   In a very delayed fashion, the medical evidence began
22 to be looked at. Again, as I said, the surveillance was
23 consistent throughout. The medical, the in-depth medical
24 analysis did not begin until about 15 months into the claim
25 or later, and then again, the AP was left out of the