UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| ERIC L. JEFFRIES, | : | Case No. C-1-02-351 |
| Plaintiff, | : | |
| | : | (Judge Beckwith) |
| vs. | : | (Magistrate Judge Hogan) |
| | : | |
| CENTRE LIFE INSURANCE COMPANY, | : | **DEFENDANT'S MEMORANDUM** |
| et al., | : | **IN OPPOSITION TO PLAINTIFF'S** |
| | : | **MOTION FOR SUMMARY** |
| Defendants. | : | **JUDGMENT ON DEFENDANT'S** |
| | : | **COUNTERCLAIM** |
| | : | |

**I.    Introduction**

There is no dispute that Mr. Jeffries is totally disabled under that portion of his policy which provides benefits for a disability caused by a mental disorder. There is also no dispute that Mr. Jeffries has been paid the full 24 months of benefits available to him under his policy. What remains in dispute is Plaintiff's claim for continued benefits. The information submitted by Mr. Jeffries in his Motion for Summary Judgment on Centre Life's Counterclaim are the opinions of four consulting doctors and one treating physician. It does not appear that Mr. Jeffries continues to be under treatment for his alleged disorder. Additionally, the information submitted by Mr. Jeffries fails to establish that he has a medical disorder which would entitle him to continued benefits. Mr. Jeffries argues that he has chronic fatigue syndrome (CFS). Centre Life paid Mr. Jeffries for 39 months of benefits. He was only entitled to 24 months of benefits. Mr. Jeffries has been overpaid by an amount in excess of $180,000.00 which amount Centre Life seeks to recover on its Counterclaim. As set forth in Centre Life's Motion

for Summary Judgment, incorporated herein by reference, it is entitled to judgment in its favor on its Counterclaim.

## II. Argument

Total disability is defined under Mr. Jeffries' policy as:

> "Total disability" and "totally disabled" means that due to Injury or Sickness, the Insured: (1) is substantially unable to perform the material duties of his/her occupation; and (2) is receiving care by a Physician which is appropriate for the condition causing the disability. We will waive this requirement when continued care would be of no benefit to the Insured.

*See* Exhibit A to Defendant's Motion for Summary Judgment at p. 3. Mr. Jeffries' policy also contains a mental disorder and/or substance use disorder limitation which states that "if a total disability or other covered loss is due to a mental disorder and/or substance use disorder, the number of months for which any benefits for total disability shall be payable under the policy during the lifetime of the insured shall not exceed in the aggregate a total of 24 months." *See id.* at Amendment to policy.

It is undisputed that Mr. Jeffries has been paid benefits under the mental disorder limitation of his policy. He has in fact been paid in excess of 24 months of benefits. Plaintiff claims however that he continues to be totally disabled under his policy, and that the 24-month limitation does not apply. Integral to this argument is his claim that he is disabled by a condition other than the mental disorder for which he has already been paid. Plaintiff cannot establish that this is the case.

### A. Plaintiff Is Not Receiving Care By A Physician Which Is Appropriate To Treat His Alleged CFS Condition.

Plaintiff must establish that he is entitled to continued payment of benefits. As a threshold matter, he has not met the second portion of the definition of total disability. To be considered totally disabled under the terms of his policy, Mr. Jeffries must be "receiving care by

a physician which is appropriate for the condition causing the disability." Mr. Jeffries argues that he has identified five experts and treating physicians who have made a medical diagnosis. Of these physicians, four are simply consulting physicians. They are not providing treatment.

Dr. Charles Poser examined Mr. Jeffries twice. The first time was June 7, 2000 and the second was May 22, 2002. *See* Exhibit 1, Poser deposition at p. 5. In support of his claim, Mr. Jeffries has attached a July 28, 2000 report of Dr. Poser drafted after the June 7, 2000 examination. There is also an undated letter to Plaintiff's counsel which references his review of letters from Drs. Burton Zwiman in April and October of 2001. In that undated letter the only reference to examinations by Dr. Poser was that he "saw Mr. Jeffries in consultation in June 2000." Mr. Jeffries has offered no other evidence of treatment by Dr. Poser. Dr. Poser was deposed in this case on July 8, 2003. Dr. Poser testified that he provided treatment in June of 2000 in the form of prescribing medications. *See id.* at p. 60. Dr. Poser admitted that he does not know whether the treatment was continued or whether it resulted in any improvement. In any event, as of the time of deposition in mid 2003, Mr. Jeffries was no longer under treatment with Dr. Poser.

