IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| ERIC L. JEFFRIES, | ) : | CASE NO. C-1-02-351 |
| Plaintiff, | ) : | JUDGE BECKWITH |
| | | Magistrate Judge Hogan |
| v. | ) : | |
| CENTRE LIFE INSURANCE CO., | ) : | |
| Defendant. | ) | |

MEMORANDUM OPPOSING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This Court should deny defendant's Motion For Summary Judgment ("Motion") because it improperly disregards and completely ignores material factual disputes. The Motion also should be denied because it improperly disregards/ignores opinions of experts who state:

1. Defendant engaged in bad faith;[1]
2. Mr. Jeffries has a medical illness;[2] and
3. Mr. Jeffries does not have a mental disorder.[3]

The defendant argues that these expert opinions and any factual assertions which contradict defendant's position "are not well taken and insufficient to support an opposition to [defendant's] motion." (*Motion, p. 34*). In the Motion, the defendant essentially sets forth its closing argument. This Court should deny the Motion because it is improper under Rule 56.

---

[1] See, Exhibit 1 (Report of Mary Fuller, Plaintiff's Insurance Practices Expert).

[2] See, Exhibit 2 (Deposition of Michael McClellan); Exhibit 3 (Report of Dr. Charles Poser); Exhibit 4 (Report of Dr. Mark Geier, manually filed as Exhibit 18 to Doc. 131); Exhibit 5 (Report of Dr. Byron Hyde); and Exhibit 6 (Report of Dr. Burton Waisbren).

[3] See Exhibit 7 (Report of Dr. Paula Shear) and Exhibit 8 (Report of Dr. Jim Hawkins).

In addition, this Court should confirm (contrary to defendant's newest assertion) that the defendant has the burden of proof at trial on the issue of whether Mr. Jeffries' undisputed "Total Disability" is caused by a mental disorder (as defendant affirmatively asserts in its Counterclaim in an effort to exercise an exclusion/limitation in the Policy) rather than a medical illness.

I.  **Summary Judgment Standard.**

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). On a motion for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party draw all inferences in the non-moving party's favor. See *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 8 L. Ed. 2d 176, 82 S. Ct. 993 (1962); *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984). The movant bears the burden of demonstrating the absence of all genuine issues of material fact. See *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 861 (6th Cir. 1986).

Based on the record evidence, the Court must deny defendant's Motion.

II. **Genuine Issues of Material Fact Exist on Plaintiff's Claims.**

Defendant seeks summary judgment on each of Mr. Jeffries' five claims: (i) breach of contract; (ii) bad faith; (iii) invasion of privacy; (iv) interference with contractual relations; and (v) conspiracy. While plaintiff, not defendant, is entitled to summary judgment on plaintiff's breach of contract claim, genuine issues of material fact exist on each of plaintiff's other claims. Therefore, this Court must deny defendant's Motion.

2

A.   <u>The Bad Faith Claim</u>

Defendant has, in bad faith, worked exclusively to deny Mr. Jeffries' Claim – a decision it made sometime in 1999.

1.   *<u>The Law of Bad Faith in Ohio.</u>*

Defendant has the duty to act in good faith in the handling and payment of Mr. Jeffries' Claim. *Hoskins v. Aetna Life Insurance Co.* 6 Ohio St 3d 272, 452 NE 2d 1315 (1985); *Zoppo v. Homestead Insurance Co.* 71 Ohio St 3d 552, 554 (1994). The *Hoskins* Court held that the "justification" for Ohio's imposition of a duty of good faith resulted from:

> "the great disparity between the economic positions of the parties to a contract of insurance; and furthermore, at the time an insured makes a claim he may be in dire financial straits and, therefore, <u>may be especially vulnerable to oppressive tactics by an insurer seeking a settlement or a release</u>." *Hoskins* 452 N.E. 2d at 1319 (*emphasis added*).

As the Ohio Supreme Court has held, "a lack of good faith is the equivalent of bad faith, and bad faith . . . imports <u>a dishonest purpose</u>, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud." *Slater v. Motorists Mutual* 174 Ohio St 148, 151, 187 NE 2d 45 (1962).

Here, the record evidence, viewed in a light most favorable to Mr. Jeffries, establishes that the defendant denied benefits to Mr. Jeffries from 1999 through the present "without reasonable justification therefor" and the evidence of bad faith (of the nature acknowledged by the Ohio Supreme Court in *Hoskins*) is overwhelming.

In *Zoppo*, the Ohio Supreme Court held that bad faith may be shown through evidence of an insurer's failure to investigate, which can consist of focusing solely on a version of the facts under which there would be no coverage, to the exclusion of other reasonable

3

possibilities.[4] Delay, unreasonably low settlement offers, and compelling an insured to file a suit to recover amounts due can also be evidence of bad faith.

