**UNIVERSITY OF Cincinnati**

McMicken College of Arts and Sciences

**Department of Psychology**
University of Cincinnati
PO Box 210376
Cincinnati OH 45221-0376

Dyer Hall
Fax (513) 556-1904

9 August, 2003

Mr. Michael A. Roberts
Graydon, Head & Ritchey, LLP
P.O. Box 6464
Cincinnati, OH 45201-6464

Mr. Roberts,

As you requested, I have reviewed the neuropsychological IME that Michael F. Hartings, Ph.D. performed on Mr. Eric Jeffries in July of 2002 and February of 2003 (including Dr. Hartings' assessment report, raw test data and interview notes). In addition, I have reviewed neuropsychological reports from Drs. Sheila Bastien and Curt Sandman and medical affidavits/reports from Drs. Michael McClellan, Michael Luggen, Corwin Dunn, Mark Geier, Charles Poser, Byron Hyde and Burton Zweiman. As you know, I have not examined Mr. Jeffries. The comments that follow center on my analysis of Dr. Hartings' evaluation:

1. <u>Introductory Comments</u>: Prior to discussing the aspects of assessment and diagnosis that appear below, it is important to emphasize the importance of standardized procedures. Policies published by the American Psychological Association dictate that clinicians use only tests that have known reliability (i.e., consistency of measurement) and validity (i.e., they measure the construct, such as personality, that they purport to measure). Before they are published, psychological tests undergo scientific study to ensure that they have adequate reliability and validity. In addition, the test authors publish manuals that provide information about correct test administration and interpretation procedures, and it is necessary to follow these guidelines closely (most would advocate following them nearly verbatim) in order to ensure maximum reliability and validity. In other words, if a clinician uses a well-known psychological test but then either administers it differently from the standardized instructions or interprets it substantially differently from those instructions, it is incumbent upon that person to discuss the ways in which he or she has modified the task and to provide scientific data to support the utility of this modified method. In the sections that follow, references are sometimes made to the test manuals or to the work of other experts in the field, in order to

Page 1

provide information about standardized procedures as they apply to the tests administered in this battery.

2. <u>Neuropsychological Testing</u>:  In terms of the cognitive test results, I agree with Dr. Hartings that Mr. Jeffries is a man with excellent intellectual abilities who, at the time of testing, demonstrated deficiencies in a number of cognitive domains, including attention, processing speed, verbal fluency, inhibition of overlearned responses, memory, and motor speed and coordination.  I note that these results are generally consistent with the findings of Drs. Bastien and Sandman, and also that the few minor discrepancies (e.g., differences in his reported intellectual functioning) are probably explicable on the basis of the differing instruments that were administered by the various psychologists to test these skills.  I agree with the statements made by Dr. Hartings as well as the other psychologists that there is no evidence that Mr. Jefferies is malingering.

I am perplexed by Dr. Hartings' statement in his report that fluctuations in scores across tests in the battery "strongly suggests that emotional/psychological fluctuations result in erratic attention, rather than neurogenic dysfunction."  It is true that attentional disturbance can cause performance variability; however, performance variability is also present in numerous populations of patients with frank brain disorders.  For example, patients with Alzheimer's disease, who have marked attentional dysfunction, were reported in a representative study not to differ from healthy controls in their performance on digits forward and a sustained attention measure from the Test of Everyday Attention, in contrast to other attentional test scores that were impaired (Calderon et al., 2001).  Similar examples could be drawn from studies of multiple different patient populations.

In addition, it is not typically expected that patients will receive percentile scores that are uniform across all tests of a given cognitive domain, such as attention.  Our clinical neuropsychological tests vary in difficulty, meaning that easier measures such as those in the Attention Concentration Index (on which Mr. Jeffries did well) may not always be sensitive to deficits in bright individuals such as Mr. Jeffries.  In addition, many individuals brings to the testing session personal strengths that reflect their experiences in other aspects of their life; for example, it is not at all surprising that a highly successful banker would be well above average at an attentional task that requires mental arithmetic, as Mr. Jeffries demonstrated.  Further, it is only appropriate to interpret neuropsychological test results in the context of normative data from the healthy population; that is, one must compare the patient's scores to those of others in the general population who share this individual's demographic characteristics.  The tests that Dr. Hartings administered, which are quite typical and accepted in the field, differ markedly in terms of the characteristics of their published normative samples, how recently the norms were collected, and which specific

demographic variables those norms take into account, meaning that they would be expected to generate somewhat different percentile score. Taken together, these various issues suggest that some performance variability is to be expected and does not necessarily suggest the presence of an emotional disturbance.

