IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| ERIC L. JEFFRIES, | ) | CASE NO. C-1-02-351 |
| | : | |
| Plaintiff, | ) | JUDGE WEBER |
| | : | Magistrate Judge Hogan |
| v. | ) | |
| | : | |
| CENTRE LIFE INSURANCE CO., et. al., | ) | DECLARATION OF |
| | : | ERIC L. JEFFRIES |
| Defendants. | ) | |

Upon oath, the Declarant states as follows pursuant to the provisions of 28 U.S.C. §746:

1.      My name is Eric L. Jeffries. I am the plaintiff in this action.

2.      I notified defendants of my Claim on February 4, 1999, and defendants received my completed Claimant Statement and Occupational Duties Form on March 8, 1999.

3.      From February 1999 through May 11, 2000, I completed defendants' boilerplate authorization forms and delivered each executed form to the defendants. (*App. A-4*).

4.      During the period of February 1999 through May 11, 2000, the boilerplate authorization form enabled defendants to properly obtain several hundred pages of medical records, interview my treating physicians, interview my former employer, and interview me in Cincinnati without my counsel present.

5.      In the Spring of 2000, I learned that the defendants were misusing the boilerplate authorization form to accomplish their goal of simply denying my Claim. Specifically, at that time, I learned that representatives of the defendants had for several months improperly been in communication with another disability insurer, Prudential Insurance Company ("Prudential"), concerning me. It is my belief that defendants' improper communications with Prudential in late February 2000 led Prudential to deny my claim for disability benefits on February 29, 2000. That improper decision was just recently reversed by Prudential, which has now paid me all monthly benefits due to date under the Prudential policy.

6.      Although I was unaware of these improper contacts, these entities: exchanged their respective files; combined their resources to separately and jointly engage private investigators to conduct secret surveillance of me many occasions over the course of many months; phoned my home under false pretenses; and trespassed on my property. In the Spring of 2000 I learned that the defendants and Prudential had, in their secret discussions with each other, expressed their intention

to deny the Claim – even though the defendants had not reviewed my medical records or had me examined by a physician.

7.      I learned of this inappropriate conduct when Prudential was required to share its file with me. That file included a telephone call "log" which recited the content of February and March 2000 phone conversations between representatives of Prudential and representatives of the defendants. (*App. A-13*).

8.      The Prudential phone log recites the content of a call wherein the defendants apparently told Prudential that the *defendants "were closely reviewing my claim because they did not believe that my claim was legitimate*."

9.      After I learned of defendants' intention to deny the Claim, their improper communications with Prudential, and their misuse of the boilerplate authorization form, which I had to that date blindly executed, I limited defendants' authority and only allowed defendants going forward to obtain information relevant to the Claim. (*App. B-1*). On May 11, 2000, I revoked all earlier authorizations and later sent defendants the following "Modified Authorization:"

> "I hereby authorize any treating physician, hospital, or medical or medically related facility, United HealthCare of Ohio, any employer, the Social Security Administration, and the Internal Revenue Service to furnish [defendants] with information regarding my medical history and/or work record and income so that benefits can be determined. This information shall be solely for purposes of [defendants]. Absent a court order, the information obtained as a result of this authorization may not then be shared with any third party. All previous authorizations signed by me are hereby revoked. This authorization is valid for ninety (90) days from the date of the most recently executed Continuation of Disability form. A photocopy of this form shall be valid as an original." (*Appendix A-14*).

10.     This modified Authorization still permitted defendants the opportunity to gather all medical, employment, and income information available on me. The Modified Authorization, therefore, fully satisfied any duty I had to cooperate.

11.     From May 11, 2000, through April 2, 2002, I *voluntarily* provided defendants with an overwhelming volume of information some of which is set forth in the Statement of Facts included in the accompanying Motion For Partial Summary Judgment at Paragraph 7.

12.     Notwithstanding the great wealth of information which came into defendants' possession and despite the clear unimpeded access to my health records, employment records, and tax records defendants asserted that I had "failed to cooperate."

13.     The documents attached to this Appendix and Appendix B are true and accurate copies of written materials created relative to my claim and transmitted between the parties.

14.     Many times, through my counsel, I offered to reevaluate my position with regard to the Modified Authorization if defendants informed me of what necessary information was needed and not authorized. The defendants refused this invitation.

15.     To this day, defendants have still refused to explain to me what necessary information is restricted by the Modified Authorization. Defendants also continue to withhold benefits from me (now totaling more than $109,000) on the argument that I failed to cooperate because I have not signed the boilerplate authorization form since June 2000. I have, however, given defendants a "unilateral medical release."

16.     My illness is one that may appropriately be assessed by an infectious disease specialist. But before the defendants ever requested that I be seen by an infectious disease specialist they allowed 3 years to elapse from the time I filed the Claim and terminated my Claim.

17.     When defendants first requested that I make myself available for examination by an infectious disease specialist I said "O.K.!" An appointment was scheduled for August 8, 2002, and I fully intended to appear. However, 1 day prior to the examination, I received notice that the examination had been cancelled. Dr. Grubbs, however, was unaware of the cancellation. (App. 30).

