IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| ERIC L. JEFFRIES, | ) | CASE NO. C-1-02-351 |
| | : | |
| Plaintiff, | ) | JUDGE BECKWITH |
| | : | Magistrate Judge Hogan |
| v. | ) | |
| | : | REPLY MEMORANDUM SUPPORTING |
| CENTRE LIFE INSURANCE CO., | ) | PLAINTIFF'S MOTION FOR SUMMARY |
| | : | JUDGMENT ON THE COUNTERCLAIM |
| Defendant. | ) | |

I.    **Introduction.**

Mr. Jeffries' Motion For Summary Judgment on defendant's Counterclaim is premised on a simple "**If/Then**" logic statement. Specifically:

» **If** there exists a medical diagnosis for Mr. Jeffries' undisputed disability;
» **Then**, defendant may not assert that Mr. Jeffries' disability is the result of Undifferentiated Somatoform Disorder as classified in the DSM-IV ("USD").

In its memorandum opposing Mr. Jeffries' summary judgment motion, defendant does not dispute the propriety of this logic because it cannot. This logic arises from the DSM-IV's diagnostic criteria for the mental disorder that defendant has finally articulated, USD.[1] (*See*, *Exhibit 1, DSM-IV Diagnostic Criteria for USD*). As stated therein, <u>before</u> a psychologist can speculate that Mr. Jeffries has USD there must exist no medical diagnosis for Mr. Jeffries' disability. *Id.* Summary judgment is proper because there exists a medical diagnosis for Mr. Jeffries' symptoms, chronic fatigue syndrome, which is also known as myalgic encephalomyelitis ("ME/CFS").

---
[1] After asserting for several months that Mr. Jeffries had other distinct mental disorders (Somatization Disorder, Severe and Obsessive-Compulsive Personality Disorder), which do not require the absence of a medical diagnosis, the defendant settled on arguing that Mr. Jeffries has USD.

1

II.     Analysis.

Cognitive testing performed on Mr. Jeffries in 2000, 2001, 2002, and 2003[2] by each party's experts repeatedly revealed that plaintiff, a former member of Mensa, suffers from *inter alia* a disabling cognitive decline. The parties agree on this point. And this disabling condition was not restricted to the 24 month period of December 1998 to December 2000. In fact, it continued through 2003 as defendant's expert found and as defendant conceded in its August 2003 Amended Answer (*See*, Doc. 89, ¶¶ 16 and 19). Although defendant now concedes that cognitive testing reveals unmistakably that Mr. Jeffries is disabled, the defendant continues to deny Mr. Jeffries benefits (and has filed suit against Mr. Jeffries) on the argument that his undisputed disability is caused by a mental disorder, USD, not a medical illness.[3]

A.      **The Prerequisite To USD Is Absent Since Mr. Jeffries' Physicians Have Determined That He Suffers From ME/CFS, A Medical Illness.**

These findings and Mr. Jeffries' other symptoms led his physicians to diagnose him with an autoimmune reaction to the hepatitis B vaccine, ME/CFS. Because he must in order to undermine Mr. Jeffries' **"If/Then"** logic statement and withstand summary judgment,

---

[2]     Psychologists who examined Mr. Jeffries in 2000 and 2001, Drs. Sheila Bastien and Curt Sandman, respectively, found that Mr. Jeffries suffers from a marked and disabling cognitive decline. These results were repeated and confirmed in testing performed in 2002 and 2003 by defendant's purported expert psychologist, Dr. Michael Hartings.

[3]     In truth, no expert has attributed Mr. Jeffries' cognitive decline to USD. Dr. Hartings attributes Mr. Jeffries' cognitive disability to Obsessive-Compulsive Personality Disorder ("OCPD"), a diagnosis abandoned by defendant and its experts. (*See*, Hartings Report, p. 8: "*This evaluation suggests that [Mr. Jeffries] is showing some decline in cognitive functions secondary to severe obsessive compulsive disorder, characterized by hesitation, rumination, overthinking and somatic preoccupations. This psychological disorder is a very significant aspect of his present functioning and contributes significantly to the experienced level of disability.*"). Defendant's in-house psychologist, Dr. Clionsky, also attributes Mr. Jeffries' cognitive disability to diagnoses now abandoned, not USD: "Mr. Jeffries . . . test results are better explained by a psychological disorder, probably best described as Somatization Disorder, severe and Obsessive-Compulsive Personality Disorder."

