UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| ERIC L. JEFFRIES, | : |
| | : Case No. C-1-02-351 |
| Plaintiff, | : |
| | : (Judge Beckwith) |
| vs. | : (Magistrate Judge Hogan) |
| | : |
| CENTRE LIFE INSURANCE COMPANY, | : **DEFENDANT'S REPLY IN** |
| et al., | : **SUPPORT OF ITS MOTION FOR** |
| | : **SUMMARY JUDGMENT** |
| Defendants. | : |

## I. INTRODUCTION

Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment contains a combination of innuendo and half-truths. Plaintiff once again relies on quantity as opposed to quality as he spins his version of the facts in this case. Defendant asks the Court to carefully evaluate the documented facts placed before it and recognize that Plaintiff's speculation and unsupported assumptions will not carry his burden to defeat Defendant's properly supported Motion for Summary Judgment. Once the established facts of this case are evaluated, it is clear that Defendant is entitled to judgment in its favor on all counts of Plaintiff's Complaint.

## II. ARGUMENT

### A. Centre Life Insurance Company Did Not Act In Bad Faith.

Because it is undisputed that Centre Life paid Mr. Jeffries' disability benefits until February 2002 when he refused to attend the medical examination required under his policy, Plaintiff's only means of attack is to focus on the administration of his claim. Plaintiff cannot escape the fact that he was paid benefits until his own actions resulted in suspension of payments. Nonetheless, he continues to assert bad faith.

He supports his assertions with incomplete and often non-existent citations to the report of Mary Fuller. As is established herein, Ms. Fuller admitted in her deposition that many of the instances she cited as examples of bad faith were, in fact, reasonable when the complete circumstances were evaluated. And, this is the key to this case -- examining the complete circumstances -- not fragments of circumstances and not the circumstances as Plaintiff would have the Court believe them to be. Instead, the Court must consider the circumstances that are established by the undisputed material facts of this case.

Of particular concern is the fact that although Plaintiff attaches a great number of exhibits to his Motion, the arguments he makes often lack citation. In several other instances where citation to an exhibit is made, reference to the exhibit reveals that it does not actually say what Plaintiff claims it says. Often with citation to deposition testimony, Plaintiff identifies the deponent but not the page or pages where the alleged testimony appears. Centre Life has made an effort to point out these inconsistencies to the Court and reiterates the need for factual evaluation of each of the claims.

There is no dispute that Plaintiff received payments under his policy through February 25, 2002. At this point, Plaintiff's benefits were suspended because of his continued refusal to attend a medical examination as required under his policy. Once he agreed to attend the medical examination, payments were resumed in February 2003.

Because payments under the policy were made as required, the crux of Plaintiff's bad faith claim is that Centre Life had developed a strategy to deny his claim without regard to his physical or mental condition. This is nothing more than pure speculation on the part of the Plaintiff. He does not even attempt to make any citation to any evidence before the Court that establishes this "strategy." This is because no such strategy existed.

Mr. Jeffries would like the Court to believe that there was some on-going scheme of Centre Life to deny his claim. What he ignores is the fact that for the great majority of his claim, even his own treating physicians had no idea what was wrong with him. Centre Life, like Mr. Jeffries and his doctors, was simply trying to determine what was wrong with him. Indeed, the affidavits of Mr. Jeffries' treating physicians all say essentially the same thing: they believe Mr. Jeffries is disabled by something but they do not know what it is. See Exhibits K, L, and M to Centre Life's Motion for Summary Judgment and Affidavits of Drs. Dunn, Luggen and McClellan.

Centre Life has not disputed that Mr. Jeffries was disabled by something. But the Company did question what it was that disabled him. Once it was finally able to obtain the medical examination, it determined that Mr. Jeffries' disability was somatoform disorder. This is a mental disorder. As such, his claim is limited to two years of benefits which have been fully paid. If Mr. Jeffries is, as he claims to be, disabled by a condition in addition to his mental condition, which condition is a physical condition, the burden is on him to establish this. The information he has submitted to date and that which has been gathered by Centre Life have established his mental disorder. This is not in issue. What remains to be determined is what if any physical disability Mr. Jeffries can establish.

