## Page 1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ERIC L. JEFFRIES,
     Plaintiff,
vs.                          CASE NO.
                             C-1-02-351
CENTRE LIFE INSURANCE CO.,
et al.,
     Defendants.

Deposition of:   MICHAEL F. HARTINGS, Ph.D.
Pursuant to:     Notice
Date and Time:   Monday, October 27, 2003
                 9:55 a.m.
Place:           Graydon, Head & Ritchey, LLP
                 1900 Fifth Third Center
                 511 Walnut Street
                 Cincinnati, Ohio 45202
Reporter:        Patti Stachler, RMR, CRR
                 Notary Public - State of Ohio

## Page 2

APPEARANCES OF COUNSEL:

For the plaintiff:
    Michael A. Roberts, Esq.
         of
    Graydon, Head & Ritchey, LLP
    1900 Fifth Third Center
    511 Walnut Street
    Cincinnati, Ohio 45202
    513.629.2722

For the defendants:
    William R. Ellis, Esq.
         of
    Wood & Lamping, LLP
    600 Vine Street
    Suite 2500
    Cincinnati, Ohio 45202
    513.852.6067

COPY

## Page 3

I N D E X

MICHAEL F. HARTINGS, Ph.D.                                PAGE
EXAMINATION BY MR. ROBERTS                                  5

                                          MARKED  REFERENCED
EXHIBIT 17                                  64        64
EXHIBIT 66                                 172       172
EXHIBIT 67                                 180       180
EXHIBIT 68                                  30        30
EXHIBIT 69-2                                 6         6
EXHIBIT 79                                 135       135
EXHIBIT 80                                 136       136
EXHIBIT 81                                  39        39
EXHIBIT 82                                  62        62
EXHIBIT 83                                 138       139
EXHIBIT 69-A                                43        43
EXHIBIT 69-B                                45        45
EXHIBIT 69-C                                48        48
EXHIBIT 69-D                                51        51
EXHIBIT 69-E                                71        72
EXHIBIT 69-F                                74        74
EXHIBIT 69-G                                83        83
EXHIBIT 69-H                                84        84
EXHIBIT 69-I                                84        84
EXHIBIT 69-J                                86        86
EXHIBIT 69-K                                90        90
EXHIBIT 69-L                                91        91
EXHIBIT 69-M                                91        91
EXHIBIT 69-N                                92        92
EXHIBIT 69-O                                92        92
EXHIBIT 69-P                                93        93
EXHIBIT 69-Q                                94        94
EXHIBIT 69-R                                95        95
EXHIBIT 69-S                                95        95
EXHIBIT 69-T                                96        96
EXHIBIT 69-U                                97        97

## Page 4

                                          MARKED  REFERENCED
EXHIBITS
EXHIBIT 69-V                                97        97
EXHIBIT 69-W                                98        98
EXHIBIT 69-X                                99        99
EXHIBIT 69-Y                               100       100
EXHIBIT 69-Z                               100       100
EXHIBITS
EXHIBIT 69-AA                              101       101
EXHIBIT 69-BB                              102       102
EXHIBIT 69-CC                              112       112
EXHIBIT 69-DD                              114       114
EXHIBIT 69-EE                              114       114
EXHIBIT 69-FF                              115       115
EXHIBIT 69-GG                              122       122
EXHIBIT 69-HH                              125       125
EXHIBIT 69-II                              125       125

Elite Reporting Agency

Elite Reporting Agency

1 impaired. We found it to be normal. The Stroop Color
2 and Word Test, which was a test of divided attention,
3 which has been reported to be impaired in chronic
4 fatigue system, we found to be impaired, she found it
5 to be normal. The Stroop and the Pegboard, we found a
6 very low score in the right dominant hand and she found
7 a normal score.
8   Q.   Do any of those discrepancies suggest that
9 the obsessive compulsive disorder diagnosis or
10 somatization disorder diagnosis are or aren't present
11 in Mr. Jeffries?
12   A.   No, none of those address that.
13   Q.   Okay. Why did you need to clarify those
14 discrepancies?
15   A.   Because it's unusual for those to -- for
16 those three to change so dramatically over a period of
17 time, unless there is an active neurogenic process.
18 And if these were -- you know, if these were real
19 changes, I thought that, you know, we ought to clarify
20 that, see where he really stands.
21   Q.   So you gave him the pegs test again?
22   A.   I did.
23   Q.   And did you give him the Stroop test a third
24 time in February?
25   A.   No. I gave him another test to clarify his

