JAMES R. GARB, M.D. - DISCOVERY
March 24, 2004

```
                                                              Page 1
 1              UNITED STATES DISTRICT COURT
 2                SOUTHERN DISTRICT OF OHIO
 3             WESTERN DIVISION AT CINCINNATI
 4
 5    *********************************
 6    ERIC L. JEFFRIES,                *
 7              Plaintiff              *  Civil Action
 8    vs.                              *  No. C-1-02-351
 9    CENTRE LIFE INSURANCE COMPANY    *
10    et al.,                          *
11              Defendant              *
12    *********************************
13
14     DISCOVERY DEPOSITION OF JAMES R. GARB, M.D.
15                      Taken at
16           CATUOGNO COURT REPORTING SERVICES
17            1414 Main Street, Monarch Place
18              Springfield, Massachusetts
19                   March 24, 2004
20                   1:21 - 1:40 p.m.
21
22
23              Deborah Leonard Lovejoy
24           Registered Professional Reporter
```

JAMES R. GARB, M.D. - DISCOVERY
March 24, 2004

Page 2

1  APPEARANCES:
2
3  Representing the Plaintiff:
4      GRAYDON HEAD & RITCHEY LLP
5      1900 Fifth Third Center
6      511 Walnut Street
7      Cincinnati, Ohio 45201
8      BY: MICHAEL R. ROBERTS, ESQ.
9      (513) 629-2799   FAX (513) 651-3836
10     E-MAIL mroberts@graydon.com
11
12 Representing the Defendants:
13     WOOD & LAMPING LLP
14     600 Vine Street, Suite 2500
15     Cincinnati, Ohio 45202-2491
16     BY: WILLIAM R. ELLIS, ESQ.
17     (513) 852-6067   FAX (513) 852-6087
18     E-MAIL wrellis@woodlamping.com
19
20
21
22
23
24

Page 3

1
2           I N D E X
3
4  DEPONENT: JAMES R. GARB, M.D.
5
6  EXAMINATION BY                    PAGE
7  Mr. Roberts                         4
8
9
10 EXHIBIT                            PAGE
11 Exhibit A, 2/6/00 letter, Garb to Palmer...  7
12     (Exhibit later withdrawn)
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

1      JAMES R. GARB, M.D., Deponent, having first
2  been duly sworn, deposes and states as follows:
3
4
5      EXAMINATION BY MR. ROBERTS:
6      Q.  Good afternoon, Dr. Garb. Mike
7  Roberts. I represent Eric Jeffries in this
8  lawsuit.
9          Your trial deposition will be taken
10 here, within the hour. Have we spoken before?
11     A.  No.
12     Q.  And just twenty minutes ago was
13 handed to me some notes that I understand you
14 prepared back in June or July of 2000 and then
15 another set of notes that you've prepared within
16 the last week; is that right?
17     A.  That's right.
18     Q.  You gave those to Mr. Ellis this
19 morning?
20     A.  That's right.
21     Q.  Had anybody ever prior to today
22 asked you for those notes, to produce those
23 notes?
24     A.  No.

Page 5

1      Q.  Okay. But you produced them to
2  Mr. Ellis this morning.
3      A.  I did.
4      Q.  And he just handed them to me within
5  the half hour.
6      A.  Correct.
7      Q.  And we're an hour away from your
8  trial testimony.
9      A.  Right.
10     Q.  Could you please state your name and
11 address for the record, please, sir.
12     A.  James Robert Garb. 77 Winterberry
13 Lane, B-E-R-R-Y, Florence, Massachusetts 01062
14     Q.  And what's your present occupation,
15 sir?
16     A.  I'm director of Occupational Health
17 and Safety at Baystate Health System.
18     Q.  Is that located here in Springfield,
19 Massachusetts?
20     A.  Yes, it is.
21     Q.  Is Disability Management Services
22 located here in Springfield, also?
23     A.  Well, they have an office here.
24 They have several offices, I believe.

JAMES R. GARB, M.D. - DISCOVERY
March 24, 2004

Page 6

1  Q. Okay. How long have you served as
2  the director of occupational health at that
3  hospital?
4  A. Since 1988.
5  Q. And prior to that?
6  A. Prior to that I worked in
7  occupational health there for three years. And
8  prior to that I was in private practice of
9  internal medicine for nine years.
10 Q. Are you board-certified in internal
11 medicine, then?
12 A. Yes, I am.
13 Q. Any other disciplines?
14 A. Occupational medicine.
15 Q. Anything else?
16 A. No.
17 Q. Your deposition was going to be
18 taken today for trial purposes because you've
19 done some work with DMS relating to Eric
20 Jeffries. You're mindful of that?
21 A. Yes.
22 Q. Have you performed other work for
23 DMS at any point in time?
24 A. Yes, I have.

