*HARTINGS*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

*67*

- - -

```
ERIC L. JEFFRIES,            . CIVIL ACTION NO. C-1-02-351
                             .
        Plaintiff,           . Cincinnati, Ohio
                             .
        - v -                . Thursday, February 19, 2004
                             . 3:22 p.m.  Hearing
CENTRE LIFE INSURANCE CO., .
et al.,                      .
                             . Testimony of Michael F.
        Defendants.          . Hartings and Newton
..........................  . Bullard, M.D.
```

TRANSCRIPT OF EXCERPTS OF PROCEEDINGS
BEFORE THE HONORABLE SANDRA S. BECKWITH, JUDGE
TRANSCRIPT ORDERED BY: Michael A. Roberts, Esq.

APPEARANCES:

For the Plaintiff:    GRAYDON, HEAD & RITCHEY, LLP
                      BY: Michael A. Roberts, Esq.
                      511 Walnut Street
                      Cincinnati, Ohio   45202

For the Defendants:   WOOD & LAMPING, LLP
                      BY: William R. Ellis, Esq.
                      and Amy G. Callow, Esq.
                      600 Vine Street, Suite 2500
                      Cincinnati, Ohio   45202

Law Clerk:            Patrick J. Smith, Esq.

Courtroom Clerk:      Mary C. Brown

Court Reporter:       Mary Ann Ranz

- - -

2

INDEX

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MICHAEL F. HARTINGS, Ph.D. | 3 | 14 | 51 | 56 |
|  |  |  | (further) 57 |  |
| NEWTON BULLARD, M.D. | 57 | 62 | 88 | -- |

1      THURSDAY, FEBRUARY 19, 2004
2          MID-AFTERNOON SESSION
3        P R O C E E D I N G S        (3:22 p.m.)
4        THE CLERK: Please be seated.
5        THE COURT: Mr. Ellis.
6    MR. ELLIS: Your Honor, Dr. Michael Hartings is a
7  witness proffered by the Defense, has been the subject of a
8  Daubert challenge by Mr. Roberts. I would like to call him
9  to the stand.
10        THE COURT: Okay.
11        THE CLERK: Please raise your right hand.
12        (Duly sworn by the Clerk.)
13        THE CLERK: Please be seated.
14              MICHAEL F. HARTINGS, Ph.D.
15  a witness herein, having previously been sworn, testified as
16    follows:
17              DIRECT EXAMINATION
18    BY MR. ELLIS:
19    Q. Dr. Hartings, would you be good enough to identify
20      yourself to the Court, please?
21    A. My name is Michael F. Hartings; H A R T I N G S.
22    Q. By whom are you employed, Dr. Hartings?
23    A. Riverhills Healthcare.
24    Q. In and in what capacity, sir?
25    A. As a psychologist.

                HARTINGS  -  DIRECT
1   Q. Tell the Court, please, where you received your training
2      for undergraduate in psychology?
3   A. I received a bachelor's degree from Xavier University
4      here in town in 1964; master's degree in psychology from
5      Northwestern in 1967, and a doctoral degree in psychology
6      from Northwestern, that's in Evanston, Illinois, in 1968.
7   Q. Since your degrees, have you been in the practice f
8      psychology?
9   A. Yes.
10  Q. Do you have a board certification or its equivalent in
11     any subspecialty of psychology?
12  A. Yes.
13  Q. What are those?
14  A. I have two board certifications: One in clinical
15     psychology and one in forensic psychology.
16  Q. Would you be good enough to tell the Court what clinical

```
13              MR. ELLIS:  The difference, Your Honor, is counsel
14   argues whether a doctor made a diagnosis or didn't make a
15   diagnosis.  Diagnosis doesn't mean anything.  The diagnosis
16   is that doctor's opinion of what the situation is at the
17   time.  It's not binding.  If the symptoms are accounted for
18   in the review of the medical records or if there are multiple
19   diagnosis as in this case, depending on which doctor you see,
20   you get a different view from everybody as to what this
21   particular patient has.
22         The fact that there's a diagnosis, counsel seems to think
23   is definitive, that's the end of it.  Diagnosis has changed
24   in this patient with everybody he saw.  It's not definitive,
25   nor is it the defining feature.  The question is did Dr.
```

