UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ERIC L. JEFFRIES,                        :
                                         :    Case No. C-1-02-351
            Plaintiff,                   :
                                         :    (Judge Beckwith)
vs.                                      :    (Magistrate Judge Hogan)
                                         :
CENTRE LIFE INSURANCE COMPANY,           :    **DEFENDANT'S TRIAL BRIEF**
et al.,                                  :
                                         :
            Defendants.                  :
                                         :

## I.     Nature Of The Action And Jurisdiction.

This is an action for individual disability benefits under a contract of disability insurance.
Plaintiff Eric Jeffries has also made a claim for bad faith. Defendant Centre Life Insurance
Company has a counterclaim and seeks return of overpaid benefits.

The jurisdiction of this Court is invoked under Title 28, United States Code, Section
1332(a)(1). This is an action in diversity. The jurisdiction of the Court is not disputed.

## II.    Summary Of Facts, Claims and Defenses.

Plaintiff Eric Jeffries owns a policy of individual disability insurance that was issued by
Centre Life Insurance Company (when the company was known as Massachusetts Casualty
Insurance Company) on April 1, 1996. The policy was initially issued in the amount of
$5,000.00 per month and contained a limitation on benefits payable to 60 months. Mr. Jeffries
has twice increased his coverage, once after the event which he claims caused his disability. As
currently written, Mr. Jeffries' policy provides him disability benefits in the amount of
$12,133.00 per month.

Disability Management Services, Inc. ("DMS") is a third-party administrator responsible for administering claims made under Mr. Jeffries' Centre Life policy. Mr. Jeffries had initially charged DMS as a Defendant in this case, but DMS was dismissed by Court Ordered dated September 18, 2003.

On February 28, 1999 Mr. Jeffries submitted a claim under his policy and alleged that he was totally disabled. This notice of claim was received by DMS on March 8, 1999. At the time of the February 1999 claim, Mr. Jeffries' exact disability and cause of disability were ill defined. When asked to describe the nature of his illness, he reported on his initial notice of claim form: "Adverse reaction to Hep. B vaccination - severe joint and muscle pain - abdominal problems - headache and eye problems." On that same form, Dr. Michael Luggen completed Mr. Jeffries' March 1999 Attending Physician Statement and listed the diagnosis as "undifferentiated connective tissue disease." Dr. Luggen reported that he expected Mr. Jeffries to return to work in 3-6 months.

Although not identified by Dr. Luggen at the time, Mr. Jeffries alleged that he suffered from an adverse reaction to a Hepatitis A and Hepatitis B vaccination he had received in July 1997. During an initial phone conference with DMS, Mr. Jeffries referenced an episode of the 20/20 newsmagazine television show he saw about adverse Hepatitis B vaccination reactions. He also encouraged DMS to contact the National Vaccine Information Center for information about Hepatitis B autoimmune reactions. Notably, Mr. Jeffries assigned a cause for his disability before any actual diagnosis of disability had been confirmed. Mr. Jeffries claims that as of September 1998, he was unable to continue in his occupation as a corporate banker and senior officer of Provident Bank. There are no medical records offered by Mr. Jeffries in this case which medically support his decision to stop working at the time he quit.

Mr. Jeffries received a Hepatitis B vaccination on June 18, 1997. At the time, Dr. Nunlist-Young was his primary physician. On the day of the injection, Mr. Jeffries had no fever but stated he had been exposed to someone with scarlet fever so Dr. Nunlist-Young did a rapid strep screen which was negative. Strep is the germ responsible for scarlet fever and Dr. Nunlist-Young wanted to be sure Mr. Jeffries did not have it. He also prescribed an antibiotic to cover any bacteria. Two days later, Mr. Jeffries returned for his Hepatitis B shot and no symptoms were documented.

Approximately five to nine days after receiving the injection, Mr. Jeffries reported to Dr. Nunlist-Young that he had suffered an adverse reaction. Mr. Jeffries described his symptoms as night sweats, headaches, joint aches, fever, abdominal pain and arthralgias. Between June 24, 1997 and July 7, 1997, Mr. Jeffries complained to Dr. Nunlist-Young on several occasions that he was not feeling any better and that he was having strange pains. On July 2, 1997 Mr. Jeffries reported that his weird pains were getting worse and that his three year old was also complaining of joint pain.

Dr. Nunlist-Young saw Mr. Jeffries again on July 7, 1997 and he continued to complain of joint pain, headache and abdominal pain. On July 8, 1997 Mr. Jeffries saw a new doctor, Dr. Corwin Dunn and complained of a sore throat, pains in his abdomen, sore muscles and joint pain.

One day after his visit with Dr. Dunn, Mr. Jeffries called Dr. Nunlist-Young, on July 9, 1997, and reported that he was feeling fine. Mr. Jeffries explained to Dr. Nunlist-Young that he was changing insurance companies and would like his recent episodes explained as an allergic reaction. Mr. Jeffries continued to report problems to Dr. Dunn for an additional two weeks, however.

