*Elite Reporting Agency*

---

```
 1           IN THE UNITED STATES DISTRICT COURT
 2               SOUTHERN DISTRICT OF OHIO
 3                    WESTERN DIVISION
 4
 5
 6   ┌─────────────────────────────────┐
     │ ERIC L. JEFFRIES,               │
 7   │        Plaintiff,               │
 8   │              vs.                │  CASE NO.
     │                                 │  C-1-02-351
 9   │ CENTRE LIFE INSURANCE CO.,      │
10   │ et al.,                         │
11   │        Defendants.              │
12   └─────────────────────────────────┘
13
14   Deposition of:   MICHAEL F. HARTINGS, Ph.D.
15   Pursuant to:     Notice
16   Date and Time:   Monday, October 27, 2003
                      9:55 a.m.
17
     Place:           Graydon, Head & Ritchey, LLP
18                    1900 Fifth Third Center
                      511 Walnut Street
19                    Cincinnati, Ohio  45202
20   Reporter:        Patti Stachler, RMR, CRR
                      Notary Public - State of Ohio
21
22
23
24
25
                                                              1
```

```
 1  APPEARANCES OF COUNSEL:
 2
         For the plaintiff:
 3
             Michael A. Roberts, Esq.
 4                     of
             Graydon, Head & Ritchey, LLP
 5           1900 Fifth Third Center
             511 Walnut Street
 6           Cincinnati, Ohio  45202
             513.629.2722
 7
         For the defendants:
 8
             William R. Ellis, Esq.
 9                    of
             Wood & Lamping, LLP
10           600 Vine Street
             Suite 2500
11           Cincinnati, Ohio  45202
12           513.852.6067
13
14                         - - -
15
16
17
18
19
20
21
22
23
24                     COPY
25
                                                              2
```

```
 1                         I N D E X
 2
 3   MICHAEL F. HARTINGS, Ph.D.                          PAGE
 4     EXAMINATION BY MR. ROBERTS                          5
 5
 6
 7   EXHIBITS                          MARKED     REFERENCED
 8     EXHIBIT 17                         -           64
       EXHIBIT 66                         -          172
 9     EXHIBIT 67                         -          180
       EXHIBIT 69                         -           30
10     EXHIBIT 77                         -            6
       EXHIBIT 79                         -          135
11     EXHIBIT 80                        136         136
       EXHIBIT 81                         39          39
12     EXHIBIT 82                         62          62
       EXHIBIT 83                        138         139
13
       EXHIBIT 69-A                       43          43
14     EXHIBIT 69-B                       45          45
       EXHIBIT 69-C                       48          48
15     EXHIBIT 69-D                       51          51
       EXHIBIT 69-E                       71          71
16     EXHIBIT 69-F                       74          74
       EXHIBIT 69-G                       83          83
17     EXHIBIT 69-H                       84          84
       EXHIBIT 69-I                       84          84
18     EXHIBIT 69-J                       86          86
       EXHIBIT 69-K                       90          90
19
       EXHIBIT 69-L                       91          91
20     EXHIBIT 69-M                       91          91
       EXHIBIT 69-N                       92          92
21     EXHIBIT 69-O                       92          92
       EXHIBIT 69-P                       93          93
22     EXHIBIT 69-Q                       94          94
       EXHIBIT 69-R                       95          95
23     EXHIBIT 69-S                       95          95
       EXHIBIT 69-T                       96          96
24     EXHIBIT 69-U                       97          97
25
                                                              3
```

```
 1
 2   EXHIBITS                          MARKED     REFERENCED
 3     EXHIBIT 69-V                       97          97
       EXHIBIT 69-W                       98          98
 4     EXHIBIT 69-X                       99          99
       EXHIBIT 69-Y                      100         100
 5     EXHIBIT 69-Z                      100         100
 6     EXHIBIT 69-AA                     101         101
       EXHIBIT 69-BB                     102         102
 7     EXHIBIT 69-CC                      -           -
       EXHIBIT 69-DD                     112         112
 8     EXHIBIT 69-EE                     114         114
       EXHIBIT 69-FF                     114         114
 9     EXHIBIT 69-GG                     115         115
       EXHIBIT 69-HH                     122         122
10     EXHIBIT 69-II                     125         125
11
12                         - - -
13
14
15
16
17
18
19
20
21
22
23
24
25
                                                              4
```

