1          UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF OHIO

3               WESTERN DIVISION

4                  - - -

5    ERIC L. JEFFRIES,          :  CIVIL ACTION 1:02cv351
                                :
6                               :  Cincinnati, Ohio
                Plaintiff,      :  Friday, October 8, 2004
7                               :
        -vs-                    :
8                               :
     CENTRE LIFE INSURANCE CO., :  Conference in chambers
9    et al.,                    :
                                :
10              Defendant.      :  9:00 a.m.

11                 - - -

12              TRANSCRIPT OF PROCEEDINGS
     BEFORE THE HONORABLE SANDRA S. BECKWITH, CHIEF JUDGE
13                 - - -

14
     For the Plaintiff:    Michael A. Roberts, Esq.
15                         Graydon, Head & Ritchey LLP
                           Fifth Third Center, Suite 1900
16                         Cincinnati, Ohio  45202

17
     For the Defendant:    William R. Ellis, Esq.
18                         Amy G. Callow, Esq.
                           Wood & Lamping
19                         600 Vine Street, Suite 2500
                           Cincinnati, Ohio  45202
20

21
     Law Clerk:  Pat Smith
22   Court Reporter:  Betty Schwab

23

24

25

1    PROCEEDINGS IN CHAMBERS

2         THE COURT:  Well, I read what each of you have

3    submitted.  I looked at the highlighted portions of the

4    proposed mutual settlement and general release agreement.

5    Most of the highlighted portions and, in fact all, as I

6    recall, have to do with the assumptive reinsurance

7    agreement and the tax consequences and not with the

8    confidentiality issue.  Am I correct?

9         MR. ROBERTS:  With the exception of what's

10   highlighted at pages 12 and 13, or at least they should

11   have been highlighted.

12        THE COURT:  Oh, in green.  Yes, yes.  Sorry.

13        MR. ROBERTS:  Which is all a section.

14        THE COURT:  Basically that was all stricken.  So

15   that left the agreement with nothing regarding

16   confidentiality.  Am I right?

17        MR. ELLIS:  Correct, Your Honor.

18        MR. ROBERTS:  That's what the defendants'

19   proposal is.

20        THE COURT:  All right.  Let me tell you what I

21   understand the problems to be, and then you can fill in the

22   blanks or correct me.  We put a settlement on the record

23   April 19th this year.  As I recall, there was an agreement

24   with regard to the tax consequences that Mr. Roberts could

25   work directly with Mr. Cohen to attempt to avoid the

1    payment of taxes on the income generated by the two million

2    dollar settlement, and they reached an agreement regarding

3    the assumptive reinsurance situation.  Apparently, there is

4    a fair amount of discussion between Mr. Cohen and

5    Mr. Roberts, and perhaps Mr. Ellis as well, off the record

6    outside the presence of the Court on the particulars of how

7    that agreement was going to work.

8                    MR. ROBERTS:  Time frame?  Prior to?

9                    THE COURT:  It was not entirely clear to me, but

10   it seems there was discussion of that.

11                   MR. ROBERTS:  Yes.

12                   THE COURT:  Privately, not in the course of our

13   settlement discussions.

14                   MR. ROBERTS:  Both before and after, right.

15                   MR. ELLIS:  I may be able to save the Court some

16   time on this, Your Honor, with regard to the tax issues.  I

17   spoke with Mr. Cohen yesterday.  He, as Mike had suggested,

18   spoke directly with the financial advisor that has been

19   employed, and they are of one mind, and she is currently

20   working it out.  As a matter of fact, he was waiting to

21   hear from her today or soon on some language, because they

22   now understand what we can and cannot do with regard to the

23   agreement.

24                   The problem wasn't the attempt to assist the

25   Jeffries in having it tax free.  The problem was that the

1    language that was used was stating things that DMS could

2    not state with any kind of certainty whatsoever.  And

3    Mr. Cohen and the financial advisor, according to what he

4    told me just yesterday, have come to the conclusion that

5    there is language that is acceptable to both parties that

6    will resolve the problem.  So I don't think the tax issue

7    is a major problem.

8          MR. ROBERTS:  I don't know that Bill's correct.

9    I did get an e-mail from my expert, who is now dialoguing

10   with Mr. Cohen, and the e-mail to me said that she had

11   spoken to him and she is going to come back with a

12   proposal.  So, whether there is one mind or agreement on

13   the tax language, I hope we're there, but right now we're

14   still in the proposal stage.  But, like I said, I'm hopeful

15   that the subject that those two discussed will result in

16   that issue being resolved.  And perhaps we just reserve

17   that in the event it's not.

18         MR. ELLIS:  I believe that one is going to be

19   taken care of.

20         THE COURT:  Okay.  Well, it was concerning to me

21   that, at some point, I think it was Mr. Ellis that said

22   please don't contact Mr. Cohen directly any longer; deal

23   with me.  And I thought that probably is not a practical

24   solution to the problem, because it seemed to me that most

25   of the language that was stricken, and maybe I'm

1   misinterpreting, was stricken by Mr. Cohen, and, if you

2   couldn't contact him directly to ask him the reasons for

3   doing that, you couldn't very easily work out the problem.

4        MR. ROBERTS:  You know, there was a reference in

5   Mr. Ellis' letter to you last week, Your Honor, that

6   suggested perhaps I had spoken to Mr. Cohen without the

7   authority to do so and improperly.  That never occurred.  I

8   was invited to speak to him before our trial on Sunday

9   evening.  I did so.  I was invited to speak with him post

10  trial in settlement.  I did so.  I had phone calls with

11  him.  I had e-mail conversations with him.  The voice mail

12  message he left for me, I believe, is in my declaration.  I

13  want to be clear that there is not the suggestion I spoke

14  to him without the authority to do so.

15        THE COURT:  My understanding was that there may

16  have been some change of heart about whether you should be

17  in contact with him directly, and it didn't seem to me that

18  that was going to help us out very much.

19        Do I understand that direct contact is not a

20  problem?

21        MR. ELLIS:  The direct contact between counsel

22  and Mr. Cohen I don't think is a problem.  Mr. Cohen

23  requested that the rest of the language be worked out

24  between the two of us.  He had said this is what I cannot

25  do.  Then Mike and I talked, and we agreed that the

1    simplest way to do this was to have the financial advisor

2    who was telling Mike, who was then putting language in, to

3    talk directly with Mr. Cohen, who was taking language out

4    and telling me.  So we just cut out the middleman and let

5    the two of them work it out.

6              MR. ROBERTS:  So Mr. Cohen is involved, but with

7    a different representative from Mr. Jeffries.

8              THE COURT:  Well, there is always the potential,

9    when you have too many people passing on messages -- it's

10   like the old party game -- that the message ends up

11   garbled.

12             MR. ELLIS:  We now have it worked out.

13             THE COURT:  Okay.  So resolution of the

14   tax-related language in the settlement is in progress, in

15   process?

16             MR. ELLIS:  Hopefully.

17             THE COURT:  Okay.  Then the other remaining issue

18   is the confidentiality situation.

19             MR. ROBERTS:  I would say yes, but, depending on

20   where that comes out, there might be an issue with regard

21   to the release, Your Honor.

22             THE COURT:  Well, can we talk about -- should we

23   talk about them separately, or are they so interrelated

24   that we can't separate them?

25             MR. ELLIS:  I don't know what the other issue is

1    with regard to the release.

2            THE COURT:  I don't either.

3            MR. ROBERTS:  I think that, if we deal with the

4    confidentiality issue first, that that may or may not take

5    care of the release.

6            THE COURT:  As I understand what Plaintiff's

7    position is, and Plaintiff has submitted information that

8    seems to support his position, that the terms of the

9    confidentiality provision to be included in the settlement

10   agreement was reserved to the plaintiff.

11           MR. ROBERTS:  It was.  And if I could highlight

12   exactly how we got to that position again, there were

13   settlement discussions that were conducted with the Court's

14   assistance during the week or ten days prior to the

15   scheduled trial date of April 19th, and they weren't

16   successful.  But on Sunday, April 18th, at 8:30 in the

17   evening I was invited to call Mr. Cohen.  And he and I

18   spoke, and we resolved -- I thought we had resolved an

19   issue about tax ability that was concerning to

20   Mr. Jeffries.

21           We also discussed confidence, and we agreed that

22   it would be at Mr. Jeffries' election if we settled, but we

23   hadn't settled that evening.  The next day, we proceeded to

24   trial, and, in the course of the proceedings the next day,

25   during the lunch hour the parties did reach an agreement.

1   And when we articulated our agreement to the Court, we

2   returned to the Court at about 2 p.m., and the transcript

3   of that afternoon began with the Court asking that, on

4   behalf of the plaintiff, I recite what the settlement terms

5   were.

6          And at page two of the transcript from that day,

7   I say:  Thank you, Your Honor.  Prior to the trial, the

8   defendant offered to pay to the plaintiff two million in

9   exchange for return of the disability policy, the return of

10  confidential documents, and left to the plaintiff an

11  election on confidentiality provisions relating to the case

12  and the settlement.

13         And there are further terms that go on, but then

14  at page four the Court invited Defendants' counsel,

15  Mr. Ellis, to state whether I had accurately reflected the

16  terms.  And Mr. Ellis says:  Your Honor, the offer that was

17  made accurately stated, to the extent I thought we were

18  asked, to provide half up front.  And he talks about

19  payment of cash.  But nonetheless, he affirms that I

20  accurately represented that the parties' agreement was that

21  confidence is at Mr. Jeffries' election.