Similarly, Dr. Hyde does not provide treatment. Like Dr. Poser, Dr. Hyde has only consulted with Mr. Jeffries. In his July 7, 2001 and June 30, 2001 reports, Dr. Poser discusses in detail his interpretations of Mr. Jeffries' various and sundry medical records. Nowhere in either report does he identify any continued treatment which he is providing. Dr. Hyde first met with Mr. Jeffries May 31, 2000. *See* Exhibit 2, Hyde deposition at pp. 13-14. Dr. Hyde did not examine Mr. Jeffries on that first visit but did an examination on a later visit. *Id.* pp. 15-16. The examination appears to have occurred on June 8, 2000. *See id.* at p. 19. The reports attached in support of Mr. Jeffries' Motion make no mention of any other continuing treatment.

Dr. Geier also does not provide ongoing treatment. In fact, Dr. Geier has never personally examined Mr. Jeffries. *See* Exhibit 3, Geier deposition at pp. 5-6. Dr. Geier's role in this case has been to review Mr. Jeffries' medical records and advocate on his behalf. *See id.* at pp. 8-9.

Dr. Burton Waisbren is another consulting physician. Dr. Waisbren saw Mr. Jeffries in September of 1999. *See* Exhibit 9 to Plaintiff's Motion. Like the other consulting physicians, Dr. Waisbren notes no treatment provided to Mr. Jeffries by him in his report. *See id.*

Of the five physicians relied upon by Mr. Jeffries in his Motion, only one, Dr. Michael McClellan, can properly be considered a treating physician. Dr. McClellan first saw Mr. Jeffries on October 14, 1998. *See* Exhibit 4, McClellan deposition at p. 5. The statement submitted by Dr. McClellan in support of Plaintiff's Motion is dated October 26, 1999. In the information submitted to Centre Life by Mr. Jeffries, there are records of additional office visits with Dr. McClellan through February 17, 2000. *See* Claim 2157. The treatment appeared to be pharmacological.

Mr. Jeffries acknowledges his lack of regular treatment. He testified at his September 10, 2003 deposition that he had seen Dr. McClellan twice during that year. *See* Exhibit 5, Jeffries deposition at p. 112. Mr. Jeffries testified that he returns to Dr. McClellan to have his thyroid tested and his thyroid medication evaluated. *Id.* Mr. Jeffries also testified that Dr. Pretorius has prescribed some sort of blood pressure medication that he takes. *See id.* at p. 136. In addition to his thyroid medication and the blood pressure medication prescribed by Dr. Pretorius, he also takes Neurontin but he was unsure who recommended this medication. *See id.* at p. 137. At the time of deposition, Mr. Jeffries said that other than his visit to Dr. Pretorius and two visits to

Dr. McClellan, he could not think of any other persons from whom he had received treatment. *Id.* at p. 137.

It is clear that none of the five doctors relied upon by Mr. Jeffries in his Motion are currently treating him for his claimed disabling condition. His resolved thyroid cancer is not disabling and there is no claim of disability due to blood pressure. As such, he has not met the definition of total disability outlined in his contract.