The evidence shows that, early in its administration of Mr. Jeffries' Claim and before it conducted any medical evaluation of the Claim, the defendant determined that it would not pay the Claim and developed a strategy for that purpose. Summary judgment is also improper because bad faith requires an examination of the "reasonableness" of defendant's actions (i.e., "no reasonable justification therefor"), a question which is inherently within the purview of the trier of fact.[5] Since this is a material element of the bad faith determination, summary judgment is precluded.

2.    *The Record Evidence Of Bad Faith.*

Plaintiff's insurance practices expert, Mary Fuller, identified many aspects of defendant's claims administration process that show that defendant acted in bad faith. (*Exh. 1*). Based on her analysis and opinions alone, there exists genuine issues of material fact on Mr. Jeffries' bad faith claim. As a result, plaintiff's and the Court's analysis of defendant's prayer for summary judgment could stop here. However, the facts on which Ms. Fuller's opinions are based bear mention:

---

[4] In Ohio an insurer must conduct an investigation "so as to be able to intelligently assess all the probabilities of the case." *Netzley v. Nationwide* 34 Ohio App. 2d 65 (1971). In *Zoppo* the Court stated that "there was ample evidence to support the jury's finding that [the insurer] failed to conduct an adequate investigation and was not reasonably justified in denying Zoppo's claim."

[5] *See e.g.*, **Kelly v. Georgia-Pacific Corp.** (1989), 46 Ohio St.3d 134, 545 N.E.2d 1244; **Helmick v. Cincinnati Word Processing, Inc.** 543 N.E.2d 1212, 45 Ohio St.3d 131 (reasonableness of employee's cessation of job search based upon representations of continued employment is a question of fact for the jury); **Greater Cleveland Regional Transit Auth. v. Ohio Civ. Rights Comm**. (1989), 58 Ohio App.3d 20, 24, 567 N.E.2d 1325, 1328-1329 ("reasonableness" is ordinarily a question of fact).

- Rather than seeking an independent medical examination to assess Mr. Jeffries' medical illness, defendant focused its efforts on establishing that the Claim was fraudulent:

    o Defendant conducted an internal non-medical investigation (*Exh. 9*);

    o Defendant performed several non-medical database searches, including searching for information on whether Mr. Jeffries, or his wife, or 2 young boys were beneficiaries of any trusts (*Exh. 10*);

    o Beginning in mid-May 1999, defendant hired In-Photo, CS Claims Group, Pro Edge, and Corporate Investigators to conduct surveillance and investigations of Mr. Jeffries in May 1999, June 1999, July 1999, August 1999, December 1999, January 2000, February 2000, March 2000, April 2000, January 2001, and in 2002 (*Exhs. 11, 12, 13, and 14*);

    o Mr. Jeffries complained to defendant regarding the surveillance. (*See, e.g., Exh 15*). He reported that investigators claiming to be delivery men would come upon his property and would also follow him and his children in public. *Id.* Mr. Jeffries also complained that investigators would phone him at home under false pretenses; *Id.*;

    o Defendant colluded with Prudential Insurance Company for the purposes of *inter alia* sharing files, sharing the cost of their surveillance of Mr. Jeffries, and denying the Claim. (*Exh. 16*). During their planning discussions, defendant characterized Mr. Jeffries' Claim as not legitimate.[6] Defendant made this statement *before* it had Mr. Jeffries or his records reviewed by a medical or mental health professional;

---

[6] The phone log between defendant and Prudential states: "[defendant] wants to do a business check on [Mr. Jeffries] . . . [defendant] believes there is a financial incentive for [Mr. Jeffries] to be [out of work] . . . [defendant] has not paid [Mr. Jeffries] since December (1999) [and] it questions where he is getting income from . . . [defendant] will be able to discuss the results of [their] visit [with Mr. Jeffries] with us tomorrow." (*Ex. 17, Depo. Of Jen Nichols of Prudential*). The telephone log also contains the following exchange from a March 9, 2000, telephone call between Prudential and the defendants: "[defendant] <u>is closely reviewing claim and do not believe that [Mr. Jeffries'] claim is legitimate</u> . . . [defendants'] field rep would like to come to Prudential to review [Prudential's] file [defendants] in turn can provide a copy of the field report and other information . . . ." (*Id., emphasis added*). In April 2000, after he learned of defendant's statements, Mr. Jeffries limited his information authorization but continued, through a Modified Authorization, to allow defendant to examine all information from treating physicians, hospitals, and medical facilities, health care insurers, employers, the Social Security Administration, and the Internal Revenue Service.