3. Personality Testing: Dr. Hartings administered the Millon Clinical Multiaxial Inventory III (MCMI-III), the Minnesota Multiphasic Personality Inventory –2 (MMPI-2) and the Rorschach. I will discuss each of these tests in turn:

*MCMI-III:* The normative sample for the MCMI-III is made up entirely of patients with psychiatric illnesses, a large percentage of whom were hospitalized. The test is designed to compare the frequency with which the examinee endorses certain symptoms *relative to this psychiatrically ill sample.* For this reason, the test developers caution in the manual that this instrument is inappropriate for psychiatrically healthy individuals, in whom it may generate spurious results. To my knowledge, Mr. Jeffries is not seeking psychological treatment and has never received such treatment in the past, which makes him different from the group of individuals for whom this test was designed. In addition, the manual states that "clinicians working with physically ill, behavioral medicine, or rehabilitation patients are directed to one of the MCMI-III's associated inventories…" (p. 6) rather than administering this specific instrument; this limitation of the MCMI-III in medical populations would also seem to potentially apply to Mr. Jeffries. Further, Mr. Jeffries' background differs from the individuals in the normative sample in other ways; for example, in the normative sample, only 26 of the 600 individuals had levels of education comparable to his. Taken together, these aspects of the normative sample and test administration instructions suggest that this test *may potentially generate scores that are somewhat inaccurate for Mr. Jeffries*, and the results should be interpreted with caution.

Turning to the interpretation of the test scores, the scales are divided into 1) those designed to assess the examinee's approach to the task, 2) those designed to assess personality disorders and 3) those designed to assess other clinical conditions. On the validity scales, the elevation on Scale Y (Desirability), together with low levels of Disclosure and Debasement, suggests that Mr. Jeffries was likely trying to present himself in a socially favorable light. This pattern is not unexpected in people who are being evaluated in conjunction with litigation, and the scoring program adjusts in part for this approach to the task when the base rates for the clinical scales are calculated. On the personality scales, the test authors write that base rate scores at or above 75 on the personality scales are considered to reflect the presence of specific personality traits, and base rates of 85 or higher to reflect the presence of a disorder. Even with adjustment for a potentially defensive response style, not one of Mr. Jeffries' clinical scales meets the cutoff of 75 that would suggest the presence of problematic

symptoms, much less the cutoff of 85 that is more suggestive of a disorder. His highest base rate (still below the cutoffs) on the personality scales is on the Compulsive scale, followed by the Histrionic and Narcissistic. All three of these scales are known at these modest elevations to potentially reflect *adaptive* traits and are also the *three most likely scales to be elevated in healthy individuals* (p. 125 of manual). For the other clinical syndromes, base rates of 75 suggests the "presence" of a syndrome and 85 the "prominance" of that syndrome (test manual, p. 61). On the clinical syndromes, Mr. Jeffries' highest score (still well below the cutoffs) is on Somatoform Disorder. Because this scale is the highest of those for all the clinical syndromes, scores at the level he achieved might be suggestive of mild somatoform symptoms *if corroborated by other clinical information (see below section on diagnosis)*. It is worthwhile to notice also that individuals who have medical conditions that are associated with the types of symptoms that Mr. Jeffries reports tend to show at least mild elevations on this scale (even in the absence of a psychiatric disorder) because the questions that load onto this scale ask about the presence of symptoms such as fatigue, pain, and odd bodily sensations.