18.     Despite my willingness to see defendants' infectious disease specialist, defendants continue to refuse to pay my benefits.

19.     In the 3½ years between the time I first filed the Claim (February 1999) and defendants' first requested that I see an infectious disease specialist (August 2002), I had seen an infectious disease specialist as well as specialists on adverse reactions to vaccinations. Those physicians, to my knowledge, all agree that I am disabled. These reports were supplied to defendants before they ceased paying me benefits in March 2002.

20.     In August 2001, defendants requested that I attend an examination to be performed by a child psychologist, Kathleen Hart, Ph.D.

21.     Since Dr. Hart is a child psychologist with no experience relevant to my illness, I did not believe that she was qualified to perform the necessary examination. I also learned that defendants had made no effort to assess or even read the results of the 1st neuropsychological examination performed on me by Dr. Sheila Bastien just a few months earlier.

22.     On January 4, 2002, I learned that Prudential reversed its decision to deny my claim (which Prudential had made on the heels of defendants' February/March 2000 improper communications with Prudential). Prudential properly concluded that I was disabled and had been

disabled since September 1998. Immediately after Prudential announced it's decision, defendants on January 10, 2002, again demanded that I see their child psychologist.

23.     I felt, however, that Dr. Hart was still not qualified to perform the necessary examination and I reasonably objected. I also objected because in the 5 months that passed between August 2001 and January 2002, 3 major medical reports were published concerning me and the defendants did not possess these reports which show that I am disabled. I, therefore, advised the defendants of these new reports and stated that the defendants should assess these reports before demanding an examination by an unqualified child psychologist. I intentionally did not send the reports to defendants because I wanted to test if defendants had any true interest in reviewing this material medical information. In response, as I suspected, the defendants did not request copies of these reports. Rather, defendants simply demanded strict compliance with their request that I see a child psychologist.

24.     Defendants' demand and their refusal to request, review, or consider the newest reports was not "reasonable."

25.     On March 6, 2002, I voluntarily supplied these new reports of Drs. Sandman, Zweiman, and Poser to defendants for their review.

26.     On April 2, 2002, four weeks after I supplied defendants with the written reports of Drs. Sandman, Zweiman, and Poser, I learned through the insurance agent that sold me the Policy (as the result of a letter the agent received *dated March 25 and postmarked March 29*) that the defendants had stopped issuing benefits to me on February 25, 2002, cancelled the waiver of premium benefit effective February 25, and that, if I did not pay a premium of $3,529.14 by March 1, 2002, the Policy would lapse. (*App. A-19*). The Policy gave me an additional 31-day grace period to make the $3,529.14 premium payment, but even the grace period had expired by the time I received word of defendants' decision. Defendants never sent this notice to me directly.

27.     Although I objected to seeing Dr. Hart in February 2002, 3 months later, in May 2002, I advised defendants that I was "agreeable to be examined by Dr. Hart." (*App. B-26*). By that time, however, the defendants had apparently come to agree that Dr. Hart was not an appropriate person to examine me. Therefore, the defendants did not make an appointment with Dr. Hart. Rather, the defendants asked that I see a different psychologist named Dr. Hartings. (*App. B-27*). I agreed and was advised that Dr. Hartings would complete his exam in "4-6 hours." (*App. B-28*).

28.     I arrived at Dr. Hartings' office on the agreed day, July 8, 2002, at the agreed time. At the end of that day, Dr. Hartings advised me that the examination was not complete. Dr. Hartings, therefore, requested that I return on July 12, 2002, in order to permit Dr. Hartings to complete the examinations. I agreed to do so, and did return on July 12.

29.     At the end of the 2nd examination day, July 12, 2002, after more than 11 hours of examination, Dr. Hartings informed me that the examination was complete, and I was free to go. Dr. Hartings also said he would finalize his written report "within 7 days."

30.     Several weeks later, the defendants requested that I return to Dr. Hartings  for retesting that would consume an additional 4 hours, approximately the same amount of time initially projected for the full examination.  I did not *at that time* reject the retesting request, even though I knew that defendants had for at least 2 years been working to deny my Claim.  I did however requested that my counsel be given the opportunity to speak with Dr. Hartings.  I understand that during that conversation, Dr. Hartings refused to provide any detail of the status of his examination. Dr. Hartings simply stated that he desired to *retest* skills and/or competencies he had already tested in the full compliment of exams administered to me over 11 hours on July 8 and July 12, 2002.

31.     Since it was my understanding that "retesting" is not required by the Policy, I rejected defendants' retesting request.

I declare the foregoing to be true and correct to the best of my knowledge and belief, upon penalty of perjury.

Dated:  November 22, 2002

## CERTIFICATE OF SERVICE

The foregoing was delivered, via hand delivery to William R. Ellis, Esq., Wood & Lamping LLP, 600 Vine Street, Suite 2500, Cincinnati, Ohio 45202, this 22nd day of November, 2002.

5