2

defendant's counsel argues that Mr. Jeffries' physicians and experts have not in fact rendered the opinions that they have clearly rendered. Defendant counsel's strategy is to, without any medical opinions supporting his argument: (i) ignore the great bulk of the medical evidence and testimony; (ii) take out of context a handful of statements secured on cross examination; and (iii) to contradict his own prior assertions and acknowledgements. Counsel's attempt is not surprisingly feckless.

The disingenuousness of defendant's present desperate attempt to show that Mr. Jeffries' physicians have not rendered the diagnosis that they have in fact clearly rendered is obvious when one examines prior statements made by defendant's counsel. For example, in a memorandum defendant filed just 2 months ago, the defendant acknowledged that Mr. Jeffries' physicians had in fact diagnosed him with ME/CFS:

> "Mr. Jeffries has actual physical symptoms . . . and has obtained the opinions of consultants who opine that the hepatitis B inoculation can cause chronic fatigue syndrome . . . **in Mr. Jeffries' case the diagnosis of chronic fatigue syndrome remains . . . Drs. Geier, Hyde and Waisbren have offered the opinion that Mr. Jeffries has either CFS or Myalgic encephalomyelitis**." (See, Doc 117, pp. 5 – 6)(*emphasis supplied*).

Summary judgment is proper because the plain (and previously acknowledged) existence of the ME/CFS diagnosis prohibits defendant from asserting that Mr. Jeffries has USD, the diagnostic prerequisite to that diagnosis is absent.[4] And defendant's attack on defendant's experts opinions fails to displace those opinions:

---

[4] In its memorandum, although it is not material to the instant motion, defendant continues to misplace the burden of proof. As addressed in plaintiff's opposition to defendant's motion for summary judgment (*Doc. 150*), since defendant is attempting to affirmatively establish the existence of a mental disorder in order to exercise an exclusion or benefit limitation, the burden is on it to prove that Mr. Jeffries' undisputed disability is caused by a mental disorder.

3

1. <u>**Dr. Poser.**</u>

Dr. Poser, who lectures and practices medicine at the Harvard Medical School (*See, Poser CV,* attached as *Exh. 2*) met with Mr. Jeffries personally and rendered a clinical diagnosis. Dr. Poser's sworn Declaration from February 5, 2004, asserts that he has diagnosed Mr. Jeffries with ME/CFS. (*Exh. 3*). Dr. Poser's earlier Report also identifies ME/CFS as a diagnosis. (*Exh. 4*). And defendant concedes in its opposing memorandum (*Doc. 146*), Dr. Poser "has diagnosed Mr. Jeffries with CFS."

Dr. Poser's diagnosis harms defendant's position. Accordingly, defendant's counsel attacks it. But defendant's argument (unsupported by any expert opinion) that the Court should throw out Dr. Poser's diagnosis and opinion is nonsense.

Although defendant's counsel does not care for Dr. Poser's opinion, it nonetheless exists and it in itself satisfies the **"If"** portion of Mr. Jeffries' **If/Then** logic statement. Accordingly, summary judgment is appropriate based on Dr. Poser's opinion alone.

It is the plain existence of Mr. Jeffries' ME/CFS diagnosis (not its "greater weight") which precludes a DSM-IV USD diagnosis from being asserted in this case. Because defendant offers no medical expert testimony to establish that no ME/CFS diagnosis exists (or medical expert testimony even challenging the propriety of a ME/CFS diagnosis), summary judgment is appropriate.