**1. Mr. Jeffries Refused to Attend a Medical Examination.**

On page 14 of his Brief, Mr. Jeffries claims that "at no time during the first three years it administered the claim did the Defendant ever seek an independent medical examination of Mr. Jeffries by a medical doctor." This is both an example of Mr. Jeffries twisting the facts of this case and asserting his own limited view of how the case should be administered. And it is not proper. The truth is that in August 2001 (notably during the first three years of claim

administration) Centre Life asked Mr. Jeffries to be examined by Dr. Kathleen Hart. Although Dr. Hart is a neuro-psycholgist, not a medical doctor, this is a distinction without a difference. Mr. Jeffries objected to an examination by Dr. Hart not because she was a psychologist, but because he had already undergone a neuro-psychological examination with a physician of his choice, Sheila Bastien. *See* Exhibit A, 8-28-01 correspondence from Jeffries' counsel at Claim 1343-44. Again, this is typical of Mr. Jeffries' design to limit the information obtained by Centre Life. He will agree to an exam, but only an exam performed by a physician of his choice on his terms.

In November 2001, Centre Life advised that it was continuing its review and evaluation of Dr. Bastien's report and reiterated its desire to have Mr. Jeffries examined by an infectious disease specialist. In a November 2, 2001 letter to Mr. Jeffries' counsel, Centre Life advised of its intent and detailed the difficulties it had encountered. *See*, Exhibit B at Claim 1252-53. Contrary to Plaintiff's assertions, Centre Life had made several requests for medical evaluations which Plaintiff refused.

On February 6, 2002, Mr. Jeffries again reiterated his refusal to attend any physical examination. *See* Exhibit C, Claim 1174-1177. Bear in mind that this was in response to Centre Life's continued requests for an initial physical examination as permitted under Mr. Jeffries' policy. Despite jumping through the hoops laid by Plaintiff and agreeing to a continued review of Dr. Bastion's neuro-psychological report, it was determined by Centre Life that numerous questions still remained. For that reason, it insisted that Mr. Jeffries undergo an initial physical examination. Once more, Mr. Jeffries refused to attend. He argued that sufficient medical information had been submitted. Not surprisingly, this was only the medical information which Mr. Jeffries chose to collect and which Mr. Jeffries chose to submit. His counsel wrote:

> Certainly it cannot be disputed that if a 100 doctors opine that a person is disabled, it's inappropriate to request a 101st examination. In this case the mountain of medical evidence and numerous opinions of physicians, including physicians employed by parties adverse to Mr. Jeffries, evidence beyond any doubt that Mr. Jeffries is totally disabled and will be totally disabled for the foreseeable future within the meaning of the Massachusetts Casualty policy. A 101st examination is not required.

*See* Exhibit C, 2-6-03 letter to Champagne from Roberts. The fact that Mr. Jeffries ignores is that the "hundred examinations" were not requested by Centre Life. Centre Life was simply trying to obtain its initial physical examination. It was only when Mr. Jeffries refused that his benefits were suspended. Any examination of Mr. Jeffries was delayed by Mr. Jeffries' actions. Ultimately, despite Centre Life's request for an examination both by a neuropsychologist and by an infectious disease specialist, Mr. Jeffries did not attend any examination until ordered to do so by this Court. Given these circumstances, his claim that there was some "strategy to deny his claim" on the part of Centre Life cannot be supported by any evidence in the record. The only "strategy" disclosed by these facts, was employed by Mr. Jeffries to avoid any medical examination other than those he chose to attend.

Although Mr. Jeffries now claims that he was always willing to see whatever doctor Centre Life requested without any conditions, nothing could be further from the truth. He cites Exhibit 15 as evidence of his agreement as of May 2002 to see doctors requested by Defendant. Exhibit 15 is in fact an affidavit dated November 2002. This affidavit was made over nine months after Mr. Jeffries' benefits were suspended due to his refusal to attend a medical examination. In it, Mr. Jeffries misstates that Centre Life cancelled Dr. Grubbs' examination originally scheduled for 8-8-02. In fact, Dr. Grubbs himself refused to see Mr. Jeffries. See, Exhibit D, Grubbs correspondence. Centre Life then scheduled an examination with Joel Katz,

M.D. in Boston, Massachusetts for 9-27-02. Mr. Roberts received notice of the examination but did not pass it to his client because he was in trial. *See*, Exhibit E, 9-25-02 correspondence to Roberts from Burrell. Plaintiff ultimately refused to see Dr. Katz and argued he should not have to travel. He made this claim despite his earlier promises to see anyone qualified and his own practice of traveling the world in search of a diagnosis. Mr. Jeffries claimed that Dr. Katz was geographically too close to Centre Life.