65

1 attention.
2   Q.   What was that test?
3   A.   The Halstead Right Hand Rhythm Test, the
4 Seashore Rhythm Test.
5   Q.   What about the verbal fluency, did you test
6 that again in February?
7   A.   No.
8   Q.   How were you going to clarify that
9 discrepancy?
10   A.   Well, I did -- I did actually give him a
11 verbal test, the verbal IQ test, but not a verbal
12 fluency test.
13   Q.   How were you going to clarify that
14 discrepancy?
15   A.   I guess we didn't.
16   Q.   Do I understand correctly that the
17 discrepancies you just identified didn't impact your
18 diagnoses that you felt existed in Mr. Jeffries of
19 obsessive compulsive disorder and somatization disorder
20 after your second visit with him?
21   A.   They didn't affect that. Rephrase your --
22 restate your question.
23   Q.   After your second visit with Mr. Jeffries and
24 after you got the test scores and reports back from
25 whoever you shipped them off to, you came to the

66

1 preliminary conclusion, at least mentally, that
2 Mr. Jeffries may be someone who suffers somatization
3 disorder and obsessive compulsive disorder, true?
4   A.   Yes.
5   Q.   Okay. Then you got Dr. Bastein's report and
6 Dr. Sandman's report. But my understanding of your
7 testimony is, while there may be discrepancies between
8 your report and their reports, those discrepancies
9 don't go to the diagnosis that you were suggesting for
10 Mr. Jeffries at that time, the somatization disorder
11 and obsessive compulsive disorder, right?
12   A.   Well, that's right. These are
13 neuropsychological procedures. They're not
14 psychological procedures.
15       I also readministered another memory test,
16 which I said I was going to do, which essentially
17 produced the same results. And I examined other -- I
18 administered other tests of attention, since the Stroop
19 Color Word is attentional measure, and basically
20 produced the same results.
21   Q.   But that's not my question. My question
22 is, if you felt, based on your testing and your
23 interviews in July, both of them, that Mr. Jeffries
24 suffered from obsessive compulsive disorder and
25 somatization disorder --

67

1   A.   Uh-huh.
2   Q.   -- and then you got Dr. Bastein's report, and
3 while there may be discrepancies in some tests that you
4 did, those discrepancies didn't impact your diagnoses,
5 so why did you have to see him a third time?
6   A.   Well, I know that now. I don't know that I
7 knew that at the time.
8   Q.   No. I thought you told me that different --
9 discrepancies in these tests between what you did in
10 the first two visits with Mr. Jeffries and
11 Dr. Bastein's testing don't impact whether someone has
12 obsessive compulsive disorder or somatization disorder.
13 If you had already arrived at that conclusion, why did
14 you have to see him a third time?
15   A.   Well, I'm not sure that I had arrived at that
16 conclusion, because at the third visit, I also
17 administered the Rorschach.
18   Q.   What are the areas of agreement that you have
19 your testing -- in your testing, Dr. Bastein's testing
20 and Dr. Sandman's testing?
21   A.   The areas of agreement are his levels of
22 performance in the three areas that I mentioned is
23 below expectations on his IQ.
24   Q.   What are those three areas?
25   A.   Medical processing speed, attention