Page 7

1  Q. Okay. On how many occasions?
2  A. I don't have an exact count.
3  Approximately fifteen.
4  Q. And those have all been since 2000?
5  A. No. They started, I think, in --
6  around 1997.
7
8      (Exhibit A, 2/6/00 letter, Garb to
9      Palmer, marked)
10
11 Q. (By Mr. Roberts) I'm going to hand
12 you Exhibit A for this deposition, sir, which is
13 a February 6th, 2000 letter which was provided to
14 me by the defendant in the lawsuit. This appears
15 to be a letter on your letterhead, at a former
16 address, to Lucinda Palmer at Disability
17 Management Services. And you conclude by saying,
18 "I look forward to being of service to your
19 company." Is it your testimony that your work
20 for DMS started prior to February of 2000?
21 A. Yes, it did.
22 Q. Do you know what prompted this
23 particular letter to Ms. Palmer?
24 A. Yes. I believe that every so

Page 8

1  often -- I'm not sure if it's every year. Every
2  couple of years they ask you to recertify your
3  credentials if you're doing consulting work for
4  DMS, and I think that's what prompted this
5  letter.
6  Q. Is Ms. Palmer someone that you had
7  worked with prior to February 2000?
8  A. Yes.
9  Q. Is it the general course that you
10 would get a case referred to you by a nurse at
11 DMS, such as Ms. Palmer?
12 A. That's how it typically works,
13 correct.
14 Q. Okay. Has there ever been a
15 situation other than that?
16 A. No. It's always been from one of
17 the case managers.
18 Q. Who can you recall receiving a
19 referral from other than Ms. Palmer?
20 A. One is a Lee Tonet.
21 Q. Can you spell that?
22 A. L-E-E, and last name is T-O-N-E-T.
23 And there have been some others, but I can't
24 recall their names.

Page 9

1  Q. Okay. I believe that in 2000 you
2  sent an invoice to DMS for about 3,000 or 3,500.
3  Is that the standard fee for your services?
4  A. Well, I charge an hourly rate. So
5  the more complicated, the more lengthy the case,
6  the higher the amount. There's no flat rate, or
7  anything.
8  Q. Have you testified at trial in any
9  case involving Disability Management Services?
10 A. No, I have not.
11 Q. Have you ever testified at trial?
12 A. Once, in a malpractice case, as a
13 fact witness.
14 Q. Better than as a defendant.
15     Do you know a gentleman by the name
16 of Dr. Charles Poser?
17 A. I do not.
18 Q. Do you know a Dr. Mark Geyer?
19 A. I do not.
20 Q. Dr. Byron Hyde?
21 A. No.
22 Q. Dr. Burton Waisbren?
23 A. Know these people personally? Or
24 know their, you know --

JAMES R. GARB, M.D. - DISCOVERY
March 24, 2004

Page 10

1  Q. Do you know of their work,
2  reputation?
3  A. I've read some articles by
4  Dr. Waisbren.
5  Q. How about the other gentlemen I
6  mentioned?
7  A. No.
8  Q. You don't know of Dr. Geyer's work
9  with regard to the hepatitis vaccine?
10 A. I read one -- like a two-page
11 article by Geyer, and that's all.
12 Q. When was that?
13 A. When was it?
14 Q. Mm-hmm.
15 A. I don't recall.
16 Q. Was it within the past year?
17 A. I think -- I think it was within the
18 past year.
19 Q. Okay. Do you recall who contacted
20 you regarding Mr. Jeffries?
21 A. To initially ask me --
22 Q. Initially.
23 A. -- to review the case?
24 Q. Yes, sir.

Page 11

1  A. It was Cindy Palmer.
2  Q. Okay. Who have you had
3  conversations with concerning Mr. Jeffries?
4      I know it's Cindy Palmer.
5  A. Right.
6  Q. We're having one.
7  A. Right.
8  Q. I know you've spoken to Bill Ellis.
9  A. Yes.
10 Q. I understand you spoke to a
11 gentleman named Dr. Donald Craven.
12 A. Yes.
13 Q. Is there anyone else that you've
14 spoken to regarding Mr. Jeffries?
15 A. I spoke with someone in their Boston
16 office.
17 Q. A gentleman --
18 A. No.
19 Q. -- or a lady?
20 A. A woman. An attorney, and I'm
21 blocking her name.
22 Q. Carrie Barnes.
23 A. Carrie Barnes.
24 Q. When was that?