                            HARTINGS  -  CROSS

50
```
 1   Hartings have a basis in the science of psychology to render
 2   the opinions he did, and that's the only issue in Daubert.
 3              MR. ROBERTS:  And under undifferentiated somatoform
 4   disorder there has to be an absence of a diagnosis.
 5              MR. ELLIS:  Okay, that --
 6              THE COURT:  I understand. I understand.  The
 7   objection, however, is overruled.  Go ahead, Mr. Roberts.
 8              MR. ROBERTS:  I can't recall what the question, Your
 9   Honor.  Mary Ann, would you try to read it back?
10         (Court reporter read back the following question:  "Did
11   Dr. McClellan make an error, in your professional judgment,
12   about the diagnosis?")
13   A.   I have no way of knowing.
14   Q.   You have no way of knowing because you don't know what
15   the sequelae are to a cognitive disability or other symptoms
16   from an autoimmune reaction to Hepatitis B vaccine; right?
17   A.   I believe I answered that.
18   Q.   You don't know; do you?
19   A.   Yeah, I do know.
20   Q.   Now you do know the sequelae?
21   A.   Didn't I answer it in the affirmative in the past?  I
22   said I don't know the medical sequelae.
23   Q.   Correct.  In fact, some of the cognitive dysfunction in
24   Mr. Jeffries you assign to this obsessive-compulsive-like
25   disorder that isn't contained in the DSM; right?
```

                          HARTINGS  -  REDIRECT

51
```
 1   A.   I believe Mr. Jeffries -- yes.
 2   Q.   Thank you.
 3   A.   That's right.  Mr. Jeffries' cognitive style reflects an
 4   obsessionalism which interferes with his thinking.
 5   Q.   So, while you don't know what amount of the cognitive
 6   disorder should be assigned to the autoimmune reaction, you
 7   just don't know, you do contend that some of the cognitive
 8   disorder I think you -- that Mr. Jeffries exhibits is
 9   attributed not to somatomization but to obsessive-compulsive,
10   which isn't even a diagnosis you make?
11   A.   Again, to restate what I said, I believe that Mr.
12   Jeffries' cognitive dysfunction is in part and significantly
13   influenced by an obsessional style of thinking and an
```

```
14   obsessional approach to life.
15   Q.  Very well.  When did Mr. Jeffries get his
16   undifferentiated somatoform disorder?
17   A.  I believe it occurred as a traumatic response to the
18   effects of his immunizations.
19   Q.  Undifferentiated somatoform disorder results are
20   associated with a physical illness; right?
21   A.  Yes.  Can be.
22           MR. ROBERTS:  Thank you.
23                    REDIRECT EXAMINATION
24   BY MR. ELLIS:
25   Q.  Dr. Hartings, are there different ways in psychology to
```

HARTINGS - REDIRECT

52

```
 1   express what it is, what symptom or sign is actually
 2   disabling a person?
 3   A.  Excuse me?
 4   Q.  Yes.  Are there different ways for different
 5   psychologists to assign or define a psychological ailment
 6   that's causing a disability such as these cognitive deficits
 7   in Mr. Jeffries?
 8   A.  There are different ways of describing disabilities, yes.
 9   Q.  If you look only at the cognitive deficit, would you
10   define it under the DSM-IV as cognitive -- cognitive disorder
11   not otherwise specified?
12   A.  Yes.
13   Q.  Now, if someone suffers from cognitive disorder not
14   otherwise specified, regardless of its cause, if that's the
15   disabling feature, that is a DSM-IV diagnosis?
16   A.  It is.
17   Q.  That's the one made by Dr. Hawkins; is that correct?
18   A.  Yes, I think I made it as well.
19   Q.  As part of your diagnosis?
20   A.  Cognitive disorder with undetermined etiology, right.
21   Q.  Now, a cognitive disorder that's caused or is part of a
22   physical ailment is an actual loss of brain cell or brain
23   function because of physical trauma, toxicity, or some such
24   thing; correct?
25   A.  Right.  It is what we call neurogenic.
```

HARTINGS - REDIRECT

53

```
 1   Q.  Correct.  If you don't have neurogenic cognitive
 2   disorder, it is then psychogenic; correct?
 3   A.  Right.
 4   Q.  Is there any evidence that you have seen in the records
 5   that were provided to you of all these doctors of Mr.
 6   Jeffries that said there was a neurogenic -- objective
 7   finding of a neurogenic deficit in his brain?
 8   A.  No.
 9   Q.  Which leaves with a psychogenic cognitive deficit?
10   A.  Yes.
11   Q.  Whether it's -- well, we already know that you classify
12   it, as did Dr. Hawkins, as a cognitive deficit not otherwise
13   specified.
14       Let's talk about somatoform.  At the time that you
```

```
15   diagnosed him -- and when you say that you brought the DSM-IV
16   to me, somatomization disorder, severe, and undifferentiated
17   somatoform disorder shared exactly the same number, 300.81;
18   correct?
19   A.   That is correct.
20         MR. ROBERTS:  Objection: Leading.
21   Q.   Subsequent to that time, did they change the .81 to .82
22   for part of that diagnosis?
23   A.   I believe that the American Psychiatric Association
24   issued a revised text which separated them.
25   Q.   Okay.  At the time and based upon the DSM-IV volume you
                    HARTINGS  -  REDIRECT
```