Mr. Jeffries continued to work until September of 1998.  In June of 1998, almost a year after receiving the injection, Mr. Jeffries returned to Dr. Dunn and once again complained of muscle pain and aches, malaise and headache with pain behind his eyes.  Between the time of his Hepatitis B inoculation in June of 1997 and his cessation of work in September 1998, Mr. Jeffries increased his disability insurance coverage.

Mr. Jeffries claims that as of September 25, 1998, he was unable to continue in his occupation as a corporate banker and senior officer of Provident Bank.  After expiration of the elimination period designated in his policy, DMS, on behalf of Centre Life, began issuing payments to Mr. Jeffries for the period beginning on December 25, 1998.  Although payment was made, Centre Life continued to evaluate Mr. Jeffries' claim and attempted to define both the cause and the effects of Mr. Jeffries' alleged disability.  During the investigation period, Mr. Jeffries, on his own initiative, consulted with and was evaluated by numerous doctors across the United States and in several other countries.  Mr. Jeffries submitted some but not all of the results of his many consultations and evaluations to Centre Life.   In these post-vaccination consultations, Mr. Jeffries ascribed the onset of his symptoms to his Hepatitis B vaccination.  As the medical evidence in this case, establishes, many of Mr. Jeffries' symptoms pre-date his vaccination.

Centre Life continued to pay Mr. Jeffries benefits until February 2002 when his payments were suspended.  The Centre Life policy issued to Mr. Jeffries contains a clause entitled "Physical Examinations" which states that:

> We, at our own expense, have the right to have you examined by an examiner of our choice as often as is reasonable while a claim is pending.

Mr. Jeffries refused to attend a neuropsychological examination scheduled by DMS. It was this refusal to comply with this request, which resulted in the suspension of his benefits and ultimately, the filing of this lawsuit.

On May 23, 2002 the Court entered an Order denying Plaintiff's Motion for a Temporary Restraining Order. In denying Plaintiff's Motion, the Court acknowledged that the policy contains a provision, which allows Centre Life to have Mr. Jeffries examined by an examiner of its choice as often as is reasonable while the claim is pending. Although Mr. Jeffries' contention had long been that he had so much medical information that no further evaluation was reasonable, the Court rejected this argument. Centre Life does not have to accept the medical records Plaintiff submits "at face value."

Shortly after the Court's Order denying Plaintiff's Motion for Temporary Restraining Order, Plaintiff agreed to submit to an examination with Dr. Michael Hartings, a neuropsychologist. An examination with Dr. Newton Bullard, a physician board certified in internal medicine, was also scheduled. On February 7, 2003 Dr. Bullard completed his examination of Mr. Jeffries. Dr. Bullard rendered a diagnosis of malaise/fatigue but review of the great many records submitted by Mr. Jeffries confirmed that there were no objective findings to support his complaints.

Dr. Hartings' also completed neuropsychological testing and examination, which continued over three sessions. After completion of the first two sessions, Mr. Jeffries refused to attend the third session until ordered by the Court. Upon completion of the examination by Dr. Hartings on February 6, 2003, he issued a report dated March 15, 2003, which concluded that Mr. Jeffries suffered from somatization disorder, which is a psychiatric illness, and not a physical one. In the report of Dr. Hartings was reviewed by Dr. Mitchell Clinosky for DMS.

Dr. Clinosky concurred with Dr. Hartings and agreed that it was "extremely unlikely that Mr. Jeffries suffers from a neurological condition and that his complaints and test results are better explained by a psychological disorder."

Mr. Jeffries' policy contains the following provision:

Mental Disorder and/or Substance Abuse Disorder Limitation: If a Total Disability or other covered loss is due to a Mental Disorder and/or Substance Use Disorder, the number of months for which any benefits for Total Disability shall be payable under the Policy during the lifetime of the insured shall not exceed in the aggregate a total of 24 months.

Under the terms of Mr. Jeffries' policy he is entitled to payment of benefits for up to 24 months if he is totally disabled due to a mental disorder or substance abuse disorder. There is no dispute on this point. Mr. Jeffries has been paid the entirety of the benefits to which he is entitled for a disability caused by a mental disorder.

The dispute in this case centers on the fact that Mr. Jeffries has not established that he is entitled to benefits beyond 24 months. Mr. Jeffries must provide sufficient proof of loss that he is totally disabled under his policy. The medical evidence before the Court establishes that Mr. Jeffries' disability is a mental disorder. To receive additional benefits, Mr. Jeffries must establish that he has a physical disability.