1  Q. I interrupted you, I'm sorry. Go ahead.
2  A. And that prepared me to assume the position
3  of associate director of the multiple sclerosis center
4  at Rush Medical College, which was the first in the
5  nation.
6  Q. Is that reflected here or not?
7  A. I don't know. Probably -- it would have been
8  during the time that -- of employment at
9  Rush-Presbyterian-St. Luke's Medical Center, which
10 begins on page 2, the second item from the bottom,
11 during those years of '71 to '78. I just didn't add
12 that to the list of my responsibilities.
13 Q. Okay. What else?
14 A. And then from 19 -- oh, boy -- from 1973
15 until 19 -- well, actually till the present -- well,
16 let's go back. To 1973. Usually from '73 until like
17 1985, I took all of my CEU in the area of
18 neuropsychology.
19    And the reason for that was I decided in 1978
20 to accept a position here with a group of physicians
21 specializing in neurology, which was then known as
22 Cincinnati Neurological Associates. And so I needed to
23 know all I could about neuropsychology. And at the
24 time that was really the only way you could get
25 training, because there were no -- late '70s, early

9

1  '80s, maybe there were one -- Oscar Parsons had a
2  program out at Oklahoma, but there were -- it was just
3  a time when the specialty was beginning and there were
4  very few formal training programs. So most of us,
5  people my age, trained by doing their homework and
6  attending workshops.
7  Q. Okay. Are you a Chicago native?
8  A. No.
9  Q. Did you spend a good portion of your early
10 career in Chicago, then moved to Cincinnati; is that
11 right?
12 A. Yes.
13 Q. What prompted that move?
14 A. I'm a native of Cincinnati. My wife is a
15 native of Cincinnati. In 1976, when we started to
16 consider coming back here, we had three sons. And I
17 didn't want to have to travel an hour to go to a
18 baseball game, I didn't want to have to inherit tickets
19 to the Chicago symphony, and I didn't want my kids
20 spending all summer every summer in camps, so we came
21 back to a much more family-friendly choice.
22 Q. Good choice. Are you still married?
23 A. Yes.
24 Q. I have one job, and I don't have a whole
25 bunch of appointments, but it appears that you

10

1  simultaneously hold different positions at different
2  locations. Since coming to Cincinnati, you've worked
3  at HealthSouth Rehab Hospital?
4  A. Yes.
5  Q. But your resume also shows that you've been
6  working at Riverhills for an overlapping period of
7  time?
8  A. Right. During my -- my practice group is
9  Riverhills Healthcare. They do not assign us duties.
10 I was asked to consult at HealthSouth in 1986 and --
11 '89, excuse me. And in 1993 I was asked to head up the
12 brain injury rehab program, which I did for three
13 years. And that's not on the resume.
14 Q. There's two references to HealthSouth Rehab
15 Hospital on your resume, one under employment, one
16 under staff appointments.
17 A. Right.
18 Q. You both -- you held those positions from '89
19 to '96?
20 A. Right.
21 Q. Are they different?
22 A. No. You can be on the staff without being in
23 the employ of the hospital.
24 Q. Okay.
25 A. And you can be in the employ of the hospital

11

1  and not be on the medical staff.
2  Q. Okay. So you were employed for seven years
3  at HealthSouth during the same period of time you were
4  employed at Riverhills?
5  A. Okay. Technically I was an independent
6  contractor at HealthSouth.
7  Q. Okay.
8  A. And all of the -- all of the fees that I
9  generated through my work at Riverhills -- at
10 HealthSouth were paid to my employer, Riverhills
11 Healthcare.
12 Q. Okay. So you've actively worked for
13 Riverhills for the 24 years since 1978 without any
14 interruption then, I guess?
15 A. Correct.
16 Q. Is that correct?
17 A. That's correct.
18 Q. And the active work for that 25-year period,
19 has that been as a psychologist the whole time?
20 A. Yes.
21 Q. I mean, is that the right title to you,
22 psychologist?
23 A. Yes.
24 Q. You never left Riverhills to go to either
25 HealthSouth or these positions and staff appointments