22         The Court then, somewhat perhaps quizzical as to

23  the confidentiality provision, at page six says, quote:

24  And the confidentiality is at the option of the plaintiff;

25  is that correct?  And I respond yes.  And Mr. Ellis'

 1    response was, quote:  It's not an issue for us, Your Honor.

 2            There were several other references to

 3    confidentiality throughout the transcript that I have

 4    highlighted that I provided to the Court.  At the bottom of

 5    page six and top of page seven, Mr. Ellis says, quote:  It

 6    makes no difference to us.  We will, of course, ask for the

 7    information Mr. Roberts found concerning it be sealed, the

 8    same with Mr. Jeffries.  No problem.

 9            Later I, through Mary Brown, the Court's

10    assistant, asked that the case be sealed, and Mr. Ellis

11    objected to that.  So, as of today, the record 02-351 is

12    not sealed.  All the documents remain public record.

13            Later in the course of that hearing at page 22,

14    Mr. Ellis said, line 23:  I think what we can do is this:

15    Today we will agree to confidentiality of all materials

16    related to Mr. Jeffries' claim, and it will not be

17    surrendered without an order of the Court.  And Mr. Roberts

18    will receive notice if anyone suggests they're going to

19    seek it by subpoena or court order, and we will leave it at

20    that today.

21            I have not received any communication from

22    Mr. Ellis that anyone has sought that information from his

23    office or his client, and I have not been advised by

24    Mr. Ellis that they've willingly given any information to

25    anyone, but we suspect perhaps an inquiry on that line is

1    appropriate.

2         At line 25 or -- excuse me -- page 25, line 13 of

3    that transcript from April 19th, Mr. Ellis says:  I don't

4    know what the concern is of the plaintiff, but I will

5    guarantee you this stuff is not going anywhere.  So we had

6    Mr. Ellis' guarantee on behalf of the plaintiff as of April

7    19th that, from that moment forward, they were to keep it

8    confidential.

9         The issue that now arises is Defendant says they

10    never suspected that Mr. Jeffries' election on

11    confidentiality could have been unilateral.  They said that

12    was not within the concept of what he perceived

13    Mr. Jeffries' election to be.  Well, that's not material.

14    It's like discretion.  What they agreed to do, what they

15    said was not an issue for them, was to leave confidence at

16    Mr. Jeffries' election.  He could elect that it be mutual.

17    He could elect that it be unilateral.  He could elect that

18    it be complete.  He could elect that it be partial.  He

19    could elect that it apply on Tuesdays if he wanted to and

20    not on Wednesdays.  It was his election in his sole

21    discretion to decide what he wanted in the way of

22    confidence, and that understanding is patent from how the

23    proceeding concluded.

24         The proceeding concluded at page 35 with juror

25    number one asking the Court:  May we hear the settlement

```
 1   terms?  The Court's response was at page 35:  Mr. Roberts,

 2   how does your client feel about it?  And I said my client

 3   would allow the jury to know.  What does that say?

 4   Mr. Ellis was in the courtroom.  The Court did not ask

 5   Mr. Ellis for his consent.  It was obvious to the Court and

 6   obvious by Mr. Ellis' failure to object that it was for

 7   Mr. Jeffries to decide which, if any, third parties could

 8   know of the settlement terms.  The jurors were third

 9   parties.  The Court said:  Mr. Jeffries, can they know or

10   can they not know?  It's up to you.  It's his election.

11   That was the understanding.  These are third parties that

12   came to know the terms of the settlement only because

13   Mr. Jeffries desired that they know.  It wasn't a mutual

14   consent.  It was completely up to him.

15           Articulating the terms of the settlement to the

16   jury did not prevent Mr. Jeffries from asking for

17   confidence from anyone at any point in time.  It was his

18   election.  He decided that they could know.  He can also

19   decide that other people can or can't know.  It was his

20   election.  They didn't object.

21           What transpired after we left that day was drafts

22   of the settlement agreements were exchanged.  I proposed a

23   settlement agreement that said Mr. Jeffries is going to

24   keep it confidential to the extent he desires, but he

25   requires that the defendants and all their agents and the
```

1    lawyers keep it confidential.  And the defendant says

2    they're not going to agree to that now.

3           It's exactly in contradiction with what happened

4    on April 19th, what they committed to on April 19th.

5    What's obvious from expressing the settlement terms to the

6    third-party jury was that it was Mr. Jeffries' decision and

7    his decision alone, and Defendants would just have to live

8    with it.  And if Mr. Jeffries requires that they keep it

9    confidential, that's what they have to live with.  That's

10   what they agreed to.

11          That was the term that was promised in exchange

12   for releasing the jury, and now they won't agree to it.

13   Mr. Ellis will say:  Well, Mr. Roberts, not Mr. Jeffries,

14   Mr. Roberts breached the confidentiality agreement because

15   he provided information about the Jeffries case to another

16   client, Mr. Kearney.

17          I don't know if the Court is aware, but I also

18   represent another individual who's been sued by DMS.  DMS

19   is third-party administrator for another insurance company

20   called Jefferson Pilot.  There wasn't a lot of discovery in

21   that case before Jeffries concluded, but I had been

22   retained by that individual before Jeffries concluded.

23   During the process of representing that individual, I

24   shared information that I came to know about DMS.

25   Subsequent to April 19th, I've continued to discuss with

1     that individual information about DMS.  I have not revealed

2     to that individual anything confidential.

3           The Court may or may not be mindful, but in the

4     Jeffries case, which was initiated in May of 2002, there

5     was no suggestion of a protective order until March of

6     2004, almost two years.  And the protective order was very

7     discreet.  It applied to personnel files and other

8     information that had to be marked "confidential."  Nobody

9     has seen those confidential materials.  Those were all

10    returned to Mr. Ellis.  Mr. Kearney has not seen those.

11    They have not been provided.

12          But, nonetheless, it's a nonissue because, if Mr.

13    Jeffries decides that Mr. Kearney can know about his case,

14    it's his election, just like the jury.  Mr. Kearney is no

15    different than the jury.  He's a third party that

16    Mr. Jeffries could choose to share that information with.

17          Mr. Ellis makes a representation in his letter of

18    September 30th that some lawyer in Arizona has gotten

19    information about the Jeffries case.  That's true.  I

20    contacted that lawyer after Mr. Ellis made that

21    representation.  His name is Charles Surano.  And I sent

22    him an e-mail, and I talked to him on the phone.  I said,

23    what have you learned.  Apparently, Mr. Kearney has sent

24    that lawyer, Charles Surano, some deposition transcripts.

25          I have, if the Court desires to review it, an

1    e-mail from Cathy Smith, who is Mr. Surano's assistant.

2    Mr. Surano, because the procedure rules in Arizona require

3    it, disclosed to DMS in a case called <u>Phillips v. Mass</u>

4    <u>Casualty Insurance Company</u>, the same defendant as here,

5    disclosed the sixth supplemental disclosure of the

6    plaintiff in June of 2004.  And in that disclosure on

7    behalf of Mr. Phillips, Attorney Surano reveals that he's

8    gotten some depositions from a lawyer in a case called

9    <u>Gralnek v. Mass Casualty</u>, a case called <u>Perry v. Mass</u>

10    <u>Casualty</u>, a case called <u>Novak v. Mass Casualty</u> and a case

11    called <u>Odom v. Mass Casualty</u>.  This lawyer in Arizona has

12    gone to great lengths to speak to lawyers who have gone up

13    against DMS and Mass Casualty, including speaking

14    apparently to Mr. Kearney.

15              According to this disclosure, Mr. Kearney or

16    someone other than me provided this lawyer with the

17    deposition transcripts of John Graff, Andy Cohen and Jeff

18    Champagne.  Those deposition transcripts were filed in the

19    public record in this case.  The depositions in whole and

20    many parts of them were cited in briefs and attached as

21    attachments to the briefs.

22              There is nothing confidential, nothing

23    confidential, about those deposition transcripts.  They're

24    not subject to any stipulated protective order.  They're

25    not marked confidential according to my protective order.

```
 1   They are part of the public record.  There is no breach of

 2   any confidence because some lawyer in Arizona, who is doing

 3   his job contacting plaintiffs throughout the country, comes

 4   up with this public record of a deposition transcript.  You

 5   don't even get there, because it doesn't matter.  It was

 6   Mr. Jeffries' election about who could and who couldn't

 7   learn information about his case.

 8            Maybe even more important than that is in May of

 9   this year I made efforts through the Court's assistant Mary

10   Brown to have the record sealed, and Mr. Ellis objected.

11   So that record remains public because Mr. Ellis objected to

12   having it sealed.  So it's a public record.  There is --

13            I submit, Your Honor, it is not logical, because,

14   within the past couple weeks, I have told Mr. Ellis:  Hey,

15   you know, if you want to talk about a confidentiality

16   arrangement, we could possibly, you and I, talk about

17   something that could be mutual that would meet whatever

18   your client's interests are.  He flatly rejected my offer

19   to speak, and he did that because, he says, "you breached

20   it."

21            Well, I haven't breached it, and it doesn't make

22   sense to me that, if I offer to get together and enter some

23   mutual confidential arrangement, that they wouldn't take me

24   up on that, unless the only thing I can come up with to

25   explain the position that they present to you today, Your
```

1   Honor, the only thing I can come up with is that they

2   haven't kept it confidential.  And if they haven't kept it

3   confidential, that would explain why it is they don't want

4   to be bound by any confidential right now.  That is what

5   makes the release an issue, because they guaranteed, his

6   own word, "guarantee you we'll keep it confidential" on

7   April 19th.

8          If he hasn't kept it or his clients haven't kept

9   it confidential since April 19th, then there is a real

10   concern about a legal claim.  Mr. Jeffries and I have

11   reason to believe that a third party has come to know

12   information about the case through Mr. Ellis or his clients

13   that may be causing Mr. Jeffries damage, any claim that may

14   exist presently for a breach of that guarantee.