**B.     The Opinions Of Mr. Jeffries' Doctors Do Not Establish Total Disability.**

Mr. Jeffries' policy requires that he provide sufficient proof of loss to show he is entitled to benefits under the terms of his policy. Under Ohio law, the person "who seeks to recover on an insurance policy generally has the burden of demonstrating coverage under the policy and then proving a loss." *See Chicago Title Insurance Company v. Huntington National Bank*, 87 Ohio St. 3d 270, 273, 719 N.E.2d 955 (1999) *citing Inland River Service Corp. v. Hartford Fire Insurance Company*, 66 Ohio St. 2d 32, 418 N.E.2d 1381 (1981). In his Motion, Mr. Jeffries improperly attempts to shift that burden back to Centre Life. He argues that the diagnosis of somatoform disorder has not been established by Centre Life, despite the fact that Centre Life has no burden to establish such diagnosis, because there is a known general medical condition which fully explains his symptoms. Despite the lack of medical evidence, if Plaintiff's argument on this point is accepted, the Court must deny his Motion for Partial Summary Judgment and find that there is a disputed issue of material fact.

Centre Life's doctors have opined that Mr. Jeffries' symptoms are better explained by the results of objective neuropsychological testing. Mr. Jeffries argues that the opinions of his physicians are more persuasive. The burden is on Mr. Jeffries. Where, as here, Defendant's physicians have offered a reasonable and plausible explanation, he cannot prevail. Even if his

argument is accepted, this necessarily results in a finding of a disputed issue of material fact. Therefore, Mr. Jeffries is not entitled to judgment in his favor. When the opinions of Mr. Jeffries' consulting physicians are closely scrutinized however, it is clear that they do not support the opinion Plaintiff advocates in his Motion.

Mr. Jeffries argues that his doctors have concluded that he suffers from a medical condition known as myalgic encephalomyelitis or chronic fatigue syndrome and that to a reasonable degree of medical certainty, this disease was triggered by an adverse reaction to a Hepatitis B vaccine he received. A close review of the opinions of his doctors reveals that this is not an accurate summary of their opinions. It is important to consider the records and deposition testimony of each of these doctors.

 1. **Charles Poser**

Plaintiff is correct in his assertion that Dr. Poser has diagnosed him with chronic fatigue syndrome. Dr. Poser testified that his diagnosis is based purely on clinical considerations. *See* Exhibit 1, Poser deposition at p. 24. Although Dr. Poser noted his impression of PET and SPECT scans performed on Plaintiff, he reiterated twice in deposition that he did not rely on the results of PET or SPECT scans in making his diagnosis and that he would not be qualified to evaluate those scans in his diagnosis. *See id.* at pp. 23-24, p. 49. Dr. Poser testified that he has his own criteria for chronic fatigue syndrome. *See id.* at p. 36. He admitted that he does not know, or even care, if the criteria he uses to diagnose CFS are accepted by the medical community. *See id.* at p. 71. He also rejects the commonly-held conclusion of the medical community that CFS is a diagnosis of exclusion. *Id.* at pp. 53-54. Dr. Poser argues that he is able to diagnose CFS because of the detailed and accurate history which he has the ability to take. *See id.* at 55. Dr. Poser's criteria are: fatigue, micromyalgia, migratory myalgia,

migratory painful paresthesia and memory and cognitive disturbances. *Id.* at p. 36. Dr. Poser argues that Mr. Jeffries met these criteria.

A careful review of Dr. Poser's records and testimony reveals that this is not the case. Despite his criticism of doctors' inability to take accurate history, Dr. Poser readily admits that he made no attempt to obtain any medical information relating to Mr. Jeffries prior to 1997 or 1998. *See id.* at p. 17. He then states that he relied on both his examination and some reports he received from either Mr. Jeffries or Dr. Hyde. These include:

- A 10/2/98 report to Dr. Nunlist-Young from UC Medical Associates
- A two page report from Starr M. Ford to Dr. Nunlist-Young from Alliance Primary Care
- A 10/13/98 office note of Dr. Luggen
- A 10/22/98 report to Dr. Nunlist-Young from Donald Jacobs of Opthmalic Center
- A report from Dr. Joseph Michalski at the University of Southern Alabama to Dr. Luggen

*See* Exhibit 6, compiled records referred to by Dr. Poser.