5

- o   During a February 2000 planning session, defendant stated its belief that Mr. Jeffries was claiming disability for "financial gain." *Id*. Defendant stated that it wondered where Mr. Jeffries was "getting money from" since it had been withholding benefits;

- o   In January 2000, a physician Mr. Jeffries visited, Dr. Spickett, wrote that "Chronic Fatigue Syndrome should be considered (post vaccination); this would account for most physical symptoms . . . ." (*Exh. 18*). Other physicians soon agreed with the diagnosis of CFS, including Drs. McClellan, Poser, and Hyde (*Exs. 2, 3, and 5*), yet defendant *never* engaged a CFS expert to assess this potential diagnosis; and

- o   In June 2000, when defendant finally engaged medical doctors to review Mr. Jeffries' medical records, defendant disregarded the opinion it received (i.e., defendant's consultants advised defendant that the hepatitis B vaccine could have caused Mr. Jeffries' symptoms, especially since he is HLA-B27 positive (*Exh. 19, Dr. Garb Report*).[7]

- When the surveillance and other activities designed to show fraud proved unsuccessful (and in fact exhibited in the video surveillance a man who is obviously disabled), defendant shifted course and attempted to create evidence that benefits should be limited to 24 months under the Mental Disorder Benefit Limitation provision contained in an Amendment to the Policy:

    - o   By October 1999, defendant had received several "unhelpful" surveillance reports from its many private investigators. Accordingly, even though defendant had not even asked Mr. Jeffries to be examined by a medical doctor or mental health professional, a nurse employed by the defendant attempted to persuade Mr. Jeffries' primary care doctor into suggesting that Mr. Jeffries disability was the result of a somatization disorder. (*Exh. 20*). Mr. Jeffries' physician rejected this suggestion. *Id.*;

---

[7]   Dr. James Garb noted that: "There are some objective diagnostic tests that suggest that [an autoimmune] process may be present . . . Mr. Jeffries may have a poorly characterized, non-inflammatory autoimmune syndrome . . . possibly related to Hepatitis B Vaccination . . . people who are HLA-B27 positive, as is Mr. Jeffries, may be more susceptible to this type of reaction." (*Ex. 20*). Dr. Craven, an infectious disease specialist, advised that he "believes there may be a relationship between the hepatitis B vaccine and rare autoimmune illnesses . . . [and some people may have an underlying disease process that may be accelerated by the vaccine." *Id*.

6

- o   Following discussions with Mr. Jeffries' physicians, defendant would issue misleading and inaccurate letters to "memorialize" the conversations. *Id.* Some of Mr. Jeffries' doctors took the time to correct the misstatements, others were so disgusted they chose to not respond at all (*Exh. 21)*;

- o   In August 2001, immediately after receiving a complaint from the Ohio Insurance Department ("OID") and a 600-page submission from Mr. Jeffries containing materials supporting his Claim, defendant advised the OID that it would have Mr. Jeffries examined "by physicians of the appropriate specialties." (*Exh. 22*).[8] That day, rather than seeking an exam by a ME/CFS, hepatitis B vaccine, or infectious disease specialist (which it never did), defendant requested that Mr. Jeffries see a child psychologist;[9]

- o   On May 16, 2003, defendant advised that the "decline in [Mr. Jeffries'] cognitive functions, were secondary to a severe obsessive-compulsive personality disorder . . . ." (*Exh. 23*). The defendant has since discarded the diagnosis of Obsessive Compulsive Disorder and has apparently reassigned the causation of Mr. Jeffries' undisputed cognitive decline to Undifferentiated Somatoform Disorder, a new diagnosis altogether;

- o   In its May 16, letter, defendant said it would consider Dr. Geier's opinion, but it never did. *Id.* In fact, defendant never considered the possibility that Mr. Jeffries' symptoms are caused by ME/CFS or an adverse reaction to the hepatitis B vaccine, despite the supporting opinions of its own consultants, Drs. Garb and Craven, and it never had Mr. Jeffries' examined by a ME/CFS expert or a hepatitis B vaccine expert; and

- o   Defendants also did not request that Mr. Jeffries be examined by an infectious disease specialist until June 2002: -- 3½ years after Mr. Jeffries filed his Claim and after defendants closed the Claim and stopped paying benefits. Despite Mr. Jeffries' agreement to see defendants' infectious disease specialist, defendant canceled the appointment and it was never rescheduled. (*Exh. 24*).

---

[8]   In August 2001, to defend their conduct to the OID defendant advised that: "we have not requested . . . access to [Mr. Jeffries] personal finances." (*Exh. 22)*. This, of course, was not true.