To summarize, this is not a notably abnormal MCMI-III profile. Even the automated test interpretation program that Dr. Hartings used to score the MCMI generated the suggestion that "On the basis of the test data (assuming denial is not present), it may be reasonable to assume that the patient is experiencing no disorder or a minimally severe disorder." I am perplexed at Dr. Hartings' statement that this profile shows "a significant psychological disorder characterized by rumination, hesitation, attention to detail, irritability, and concern for mild irrelevancies." I see no evidence of these serious difficulties in this protocol when applying the standardized test interpretation criteria that are published by the author of the test.

*MMPI-2:* Similar to the MCMI-III, the MMPI-2 profile can be divided into validity scales, which provide information about the examinee's test-taking approach, and clinical scales. The validity scales suggest that Mr. Jeffries is not endorsing a great deal of subjective emotional distress and is likely to be reluctant to admit to personal deficiencies. This pattern of elevations is not unusual in persons who are being evaluated in conjunction with litigation, and is also used as a correction factor in calculating his scores on certain of the clinical scales. Mr. Jeffries' clinical scales do show significant elevation, and the pattern of elevations is open to several different interpretations. This pattern is often indicative of psychological maladjustment that is characterized by anxiety, somatic preoccupation, a tendency to feel misunderstood by others, and a strong propensity to express psychological concerns through bodily complaints. According to this interpretation, Mr. Jeffries' profile is believed to indicate a chronic maladaptive pattern of behavior that has been present persistently, most likely well before the present illness began, and that may be exacerbated

by acute stressors (see Graham, 1993). Dr. Hartings is following this interpretation when he states that the MMPI-2 suggests "a significant psychological disorder" and "chronic pattern of psychological maladjustment," with a focus on "bodily preoccupations." (See section below about diagnosis for more information about whether Mr. Jeffries' symptoms appear to be chronic.) I note also that he achieved a score that was entirely within the normal range on an MMPI scale that was designed to assess obsessiveness (OBS).

As described above for the MCMI-III, MMPI-2 scales that are designed to measure certain personality traits can become elevated if patients experience true medical symptoms that happen to overlap with the types of experiences that are surveyed on this test. His elevations on scales 1, 3 and 8 are consistent with reports of MMPI findings in patients with chronic fatigue syndrome (Schmaling and Jones, 1996), meaning that the symptoms he endorses on the MMPI-2 are not unexpected if he has a medical diagnosis similar to that suggested by some of his examining physicians. These elevated personality test results in patients with chronic fatigue are sometimes thought to reflect chronic patterns of somatic preoccupation that make certain individuals psychological vulnerable to develop symptoms of this disorder. It is interesting to notice, however, that personality test results in patients with chronic fatigue are strikingly similar to those in patients with multiple sclerosis, a serious neurologic condition with an undisputed neuropathological basis but physical symptoms that overlap substantially with the fatigue, pain, numbness and dizziness endorsed by patients with chronic fatigue syndrome (Christodoulou et al., 1999). Therefore, it is not resolved in the published literature whether the findings in CFS reflect personality difficulties or, at least in part, the impact of these physical symptom constellations on the results of personality instruments. Indeed, the elevation that Mr. Jeffries shows on the MMPI-2 scales reflecting somatic preoccupation is the single most common finding in patients with medical illness, according to the test publishers. Therefore, any decision about whether Mr. Jeffries' MMPI-2 profile reflects psychological maladjustment, endorsement of symptoms related to a true medical condition, or the presence of premorbid personality features that are exacerbating the effects of a current medical condition, is dependent on a careful clinical evaluation to examine relevant aspects of his history and personal adjustment. This issue of diagnosis is discussed in greater detail below.

*Rorschach*: The Rorschach is distinct from the MMPI and MCMI in that it is a "projective test." That is, is consists of a series of ambiguous stimuli on which the examinee is thought to "project" aspects of his or her personality. This test is highly controversial in the psychological literature, because of the large number of ways in which clinicians have administered and interpreted the instrument, often without scientific validation. It is an interesting testament to the level of this controversy that the Council of University Directors of Clinical Psychology (CUDCP; an organization composed of the directors of university-