2. <u>**Dr. Michael McClellan.**</u>

Dr. McClellan has followed Mr. Jeffries' care for several years. He was cross-examined about his opinions over the course of two days by defendant's counsel. The relevant testimony

4

and opinions of Dr. McClellan show that summary judgment is proper because he too has diagnosed Mr. Jeffries with a medical illness. Dr. McClellan testified:

> Q: "You have not come up with a definitive diagnosis for [Mr. Jeffries] symptoms, is that correct?"
>
> A: "I feel that we have a definitive diagnosis as much as that diagnosis can be rendered." (*See, McClellan Depo., Exhibit 5, p.* 17).
>
> Q: "You say potential hepatitis B relationship, you're saying that hasn't been definitively determined?"
>
> A: "My personal opinion is that [Mr. Jeffries' symptoms] are directly and casually related to the vaccine" (*Id., p. 18*).
>
> A. "I became convinced that [the vaccine] was the cause of his symptoms . . . by October 1999 . . . he has a postvaccinal encephalomyalgic process brought on by hepatitis B vaccine . . . it is an inflammatory process involving the nervous system . . . his diagnosis is what we call a clinical diagnosis." (*Id., pp. 20-23*).
>
> A. "I think he has an autoimmune mediated process . . . on the basis of an immune reaction to the hepatitis vaccine . . . that's my feeling as to [Mr. Jeffries'] diagnosis." (*Id., p. 90*).

And on cross-examination when defendant's counsel suggested that somatization disorder and/or obsessive compulsive disorder was the more appropriate diagnosis, Dr. McClellan rejected the suggestion, stating: "having a fair number of obsessive compulsive patients in my practice that I see and having seen some patients with somatization disorder as well, I would have to say that Mr. Jeffries' presentation would be atypical in the patients that I see." (*Id. p. 60*). Dr. McClellan continued: "my feeling after seeing Mr. Jeffries for the last five years is that he has real pain, that the pain and cognitive deficits are disabling him and the basis of that is not a psychiatric disorder but a medical, physiologic physical problem . . . there was a trigger of his immune system caused by the hepatitis B vaccine . . . it's a clinical diagnosis." (*Id.*

5

*p. 74*). When questioned yet another time about the possibility of a mental disease, Dr. McClellan testified: "my position and my feeling is that Mr. Jeffries' symptoms are not psychogenic, do not relate to a primary psychiatric disorder, be it somatization or obsessive compulsive disorder, but that based on many years and multiple interactions with this man, I think that his symptoms relate to a primary medical auto-immune related disorder that was instigated and began by his hepatitis b vaccine." (*Id., p. 105*).

There is no basis to disregard Dr. McClellan's opinion that Mr. Jeffries has a medical illness. Accordingly, summary judgment is proper since no psychologist may, therefore, suggest USD as a diagnosis.

3. **Dr. Hyde.**

As the defendant acknowledged a short time ago when it filed Doc. 117, "in Mr. Jeffries' case the diagnosis of chronic fatigue syndrome remains . . . Drs. Geier, Hyde and Waisbren have offered the opinion that Mr. Jeffries has either CFS or Myalgic encephalomyelitis." (*See, Doc 117, pp. 5 – 6*)(*emphasis supplied*). Because this concession is detrimental to defendant's attempt to oppose plaintiff's motion for summary judgment, defendant now desires to recant its clear acknowledgment of the substance of the opinions of Drs. Hyde, Geier, and Waisbren.

According to defendant, Dr. Hyde's opinion is useless because in Dr. Hyde's July 2001 report he refers to Mr. Jeffries' medical illness as an "evolving, ongoing immune mediated injury," a medical illness and a medical diagnosis rather than using the term chronic fatigue syndrome. (*Exh. 6*) Yet Dr. Hyde's textbook, *The Clinical And Scientific Basis of Myalgic Encephalomyelitis / Chronic Fatigue Syndrome*, refers to ME/CFS as the "disease of a thousand names." (*See, Hyde CV, attached as Exhibit 7*). There is no substantive distinction between a

6

reference to Mr. Jeffries' illness as ME/CFS or "an evolving ongoing, immune mediated injury." And defendant's counsel's statement that Dr. Hyde "actually does not believe in Chronic Fatigue Syndrome" when it was the subject of a major textbook authored by Dr. Hyde is nonsense. Regardless, for purposes of the instant summary judgment motion, Dr. Hyde's diagnosis of a medical illness prevents the existence of the prerequisite to a USD diagnosis.