Additionally, it is important to note that Mr. Jeffries' affidavit illustrates his belief that he should be the one to dictate who he sees and what information Centre Life obtains. In his affidavit, he says that his illness may appropriately be assessed by an infectious disease specialist. He does not believe that a neuropsychological examination was appropriate and claims on this basis to have objected to Dr. Hart. In reality, Mr. Jeffries objected to the obtaining of any information that was not first screened by or filtered through him. As the Court pointed out in its 1-13-03 Order (*Document No. 30*), if Mr. Jeffries had concerns with the qualifications of an evaluating physician, he was free to raise this as an argument. But, his concerns do not give him the right to refuse the evaluation.

**2. Ms. Fuller's Report Does Not Establish Bad Faith.**

The non-moving party to a motion for summary judgment "is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial. *See 60 Ivy Street Court v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987). The opposing party may not simply restate the allegations of his pleading but must instead set forth specific facts which show there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S. Ct. 1505 (1986). Mr. Jeffries has done no more than put forth his version of the allegations of his Complaint and rest his bad faith claim on the report of Mary

Fuller. Ms. Fuller's opinion is subject to a motion to exclude file by Defendant. As careful examination of Ms. Fuller's report reveals, her opinion does not establish bad faith nor is it based on accurate facts.

- Plaintiff asserts that Centre Life acted in bad faith by conducting an internal non-medical investigation. In support of his argument, he relies on Exhibit 9 to his Motion. The majority of Exhibit 9 is in fact documentation of only a portion of the medical investigation conducted by Centre Life. There is reference to other sources of information as well. There is no evidence before the Court that would limit Centre Life's investigation to only those medical issues offered by Plaintiff.

- Plaintiff contends that Centre Life's investigation into Mr. Jeffries' financial status was evidence of bad faith. But in her deposition, Ms. Fuller acknowledged that tax returns can be used to verify the facts given to an insurance company about the policy or increases in the policy. *See* Fuller deposition at p. 16. She also acknowledged that claims handlers will look to see whether there are secondary gain issues contributing to the disability. *See id.* at p. 18.

- Jeffries also complains about the surveillance conducted by DMS. Ms. Fuller acknowledged that in her review of the claims file, she was unable to determine what surveillance was done by Prudential and what was done by DMS. *See* Fuller deposition at p. 107. The exhibits attached to Plaintiff's Brief inappropriately combined the surveillance performed by the two companies. Plaintiff incorrectly alleges that DMS hired several surveillance companies to conduct surveillance of Mr. Jeffries. In fact, the surveillance authorized by DMS was that conducted by CS Claims Group, Inc. and only one of the investigations conducted by Corporate

Investigative Services, Inc. with regard to Exhibits 11 and 12. Exhibit 13 contains an internal research report from DMS and copies of surveillance ordered by Prudential. Exhibit 14 is a record search.

- Plaintiff asserts that Centre Life acted in bad faith by colluding with Prudential for the purposes of sharing files, sharing the cost of surveillance and denying the claim. Although he offers Exhibit 16 in support of this assertion, the documents in Exhibit 16 establish that Mr. Jeffries authorized his carriers to share information. Indeed, the only document of substance in Exhibit 16 is an authorization signed by Mr. Jeffries which permits Prudential to release information to:

    > all physicians, hospitals, medical service providers, druggists, employers, and all other agencies or organizations. (This includes other insurers, Blue Cross/Blue Shield and pre-paid health plans). For claim purposes, I agree that Prudential or its representatives may see, or obtain a copy of all records which pertain to Eric Jeffries.

By signing this document, Mr. Jeffries explicitly permitted Prudential to release information to other insurers. Any documents provided to DMS by Prudential were released pursuant to this authorization. Although not included in Exhibit 16, Mr. Jeffries signed a similar authorization permitting Centre Life to release information to other insurance carriers. The authorization also allowed Centre Life to obtain information from any other insurance carriers, providing, in pertinent part, any insurance company to give Centre Life "or its representatives any and all such information required by them to determine my eligibility for policy claim benefits." *See* Exhibit B to Defendant's Motion for Summary Judgment at Claim 3134. In light of these facts, any sharing of files between Prudential and Centre Life was specifically authorized by Mr. Jeffries.