68

**Page 69**

1  concentration measures and memory.
2  Q. Do you have an opinion as to whether someone
3  with those documented deficiencies can perform an
4  occupation of an investment banker or senior banker?
5  A. Not without treatment.
6  Q. So, in essence, Mr. Jeffries is disabled? I
7  asked you that earlier in this deposition. You said
8  you hadn't been asked the question yet. But I guess
9  your testimony is, without treatment, those conditions
10 do disable him from performing his former occupation?
11 A. I think, without treatment, the combination
12 of whatever physical condition he may have and his
13 conditions, as I diagnosed them, render him temporarily
14 disabled from the performance of his job, yes.
15 Q. Temporarily until when?
16 A. Until he gets treatment and gets better.
17 Q. You referred him to a psychiatrist for
18 treatment?
19 A. No.
20 Q. Or you gave an example of --
21 A. No. I mentioned some physicians that I
22 thought could help him, yes.
23 Q. What was the specialty of those physicians?
24 A. They're psychiatrists.
25 Q. Same profession as Dr. Jim Hawkins?

**Page 70**

1  A. With a little twist, that is correct. The
2  twist is that these are trained analysts.
3  Q. Dr. Hawkins is not a trained analyst?
4  A. The best of my knowledge, he is not.
5  Q. Okay. What does it mean to be a trained
6  analyst?
7  A. To be a trained analyst means that one has
8  completed a postresidency course of training in
9  psychological diagnosis and treatment of usually
10 neurotic and personality disorders which usually
11 involves one's own analysis, a number of -- I don't
12 know how many courses, but there are at least two or
13 three years' worth of course work in psychological
14 dynamics, psychological intervention, which equip a
15 psychiatrist or a psychologist at the doctoral level to
16 provide the best possible psychological care to
17 patients.
18 Q. So it's your opinion that Dr. Jim Hawkins
19 doesn't have the skill level or training or experience
20 required to effectively treat Mr. Jeffries?
21 A. I have no opinion on his level of skill. I
22 don't know him.
23 Q. I thought you worked on some cases with
24 him?
25 A. I have. In fact, now that you remind me of

**Page 71**

1  that, I -- of course, one can only go by his own lights
2  and my own understanding of people and the profession.
3  I think that in some cases Dr. Hawkins has missed the
4  forest for the trees in some of his work. And I
5  would -- and I know these folks over there at the
6  Institute. I think they would be the ones to provide
7  the care.
8  Q. Has Dr. Hawkins' license ever been suspended,
9  as far as you know?
10 A. I have no idea. Not as far as I know.
11 Q. Has Dr. Shear's license to practice ever been
12 suspended, as far as you know?
13 A. As far as I know, not.
14 Q. I have a bunch of more tests that we can
15 rattle through here. 69-E. What is 69-E,
16 Dr. Hartings?
17 A. That's the face sheet of data from our
18 neuropsychological evaluation.
19 Q. When is this form completed?
20 A. 7/8/02.
21 Q. So you generate all this data on that day, or
22 is this a working document?
23 A. Pretty much. I think that -- of course, some
24 of it was generated at a later visit, but the original
25 document would have been -- wait a minute.

**Page 72**

1  Q. That's my question.
2  A. 7/8/02. Yes.
3  Q. This is something you started when
4  Mr. Jeffries first came in, but then --
5  A. Right.
6  Q. -- it's a living document, that its data is
7  generated, you added to the form?
8  A. Right.
9  Q. Including the February 2003 Rorschach?
10 A. Right, correct.
11 Q. I learned one thing in this case. Data?
12 A. Right.
13 Q. Okay. Is there anything on here that you can
14 point to that gives information that suggests that
15 Mr. Jeffries suffers from the diagnosis identified in
16 your March 2003 report?
17 A. That would not be evident from the abstract
18 test scores, no.
19 Q. Okay.
20 A. Well, you know, to someone that knows what
21 they mean -- I mean, if I look at it, I say, hey, look
22 at that discrepancy between the faces on the Warrington
23 and the faces on the Wechsler Memory Scale. That's a
24 big discrepancy. What accounts for that?
25 Q. That's what I would like for you to point out