Page 12

1  A. Just within the past week or so,
2  when she asked me to be prepared for this.
3  Q. Okay. On how many occasions have
4  you spoken to her?
5  A. On how many occasions?
6  Q. Yes, sir.
7  A. I think three in the past week, just
8  to set the date for this, and the time and what
9  have you.
10 Q. Did you speak substantively --
11 A. No.
12 Q. -- with her at all?
13     Prior to March 1st of 2004, going in
14 reverse chronological order, what was your last
15 communication with anyone regarding Mr. Jeffries?
16 A. The last would have been when I
17 submitted this report in July of 2000.
18 Q. Was there any follow-up, other than
19 paying your invoice, with you about Mr. Jeffries'
20 report?
21 A. Not that I recall.
22 Q. And tell me about the sequence of
23 events this month that you can recall, being
24 reengaged on Mr. Jeffries' case.

Page 13

1  A. I got a call from Cindy Palmer,
2  saying that I would be hearing from Carrie Barnes
3  about a deposition. And then Carrie Barnes
4  called me. We talked about some potential dates.
5  She called back. We talked more about some
6  potential dates. I called her back with a
7  question. And then that was it, till today.
8  Q. On how many occasions have you
9  spoken to Mr. Ellis or anyone from his Cincinnati
10 office?
11 A. I met him for the first time this
12 morning, have not spoken to anyone from his
13 office.
14 Q. Did you speak to him prior to today?
15 A. No.
16 Q. Did you ask Lucinda Palmer, when she
17 called you, why it was that your deposition was
18 being sought?
19 A. I don't think I asked her. I
20 mean --
21 Q. Were you curious, after four years?
22 A. Well, I mean, I understood that
23 because I had done a report that people might be
24 interested in that, but I didn't ask her. You

4 (Pages 10 to 13)

JAMES R. GARB, M.D. - DISCOVERY
March 24, 2004

Page 14

1  know, we don't usually discuss issues regarding
2  these cases after I submit my report.
3      Q.  I notice you have no notes -- that
4  have been produced to me, anyway, as of now;
5  maybe there will be some later. But you have no
6  notes regarding any of your communications with
7  Ms. Palmer. Is there a reason for that?
8      A.  It's not part of my practice to keep
9  notes like that.
10     Q.  Okay. You billed DMS for a case
11 conference with them, a phone conference. Or was
12 it in person?
13     A.  I don't understand.
14     Q.  Other than submitting a written
15 report to DMS --
16     A.  Mm-hmm.
17     Q.  -- did you give them a verbal --
18     A.  In this --
19     Q.  -- report?
20     A.  -- particular case?
21     Q.  Yes, sir. Mm-hmm.
22     A.  I don't recall that I did.
23     Q.  There also wasn't produced a
24 retention letter. There's no letter to you

Page 15

1  saying, "We want you to do this work, and here's
2  what we want you to do." Is that unusual?
3      A.  I think it's probable that I sent
4  that back with the case. You know, they send me
5  a large volume of material with the letter, and
6  usually at the end I send it back.
7      Q.  That hasn't been produced to me, and
8  I'm sure you can't explain why. But it's
9  generally the practice that you would get some
10 kind of retention letter --
11     A.  Yes --
12     Q.  -- setting forth what --
13     A.  -- it is.
14     Q.  -- the company is asking you to do.
15         And in your report there's six or
16 seven specific questions that you laundry-list
17 and then you comment on. You would have had to
18 have gotten those questions from some written
19 document --
20     A.  That's correct.
21     Q.  -- that was provided to you. You
22 didn't just listen over the phone and write those
23 questions down.
24     A.  No. They're given to me in writing.