54

```
1    were using, they bore exactly the same diagnostic numbers;
2    correct?
3          MR. ROBERTS:  Objection:  Leading.
4          THE COURT:  Sustained.
5    A.   Yes, they did.
6    Q.   Dr. Hartings, counsel has badgered you about whether or
7    not you could accept or not accept a diagnoses of the
8    treating physicians.
9        Did you or did you not, between the second and third
10   visit with Mr. Jeffries, review a huge stack of medical
11   records?
12   A.   I did.
13   Q.   Was there any consistency in the diagnoses that were
14   rendered among all these doctors?
15   A.   Not that I could detect.
16   Q.   Were there any objective findings made by the doctors to
17   support a diagnosis?
18   A.   All -- all of the doctors that I recall reviewing had no
19   medical -- no positive medical tests that would support a
20   diagnosis.
21   Q.   When Dr. Hawkins was asked about chronic fatigue
22   syndrome, he was asked are you aware of whether or not
23   research has ever settled whether chronic fatigue syndrome
24   was psychogenic or physical, he answered, "I think the answer
25   to that question is yes" --

                    HARTINGS  -  REDIRECT
```

55

```
1          MR. ROBERTS:  Objection.
2    Q.   "...I'm aware that nobody knows."
3        "Are you aware whether there's any definition of chronic
4    fatigue or psychogenic or physical" --
5          MR. ROBERTS:  Whose deposition did we just read
6    from?
7          MR. ELLIS:  Dr. Hawkins.  Your psychiatrist.  Pages
8    30 --
9          MR. ROBERTS:  In what context and what does it have
10   to do with this witness and Daubert?
11         MR. ELLIS:  Pages 30 and 31.  We're talking about
12   whether -- even if there is chronic fatigue, if someone says
13   he has chronic fatigue, the question is, is it physical or
14   psychological and nobody knows, including his psychiatrist.
15   I'm asking if maybe Dr. Hartings knows.
16         MR. ROBERTS:  This witness testified it's in the
```

```
17   field of immunology.  It doesn't have to do with his Daubert
18   challenge and whether or not he ever gets to undifferentiated
19   somatoform disorder when he doesn't have the discretion to
20   ignore doctors' opinions.
21           THE COURT:  Well, I'll sustain the objection.  I
22   think it's outside the scope of cross in any event.
23   Q.  Doctor, did you, in evaluating this patient and coming to
24   your conclusions that it's somatomization disorder, or
25   somatoform disorder, whatever the current term is, ignore the
```

                         HARTINGS   -   RECROSS

**54**
```
 1   medical records or medical diagnosis of any of these
 2   physicians?
 3   A.  Absolutely not.  I pored over them with a fine-tooth
 4   comb.
 5           MR. ELLIS:  That's all I have.  Thank you.
 6           THE COURT:  Recross?
 7                    RECROSS EXAMINATION
 8   BY MR. ROBERTS:
 9   Q.  You didn't pore over Dr. Poser's opinion with a
10   fine-tooth comb.  You didn't even look at it.
11   A.  Well, I would have to go see if his record is in my file.
12   Q.  You don't refer to it in your report.  You told me in
13   your deposition that you don't recall ever seeing it.
14   A.  No, I said -- I didn't refer to any of the doctors that I
15   reviewed in my -- Let's put it this way:  I did not list all
16   of the records that I reviewed in my report.
17       As I sit here today, I recognize the name Dr. Posner.  I
18   do not know if I reviewed his record in connection with this.
19   But every record that was provided to me I reviewed with a
20   fine-tooth comb.
21   Q.  Okay.  Let's be clear though.  You testified in your
22   deposition you didn't remember looking at Dr. Poser and you
23   don't mention Dr. Poser in your report.
24   A.  Right.
25   Q.  And you couldn't have reviewed Dr. McClellan's d
```
deposition

                         BULLARD   -   DIRECT

**57**
```
 1   testimony because that occurred after your report; right?
 2   A.  From what you say I did, yes.
 3           MR. ROBERTS:  Thank you.
 4                FURTHER REDIRECT EXAMINATION
 5   BY MR. ELLIS:
 6   Q.  Did you mention by name any of the other 84 doctors --
 7           MR. ROBERTS:  Re-re?
 8   Q.   -- you reviewed?
 9           THE COURT:  Sustained.  Thank you, Doctor.  You can
10   step down.  You're excused.
11       (Witness excused.)
12           MR. ELLIS:  Your Honor, we'll call Dr. Bullard, if
13   the Court wishes to continue at this time.
14           THE COURT:  Fine.
15           THE CLERK:  Please raise your right hand.
16       (Witness duly sworn in by the Clerk.)
17           THE CLERK:  Please be seated.
```