Centre Life suspended Mr. Jeffries' payments in March 2002 when he persisted in his refusal to attend a physical examination as required by the clear and unambiguous language of his policy. An additional monthly payment was made immediately after Mr. Jeffries completed the examinations by Drs. Hartings and Bullard. After receipt of a neuropsychological evaluation and objective testing, Centre Life determined that there was sufficient medical information to support Mr. Jeffries' claim of total disability resulting from a mental disorder. Because Plaintiff

had already received the entirety of the benefits to which he was entitled for a disability caused by a mental disorder, his benefits were terminated as of May 2003.

Prior to the neuropsychological evaluation, the medical information submitted by Plaintiff had failed to make clear the existence of any disorder that would render him unable to perform the important duties of his occupation. Nonetheless, Centre Life had continued to pay benefits to Mr. Jeffries while it gathered medical information and investigated his claim. Plaintiff argues that the great volume of medical information submitted by him should have been accepted at face value without evaluation by Centre Life. He ignores the fact that even some of his own doctors could not determine what caused his medical problems. He also ignores the fact that some of his own doctors believed that his problems were psychological. In fact, despite his subjective complaints, the great majority of Plaintiff's physical test results were normal and quite literally, scores of diagnoses had been considered and ruled out. This left the suggestion of a mental disorder, the consideration of which Plaintiff fought at every turn. In the end however, it is a mental disorder, not a physical problem that impaired Plaintiff.

Under the terms of his policy, payment for a disability caused by a mental disorder or substance abuse problem has a maximum benefit period of 24 months. Plaintiff received benefits for 39 months before the appropriate medical evaluation was obtained. Plaintiff has never met his burden of establishing the existence of any physical cause that impairs him. As such, Centre Life has filed a counterclaim and sought return of the overpaid benefits.

**III.     Stipulated Facts.**

The parties have stipulated to the following facts:

1.      Mr. Jeffries purchased a policy of disability insurance from Centre Life which became effective in April 1996. At that time Centre Life was known as Massachusetts Casualty Insurance Company. The Company is now known as Centre Life Insurance Company.

2.      In June 18, 1997 Mr. Jeffries received vaccinations for hepatitis A and B.

3.      Mr. Jeffries' last day of work was September 25, 1998. Using that date as the date of disability, and factoring in the elimination period, Centre Life paid Mr. Jeffries 24 months of disability benefits (December 1998 to December 2000). Some of these benefits were paid under a "reservation of rights" but the parties agree that they were paid.

4.      Centre Life has paid to Mr. Jeffries 39 months of benefits in total.

5.      Plaintiff's policy provides that benefit for a disability caused by a mental disorder will not exceed 24 months.

6.      Mr. Jeffries filed his claim for benefits in February 1999 and provided Centre Life with an Authorization to obtain information it requested. Centre Life subsequently obtained medical records concerning Mr. Jeffries, interviewed two of Mr. Jeffries' treating physicians, and interviewed Mr. Jeffries' former employer. Centre Life also interviewed Mr. Jeffries in Cincinnati.

7.      In May 2000, Mr. Jeffries limited the Authorization required by Centre Life.

8.      In April 1999 and March 2000, Centre Life requested its in-house physician, Dr. Hall, to examine Mr. Jeffries' medical records. In June/July 2000, Centre Life retained a consulting physician, Dr. James Garb, to evaluate Mr. Jeffries' medical records.

9.      Sometime between August 16, 2000 and September 14, 2000, Mr. Jeffries' attorney submitted additional Medical Records to Centre Life's Administrator.

10.    In August 2001, Centre Life asked Mr. Jeffries to submit to a physical examination. Mr. Jeffries refused and asked Centre Life to review additional medical records.

11.    In January 2002, Centre Life again requested that Mr. Jeffries see Dr. Hart, a neuropsychologist. He refused.

12.    In late 2002 and early 2003 Mr. Jeffries was examined by doctors at the request of Centre Life including a neuropsychologist, Dr. Hartings, and a board-certified internist, Dr. Bullard.

## IV.    Disputed Issues of Fact and Law.

### 1.    Plaintiff Cannot Establish That He Suffers Or At Any Time Has Suffered From A Physical Impairment That Rendered Him Unable To Perform The Important Duties Of His Occupation.

Of primary issue in this case is whether Mr. Jeffries has a physical impairment that has left him unable to perform the important duties of his occupation. Mr. Jeffries, as the insured, must present sufficient proof of loss to prove that he is entitled to receive benefits and in what amount. This, he has not done.

From the initial filing of his claim there has been a recurring question about what is wrong with Mr. Jeffries. It is undisputed that he has significant subjective complaints. It is also undisputed that when asked, his doctors for the most part will agree that they think something is wrong with Mr. Jeffries but then concede that they do not know what exactly that is. Finally, it is also undisputed that the overwhelming majority of Mr. Jeffries' objective medical tests are normal or negative.