12

```
1  on page 3?
2     A.  No, I never left Riverhills to go anywhere
3  else.
4     Q.  Okay.  So we're clear, for the last 25 years,
5  you've been working there as a psychologist at
6  Riverhills, right?
7     A.  Right.
8     Q.  Okay.  Have you ever been convicted of a
9  crime?
10    A.  No.
11    Q.  How did you become involved with Boys' Hope
12 of Cincinnati?
13    A.  That's a program that's conducted by -- how
14 did I become involved?  I was asked --
15    Q.  I am also involved, that's why I'm curious.
16    A.  I was asked in, I don't know what time frame
17 it was, the '80s sometime, to help out with the
18 evaluation of candidates for the program.  Earl
19 Kronenberger was the psychologist involved and he was
20 cutting back and he asked me to pick up some of it,
21 which I did.
22    Q.  Okay.  In the Cincinnati Neuropsychology Peer
23 Review Group, you're a founding member of that
24 organization?
25    A.  Uh-huh.
                                                    13

1     Q.  That's a group of seven or eight
2  psychologists in town that get together?
3     A.  It's fluctuated.  It started with three and
4  ended with three, if it's over.  It probably isn't.  We
5  still meet from time to time, but not with the
6  regularity that we did for the first 23 years.
7     Q.  The staff psychologist position that you held
8  at Bethesda, Christ and Jewish, those all ran from '78
9  to '95.  Why did you stop that?
10    A.  Well, health care went south, as you know,
11 especially mental health care.  And the hospitals
12 basically let go of their psychologists.  They didn't
13 want them, especially due to the turf battles with
14 psychiatry.  Psychiatry didn't want them in.
15        And basically I was on the staff in those
16 hospitals because psychiatry colleagues would ask me to
17 go there to see patients and evaluate them.  And I
18 would do that.  And that pretty much ended in the mid
19 '90s.  So I didn't want to pay my money to stay on the
20 staff.
21    Q.  Is that why your position at HealthSouth came
22 to a conclusion as well about the same time?
23    A.  No.  I ended that because, if you've been
24 reading about HealthSouth lately, I suspected -- and
25 the way they attempted to manage my service, I felt was
                                                    14

1  duplicitous at best, unethical at worst, and I simply
2  decided I did not want to deal with those folks
3  anymore.
4     Q.  Okay.
5         MR. ROBERTS:  We're off the record.
6         (Off the record.)
7  BY MR. ROBERTS:
8     Q.  Doctor, you were also kind enough to share
9  with me identification of testimony that you've
10 provided in cases in the last four years, both by way
11 of deposition and trial, I presume.  And Exhibit 78 is
12 the statement -- the identification; is that right?
13    A.  Yes.
14    Q.  Which of these cases referenced in Exhibit 78
15 are cases in which you testified at trial?
16    A.  I really have no idea.  Okay.  '99, none of
17 them.  2000, I don't remember.  2001, E. Johnson versus
18 E.W. Scripps was a trial testimony.
19    Q.  Do you know which court that might be in?
20    A.  I believe -- it was in Northern Kentucky.  I
21 believe it was the Federal Court for the District of
22 Northern Kentucky.
23    Q.  And do you know the first name of the Johnson
24 individual?
25    A.  Esther.
                                                    15

1     Q.  And on behalf of which party did you
2  testify?
3     A.  Scripps.
4     Q.  What was the nature of the lawsuit?
5     A.  Esther Johnson is a real estate developer in
6  Northern Kentucky who was investigated by Eye One or
7  Channel 9, Eye One News, whatever it is, particular
8  reporter whose name I can't remember.  And Esther
9  Johnson thought that the reporting on her business was
10 slanderous.  And she sued the Scripps news service and
11 this reporter in particular claiming emotional and
12 psychic damage.
13        I examined her on behalf of the defendant and
14 rendered an opinion as to her emotional and
15 psychological condition and the effects of any -- if
16 any, of the news report written about her.
17    Q.  Do you recall who the lawyers were involved
18 in that case?
19    A.  Uh-huh.
20    Q.  Could you share those with me?
21    A.  I mean yes.  The lawyer for Scripps Howard
22 was Phillip Taliaferro.
23    Q.  Do you recall who the other lawyer was?
24    A.  I do not.
25    Q.  How about the Paul Revere case in 2001?
                                                    16
```