15          I would ask that the Court inquire of Mr. Ellis

16   about what disclosures he's made since April 19th.

17          THE COURT:  Mr. Ellis?

18          MR. ELLIS:  Your Honor, I don't think it was ever

19   contemplated that the confidentiality that we left to

20   plaintiffs' election could be partial, selective or

21   unilateral.  None of those makes any sense for my clients,

22   obviously.  The concern that we have for the unilateral

23   confidentiality is very simple.  As Mr. Roberts has

24   evidenced in depositions in Mr. Kearney's case, he will use

25   the information in the Jeffries case offensively, spin it

1    how he will in his prosecution of other cases. He's also,

2    or someone has, through Mr. Roberts, disseminated this

3    information to other plaintiffs' lawyers around the

4    country. So we're going to be faced with the information

5    that was developed in the Jeffries case and the outcome of

6    the Jeffries case and so forth with the spin of the

7    particular plaintiff's attorney who has it.

8            Under the confidentiality agreement as proposed

9    unilaterally, Plaintiffs can spin it and do whatever they

10   wish with it, and our only response can be it's

11   confidential. If we do that, then the Courts involved in

12   those cases get a significant misimpression about what

13   happened here, and they get a significant misimpression

14   about what DMS or its other insurers, insurers for whom it

15   works, can say what has happened in the past.

16           We had the experience in the transcripts in the

17   Kearney case. I brought for you some examples of what kind

18   of things we're dealing with. It's true we agreed not to

19   seal or we objected to sealing the case, which was, by the

20   way, just days before this deposition that that motion was

21   made, saying we would be glad to seal it once we had the

22   agreement completed and the confidentiality worked out.

23   The Court agreed with us on that and did not seal the case

24   for that purpose.

25           If you look at the first deposition transcript,

1    Exhibit 1 or page 100 and 101, which was the deposition of

2    Valerie Loftin, it's the second and third page that I have

3    given you, Mr. Roberts in his question is asking her if

4    she's mindful of a jury in Ohio concluding that DMS acted

5    in bad faith.

6         Well, now, if we can't respond and say that was a

7    summary jury trial and actually it was settlement technique

8    as opposed to an actual trial, and we can only say it's

9    confidential, there is no dispute that what Mr. Roberts

10   couches as a jury verdict was, in fact, the case.

11        In Todd Ditmar's deposition, page 16 and 17, we

12   had the same situation where he refers to a jury

13   determination in Hamilton County that DMS has acted in bad

14   faith.  Further, on page eight, he discloses the jury

15   verdict -- I'm sorry -- page eight in a discussion with me,

16   he refers to the jury verdict of bad faith again and to the

17   settlement itself.

18        THE COURT:  Are you talking about the Ditmar

19   deposition?

20        MR. ELLIS:  Yes.  This is Mr. Ditmar at page

21   eight and nine.  Page six, which probably should have

22   preceded those, is my objection to Mr. Roberts' use of

23   material from the Jeffries case.  He told me he had already

24   given it to Mr. Kearney and therefore it's a public

25   document, and so he's not bound by it, although it was he

```
 1    using it in the deposition.

 2              Page 65, he marked Exhibit 30.  Exhibit 30

 3    contained documents from the Jeffries case, specifically

 4    personnel records identified as DMS 47, 48 and 49 from the

 5    Jeffries case.  If the Court will skip back just a few

 6    pages, you will see that a motion was made to seal what was

 7    then called Exhibit 3, which was DMS pages 47 to 53,

 8    including the pages that were used in this deposition.

 9              MR. ROBERTS:  Where are you reading from?

10              MR. ELLIS:  There would be a motion to seal

11    Exhibit 3, which is a couple -- which is at the end of the

12    transcripts.  That generated a Court order which

13    immediately follows in which Judge Hogan, under the heading

14    "Defendants' Motion to Seal Exhibit 3," said Defendants'

15    motion placing Exhibit 3 under seal is unopposed and hereby

16    granted.  The exhibit contains information from the

17    personnel file of one of the defendant's employees.  The

18    Court finds such information to be protected from public

19    query and Plaintiff's failure to take issue with this fact

20    is sensible.

21              Further, two pages later in that order on

22    follow-up performance evaluations, the Court says that the

23    only way to get to the truth is to order the disclosure of

24    redacted -- of the redacted material made in these cases

25    and that that would be subject to a protective order, which
```

1   is what the Court said.  Further on the next page, the next

2   order stipulated protected order pursuant to Magistrate

3   Hogan's March 23rd order, item two, this order applies to

4   the financial information referenced in March 3, '04 order,

5   the administrative services agreement and previously

6   redacted performance evaluations, all of which Mr. Roberts

7   used in the Kearney case.

8            My client has no belief at this point that there

9   ever was an intention on the part of Mr. Jeffries or his

10  counsel to keep anything confidential, and we know that it

11  has spread around the country already.

12           Mutual confidentiality makes no sense to anybody.

13  It was never contemplated by me.  It was never

14  contemplated, and, if we did not have a meeting of the

15  minds, we did not have a meeting of the minds, and then

16  Mr. Jeffries would have the option of saying we did not

17  settle the case, at which case we can put it back on the

18  trial calendar.

19           My client can't take the untenable position of

20  not being able to respond to the information from the

21  Jeffries case being spun whichever way Mr. Roberts or some

22  other plaintiff's attorney wishes to spin it without being

23  able to respond to it other than saying it's confidential.

24  There was no mention in that entire transcript before the

25  court settlement of unilateral confidentiality.  That word

1    doesn't appear anywhere in the transcript, and I have read

2    it four times.

3            In fact, if the Court looks at that transcript,

4    and specifically at pages six and seven, which was

5    partially suggested by counsel, it's apparent that, when he

6    asked that all of the information in the case be sealed,

7    that I was saying it makes no difference to us of course,

8    expecting that all of the information that he has would

9    also be sealed.  It showed that I asked for it to be

10   mutual.  Likewise, throughout, I have said I would keep it

11   confidential, and we were assuming at the time that that

12   was a request for mutual confidentiality.

13           The only one who was raising the issue of keeping

14   it confidential was Mr. Roberts, but I never believed for a

15   moment that he expected my client to sit dumbly by while he

16   spreads information around the country to other plaintiff's

17   lawyers and then gags our ability to respond to it.  So we

18   can't agree with unilateral confidentiality.

19           His offer to now make the confidentiality mutual

20   has the same effect as unilateral, because the information

21   has already been spread by Mr. Roberts and his other

22   clients to various and sundry people around the country.

23   So there is no advantage; in fact, there is a significant

24   disadvantage to gagging my client in its response to the

25   way this information is being used in other cases.  And

1    that's our concern with regard to confidentiality.

2              MR. ROBERTS:  Your Honor, may I have a brief

3    reply?

4              THE COURT:  Um-um.

5              MR. ROBERTS:  Mr. Ellis' 90-second overview of

6    what he suggests was improper disclosures by me in Kearney

7    depositions is baseless.  Following those depositions -- we

8    were here before you at the trial on April 19th.  Those

9    depositions occurred May 14th.  Following those

10   depositions, in June of this year Mr. Ellis filed a motion

11   with Magistrate Judge Hogan, who happens to be the

12   magistrate on the Kearney case; he was the magistrate on

13   this case.  Judge Hogan was very mindful of the discovery

14   issues in the Jeffries case.  Mr. Ellis filed a motion

15   asking that Judge Hogan or Judge Spiegel sanction me

16   personally for having breached some confidentiality

17   arrangement in the Jeffries case by using this same

18   information that he's highlighted to you.  Judge Hogan

19   resolved that motion by finding that Mr. Ellis' allegations

20   were, quote, baseless, and he sanctioned Mr. Ellis for even

21   suggesting that what I did in Kearney violated anything

22   that was protected in Jeffries.

23             So I could respond in detail to defend what he

24   asserts as improper conduct in Kearney.  It's baseless.  It

25   essentially comes down to this.  Like I said, there was no

 1   suggestion of a protective order of confidentiality in

 2   Jeffries until March of 2004.  Months prior to that, I had

 3   been retained by Kearney, and I was providing Kearney with

 4   nonprotected information.  In August of 2003, eight months

 5   before there was any suggestion of confidentiality, in

 6   August of 2003 I received a letter from Mr. Ellis, which is

 7   Exhibit 31 in the Jeffries -- in the Kearney transcript.

 8   He referenced Exhibit 30.  Exhibit 31 is his cover letter

 9   to me from August of 2003 saying:  Mike, enclosed please

10   find the personnel files that are Bates labled 01 through

11   0100.  There was no suggestion of confidence in the cover

12   letter.  There was no suggestion of confidence or

13   protective order prior to the cover letter.  There was no

14   statement of confidence on these documents.  Those

15   unprotected documents are what I used in Kearney.