Dr. Poser's records are attached to Plaintiff's Motion for Summary Judgment. His "history" consists only of 1-1/4 pages of handwritten notes from his meeting with Mr. Jeffries on 6/7/00. In deposition he claims he relies on the other information listed above as well as his examination to meet his criteria. The defining criteria of chronic fatigue syndrome is fatigue. Dr. Poser accepts Mr. Jeffries' subjective report of fatigue. The other records relied upon by Dr. Poser in fact <u>do not</u> establish a severe and debilitating fatigue. Of the documents listed above, only the 10/2/98 letter to Dr. Nunlist-Young from UC Medical Associates notes "complete fatigue." *Id.* at Exhibit 6. Although Dr. Michalski's letter mentions "some fatigue" during episodes, none of the other records make any note of fatigue. *Id.* Dr. Ford's 10/9/98 letter in fact reports that Mr. Jeffries generally sleeps well. *Id.* Dr. Michalski's 1/26/99 letter also says that Mr. Jeffries sleeps well and awakes feeling rested except for during most severe

attacks. *Id.* The criteria of severe and debilitating fatigue is not established in the records relied upon by Dr. Poser.

More importantly, none of the reports make any reference to any memory or cognitive disturbances. Despite Dr. Poser's note that the neurological examination he performed on Mr. Jeffries was entirely normal (*see* Poser depo. at p. 20) he argued in deposition that memory and cognitive problems were a major problem for Mr. Jeffries. *See id.* at pp. 44-45. Notably, Dr. Michalski's report confirms that the results of his neurologic exam revealed that Mr. Jeffries' cognitive function and cranial nerves were normal. *Id.* at Exhibit 6.

Dr. Poser's diagnosis, even under his own criteria, whether or not accepted by the medical community in general, does not establish that Mr. Jeffries has severe and debilitating chronic fatigue syndrome. He claims to have relied upon other records to meet his criteria but review of these records show that the criteria is not in fact met. The records do not establish severe and debilitating fatigue and one of the primary criteria, impaired memory function, is not even a complaint of Mr. Jeffries in the records made contemporaneous with his initial claims of disability. As such, Dr. Poser's opinion is not reliable.

### 2. Byron Hyde

Turning to the opinion of Dr. Hyde, Mr. Jeffries claims that Dr. Hyde too makes the diagnosis of chronic fatigue syndrome. This is not a true statement.[1] In deposition, Dr. Hyde testified that he actually does not believe in chronic fatigue syndrome. *See* Exhibit 2, deposition of Dr. Hyde at p. 35. After much back and forth regarding his actual diagnosis of Mr. Jeffries, Dr. Hyde testified that he believes Mr. Jeffries has a central nervous system injury. He was questioned:

Q: Well, I am asking what your diagnosis is of Mr. Jeffries' condition?

---

[1] Defendant will not speculate as to Plaintiff's counsel's motives for making an inaccurate factual statement.

>    A:   Central nervous system injury, number one, based on the pathophysiology of the tests we performed.

*See id.* at p. 86. He relies on Mr. Jeffries' PET and SPECT scans to make this diagnosis. Dr. Hyde admits, however, that although he believes he has the ability to read PET/SPECT scans, he has had no formal training. *Id.* at pp. 55-56. He admits that when compared to doctors who have had formal training "I would say that they are the experts, not me." *Id.* at 56. The reports reviewed by Dr. Hyde do not tie Mr. Jeffries' alleged CFS to his Hepatitis B inoculation

Dr. Hyde was also questioned whether he had actually related Mr. Jeffries' problems to the Hepatitis B vaccination.

>    Q:   Doctor, you are telling me that as it stands today you have no specific disease with which you can diagnose Mr. Jeffries?
>    A:   It depends what you -- he definitely has a disease process.
>    Q:   Would you opine it is caused by a Hepatitis B shot back in 1997?
>    A:   I don't understand your word "supine?"
>    Q:   No, no. You --
>    A:   Opined?
>    Q:   -- Opine, you offered the opinion --
>    A:   Okay.
>    Q:   -- Several times in these various reports --
>    A:   Yeah.
>    Q:   -- That all of Mr. Jeffries' problems are related to this Hepatitis B inoculation in 1997.
>    A:   I don't -- did I say that, can you pull that out for me?