[9]   Because Mr. Jeffries had a medical illness as confirmed by opinions of his medical doctors, which defendant never explored through an IME and because Dr. Hart was a child psychologist rather than a person with any appropriate experience, Mr. Jeffries objected to seeing Dr. Hart but offered to see an appropriate medical doctor. Defendant then Closed the Claim.

7

- Defendant delayed decision on the Claim, increased Mr. Jeffries' costs, and attempted to create insecurity in Mr. Jeffries all in order to orchestrate an unreasonably low settlement of the Claim:

    o In many of defendant's letters to Mr. Jeffries, the defendant advised that in the absence of objective medical evidence he may not receive benefits, *even though* "objective medical evidence" is not required by the Policy and even though many known medical illnesses have no associated objective findings (*See, e.g., Exh. 25*);

    o In May 2001, Mr. Jeffries advised defendant that he needed a decision on whether defendant intended to approve the Claim and pay benefits or whether he would need to proceed with the alternative means of resolution discussed previously (i.e., a lawsuit);" (*Exh. 26*);

    o In November 2002, even though Mr. Jeffries had agreed to see and had seen Drs. Grubbs and Hartings as defendant requested, defendant stated that it was continuing to refuse to pay benefits (which it had done since January 2002) because Mr. Jeffries he had not executed a "unilateral medical release." (*Exh. 27*). However, a "unilateral medical release" had *always* been available – it is the very essence of the Modified Authorization (*Exh. 28*);

    o In October 2001, Mr. Jeffries' counsel conveyed unequivocally Mr. Jeffries' extreme frustration with the defendant's delays. Defendant responded with an offer (its first) to settle the Claim for less than 10% of its value. (*Exh. 29*);

    o On February 25, 2002, without any notice to Mr. Jeffries, defendant terminated Mr. Jeffries' Claim. (*Exh. 30*). During the course of multiple phone calls which occurred between defendant and Mr. Jeffries' counsel on February 26, 27, and 28, the defendant failed to advise that it had already taken this action. (*Exh. 31*). During these calls, however, defendant did again offer to settle for less than 10% of the value. *Id.* Defendant also commented that Mr. Jeffries' position was "bull shit." *Id.*;

    o On April 2, 2002, Mr. Jeffries' insurance agent received a premium notice (mailed on March 28, 2002) informing him that Mr. Jeffries' Policy had been Closed and taken off Waiver of Premium effective February 25, 2002 (the waiver was processed on February 21, 2002) and that the Policy

8

would lapse if premiums were not paid prior to April 1, 2002, the day before the letter was received (*Exh. 32*); and

- o Even though defendant had "Closed" the Claim one month earlier, on March 21, 2002, defendant advised Mr. Jeffries that defendant "has been left with no option but to *consider* termination of further benefits absent compliance." (*Exh. 33*). By saying that it may "consider" termination, defendant was affirmatively concealing the fact that the Claim in fact was Closed and would soon lapse.

   3.   *The Opinion of Plaintiff's Insurance Practices Expert*.

Based on the above overview of the facts and other actions she has gleaned from the record, Mary Fuller, plaintiff's insurance practices expert, opines that defendant violated the standard of care in the disability insurance industry in a number of respects and that there is no reasonable justification for defendant's withholding of benefits from Mr. Jeffries from December 1999 through the present.[10]

   (a).   The Defendant Failed To Investigate The Relevant Facts.

Ms. Fuller has offered her expert opinion that defendant failed to investigate fully the relevant and applicable facts. (*Exh. 1*).[11]

She states her analysis and opinion is based on the above facts and the fact that: (i) there was no vocational analysis performed by defendant at any time; (ii) the "majority of what Mr.

---

[10] In its Motion, Defendant attempts to characterize the actions of bad faith as beginning in February 2002 rather than February 1999 when Mr. Jeffries filed his claim. As detailed herein, defendants' bad faith strategy to deny Mr. Jeffries' claim was developed sometime in 1999 and runs through the present.

[11] In *Zoppo*, as here, the insurer was motivated to deny the claim because the insurer believed that the plaintiff had "had a motive for [making the claim] namely, financial gain." And in *Zoppo*, the Supreme Court made special note of the fact that "Zoppo's expert, a claims consultant, testified that the Homestead investigation was inadequate and that Homestead was not justified in denying the claim."

Jeffries was required to produce was irrelevant and . . . an invasion of privacy . . . [and] harassment;" (iii) defendant improperly searched to determine whether Mr. Jeffries or any of his family members, including his children, were beneficiaries of any trust funds, "a fact that had absolutely nothing to do with his claim;" (iv) the surveillance activity was conducted for the sole purpose of attempting to prove fraud (the extent to which defendant conducted surveillance on this case was far beyond what one would normally see); and (v) the techniques used for surveillance were highly questionable (and defendant's delayed response to Mr. Jeffries' inquires about the surveillance was unprofessional). *Id.*

### (b). The Defendant Failed To Fairly Consider All Information Obtained Including That Which Tends to Favor Claim Payment.