based doctoral programs in clinical psychology) includes questions in its biannual survey of members about the teaching of projective measures in doctoral training programs across the country. These numbers reflect the views of experts throughout the nation who are currently training doctoral students in contemporary assessment methods. In the 2000 CUDCP data (the most recent numbers that I have available right now), the 63 program directors responding to the survey indicated that they devote approximately half as much time to training in projective as they do to objective personality testing; in addition, 17 of 63 reporting programs stated that they do not train students in projective tests at all. Of those that do provide this training, only one third of those who responded indicated that they are teaching these techniques because they believe in their utility (although this question had a low response rate and may thus not be fully representative of all programs); the remainder stated that they feel students should learn projectives because they may be expected by internship programs to know this material, because students are interested in learning more, or because they want to highlight limitations of projective testing. Thus, there continues to be considerable controversy about the use of the Rorschach.

What is undisputed is that the Rorschach must be administered according to standardized administration, scoring and interpretation methods in order to be valid; for the vast majority of clinicians, this means the application of the Exner approach (Exner, 1993), which is by far the best validated method. I personally choose not to use the Rorschach in my assessments because of concerns about validity and, thus, cannot speak to subtleties in Mr. Jeffries' protocol. Based on the test protocol that I have, however, I can state that I have serious concerns about whether this protocol can be interpreted according to the Exner system.

On the Rorschach, the examinee is shown each of ten cards twice, and the dialogue between examiner and examinee is to be recorded verbatim. In the first phase of responses, the examiner provides responses to indicate what he or she perceives in each card; in the Inquiry phase, the examiner returns to each response that was made initially and asks for information to clarify where on the card the examinee saw the response and what features of the blot were used to organize the information. The responses are then scored according to rather complex criteria along a number of different dimensions, and the scores compared to a normative database for interpretive purposes. In examining Mr. Jeffries' protocol, I am having difficulty determining in certain places which are unique responses and which are elaborations of responses that were already generated, which makes it impossible for me to verify the scoring. (Typically, individual responses are numbered by the examiner.) I was not provided with a location sheet, which would show where on the blot the responses were drawn from, a critical factor in determining whether or not an examinee's responses are unusual, or a structural summary that indicates how the protocol was scored. Also, several of the inquiries in the second phase of the administration do not permit application of the Exner

criteria because they do not provide sufficient information about how Mr. Jeffries organized his responses; for example, "I was just trying to come up with it" is not sufficient information to score the final response to Card IV and "OK" is not sufficient on Card X. (There are also other problematic inquiry data.)

To summarize, it is not clear what Rorschach method is being applied. The best validated method is by Exner, but administration problems during the Inquiry phase of this protocol do not permit this scoring system to be used. In addition to this administration problem, there is no scoring information provided, insufficient documentation of location of the responses on the blot to interpret the information that is available, and no reference to normative data or standardized interpretation procedures. Therefore, I am unfortunately left with no scientific basis on which to judge the accuracy of Dr. Hartings' statements that the Rorschach demonstrates the presence of "a personality disorder with obsessive-compulsive features."

4. <u>Diagnosis</u>: Dr. Hartings has concluded that Mr. Jeffries suffers from Cognitive Disorder, with which I concur based on the results of this and past neuropsychological evaluations. In addition, however, he suggests that Mr. Jeffries has severe somatization disorder and obsessive-compulsive personality disorder, and suggests that it is important to rule out an auto-immune disorder. Let me share some general information about diagnosis and then address each of these psychiatric diagnoses in turn:

*General Comments*: Somatization disorder and obsessive-compulsive personality disorder are both specialized terms that refer to standardized diagnostic criteria in the *Diagnostic and Statistical Manual of Mental Disorders (DSM)*, which is published by the American Psychiatric Association. The current version of this diagnostic handbook is the DSM-IV-TR, and this text is by far the most widely used source of diagnostic information in the U.S. These published criteria are drawn from scientific studies of the reliability and validity of the diagnostic categories, as well as from the consensus of recognized experts in the field. For each mental disorder in the DSM, the clinician is provided with explicit criteria that the patient must meet before a diagnosis is assigned. Therefore, before making a diagnosis of a mental disorder, one must demonstrate that the patient meets the relevant criteria.