    4.    <u>**Drs. Waisbren and Geier.**</u>

As recited above, before Mr. Jeffries filed his motion for summary judgment, the defendant readily acknowledged that Drs. Geier and Waisbren had opined that Mr. Jeffries has a medical illness. Now, out of expediency, because defendant's former acknowledgement requires that the Court sustain Mr. Jeffries' summary judgment motion, defendant's counsel desperately attempts to cast doubt on these opinions without any supporting medical opinions of his own.

Defendant makes the conclusory argument that Dr. Geier's opinion shouldn't be considered whatsoever because Dr. Geier is too great an expert in adverse reactions to vaccines. And defendant argues that Dr. Waisbren's opinion (that Mr. Jeffries has "post-vaccinal encephalomyelitis and acquired autoimmunity") should be "destroyed" because it is in defendant's counsel's judgment "not a complete opinion."

Defendant offers only arguments of counsel in taking the position that plaintiff's expert medical doctors know nothing and their opinions should be disregarded. The simple fact is that those opinions are based on valid scientific principles and the clinical diagnosis rendered stand. Because those diagnosis exist, no psychologist can suggest that Mr. Jeffries has USD and summary judgment is appropriate.

B.  **Defendant's Two Additional Arguments Miss the Mark.**

Defendant raises two additional arguments in its opposing memorandum that are neither accurate nor material to the disposition of Mr. Jeffries' Motion For Summary Judgment (i.e., the propriety of a psychologist asserting a diagnosis of USD in the face of a medical diagnosis, ME/CFS). Each argument also contradicts defendant's earlier judicial admissions.

1.  **Frequency Of Doctor Appointments: January to August 2003.**

First, the defendant argues that Mr. Jeffries' two visits to his physician in the first 8 months of 2003 are insufficient in number to qualify him for benefits under the Policy.[5]

This argument fails for several reasons. First, it is factually incorrect. Most importantly, however, defendant's argument is immaterial to whether its psychologist can properly attribute Mr. Jeffries' disabling cognitive decline to USD when a medical diagnosis exists.

In addition, through its attempt to employ the Mental Disorder Benefit Limitation of the Policy and in its overt judicial admissions that Mr. Jeffries is "Totally Disabled" within the meaning of the Policy, the defendant has by definition conceded that Mr. Jeffries has satisfied the physician-visit requirement of the Policy's "Total Disability" definition. Specifically, the Mental Disorder Benefit Limitation contained in the Amendment to the Policy states:

> "If a ***Total Disability*** . . . is due to a Mental Disorder . . . the number of months [of] benefits for Total Disability . . . shall not exceed in the aggregate a total of 24 months. 'Mental Disorder' . . . means a manifestation of any disorder classified

---

[5]  Apparently, defendant is signaling that when it loses this case on summary judgment or at trial, it intends to continue to deny benefits to Mr. Jeffries on the argument that he no longer meets the definition of "Totally Disabled" because he does not see his doctor with the frequency that defendant likes. Defendant appears willing to take this position even though in 2002 and 2003 its experts found that Mr. Jeffries suffers from a Totally Disabling condition, cognitive decline. Nor has defendant articulated what physician-visit frequency is appropriate for someone with ME/CFS and undisputed cognitive impairment. Will defendant's bad faith ever cease?

in the then current issue of the Diagnostic and Statistical Manual of Mental Disorders (DSM) . . . ." (*Emphasis added*).