In footnote 6 of his Brief, Mr. Jeffries includes a statement which contains several ellipsis and brackets and purports to establish that a phone log between Centre Life and Prudential revealed Centre Life's questioning of Mr. Jeffries' financial incentives. Plaintiff tellingly does not cite the page or pages from which this quote was constructed.[1] In any event, the quote as constructed by Plaintiff does not appear in the deposition of Ms. Nichols. Moreover, Ms. Nichols testified that with regard to DMS' question as to whether Mr. Jeffries had a financial incentive to be disabled, DMS did not tell Ms. Nichols whether they were or were not paying Mr. Jeffries' claim. This is contrary to the statement in Mr. Jeffries' Motion. With regard to the March 9, 2000 telephone call also cannot be found in Ms. Nichols' deposition. Mr. Jeffries' practice of creating quotations pulled from apparently numerous phrases with several words stuck in by brackets and several words omitted by ellipses does not show bad faith.

- Jeffries alleges that DMS stated a belief that Mr. Jeffries was claiming disability for financial gain and stated that it had been withholding benefits. Again, there is no citation to where in the record this appears. If the *id.* relates to Exhibit 16, it is a clear misstatement.

**B.    Mr. Jeffries Cannot Establish Nor Prevail On His Remaining Claims in His Complaint.**

Under Ohio law, an actionable invasion of the right to privacy can be made, in pertinent part, if one alleges and establishes the wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities. *See Housh v. Peth*, 165 Ohio St. 3d 133 N.E.2d 340 (1956). Although this case was the first to recognize that a right to privacy could be invaded under Ohio law, the case also aptly illustrates the degree of harassment required to support such an invasion of privacy claim.

---

[1] This is not the first pleading in which Plaintiff has used questionable citations and incomplete or incorrect

Mr. Jeffries in no way meets this standard. In *Housh* the court determined that the record established "that the defendant deliberately initiated the systematic campaign of harassment of the plaintiff, not only in numerous telephone calls to the plaintiff herself every day for a period of three weeks, some of which were late at night, but also calls to her superiors over the telephone, informing them of the debt; that she was called out of the classroom in the public school where she was employed three times within 15 minutes; that she lost a roomer at her rooming house because of the repeated calls, and was threatened with loss of employment unless the telephone calls ceased." *See id.* at p. 344. Mr. Jeffries alleges that Centre Life phoned his home under false pretense and trespassed on his property falsely claiming to be delivery personnel. E neither supports this claim with fact nor establishes that these actions, if true, rose to the level of an actionable tort.

As a threshold matter, Ms. Fuller's deposition makes clear that she was unable to determine what surveillance was conducted by Centre Life and what was conducted by Prudential.[2] And in fact, the surveillance reports attached to Plaintiff's Motion contain reports conducted both by Prudential and DMS. The 5/27/99 and 6/7/99 reports attached as Exhibit 11 conducted by In Photo Surveillance were ordered by Prudential. They display a different claim number than the one assigned by DMS and refers to a different insured. Although the 6/4/99 surveillance conducted by CS Claims Group, Inc. was ordered by DMS for Centre Life, this report documents no phone calls or visits to Mr. Jeffries' home. The 6/24/99 report of DMS only concerned investigation regarding a 20/20 program. The first note of actual surveillance ordered by DMS is the 7/14/99 report. This report documents only a single pretext phone call to the Jeffries' home number. The Jeffries were not home at the time and no information regarding the

---

quotations.
[2] The surveillance in question was requested by DMS, the Third-Party Administrator for Centre Life.

- 10 -

Jeffries' private affairs were noted. The person answering the phone voluntarily gave Mr. Jeffries' cell phone number and that number was not called.

An 8/10/99 report for surveillance ordered by DMS also documents a pretext phone call to Mr. Jeffries' home at which time the person answering the phone again advised that the Jeffries were in California and again voluntarily gave Mr. Jeffries' cell phone number. According to the report, the person answering the phone offered the information that Mr. Jeffries works out of his home and has odd hours. One additional phone call is noted in this report. There is no documentation of any entry onto Mr. Jeffries' property. An 8/31/99 report also documents two pretext phone calls over a four-day period but again no entry onto Mr. Jeffries' property. With Exhibit 12, Mr. Jeffries again incorrectly and inappropriately offers surveillance conducted by Prudential Insurance as evidence of Centre Life's bad faith.