Page 16

1      Q.  You don't have a copy of that with
2  you today, do you?
3      A.  I don't --
4      Q.  If you want to take some time to go
5  through that pile, go ahead and do so. We can go
6  off the record.
7      A.  You know, if it's not at the very --
8  oh, no, that's my report. If it's not at the
9  very front, then I don't believe it's in here.
10         MR. ROBERTS: Why don't we go off
11     the record for a second.
12
13         (Pause in proceedings)
14
15     Q.  (By Mr. Roberts) Doctor, you've
16 brought with you today a stack of documents which
17 is three or four inches thick there. Is that,
18 primarily, medical records that you were provided
19 to review?
20     A.  That's correct.
21     Q.  And then there's your report?
22     A.  Correct.
23     Q.  Articles that you researched and
24 printed and thought were material to your

Page 17

1  commentary?
2      A.  Right.
3      Q.  Is it your understanding that there
4  is or isn't a retention letter in those
5  documents?
6      A.  I'm sure that there was a letter. I
7  don't know if it's in -- I don't remember seeing
8  it recently, this week, in those documents.
9      Q.  Why is it the practice that you send
10 those letters back to DMS when you submit your
11 report? Are you told to do that?
12     A.  Well, they generally want the
13 records back that they send me.
14     Q.  Okay.
15     A.  And I consider that part of what
16 they send me, so I send the whole thing back.
17         MR. ELLIS: For the record, the
18     stack of documents here, the medical
19     records, were recently reproduced for
20     review. They're not the ones that he -- he
21     hasn't had them since 2000.
22         MR. ROBERTS: As long as we're
23     making narrative comments on the record,
24     the retention letter has never been

JAMES R. GARB, M.D. - DISCOVERY
March 24, 2004

Page 18

1  produced to me. It's not in the claims
2  file. It's never been produced. It's
3  curious.
4     Back to you, Doctor.
5  Q. (By Mr. Roberts) So when you first
6  received the phone call from Ms. Palmer, is it
7  general practice that she describes for you a
8  little bit about the case?
9  A. Back in 2000, when she was first
10 giving me the case? Or --
11 Q. General practice. When you get
12 cases from her, is it the general practice that
13 she'll describe for you some of the --
14 A. Very briefly, yeah.
15 Q. Is it her practice to describe for
16 you what her assessments are from her prior
17 review?
18 A. No. She wants me to form my
19 independent judgment, so she tries hard not to
20 bias me in any way.
21 Q. Do you know, one way or the other,
22 whether that happened here or not?
23 A. I can't recall, specifically, the
24 conversation, but that's always been the way we

Page 19

1  operate.
2  Q. And you have no notes of those phone
3  calls.
4  A. No.
5  Q. Are you doing any ongoing cases for
6  DMS now, this year?
7  A. There was one at the very end of
8  2003, and nothing since then.
9  Q. Is it your expectation that you'll
10 get some more work from DMS?
11 A. I generally do two or three,
12 maybe -- you know, four cases a year, something
13 like that. So periodically I get cases.
14 Q. DMS isn't the only insurance company
15 that you perform this service for, is it?
16 A. It is at the moment. I've done it
17 for other companies.
18 Q. Why is DMS the sole company you do
19 that for now?
20 A. Well, another company I did it for
21 wanted me to be on site during the day, which is
22 hard for me. This way, they send me the files
23 and I can do it on the weekend or in the evening,
24 so. I mean, I don't look for this as a major

Page 20

1  part of my work, really. I'm pretty busy with my
2  full-time job.
3  Q. Makes sense.
4     Have you ever spoken to Jeff
5  Champagne?
6  A. I don't recall speaking to Jeff
7  Champagne.
8  Q. How about John Midghall?
9  A. No, I don't recall that.
10 Q. Have you spoken to Andrew Cohen?
11 A. No, I don't think so.
12 Q. What did you discuss with Mr. Ellis
13 this morning?
14 A. We discussed, generally, what these
15 proceedings would involve, how I operate, and my
16 consulting work. That was, essentially, what we
17 discussed.
18 Q. Did he ask you for any opinions?
19 Did he ask you for any opinions about
20 Mr. Jeffries' case?
21 A. He -- I'm trying to recall. I think
22 he did ask me if I thought that his symptoms were
23 related to the hepatitis B vaccine.
24 Q. Have you reviewed any of

Page 21

1  Mr. Jeffries' medical records that have been
2  created since July of 2000?
3  A. No. I haven't seen anything since I
4  reviewed these in July of 2000.
5  Q. Reviewed any medical opinions of
6  experts that have been created since July of
7  2000?
8  A. No.
9  Q. Reviewed any neuropsychological
10 testing on Mr. Jeffries at any time?
11 A. No.
12    MR. ROBERTS: Okay. I'm done.
13 Thanks.
14    THE WITNESS: Okay.
15
16    (Pause in proceedings)
17
18    MR. ROBERTS: I'm going to pull back
19 that Exhibit A.
20    THE WITNESS: Okay.
21    MR. ROBERTS: That was really for my
22 contemporaneous purposes.
23    So the deposition -- the discovery
24 deposition will be the transcript, without