Mr. Jeffries' policy requires that he provide sufficient proof of loss to show that he is entitled to benefits under the terms of his policy. Under Ohio law, the person "who seeks to recover on an insurance policy generally has the burden of demonstrating coverage under the

policy and then proving a loss." *See Chicago Title Insurance Company v. Huntington National Bank*, 87 Ohio St. 3d 270, 273, 719 N.E.2d 955 (1999) *citing Inland River Service Corp. v. Hartford Fire Insurance Company*, 66 Ohio St. 2d 32, 418 N.E.2d 1381 (1981). In this case Mr. Jeffries has put forth evidence which has established he has a disability caused by a mental disorder. Benefits have been paid under his policy for a mental disorder. The burden rests on him to prove that he has a physical disorder for which continued benefits under his policy are due. The medical evidence before the Court demonstrates that Mr. Jeffries has not met this burden.

The vast amount of medical information in this case can be summarized in the several affidavits prepared by Mr. Jeffries' treating physicians and submitted by Mr. Jeffries in support of his claim. None of the affidavits of Mr. Jeffries' treating physicians assign a cause to his disability. Dr. Dunn states in pertinent part:

- Since July 1997, I have treated Mr. Eric Jeffries on an intermittent basis for a malady which he continues to suffer. . . . After seeing Mr. Jeffries several times, I am certain that Mr. Jeffries' symptoms are real and have a significant debilitating effect on him.

- Since beginning my treatment of Mr. Jeffries, I have suspected that his condition presents some systemic illness with rheumatologic features.

- **It is my opinion that irrespective of my inability to precisely diagnose Mr. Jeffries' condition,** the effects of his illness make him unable to perform the material and substantial duties of his occupation of a merchant banker."

Dr. Luggen has concurred:

- Specific diagnostic testing has failed to yield a precise diagnosis of Mr. Jeffries' illness.

- I am reasonably certain that many of Mr. Jeffries' symptoms are real and have a debilitating effect on Mr. Jeffries. I believe he suffers from substantial pain even though diagnostic test results to date have not focused on any one disease.

- It is my opinion that **irrespective of my inability to precisely diagnose Mr. Jeffries' condition, the effects of his illness make him unable to function in a consistent manner and he is unable to function professionally without interruption.**

Finally, Dr. McClellan also admits that he is unable to precisely diagnose Mr. Jeffries although he continues to believe he is disabled.

- I believe he is disabled even though specific diagnostic tests have failed to yield a precise diagnosis or a common name for his illness.

- It is my opinion that irrespective of **the inability to precisely diagnose Mr. Jeffries' condition,** the effects of his illness make him unable to perform the material and substantial duties of his occupation of a merchant banker.

What these affidavits have in common is their admitted inability to precisely diagnose Mr. Jeffries' condition. Without a diagnosis there can be no valid opinion as to causation. Ohio law requires that the opinion of a physician be rendered to a reasonable degree of medical certainty. In this case, Plaintiff attempts to establish a causal connection between his Hepatitis B vaccination and his illness. With regard to a causal relationship, the Sixth Circuit has held "[W]e believe that a medical expert must be able to articulate that there is more than a mere possibility that a causal relationship exists between the defendant's negligence and the injury for which the plaintiff seeks damages." *Mayhew v. Bell S.S. Company,* 917 F.2d 961, 963 (6th Cir. 1990). Although the liability issues were obviously different in that case, the causation question is analogous. Mr. Jeffries' doctors cannot opine a medically sufficient connection between the Hepatitis B vaccination and a physical illness. Speculation or guessing is not sufficient.

Dr. Hartings, on the other hand, has offered the opinion that Mr. Jeffries suffers from a mental disorder. Dr. Hartings' conclusion is based on his examination of Mr. Jeffries, his neuropsychological analysis of Mr. Jeffries and extensive neuropsychological testing performed on Mr. Jeffries. It is also consistent with the pattern displayed in Mr. Jeffries' contacts with his

- 11 -

treating physicians. Mr. Jeffries' history of numerous subjective complaints without verifiable objective findings is in line with the diagnosis of somatoform disorder. Mr. Jeffries experiences actual physical complaints. These complaints however cannot be fully explained by any known general medical condition. These symptoms are not false and disturb his functioning. As Dr. Hartings testified, Mr. Jeffries has undifferentiated somatoform disorder and fits the criteria of that diagnosis.

In Mr. Jeffries' case, his treating physicians all acknowledged that they are unable to precisely diagnose his condition. Without a precise diagnosis, it is impossible to determine a cause. Therefore, Mr. Jeffries has failed to establish that that his problems were caused not by his somatoform disorder but by his Hepatitis B vaccination.