16          The allegation, as Judge Hogan has already --

17   he's read motions on it; he's read the set of exhibits;

18   he's gotten more than that 60-second snippet from

19   Mr. Ellis.  He concluded that what Mr. Ellis is arguing is,

20   quote, baseless.  It's document number 76 in case number

21   02-479.

22          MR. ELLIS:  To my knowledge, I have not been

23   sanctioned for filing any frivolous motion.  Also to my

24   knowledge, at Mr. Roberts' request, his counsel and my

25   counsel spoke with Judge Beckwith -- I'm sorry -- with

1    Magistrate Judge Hogan concerning the issues that were

2    raised in that.  I had offered and continue to offer to

3    have that entire record reviewed by an independent member

4    of either the judiciary or the ethics committee to

5    determine whether or not things broke.  My understanding

6    also is that, at Mr. Roberts' request, that particular

7    order has been stricken or is to be stricken.

8              THE COURT:  Document number 76?

9              MR. ELLIS:  Document 76.

10             MR. ROBERTS:  It was a recommendation that

11   Mr. Ellis and I each be sanctioned, and Judge Hogan has

12   stated that he intends to withdraw that, but he hasn't.

13             But my point is the same.  I mean, that doesn't

14   affect the point.  My point is Mr. Ellis made this argument

15   to Judge Hogan, who reviewed it and said, Bill, that's

16   baseless, and I'm going to sanction you for even suggesting

17   it.  That's the point.

18             Has Mr. Ellis been sanctioned as we sit here

19   today?  No.  Judge Hogan was persuaded that, largely

20   because of efforts I made to smooth the waters with

21   Mr. Ellis, that it should be stricken, and he hasn't to

22   date, but my understanding is he intends to.  I hope he

23   does.

24             MR. ELLIS:  Regardless, Your Honor, I don't know

25   how the Court can ignore the specific sealing of the

1    specific exhibit that was used in the deposition still

2    bearing the same Bates numbers identified in the motion

3    sealed by the Court.

4            I don't want to get into the issues that we had

5    in front of Judge Hogan.  I can only tell the Court that,

6    with regard to confidentiality, the fact that information

7    from the Jeffries case has spread throughout the country

8    and among plaintiffs' lawyers and is being used

9    aggressively by them and by Mr. Roberts in other cases

10   offers no basis or no reason for us to even consider

11   maintaining any confidentiality.  If we are going to have

12   to respond, we're going to respond in full to these various

13   allegations so that other courts don't get a misimpression

14   about what occurred in the Jeffries case.

15           MR. ROBERTS:  But it's a public record.  As we

16   sit here today, it's as public as today's Cincinnati

17   Enquirer --

18           MR. ELLIS:  And it will stay there.

19           MR. ROBERTS:  -- because I asked that the 02-351

20   record be sealed and Mr. Ellis refused to consent to that.

21   So the three depositions that are now in the possession of

22   some lawyer in Arizona are as public as any document that

23   exists.

24           THE COURT:  All right.  I buy that.  As far as

25   I'm concerned, the only issue in play now is personnel

1    records that were used in the deposition in the Kearney

2    case that were under seal, as I understand it.

3              MR. ROBERTS:  That's not the case.  There was one

4    personnel file that was asked to be put under seal in the

5    Jeffries case, and it was.  It is under seal apparently in

6    the Jeffries case.

7              THE COURT:  And it was not used in any other

8    deposition?

9              MR. ROBERTS:  It was used in Kearney.

10             THE COURT:  Okay.

11             MR. ROBERTS:  I mean, it was under seal in the

12   Jeffries case, and Judge Hogan drew a line there.  There

13   was no overriding protective order that that couldn't be

14   used.  It was placed under seal in the Jeffries case.  It

15   and the other personnel files that were never marked

16   confidential, were never subject to a protective order,

17   were used in Kearney.

18             I have offered, and this is what I offered as

19   soon as Mr. Ellis objected, when he called Judge Hogan

20   during the middle of the deposition, I said, Judge, I'm

21   happy to redact any names, any identifying information from

22   these as exhibits to this deposition transcript.

23             When I offered them as a deposition exhibit, I

24   didn't think there was a problem, because I had had them

25   for eight months.  I had shared them with Mr. Kearney

```
 1    months before there was any request that they be held

 2    confidential or put under seal.  Months.  They were in my

 3    possession and I shared them with my client.  When I

 4    offered them in the deposition, a phone call was made to

 5    Judge Hogan five minutes later.  I said, Judge, we will

 6    redact any identifying information from these.

 7              That issue has been briefed extensively, and

 8    Judge Hogan's conclusion, which I agree with, is that the

 9    allegation I did anything improper is baseless.

10              THE COURT:  Those items are now under a

11    protective order or under seal in the Kearney case?

12              MR. ELLIS:  No.  We requested that the Court --

13    let me think about that.  I don't remember whether we

14    requested the Court strike them or put them under seal or

15    not, because, frankly, they're out in the public, and

16    plaintiffs' lawyers around the country have been given

17    them.

18              MR. ROBERTS:  I have not given them to anybody.

19              THE COURT:  I thought you had indicated that you

20    had filed a motion subsequent to the depo.

21              MR. ELLIS:  We had, Your Honor.

22              THE COURT:  Motion to place Exhibit 3 under seal.

23              MR. ELLIS:  That was in the Jeffries case, Your

24    Honor.  That's this one.  That was the one that resulted in

25    an order sealing it before it was used.  Also, there is a
```

1    second order which refers to the previously redacted

2    personnel records, because, as Judge Hogan said, personnel

3    records are not to be put out in the public.

4         They are out in the public, and they're being

5    used by Mr. Roberts, and I expect we'll see them in other

6    cases as well.

7         MR. ROBERTS:  So the record is clear, the

8    previously redacted -- the reason why I got two sets of

9    personnel files is because one was so redacted that it

10   didn't make such sense.  So I went to the Court and said,

11   Judge, I got some redacted personnel files.  There was no

12   agreement about what could be redacted.  There was no

13   statement about what would be redacted.  I don't know

14   what's been redacted.  I need them produced again.  And

15   Mr. Ellis went to the Court and said, well, I will produce

16   them again in unredacted form, but those unredacted forms

17   need to be subject to protective order.  And they were.  It

18   was the unredacted personnel files that were subject to the

19   protective order.  The redacted ones, which I had for eight

20   months without any request for confidence and which I

21   shared with my other client, were never subject to any

22   protective order.

23        THE COURT:  Okay.  Seems to me the fair and

24   simple solution is that the settlement agreement should

25   contain the language proposed by the plaintiff with

```
 1   additional language that would permit the Court to allow

 2   the disclosure of otherwise confidential information in

 3   response to information that the plaintiff's counsel might

 4   use in other cases.

 5           If you choose to open the door, then defense

 6   should be allowed, or it's actually the reverse in the

 7   other case right now, should be able to respond with any

 8   information that would otherwise be confidential.  And it

 9   would have to be done in good faith of course.

10           MR. ROBERTS:  I think that concept is already

11   within the agreement.  I mean, their obligation of

12   confidence is absolutely absolute absent process, subpoena,

13   something like that, as every confidentiality agreement

14   contains.

15           So, you know, I meant to say this earlier, but

16   Bill's major argument is, gee, Mike Roberts and his client

17   and other plaintiffs around the country can talk about the

18   Jeffries case and we have to stay mum.  That's not true,

19   because process can open the door for Defendant to say, and

20   that's contained in the agreement.  So that concern really

21   is hollow.

22           But so it's consistent with what you're saying,

23   but I suggest it's already contemplated.

24           The problem exists, Your Honor, because there is,

25   I believe, a third party out there that's not issued any
```

1  subpoena to Mr. Ellis or his clients who, I believe, has

2  been educated by Mr. Ellis or his clients since April.

3      THE COURT:  Mr. Ellis, has any of the information

4  that you said you would hold confidential been shared with

5  third parties?

6      MR. ELLIS:  No ma'am, not a single document.

7      MR. ROBERTS:  What about just conversations?

8      MR. ELLIS:  Not a single word about the

9  settlement, its amount, other than that there was a

10  confidential settlement, and that was in response to a call

11  from Prudential's counsel who told me that Mike Roberts had

12  called him and said he had some significant success against

13  us.  And he wanted to know the details, and I didn't give

14  them to him.  So Mr. Roberts had spoken with him and

15  prompted his phone call to me.  I have not provided him

16  with anything, nor have I received a subpoena from him.

17      However, Your Honor, in keeping that good faith

18  from April 19th, we were unaware and remained unaware,

19  until the use of the materials in the Kearney case, that

20  Mr. Roberts had an unspoken idea of unilateral

21  confidentiality to which DMS cannot and will not agree.  If

22  there was not a meeting of the minds in the settlement

23  agreement, so be it.  If that is a deal breaker and we have

24  to try this case, so be it.