*See id.* at p. 96. In other words, contrary to the representations of Plaintiff on page 3, Dr. Hyde in fact has not diagnosed him with ME/CFS and seems surprised at the suggestion that he had offered the opinion that regardless of his medical condition, it was caused by his Hepatitis B vaccination. He admits later in his deposition, when asked whether he can render an opinion on the Hepatitis B causation issue with reasonable scientific certainty, that he cannot. He states: "Oh. "With reasonable scientific certainty? All we can say is that he had a Hepatitis B, and that

he has these brain changes, period." *Id.* at 99. This is not a scientifically sound causal connection. Dr. Hyde has clearly not established Plaintiff's medical condition.

        **3.**        **Mark Geier**

Dr. Geier is an advocate who argues that vaccines in general cause terrible reactions. His commentary is not limited to Hepatitis B vaccinations but spans many different vaccinations.

With regard to his Hepatitis B opinion, Dr. Geier has relied upon statistics from the Vaccine Adverse Event Reporting System (VAERS) database. VAERS is a voluntary forum to which adverse reactions to vaccines can be reported. Dr. Geier's reliance on VAERS as statistical support for his adverse vaccine reaction conclusion has been criticized. In particular, problem associated with VAERS reporting include incomplete data to verify diagnoses, incorrect diagnoses, incomplete reporting, inconsistent reporting of adverse events and lack of data on underlying diseases or other possible causes. Dr. Geier's use of VAERS evidence has been criticized in the American Academy of Pediatrics article attached as Exhibit A to Defendant's Hepatitis B Daubert Motion.

Also disconcerting is the fact that Dr. Geier for the most part cites to himself as authority for his opinions. Neither *Daubert* nor the Federal Rules of Evidence require a district court to admit opinion evidence that is connected to existing data by only the *ipse dixit* of the expert. An expert's opinion may properly be excluded when the court concludes that there is simply too great an analytical gap between the data and the opinion proffered. *See General Electric Company v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 519 (1997). Here Dr. Geier fulfills his role as an advocate. He has failed to establish however that his opinion is scientifically sound and it is therefore unreliable.

4.      **Burton Waisbren**

Dr. Waisbren, like Mr. Jeffries' other consulting physicians, accepts his history of illness at the time of inoculation. *See* Claim 02378 through 02383. Dr. Waisbren argues that because Mr. Jeffries had a sore throat, there were antigens present in his body that acted as immunologic adjuvants. *See id.* at 2382. This conclusion is based on incorrect and incomplete information. It is thus not reliable.

Dr. Waisbren's opinion is based not on any objective findings with regard to Mr. Jeffries or his "exclusion of other diseases . . . reports of similar situations . . . experience with autoimmune diseases" and his own personal experience with other cases. He then concludes that Mr. Jeffries has post-vaccinal encephalomyelitis and acquired autoimmunity. Once again, contrary to the claim of Mr. Jeffries, Dr. Waisbren has not diagnosed him with chronic fatigue syndrome. What Dr. Waisbren has failed to rule out however, and what destroys his case, is any psychological disorder. As such, he has not offered a complete opinion.

5.      **Michael McClellan**

Dr. McClellan is the only one of Plaintiff's actual treating physicians upon whose opinion Plaintiff relies. The other treating physicians who evaluated Mr. Jeffries contemporaneous in time to his inoculation have not offered the opinion that he is totally disabled due to chronic fatigue syndrome. This is perhaps why Mr. Jeffries chose to omit their opinions in his Motion. Mr. Jeffries argues that Dr. Hartings has not ruled out all possible medical conditions. In fact, Dr. Hartings testified that he did not ignore the diagnoses of the other medical doctors in this case; he simply did not assume that the diagnoses reflected a real medical condition. *See* Exhibit 7, Hartings deposition at p. 133. The bottom line however is that Dr. McClellan admits that the diagnostic tests performed on Mr. Jeffries have failed to yield a precise diagnosis. *See*

McClellan statement attached to Plaintiff's Brief. If there is no precise diagnosis, there can be no clear opinion as to causation. There are objective test results in this case however. Dr. Hartings has conducted such objective tests and has reached a verifiable opinion.