Ms. Fuller has offered her expert opinion that defendant failed to consider all of the evidence obtained, including the evidence supporting payment of benefits. *Id.*

She states her opinion is based on *inter alia* the following facts: (i) surveillance showed disability but defendant continued to order more surveillance ("clearly an attempt to find some basis for denial"); (ii) defendant's medical consultants did not dispute Mr. Jeffries' symptoms and in fact acknowledged the presence of objective tests to support an autoimmune disorder, but defendant continued to view the claim as though it was fraudulent – "it is not clear why defendant continued to challenge the legitimacy of Mr. Jeffries' symptoms;" (iii) defendant "repeatedly refused to acknowledge" the supporting medical evidence; and (iv) benefits were denied without providing Mr. Jeffries' physicians the opportunity to comment on any contrary findings; (v) defendant's "aggressive pursuit of an IME following Dr. Garb's review, was clearly inconsistent with the concept of considering information that tends to favor claim payment.

Defendant [was] focused on finding information to terminate benefits;" (vi) defendant ignored the two neuropsychological evaluations which each suggested that Mr. Jeffries' cognitive impairment was most likely neurologic in origin;" and (vii) Dr. Hartings' ignored evidence that the cause of Mr. Jeffries' symptoms was not psychological. *Id.*

Ms. Fuller opines that the defendant "was unfair and clearly biased . . . the focus of its investigation was its own self-interest. Evidence of its bias is particularly clear in its complete disregard for the opinions of the multiple treating providers . . . defendant accepted their own consultant's opinion with absolutely no objective medical evidence to substantiate it. Defendant was clearly holding Mr. Jeffries to a much higher standard of proof than it required of itself. In addition, it completely ignored a standard principle within the claims industry, that being, 'When there is reasonable doubt, rule in favor of the insured.' The medical evidence would suggest that there was more than enough evidence to support payment in the face of uncertainty as to the condition; Mr. Jeffries was clearly not given equal or fair consideration in the matter." *Id.*

### (c) Defendant Failed To Promptly and Timely Pay Benefits Owed Under The Policy.

In its Motion, defendant performed no analysis of the actions it took prior to February 2002, which were highly criticized by Ms. Fuller. Rather, defendant argues that it cannot be guilty of bad faith for anything that occurred prior to February 2002 because Mr. Jeffries was paid all benefits due him for December 1998 through January 2002. This argument is meritless.

While defendant has paid all benefits for that time frame, its payments were routinely 1, 2, or 3 months late. (*Exh. 34*). As Ms. Fuller details, defendant is not entitled to sweep its

11

improper conduct under the rug simply because it *ultimately* paid benefits to Mr. Jeffries. All testing including neuropsychological testing from 1998 through March 2003, showed that Mr. Jeffries was disabled. Nonetheless, as Exhibit 34 indicates, in December of 1999, at a time that defendant had numerous medial records from Mr. Jeffries' treating providers supporting impairment, defendant stopped paying benefits to Mr. Jeffries. And in February 2000, defendant showed frustration and curiosity as to where Mr. Jeffries' money was coming from because the defendant had intentionally been withholding payment. (*Exh. 16*). And Mr. Jeffries' attorney had to consistently intervene to obtain past due benefits which were repeatedly withheld. On February 21, 2002, without any medical or psychological evidence to support its decision, defendant removed Mr. Jeffries' Policy from waiver of premium status and "Closed" Mr. Jeffries' claim. (*Exh. 30*). This decision was not communicated to Mr. Jeffries or his counsel even though defendant continued to discuss aspects of the Claim with Mr. Jeffries. (*Exh. 31*).

**(d).   Defendant Failed To Establish and Maintain Procedures for the Purpose of Guaranteeing Compliance of Its Obligations.**

According to Ms. Fuller, defendant's procedures (which are not stated in any claims manual) are not consistent with industry standards for fair claims practices.