A diagnostic evaluation can include several different elements, including psychological testing, the clinical interview, and observations made by the clinician during the assessment. The results of tests such as the MMPI, MCMI and Rorschach must always be interpreted in the context of other clinical information that is available, because their results may otherwise be misleading. This principle of assessment is so basic that it appears in every reputable published test manual and even in introductory psychology textbooks that are intended for college freshmen. None of the tests that Dr. Hartings administered can accurately be used

alone to make mental health diagnoses, because they assess symptoms but do not examine whether the full constellation of criteria is met that would indicate a specified disorder. Therefore, if a clinician feels on the basis of testing that a patient may have a given disorder, he or she should then confirm this hypothesis by gathering appropriate corroborative information from the medical record, behavioral observations, and clinical interview (sometimes including collateral sources such as family members) before a diagnosis can be confirmed.

An additional general comment is that, based on the written record of Dr. Hartings' evaluation of Mr. Jeffries, I am struck by the strongly negative tone and repeated use of words that have a pejorative connotation (e.g., "over-wrought," "anguish over simple responses," "he rejected this," "this threw him again into a quandry," "he then worried," "used dramatic…language"). This choice of language implies a type of hysterical presentation that is not at all evident in the many other evaluations in the file. Similarly, the notes from Dr. Hartings' assistant, Denise Middeler, M.A., L.S.W., who appears to have administered the majority of the testing, are written with a negative, judgmental quality (e.g., "he whined that he didn't want to take it"). These comments are important because they raise the question of whether adequate rapport was established with Mr. Jeffries to elicit the most valid data and also whether the behavioral observations that were recorded during the testing are sufficiently objective. In this vein, I note that on the Rorschach Mr. Jeffries said "I am trying to give you what you want, but you are not happy." This type of comment, in the context of the language used by Dr. Hartings and his assistant, leads me to wonder whether perhaps Mr. Jeffries did not feel comfortable during this evaluation, which may have potentially impacted his test performance and his interpersonal behavior during the sessions.

In the sections that follow, I will outline the criteria for the diagnoses that Dr. Hartings assigned and discuss the evidence available from the file relevant to each criterion. Because I did not examine Mr. Jeffries, I cannot offer an opinion beyond what is evident from the file.

*Somatization Disorder, Severe*: Somatization disorder is a severe psychiatric disturbance characterized by multiple bodily complaints that either have no physical basis or that are substantially disproportionate to what would be expected on the basis of known physical conditions. According to the DSM, this is a rare condition, occurring in only 0.2% of men, and tends to persist across many years of life. The following is a summary of the DSM criteria:

There must be a history of multiple physical complaints that span several years and require either medical evaluations or cause significant functional impairment, *beginning before the age of 30*. Mostly commonly, this disorder is evident by adolescence. I see no evidence in

the medical records or in data from Dr. Hartings' clinical interview with Mr. Jeffries to suggest that he has a history of physical complaints prior to age 30 or prior to the time he received the immunizations that he claims led to his current illness.

*All* of the following criteria must be met: 1) pain in four different bodily sites, 2) two gastrointestinal symptoms, 3) one sexual symptom, and 4) one symptom suggestive of a neurological disorder, such as balance disturbance. From the medical record, I believe that Mr. Jeffries meets criteria 1, 2 and 4, but there is no documentation of a sexual symptom (in fact he comments on his satisfactory sexual relationship with his wife during one examination), nor do I see anywhere that Dr. Hartings inquired about this criterion in his clinical interview.

Either *each* of the symptoms above cannot be explained fully by a known medical condition or else there is an established medical condition but the physical complaints are in excess of what is expected. I understand from the file that several medical experts feel that his physical and cognitive symptoms follow the pattern that would be expected in such a condition. Also, both his cognitive (Dobbs et al., 2001; Ross et al., 2001) and his personality testing (Schmaling et al., 1996) are consistent with what has been reported in other individuals with chronic fatigue syndrome, which several of the medical experts have stated may accompany his possible autoimmune disorder. Therefore, it is at least plausible to consider as a possibility that his symptoms are fully explained by a known medical condition.

The symptoms cannot be intentionally produced. I believe that all of the many clinicians who have seen Mr. Jeffries are consistent in stating that they do not believe he is consciously fabricating his symptoms.