This benefit limitation plainly applies only to persons whom the defendant determines satisfy the definition of "Total Disability," a capitalized term in the benefit limitation and a term expressly defined in the Policy. And Total Disability does not exist unless defendant has concluded (or has waived the requirement) that the person "is receiving care by a Physician, which is appropriate for the condition causing the disability." If this benefit limitation applies to Mr. Jeffries, as defendant affirmatively suggests, then Mr. Jeffries must fall within the definition of Total Disability and must also, therefore, have satisfied the physician-visit requirement of that term.

2. **"Total Disability" Is Conceded**.

Second, the defendant now argues, contrary to its earlier judicial admissions and the opinions of its own experts, that there is insufficient evidence of a "total disability." This argument is immaterial to the discreet issue set forth in defendant's motion (i.e., since there is a ME/CFS diagnosis, no DSM-IV USD diagnosis can ever arise), but is also a total mischaracterization of the record evidence:

Since February 1999, the defendant has scrutinized everything about Mr. Jeffries' lifetime of physical and mental health. And just four months ago (on September 24, 2003) in its Amended Answer (*Doc. 89*), the defendant admitted that:

- "Mr. Jeffries is totally disabled in his occupation." (*Doc. 89, Amended Answer, ¶¶ 16 and 19*).[6]

---

[6] Earlier, in its Motion For Leave To File An Amended Answer, the defendant stated: "additional information has come to light which has necessitated amendment. Specifically, [defendant] has determined that Mr. Jeffries is totally disabled pursuant to the terms of the policy by reason of a mental disorder." (*Doc. 64, Motion For Leave, p. 1*).

9

This amendment/concession was required because defendant's psychologists confirmed through their own independent tests performed in 2002 and 2003 that Mr. Jeffries has a disabling, diminished cognitive state. Accordingly, defendant was forced to concede that Mr. Jeffries is unable to perform his Occupation and is "Totally Disabled" as defined by the Policy.

To avoid summary judgment, the defendant obviously sees it as expedient and advantageous to now contradict its earlier judicial admissions and its experts' conclusions concerning Mr. Jeffries' disabling cognitive state and argue that the testing performed and opinions generated by each party's experts do not evidence "Total Disability." The defendant, however, is estopped from withdrawing its admissions and its experts' opinions concerning Mr. Jeffries' disabling cognitive condition.

### Conclusion

Defendant has admitted that Mr. Jeffries is disabled and that his many doctors offer opinions that he has a medical illness. (*See*, *Doc. 89*, *¶¶ 16 and 19*). Defendant cannot now change its position to suit the purposes of its latest argument.

Even though the issue raised in Mr. Jeffries' motion does not require some "greater weight" type analysis, defendant offers no medical or expert testimony whatsoever to controvert what it had previously freely recognized: Mr. Jeffries' physicians opine that he has ME/CFS. With the existence of the ME/CFS diagnosis by Drs. Poser, McClellan, Hyde and others, there is no proper basis under the DSM-IV for the defendant or its experts to contend that Mr. Jeffries has USD.

Accordingly, defendant cannot offer evidence that Mr. Jeffries has USD at trial and this Court should sustain Mr. Jeffries' Motion For Summary Judgment on defendant's counterclaim since there exists no genuine issue of material fact on that counterclaim.

Respectfully submitted,

| | |
|---|---|
| OF COUNSEL | /s Michael A. Roberts_____ |
| | Michael A. Roberts, Esq. (0047129) |
| GRAYDON HEAD & RITCHEY LLP | GRAYDON HEAD & RITCHEY LLP |
| 1900 Fifth Third Center | 511 Walnut Street, Suite 1900 |
| 511 Walnut Street | Cincinnati, Ohio 45202 |
| Cincinnati, Ohio 45202 | (513) 629-2799 |
| (513) 621-6464 | (513) 651-3836 (fax) |
| | email:mroberts@graydon.com |

## CERTIFICATE OF SERVICE

The foregoing was electronically filed and thereby delivered to William R. Ellis, Esq., Wood & Lamping LLP, 600 Vine Street, Suite 2500, Cincinnati, Ohio 45202, this 17th day of February, 2003.

/s Michael A. Roberts