The Ohio courts have held that there can be no actionable claim for invasion of privacy where there is no evidence of actions taken in bad faith or with corrupt motive. *See Sustin v. Fee*, 23 O.O. 3d 182, 431 N.E.2d 992 (1982). Notably, Sustin involved facts similar to this case. There, Sustin brought an invasion of privacy action against a township zoning inspector after he engaged in surveillance of Sustin's property. It is essential to an invasion of privacy claim that the affairs viewed must be private and not in public view. *See Jackson v. Playboy Enterprises, Inc.*, 574 F. Supp. 10, 10-12 (S.D. Ohio 1983) Restatement of the Law, Torts (1977) § 652B Comment C. Here, the only surveillance which can properly be attributed to DMS details a few pretext phone calls spread out over several months and observation of Mr. Jeffries in public areas. The on property pretext visit Mr. Jeffries complains of is not described in the surveillance authorized by DMS. Even if it were, such conduct does not rise to the level of outrage sufficient to support Mr. Jeffries' invasion of privacy claim.

Mr. Jeffries' conspiracy claim must also fail. Plaintiff correctly identifies the elements of an unlawful conspiracy under Ohio law. A crucial requirement is the existence of an unlawful act independent from the actual conspiracy. Setting aside the fact that Plaintiff cannot establish that Centre Life, Prudential, Disability Management Services or any of their independent investigators colluded to injure him, he cannot establish that there was an unlawful act independent from the actual conspiracy. Mr. Jeffries' claim is that Centre Life breached his contract and acted in bad faith. Neither claim has been established here. It is important to remember that Mr. Jeffries' case stems from unsupported speculation. He has alleged the existence of an ulterior motive to Centre Life in its investigation of his claim. What he ignores is the fact that even his own doctors were unable to identify what was wrong with him. Centre Life appropriately and responsibly investigated this claim.

Similarly, Plaintiff's interference with contract claim must fail. Plaintiff has alleged that Prudential's decision regarding Mr. Jeffries' policy was based on information provided by DMS. He argues that Prudential's decision to terminate his claim, if it was in fact terminated by Prudential, was based on a statement by DMS that it did not consider Mr. Jeffries' claim legitimate. He makes this claim despite the fact that at the time the statement was said to have been made, DMS continued to pay Mr. Jeffries' claim. It is inconceivable why DMS would somehow entice Prudential to terminate Mr. Jeffries' claim while it continued to pay his claim. This is another example of speculation by Mr. Jeffries not supported by any evidence. He is not entitled to judgment on this aspect of his claim.

### III. CONCLUSION

Mr. Jeffries has a mental disorder as defined under the terms of his policy. He has been paid the entirety of the benefits to which he is owed under the terms of his policy. With regard

to Mr. Jeffries' bad faith claim, this Court has already determined that Centre Life acted reasonably and with justification in its suspension of Mr. Jeffries' benefits when he refused to attend a medical examination. There can thus be no bad faith for non-payment of benefits between February 2002 when the benefits were suspended and the time Mr. Jeffries finally attended the medical examinations. The subsequent termination of benefits in May, 2003 was also made in good faith. Centre Life's determination was reasonably justified based upon the reports and examinations of Dr. Hartings and Dr. Bullard and the review of Dr. Clinosky. Moreover, Plaintiff cannot establish that he in fact has a physical disorder which would entitle him to payment of continued benefits. Even if he could however, this would still not justify a finding of bad faith. Centre Life further moves for summary judgment on the remaining claims of Plaintiff's Complaint and seeks reimbursement of those benefits overpaid. Centre Life respectfully requests the opportunity to present oral argument on this issue.

Respectfully submitted,

s/Amy Gasser Callow
William R. Ellis (0012279)
Peter M. Burrell (0044139)
Amy Gasser Callow (0063470)
Wood & Lamping LLP
600 Vine Street, Suite 2500
Cincinnati, OH 45202-2491
(Telephone) (513) 852-6000
(Facsimile) (513) 852-6087

Attorneys for Defendants
Massachusetts Casualty Insurance Company
and Disability Management Services, Inc.

- 14 -

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been filed with the Court by electronic means on this 17th day of February 2004.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

s/Amy Gasser Callow<br>
Amy Gasser Callow, Esq.

199176.1