JAMES R. GARB, M.D. - DISCOVERY
March 24, 2004

Page 22

1  any exhibits.
2  (Deposition concluded at 1:40 p.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 23

1  I, DEBORAH LEONARD LOVEJOY, Registered
2  Professional Reporter, a Notary Public in and for
3  the Commonwealth of Massachusetts, do hereby
4  certify that JAMES R. GARB, M.D., came before me
5  on the 24th day of March, 2004, at Springfield,
6  Massachusetts, and was by me duly sworn to
7  testify to the truth, and nothing but the truth,
8  as to his knowledge touching and concerning the
9  matters in controversy in this cause; that he was
10 thereupon examined upon his oath and said
11 examination reduced to writing by me; and that
12 the statement is a true record of the testimony
13 given by the witness, to the best of my knowledge
14 and ability.
15     I further certify that I am not a relative
16 or employee of counsel/attorney for any of the
17 parties, nor a relative or employee of such
18 parties, nor am I financially interested in the
19 outcome of the action.
20     WITNESS MY HAND this 31st day of March,
21 2004.
22
23 Deborah Leonard Lovejoy, RPR, Notary Public
24 My Commission expires May 24, 2007

Page 24

1  Today's date:   March 31, 2004
2  To:        William R. Ellis, Esq.
3  Copied to:   Michael A. Roberts, Esq.
4  From:       Deborah Leonard Lovejoy, RPR
5  Deposition of: James R. Garb, M.D.
6  Taken:      March 24, 2004
7  Action:  ERIC L. JEFFRIES
8     vs. CENTRE LIFE INSURANCE COMPANY et al.
9
10     Enclosed is a copy of the discovery
11 deposition of Dr. Garb. Pursuant to the Rules
12 of Civil Procedure, Dr. Garb has thirty days to
13 sign the transcript from today's date.
14     Please have Dr. Garb sign the enclosed
15 signature page. If there are any errors, please
16 have him mark the page, line, and error on the
17 enclosed correction sheet. He should not mark
18 the transcript itself. This addendum should be
19 forwarded to all interested parties.
20     Thank you for your cooperation in this
21 matter.
22
23
24

Page 25

1        UNITED STATES DISTRICT COURT
2        SOUTHERN DISTRICT OF OHIO
3        WESTERN DIVISION AT CINCINNATI
4
5  *******************************
6  ERIC L. JEFFRIES,           *
7        Plaintiff     * Civil Action
8  vs.                 * No. C-1-02-351
9  CENTRE LIFE INSURANCE COMPANY *
10 et al.,             *
11       Defendant     *
12 *******************************
13    I, JAMES R. GARB, M.D., do hereby certify
14 under the pains and penalties of perjury, that
15 the foregoing testimony, taken on March 24, 2004
16 in a discovery deposition, is true and accurate,
17 as transcribed or with the changes noted on the
18 attached corrections sheet, to the best of my
19 knowledge and belief.
20    WITNESS MY HAND, this   day of       ,
21 2004.
22
23 _____
24 DRL           JAMES R. GARB, M.D.

7 (Pages 22 to 25)

1   I, DEBORAH LEONARD LOVEJOY, Registered
2   Professional Reporter, a Notary Public in and for
3   the Commonwealth of Massachusetts, do hereby
4   certify that JAMES R. GARB, M.D., came before me
5   on the 24th day of March, 2004, at Springfield,
6   Massachusetts, and was by me duly sworn to
7   testify to the truth, and nothing but the truth,
8   as to his knowledge touching and concerning the
9   matters in controversy in this cause; that he was
10  thereupon examined upon his oath and said
11  examination reduced to writing by me; and that
12  the statement is a true record of the testimony
13  given by the witness, to the best of my knowledge
14  and ability.
15      I further certify that I am not a relative
16  or employee of counsel/attorney for any of the
17  parties, nor a relative or employee of such
18  parties, nor am I financially interested in the
19  outcome of the action.
20      WITNESS MY HAND this 31st day of March,
21  2004.
22  *[signature: Deborah Leonard Lovejoy]*
23  Deborah Leonard Lovejoy, RPR, Notary Public
24  My Commission expires May 24, 2007