### 2.  Plaintiff Cannot Establish That He Received Appropriate Care For The Condition He Claims Caused His Disability.

In order to establish that he is totally disabled under the terms of his policy, Mr. Jeffries must be "receiving care by a physician which is appropriate for the condition causing the disability." Setting aside for the sake of argument the fact that Mr. Jeffries has failed to prove his disability is anything other than a mental one, it is clear that he has not satisfied the requirements of his policy. Mr. Jeffries argues that he has identified five experts and treating physicians who have made a medical diagnosis. Of these physicians, four are simply consulting physicians. They are not providing treatment. There is no question that Mr. Jeffries' consulting physicians do not provide appropriate care.

Dr. Charles Poser examined Mr. Jeffries twice. The first time was June 7, 2000 and the second was May 22, 2002. *See* Poser deposition at p. 5. In support of his claim, Mr. Jeffries has submitted a July 28, 2000 report of Dr. Poser drafted after the June 7, 2000 examination. There is also an undated letter to Plaintiff's counsel which references his review of letters from Drs.

Burton Zweiman in April and October of 2001. In that undated letter the only reference to examinations by Dr. Poser was that he "saw Mr. Jeffries in consultation in June 2000." Mr. Jeffries has offered no other evidence of treatment by Dr. Poser. Dr. Poser was deposed in this case on July 8, 2003. Dr. Poser testified that he provided treatment in June of 2000 in the form of prescribing medications. *See* Poser deposition at p. 60. Dr. Poser admitted that he does not know whether the treatment was continued or whether it resulted in any improvement. In any event, as of the time of deposition in mid 2003, Mr. Jeffries was no longer under treatment with Dr. Poser.

Similarly, Dr. Hyde does not provide treatment. Like Dr. Poser, Dr. Hyde has only consulted with Mr. Jeffries. In his July 7, 2001 and June 30, 2001 reports, Dr. Poser discusses in detail his interpretations of Mr. Jeffries' various and sundry medical records. Nowhere in either report does he identify any continued treatment, which he is providing. Dr. Hyde first met with Mr. Jeffries May 31, 2000. *See* Hyde deposition at pp. 13-14. Dr. Hyde did not examine Mr. Jeffries on that first visit but did an examination on a later visit. *Id.* pp. 15-16. The examination appears to have occurred on June 8, 2000. *See id.* at p. 19. There is no mention of any other continuing treatment.

Dr. Geier also does not provide ongoing treatment. In fact, Dr. Geier has never personally examined Mr. Jeffries. *See* Geier deposition at pp. 5-6. Dr. Geier's role in this case has been to review Mr. Jeffries' medical records and advocate on his behalf. *See id.* at pp. 8-9.

Dr. Burton Waisbren is another consulting physician. Dr. Waisbren saw Mr. Jeffries in September of 1999. Like the other consulting physicians, Dr. Waisbren notes no treatment provided to Mr. Jeffries by him in his report.

Of the five physicians relied upon by Mr. Jeffries in his Motion, only one, Dr. Michael McClellan, can properly be considered a treating physician. Dr. McClellan first saw Mr. Jeffries on October 14, 1998. *See* McClellan deposition at p. 5. Plaintiff has made reference to a statement submitted by Dr. McClellan dated October 26, 1999. In the information submitted to Centre Life by Mr. Jeffries, there are records of additional office visits with Dr. McClellan through February 17, 2000. *See* Claim 2157. Plaintiff has also recently submitted office notes from Dr. McClellan, which show a consultation as late as February 2004. No treatment for his claimed chronic fatigue is noted.

Mr. Jeffries has acknowledged his lack of regular treatment. He testified at his September 10, 2003 deposition that he had seen Dr. McClellan twice during that year. *See* Jeffries deposition at p. 112. Mr. Jeffries testified that he returns to Dr. McClellan to have his thyroid tested and his thyroid medication evaluated. *Id.* Mr. Jeffries also testified that Dr. Pretorius has prescribed some sort of blood pressure medication that he takes. *See id.* at p. 136. In addition to his thyroid medication and the blood pressure medication prescribed by Dr. Pretorius, he also takes Neurontin but he was unsure who recommended this medication. *See id.* at p. 137. At the time of deposition, Mr. Jeffries said that other than his visit to Dr. Pretorius and two visits to Dr. McClellan, he could not think of any other persons from whom he had received treatment. *Id.* at p. 137.

It is clear that none of the five doctors identified by Mr. Jeffries are currently treating him for his claimed disabling condition. It is equally clear that he has never received appropriate treatment for any disabling condition. The treatment Plaintiff can identify is for his resolved thyroid cancer and his high blood pressure. His resolved thyroid cancer is not disabling and

there is no claim of disability due to blood pressure. As such, he has not met the definition of total disability outlined in his contract.