25      As to the language that's provided by Mr. Roberts

1    in his desired confidentiality agreement, if the Court

2    reads it, it requires me to surrender my litigation file to

3    him.   That I will not do without this Court's order and an

4    appeal from this Court's order, because that is my

5    litigation file.   It is attorney-client privileged, and I

6    will not turn it over to Mr. Roberts willingly.

7            It also requires experts in our case to sign off

8    on a settlement agreement while requiring no one on his

9    side to do the same.   It also requires that all files and

10   all materials developed either in litigation with experts

11   or at DMS be turned over to Mr. Roberts, with the exception

12   of one copy of what DMS deems is appropriate, which is

13   basically all they keep anyway.   But I'm not turning over

14   all of the exhibits and everything else or all of the

15   documents and all my communication, electronic and

16   otherwise, with my client to Mr. Roberts, nor is my client

17   going to turn over to Mr. Roberts just because it happens

18   to mention Jeffries.   So we're just not willing to do what

19   Mr. Roberts demands and suggests that we somehow agreed to.

20           If the Court looks at the transcript, you will

21   see that I said:   I don't know what, if anything, I can

22   give him until I hear from Mr. Cohen.   Mr. Cohen has

23   refused the suggestion that we surrender the videotapes.

24   He said he will not gut a claims file that could be

25   reviewed by a third party, and that's his ruling on it.   I

```
 1   said at the very beginning I didn't know the answer to the

 2   question.  I think my exact words were I would have to get

 3   authority from on high to agree to provide Mr. Jeffries

 4   with all this material.  I got the opposite answer.

 5            So we can't do what Mr. Roberts has demanded to

 6   do, and we have no real desire to enter into a unilateral

 7   confidentiality agreement by which material is spread and

 8   has been spread.  You can't really put the horse back in

 9   the barn here on this one.  It's out.  It's among the

10   plaintiffs' counsel around the country, and we are going to

11   see it time and again, and we are going to respond to it

12   appropriately with the information that we have on this

13   case.

14            So, you know, if we did not have a meeting of the

15   minds and if I did not understand the unspoken unilateral

16   or selective idea that Mr. Roberts had when he suggested

17   confidentiality, which will be the first time in 30 years

18   of practice I have ever seen confidentiality that wasn't

19   mutual.  Confidentiality means keep something quiet; keep

20   it concealed; keep it under wraps.  If one party does it

21   and the other doesn't, it's not confidential.  It's a

22   contradiction in terms.

23            THE COURT:  Mr. Ellis, by the same token,

24   Mr. Roberts could argue that your unspoken expectation that

25   there would either be full mutual confidentiality or no
```

1  confidentiality is no less --

2          MR. ELLIS:  Absolutely correct, Your Honor.

3          THE COURT:  -- a problem.

4          MR. ELLIS:  So if we didn't have a meeting of the

5  minds, then we don't have an agreement.

6          THE COURT:  But what you said in open court is we

7  don't care.  It's at the election of the plaintiff.

8          MR. ELLIS:  Confidentiality or no

9  confidentiality, that's correct.

10          THE COURT:  But that isn't what you said.

11          MR. ELLIS:  I said confidentiality is at the

12  election of the plaintiff.  The Court said the same thing.

13  I don't believe that the Court suspected at that time that

14  one side would be able to do whatever they wanted with the

15  material and spread it anywhere they wanted and the other

16  side would have to stay mum.

17          MR. ROBERTS:  Yes, it did.  That's when the jury

18  came in.

19          MR. ELLIS:  I'm sorry.  I was asking the Court

20  what the Court perceived.  If the Court perceived that this

21  was unilateral, then I was the only idiot in the room that

22  didn't.

23          MR. ROBERTS:  When the jury returned, the jury

24  asked the Court can we learn.  The Court turned to

25  Mr. Jeffries and asked him and him alone.  Now that request

1  to Mr. Jeffries and his saying, yes, they can learn, didn't

2  mean -- I don't think anybody in the room thought that

3  meant everybody in the world can know everything.  It was

4  his election to let this third party know.  That was the

5  understanding.

6       And the point Mr. Ellis makes about they're not

7  going to give me anything now, that consumed an extra 45

8  minutes on April 19th.  What I understood on April 19th

9  what the concern was, we need to keep what we need to keep

10  to keep state regulators happy.  So they need one copy.

11  They need to keep -- my understanding going away on April

12  19th was they were going to keep one copy of whatever they

13  required to keep state regulators happy; otherwise,

14  everything would be returned to me.

15       I have not received any documents from Mr. Ellis

16  since that day.  I have returned to Mr. Ellis all documents

17  he gave me marked confidential.

18       THE COURT:  Well, it seemed to me that the

19  authority or, well, I guess authority to determine the

20  terms, if any, of any confidentiality agreement were vested

21  in the plaintiff.  And the reason I asked the question is

22  it's usually the defendant who says I demand a

23  confidentiality agreement as a part of this settlement.

24       MR. ELLIS:  Which is correct.

25       THE COURT:  Which you did not do.

1          MR. ELLIS:  No, because we didn't particularly

2    care whether it was confidential or not.  But we're not

3    going to be -- I don't think we should be placed in a

4    position where we're the only ones that have to keep it

5    confidential.  The plaintiff can and has done anything it

6    wants with the material in the file.  And if it's a public

7    document, as counsel says, until we reach this agreement, I

8    guess I can distribute anything I want to anybody I care

9    to.

10          MR. ROBERTS:  We settled the deal on April 19th

11    with your guarantee that it would remain confidential.

12    That was clear.

13          MR. ELLIS:  That guarantee was contingent upon it

14    being mutual.  My understanding was that it was mutual.  If

15    I misunderstood you, Mike, I'm sorry, but then we don't

16    have an agreement.

17          THE COURT:  Well, technically, I think that the

18    language here only permits Centre, its counsel, DMS or any

19    expert retained by Centre or its counsel to reveal

20    confidential information in response to a subpoena seeking

21    testimony or documents relating to the Jeffries case.

22    Obviously, if Centre, its counsel, DMS or any experts

23    retained by Centre or its counsel needed documents from the

24    Jeffries case in order to respond to any information that

25    came out in another case, Mr. Ellis wouldn't be serving the

1    subpoena on himself.  So maybe that's a problem.

2         But I think, based on the record, that the

3    plaintiff has a perfect right to say I elect unilateral

4    confidentiality or partial confidentiality.  I think the

5    defendant makes a valid point that, if the materials that

6    have been deemed to be confidential are legitimately at

7    issue in another case and the defendant would be unfairly

8    disadvantaged by not being able to produce those materials,

9    there should be some safety valve in the settlement

10   agreement.

11        But to say that, because Plaintiff intends to

12   reserve to himself the right to disclose whatever he

13   chooses in the case and not give the defendant the same

14   option, I think is what you asked for, what you opened the

15   door to.  And you say it makes no difference, and it

16   doesn't make any difference as long as you are able to

17   utilize the material to the extent necessary to defend your

18   current or future clients from any otherwise confidential

19   material that has come into Mr. Roberts' hands as a result

20   of this case.

21        MR. ROBERTS:  I've never heard that concern

22   articulated by Mr. Ellis, but I have offered to discuss

23   with him adding terms to this agreement, and he's refused.

24   I think what you're suggesting is appropriate and

25   reasonable, and I think we would agree to it.

37

1    MR. ELLIS:  Your Honor, this issue is not going

2    to come up only in cases that I have with DMS.  It's

3    already coming up in a state court case in Arizona in which

4    DMS is represented by counsel in Arizona.  All of DMS's

5    outside counsel will have the same difficulty as they're

6    faced with information that was provided and disseminated

7    from the Jeffries case.

8        Had there been a situation in this case where

9    Mr. Roberts kept personnel files confidential or where he

10   kept the information in the case confidential, as I assumed

11   had been done, as we did with the material that we gathered

12   on his client, we would have had no problem of a mutual

13   confidentiality agreement.  However, to make an agreement

14   to keep mum unilaterally was never contemplated.  I don't

15   think any language that I said in there ever suggests it

16   other than as Mr. Roberts spins it.

17       In 30 years of practice, there either is or is

18   not confidentiality.  Partial confidentiality, unilateral

19   confidentiality is a direct contradiction in terms as I

20   understand the word "confidential" in the English language,

21   and we cannot agree to it.  We did not agree to it.

22       THE COURT:  Well, it seems to me that your

23   argument, at least in part, is for partial confidentiality,

24   because you're saying that the unredacted personnel files

25   were under seal and therefore are subject to either

1  confidentiality or protection of the Court.  And even if

2  you had an agreement that there was no mutual

3  confidentiality, I would think that those items would still

4  remain subject to seal.

5          MR. ELLIS:  Well, Your Honor, they were the

6  subject of the Court orders.  However, with complete

7  impunity, counsel has said, too bad; I did it before the

8  Court order, which we have no way of disproving, and

9  therefore he uses whatever he chooses, including ones that

10 were identified specifically by Bates numbers as being

11 sealed.  So we have no reason to believe that, even in the

12 mutual confidentiality agreement, at this point that it

13 would be adhered to by the plaintiff.

14          So we just don't know exactly where to go from

15 here.  We were willing on April 19th, with the assumption

16 that the case, all the documents in it were going to be

17 sealed, all done, everybody's confidential; it's over.