Dr. McClellan admits that the diagnosis of chronic fatigue is one of exclusion. *See* Exhibit 4, McClellan deposition at p. 112. "I would say that is correct, that there is no way to definitively make the diagnosis other than through exclusion." He then goes on to acknowledge that the potential psychological diagnosis of Dr. Dalvi is a reasonable one. *See id.* at p. 113. Dr. McClellan may reject Dr. Hartings' diagnosis of somatoform disorder but he still must admit that there is another reasonable diagnosis other than chronic fatigue syndrome which has not been appropriately excluded. As such, this opinion, like the others above, does not satisfy Mr. Jeffries' burden.

### C. Mr. Jeffries' Attempt To Rely On The Opinions Of Defendants' Experts Is Misplaced And Taken Out Of Context.

On page 8 of his Brief, Plaintiff attempts to rely on the reports of Defendant's evaluating physicians in support of his position. In so doing, he misquotes, misconstrues and misstates these opinions.

For example, Mr. Jeffries claims that the report of Dr. Currin shows a correlation between the vaccine and the illness. What Dr. Currin actually concluded in his report is that "there is no medical documentation to support a causal relationship between [Mr. Jeffries]' symptoms and his last diagnosis of post-vaccinal encephalomyelitis and acquired autoimmune immunity. This would require ad hoc (ergo: procter hoc) reasoning, which may not be considered scientifically reasonable." Plaintiff also misquotes the deposition testimony of Dr. Bullard. Dr. Bullard acknowledges that adverse reactions can occur with a Hepatitis B vaccination. As documented on the Hepatitis B fact sheet included in Plaintiff's Motion, an

adverse reaction includes reactions such as soreness, redness or swelling at the injection site. Dr. Bullard at no time agrees with Plaintiff's contention that the Hepatitis B vaccination can cause chronic fatigue syndrome. He states "the symptoms of an adverse reaction to a vaccine are remarkably similar to any number of ordinary illnesses." This is not an advocation of Plaintiff's position.

Plaintiff also refers to "Dr. Donald Craven for the opinion that a relationship exists between the Hepatitis B vaccine and rare autoimmune illnesses." He does not quote Dr. Craven accurately however and significantly, deletes the word "may" from that sentence. When read in its entirety, this sentence should actually say "he [Dr. Craven] believes there <u>may</u> be a relationship between the Hepatitis B vaccine and rare autoimmune illnesses, however the risk is 'very low.'" Plaintiff's use of misleading and inaccurate citation will not support his Motion.

### III.    Conclusion

Mr. Jeffries argues that the medical records establish that he has chronic fatigue syndrome caused by his Hepatitis B vaccination. Review of the records indicates that this conclusion is not as simple nor as clear as Mr. Jeffries would have the Court believe. Mr. Jeffries' symptoms are better explained by the results of his objective neuropsychological testing. He was disabled by a mental disorder and has been paid the entirety of benefits to which he is due. He has failed to establish that he continues to be disabled by some other physical

malady and as such he is not entitled to summary judgment.  Defendant respectfully requests that Plaintiff's Motion be denied.

                                  Respectfully submitted,

                                  <u>s/Amy Gasser Callow</u>
                                  William R. Ellis (0012279)
                                  Peter M. Burrell (0044139)
                                  Amy Gasser Callow (0063470)
                                  Wood & Lamping LLP
                                  600 Vine Street, Suite 2500
                                  Cincinnati, OH  45202-2491
                                  (Telephone) (513) 852-6000
                                  (Facsimile) (513) 852-6087

                                  Attorneys for Defendants
                                  Massachusetts Casualty Insurance Company
                                  and Disability Management Services, Inc.

- 15 -

## **CERTIFICATE OF SERVICE**

     I hereby certify that a copy of the foregoing has been filed with the Court by electronic means on this 30th day of January 2004. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

                                         s/Amy Gasser Callow
                                         Amy Gasser Callow, Esq.

197920.1