In her report, Ms. Fuller bases her opinion on *inter alia*: (i) the absence of a written file plan for the management of Mr. Jeffries' claim (yet it is clear from the aggressive way in which defendant investigated the Claim that it had concerns from the onset); (ii) the fact that Prudential's phone log memorializes numerous conversations with defendant, but defendant's file omits these calls; (iii) defendant attempted to gain access to Mr. Jeffries' information but

"did not have proper authorization to obtain the records;" (iv) activities kept occurring on the claim with no documentation as to why; (v) defendant's failure to share any opinions with Mr. Jeffries' providers is not consistent with industry standards of fair claims practice; (vi) the participation of an Assistant Vice President in the administration of a claim is evidence of high visibility and financial exposure but "it is entirely inconsistent to have that level of resource involved and to see no documentation as to discussions regarding issues and concerns as well as action plans established;" (vii) defendant closed the claim in February of 2002 one month prior to completing the medical review - further evidence that it intended to close the claim and was simply going through steps to appear as though they were being fair and thorough; and (viii) defendant asked Dr. Bullard to conduct an independent medical examination, but Dr. Bullard was not a specialist in any relevant field (the "usual customary procedure is to identify an expert resource that is able to address the pertinent medical issues in a file," but Dr. Bullard was not qualified to do so).

**(e).   Defendant Failed To Administer The Claim According to Applicable Laws.**

As Ms. Fuller explains, defendant's response to the Ohio Insurance Department's investigation of its claim process was intentionally misleading and inaccurate (e.g., defendant told the Ohio Insurance Department that it had not asked for access to Mr. Jeffries' personal finances - but they had).

For all of the above reasons, Ms. Fuller, states that defendant breached its obligation of good faith and fair dealing in the administration of Mr. Jeffries' claim and that it failed to administer the claim in accordance with industry fair claims practice standards.

In conclusion, a Civil Rule 56 assessment of these facts establishes that shortly after Mr. Jeffries filed his Claim, defendant developed a strategy to deny the Claim without regard for Mr. Jeffries' physical or mental condition.  For nearly 2 years and to the exclusion of any other analysis, defendant focused first on showing fraud or financial incentive for filing the Claim. When that effort failed, defendant focused on limiting benefits to 24 months by suggesting that Mr. Jeffries had a mental disorder.  In doing so, defendant disregarded the opinions of his medical doctors and defendant's own consultants.  Finally, defendant's strategy was designed to create substantial insecurity in Mr. Jeffries.  One of defendant's principles refers to this through the euphemism of "managing expectations."  (*Ex. 35*).

Defendant hoped its strategy would create insecurity in Mr. Jeffries so that it could settle the Claim for pennies on the dollar.  At no time during the first three years it administered the claim did defendant ever seek an independent medical evaluation of Mr. Jeffries by a medical doctor.

    4.    <u>Defendant's Argument That It Is Not Liable For Bad Faith Since February 2002 Is Meritless</u>.[12]

While defendant routinely paid Mr. Jeffries late from February 1999 through February 2002, it withheld payment altogether from February 2002 to February 2003. (*Exh. 34*). Defendant then made a single payment to Mr. Jeffries for January 15, 2003 through February 15, 2003. *Id.* Defendant's refusal to pay benefits from February 2002 through the present not only continued

---

[12]    The fact that this suit has been pending since May 2002 does not relieve defendant of potential bad faith liability for the period after the suit was commenced. *Spadafore v. Blue Shield*, 486 N.E.2d 1201, 1204, (Ohio Ct. App. 1985).

14

its 1999 strategy to deny benefits without regard for Mr. Jeffries' disability, but was done with no "reasonable justification therefor."

In May 2002, Mr. Jeffries advised defendant that he would see (and later did see) any and all doctors that defendant requested without any condition. (*Exh. 15*). At that time, benefits should have been reinstated but they were not. In fact, benefits were withheld for the next 9 months without any reasonable justification. On November 14, 2002, defendants stated that they would continue to refuse to pay benefits until they received his "unilateral medical release." (*Exh. 27*). A "unilateral medical release," however, has *always* been available to defendants and is the essence of the Modified Authorization. (*Exh. 28*).

Separately, as fully detailed in plaintiff's Motion For Summary Judgment, there has been no reasonable justification for the denial of benefits since March 2003 (when defendant asserted that Mr. Jeffries was not entitled to more than 24 months of benefits as the result of Dr. Hartings' Report).[13] The Report incorrectly asserts that Mr. Jeffries has Somatization Disorder and Obsessive Compulsive Disorder. Defendant's follow-up letter recites these 2 diagnoses as the basis for denying benefits. But there is no reasonable justification for denying benefits on this basis. Even Dr. Hartings does not stand behind his own Report any longer: he has dropped his OCPD diagnosis and has changed the somatization disorder diagnosis to Undifferentiated Somatoform Disorder.

---

[13] Defendant's counsel has used Dr. Hartings as an expert on dozens of occasions over the course of the last 18 years. Dr. Hartings lost his license in the mid-1990s for "low standards." And Dr. Hartings did not testify truthfully about his suspension during his deposition in this action.