Thus, the age of onset criterion has clearly not been met, there is no documentation from Dr. Harting's evaluation or others that the sexual symptom criterion has been met, and it is not established that any of his symptoms are beyond what would be expected given a known medical condition. In addition, as described above, the MCMI provides only very modest possible support for somatoform symptoms, the MMPI-2 results are equivocal with regard to the presence of somatic preoccupation that exceeds what is expected from endorsing complaints typical of a medical illness, and I do not believe that the Rorschach administration can be interpreted in a valid manner. Together, these issues suggest to me that Dr. Hartings has not demonstrated the presence of somatization disorder and also has not shown that he has systematically examined the symptoms that are required to be present in this disorder during his evaluation.

*Obsessive-Compulsive Personality Disorder (OCPD)*: Again, I will refer to the DSM-IV-TR

for the most widely respected diagnostic information about this disorder. Personality refers to longstanding patterns that we all have in the manner in which we process and interpret information about others, the world and ourselves. One is considered to have a personality disorder if these patterns are rigid and maladaptive and lead to impaired functioning. By definition, *personality disorders must have an onset by at least adolescence or early adulthood and must affect multiple areas of functioning*. It is not possible to abruptly develop a personality disorder at Mr. Jeffries' age unless it is the direct result of a medical illness (in which case a different diagnosis is given) or to have it affect only his search for medical treatment without impacting other aspects of his life. The specific criteria for OCPD follow:

"A pervasive pattern of preoccupation with orderliness, perfectionism and mental and interpersonal control, at the expense of flexibility, openness, and efficiency, beginning by early adulthood and present in a variety of contexts ..." I am unable to find any evidence at all in Mr. Jeffries' record that he has longstanding symptoms of a personality disorder. People with OCPD have extreme difficulty with their interpersonal relationships, including marital relationships, interactions with their children (tending to be highly controlling), co-workers and supervisees (highly perfectionistic and unable to delegate), and supervisors (so concerned about doing each task perfectly that it is hard to prioritize, hard to complete things successfully, and deadlines are very commonly missed). The presence of this symptom constellation would tend to keep people from being successful in demanding work settings and from having close interpersonal relationships. From the material in the file, I see no evidence that Mr. Jeffries had any of these difficulties at work before this illness, nor that he had impairment in other aspects of his life prior to his illness. It would be quite atypical for someone with OCPD to advance as well as he has in his education and career.

In order to meet diagnostic criteria for OCPD, he must show *four* of the following:

"is preoccupied with details, rules, lists, order, organization or schedules *to the extent that the major point of the activity is lost*." I see no evidence of this pattern of behavior in Mr. Jeffries' record, with the exception of the observations made by Dr. Hartings' assistant that he had difficulty doing things like dichotomizing his responses into "true or false" on the MMPI-2, which is actually not particularly unusual. In fact, Mr. Jeffries' approach to seeking a diagnosis and treatment illustrates efficient and goal-oriented behavior, in that he systematically sought diverse resources around the world, successfully scheduled appointments with a broad range of clinicians, and following through efficiently with his planning. I also see no evidence in the record that Dr. Hartings asked questions in his interview about situations in which rigid organization may have been evident.

"shows perfectionism that interferes with task completion" There is no evidence of this in the record, aside from his purported behavior during Dr. Hartings' testing. (Remember also that a personality disorder is only present if maladaptive behaviors are present across a variety of settings, rather than in the context of a single assessment.) It is exceedingly unlikely that this type of behavior was a serious problem for Mr. Jeffries premorbidly, given his occupational success. I also see no evidence that Dr. Hartings asked about these types of issues during his interview.

"is excessively devoted to work and productivity to the exclusion of other leisure activities" Mr. Jeffries did describe to Dr. Hartings a strong devotion to his job, and it is not clear from the interview data whether or not his behavior in this regard is different from any of his peers at work.

"...inflexible about matters of morality, ethics, or values" There is no evidence of this symptom in the file, and Dr. Hartings does not seem to have asked questions about these areas in his interview.

"unable to discard...worthless objects" There is no evidence of this symptom in the file, and Dr. Hartings does not seem to have asked questions about these areas in his interview.