### 3.    Centre Life Has Never Admitted Total Disability.

Plaintiff often argues that Centre Life has conceded that he is totally disabled. The period of time for which Centre Life has paid total disability benefits is limited to a total disability caused by a mental disorder. The acknowledgement of total disability by Centre Life in both its Amended Answer to Plaintiff's Verified Complaint and in the Motion to Amend the Answer is limited to an admission of total disability consistent with the mental disorder provision of the policy. Centre Life has not conceded total disability as argued by Plaintiff. Under the terms of the policy, where an insured's total disability is caused by a mental disorder, the insured's benefits are limited to 24 months. In its Answer, Centre Life admitted that Mr. Jeffries had established his entitlement to benefits for a total disability caused by a mental disorder. This entitlement to benefits is limited to 24 months, which have been paid in full. Even if Mr. Jeffries continues to be disabled by a mental disorder, he is not entitled to continued payment of benefits.

Plaintiff argues that Centre Life's admission of total disability satisfies Plaintiff's burden of establishing coverage under the general terms of the policy. Centre Life's admission is limited to total disability caused by a mental disorder, not a general admission of disability as Plaintiff argues. The Court must remain mindful that disability under the policy requires more than just an inability to perform all of the material duties of one's occupation. Centre Life agrees that for the 24 months of coverage contemplated under the mental disorder section of the policy, Plaintiff has satisfied his obligations and, to this end, benefits have been fully paid. Centre Life does *not* agree that any admission of total disability under the mental disorder section of the policy amounts to an acknowledgement of continued disability for a physical cause. Nor does this

- 15 -

admission in any way address Plaintiff's obligation to be under the care of a physician or to submit an acceptable monthly or periodic proofs of loss.

The essential question in this case is whether Plaintiff is totally disabled as defined in the policy by a physical injury or illness. This would be the basis of his claim for benefits. In its Motion to Amend its Answer and file a Counterclaim, Centre Life contends that after review of the reports of Dr. Hartings and Dr. Bullard and the opinion letter of Dr. Clionsky, it was determined that Mr. Jeffries suffers from somatization disorder, severe, or somatoform disorder and has significant obsessive compulsive traits at a minimum, and cognitive disorder. Plaintiff's own Psychiatrist and psychologists identify "Cognitive Disorder, NOS" as the disabling disease, which is also a mental disorder specified in the DSM. These disorders are mental disorders which may entitle him to benefits under the terms of his policy for a total of 24 months. Benefits have been paid to Mr. Jeffries in accordance with this policy provision for that period of time. In its Amended Answer, Centre Life admitted in response to paragraph 16 that it had determined that Mr. Jeffries was totally disabled in his occupation due to a mental disorder as defined in the policy. All other allegations of paragraph 16 were denied. Accordingly, Defendant's admission of total disability is limited to a total disability caused by the mental disorder. There is *no* admission of total disability caused by a physical disorder.

### 4.    Centre Life Should Not Be Required To Prove That Mr. Jeffries Does Not Have A Physical Disability.

Centre Life has paid Mr. Jeffries 24 months of total disability benefits as a result of his mental disorder. It has never sought repayment of this benefits despite the fact that Mr. Jeffries has never received appropriate care for his mental disorder. Centre Life does object to any payment in excess of the 24 months. Mr. Jeffries' has never established the existence of a physical disability that would entitle him to continued payment.

Under Ohio law a person "who seeks to recover on an insurance policy generally has the burden of demonstrating coverage under the policy and then proving a loss." *See Chicago Title Insurance Company v. Huntington National Bank*, 87 Ohio St. 3d 270, 273, 719 N.E.2d 955 (1999) *citing Inland River Service Corp. v. Hartford Fire Insurance Company*, 66 Ohio St. 2d 32, 418 N.E.2d 1381 (1981). It is correct that an insurer has the burden of proving that a policy exclusion applies. *See Continental Insurance Company v. Lewis Marks and Company, Inc.*, 64 Ohio St. 2d 399, 415 N.E.2d 315 (1980). The critical difference here is that the amendment to the policy in this case is not an exclusion. It simply sets forth a maximum benefit period.

In the case of Mr. Jeffries specifically, where he is totally disabled, as defined in the policy, by a mental disorder he is entitled to benefits. The time period of the benefits is for 24 months of payments. Even though coverage for disability continues and a subsequent physical disability may give rise to additional benefits, the maximum benefit period for a mental disorder has expired and the insured is no longer entitled to benefits. This is no different than the general terms of his policy which limit his payments until he reaches age 65. There is no exclusion under the policy, simply a contractually-agreed limitation as to how long benefits will be paid.

The burden must remain with Mr. Jeffries to establish that he is entitled to continued benefits. He must submit sufficient medical proof of a physical disability that renders him unable to perform the important duties of his occupation. He must also establish that he is receiving appropriate care for the alleged disability. To shift the burden to Centre Life to prove that Mr. Jeffries does not have a physical disability rewrites not only the contract between the parties but also Ohio law.