18 That's not a problem.  What Mr. Roberts proposes and the

19 language that he proposes is a significant problem.  It's a

20 problem that I don't think we should be forced to bear, and

21 we're going to have to do whatever is necessary not to be

22 so handicapped as to have our information, including the

23 financial information in the deposition of chief counsel,

24 which, although the Court never ruled on, we did ask to be

25 sealed and we asked Mr. Roberts to agree to be sealed.  No

1    matter.  It was gone, sent.

2              The simple fact is that we have no confidence

3    whatsoever or reason to maintain confidentiality, and all

4    of our outside counsel are going to have to deal with

5    Jeffries documents throughout the course, because, no

6    matter who we see or where they come from, they will say we

7    got them before such and such an order.  We know at least

8    two counsel in Arizona who already have these depositions,

9    at least two.

10             THE COURT:  Depositions.  But those were in the

11   court record.

12             MR. ELLIS:  Your Honor, everything is in the

13   court record.  All those videotapes are in the court record

14   as well.

15             MR. ROBERTS:  Not by my choice.  I asked they be

16   sealed in April.

17             MR. ELLIS:  We asked that Mr. Cohen's deposition

18   be sealed, and you didn't want to do that.  We moved the

19   Court, and the Court didn't do it.

20             MR. ROBERTS:  I asked you to agree with me that

21   everything be sealed, and you said no.

22             MR. ELLIS:  I'm not going to do it unilaterally,

23   Judge, and neither is my client.  We shouldn't be forced to

24   do so.

25             MR. ROBERTS:  The evidence of that is patent.

1  When the jury came out, it was clear that one person could

2  decide whether this person, third party, could or couldn't

3  learn the terms.  And Mr. Jeffries, consistent with the

4  unilateral confidentiality, said, yes, they can learn.

5           MR. ELLIS:  It's also consistent with mutual

6  confidentiality that was at his election.  If he elected to

7  be not mutually, you know, quiet to a jury, then that's

8  fine.  But never did I suggest that we would keep silent

9  while he spoke and spread whatever he wanted around the

10  country.  That's not fair.  That's just not fair.

11           THE COURT:  Well, I have offered you an option by

12  which you can respond to whatever has been used from this

13  case by Mr. Roberts in any other case, not just you, but

14  DMS's counsel.  It doesn't mention your name.  It says --

15           MR. ELLIS:  It mentions my name specifically,

16  Your Honor.

17           THE COURT:  It says:  If Centre, its counsel, DMS

18  or any expert retained by DMS or its counsel in the action

19  would receive a subpoena, and "in the action" refers to

20  some other action.

21           MR. ELLIS:  It refers to the Jeffries case,

22  Judge.

23           THE COURT:  All right.  Well, then you can solve

24  that problem by adding some language that would protect

25  your client and your client's counsel in other cases

1    elsewhere.

2         I need to do some research, but here are your two

3    options.  I would order, subject to my research as to my

4    authority, unilateral confidentiality with the escape valve

5    to permit DMS or Centre Life or their counsel wherever they

6    may be litigating the opportunity to have access to what is

7    otherwise confidential and in the possession of the

8    defendant in our case.

9         The other option is to set the matter for trial

10   again and charge against Centre Life the costs of the first

11   case and probably some sanction for failing to consummate

12   the settlement in good faith.  Because I think the fact

13   that you did not mention or reserve the right to limit the

14   plaintiff's options to full mutual confidentiality or no

15   confidentiality left the door open.

16        MR. ELLIS:  So page seven meant nothing as far as

17   requiring that it be mutual?

18        THE COURT:  Let me look again.  As far as sealing

19   the whole record in this case?

20        MR. ELLIS:  The whole record.  That's the

21   ultimate confidentiality.

22        THE COURT:  It's fine with us, or returning it.

23   It makes no difference to us.  We would, of course, ask for

24   the information Mr. Roberts found concerning us be sealed,

25   and the same with regard to Mr. Jeffries.  No problem.

1          MR. ELLIS:  So there is the whole file sealed, no

2     problem.

3          THE COURT:  Whole record in this case.

4          MR. ELLIS:  Whole record, no problem.

5          THE COURT:  And then, when Mr. Roberts moved to

6     do that, you resisted.

7          MR. ELLIS:  Your Honor, when Mr. Roberts moved to

8     do that, we were having difficulties with the language of

9     the settlement the agreement.  We couldn't very well.

10          MS. CALLOW:  Actually, Bill, at that point we

11     hadn't received a proposed settlement agreement, and we

12     simply suggested to Mr. Roberts that that's part of the

13     settlement agreement; go ahead and send it to us and that

14     will be in there.  Whatever sealing the case was going to

15     be part of the settlement agreement, and we hadn't received

16     a proposed settlement agreement at that point.

17          MR. ROBERTS:  Your Honor, they're talking about a

18     different issue.  If you go a couple lines up as to what

19     Mr. Ellis wants to focus on, after you asked Mr. Ellis

20     about whether it's a confidentiality option at

21     Mr. Jeffries' election, I then say, Your Honor, the only

22     thing I would add as an additional issue is that there is

23     an extraordinary amount of personal information in this

24     record.  We may come to the Court with the request that it

25     be sealed, the actual record here, the 02-351, that it be

1    sealed.  That's a different issue than Mr. Jeffries being

2    able to share with someone at his choice, at his election,

3    what happened, the terms of the settlement.  It's an

4    additional issue.

5              And then Mr. Ellis, there is no agreement on it.

6    It's just:  I would add that we may come to the Court with

7    such a request to seal the record.  And that's what

8    Mr. Ellis' response was directed to.

9              THE COURT:  The other problem that I see is the

10   record in the case is not as far reaching as what would

11   normally be the confidentiality concerns of the parties.

12   There may be information in the hands of either side which

13   is not yet part of the record, which was never filed with

14   the Court, but still may have concerns about sensitive

15   personal or corporate information.  I mean --

16             MR. ELLIS:  Any sensitive corporate information

17   has already been disseminated, Your Honor, so it doesn't

18   matter.  We're already dealing with it in other cases from

19   other lawyers.

20             MR. ROBERTS:  So the record is clear, I have not

21   given a document to anyone other than Mr. Kearney, ever.

22             MR. ELLIS:  Who then gave the document to whoever

23   he wanted and/or Mr. Jeffries.  Whoever spread it around,

24   all we know is the Jeffries documents and the Jeffries

25   transcripts are out there.

1          MR. ROBERTS:  I gave him public record documents.

2          MR. ELLIS:  Well, you gave him personnel records

3    of people from DMS.

4          MR. ROBERTS:  No.  I shared with him over the

5    phone.  I used one in the deposition, and then I

6    immediately said let's redact whatever information concerns

7    you.

8          MR. ELLIS:  That's a little different, Your

9    Honor.  When we challenged the use of those, quote, what we

10   thought were sealed documents in the Kearney case,

11   Mr. Roberts told us he had given them to Mr. Kearney and

12   gotten them back from Mr. Kearney, and that's why they

13   weren't covered by the order, because he had done that

14   before the order went on.

15         MR. ROBERTS:  I had given him information.

16         MR. ELLIS:  If that's the case, that, you know,

17   as long as there's no order on, anything can go off, then

18   we might as well get the case out in the open and let it be

19   done, and then I'll sign any confidentiality the Court

20   wants.  But we did in good faith maintain confidentiality

21   after April 19th.  We didn't use the Jeffries material in

22   any other case.  We didn't use the information or share the

23   information with anyone, contrary to the way we were

24   treated by the other side.

25         Now the Court is suggesting that that is the

1    proper way to do things, that we are bound and they are

2    not.  There is nowhere in that entire transcript where it

3    is ever suggested or stated that Mr. Roberts had the

4    concept that only we would be bound by confidentiality; he

5    and his other clients and Mr. Jeffries could spread

6    whatever they wanted anywhere they wanted around the

7    country.

8            We have now learned that that's what is going on.

9    We have no desire whatsoever to enter into a

10   confidentiality agreement, and I respectfully disagree with

11   the Court that that position puts me in some kind of

12   sanctionable position or bad faith for not going through

13   with an agreement that we never made.

14           THE COURT:  Well, there is nothing in the

15   transcripts where Mr. Roberts said, well, if you will do

16   that, I'll do the same; I'll hold it all in confidence.

17   You're the one who said, more or less sua sponte, I

18   guarantee you we will keep these matters confidential.

19           MS. CALLOW:  Respectfully, Your Honor, that had

20   to do with the videotape specifically.

21           THE COURT:  I don't see that.

22           MR. ROBERTS:  Multiple references.

23           MR. ELLIS:  Your Honor, if you read the entire

24   transcript, I can't tell you how many times I said there is

25   only so much I can do today for the plaintiff to try and

1   get this resolved, but at no time in that entire record was

2   it ever suggested, ever suggested, that this was to be

3   unilateral.  Nowhere was it every suggested it was

4   unilateral.  And in 30 years of practice, I have never seen

5   a suggestion that there be unilateral confidentiality,

6   because the concept doesn't make any sense.

7            THE COURT:  Apparently, it does.

8            MR. ELLIS:  Not to me, it doesn't.

9            MR. ROBERTS:  The evidence of the disclosure to

10  the jury directly contradicts Mr. Ellis' argument.

11           MS. CALLOW:  It could also be argued that

12  evidence of disclosure to the jury was:  Is this

13  confidential or not?  No, it is not; therefore, the jury

14  can find out.