Moreover, Dr. Hartings admits in his Report that he cannot and does not opine on whether Mr. Jeffries has a medical illness. As detailed in plaintiff's Motion For Summary Judgment, plaintiff is entitled to summary judgment on defendant's counterclaim since the diagnosis of USD-300.82 cannot exist in light of the diagnosis of several physicians that Mr. Jeffries has ME/CFS, which is unrebutted by any medical evidence defendant offers.[14]

The evidence shows that defendant has also been guilty of bad faith during the period February 2002 through the present as well as February 1999 through February 2002. For all of the above reasons, there remain genuine issues of material fact on the question of whether defendant is liable to Mr. Jeffries for bad faith.

B.  **The Invasion of Privacy Claim.**

As indicated by Ms. Fuller, the Claim File shows, *inter alia*, that defendant phoned Mr. Jeffries' home under false pretense and trespassed on his property falsely claiming to be delivery personnel. This and the extent of the surveillance conducted on Mr. Jeffries is sufficient to create a genuine issue of fact on Mr. Jeffries' invasion of privacy claim. In Ohio, an invasion of privacy claim exists where defendant wrongful intrudes into private activities in such a manner as to outrage. *Housh v. Peth*, 165 Ohio St. 35, 133 N.E.2d 340 (1956). Based on the record evidence, there are genuine issues of material fact on the invasion of privacy claim.

C.  **The Conspiracy Claim**.

On the basis of the above facts, there exists genuine issues of material fact on whether defendant, together with Prudential, Disability Management Services ("DMS"), and the private

---

[14]   Mr. Jeffries' other disability insurer, Prudential, has determined that Mr. Jeffries is and has been Totally Disabled for the entire period September 1998 through the present and it has issued benefits to Mr. Jeffries.

16

investigative service entities defendant engaged entered into an unlawful conspiracy to deny disability benefits to Mr. Jeffries. In Ohio an unlawful conspiracy consists of: (1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy. ***Universal Coach. v. NYC Transit*** (1993), 90 Ohio App.3d 284, 292, 629 N.E.2d 28. Based on the above record evidence, genuine issues of material fact on the conspiracy claim.

D.  *The Interference Claim.*

Shortly after defendant told Prudential that defendant did not consider Mr. Jeffries' Claim legitimate, Prudential denied benefits to Mr. Jeffries. (*Exh.* 17). A decision Prudential did not correct until February 2002, nearly 2 years later and at great expense to Mr. Jeffries. (*See*, *Case No C-1-01-680*). For this reason there exist genuine issues of material fact on whether defendant is entitled to summary judgment on the interference claim. The elements of an tortious interference claim are: (1) existence of contract, (2) wrongdoer's knowledge of contract, (3) wrongdoer's intentional procurement of contract's breach, (4) lack of justification, and (5) resulting damages. ***Siegel, L.P.A. v. Arter & Hadden***, 85 Ohio St.3d 171, 707 N.E.2d 853 (1999).

E.  **The Breach of Contract Claim.**

Plaintiff has filed a Motion For Summary Judgment on defendant's Counterclaim. For the same reasons that summary judgment is appropriate on the Counterclaim, summary judgment in favor of Mr. Jeffries is appropriate on his affirmative breach of contract claim: defendant admits that Mr. Jeffries is "Totally Disabled" as defined in the Policy, and no basis exists for Dr. Hartings' diagnosis of a mental disorder (since the prerequisite to the diagnosis – the absence of a medical explanation for Mr. Jeffries' symptoms – does not exist). This Court

17

should, therefore, deny defendant's motion for summary judgment on Mr. Jeffries' breach of contract claim.

IV.  **Mr. Jeffries, Not Defendant, Is Entitled to Summary Judgment on Defendants' Counterclaim.**

Defendant's argument that it is entitled to summary judgment on its counterclaim is frivolous. As discussed above and in plaintiff's Motion For Summary Judgment (*Doc. 135 - incorporated herein*), there is no factual basis for Dr. Hartings' assertion that despite a medical diagnosis for Mr. Jeffries' illness, he has Undifferentiated Somatoform Disorder.

Regardless, Mr. Jeffries' experts (a University of Cincinnati Professor of Psychology, Dr. Paula Shear, and a private practice psychiatrist, Dr. James Hawkins) assert that he does not have a mental disorder of any sort. (*Exhs. 7 and* 8). Accordingly, should this Court not award summary judgment to Mr. Jeffries on defendant's Counterclaim, the trier of fact must decide who to believe, Dr. Hartings or Drs. Shear/Hawkins/Poser/Geier/Hyde/Waisbren/McClellan.

V.  **Defendant Has The Burden Of Proof At Trial.**

In the Motion, defendant argues that Mr. Jeffries has the burden of establishing that his "Total Disability" is not caused by mental disorder.[15] Defendant's argument is meritless, and the plaintiff asks that the Court confirm this expressly in its decision.