"is reluctant to delegate tasks or to work with others unless they submit to exactly his or her way of doing things" This symptom is not documented in the file, nor do questions about this behavior appear in Dr. Hartings' interview. Note that these types of symptoms tend to make patients unpopular in work settings, particularly with subordinates, and often interfere with promotion. It is atypical for people with Mr. Jeffries' successful vocational history to suffer from this type of rigidity.

"adopts a miserly spending style toward both self and others" This symptom is not documented in the file, nor do questions about this behavior appear in Dr. Hartings' interview.

"shows rigidity and stubbornness" Again, this is evident only in Mr. Jeffries' purported behavior with Dr. Hartings, and there are not questions about this trait in the interview.

It is striking that Mr. Jeffries has not been demonstrated to meet *any* of the diagnostic criteria for OCPD. There is no corroborative evidence for obsessive features aside from Dr. Hartings' interpretation of the personality testing (but see comments above about these interpretations) and purported behaviors during the testing that are interpreted as showing obsessiveness. There is no history of the type of maladjustment in early life that should be

documented in personality disorder; and there is no documentation that Dr. Hartings asked questions on interview that would clarify any of these diagnostic issues.

Thus, I think it is exceedingly unlikely that Mr. Jeffries has either somatization disorder or OCPD. In any case, Dr. Hartings has definitely not demonstrated that Mr. Jeffries meets DSM-IV-TR criteria for either of these disorders and also has not described any systematic or scientifically validated criteria according to which he has determined that these conditions are present.

5. Summary: I agree with Dr. Hartings that his and previous neuropsychological evaluations show clear evidence of cognitive deficits that are not likely due to malingering. The pattern of both the cognitive and the personality test results is consistent with what others have reported in patients who have illnesses such as chronic fatigue syndrome, and bright individuals in highly demanding positions who have cognitive findings such as these would be expected to have difficulty in meeting the requirements of their positions, as Mr. Jeffries describes. There is absolutely no basis for giving diagnoses of somatization disorder or obsessive-compulsive personality disorder in the absence of evidence that the diagnostic criteria for these illnesses are met.

I hope that these comments are helpful to you in your review of this case.

Sincerely,

Paula K. Shear, Ph.D.
Associate Professor of Psychology and Psychiatry
Director of Clinical Training / Co-Director of Graduate Studies

References

American Psychiatric Association (2000). *Diagnostic and Statistical Manual of Mental Disorders, 4th Edition Text Revision*. Washington, D.C.: American Psychiatric Association Press.

Calderon, J., Perry, R.J., Erzinclioglu, S.W., Berrios, G.E., Dening, T.R and Hodges, J.R. (2001). Perception, attention and working memory are disproportionately impaired in dementia

with Lewy bodies compared with Alzheimer's disease. *Journal of Neurology, Neurosurgery and Psychiatry*, 70, 157-164.

Christodoulou, C., DeLuca, J., Johnson, S.K., Lange, G., Gaudino, E.A and Natelson, B.H. (1999). Examination of Cloninger's basic dimensions of personality in fatiguing illness: chronic fatigue syndrome and multiple sclerosis. *Journal of Psychosomatic Research*, 47, 597-607.

Dobbs, B.M., Dobbs, A.R. and Kiss, I. (2001). Working memory deficits associated with chronic fatigue syndrome. *Journal of the International Neuropsychological Society*, 7, 285-293.

Exner, J.E. Jr. (1993) *The Rorschach: A Comprehensive System Volume 1: Basic Foundations, Third Edition*. New York: John Wiley & Sons, Inc.

Graham, J.R., (1993) *MMPI-2: Assessing Personality and Psychopathology, 2nd Edition*. New York: Oxford University Press.

Ross, S., Fantie, B., Straus, S.F. and Grafman, J. (2001). Divided attention deficits in patients with chronic fatigue syndrome. *Applied Neuropsychology*, 8, 4-12.

Schmaling, K.B. and Jones, J.F. (1996). MMPI profiles of patients with chronic fatigue syndrome. *Journal of Psychosomatic Research*, 40, 67-74.