The Ohio Supreme Court has declared that "if a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined." *See Inland*

*Refuse Transfer Co. v. Browning-Ferris Industries of Ohio, Inc.*, 15 Ohio St. 3d 32, 322, 474 N.E.2d 271, 272 (1984). Courts have "an obligation to give plain language its ordinary meaning and to refrain from rewriting the contractual agreement of the parties." *See Miller v. Marrocco*, 28 Ohio St. 3d 438, 439, 504 N.E.2d 67, 69 (1986). In other words, "when the language of an insurance policy has a plain and ordinary meaning, it is unnecessary and impermissible for this court to resort to construction of that language." *See Karabin v. State Auto Mut. Ins. Co.*, 10 Ohio St. 3d 163, 166-167, 462 N.E.2d 403, 406 (1984).

Disability insurance policies often provide benefits for a maximum term be it 24 months, 60 months or some other determination based on the insured's age or the insured's age when the disability begins. The effect of the Court's ruling is to rewrite Mr. Jeffries' policy, and by extension all other policies which contain benefit terms, to enlarge the coverage to lifetime benefits. Rather than end at 24 months, as the plain language of the policy requires, the Court has imposed an additional burden on Centre Life to prove that Mr. Jeffries is no longer disabled before benefits can end. This was not contemplated by the parties to the insurance policy.

### 5.    Centre Life Has Not Acted In Bad Faith

The law in Ohio with regard to bad faith is clear; there can be no bad faith if an insurer acts with reasonable justification for its actions. This is not a question of compliance with industry standards or conformance to one person's opinion as to how a claim should be handled. It is a question of whether there was a reasonable evaluation of the information presented to the insurance company and whether the decisions made by the insurance company based on that information were justified by that information. Under this standard, there cannot be a one-size-fits-all approach to claims decisions. The insurer has a duty to consider the information presented to it and to act reasonably in light of this information. In spite of the conflicting and inconclusive

information presented to it, as well as the roadblocks and hurdles thrown up by Mr. Jeffries and his counsel, Centre Life acted in good faith in its determination of Mr. Jeffries' claim.

Despite the fact that Mr. Jeffries received his disability benefits from the time he first filed his claim with Centre Life in February, 1999 until he refused to proceed with the requested IME, he asserts that Centre acted in bad faith. But this Court in its January 15, 2003 Order denying Plaintiff's Summary Judgment Motion found that Centre had a reasonable justification for suspending Mr. Jeffries' benefits until he agreed to attend the IME. ("The Court views his initial refusal to attend Dr. Hart's examination as justifying Defendant's action in withholding policy payments until his cooperation is secured . . . the Court regards ... Defendant to be justified in refusing further monthly payments under the policy until Plaintiff complies with his obligations thereunder.") (*Id.* at page 6 and 9.) The IMEs revealed that Mr. Jeffries is suffering from a psychiatric, not a physical illness. Because Mr. Jeffries' policy provides that he is entitled to benefit payments for a total of twenty-four months if his loss is due to a mental disorder (and Mr. Jeffries had been paid for 39 months), Mr. Jeffries was paid the entirety of benefits to which he was entitled. Centre Life determined that based on their IMEs and its review of the medical record to date, Mr. Jeffries was not entitled to further benefits under the policy.

Ohio law on bad faith is clear. An insurer has a right to legitimately question a claim without exposing itself to damages for bad faith. For bad faith to exist, Plaintiff must establish that Centre Life's decision to suspend and later deny benefits was made without reasonable justification. *See Hoskins v. Aetna Insurance Company*, 6 Ohio St. 3d 272, 452 N.E.2d 1315 (1983); *Staff Builders, Inc. v. Armstrong*, 37 Ohio St. 3d 298, 515 N.E. 2d 783 (1988). The test annunciated in *Hoskins* and *Staff Builders* and restated in *Zoppo v. Homestead Insurance*

*Company*, 71 Ohio St. 3d 552, 644 N.E.2d 397 (1994) requires that the insured prove that the insurer lacked "reasonable justification" for the denial of benefits. *See Hoskins*, *Staff Builders* and *Zoppo*, *supra*. Under this "reasonable justification" standard, "an insurer fails to exercise good faith in the processing of a claim of its insured where its refusal to pay the claim is not predicated upon circumstances that furnish reasonable justification therefore." *See Staff Builders*, 525 N.E.2d at 788. In other words, the plaintiff must show that the insurer had no reasonable justification whatsoever for denying the claim. *Hoskins*, 3 Ohio St. 3d at 276, 452 N.E.2d at 1320. Under Ohio law, a breach of contract does not constitute a tort, regardless of motive. *Ketcham v. Miller*, 104 Ohio St. 372, 136 N.E.2d 145 (1922).