15           MR. ELLIS:  We can interpret this any way we

16  want, but the simple fact is apparently we didn't have an

17  agreement, and I thought that we did.

18           THE COURT:  Well, that's fine if you want to try

19  this case.  You understand the peril, and you understand

20  that the cost of the trial will be assessed -- the aborted

21  trial would be assessed against your client, and I will

22  consider sanctions.

23           And I'm going to look at the extent to which I

24  have authority to simply impose what I perceive to have

25  been the agreement between the parties.  I know that I have

1   the right to interpret what's on the record, as I

2   understand it, and impose it on the parties.  I think the

3   record is pretty clear.

4           MR. ELLIS:  Can I ask the Court if at the time on

5   April 19th this Court assumed this was going to be one way

6   confidential?

7           THE COURT:  I didn't assume either way.  I

8   thought it was entirely at Mr. Jeffries' option.

9           MR. ELLIS:  As to whether or not it was

10  confidential or as to some crafted version of

11  confidentiality that defies the definition?

12          THE COURT:  From full mutual confidentiality to

13  no confidentiality and everything along the spectrum.

14          MR. ELLIS:  Then I'm the one who misunderstood

15  apparently, Your Honor, because I have never seen that

16  before.

17          THE COURT:  Well, I can understand what you're

18  saying.  But I also think that, if the defendant has the

19  right to secure whatever it needs to defend itself here or

20  elsewhere from the record in this case, that that is a fair

21  resolution of the situation.

22          MR. ELLIS:  So that we may go further, Your

23  Honor, I'll have to discuss, obviously, with my client what

24  election we make on this.  So that I can properly discuss

25  this with my client, my understanding is that, if the Court

1    is of a mind to order unilateral confidentiality, that only

2    my client cannot talk about the case, that the plaintiff

3    can spread whatever he wants anywhere he wants in the

4    country, that only when it is used or mentioned in another

5    case are we permitted to divulge information about the

6    Jeffries case.  Is that correct?

7              THE COURT:  That's pretty much correct.

8              MR. ELLIS:  And we can divulge whatever is

9    necessary to respond to whatever is used in the Jeffries

10   case in any other case.

11             THE COURT:  Yes.

12             MR. ELLIS:  All right.  My understanding is

13   further, Your Honor, that you were going to adopt the

14   language that Mr. Roberts put in where my litigation file

15   is given to him.

16             THE COURT:  Help me out here.  I didn't read it

17   as requiring that, but show me the language.

18             MR. ELLIS:  I'll be glad to help you out, Your

19   Honor.  His language specifically is at the end of the

20   portion here that one copy only -- this is top of the page

21   13 of 13.  One copy only of all the information Centre

22   determines is necessary for maintenance in a, quote,

23   Jeffries claims file, end quote, shall be maintained in the

24   possession and the control of DMS general counsel -- just

25   as an aside, he is not the records custodian of the claims

```
1    file -- for as long as DMS shall serve Centre or Centre's

2    third-party administrator.  Any additional copies shall be

3    returned to Mr. Jeffries' counsel, attorney Michael

4    Roberts, forthwith with a sworn certification of William R.

5    Ellis and Andrew Cohen that no additional copies of any

6    information relating to Mr. Jeffries are maintained at the

7    offices of Wood & Lamping, including electronically stored

8    information, or at DMS.

9            Now that is telling me to dispose of my claims

10   file and give it to Mr. Roberts.  I wouldn't do that,

11   Judge.

12           THE COURT:  I don't read that as requiring you to

13   give up any of your work product.

14           MR. ELLIS:  Your Honor, that would be material

15   concerning Mr. Jeffries.

16           THE COURT:  Okay.  Well, I think it should be

17   modified to make clear that your work product, your

18   personal litigation file should not be surrendered.  I'm

19   sure, I trust that Mr. Roberts did not intend that.

20           MR. ROBERTS:  The language tracks what I

21   understood the agreement to be.  There was a 45-minute

22   discussion of the concern about state regulators;

23   otherwise, we could have everything.  So it tracks that.

24   But I was given no opportunity to dialogue with Mr. Ellis

25   about it, because he struck the whole thing and wouldn't
```

1    talk to me about it.  I will be happy to talk to him about

2    that and any concerns he has.

3            THE COURT:  No, I would not expect you to turn

4    over your file to him.

5            MR. ELLIS:  Well, Your Honor, I didn't expect to

6    have unilateral confidentiality either, but I have to make

7    sure we're on the record or very clear at this point that

8    I'm not giving up my litigation case file nor any of my

9    e-mails with my clients nor any of my e-mails concerning

10   this case, nor any electronic data that I have stored on my

11   computer, nor any of the exhibits and so forth that we

12   generated for this case.

13           MR. ROBERTS:  Are e-mails exchanged with a lawyer

14   representing a third party something he can maintain and

15   not provide to me?

16           THE COURT:  I'm not entirely sure I follow the

17   question.

18           MR. ROBERTS:  Let's assume that Mr. Ellis has

19   engaged in e-mail correspondence with an attorney

20   representing Prudential Insurance Company, a different

21   insurer.  Are those things that don't need to be returned?

22           THE COURT:  I think they're part of Mr. Jeffries'

23   litigation file, his work product, and he would be --

24           MR. ROBERTS:  What if they're evidence of some

25   disclosure or breach of confidence?

1          THE COURT:  Well, I don't think that's before the

2    Court right now.

3          MR. ROBERTS:  It's not right now.

4          THE COURT:  It may be in some other case at some

5    other time, but that's a different issue.

6          And I understand that there may be things in your

7    file that can't be easily separated from your own notes and

8    thought processes.  I think there should be some agreement

9    between the parties that you will secure the matters and

10   the materials that you have related to this case.

11         MR. ELLIS:  Your Honor, I had no problem with

12   that on April 19th, and, if it was mutual, I would have no

13   problem with it today.

14         THE COURT:  Well, I understand your position.

15         MS. CALLOW:  Your Honor, I just had one other

16   thought based on Mr. Roberts' comments to you that I'm not

17   sure how we take care of.  But if Mr. Jeffries and

18   Mr. Roberts can disseminate information regarding this

19   case, but if there is an obligation on DMS not to

20   disseminate that information and information is in fact

21   disseminated, for example, through other clients that the

22   Jeffries themselves did not authorize or disseminate, but

23   then it's charged back that possibly DMS disseminated it,

24   how do we handle that in the settlement agreement?  Because

25   I don't think that's addressed here.

1          For example, third party dissemination,

2   Mr. Roberts has stated that, if a document is out there,

3   it's public record; it's in the public.  DMS obviously

4   can't disseminate, but anybody else can once it's out

5   there.  There are concerns that, if Mr. Roberts is making

6   accusations that we have already disseminated information,

7   which we haven't, that that might be an ongoing problem.

8          MR. ROBERTS:  I would reassert my request that

9   the record be sealed right now, ask you to agree to that.

10  And as far as the other issue goes, it's an evidentiary

11  issue.  You think I have breached the agreement;  I think

12  you have.  It's an evidentiary issue about where the

13  document came from.

14          THE COURT:  I tend to agree.  My crystal ball is

15  foggy this morning, and I don't know what's going to happen

16  in other cases in other jurisdictions.

17          MS. CALLOW:  Right.  Which is why I think we all

18  wanted a resolution to end this case.  And it sounds like

19  what we're going down is the path of more litigation.

20          MR. ROBERTS:  Let's seal the record right now.

21          MR. ELLIS:  As soon we have an agreement, Your

22  Honor, I think we can do that.

23          THE COURT:  All right.  Well, as I said, I'm

24  going to review my options.  If you want to submit some

25  briefs on that point, you can.

1          MR. ELLIS:  Thank you, Judge.  I think we will.

2          THE COURT:  As I said, what I'm contemplating is,

3   if I don't have the authority for some reason, after I have

4   given this some more thought and better research, then the

5   only other option is to set it for trial again and assess

6   the costs against one side or the other.  And I can tell

7   you now it would be the defense.  And there may be

8   sanctions, and I'm thinking of sanctions in the nature of

9   ten percent interest on the unpaid settlement amount for

10  the period during which no settlement agreement language

11  was agreed between the parties, and that will be a

12  substantial amount, ten percent for six months on two

13  million dollars.

14          MR. ELLIS:  Well, let's consider a couple things

15  there, Your Honor.  First of all, obviously, that sanction

16  will be improper if a defense verdict is rendered in the

17  case ultimately.

18          THE COURT:  Not necessarily.

19          MR. ELLIS:  Okay.  Secondly, the reason that it

20  has taken six months, if the Court follows the time line

21  that we presented with regard to the settlement agreement,

22  there has not been delay on the part of DMS in trying to

23  get this resolved.  We waited a month for the first draft.

24  We sent back interlineages 12 days after Mr. Jeffries had

25  made an election as to how he wanted the money, and then we

1    waited two-and-a-half months for a return from Mr. Roberts

2    as to what he didn't like about what we had sent him, if

3    anything.  So the delay was not on our part.  We responded

4    promptly and as quickly as possible each time.  Mr. Roberts

5    begins his letter saying it's been six months.  What he

6    doesn't say is that we responded promptly every time we got

7    a draft.