Defendant's original Answer did not assert, as a defense or otherwise, that Mr. Jeffries has a mental disorder. (*Doc. 9*). Rather, defendant denied completely that Mr. Jeffries was "Totally Disabled." *Id.* Since that time, defendant has acknowledged – as Mr. Jeffries and his

---

[15] It is almost as if defendant is arguing that if someone is "Totally Disabled" as defined by defendant's Policy, there is a rebuttable presumption that an insured needs to overcome that the "Total Disability" is caused by a mental disorder. This is not the case.

18

physicians had asserted all along – that a decline in Mr. Jeffries' cognitive functioning has made him "Totally Disabled" as defined by the Policy.

Following defendant's concession, defendant filed a Counterclaim seeking a recovery from Mr. Jeffries of benefits defendant claims he is not entitled to receive. (*Doc. 89*). There can be no dispute that a defendant asserting a Counterclaim has the burden of proof on that Counterclaim. This case is no different. In order to recover on its Counterclaim, defendant has the burden of establishing that Mr. Jeffries has been overpaid. Defendant can only do this by establishing that Mr. Jeffries' conceded "Total Disability" is caused by a mental disorder as opposed to a medical illness (i.e., ME/CFS as diagnosed by Drs. Poser, McClellan, Hyde, Geier, and Waisbren).

This is nothing new or controversial. Even if defendant had never filed a Counterclaim, the burden in this case is still defendant's because it desires to affirmatively exercise a benefit limitation or policy exclusion. **Continental Ins. Co. v. Louis Marx & Co. Inc**. (1980), 64 Ohio St. 2d 399, 415 N.E.2d 315.[16] As in other civil actions, the burden of proof in this action falls upon the party asserting the affirmative of an issue. Here, it is defendant who is affirmatively asserting that it may exercise a benefit limitation contained in an Amendment to the Policy. That being the case, defendant has the burden of establishing that Mr. Jeffries' Total Disability is caused by a mental disorder, not a medical illness.

---

[16] *See, e.g.*, **Michigan Miller Ins. Co. v. Anspach** (1996), 109 Ohio App.3d 618, 672 N.E.2d 1042; **Midwesterrn Indemnity Co. v. Manthey** (1990), 68 Ohio App.3d 539, 589 N.E.2d 95; **Kuss v. United States Fidelity & Guaranty** 2003-Ohio-4846 (the insurance company trying to enforce an exclusion in an insurance policy, has the burden of proof to show that the exclusion applies); **Michigan Millers Ins. Co. v. Anspach** 672 N.E.2d 1042, 109 Ohio App.3d 618 (2nd Dist. 1996); **Trishman v. J. C. Penney Cas. Ins. Co**. 374 N.E.2d 651, 54 Ohio App.2d 35 (1977); **Arcos Corp. v. American Mut. Liability Ins. Co**. 350 F.Supp. 380, 384 (D.C.E.D.Pa.1972)(a defense based on an exception or exclusion in an insurance policy is an affirmative one, and like an affirmative defense, the burden is cast on the insurer to establish it).

VI. **Unsupported Claims and Statements in Defendants' Memorandum**.

Throughout defendants' Memorandum there are numerous misleading and in some cases incorrect factual statements. As a result, many of the assertions appear without a citation to the record. There is no purpose served by plaintiff refuting each of these factual misstatements because they do not raise genuine issues of material fact.

**CONCLUSION**.

This Court should deny defendant's Motion since there are genuine issues of material fact on each of Mr. Jeffries' claims, save the breach of contract claim - which should be resolved through summary judgment in favor of Mr. Jeffries. This Court should similarly deny defendant's motion for summary judgment on defendant's counterclaim and award summary judgment to Mr. Jeffries on the counterclaim.

Respectfully submitted,

OF COUNSEL

GRAYDON HEAD & RITCHEY LLP
1900 Fifth Third Center
511 Walnut Street
Cincinnati, Ohio 45202
(513) 621-6464

/s Michael A. Roberts
Michael A. Roberts, Esq. (0047129)
GRAYDON HEAD & RITCHEY LLP
511 Walnut Street, Suite 1900
Cincinnati, Ohio 45202
(513) 629-2799
(513) 651-3836 (fax)
email:mroberts@graydon.com

**CERTIFICATE OF SERVICE**

The foregoing was electronically filed and thereby delivered to William R. Ellis, Esq., Wood & Lamping LLP, 600 Vine Street, Suite 2500, Cincinnati, Ohio 45202, this 9th day of February, 2003.

/s Michael A. Roberts