As a result, even if it is determined that Centre Life breached its contract with Mr. Jeffries by not paying him benefits, this is not, in and of itself, bad faith. In other words, the liability of an insured does not arise from the omission to perform a contractual obligation. Rather, liability arises from a breach of a positive legal duty imposed by law due to the relationship between the parties. For that reason, even if it is determined that Mr. Jeffries established he was entitled to benefits and that Centre Life should have paid him benefits, there cannot be a finding of bad faith if Centre Life's position was reasonably justified. In other words, to find that Centre Life acted in bad faith, Mr. Jeffries must establish that Centre Life did more than erroneously fail to pay benefits due to him under the Contract.

### 6. Punitive Damages Are Not Recoverable Because Plaintiff Cannot Prove By Clear And Convincing Evidence That Centre Life Acted With Malice.

Even if it is established that Centre Life breached its duty of good faith to Mr. Jeffries and that he suffered actual harm, punitive damages are not available to Plaintiff unless the jury finds by clear and convincing evidence that, in breaching their duty of good faith, (1) the Defendant's acts or failures to act demonstrated malice, aggravated or egregious fraud,

oppression or insult; and (2) the Plaintiff presented proof of actual damages resulting from those acts of the Defendant. *Staff Builders v. Armstrong*, (1988) 37 Ohio St. 3d, 298, 304, 525 N.E. 2d, 783; *Shimola v. Nationwide Insurance Co.*, (1986) 25 Ohio St. 3d, 84, 86, 495 N.E. 2d, 391.

Moreover, the conduct required to find a defendant liable for punitive damages is of a different dimension than that required to find the Defendant liable for breaching the duty of good faith. A breach of duty of good faith alone without malice is not sufficient to find a defendant liable for punitive damages. Rather, punitive damages should be awarded only if the defendant's conduct is so reprehensible as to warrant the imposition of sanctions beyond compensatory damages for the purposes of punishment or deterrents. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 123 Supp. Ct., 1513, 1521 (2003).

Also, punitive damages are not favored in the law because they lead to excessive compensation for a plaintiff's injuries. They are not to be awarded in the ordinary case, but instead are reserved the extraordinary case in which the defendant's conduct is so despicable that punishment is warranted above and beyond the awarding of damages. *Id*, at 1521.

Finally, the amount of punitive damages, if any, must be proportionate to the wrongfulness of defendant's conduct. In determining the degree of reprehensibility of a Defendant's conduct, the jury may consider the following factors: (1) whether the harm caused to Plaintiff was physical as opposed to economic; (2) whether the conduct evidenced in indifference to or reckless disregard of the health or safety of others; (3) whether the Plaintiff was financially vulnerable; (4) whether the Defendant's conduct involved repeated actions or instead was an isolated incident; and (5) whether the harm to the Plaintiff resulted from intentional malaise, trickery or deceit. *Id* at 1521. Even if the Jury finds that some of the factors weighing in favor of finding of reprehensibility are present, that does mean that a large, or

indeed, any punitive damages awarded is necessarily warranted. If the jury does not find any of these factors showing reprehensibility to be present, punitive damages are most likely not justified and should not be awarded.

## V.    Conclusion

In short, this case must be viewed in segments. First, from the inception of the claim until February 2002, Centre Life cannot be liable for either breach of contract or bad faith because the claim was being paid. Second, from March 2002 until March 2003, this Court, pursuant to Judge Hogan's unchallenged January 15, 2003 Order, found that benefits need not be paid until Plaintiff complied with his contractual obligations to attend medical examinations. For that reason, Centre Life cannot be held to have unreasonably denied benefits to Plaintiff. Finally, from March 2003 to the present, while there may be a jury question as to the nature of Plaintiff's claim, by denying all Motions for Summary Judgment on the issue, this Court found that reasonable minds may differ on the nature of his claim. If reasonable minds can differ, it is not logically possible to hold that Centre Life lacked a reasonable basis for determining that Plaintiff's claims were psychological in nature. Moreover, Dr. Hawkins, one of Plaintiff's experts, as well as Drs. Nunlist-Young, Dalvi, and Furlan, Plaintiff's treating physicians, all suggested either psychological evaluation, treatment or a possible psychogenic origin to his complaints. Accordingly, this case should be tried on one issue – and that is the nature of Plaintiff's impairment.

Respectfully submitted,


s/William R. Ellis
William R. Ellis (0012279)
Peter M. Burrell (0044139)
Amy Gasser Callow (0063470)
Wood & Lamping LLP
600 Vine Street, Suite 2500
Cincinnati, OH  45202-2491
(Telephone) (513) 852-6000
(Facsimile) (513) 852-6087

Attorneys for Defendants
Massachusetts Casualty Insurance Company
and Disability Management Services, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been filed with the Court by electronic means on this 12th day of April 2004. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/William R. Ellis
William R. Ellis, Esq.

204420.1