8           THE COURT:  Well, think about that as a starting

9    point, and then we'll talk about it.

10           MR. ELLIS:  I understand Your Honor wants this to

11    be resolved.

12           THE COURT:  I do.

13           MR. ELLIS:  I think we would like to see this

14    resolved as well.

15           For the record, Your Honor, I think that the

16    imposition of costs and sanctions, because apparently the

17    Court thinks I'm the only one that misunderstood what was

18    being said about confidentiality, I think is obviously a

19    matter my client's going to have to consider but strikes me

20    personally as being somewhat unfair.

21           THE COURT:  Well, let me just tell you why I'm

22    thinking that, preliminary thoughts on that subject.  I

23    look the at proposed settlement agreement.  I see

24    substantial amounts of red lining with no apparent

25    explanation of why, and, unless I'm missing the point here,

1   I'm hearing, I believe, from the plaintiff that there was

2   no explanation forthcoming of why this was all red lined.

3   And things simply drifted after that.  And there was

4   ambiguous but apparently peremptory language from the

5   defense that said this is the final version, which has a

6   sort of take-it-or-leave tone to it, to my ear.  Now, maybe

7   that is not what was intended, but that's the way I have a

8   tendency to hear it.

9        When somebody tells me this is the final version,

10  that sounds to me this is our final offer.  Take it or

11  leave it.  And if you don't respond and soften that

12  position and engage in dialogue, then that seems to

13  reinforce that impression.

14       MR. ELLIS:  Your Honor, I don't know when I

15  didn't respond to Mr. Roberts.  In fact, subsequent to

16  that, quote, final version, there is an e-mail in which he

17  said I'm glad to see that we can still work on the tax

18  issue.  And with regard to the confidentiality, I expressed

19  to him a number of times our concerns with the unilateral

20  nature of it.  Mr. Cohen expressed to him in his voice mail

21  and e-mail that he has concerns about unilateral

22  confidentiality because he never heard of it.  If you read

23  Mr. Cohen's voice mail, he says that's something that, you

24  know, we have to talk about.

25       MR. ROBERTS:  The voice mail predated by two or

1    three months the e-mail from Mr. Ellis which said this is

2    the final version.

3            MR. ELLIS:  In any event, I had discussed with

4    Mike, he wanted to know about the reasons for the

5    interlineages.  I told him what we could not do, for

6    example, on the tax issue.  I told him in our telephone

7    discussions that we could not sign off and say that

8    Mr. Jeffries paid for his premiums with post-tax dollars.

9    We don't know that.  We didn't know that for a fact.  Mike

10   said, well, you investigated it for four months.  But we

11   didn't get the information from the bank, no matter how

12   hard we tried, to confirm it one way or in other.  And we

13   can't take a position that we can't back up should we ever

14   be questioned about it.  So, I said you're asking us to say

15   more than we can say.  It's that simple.

16           Mr. Cohen and his financial advisor are hopefully

17   working out language that will satisfy her concerns about

18   taxes and not make us extend and say something we can't

19   say.  Same thing with all the confidentiality provisions,

20   they have been overreaching, as is this one demanding my

21   file.  And, you know, and the unilateral nature of it just

22   frankly threw me for a loop.  I have never heard of such a

23   thing where one side can say anything to anybody in the

24   country they want and the other said remains mute.  It

25   doesn't even fit within the definition of the word

1   "confidential." Confidential by it's own definition

2   requires that nobody says anything. Now, if I'm using the

3   wrong language here, I guess that's my fault, but that's

4   what that word has always meant to me.

5        And I will be happy to brief the issue for the

6   Court. I don't think there is a case in the country where

7   unilateral confidentiality has ever been expressed, adopted

8   ordered or even agreed to, because I think the terms are

9   mutually exclusive.

10       THE COURT: Well, I respectfully disagree, but

11  let's have a schedule on this. I think blind briefs two

12  weeks, and I'll just rule. I'll issue my order, and that

13  will be it.

14       MR. ELLIS: In the meantime, I should discuss

15  with my client whether they want to go forward. Well, we

16  don't know actually how to make that decision yet, because

17  we don't know what the Court's going to rule.

18       THE COURT: 10/22, close of business.

19       MR. ROBERTS: That's fine, Your Honor.

20       MR. ELLIS: Close of business is five o'clock,

21  Your Honor?

22       THE COURT: Yes. Close of our physical, not

23  electronic, doors.

24       MR. ELLIS: Well, I asked for a specific reason,

25  Your Honor.

1          THE COURT:  I know, I know.  It lost it's meaning

2     in the new world order.  If you can resolve this between

3     the two of you or between yourselves and Mr. Cohen and the

4     financial person between now and then and save yourselves

5     time and effort, that's fine.  Otherwise, I'm going to do

6     something autocratic about it.

7          MR. ELLIS:  Yes, ma'am.

8          THE COURT:  You put me in the position where I

9     have to.

10          MR. ELLIS:  Your Honor, believe me, I didn't want

11     the Court in this position, nor did I ever dream that this

12     was a potential.  But I don't know what to do when someone

13     can use whatever he chooses to use in any other case,

14     whether it's sealed, confidential or otherwise and then

15     expect us to remain mute about it.

16          THE COURT:  Well --

17          MR. ELLIS:  It's a difficult situation for my

18     client to be in.

19          THE COURT:  Maybe you can narrow the

20     confidentiality by agreement to Mr. Jeffries personal

21     information, medical information, whatever.

22          MR. ROBERTS:  I have offered to talk about --

23          MR. ELLIS:  Your Honor, I never would disseminate

24     medical information in any event.  It would be a violation.

25          MR. ROBERTS:  I have offered to talk about mutual

1    confidentiality since I got the final version.  It's gone
2    nowhere.
3            THE COURT:  I can't help but think, with two
4    brilliant legal minds on both sides that you can't
5    fabricate.
6            MR. ROBERTS:  I only have one on my side.
7            THE COURT:  They have two.
8            MR. ELLIS:  They have --
9            MR. ROBERTS:  They have two.
10           THE COURT:  Construct a resolution of this
11   problem.  It's not insoluble.
12           MR. ELLIS:  We have to make the effort, Your
13   Honor.
14           THE COURT:  Well, why don't you do it?  You can
15   make it as detailed, as fine tuned, as unique, as you
16   choose.  You can do that by agreement, and, unless it's the
17   most peculiar arrangement I have ever seen, I'm sure, I
18   will adopt it and sign off on it.
19           MR. ELLIS:  Do I understand from the current
20   status of things, Your Honor, so that I know if other
21   information is divulged, that, as of now there is no
22   confidentiality agreement until we come to one, and that,
23   whatever is divulged at this point to whatever lawyers
24   around the country is tough luck?
25           MR. ROBERTS:  No.  I'll represent this, that we

```
 1   settled the case on April 19h based on a representation

 2   that you would maintain confidence from that moment

 3   forward.  And I expect that to continue.

 4            MR. ELLIS:  I settled it with the same

 5   expectation that you would be confidential.

 6            MR. ROBERTS:  Well, you told me on the record

 7   that you would guarantee from that day forward it would be

 8   confidential, not just the videotapes, everything.  I

 9   wasn't just concerned about the videotapes.

10            I will represent that I have shared information

11   with Mr. Kearney, and that's it.  I haven't given documents

12   to anybody, and I don't intend to.

13            MR. ELLIS:  In which case Mr. Kearney is very

14   well connected with plaintiffs' counsel around the country.

15            MR. ROBERTS:  Mr. Kearney is not the only

16   individual.  First of all, that lawyer from Arizona you saw

17   has collected documents from many cases from many

18   jurisdictions.  He's done research.  Mr. Kearney isn't the

19   only person that had access to that.  The entire world has

20   access to the record right now.

21            I again ask you, let's seal it.

22            MR. ELLIS:  I'm sorry.  I thought you told me

23   that you spoke with Mr. Kearney about it on the phone but

24   didn't give it to him.  Now, you're telling me Mr. Kearney

25   got it and sent it.
```

1       THE COURT:  You're homogenizing the arguments

2   over the personnel files and the depositions, and I

3   understand the distinction, and I don't know that it's

4   fruitful to revisit it for the fourth or so time.  But I

5   expect the defendant to hold the information that it's

6   acquired during the course of this case confidential.

7   Plaintiff has essentially recommended sort of a status quo

8   for at least the next couple of weeks.  Is that a fair

9   statement?

10       MR. ROBERTS:  We can maintain everything in

11  confidence for the next -- until further order of the Court

12  or further instruction from the Court.

13       THE COURT:  All right.

14       MR. ELLIS:  Can we have the same agreement that

15  counsel will advise Mr. Kearney to do the same with regard

16  to the Jeffries material?  It's his client.

17       MR. ROBERTS:  I will instruct Mr. Kearney to not

18  share any Jeffries information with anyone.

19       THE COURT:  Okay.

20       MR. ELLIS:  That will do for the moment, Your

21  Honor.

22       THE COURT:  All right.  Thank you.

23       CONFERENCE CONCLUDED AT 10:35 A.M.

24

25

1                    C E R T I F I C A T E

2          I, Betty J. Schwab, the undersigned, do

3   hereby certify that the foregoing is a correct

4   transcript from the record of the proceedings in

5   the above-entitled matter.

6

7                        _____

8                        BETTY J. SCHWAB, RPR
                         Official Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25